DUANE MORRIS LLP
1540 Broadway
New York, New York 10036-4086
(212) 692-1000
Gerard S. Catalanello, Esq.
Patricia H. Heer, Esq.

*Counsel to Monty One, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : |  |
|  | : | Case No. 14-12057 (SCC) |
| D.A.B. Group LLC, | : |  |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| In re: | : |  |
|  | : |  |
| 77-79 Rivington Street Realty LLC, | : | Case No. 14-10339 (SCC) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
|  | : |  |
| Monty One, LLC, | : | Adv. Proc. _____ |
| Plaintiff | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| D.A.B. Group LLC and 77-79 Rivington Street Realty LLC, | : |  |
|  |  |  |
| Defendants. |  |  |

## **COMPLAINT**

Monty One, LLC ("**Monty**") hereby files this complaint seeking a judgment: (1) declaring that the funds Monty deposited into escrow (the "**Deposit**") prior to the petition date pursuant to an agreement that was subsequently terminated prepetition, between Monty and D.A.B. Group LLC ("**D.A.B.**" or "**Debtor**") are not property of the Debtor's estate pursuant to

§ 541 of title 11 of the United States Code (the "**Bankruptcy Code**"); (2) declaring that the automatic stay does not apply to the Deposit, or, in the alterative, modifying the automatic stay to permit Monty to take any and all actions and measures necessary and appropriate to obtain the release of the Deposit pursuant to § 362(d)(1) of the Bankruptcy Code; and (3) directing the Title Company (defined below) to release the Deposit to Monty; and in support thereof, Monty states as follows:

**JURISDICTION**

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.       The statutory predicate for the relief sought herein is 11 U.S.C. §§ 105, 362 and 541.

**PARTIES**

3.       Monty is a limited liability company organized under the laws of the state of New York, with a principal place of business at 505 Park Avenue, New York, New York 10022.

4.       D.A.B. is a limited liability company organized under the laws of the state of New York, with a principal place of business at 85 West Hawthorne Avenue, Valley Stream, New York 11580.

5.       77-79 Rivington Street Realty LLC ("**Rivington**") is a limited liability company organized under the laws of the state of New York, with a principal place at 77-79 Rivington Street, New York, NY 10002.

**BACKGROUND**

**A.       Monty And D.A.B. Executed A Purchase And Sale Agreement (the "PSA")**

6.       On May 9, 2013, Monty entered into the PSA with D.A.B. pursuant to which D.A.B., as the seller under the PSA, agreed to sell to Monty, as the purchaser, real property

2

known as 139-141 Orchard Street, New York, New York (the "**Property**").    A copy of the PSA is attached hereto as **<u>Exhibit "A"</u>**.

7.      Rivington is a signatory to the PSA solely with respect to the following paragraphs: ¶ 1(b) - lease of separate property; ¶ 2 - title and survey; and ¶ 11 - environmental matters.  None of these paragraphs relate to the Deposit.

8.      Consistent with the terms of the PSA, Monty delivered the Deposit in the amount of $462,500.00 for the purchase of the Property to be held in escrow by a title company.  PSA §§ 3(a) and 26.

9.      Commonwealth Land Title Insurance Company serves as the title company and escrow agent under the PSA (the "**Title Company**").

10.      The PSA provided for, among other things, a sixty (60) business day period from the effective date of the PSA for Monty to conduct due diligence in connection with the purchase of the Property.

11.      The due diligence period was set to expire on August 7, 2013 (the "**Due Diligence Expiration Date**").  PSA § 4(c).

12.      Monty's rights to terminate the PSA on the Due Diligence Expiration Date and its right to the immediate return of the Deposit thereupon is contained in section 4(d) of the PSA:

> Purchaser may terminate this Agreement, for any reason or no reason, by notice to Seller given on or before 5:00 p.m. on the Due Diligence Expiration Date.  In the event Purchaser terminates this Agreement on or before the Due Diligence Expiration Date, this Agreement shall be null and void, and the **<u>Deposit forthwith shall be returned to Purchaser</u>**.

PSA § 4(d) (emphasis added).

13.      Up until 5:00 p.m. on the Due Diligence Expiration Date, Monty had an unfettered right to terminate the PSA.  PSA § 4(d).

3

14.     Upon termination by Monty, the PSA required the Deposit to be returned to

Monty.  PSA § 4(d).

15.     Further, section 26 of the PSA provided as follows:

> If disbursement from Title Company is requested pursuant to subparagraphs (ii)
> or (iii) above [default by either the Seller or Purchaser], notice thereof (the
> "Requesting Notice") shall be given by the requesting party to the non-requesting
> party and Title Company.  Such notice shall detail the basis for the request and
> shall be given by as set forth in Paragraph 20, and Title Company shall not make
> any disbursement pursuant to subparagraphs (ii) or (iii) unless and until ten (10)
> days after receipt of the Requesting Notice.  If either Seller or Purchaser desires to
> contest the disbursement of the Deposit, it shall notify the requesting party and
> Title Company, within ten (10 days after receipt of the Requesting Notice,
> whereupon Title Company shall either hold same pending resolution of such
> conflict or deposit same, as a stakeholder, into a court of competent jurisdiction
> for the resolution of such dispute.  Notwithstanding the foregoing to the contrary,
> **in the event Purchaser terminates this Agreement (x) prior to the expiration
> the Due Diligence Period,** (y) due to Seller's failure to satisfy any of the
> conditions set forth in Paragraph 18 hereof, **Seller acknowledges that it shall
> have no right to challenge the release of the Deposit to Purchaser in either
> event**.

PSA § 26 (emphasis added).

16.     The PSA explicitly prohibited objections to the release of the Deposit to Monty, if

among other things, **the PSA was terminated prior to the Due Diligence Expiration Date**.

PSA § 26.

**B.     The PSA Terminated Prior To The Due Diligence Expiration Date**

17.     On August 2, 2013, Monty sent a letter to D.A.B. by federal express and email

requesting that, either D.A.B. extend the Due Diligence Expiration Date from August 7, 2013 to

September 15, 2013, and confirm same by countersigning and returning the letter to Monty by

August 5, 2013, or the PSA would be deemed terminated as of 4:59 p.m. on August 5, 2013 (the

"**Termination Letter**").  A copy of the Termination Letter is attached hereto as **Exhibit "B"**.

4

18.     D.A.B. did not return a countersigned copy of the letter by August 5, 2013 (or any other date for that matter).  Therefore, the Due Diligence Expiration Date was not extended.

19.     As a result, **the PSA was terminated on August 5, 2013**, prior to the Due Diligence Expiration Date.

20.     The PSA terminated almost one (1) year prior to the date D.A.B. filed for bankruptcy relief.

**C.     D.A.B. Has Repeatedly Acknowledged That The PSA Was Terminated**

21.     On or about August 13, 2013, Monty commenced an action against D.A.B. and Rivington in New York County Supreme Court, styled *Monty One, LLC v. D.A.B. Group, LLC and Rivington Realty, LLC*, Index No. 652844/2013 (the "**State Court Action**").[1]

22.     On or about August 14, 2013, Monty also filed a Notice of Pendency to give notice of the State Court Action.

23.     In its responsive pleadings filed in the State Court Action, D.A.B. clearly acknowledged that the PSA was terminated prior to the Due Diligence Expiration Date.

24.     Specifically, D.A.B., in its amended answer which was filed on December 23, 2013, a copy of which is attached hereto **as Exhibit "C"** (the "**Amended Answer**"), stated that "Pursuant to the Agreement itself and the Letter written by Plaintiff itself, the Agreement is terminated."  Amended Answer ¶ 7.

25.     In addition, D.A.B.'s principal Ben Zhavian, in an affidavit submitted on December 23, 2013 (the "**Zhavian Affidavit**"), in support of D.A.B.'s motion to dismiss the State Court Action (the "**Motion to Dismiss**"), stated that, "Plaintiff itself terminated the

---

[1] On October 14, 2014, D.A.B. filed a notice of removal of the State Court Action to the United States District Court for the Southern District of New York (the "**District Court**"), and on October 29, 2014 the State Court Action was referred to this Court pursuant to the District Court's standing order of reference. [Docket No. 52].  On October 28, 2014, Monty filed its Statement Pursuant to Rule 9027(e)(3) of the Federal Rules of Bankruptcy Procedure.

Agreement". Zhavian Affidavit ¶ 6. A copy of the Zhavian Affidavit is attached hereto **Exhibit "D"**.

26.    D.A.B. also submitted an affirmation of its counsel, Jon Ari Lefkowitz, Esq. in support of the Motion to Dismiss, a copy of which affirmation is attached hereto as **Exhibit "E"** (the "**Lefkowitz Affirmation**"). The Lefkowitz Affirmation likewise states that the PSA was terminated as of August 5, 2013. Lefkowitz Affirmation ¶ 5 ("Pursuant to the Agreement and the Letter written by plaintiff itself, the Agreement was therefore terminated as of 4:59 p.m. on August 5, 2013"); ¶ 7 ("The documentary evidence is clear that the Agreement was terminated"); ¶ 9 (same).

27.    As such, D.A.B. acknowledges that the PSA was terminated **prior** to the Due Diligence Expiration Date.

**D.    D.A.B. Acknowledged That The Deposit Is Not Property Of The Estate**

28.    On July 14, 2014 (the "**Petition Date**"), D.A.B. filed a petition for relief in this Court under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**") and simultaneously filed its schedules and statement of financial affairs.

29.    D.A.B. did not include the Deposit as an asset of the estate in any of its schedules [Doc. No. 1].

30.    On Schedule B – Personal Property, which D.A.B. amended after, and in response to, the Motion, D.A.B. still indicated "**None**" in response to <u>Item 19</u>: whether D.A.B. had any "Equitable or future interest, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule A – Real Property"; and <u>Item 21</u>: "Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims" [Doc. No. 33].

DM3\3063236.4

31.     D.A.B. did not list the Deposit in response to <u>Item 35</u>: "Other personal property of any kind not already listed" [Doc. No. 33].

32.     Nor was the PSA included on Schedule G as an executory contract [Doc. No. 1].

**E.     Monty Requested The Release Of The Deposit**

33.     On July 22, 2014, Monty, through its counsel Steven M. Goldman, sent a letter to the Title Company requesting the release of the Deposit to Monty (the "**Demand Letter**").   A copy of the Demand Letter is attached hereto as **Exhibit "F"**.

34.     The PSA provides that, in the event disbursement of the Deposit is requested but is contested, the Title Company shall hold the Deposit pending resolution of the conflict or place the Deposit with a court for the resolution of the dispute.  PSA § 26.

35.     The PSA further provides that, if the PSA was terminated prior to the Due Diligence Expiration Date, then D.A.B. "shall have no right to challenge the release of the Deposit."  PSA § 26.

36.     Despite the fact that D.A.B. has no right to contest or otherwise object to the release of the Deposit, D.A.B., through one of its counsel Favata & Wallace, sent a letter on July 24, 2014 to the Title Company advising the Title Company of the Bankruptcy Case and the State Court Action (the "**Contesting Letter**").   A copy of the Contesting Letter is attached hereto as **Exhibit "G"**.

37.     That same day, the Title Company advised counsel for Monty by email that it would not release the Deposit to Monty given the pendency of the Bankruptcy Case and the State Court Action (the "**Title Company Letter**").   A copy of the Title Company Letter is attached hereto as **Exhibit "H"**.

38.     Upon information and belief, the Title Company continues to hold the Deposit.

7

## FIRST CLAIM FOR RELIEF

**(Declaratory Relief to Determine Property of Estate 11 U.S.C. § 541)**

39.     Monty incorporates by reference and realleges each of the foregoing paragraphs of this Complaint.

40.     The PSA set forth, *inter alia*, the parties to the PSA, the amount to be deposited (§ 3(a)), the definition for the third-party escrow agent (§§ 2(a) and 26), the parties to receive the funds and the conditions to be met before releasing the funds (§§ 3(a) and 26).

41.     Monty, as the grantor, delivered the Deposit to the Title Company to be held in escrow pursuant to the terms of the PSA.

42.     Title to the Deposit remains with Monty until the occurrence of the conditions under the PSA authorized the release of the Deposit to D.A.B.

43.     Those conditions were never met, because the PSA was terminated on August 5, 2014, prior to the Due Diligence Expiration Date.

44.     The PSA explicitly instructs that, in the event the PSA is terminated prior to the Due Diligence Expiration Date, the Deposit is to be immediately returned to Monty.

45.     The PSA was terminated prior to the Due Diligence Expiration Date.

46.     The PSA was terminated almost one (1) year prior to the date D.A.B. filed for bankruptcy relief.

47.     D.A.B. does not have legal title to, or an equitable interest in, the Deposit.

48.     D.A.B., however, has taken the position that the Deposit should remain in escrow. *See Debtor's Opposition to the Motion of Monty One LLC for Relief from the Automatic Stay to Pursue Release of a Contract Deposit* [Case No. 14-12057, Docket No. 34] ("**D.A.B. Stay Relief Opposition**").

8

49.    There is a justiciable controversy between D.A.B. and Monty regarding the Deposit.

50.    Monty is entitled to a judicial declaration that the Deposit is not property of D.A.B.'s estate under section 541(a).

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief Regarding the Automatic Stay 11 U.S.C. § 362)

51.    Monty incorporates by reference and realleges each of the foregoing paragraphs of this Complaint.

52.    D.A.B. has no legal or equitable interest in the Deposit.

53.    Consequently, the Deposit is not property of D.A.B's bankruptcy estate and therefore does not fit within the definition of the automatic stay under 11 U.S.C. § 362(a).

54.    D.A.B., however, has taken the position that the Deposit should remain in escrow. *See* D.A.B. Stay Relief Opposition.

55.    There is a justiciable controversy between D.A.B. and Monty regarding the Deposit.

56.    As such, Monty is entitled to a judicial declaration that the automatic stay does not apply to the Deposit, nor does the stay prevent any efforts or actions by Monty to obtain the release of the Deposit, or the Title Company's release of the Deposit to Monty.

## THIRD CLAIM FOR RELIEF

### (Modification of the Automatic Stay 11 U.S.C. § 362(d)(1))

57.    Monty incorporates by reference and realleges each of the foregoing paragraphs of this Complaint.

9

58.     To the extent that the Court determines that the automatic stay applies and relief from the automatic stay is required, "cause" exists to modify the stay under 11 U.S.C. § 362(d)(1) to permit Monty to take any and all actions and measures necessary and appropriate to obtain the release of the Deposit from the Title Company to Monty, and to permit the Title Company to release the Deposit to Monty.

59.     Cause exists to modify the automatic stay under § 362(d)(1).

60.     Thus, to the extent required, the automatic stay should be lifted to permit Monty to seek the release of the Deposit from the Title Company, and for the Title Company to release the Deposit to Monty.

**WHEREFORE**, Monty demands judgment as follows:

a.   On the First Cause of Action, declaring that the Deposit is not property of the estate;

b.   On the Second Cause of Action, declaring that the automatic stay under 11 U.S.C. § 362 does not apply to the Deposit;

c.   On the Third Cause of Action, in the event that the Court finds that the automatic stay applies to the Deposit, modifying the stay to permit Monty to take any and all efforts and actions to seek the release of the Deposit from the Title Company;

d.   On the First, Second and Third Causes of Action, directing the Title Company to immediately turn over the Deposit to Monty; and

e.   Such additional and further relief as the Court may deem just and proper.


Dated:  New York, New York
        November 17, 2014

                                        **DUANE MORRIS LLP**

                                         */s/ Gerard S. Catalanello*


10

DM3\3063236.4

Gerard S. Catalanello, Esq.
Patricia H. Heer, Esq.
1540 Broadway
New York, New York 10036-4086
(212) 692-1000
(212) 692-1020 (facsimile)
gcatalanello@duanemorris.com
phheer@duanemorris.com

*Counsel to Monty One, LLC*

## **Exhibit A**

**PSA**

<u>AGREEMENT OF PURCHASE AND SALE</u>

Seller:

D.A.B. GROUP, LLC

Purchaser:

MONTY ONE, LLC

Dated:  May $\underline{9}$ , 2013

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "Agreement") made as of this __Q__ day of May, 2013, by and between D.A.B. GROUP, LLC, a New York limited liability company, having an office at 85 West Hawthorne Avenue, Valley Stream, New York 11580 ("Seller"), and MONTY ONE, LLC, a New York limited liability company, having an office at 505 Park Avenue, New York, New York 10022, or its assignee in accordance with the terms of this Agreement ("Purchaser").

## W I T N E S S E T H

1.   Agreement to Sell, Purchase and Lease.

(a)   Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained, the real property commonly known as 139-141 Orchard Street, New York, New York, and consisting of the following:

(i)   All that certain lot, piece or parcel of land designated as Block 415, Lots 66 and 67 on the tax map of the City of New York, County of New York, a metes and bounds description of which is set forth in Exhibit A annexed hereto and made a part hereof, together with the buildings and other improvements thereon (the "Hotel Property");

(ii)   All right, title and interest, if any, of Seller in and to any land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Hotel Property, to the center line thereof, and all right, title, and interest of Seller, if any, in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Real Property by reason of change of grade of any street. Seller will, upon demand, execute and deliver to Purchaser at the Closing (as hereinafter defined) or thereafter, on demand, all proper instruments for the conveyance of such right, title, and interest and for the assignment and collection of any such awards;

(iii)   All easements, rights of way or use, privileges, licenses, appurtenances and rights belonging or appertaining to the Hotel Property;

(iv)   All fixtures now or hereafter affixed to or located on the Hotel Property;

(v)   All rights and interests under the Zoning Lot Development Agreement by and between Seller and 81-83 Rivington Corp., dated as of April 2, 2008 (the "ZLDA");

(vi)    All documents, records and books of accounts relating to the construction, ownership, leasing, operation, management and/or maintenance of the Hotel Property; and

(vii)    All plans, specifications, marketing materials, books, records, and original leases and other documents related to the Hotel Property;

(viii)    All architect agreements, engineer agreements, construction contracts and all propriety information prepared by architects, engineers, contractors and any other construction consultant in connection with any proposed development of the Hotel Property; and

(ix)    All approvals, permits, agreements, rights and privileges, including those with respect to construction of the Hotel Property shall be assigned to Purchaser at Closing in a manner such that same may be enforced by Purchaser following said assignment.  This Agreement shall exclude all liabilities, contingent and otherwise, associated with the Hotel Property and its operations.

The Hotel Property, land, buildings and improvements along with all of the foregoing is hereinafter sometimes collectively called the "Real Property".

(b)    Seller shall cause its affiliate, 77-79 Rivington Street Realty LLC ("Lessor"), to lease to Purchaser, pursuant to the terms and conditions of a ninety-nine (99) year lease (which by its terms permits same to be financed and used as collateral by Purchaser for any loan obtained in connection with this transaction), in consideration of annual rent of Two Hundred Thousand and 00/100 ($200,000.00) Dollars, with a Five percent (5%) increase every five (5) years during the term, commencing on the sixth (6th) full year of the term (the "Lease"), the following:

(i)    an adjacent parcel of vacant land commonly known as 77 Rivington Street, New York, New York designated as Block 415, Lot 61 on the tax map of the City of New York, County of New York, a metes and bounds description of which is set forth in Exhibit A-1 annexed hereto and made a part hereof (the "Gore");

(ii)    the ground floor and the outside backyard courtyard of the building commonly known as 79 Rivington Street, New York, New York designated as Block 415, Lot 62 on the tax map of the City of New York, County of New York, a metes and bounds description of which is set forth in Exhibit A-2 annexed hereto and made a part hereof (the "Building").

The Gore and the Building are hereinafter sometimes collectively called the "Leased Property".  The Real Property and the Leased Property are hereinafter sometimes collectively called the "Property"),

2.    Title and Survey.  At Closing, Seller shall convey to Purchaser: (i) valid, marketable and insurable fee title to the Real Property and (ii) a leasehold interest in the Leased Property (which by its terms permits same to be financed and used as collateral by Purchaser for any loan obtained in connection with this transaction), with a subordination, non-disturbance and attornment agreement reasonably acceptable to Purchaser and any lender of the Leased Property subordinating the Lease to lender's interest subject to non-disturbance and attornment, all of the foregoing subject only to such title encumbrances, if any, which are acceptable to Purchaser (the "Permitted Encumbrances"), free and clear of all leases, tenancies and occupancies.

(a)    Within five (5) days of the Effective Date (as hereinafter defined), Seller shall deliver to Purchaser the latest survey of the Real Property and the Leased Property in Seller's possession or control; it being understood that Purchaser may at its option obtain a new or updated survey (collectively, the "Survey"); and Purchaser shall, within seven (7) days of the Effective Date apply to a title insurance company selected by Purchaser (the "Title Company") for a binding, irrevocable commitment in form acceptable to Purchaser (the "Title Commitment") for an owner's title insurance policy to be issued to Purchaser (the "Title Policy") in the amount of the Purchase Price (as hereinafter defined) effective as of the date of recording of the deed (i.e., no "gap"), evidencing that Seller owns and can convey valid, insurable and marketable fee title to the Real Property, free and clear of all encumbrances except the Permitted Encumbrances and to the Lease as provided herein.

(b)    After Purchaser's receipt of both the Title Commitment and Survey, Purchaser, or its counsel, shall furnish Seller with a title notice of (i) any liens, encumbrances or other title exceptions or state of facts related to the Title Commitment or Survey which Purchaser does not agree to take subject to, as determined in Purchaser's sole discretion; (ii) any Title Company requirements which Purchaser contends Seller must satisfy; and (iii) any endorsements to the Title Policy which Purchaser requires for Closing (as hereinafter defined).  After the execution hereof, no further liens, encumbrances, easements or restrictions shall be voluntarily created or filed by Seller on or with respect to the Property ("Subsequent Encumbrances").

(c)    Except with respect to the Outstanding Obligations (as hereinafter defined), which may be resolved by Purchaser in accordance with Paragraph 4(c)(iii) below:

(i)    Seller shall have a period of thirty (30) days following receipt of said title notice to remove, correct, cure or satisfy to Purchaser's satisfaction, any Survey or title exceptions set forth in the title notice described in Paragraph 2(b) above, ("Title Correction") or Title Company requirements set forth in said title notice and to obtain from the Title Company the endorsements set forth in said title notice.  If Seller is unable to obtain Title Correction within such thirty (30) day period, Seller shall be entitled to not more than two (2) additional periods of thirty (30) days each in which to

obtain Title Correction.  Seller shall be required to obtain Title Correction of all Survey and title exceptions set forth in the title notice, unless thereafter waived by Purchaser.

          (ii)    If any Subsequent Encumbrance (including ones filed by parties other than Seller) shall be placed on the Real Property, Seller shall be required, regardless of amount, to remove such Subsequent Encumbrance by payment, by bonding, or causing the Title Company to insure over the same.  Seller may use proceeds from this transaction to satisfy same at Closing.

          (d)    Subject to Seller's obligation in Section 2(c)(ii), in the event that Seller is unable or elects not, within said thirty (30) day period, to obtain Title Correction, Purchaser shall have the right at its sole option either (i) to terminate this Agreement, in which event the Deposit shall be returned to Purchaser and neither party shall, thereafter, have any further liability hereunder, or (ii) to accept such state of facts and such title as is disclosed by the Survey and Title Commitment without Title Correction, thereby waiving any rights against Seller with respect thereto.  Said initial election shall be made by Purchaser within ten (10) days following Purchaser's receipt of notice by Seller that Seller has not been able to or will not obtain Title Correction.

          (e)    In the event that Seller shall undertake Title Correction as aforesaid, and shall be successful, this Agreement shall continue in full force and effect and Purchaser shall close the transaction contemplated hereby in accordance with the terms hereof.  In the event that Seller shall only be partially successful in obtaining Title Correction, Purchaser shall have the same alternative rights as Purchaser would have in the event Seller had declined to seek Title Correction or was unable to obtain Title Correction (as set forth in subparagraph (d) above).  Purchaser shall make its election within ten (10) days after Purchaser's receipt of notice from Seller to Purchaser of the extent to which title has been corrected.

        3.    <u>Purchase Price</u>.  The purchase price (the "Purchase Price") for the Property is up to Twenty-Eight Million and 00/100 ($28,000,000.00) Dollars comprised of the following: (x) the sum of Nine Million Two Hundred Fifty and 00/100 ($9,250,000.00) Dollars payable to Seller as and for the Real Property; (y) up to such amount of the maximum Settlement Amount (as hereinafter defined) as is necessary to satisfy the Outstanding Obligations; and (z) the value of any transfer taxes paid by Purchaser for the benefit of Seller hereunder.  The Purchase Price shall be payable by Purchaser to Seller as follows:

          (a)    Four Hundred Sixty-Two Thousand Five Hundred and 00/100 ($462,500.00) Dollars (together with the interest earned thereon, the "Deposit"), within two (2) business days after execution of this Agreement by Seller and Purchaser, by wire transfer of immediately available funds, which shall be held in escrow by the Title Company (as hereinafter defined) as hereinafter provided.  In the event Purchaser elects to cancel and terminate this Agreement pursuant to the provisions of this Agreement, the

4

Deposit shall be promptly returned to Purchaser by Escrow Agent. If Closing occurs, then the Deposit shall at Closing be paid to Seller and said amount (together with any accrued interest thereon) shall be credited against the Purchase Price;

(b)    The Settlement Amount at Closing, by wire transfer of immediately available funds in accordance with wiring instructions of Title Company or Creditors (as hereinafter defined), as applicable, furnished at least two (2) business days prior to Closing

(c)    The balance of the Purchase Price of Eight Million Seven Hundred Eighty-Seven Thousand Five Hundred and 00/100 ($8,787,500.00) Dollars, subject to the prorations and adjustments set forth in this Agreement, at Closing, by wire transfer of immediately available funds in accordance with wiring instructions of Seller furnished at least two (2) business days prior to Closing.

    4.    <u>Due-Diligence Period.</u>

(a)    Purchaser acknowledges that some or all of the Property is encumbered by various mortgages, liens, notes, guarantees, including, but not limited to: (i) a mortgage lien on the Hotel Property held by one or more of the following, Westport Capital, Orchard Hotel LLC and/or Orchard Construction LLC (collectively, "Westport"); (ii) certain claims for services rendered by the architectural firm Edward I. Mills & Associates ("Mills"); (iii) certain claims for work performed at the Real Property by Flintlock Construction Services, LLC and/or CAVA Construction & Development and various subcontractors retained by Flintlock Construction Services and/or CAVA Construction & Development (collectively, "Flintlock"); and (iv) those certain other claims: by parties who have performed work on and provided materials to the Hotel Property and have claimed liens or rights with respect thereto, for various violations from local governmental authorities and for unpaid taxes and assessments (collectively, (i), (ii), (iii) and (iv) are the "Outstanding Obligations").

(b)    Simultaneously with delivery by Seller to Purchaser of a fully executed copy of this Agreement, dated the date of the last signature thereto (such date being the "Effective Date"), Seller shall deliver to Purchaser to the extent in Seller's possession or control all documents, reports, studies, assessments, test results or other documents relating to the ownership, use, leasing, operation or environmental condition of the Property, including, but not limited to, any title policies, surveys, easements, restrictions, covenants, leases, licenses or other agreements or restrictions with respect to the Property; all reports, studies, soil or groundwater test or monitoring results, logs, applications, correspondence relating to the environmental condition of the Property; any real estate tax bills; all licenses, permits, approvals, or other documents relating to the Property, the use thereof, the construction or operation of any improvements thereon or the compliance or non-compliance of the Property with any applicable municipal, state or federal laws, rules or regulations (including zoning); all notices of violations of laws with

respect to the Property; all architectural and engineering plans, specifications, drawings, percolation tests and reports with respect to the Property and the construction of any improvements thereon; any guaranties or warranties with respect to the Property; and all other documents with respect to the construction, leasing, operation, management and maintenance of the Property.

(c)     Through the period (the "Due Diligence Period") ending on the date which is sixty (60) business days after the Effective Date (the "Due Diligence Expiration Date"), Purchaser:

(i)     may investigate the status of all plans, specifications, permits and the feasibility of completion of construction of the hotel on the Hotel Property and the transfer of all approvals and permits from the New York City Board of Standards and Appeals, and all other applicable governmental agencies from Seller to Purchaser.

(ii)     may perform, or cause to be performed, tests, investigations and studies of or related to the Property, including, but not limited to, a Phase I Environmental Site Assessment, percolation tests, surveys, architectural, engineering, subdivision, environmental, access, financial, market analysis, development and economic feasibility studies and such other tests, investigations or studies as Purchaser, in its sole discretion, determines is necessary or desirable in connection with the Property and may inspect the physical (including environmental) and financial condition of the Property. Purchaser shall repair and restore any portion of the surface of the Property disturbed by Purchaser, its agents, representatives or contractors during the conduct of any tests and studies to substantially the same condition as existed prior to such disturbance. Purchaser agrees that, prior to undertaking any physical inspections of the Property, Purchaser or Purchaser's agents will provide a certificate of insurance evidencing comprehensive general liability insurance which names Seller as additional insured thereunder in the amount of not less than One Million ($1,000,000.00) Dollars. If Purchaser determines, in its sole judgment and based upon the Phase I results, that it will require a Phase II environmental site assessment of the Property, including soil and groundwater sampling, Purchaser shall notify Seller on or before the Due Diligence Expiration Date, and the Due Diligence Period shall be extended for an additional period of thirty (30) days.

(iii)     shall have the exclusive right to negotiate with Westport, Mills, Flintlock and the holder of any and all of the Outstanding Obligations (collectively, the "Creditors") to determine if a settlement can be reached with respect to satisfaction of the Outstanding Obligations. Purchaser shall seek to obtain a release (or a lien waiver for those liens secured by mechanics liens) from the holder of all Outstanding Obligations (including the note and guaranty underlying the Westport claims, other than environmental issues indemnities related thereto) which are being satisfied at Closing from proceeds of the Purchase Price allocable to the Settlement Amount, with respect to the underlying debt associated with those Outstanding Obligations, for the benefit of

Seller and Ben Zhavian, an individual (collectively, the "Releases"). During such exclusive period, Seller (and its representatives) shall refrain from communications with any of the Creditors with respect to their respective outstanding claims. Any interference by Seller, its agents, servants or employees, with respect to Purchaser's rights during the exclusive period shall be deemed a default by Seller hereunder entitling Purchaser to enforce any and all rights it may have against Seller in law and equity.

   (d) In the event that:

     (i) Purchaser is unable to reach a settlement satisfactory to Purchaser in its sole discretion, to resolve the Outstanding Obligations for a sum less than or equal to Eighteen Million Seven Hundred Fifty Thousand and 00/100 ($18,750,000.00) Dollars (the "Settlement Amount") and obtain settlement agreements executed by each and every holder of an Outstanding Obligation requiring such party to deliver a satisfaction and release of its respective claims(s) such that Purchaser receives at Closing title to the Hotel Property free and clear of such Outstanding Obligation in form and substance satisfactory to Purchaser in its sole discretion, or

     (ii) Purchaser is not satisfied, in its sole discretion, with the status and transferability of the approvals and permits or its investigation of the Property, or

     (iii) Seller has not delivered to Purchaser either evidence that the ZLDA Litigation (as hereinafter defined) has been dismissed with prejudice or that the ZLDA Litigation does not impact Purchaser's continued construction of the Hotel Property as contemplated by Purchaser, in form reasonably acceptable to Purchaser, or

     (iv) Seller has not delivered to Purchaser a subordination, non-disturbance and attornment agreement from any lender on the Leased Property (subordinating the Lease to lender's interest subject to non-disturbance and attornment), consenting to non-disturbance and financing of the Lease, in form and substance reasonably satisfactory to Purchaser, then

Purchaser may terminate this Agreement, for any reason or no reason, by notice to Seller given on or before 5:00 p.m. on the Due Diligence Expiration Date. In the event Purchaser terminates this Agreement on or before the Due Diligence Expiration Date, this Agreement shall be null and void, and the Deposit forthwith shall be returned to Purchaser. In the event Purchaser does not terminate this Agreement on or before the Due Diligence Expiration Date, Purchaser shall be deemed to have elected not to terminate this Agreement pursuant to this Paragraph. In the event this Agreement is not terminated by Purchaser, Purchaser may, at its election, record a memorandum of this Agreement in the form of Exhibit B hereto and Seller shall execute same and any such other documents necessary to effectuate the recording of same.

(e)    During the Due Diligence Period, Purchaser, its agents, representatives and contractors, shall have access to the Property and other information pertaining thereto in the possession or within the control of Seller for the purpose of performing such studies, tests, borings, investigations and inspections for the purposes described in this Paragraph, to the extent permitted by any court appointed receiver. Seller shall cooperate with Purchaser in facilitating its due diligence inquiry and shall obtain, and use their reasonable efforts to obtain, any consents that may be necessary in order for Purchaser to perform same.

(f)    Seller acknowledges that there are existing building and project mortgages (collectively, the "Existing Mortgage") encumbering all or a portion of the Property, which have principal amounts of approximately $13,460,673 in the aggregate, plus unpaid interest and late fees, the details of which are set forth in in pleadings filed in the New York Supreme Court in connection with a foreclosure action commenced by the holder of the Existing Mortgage bearing Index Number 850044/2011. If Purchaser finances this transaction with a mortgage lender, Seller agrees to request that the holder of the Existing Mortgage assign the Existing Mortgage to Purchaser's mortgage lender at the Closing. Assignment of the Existing Mortgage is a condition to Purchaser's obligation to close hereunder. In connection with its resolution of the Outstanding Obligations, Purchaser shall seek to obtain an assignment of the Existing Mortgage from the holder thereof.

5.    Closing.

(a)    The delivery of the Deed (as hereinafter defined), the Lease and consummation of the subject transaction shall be held at 10:00 a.m. on the date (the "Closing") which is sixty (60) days after the Due Diligence Termination Date at the offices of Kurzman Eisenberg Corbin & Lever, LLP, counsel for Purchaser or at the offices of Purchaser's lender, if any; provided, however, that if such date shall be a Saturday, Sunday or legal holiday, then the Closing shall take place on the first business day thereafter. In addition, Purchaser, may extend the Closing for up to fifteen (15) days' upon notice to Seller given at least two (2) business days prior to the originally scheduled Closing.

(b)    At or before the Closing, Seller shall execute and/or deliver to Purchaser the following:

(i)    A Bargain and Sale Deed without covenants (the "Deed"), prepared by counsel to Seller and in proper recordable form and substance reasonably satisfactory to counsel for Purchaser and the Title Company, duly executed and acknowledged so as to convey to Purchaser good, marketable and insurable title, as aforesaid, to the Real Property, free and clear of all liens and encumbrances, except the Permitted Encumbrances. Seller agrees to include in the Deed the legal description of the

Real Property prepared by Purchaser's surveyor if such description and the Survey from which it is derived are certified to Seller.

      (ii)    The returns required under the New York State transfer tax laws, if any, and any other tax laws applicable to the transactions contemplated herein, including an executed New York City Real Property Transfer Tax Return and RP5217-NYC and New York State Real Estate Combined Transfer Tax Return (Form TP-584).

      (iii)    An assignment and assumption of contracts, if applicable.

      (iv)    A settlement statement, in form and reasonably satisfactory to Seller and Purchaser, and finalized at a minimum of one (1) business day before Closing, setting forth the amounts paid by or on behalf of and/or credited to each of Seller and Purchaser pursuant to this Agreement.

      (v)    Any other affidavit, document or instrument required to be delivered by Seller or reasonably requested by the Title Company, pursuant to the terms of this Agreement or applicable law in order to effectuate the transfer of title to the Premises and issue a title policy satisfactory to Purchaser.

      (vi)    Affidavit of Consideration by Seller.

      (vii)    The Lease along with a subordination, non-disturbance and attornment agreement from any lender on the Leased Property, consenting to non-disturbance and financing of Lease, and subordinating the Lease to lender's interest subject to non-disturbance and attornment, in form and substance reasonably satisfactory to Purchaser.

      (viii)    An affidavit showing that any judgments, bankruptcies or other returns disclosed by a title search against other persons having names the same as or similar to Seller's are not against Seller, and such other documents as Purchaser or the Title Company may reasonably require in order to render and/or insure title to the Real Property.

      (ix)    An assignment (including actual transfer of any and all approvals and permits with respect to completion of improvements at the Hotel Property) of all unexpired licenses, permits, warranties and guaranties then in effect, if any, with respect to any part of the Real Property and/or any mechanical equipment on the Real Property to the extent assignable.

      (x)    FIRPTA affidavit in form reasonably satisfactory to Purchaser to the effect that Seller is not a "foreign person" under Section 1445 of the Internal Revenue Code. If Seller is a "foreign person" (as defined in IRC Paragraph 1445(f)(3) and the regulations issued thereunder), or if Seller fails or refuses to deliver the non-foreign affidavit required by this subparagraph (ix), or if Purchaser receives

notice that such affidavit is false, or Purchaser has actual knowledge that such affidavit is false, Purchaser shall deduct and withhold from the Purchase Price a tax equal to ten (10%) percent thereof, as required by IRC Paragraph 1445. If any such withholding is made by Purchaser, Seller's obligation to deliver title hereunder shall not be excused or otherwise affected. Purchaser shall remit such withheld amount to the IRS and file the required form with the IRS, and if Seller claims that the amount so withheld by Purchaser and remitted by Purchaser to the IRS exceeds the amount required to be withheld under the IRC for any reason whatsoever, Seller's remedies with respect to such claim shall be limited solely to an action against the IRS for refund, and Seller hereby waives any right of action against Purchaser on account of such withholding. The provisions of this Paragraph shall survive the Closing hereunder.

(xi)     An affidavit of Seller dated as of the Closing stating that all representations and warranties of Seller contained herein are true and complete as of the Closing.

(xii)    An assignment to Purchaser of Seller's right, title and interest in any existing proceedings for the reduction of the assessed value of the Real Property and an executed stipulation of substitution of counsel with respect to such proceeding in favor of counsel designated by Purchaser.

(xiii)   All certificates, permits, authorizations and approvals for, or with respect to, the Real Property issued by governmental authorities having jurisdiction

(xiv)    All keys to the Property in Seller's possession or control.

(xv)     Any plans and specifications covering the buildings and improvements on the Real Property.

(xvi)    Certified resolutions of Seller or other evidence of authority authorizing the transaction provided for herein.

(xvii)   Evidence that the ZLDA Litigation has been dismissed with prejudice or that the ZLDA Litigation does not impact Purchaser's continued construction of the Hotel Property as contemplated by Purchaser, in form reasonably acceptable to Purchaser

(xviii)  Such other instruments as Purchaser or the Title Company may reasonably desire in connection with or to consummate the transactions contemplated by this Agreement.

(c)     At the Closing, Purchaser shall execute and/or deliver to Seller the following:

H:\84148\0007\00171702.DOC

10

(i)     The balance of the Purchase Price required pursuant to Paragraph 3 hereof.

(ii)    Affidavit of Consideration.

(iii)   A certified resolution of Purchaser or other evidence of authority authorizing the transaction provided for herein.

(iv)    An affidavit of Purchaser dated as of the Closing stating that all representations and warranties of Purchaser contained herein are true and complete as of the Closing.

(v)     An assignment and assumption of contracts, if any.

(vi)    The Lease.

(vii)   The Closing Statement.

(viii)  Such other instruments as the Title Company may reasonably desire in connection with or to consummate the transactions contemplated by this Agreement.

(ix)    The Releases.

Drafts of all documents to be prepared by Seller or Purchaser under this Paragraph 5 shall be delivered to counsel for the other party for review and approval at least five (5) days before the Closing.

6.      Adjustments at Closing.

(a)     At the Closing, with respect to those of the following claims accruing following the Effective Date, to the extent applicable, gas, water, electricity, heat, fuel, sewer and other utilities charges, real estate taxes on the Real Property (collectively, "Carry Costs") shall be apportioned between the parties as of the close of business on the date prior to Closing in accordance with the customs in respect to title closings prevalent in New York, New York. To the extent that the amounts of the items to be adjusted are not reasonably ascertainable as of the Closing, they shall be adjusted and paid as promptly thereafter as the amounts thereof can be ascertained. The provisions of this Paragraph 6 shall survive Closing. With respect to all such Carry Costs accrued as of the Effective Date, Purchaser shall resolve same with Westport in connection with settlement of Westport's Outstanding Obligation.

(b)     All prorations and payments to be made under the foregoing provisions shall be made on the basis of a written statement or statements. Within three (3) business days prior to Closing, Seller will deliver to Purchaser a proposed statement

showing all adjustments to be made at Closing (the "Proposed Closing Statement"). The parties shall review and provide comments to such Proposed Closing Statement or any modification thereto so that a final closing statement can be executed by the parties at Closing. In the event any prorations, apportionments or computations shall prove to be incorrect for any reason, then either party shall be entitled to an adjustment to correct the same, provided that it makes written demand on the one from who it is entitled to such adjustment within two (2) years after the erroneous payment or computation was made.

7.      Assessments. If, on the Closing, the Real Property or any part thereof shall be or shall have been affected by assessments which are, or which may become, payable in annual installments (collectively, "Assessments"), of which the first installment is then a charge or lien, or has been paid, then for the purposes of this Agreement all of the unpaid installments of any such assessments, including those which are to become due and payable after the Closing, shall be deemed to be due and payable and to be liens upon the Real Property affected thereby and shall be paid and discharged or allowed as a credit against the Purchase Price by Seller on the Closing, to the extent same accrue after the Effective Date. With respect to all such Assessments accrued as of the Effective Date, Purchaser shall resolve same with Westport in connection with settlement of Westport's Outstanding Obligation. If any assessment with respect to the Real Property is confirmed following the time of Closing, or if subsequent to Closing any assessment, including special or added, is determined to be incorrect, then, Seller shall make payment to Purchaser within ten (10) days of receipt of the tax assessor's calculation of the confirmed assessment or corrected assessment. Seller shall indemnify and hold Purchaser harmless from and against all costs and expenses, including reasonable attorneys' fees, incurred by Purchaser in connection with Seller's failure to perform Seller's obligation under this Paragraph 7.

8.      Meter Readings. Seller shall arrange for a final reading of all utility meters (covering gas, electricity and steam) as of the Closing. The payment of such utility costs shall be made in accordance with the allocation of responsibility for Carry Costs by Seller or through the Westport settlement, as applicable. The provisions of this Paragraph 8 shall survive the Closing.

9.      Transfer Taxes. All taxes imposed on the transfer of title to the Real Property shall be paid by Purchaser as part of the Purchase Price and Purchaser shall pay all recording charges for recording the Deed.

10.     Closing Costs. For the purposes of this Agreement, Purchaser's closing costs shall mean the expenses incurred by Purchaser for title examination and policy, any survey re-dating or the cost of any new survey ordered, the cost of any engineering reports and/or appraisals of the Property, attorneys' fees and disbursements and such other costs and expenses as shall actually be incurred by Purchaser in connection with this transaction. For purposes of this Agreement, Seller's closing costs shall mean the expenses incurred by Seller with respect to or payable to Broker (as hereinafter defined),

attorneys' fees and disbursements and such other costs and expenses as shall actually be incurred by Seller in connection with this transaction.

11.    Environmental Matters. This Paragraph shall exclusively control environmental matters.

(a)    Environmental Representations:

(i)    Simultaneously with the execution of this Agreement, Seller shall deliver to Purchaser originals or true copies of the following documents in Seller's possession, relating to:

(A)    all approvals, plans, specifications, test borings, percolation tests, engineering studies, surveys or other data concerning the Real Property and Leased Property;

(B)    permits, approvals, registrations, Underground Storage Tank Registration Questionnaires, certificates, applications, notices, orders, directives, legal pleadings, correspondence, or other documents of any nature which Seller, any tenant of Seller, any of Seller's predecessors-in-title, or any tenant or Seller's predecessors-in-title have submitted to or received from any federal, state, county, municipal or other governmental entity regarding the Real Property and Leased Property, its use or compliance or non-compliance with Environmental Laws or the presence of Hazardous Substances on, at, under or emanating from the Real Property and Leased Property; and

(C)    the results of any investigation of the Real Property and Leased Property which are available to Seller including, but not limited to, tests or investigation of soil or other substrate, groundwater, surface water, or the building interior, and any testing results from the removal of any underground storage tank on the Real Property and Leased Property.

(ii)    Seller shall immediately provide to Purchaser, but in no event later than the Closing, any information described in this Paragraph 11(a)(i), which Seller has received from the date of this Agreement to the date of Closing.

(iii)    Except as has been disclosed by Seller to Purchaser pursuant to Paragraph 11(a)(i), Seller has no actual knowledge of, and has received no notice of, any outstanding violation of any governmental law, rule, statute, ordinance or regulation, including, without limitation, Environmental Laws, whether or not they were previously corrected, with respect to the Real Property and Leased Property.

(iv)    Except as has been disclosed by Seller to Purchaser pursuant to Paragraph 11(a)(i), to the best of Seller's knowledge, no spills, discharges, releases, leaks, deposits or emplacements of any Hazardous Substances have occurred on the Real Property and Leased Property.

(v)    To the best of Seller's knowledge, there are no underground storage tanks currently located on the Real Property and Leased Property, and Seller has not installed any storage tanks, barrels, sumps, impoundments or other containers or equipment (moveable or fixed) for the containment of Hazardous Substances in any part of the Real Property and Leased Property, and Seller is not aware of any prior installations.

(vi)    As used in herein, the following terms shall have the meanings indicated below:

(A)    "Environmental Laws" means Any federal, state or local laws, common law, ordinances, regulations or policies, as well as orders, decrees, judgments or injunctions issued, promulgated, approved, or entered thereunder issued by any Governmental Authority, relating to the environment, health and safety as it relates to environmental issues, Hazardous Substances (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof), industrial hygiene as it relates to environmental issues, or the environmental conditions on, under or about the Mortgaged Property, including, without limitation, soil and groundwater. The term "Environmental Laws" shall include, but not limited to, the Federal Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.; Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq.; Federal Clean Air Act, 42 U.S.C. §§ 7401-7626; Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.; Federal Clean Water Act of 1977, 33 U.S.C. § 1251 et seq.; Federal Insecticide, Fungicide, and Rodenticide Act, Federal Pesticide Act of 1978, 7 U.S.C. § 136 et seq.; Federal Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.; Federal Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.; Hazardous Materials Transportation Act, as amended, 49 U.S.C. § 1801 et seq., and the regulations adopted or publications promulgated pursuant thereto,

(B)    "Hazardous Substances" means any (i) petroleum or petroleum products or waste oil, flammable substances (if regulated by Environmental Laws), explosives, radioactive materials, hazardous wastes or substances, toxic mold, toxic wastes or substances or any other wastes, materials or pollutants which (A) pose an environmental hazard to the Property or to Persons on or about the Property or (B) cause the Property to be in violation of any Environmental Laws; (ii) asbestos containing materials in any form which are or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls, or radon gas; (iii) chemical, material or substance defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances" or words of similar import under any applicable Environmental Laws; and (iv) other chemicals, materials or substances, exposure to which is prohibited, limited or regulated pursuant to any Environmental Law.

(b)    On and after Closing, Seller shall indemnify, defend and hold Purchaser harmless from and against (a) all liabilities, obligations, losses, liens, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' and consultants' fees (incurred to enforce this indemnity or for any other purpose) and disbursements which may be imposed upon or incurred by or asserted against Purchaser arising, directly or indirectly, out of or in connection with a breach of Seller's representations, warranties, covenants or other obligations pursuant to Paragraph 11 of this Agreement (herein collectively referred to as "Claims Against Purchaser"); and (b) all actions, suits, proceedings, demands, assessments, judgments, costs and expenses, including reasonable attorneys' and consultants' fees (incurred to enforce this indemnity or for any other purpose) and disbursements, incident to Claims Against Purchaser.

(c)    The provisions of this Paragraph 11 shall survive Closing for a period of ninety (90) days only to the extent of any misrepresentation by Seller.

12.    Certiorari Proceedings. If Seller has heretofore filed applications for the reduction of the assessed valuation of the Real Property and/or instituted certiorari proceedings to review such assessed valuations for any prior tax years or if the municipality has filed applications for an increase in the assessed valuation of the Real Property, Purchaser shall have sole control with respect to such proceedings, including the right to withdraw the same, compromise and/or settle the same or cause the same to be brought on for trial and to take, conduct, withdraw and/or settle appeals, and Seller hereby consents to such actions as Purchaser may take therein. Any refund or tax savings for any year or years prior to the tax year in which the Closing occurs shall belong solely to Seller. Any tax savings or refund for the tax year in which the Closing occurs shall be pro-rated between Seller and Purchaser in accordance with Paragraph 6 after deduction of attorneys' fees and other expenses related to the proceeding. Seller will execute all consents, receipts, instruments and documents which may reasonably be requested in order to facilitate settling such proceeding and collecting the amount of any refund or tax savings. The provisions of this Paragraph 12 shall survive the Closing.

13.    Condemnation; Casualty.

(a)    If, prior to the Closing, all or any portion of the Property is taken by eminent domain (or is the subject of a pending or contemplated taking which has not been consummated) or in the event of a conveyance in lieu thereof, Seller shall promptly notify Purchaser of such fact and Purchaser shall have the option to terminate this Agreement upon notice to Seller given not later than thirty (30) days after the date Seller notifies Purchaser as aforesaid. If this Agreement is terminated, as aforesaid, Seller shall cause the Deposit to be refunded to Purchaser. Upon such refund neither party shall have any further rights or obligations hereunder. In the event Purchaser does not so elect to terminate this Agreement the Closing shall occur on the date specified in Paragraph 5 and Seller shall assign and turn over, and Purchaser shall be entitled to receive and keep, all awards for the taking by eminent domain or the right to receive the awards.

Notwithstanding anything to the contrary contained herein, if Seller notifies Purchaser of any such taking less than thirty (30) days prior to the date specified in Paragraph 5 for the Closing, the date of the Closing shall be adjourned by the number of days required to provide Purchaser with thirty (30) days in which to make its election to terminate this Agreement.

      (b)    If any part of the Property (including, but not limited to, any parking areas, driveways, or any means of ingress thereto or egress therefrom) is destroyed by fire or other casualty, Seller shall promptly notify Purchaser of such fact and Purchaser shall have the option to terminate this Agreement upon notice to Seller given not later than thirty (30) days from the date Seller notifies Purchaser as aforesaid.  If this Agreement is terminated, as aforesaid, Seller shall cause the Deposit to be refunded to Purchaser. Upon such refund neither party shall have any further rights or obligations hereunder. Notwithstanding anything to the contrary contained herein, if Seller notifies Purchaser of any such casualty less than thirty (30) days prior to the date specified in Paragraph 5 for the Closing, the date of the Closing shall be adjourned by the number of days required to provide Purchaser with thirty (30) days in which to make its election to terminate this Agreement.

      14.    <u>Seller's Representations and Warranties</u>.  Seller covenants, represents and warrants to Purchaser as follows:

      (a)    Seller is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of New York and is qualified to do business in the State of New York.  Seller has the right, power and authority to enter into this Agreement and to fulfill its terms;

      (b)    Seller, by virtue of the laws of the State of New York, is entitled to own its property and is legally competent to execute and perform its obligation under this Agreement, and the execution and performance of this Agreement will not violate any provision of any agreement, judicial decree, statute or regulation to which Seller is a party or by which Seller or the Property may be bound or affected;

      (c)    There are no leases, subleases, licenses or other occupancy agreements affecting the Real Property and the Leased Property is vacant;

      (d)    Seller has no actual knowledge and has not received written notice of any violation of laws, ordinances or regulations relating to the Property or any pending or threatened condemnation or eminent domain proceedings which would affect the Property, other than disclosed in that certain Examination of Title prepared by Metropolitan Abstract Company dated  August 7, 2012 and bearing title number NY346979;

(e)    Seller has received no written request from any insurance company insuring the Property or by any board of fire underwriters or other body exercising similar functions requiring Seller to do any work on the Property;

(f)    There are no service or maintenance contracts in force with respect to the Property.

(g)    There is no litigation or proceeding pending (or to Seller's knowledge threatened) against or related to the Property or Seller other than

(i)    Signature Bank versus 77-79 Rivington Street Realty LLC, in the New York State Supreme Court, New York County, bearing index number 850001/2012;

(ii)    81-83 Rivington Corp versus  D.A.B. Group, LLC, in the New York State Supreme Court, New York County, bearing index number 116794/2010 (the "ZLDA Litigation");

(iii)    Travelers Casualty Insurance versus D.A.B. Group, LLC, in the New York State Supreme Court, New York County, bearing index number 112633/2011.

(h)    No tax reduction proceedings are pending or outstanding;

(i)    No other person has any option, right of first refusal or other right to purchase the Property or any part thereof or interest therein and Seller has not assigned or transferred any rights under the ZLDA;

(j)    Seller has obtained all consents required to permit all of the transactions contemplated by this Agreement (including but not limited to the sale and lease of the Property to Purchaser) and required under any agreement concerning it or to which it is a party, or by any law or regulations, and the sale of the Property does not require the consent or approval of any public or private authority which has not already been obtained by Seller,  other than the BAS Approval (as hereinafter defined);

(k)    Seller is currently in compliance with and shall at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of Treasury (including those named on OFAC's specially Designated Nationals and Blocked Persons List) and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action relating thereto.

(l)    Seller represents and warrants and guaranties (to be reconfirmed at Closing) to Purchaser that this transaction does not constitute a "fraudulent conveyance" and is not otherwise voidable in bankruptcy or insolvency proceedings affecting Seller; Seller will not voluntarily commence bankruptcy or similar proceedings before Closing; any involuntary proceedings commenced against Seller will be dismissed within sixty (60) days of the Closing; Seller will be solvent through Closing; and further guarantying the immediate refund of the Deposit, in the event of a breach of any of the foregoing covenants (without thereby limiting Purchaser's other remedies).  Seller is not insolvent, and this transaction will not render Seller insolvent.

15.    Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller as follows:

(a)    Purchaser is a corporation, duly organized and validly existing and in good standing under the laws of the State of New York.  Purchaser has the right, power and authority to enter into this Agreement and to fulfill its terms; and

(b)    The execution, delivery and performance of this Agreement in accordance with its terms does not violate any contract, agreement, commitment, order, judgment, decree, law, regulation or ordinance to which Purchaser is a party or by which it is bound.

(c)    Purchaser is currently in compliance with and shall at all times during the term of this Agreement (including any extension thereof) remain in compliance with the regulations of OFAC (including those named on OFAC's specially Designated Nationals and Blocked Persons List) and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action relating thereto.

16.    Seller's Agreements.  Seller covenants and agrees with Purchaser between the Effective Date and the Closing:

(a)    Not to make any new leases, permit any space that now is vacant or becomes vacant to be occupied, nor enter into any contract, mortgage or other agreement affecting title to or the use, possession or operation and maintenance of the Real Property, which cannot be terminated at or prior to Closing, without the prior written consent of Purchaser.

(b)    To pay real estate taxes and other lienable charges required with respect to the Property following the Effective Date or cause same to be discharged at Closing and maintain at least existing insurance coverage.

(c)    Not to withdraw, settle or otherwise compromise any pending tax reduction proceeding as to the Real Property without the consent of Purchaser.

(d)    To permit Purchaser and its agents, upon reasonable notice, reasonable access to the Property and Seller's records related thereto, subject to approval of any rights of any receiver currently in place.

(e)    To maintain until Closing liability insurance in a coverage amount of not less than that currently maintained by Seller or as required by Seller's mortgage lender (if any) or provide evidence that same is being carried by the receiver.

(f)    To deliver the Real Property vacant on the date of Closing.

(g)    To deliver the Leased Property in the condition required under the Lease on the date of Closing.

17.    <u>Survival</u>.  All covenants, representations and warranties of Seller under Paragraph 21 shall survive the Closing and shall be true as of the Closing as a condition of Purchaser's performance hereunder.  Seller shall indemnify, defend and hold Purchaser harmless from and against any and all actions, suits, proceedings, demands, assessments, judgments, liabilities, obligations, losses, liens, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees (incurred to enforce this indemnity or for any other purpose) and disbursements, which may be imposed upon or incurred by or asserted against Purchaser arising, directly or indirectly, out of or in connection with a breach of Seller's representations, warranties, covenant or other obligations pursuant to Paragraph 21 of this Agreement.

18.    <u>Conditions to Closing</u>.  The obligation of Purchaser to consummate the transaction contemplated by this Agreement is subject to the following conditions precedent being fully complied with at or prior to the Closing (and if all these conditions are not satisfied at the Closing, Purchaser may terminate this Agreement by notice to Seller in which event the Deposit shall promptly be returned to Purchaser), each of which conditions may be waived or modified in whole or in part by Purchaser in its sole discretion:

(a)    Seller shall have delivered to Purchaser title to the Property as required by Paragraph 2.

(b)    Seller shall have delivered all items described in Paragraph 5 and performed all other obligations of Seller provided herein.

(c)    All representations and warranties of Seller stated in Paragraph 14 shall be true, correct and complete as of the Closing and Seller shall have performed each and all of its covenants and agreements hereunder within the time provided.

(d)    All documents of Seller with respect to the transactions contemplated herein shall be reasonably satisfactory to Purchaser's counsel and to the Title Company insuring Purchaser's title to the Property as being in accordance with the terms of this Agreement.

(e)    Subject only to payment of its premiums for same, the Title Company shall be prepared to issue at Closing (or prepared to unconditionally commit to issue at Closing, with no "gap") its Title Policy in the required form (including all endorsements) set forth in Paragraph 2, subject only to the Permitted Encumbrances.

(f)    Seller shall have obtained all consents required to permit all of the transactions contemplated by this Agreement (including but not limited to the sale of the Property to Purchaser under any partnership, shareholder, or limited liability company agreement, or any covenant or other agreement concerning it or to which it (or any of its partners, members or shareholders) is a party or by any law or regulations and the sale of the Property shall not require the consent or approval of any public or private authority which has not already been obtained by Seller.

(g)    Confirmation by Purchaser, as determined in its sole discretion, that all necessary assignments, approvals and certificates required from all applicable governmental authorities, including, but not limited to, the New York City Board of Standard and Appeals ("BSA Approval"), have been obtained to reinstate any permits, approvals or applications to continue performance of the construction by Purchaser in accordance with previously submitted and approved plans and specifications and related permits.

(h)    Seller shall have assigned to Purchaser all rights and interests under the ZLDA.

(i)    Purchaser shall have received and assignment of the Existing Mortgage as provided in Paragraph 4(f).

19.    Default.

(a)    If Purchaser defaults under this Agreement beyond any applicable cure period, Seller shall retain all sums at such time paid on account of the Purchase Price, together with interest accrued thereon, as liquidated damages in lieu of any and all rights or remedies of Seller at law or in equity against Purchaser, any partner, member or principal of Purchaser, whether disclosed or undisclosed, or any agent or assign of Purchaser, it being expressly understood that the receipt by Seller of such monies shall be the sole and exclusive right and remedy of Seller, and constitutes a fair and reasonable amount for the damage sustained by Seller by reason of Purchaser's breach of this Agreement.  Seller hereby waives and releases any right to seek specific performance

against Purchaser or to collect any damages other than such liquidated damages from Purchaser.

      (b)    If Seller defaults under this Agreement beyond any applicable cure period, or breaches any representation or warranty contained herein, Purchaser shall be entitled either (i) to specific performance and any costs, including reasonable attorneys' fees incurred in pursuing an action for specific performance, or (ii) to terminate this Agreement and receive the Deposit, plus all interest accrued thereon, together with reimbursement from Seller for Purchaser's actual and reasonable out-of-pocket title search, survey and due diligence costs, which reimbursement shall be made within ten (10) days after receipt by Seller of invoices evidencing that such expenses were actually incurred by Purchaser; provided, however, if Seller has breached this Agreement by agreeing to sell the Premises to a third party, then should Purchaser not elect to specifically enforce this Agreement, Purchaser shall be entitled to seek any remedy available to Purchaser at law or in equity.

      20.    <u>Notices</u>. Any notice required or permitted to be given pursuant to this Agreement shall be in writing and sent by Seller, Purchaser, Escrow Agent, or its attorney by (a) personal delivery, or (b) reputable overnight delivery service with proof of delivery, or (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) legible facsimile transmission sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile transmission, as of the date of the facsimile transmission. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

      If to Seller:

                D.A.B. Group LLC
                Rivington Street Realty LLC
                85 West Hawthorne Avenue
                Valley Stream, New York 11580
                Attention: Mr. Ben Zhavian

      with a copy to:      The Law Firm of Favata & Wallace LLP
                229 Seventh Street, Suite 300
                Garden City, New York 11530
                Attention: William G. Wallace, Esq.

| | |
|---|---|
| If to Purchaser: | Monty One, LLC<br>505 Park Avenue, 17th Floor<br>New York, New York 10022<br>Attention: Roy Stillman, President |
| with a copy to: | Kurzman Eisenberg Corbin & Lever, LLP<br>One North Broadway, 10th Floor<br>White Plains, New York 10601<br>Attention: Steven Goldman |
| To Escrow Agent: | Commonwealth Land Title Insurance Company<br>140 East 45th Street<br>New York, NY 10017<br>Attention: James B. McEvoy |

Notices shall be deemed given on the earlier to occur of (i) the date received or (ii) the date delivery is refused. Any notice given by an attorney for a party shall be effective for all purposes.

21.    Broker. The parties represent and warrant to each other that neither party has dealt with any broker in connection with this transaction, except Seller states that it previously had discussions with Massey Knakal (the "Broker") but such relationship, if any, does not give Broker a claim under this Agreement. Seller and Purchaser hereby agree to indemnify, defend and hold the other harmless against all claims for real estate commissions, finder's fees or similar compensation asserted another broker or by any other person based on acts or agreements of Seller in connection with any of the transactions contemplated by this Agreement. Seller shall be responsible for the payment of any real estate commission, finder's fee or similar compensation payable in connection with this transaction, including any real estate commission payable to the Broker. The provisions of this Paragraph 21 shall survive the Closing.

22.    Entire Agreement. This Agreement (including the exhibits attached hereto) contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto. The provisions of this Paragraph 22 shall survive the Closing.

23.    Undisclosed Principals. The covenants and agreements of Purchaser and Seller herein contained are accepted by Purchaser and Seller, as applicable, as the covenants and agreements of the entity named at the top of the first page hereof and of no

H:\84148\0007\00171702.DOC

other person, firm or corporation and shall be enforceable by Purchaser or Seller against said entity only and not against any other person, firm or corporation as either disclosed or undisclosed principals.

24.    No Joint Venture. Nothing contained herein shall be construed as making Seller and Purchaser the partner, joint venture or agent of the other and neither party shall have the power or authority to bind the other. The parties have no relationship to each other except as vendor and vendee of the Property.

25.    No Waiver. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

26.    Escrow. The Deposit shall be held in escrow by Title Company. Title Company shall hold the Deposit in an interest-bearing attorney trust account in a banking institution insured by the federal government. Title Company shall hold the Deposit until either (i) the Closing, in which case the Deposit will be disbursed to Seller (the Deposit to be applied as a Purchaser's credit against the Purchase Price), (ii) the default of Seller under this Agreement or such other time or condition, the passing or occurrence of which would entitle Purchaser to a refund thereof under this Agreement, in which case the Deposit will be disbursed to Purchaser, or (iii) the default of Purchaser under this Agreement, or such other time or condition, the passing or occurrence of which would entitle Seller to retain the Deposit, in which case the Deposit (except any accrued interest thereon) shall be disbursed to Seller. If disbursement from Title Company is requested pursuant to subparagraphs (ii) or (iii) above, notice thereof (the "Requesting Notice") shall be given by the requesting party to the non-requesting party and Title Company. Such notice shall detail the basis for the request and shall be given by as set forth in Paragraph 20, and Title Company shall not make any disbursement pursuant to subparagraphs (ii) or (iii) unless and until ten (10) days after receipt of the Requesting Notice. If either Seller or Purchaser desires to contest the disbursement of the Deposit, it shall notify the requesting party and Title Company, within ten (10) days after receipt of the Requesting Notice, whereupon Title Company shall either hold same pending resolution of such conflict or deposit same, as a stakeholder, into a court of competent jurisdiction for the resolution of such dispute. Notwithstanding the foregoing to the contrary, in the event Purchaser terminates this Agreement (x) prior to the expiration the Due Diligence Period, or (y) due to Seller's failure to satisfy any of the conditions set forth in Paragraph 18 hereof, Seller acknowledges that it shall have no right to challenge the release of the Deposit to Purchaser in either event.

27.    Binding Effect. This Agreement shall bind and inure to the benefit of the successors and assigns of Seller and Purchaser.

28.    Assignment. At any time prior to Closing, upon notice to Seller but without the consent of Seller, Purchaser may assign this Agreement all Purchaser's rights and obligations thereunder to an affiliated entity of Purchaser.

29.    Disclosure. Seller and Purchaser will maintain the confidentiality of these negotiations both now and after Closing. The previous sentence does not prevent either party from disclosing information: (a) to its advisors and actual or prospective lenders or equity investors, provided each recipient has been directed to preserve the confidentiality of such information; or (b) as law requires. Any publicity requires consent by both parties. If no Closing occurs, then Purchaser agrees to return (and to cause its advisers to return) to Seller any and all documents and other written information (and all copies thereof) received directly or indirectly from Seller regarding the Property, together with any analysis, summary or report about the Property that Purchaser or its advisers or consultants prepared. The provisions of this Paragraph 29 shall survive the Closing or termination of this Agreement.

30.    No Marketing or Sale. So long as Purchaser has not terminated this Agreement, Seller will not solicit, seek or negotiate other offers from other potential purchasers of the Property, will direct Broker to suspend marketing activities, will not enter into a contract with a third party for the sale or lease of any portions of the Property subject to the Agreement, and will negotiate exclusively with Purchaser.

31.    Further Assurances. After the Closing, Seller shall execute, acknowledge and deliver, for no further consideration, all such assignments, transfers, consents and other documents as Purchaser may reasonably request to carry out the provisions of this Agreement.

32.    Invalidity. If any provision hereof shall be declared invalid by any court or in any administrative proceedings, then the provisions of this Agreement shall be construed in such manner so as to preserve the validity hereof and the substance of the transaction herein contemplated to the extent possible. The captions and Paragraph headings are provided for purposes of convenience of reference only and are not intended to limit, define the scope of, or aid in interpretation of any of the provisions hereof.

33.    No Construction Against Drafter. This Agreement was negotiated at arms length with each party receiving advice from its legal counsel. It is the intent of the parties hereto that no part of this Agreement is to be construed against any party because of the identity of the drafter.

34.    Governing Law. This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York.

35.    Business day. In the event any deadline specified herein falls on a day which is not a regular business day, then the deadline shall be extended to the end of the next following regular business day.

36.    Counterparts. This Agreement may be executed and delivered in several counterparts, each of which, when so executed and delivered, shall constitute an original, fully enforceable counterpart for all purposes.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

WITNESS: *WILLIAM WALLACE*

_____

Print Name:

WITNESS: *WILLIAM WALLACE*



Print Name:

WITNESS: _____

_____

Print Name:

SELLER:

D.A.B. GROUP, LLC

By: _____
Name: *MANAGER MEMBER*
Title:

Date of execution: *5-9-13*

LESSOR (with respect to paragraphs 1(b), 2, and 11):

77-79 RIVINGTON STREET REALTY LLC

By: *5-9-13*
Name: *MANAGER MEMBER*
Title:

Date of execution: *5-9-13*

PURCHASER:

MONTY ONE, LLC

By: _____
Name:  Roy Stillman
Title:  Manager

Date of execution: _____

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

WITNESS:

SELLER:

D.A.B. GROUP, LLC

By:_____
Name:
Title:

Print Name:_____

Date of execution:_____

WITNESS:

LESSOR (with respect to paragraphs 1(b), 2, and 11):

77-79 RIVINGTON STREET REALTY LLC

By:_____
Name:
Print Name:
Title:

Date of execution:_____

WITNESS:

PURCHASER:

MONTY ONE, LLC

By:_____
Name:  Roy Stillman
Title:  Manager

Print Name: Christopher Sullivan

Date of execution: May 8 2013

The undersigned hereby executes this Agreement solely in its capacity as Escrow Agent and solely to evidence its agreement to be bound by the terms of **Paragraph 26** hereof.

ESCROW AGENT:

COMMONWEALTH LAND TITLE
INSURANCE COMPANY

By: _____
Name: James B. McEvoy
Title: Vice President

C:\Users\NYNYJM1\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\R2O976OF\Orchard Contract - Clean (2).doc

26

## EXHIBITS

| Exhibit A | Legal Description of Real Property |
| Exhibit A-1 | Legal Description of Gore |
| Exhibit A-2 | Legal Description of Building |
| Exhibit B | Memorandum of Agreement |

H:\84148\0007\00171702.DOC

# EXHIBIT A

# LEGAL DESCRIPTION OF REAL PROPERTY

# S C H E D U L E   A

**Tax Lot 66**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 77 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 8-1/2 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 8-1/2 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING.

Said Property being known as and by the street number 141 Orchard Street, New York, New York.

**Tax Lot 67**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 102 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 6 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 6 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING.

- continued on next page -

**S C H E D U L E  A  (continued)**

Said  Property being known as and by the street number 139 Orchard Street, New York, New York.

# **EXHIBIT A-1**

# **LEGAL DESCRIPTION OF GORE**

## S C H E D U L E   A

OVERALL:

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County, City and State of New York, being bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Rivington Street with the easterly side of Allen Street; and

RUNNING THENCE in an easterly direction along the southerly side of Rivington Street, 37.58 feet;

THENCE in a southerly direction, 77.00 feet;

THENCE in a westerly direction; a distance of 37.58 feet to a point on the easterly side of Allen Street;

THENCE in a northerly direction along the easterly side of Allen Street, a distance of 77.00 feet to the point or place of BEGINNING.


ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

LOT 61:  (the Gore)

KNOWN AND DESIGNATED as Damage Parcel Number 12, Additional Lands of the Damage Map dated August 31, 1926 shown property to be acquired in the matter of acquiring title to the widening of Allen Street from Schiff (Delancey Street) Parkway to East Houston Street, First Avenue from East Houston Street to First Street in the Borough of Manhattan, City of New York, together with the additional lands to be acquired in Condemnation therewith said parcel being more particularly bounded and described as follows:

BEGINNING at the intersection of the easterly side of Allen Street with the southerly side of Rivington Street;

- continued on next page -

### S C H E D U L E  A  (continued)

THENCE RUNNING Southerly along the easterly side of Allen Street as now laid out, 77.00 feet;

THENCE Easterly 12.58 feet along the southerly side of Damage Parcel Number 12 as shown on said map;

THENCE Northerly along the easterly side of Damage Parcel Number 12 as shown on said map, 77.00 feet to the southerly side of Rivington Street;

THENCE Westerly along the southerly side of Rivington Street, 12.58 feet to the point or place of BEGINNING.

LOT 62:

BEGINNING at a point on the southerly side of Rivington Street, distant 50.00 feet (Deed) (50.17 feet Tax Map) Westerly from the westerly side of Orchard Street;

THENCE RUNNING Westerly along the said southerly side of Rivington Street, 25.00 feet;

THENCE at right angles Southerly and on a line parallel with the said westerly side of Orchard Street, 77.00 feet;

THENCE at right angles Easterly on a line parallel with the said southerly side of Rivington Street, 25.00 feet;

THENCE at right angles Northerly on a line parallel with the said westerly side of Orchard Street, 77.00 feet to the point or place of BEGINNING.

Said premises are known as 77-79 Rivington Street, New York, New York and designated as Section 2, Block 415, Lots 61 and 62 as shown on the Tax Map of the City and County of New York.

## EXHIBIT A-2

## LEGAL DESCRIPTION OF BUILDING

# SCHEDULE A

OVERALL:

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County, City and State of New York, being bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Rivington Street with the easterly side of Allen Street; and

RUNNING THENCE in an easterly direction along the southerly side of Rivington Street, 37.58 feet;

THENCE in a southerly direction, 77.00 feet;

THENCE in a westerly direction, a distance of 37.58 feet to a point on the easterly side of Allen Street;

THENCE in a northerly direction along the easterly side of Allen Street, a distance of 77.00 feet to the point or place of BEGINNING.


ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

LOT 61:

KNOWN AND DESIGNATED as Damage Parcel Number 12, Additional Lands of the Damage Map dated August 31, 1926 shown property to be acquired in the matter of acquiring title to the widening of Allen Street from Schiff (Delancey Street) Parkway to East Houston Street, First Avenue from East Houston Street to First Street in the Borough of Manhattan, City of New York, together with the additional lands to be acquired in Condemnation therewith said parcel being more particularly bounded and described as follows:

BEGINNING at the intersection of the easterly side of Allen Street with the southerly side of Rivington Street;

- continued on next page -

**S C H E D U L E  A  (continued)**

THENCE RUNNING Southerly along the easterly side of Allen Street as now laid out, 77.00 feet;

THENCE Easterly 12.58 feet along the southerly side of Damage Parcel Number 12 as shown on said map;

THENCE Northerly along the easterly side of Damage Parcel Number 12 as shown on said map, 77.00 feet to the southerly side of Rivington Street;

THENCE Westerly along the southerly side of Rivington Street, 12.58 feet to the point or place of BEGINNING.

LOT 62: (the Building)

BEGINNING at a point on the southerly side of Rivington Street, distant 50.00 feet (Deed) (50.17 feet Tax Map) Westerly from the westerly side of Orchard Street;

THENCE RUNNING Westerly along the said southerly side of Rivington Street, 25.00 feet;

THENCE at right angles Southerly and on a line parallel with the said westerly side of Orchard Street, 77.00 feet;

THENCE at right angles Easterly on a line parallel with the said southerly side of Rivington Street, 25.00 feet;

THENCE at right angles Northerly on a line parallel with the said westerly side of Orchard Street, 77.00 feet to the point or place of BEGINNING.

Said premises are known as 77-79 Rivington Street, New York, New York and designated as Section 2, Block 415, Lots 61 and 62 as shown on the Tax Map of the City and County of New York.

# EXHIBIT B

## MEMORANDUM OF AGREEMENT

### CITY OF NEW YORK, County of NEW YORK

**139-141 Orchard Street, NY, NY**
**Block 415, Lots 66 & 67**

**77 Rivington Street, NY, NY**
**Block 415, Lot 61**

**79 Rivington Street, NY, NY**

**Block 415, Lot 62**

**Record & Return to:**

**Steven Goldman, Esq.**
**Kurzman Eisenberg Corbin & Lever LLP**
**1 North Broadway, Suite 1004**
**White Plains, NY 10601**

H:\84148\0007\00171702.DOC

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is executed with the intention that it be recorded in the real estate records to evidence the execution of a certain Purchase and Sale Agreement (the "Agreement") dated May ___, 2013 between, D.A.B. Group LLC and 77-79 Rivington Street Realty LLC, each as Owner or Seller, and, Monty One, LLC, a New York limited liability company, as Purchaser, all of the terms, conditions and provisions of which the Agreement are incorporated herein by reference. To the extent of any discrepancies between the Agreement and this Memorandum of the Agreement, the terms of the Agreement shall prevail.

1.     The Owner and grantor of the purchase option under the Agreement is D.A.B. Group LLC, having an address of 85 West Hawthorne Avenue, Valley Stream, NY 11580.

2.     The Owner and grantor of the lease options under the Agreement is Rivington Street Realty LLC, having an address of 85 West Hawthorne Avenue, Valley Stream, NY 11580.

3.     The grantee of the purchase option and lease option under the Agreement is Monty One, LLC, having an address of 505 Park Avenue, 17th Floor, New York, NY 10022.

4.     The Agreement was executed on May ___, 2013.

5.     The real property that is the subject of the Agreement is known as: Block 415, Lots 61, 61, 66 & 67, New York County.

6.     The purchase option granted under the Agreement will expire if not exercised on or before _____ ___, 2013.

This Memorandum of the Agreement is executed and will be recorded pursuant to the provisions of Section 294(7) of the Real Property Law of the State of New York.

IN WITNESS WHEREOF, the undersigned have executed this Memorandum of Purchase the Agreement as of the ___ day of May, 2013.

MONTY ONE, LLC

By:_____

Name:

Title

D.A.B. Group LLC

By:_____

Name:

Title:

Rivington Street Realty LLC

By:_____

Name:

Title:

STATE OF NEW YORK          )

                         )ss:.

COUNTY OF _____    )

On the _____ day of May in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

STATE OF NEW YORK            )

                              )ss:.

COUNTY OF _____    )

On the _____ day of May in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public


STATE OF NEW YORK            )

                              )ss:.

COUNTY OF _____    )

On the _____ day of May in the year 2013 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



_____
Notary Public


H:\84148\0007\00171702.DOC

**<u>Exhibit B</u>**

**Termination Letter**

# KURZMAN EISENBERG CORBIN & LEVER, LLP

### ATTORNEYS AT LAW

ONE NORTH BROADWAY
WHITE PLAINS, NEW YORK 10601

TEL: (914) 285-9800
FAX: (914) 285-9855

**IRYNA LOMAGA CAREY**
**Partner**
icarey@kelaw.com
Phone (914) 286-6372
Fax    (914) 993-6028

August 2, 2013

**<u>Via Federal Express</u>**

D.A.B. Group, LLC
85 West Hawthorne Avenue
Valley Stream, NY 11580
Attn: Mr. Ben Zhavian

**<u>Via Federal Express and Email</u>**

The Law Firm of Favata & Wallace LLP
229 Seventh Street, Suite 300
Garden City, NY 11530
Attention: William G. Wallace, Esq.

> Re:    Agreement of Purchase and Sale between D.A.B. Group, LLC, as
> Seller and Monty One, LLC, as Purchaser, dated May 9, 2013,
> relating to parcels of land located at 139-141 Orchard Street and 77-
> 79 Rivington Street (the "Agreement")

Gentlemen:

Reference is made to Section 4(c) of the Agreement pursuant to which the Due Diligence Expiration Date was agreed to by the parties to be August 7, 2013. If executed by Seller before 5:00PM on Monday, August 5, 2013, this letter shall serve to extend the Due Diligence Expiration Date through the close of business on September 15, 2013. Please note that capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

Promptly following execution and delivery of this extension letter, Seller shall, in accordance with its obligation under Section 4(b) of the Agreement, deliver all documents in Seller's possession or control to Purchaser so that Purchaser can conduct its due diligence within the time period specified in the Agreement, as amended by this extension letter.

Kurzman Eisenberg Corbin & Lever, llp

D.A.B. Group, LLC
The Law Firm of Favata & Wallace LLP
August 2, 2013
Page 2

If the foregoing is acceptable, please execute on the acknowledgement below and return an executed copy of this letter to the undersigned before 5:00PM on Monday, August 5, 2013. Purchaser is willing to accept a PDF (portable data format) version of Seller's signature for purposes of the extension received via email from Seller or its counsel. If an executed counterpart of this letter extending the Due Diligence Expiration Date is not received before 5:00PM on Monday, August 5, 2013, this letter shall automatically be deemed notice by Purchaser to Seller, under Section 4(d) of the Agreement, effective as of 4:59PM on August 5, 2013, that Purchaser has elected to terminate the Agreement.

Notwithstanding an extension of the Due Diligence Expiration Date, or a termination of the Agreement, Purchaser reserves all of its rights and remedies in law and in equity, including specific performance, against Seller for its failure to comply with the terms of the Agreement.

Your prompt attention is appreciated.

Very truly yours,

Iryna Lomaga Carey,
as counsel to Purchaser pursuant to
Section 20 of the Agreement

cc:   Mr. Roy Stillman

AGREED AND ACCEPTED THIS
_____ DAY OF AUGUST, 2013

D.A.B. GROUP, LLC

_____
Name:
Title:

H:\84148\0007\00195309.DOCX

**<u>Exhibit C</u>**

**Amended Answer**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------X

MONTY ONE, LLC,

                             Plaintiff,                        Index No. 652844/2013

                -against-

D.A.B. GROUP, LLC and 77-79 RIVINGTON         **AMENDED ANSWER**
STREET REALTY, LLC,                                  WITH COUNTERCLAIM

                               Defendants.

-------------------------------------------------------------------------X

       Defendants, D.A.B. Group, LLC and 77-79 Rivington Street Realty, LLC by their attorney,

Jon Ari Lefkowitz, P.C., answer the complaint herein as follows:

       1.     Deny knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraphs 1, 13, 18 and 32.

       2.     Deny each and every allegation set forth in paragraph 4 of the complaint except

admit that Ben Zhavian in the managing member of both defendants.

       3.     Deny each and every allegation set forth in paragraph 5 of the complaint except

admit that D.A.B. entered into an agreement with Plaintiff.

       4.     Deny each and every allegation set forth in paragraph 6 of the complaint and refer

this Court to the agreement referred therein for the terms, conditions and construction thereof.

       5.     Deny each and every allegation set forth in paragraphs 7, 8, 16, 17, 22, 23, 24, 28,

29, 30, 34, 35, 37, 38, 39, 42, 43 and 44.

       6.     Deny each and every allegation set forth in paragraph 9 of the complaint except

admit that Defendant Rivington was a signatory to the agreement referred to therein and refer this

Court to that agreement to the terms, conditions and construction thereof.

       7.     Deny each and every allegation set forth in paragraph 10 of the complaint except

admit that the purchase price was Twenty Eight Million ($28,000,000.00) Dollars.

8.    Deny each and every allegation set forth in paragraph 14 of the complaint except refer this Court to the agreement referred to therein for the terms, conditions and construction thereof.

9.    Deny each and every allegation set forth in paragraph 15 of the agreement except admit that the Plaintiff sent a letter dated July 15, 2013.

10.    Deny each and every allegation set forth in paragraph 19 of the complaint and refer this Court to the agreement referred to therein for the terms, conditions and construction thereof.

11.    Deny each and every allegation set forth in paragraph 20 of the complaint and refer this Court to the agreement referred to therein for the terms, conditions and construction thereof.

12.    Deny each and every allegation set forth in paragraph 25 of the complaint except admit the existence of the letter dated August 5, 2013 referred to therein.

13.    Deny each and every allegation set forth in paragraph 33 of the complaint except refer this Court to the agreement referred to therein for the terms, conditions and construction thereof.

14.    Deny each and every allegation set forth in paragraph 41 of the complaint and refer this Court to the agreement referred to therein for the terms, conditions and construction thereof.

15.    These answering Defendants repeat and reallege each and every admission and denial heretofore set forth as those admissions and denials refer to allegations repeated and realleged in paragraphs 27, 36 and 40.

### FIRST AFFIRMATIVE DEFENSE

16. The complaint, and each and every cause of action therein fail to state a cause of action or claim upon which relief may be granted.

### 2nd AFFIRMATIVE DEFENSE

17. The complaint is barred by the doctrine of unclean hands, as plaintiff is the one who cancelled the contract.

<h2 align="center">1st COUNTERCLAIM</h2>

1. Defendants incorporate herein by reference, each and every allegation, answer and denial contained in each of the above paragraphs.

2. Upon information and belief, Plaintiff is a New York limited liability company, having its principal place of business at 505 Park Avenue, New York, New York 10022.

3. On or about May 9, 2013, the Plaintiff and Defendants entered into a Purchase and Sale Agreement ("PSA") for the sale of the property known as 139-141 Orchard Street, New York, New York.

4. On or about August 2, 2013, Plaintiff's attorneys sent a letter to Defendants asking for an extension of the Due Diligence Expiration Date.

5. The Letter states that if this letter is not acknowledged by Defendant's signature, and delivered to the attorneys before 5:00 p.m. on August 5, 2013, the Agreement is terminated.

6. Neither Defendants nor any of their agents sent such acknowledgement to the Plaintiff.

7. Pursuant to the Agreement itself and the Letter written by Plaintiff itself, the Agreement was terminated as of 4:59 p.m. on August 5, 2013.

8. On August 14, 2013, Plaintiff filed a Notice of Pendency with the New York County Supreme Court noticing 139-141 Orchard Street, New York, New York.

**COUNT 1: TORTIOUS INTERFERENCE**

9. Defendants incorporate herein by this reference hereto each and every allegation contained in each of the above paragraphs of this answer, defenses and counter claims as if fully set forth herein.

10. Plaintiffs' improper attachment of the notice of pendency on the premises interfered with business relations the Defendants had with a third party, to wit; an agreement sell the premises to a third party. Plaintiff knew about defendants' attempt to sell the property to a third party.

11. Plaintiff intentionally procured the third party's breach of that contract without justification,

12. Because of the baseless *lis pendens*, defendants lack clear title, and without clean title any relationship Defendants are able to have with the prospect of selling the premises is impaired.

13. Defendants were injured to the extent that the property remains unsold, and is a drain on Defendants' resources, and defendants lost the benefit of the bargain as well as the $9,250,00.00 which plaintiff promised to pay defendant.

14. In addition, every month that goes by without a sale of the property costs the defendant interest at the default rate of 24%.

## COUNT 2: ABUSE OF PROCESS

15. Defendants incorporate herein by this reference hereto each and every allegation contained in each of the above paragraphs of this answer, defenses and counter claims as if fully set forth herein.

16. Plaintiff had no legitimate reason to sue defendant, and used and undertook its lawsuit AND NOTICE OF PENDENCY maliciously.

17. The plaintiff intended to harm defendants, without excuse or justification, and used the court process in a perverted manner to obtain a collateral objective, among other things, to intimidate or extort defendant into lowering the agreed upon purchase price.

18. The action was initiated by the plaintiff against the defendants with malice, without probable cause to believe it could succeed or any legitimate basis.

19. Plaintiff did not have a claim to any right, title or interest in the property but nonetheless improperly used the regularly issued process of a notice of attachment to obtain the objective of clouding title to the Defendants' real property.

20. As a result of plaintiff's frivolous lis pendens, Defendants are not able – and have not been able – to sell or refinance their property.

21. During this time, the defendants' property is being foreclosed, and the foreclosing lender is charging defendants the default interest rate of 24%.

**WHEREFORE**, these answering Defendants demand judgment dismissing the complaint in its entirety together with judgment on the counterclaim against plaintiff in an amount to be determined at trial, but at least $11,750,000.00 , together with an award of costs, attorneys fees and such other relief as may be just.

Dated: Brooklyn, New York
         December 23, 2013

By: _____
         Jon Ari Lefkowitz
         Attorneys for Defendants
1222 Ave. M, suite 204
         Brooklyn, New York 11230
         (718) 692-0459

STATE OF NEW YORK, COUNTY OF KINGS                ss.:

Ben Zhavian, a member of defendants in the within action states; deponent has read the
amended answer with counterclaim, and knows the contents thereof; and the same is true
to deponent's own knowledge, except as to the matters therein stated to be alleged  upon
information  and belief, and as to those  matters, deponent  believes it to be true.

Sworn to before me on December 23, 2013    _____

                                                                    Ben Zhavian

JON A. LEFKOWITZ
Notary Public, State of New York
No. 02LE5022620
Qualified in Kings County
Commission Expires Jan. 19, 12, 2018

**<u>Exhibit D</u>**

**Zhavian Affidavit**

DM3\2988900.6

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

Index No.: 652844/2013

MONTY ONE, LLC,

Plaintiff,

**AFFIDAVIT IN SUPPORT**

- against -

D.A.B GROUP, LLC and 77-79 RIVINGTON REALTY, LLC,

Defendant.

STATE OF NEW YORK   }
COUNTY OF KINGS      }ss:

BEN ZHAVIAN, being duly sworn, deposes and says:

1. I am the principal of the Defendant, D.A.B GROUP, LLC, and I have personal knowledge of everything stated herein, and I make this Affidavit in support of the instant motion.

2. I entered into the Agreement of Purchase and Sale with the Plaintiff on May 9, 2013.  See Agreement annexed as **EXHIBIT "A,"** and pleadings annexed as **EXHIBIT "B."**

3. Thereafter, on or about, August 5, 2013, I received a letter from Plaintiff's attorneys directing that I grant an extension of the Due Diligence Expiration Date, or else they will elect to terminate the Agreement.  See Letter annexed as **EXHIBIT "C."**

4. I did not execute and return the Letter as was instructed, and therefore deemed the Agreement terminated as of 4:59 p.m. on August 5, 2013, pursuant to Plaintiff's letter.

5. Since such time Plaintiff has commenced these proceedings and filed a notice of pendency against my property located at 139-141 Orchard Street, New York, New York.  See Notice of Pendency annexed as **EXHIBIT "D."**

6. Plaintiff itself terminated the Agreement, and therefore it had no right to file this claim, purportedly based on the said agreement.

7. There were no other agreements, either oral or written, entered into between the Plaintiff and myself.

8. No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, I respectfully request that the Court grant me the relief requested in my Order to Show Cause papers, together with such other, further and different relief as to the court may seem just and proper.

_____
BEN ZHAVIAN

Subscribed and Sworn to
before me on_____12/23/13

_____
NOTARY PUBLIC

JON A. LEFKOWITZ
Notary Public, State of New York
No. 02LE5022620
Qualified in Kings County
Commission Expires Jan. 18, 2018

**<u>Exhibit E</u>**

**Lefkowitz Affirmation**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

_____

Index No.: 652844/2013

MONTY ONE, LLC,

                              Plaintiff,          **AFFIRMATION IN**
                                                   **SUPPORT**

            - against -

D.A.B GROUP, LLC and 77-79 RIVINGTON REALTY, LLC,
                              Defendant.

_____

    JON ARI LEFKOWITZ, an attorney duly licensed in the State of New York, under penalty of perjury affirms and says:

1. I am the attorney for Defendants D.A.B GROUP, LLC and 77-79 RIVINGTON REALTY, LLC, and I make this affirmation in support of the instant order to show cause seeking omnibus relief.

## BACKGROUND

2. The Agreement of Purchase and Sale contract ("Agreement") on which this action centers was entered into by the parties on May 9, 2013. See Agreement attached as **EXHIBIT "A."** The pleadings are annexed hereto as **EXHIBIT "B."**

3. In relevant part, the Agreement specifies in paragraph 4 (d)(iv) that in the event that the "Seller has not delivered to Purchaser a subordination, non-disturbance and attornment agreement," then "Purchaser may terminate this Agreement, for any reason or no reason, by notice to Seller given on or before 5:00 p.m. on the Due Diligence Expiration Date." The Due Diligence expiration date was August 6, 2013, 90 days from the execution of the contract.

4.  On August 2, 2013, Plaintiff's attorneys sent a letter ("Letter") to Defendants asking for an extension of the Due Diligence Expiration Date.  See Letter attached as **EXHIBIT "C."**

5.  The Letter further states that if this letter is not acknowledged by Defendants' signature, and delivered to the attorneys before 5:00 p.m. on August 5, 2013, the Agreement is terminated. No such acknowledgement was sent by Defendants or any of his agents. Pursuant to the Agreement and the Letter written by plaintiff itself, the Agreement was therefore terminated as of 4:59 p.m. on August 5, 2013.  Plaintiff even admits this in paragraph 25 of its Verified Complaint.

## PURSUANT TO CPLR § 3211 DISMISSING THE CAUSE OF ACTION AGAINST THE DEFENDANTS

6.  Pursuant to CPLR § 3212 (, the present action against the Defendants must be dismissed in its entirety.

7.  The documentary evidence is clear that the Agreement was terminated, and as such, Plaintiff is not accorded any rights to the subject property, including the right to purchase real property, pursuant to CPLR § 3211(a)(1). The cause of action must also be dismissed for failure of Plaintiff's pleadings to state a cause of action for which relief can be granted, pursuant to CPLR § 3211(a)(7).

8.  When a motion to dismiss is made pursuant to CPLR § 3211(a)(7), as a general rule we assume the truthfulness of the factual allegations of the pleading and determine simply whether the allegations make out any cognizable cause of action. See Matter of Law Barbera v. Town of Woodstock, 29 A.D.3d 1054 (3d Dept 2006).  However, when such a motion is supported by evidence extrinsic to the petition/complaint, the inquiry becomes whether the plaintiff indeed has a cause of action, not simply whether he or she has stated

one in the complaint, and the plaintiff no longer can rely only on the unsupported factual allegations of the pleading, but must submit evidence demonstrating the existence of a cause of action.  Id.; see also Hotel Capital, LLC v. Wells Fargo Bank, 35 Misc. 3d 1218A (Sup. Kings County 2012).

9. As is clear from Exhibit C, the Agreement was terminated, and terminated *by Plaintiff*. As such, Plaintiff has no right to specific performance or action for breach of contract. Plaintiff is not entitled to conduct any due diligence on the subject premises, because no such sale will take place, due to *Plaintiff's* termination of the Agreement.

## THE NOTICE OF PENDENCY MUST BE CANCELLED.

10. CPLR § 6501 provides, in pertinent part, that "[a] notice of pendency may be filed in any action in a Court of this State or of the United States in which the judgment demanded would affect the **title to, or the possession, use or enjoyment of, real property**, except in a summary proceeding brought to recover the possession of real property (emphasis added). Plaintiff has not stated any claim to an interest in defendant's property, nor can it state such a claim, as Plaintiff itself is the one who terminated the Agreement.

11. Plaintiff's notice of pendency is an improper attempt to cloud title to defendants' real property. Plaintiff's Complaint seeks specific performance of the production of Due Diligence Materials to Plaintiff.  This is not the same thing as a claim to any right, title, or interest in the property.

12. In fact, Plaintiff does not make any claim to **title** of Defendants' real property. Plaintiff does not make any claim to **possession** of defendants' real property. Plaintiff does not make any claim to **use or enjoyment** of defendants' real property. Therefore, Plaintiff has no right to any notice of pendency.

13. Having itself terminated the Agreement to purchase the subject property, Plaintiff is no

longer entitled to a *lis pendens* on the property since it *voluntarily* relinquished its interest

in that property.  See 5303 Realty Corp. v. O&Y Equity Corp., 64 N.Y.S.2d 313 (1984),

and Eisele v. Eisele, 37 A.D.3d 376 (NY App Div 1st Dept 2007).

14. Courts have consistently held that to file a Notice of Pendency is an extraordinary

privilege and that the statute conferring this privilege, CPRL § 6501, should be strictly

and narrowly construed.  As the Court of Appeals recognized in 5303 Realty Copy. v. O

& Y Equity Corp., 64 N.Y.2d 313, 315-16, 486 N.Y.S.2d 877, 879 (1984):

> A notice of pendency can be a potent shield to protect litigants claiming an
> interest in real property. The powerful impact that this device has on the
> alienability of property, when conjoined with the facility with which it
> may be obtained, calls for its narrow application to **only those lawsuits
> directly affecting title to, or the possession, use or enjoyment of, real
> property**. (Emphasis added). See also, Israelson v. Bradley, 308 N.Y. 511,
> 516 (1995); Chambi v. Navarro, Vives & Cia, Ltd., 95 A.D.2d 667, 646
> N.Y.S.2d 218 (1st Dep't 1983). Moreover, the Court in 5305 Realty
> defined the purpose of a Notice of Pendency as protecting some right, title
> or interest claimed by a plaintiff in the lands of a defendant which might
> be lost...in the event of a transfer of the subject property..." 5303 Realty,
> supra 64 N.Y.2d at 322. It is clear that, in this action, Plaintiff have
> claimed no right, title, or interest in defendants' real property.

15. A *lis pendens* may not be filed where no claim is made in the complaint against the

defendants' real property. Starkie v. Nib Const. Corp., 235 App.Div., *699, 255 N.Y.S.*

*401.* An action based upon a personal obligation, unrelated to the real property described

in the complaint, does not justify the filing of a notice of pendency. Mt. Vernon Co.

Silversmiths, Inc., v. Mt. Vernon Metal Products Co., Inc., 202 App.Div., *753, 195 N.Y.S.*

*21.*

16. In the present action the Plaintiff does not have a claim to warrant a *lis pendens*, nor does

Plaintiff have any judgment against Defendants.  No claim is made against the

Defendants' real property. Perhaps because plaintiff is aware of this, plaintiff has

HINTED at what can only be described as a metaphysical possibility of a right to

purchase the property. In both paragraph 34 and 44(iii) (*ad damnum* clause) of the

verified complaint, plaintiff reveals that it seeks that, "the PSA is reinstated, including all

of plaintiffs rights and defendants' obligations thereunder, and the due diligence period

and Exclusive period are both **reset** for a period of 60 business days … such that plaintiff

be afforded the opportunity to exercise all of its rights under the PSA, including its right

to purchase the real property…" (emphasis added). A complaint seeking an order that

defendants specifically perform an agreement other than to convey real property is not a

basis for a notice of pendency. See Zanfardino v. Newberg, 145 N.Y.S.2d 15, 17 (1955).

17. But a demand to "reset" the contract and create NEW obligations is not the same thing as

a demand for title to, or the possession, use or enjoyment of, real property. Moreover, it is

an acknowledgment that the contract is no longer in effect, inasmuch as it has been

terminated by plaintiff. The plaintiff is asking for reinstatement of the contract; but right

now, the contract is terminated. Therefore, plaintiff cannot claim that there is any **extant**

contract whose terms defendant must "specifically perform." It thus follows that the

claim in the Notice of Pendency (**EXHIBIT "D"**) that the plaintiff seeks a "judgment

directing that the defendants specifically perform their obligations under a contract of

sale" is a reference to a contract that has already been terminated, and terminated by

plaintiff. A terminated contract is, of course, of no force or effect, and cannot be a basis

for a lawsuit or a notice of pendency. Since plaintiff has no claim against defendants, it

can have no notice of pendency either,  Sorenson v 257/117 Realty, LLC, 62 A.D.3d 618;

881 N.Y.S.2d 43 (1st Dep't 2009).

18. In entertaining a motion to cancel a Notice of Pendency, the Court is essentially limited
    to a review of the pleadings, to ascertain whether the action falls within the ambit of
    CPLR § 6501. Shibab v. 215-217 West 108th Street Assoc., 506 N.Y.S.2d 651 (Civil
    Court, New York County 1986); Interboro Operating Corp. v. Commonwealth Security &
    Mortgage Corp., 269 N.Y. 56 (1935).

19. Since the Complaint and *lis pendens* are completely devoid of any claim to the title, use,
    possession, or enjoyment of the property of defendants, there is no basis for the Notice of
    Pendency, and it must therefore be vacated. When an action, such as this one, does not
    have a direct bearing on title to or use and occupancy or possession of the defendants'
    property, the Notice of Pendency must be canceled. 5303 Realty Corp. v. O & Y Equity
    Corp., supra (application of CPLR §6501 is restricted to cases where relief requested
    directly affects title to or possession of real property); Village Park Associates v. City of
    New York, 156 A.D.2d 446, 548 N.Y.S.2d 563 (2d Dep't. 1989).

### LEAVE TO FILE A COUNTERCLAIM AGAINST THE PLAINTIFF

20. If the case is not dismissed, Defendants request leave to amend the answer by adding an
    affirmative defense and a counterclaim in the form annexed hereto.

21. Pursuant to CPLR § 3025(b) "[a] party may amend his or her pleading, or supplement it
    by setting forth additional or subsequent transactions or occurrences, at any time by leave
    of court . . . Leave shall be freely given upon such terms as may be just."

22. Defendants seek to amend their Answer to reflect the counterclaim of tortious
    interference with business relations and abuse of process.

23. Under New York law such a claim may be asserted based upon the following four
    conditions:

    i.    the defendants had business relations with a third party;

    ii.    the plaintiff interfered with those business relations;

    iii.    the plaintiffs acted for a wrongful purpose or used dishonest, unfair, or improper means; and

    iv.    the plaintiffs injured the relationship.  Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir.2002);  see also Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir.1997).

24. Plaintiffs' improper attachment of the notice of pendency on the premises interfered with business relations the Defendants have with a third party, and the defendants' plan to sell the premises to a third party.  Defendants were injured to the extent that the property remains unsold, and is a drain ON DEFENDANTS because defendants are being on foreclosed and the lenders are charging interest which increases every day.  Without clean title, Defendants are not able to sell their property, make any profit, or even pay off their loans.

25. A claim for abuse of process has three essential elements:

    i.    regularly issued process, either civil or criminal;

    ii.    an intent to do harm without excuse or justification; and

    iii.    use of the process in a perverted manner to obtain a collateral objective (Board of Educ. v Farmingdale Classroom Teachers Assn., 38 NY2d 397 [1975]).

26. Here the Plaintiff did not have a claim to any right, title or interest in the property but nonetheless improperly used the regularly issued process of a complaint plus a notice of attachment to obtain the objective of clouding title to the Defendants' real property. There is no excuse or justification for this action, which contradicts Plaintiff's own

*choice* to terminate the Agreement with the Defendants, except to do harm to the

Defendants. The perverted objective is, upon information and belief, to force defendants

to lower the purchase price from that which was agreed in the contract.

27. Due to the foregoing, Defendants should be allowed to assert these counterclaims against

the Plaintiff.

28. No prior request for this relief has been made.

WHEREFORE, Defendants respectfully request that the court grant the motion and dismiss the

complaint and vacate the notice of pendency, or in the alternative, vacate the notice of pendency,

and allow defendant to amend the answer by adding the counterclaim.

Dated: December 19, 2013
Brooklyn, NY

Jon Ari Lefkowitz, Esq.

**<u>Exhibit F</u>**

**Demand Letter**

# KURZMAN EISENBERG CORBIN & LEVER, LLP

### ATTORNEYS AT LAW

ONE NORTH BROADWAY
WHITE PLAINS, NEW YORK 10601

TEL: (914) 285-9800
FAX: (914) 285-9855

**STEVEN M. GOLDMAN**
Partner
SGoldman@kelaw.com
Direct Phone (914) 993-6052
Direct Fax    (914) 993-6007

July 22, 2014

***Via Federal Express***

Commonwealth Land Title Insurance Company
140 East 45th Street
New York, New York 10017
Attn: Ms. Grace Onaga – Vice President

Re:    **Purchase Agreement between DAB Group, LLC, as Seller
and Monty One, LLC, as Purchaser**

Dear Ms. Onaga:

Pursuant to Section 20 of the above referenced Agreement, dated May 9, 2013 (the "Agreement"), we hereby give Notice on behalf of the Purchaser directing the Escrow Agent to return Purchaser's Deposit in the amount of Four Hundred Sixty-Two Thousand Five Hundred and No/100 Dollars ($462,500.00) (plus any interest that may have accrued thereon), as set forth in Section 26 of the Agreement. Please return the funds via wire transfer as follows:

Hudson Valley Bank
60 East 42nd Street, Suite 1836
New York, New York, 10165
ABA # 021909300
IOLA FUND ACCOUNT #1700874301

Kurzman Eisenberg Corbin & Lever LLP
1 North Broadway, 10th Floor
White Plains, NY  10601

Should you have any questions concerning this matter, please feel free to contact me at your convenience.

Very truly yours,

KURZMAN EISENBERG CORBIN & LEVER, LLP

Steven M. Goldman, Partner

H:\84148\0007\00258367.DOC

KURZMAN EISENBERG CORBIN & LEVER, LLP

Ms. Grace Onaga
Commonwealth Land Title Insurance Company
July 22, 2014
Page 2

cc:   D.A.B. Group LLC (*via Federal Express*)
     Rivington Street Realty LLC
     85 West Hawthorne Avenue
     Valley  Stream, New York 11580
     Attn: Mr. Ben Zhavian

     The Law Firm of Favata & Wallace LLP (*via Federal Express*)
     229 Seventh Street, Suite 300
     Garden City, New York 11530
     Attn: William G. Wallace, Esq.

     Monty One, LLC (*via Federal Express*)
     505 Park Avenue, 17th Floor
     New York, New York 10022
     Attn: Mr. Roy Stillman - President

**<u>Exhibit G</u>**

**Contesting Letter**

### FAVATA & WALLACE LLP

ATTORNEYS AT LAW
229 SEVENTH STREET
GARDEN CITY, NEW YORK 11530

——————
(516) 742-9494
FAX NO. (516) 742-7088

ROBERT FAVATA
WILLIAM G. WALLACE
——————
OF COUNSEL
MAUREEN A. CARROLL

NEW YORK OFFICE:
228 EAST 45TH STREET
17TH FLOOR
NEW YORK, N.Y. 10017

*via overnight delivery and email*

July 24, 2014

**COMMONWEALTH LAND TITLE INSURANCE CO.**
140 East 45th Street
New York, New York 10017
**Attn: Ms. Grace Onaga, Vice President**

**Re: Purchase Agreement between DAB Group, LLC as Seller and
Monty One, LLC as Purchaser
Title No.: NY130352**

Dear Ms. Onaga:

This firm represented the seller in connection with the above captioned transaction. I am in receipt of a copy of a letter from Steven M. Goldman, Esq. on behalf of the purchaser requesting a release of the escrow deposit of $462,500.00.

Please note that the seller DAB Group, LLC has filed for protection under Chapter 11 of the Bankruptcy Code. I am herewith enclosing a copy of the notice of filing.

Accordingly, pursuant to Section 362 (a) of the Bankruptcy Code, all actions with respect to the debtor are "stayed".

Moreover, prior to the filing, the entitlement to this deposit was the subject of litigation in the Supreme Court, New York City.

Therefore, DAB Group LLC does <u>not</u> consent to the release of this deposit.

Very truly yours,
**FAVATA & WALLACE, LLP**

William G. Wallace

WGW/aa
enc.
cc: Steven M. Goldman, Esq.
    DAB Group, LLC via email
    Kevin Nash, Esq.

FILED: NEW YORK COUNTY CLERK 07/14/2014

NYSCEF DOC. NO. 861

INDEX NO. 850044/2011

RECEIVED NYSCEF: 07/14/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------x

ORCHARD HOTEL LLC,                                     Index No. 850044/2011

                        Plaintiffs,

        -against-

D.A.B. GROUP, LLC, et al.

                        Defendants.

-------------------------------------------------------------x

## NOTICE OF BANKRUPTCY FILING

        PLEASE TAKE NOTICE that on July 14, 2014, D.A.B. Group, LLC (the "Debtor") filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York for relief under chapter 11 of the Bankruptcy Code. A copy of the notice of bankruptcy case filing is attached hereto as Exhibit "A".

        PLEASE TAKE FURTHER NOTICE that pursuant to section 362(a) of the Bankruptcy Code, the Debtor's filing of its voluntary petition operates as a stay, applicable to all entities, of, among other things: (a) the commencement or continuation of all judicial, administrative, or other actions or proceedings against the Debtor (i) that were or could have been commenced before the commencement of the Debtor's case or (ii) to recover any claims against the Debtor that arose before the commencement of the Debtor's case; (b) the enforcement, against the Debtor or against any property of the Debtor's bankruptcy estates, of a judgment obtained before the commencement of the Debtor's cases; or (c) any act to obtain

possession of property of or from the Debtor's bankruptcy estate, or to exercise control over

property of the Debtor's bankruptcy estate.

Dated: New York, New York
July 14, 2014

GOLDBERG WEPRIN FINKEL
GOLDSTEIN LLP
*Attorneys for the Defendant*
1501 Broadway, 22nd Floor
New York, New York 10036

By: _____
J. Ted Donovan, Esq.

TO:    Morrison Cohen LLP
       *Attorneys for Plaintiff*
       909 Third Avenue
       New York NY 10022

       Simon J.K. Miller, Receiver
       Blank Rome LLP
       405 Lexington Avenue
       New York, NY 10174

2

# **EXHIBIT H**

## **Title Company Letter**

## Heer, Patricia H.

| | |
|---|---|
| **Subject:** | D.A.B. Group LLC & 77-79 Rivington Street Realty, LLC ( sellers ) -to- Monty One, LLC ( purchaser )   Premises: 139-141 Orchard Street and 77-79 Rivington Street, New York, N.Y ( Commonwealth Title # NY130352 ) |
| **Attachments:** | NY130352 objection letter.pdf; ATT00001.htm |

From: "Hoffman, Frank" <Frank.Hoffman@fnf.com<mailto:Frank.Hoffman@fnf.com>>
Date: July 24, 2014 at 1:42:51 PM EDT
To: Steve Goldman <SGoldman@kelaw.com<mailto:SGoldman@kelaw.com>>, Iryna Lomaga Carey
<ICarey@kelaw.com<mailto:ICarey@kelaw.com>>, Jennifer Shapiro-Barash
<jbarash@kelaw.com<mailto:jbarash@kelaw.com>>
Cc: "Onaga, Grace" <Grace.Onaga@fnf.com<mailto:Grace.Onaga@fnf.com>>, "Ende, Don"
<Don.Ende@fnf.com<mailto:Don.Ende@fnf.com>>
Subject: D.A.B. Group LLC & 77-79 Rivington Street Realty, LLC ( sellers ) -to- Monty One, LLC ( purchaser )  Premises:
139-141 Orchard Street and 77-79 Rivington Street, New York, N.Y  ( Commonwealth Title # NY130352 )

Steve, Commonwealth has received the attached objection letter concerning your request to release to the purchaser
the $462,500.00 contract deposit being held by Commonwealth.  To complicate matters there is a both a current NY
County Supreme Court action concerning this transaction and the seller has filed for Bankruptcy in the Southern District
of New York.

Commonwealth will continuation to hold the contract deposit in an interest bearing account.  The current balance of the
account with interest through 6/30/2014 is $463,021.75.

Frank

Francis M. Hoffman, Esq.
Assistant Vice President - Associate Branch Counsel Commonwealth Land Title Insurance Company
140 East 45th Street -22nd Floor - New York, N.Y. 10017
(212) 973-6736
_____
NOTICE: The information contained in this message is proprietary and/or confidential and may be privileged. If you are
not the intended recipient of this communication, you are hereby notified to: (i) delete the message and all copies; (ii)
do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately.

Confidentiality Notice
This e-mail (including any attachments hereto) originated from the law firm of Kurzman Eisenberg Corbin & Lever, LLP
("KECL") and may contain information that is confidential and/or privileged. If you are not the intended recipient, you
are hereby notified that any dissemination of this communication is strictly prohibited. If you received this
communication in error, please delete the original message without making any copies and notify the sender
immediately by e-mail or telephone at (914) 285-9800. All personal messages express views solely of the sender, which
are not to be attributed to KECL.

Circular 230 Notice

Under standards of professional practice before the IRS, certain tax advice must meet requirements as to form and substance. To ensure compliance with these standards, we disclose to you that nothing contained in this communication (including any attachments hereto) was intended or written to be used, and cannot be used or relied upon, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting or marketing, or recommending to another person, any transaction or tax related matter contained herein.

### FAVATA & WALLACE LLP

ATTORNEYS AT LAW

229 SEVENTH STREET

GARDEN CITY, NEW YORK 11530

———

(516) 742-9494

FAX NO. (516) 742-7088

ROBERT FAVATA
WILLIAM G. WALLACE

———

OF COUNSEL
MAUREEN A. CARROLL

NEW YORK OFFICE:
228 EAST 45TH STREET
17TH FLOOR
NEW YORK, N.Y. 10017

*via overnight delivery and email*

July 24, 2014

**COMMONWEALTH LAND TITLE INSURANCE CO.**
140 East 45th Street
New York, New York 10017
**Attn: Ms. Grace Onaga, Vice President**

Re: Purchase Agreement between DAB Group, LLC as Seller and
    Monty One, LLC as Purchaser
    Title No.: NY130352

Dear Ms. Onaga:

This firm represented the seller in connection with the above captioned transaction. I am in receipt of a copy of a letter from Steven M. Goldman, Esq. on behalf of the purchaser requesting a release of the escrow deposit of $462,500.00.

Please note that the seller DAB Group, LLC has filed for protection under Chapter 11 of the Bankruptcy Code. I am herewith enclosing a copy of the notice of filing.

Accordingly, pursuant to Section 362 (a) of the Bankruptcy Code, all actions with respect to the debtor are "stayed".

Moreover, prior to the filing, the entitlement to this deposit was the subject of litigation in the Supreme Court, New York City.

Therefore, DAB Group LLC does <u>not</u> consent to the release of this deposit.

Very truly yours,
**FAVATA & WALLACE, LLP**

William G. Wallace

WGW/aa
enc.
cc: Steven M. Goldman, Esq.
    DAB Group, LLC via email
    Kevin Nash, Esq.

FILED: NEW YORK COUNTY CLERK 07/14/2014

NYSCEF DOC. NO. 861

INDEX NO. 850044/2011

RECEIVED NYSCEF: 07/14/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

ORCHARD HOTEL LLC,                                    Index No. 850044/2011

                        Plaintiffs,

      -against-

D.A.B. GROUP, LLC, et al.

                        Defendants.
-----------------------------------------------------------------x

### NOTICE OF BANKRUPTCY FILING

PLEASE TAKE NOTICE that on July 14, 2014, D.A.B. Group, LLC (the "Debtor") filed a voluntary petition in the United States Bankruptcy Court for the Southern District of New York for relief under chapter 11 of the Bankruptcy Code. A copy of the notice of bankruptcy case filing is attached hereto as Exhibit "A".

PLEASE TAKE FURTHER NOTICE that pursuant to section 362(a) of the Bankruptcy Code, the Debtor's filing of its voluntary petition operates as a stay, applicable to all entities, of, among other things: (a) the commencement or continuation of all judicial, administrative, or other actions or proceedings against the Debtor (i) that were or could have been commenced before the commencement of the Debtor's case or (ii) to recover any claims against the Debtor that arose before the commencement of the Debtor's case; (b) the enforcement, against the Debtor or against any property of the Debtor's bankruptcy estates, of a judgment obtained before the commencement of the Debtor's cases; or (c) any act to obtain

possession of property of or from the Debtor's bankruptcy estate, or to exercise control over

property of the Debtor's bankruptcy estate.

Dated: New York, New York
       July 14, 2014

                                    GOLDBERG WEPRIN FINKEL
                                    GOLDSTEIN LLP
                                    *Attorneys for the Defendant*
                                    1501 Broadway, 22nd Floor
                                    New York, New York 10036

                                    By: _____
                                           J. Ted Donovan, Esq.


TO:    Morrison Cohen LLP
       *Attorneys for Plaintiff*
       909 Third Avenue
       New York NY 10022

       Simon J.K. Miller, Receiver
       Blank Rome LLP
       405 Lexington Avenue
       New York, NY 10174

                                    2