## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE ("Agreement") is made as of December ___, 2014 by and between D.A.B. Group LLC, a New York Limited Liability Company and Debtor in Chapter 11 Case No. 14-12057 (SCC) United States Bankruptcy Court, Southern District of New York, having an address at 85 West Hawthorne Avenue, Valley Stream, New York 11580 Attention: Zvi Benjamin Zhavian ("Seller") and Arcade Orchard Street LLC ("Purchaser"), c/o Arcade Capital, LLC, having an address at 200 Park Avenue South, Suite 1305, New York, New York 10003. Seller and Purchaser together shall hereinafter be the "Parties."

## W I T N E S S E T H :

**WHEREAS,** Seller is the Debtor and Debtor in Possession in a Chapter 11 bankruptcy case entitled *In re D.A.B. Group LLC*, Case No. 14-12057 (the "Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

**WHEREAS,** Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Acquired Assets, including but not limited to the Property (as hereinafter defined), upon the terms and subject to the conditions set forth herein, and pursuant to an amended plan of reorganization to be filed by the Seller and confirmed by the Bankruptcy Court and sections 105(a), 1123, 1129, 1141 and 1146 of the Bankruptcy Code, and free and clear of all Liens and Encumbrances (as hereafter defined), except as specifically provided in Section 2.4 hereof;

**NOW, THEREFORE,** for and in consideration of the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

## DEFINITIONS

"**Acquired Assets**" has the meaning set forth in Section 1.1(g).

"**Agreement**" has the meaning set forth in the introductory paragraph hereto.

"**Auction**" has the meaning set forth in Section 13.1.

"**Bankruptcy Case**" has the meaning set forth in the WHEREAS clauses.

"**Bankruptcy Court**" has the meaning set forth in the WHEREAS clauses.

"**BSA**" has the meaning set forth in Section 1.1(d).

"**Break-up Fee**" has the meaning set forth in Section 13.2.

"**Broker**" has the meaning set forth in Section 12.

"**Building**" has the meaning set forth in Section 1.1(a).

"**Business Day**" means any day other than a Saturday, Sunday or a holiday on which the New York Stock Exchange is closed.

"**Casualty Election Date**" has the meaning set forth in Section 11.4.

"**Closing**" has the meaning set forth in Section 4.1.

"**Closing Date**" has the meaning set forth in Section 4.1.

"**Code**" has the meaning set forth in Section 7.1.2.

"**Confirmation Order**" has the meaning set forth in Section 4.1.

"**Cure Costs**" has the meaning set forth in Section 1.3.

"**Current Tax Year**" has the meaning set forth in Section 6.1.1.

"**Deed**" has the meaning set forth in Section 8.1.1.

"**Deposit**" has the meaning set forth in Section 3.2.1.

"**Deposit Return**" has the meaning set forth in Section 10.2.

"**Designated Contracts**" has the meaning set forth in Section 1.3.

"**Environmental Laws**" has the meaning set forth in Section 5.3.

"**Escrow Agent**" has the meaning set forth in Section 3.2.1.

"**Equalization Form**" has the meaning set forth in Section 8.1.4.

"**Excluded Assets**" has the meaning set forth in Section 1.2.

"**Facts**" has the meaning set forth in Section 2.1.4.

"**Hazardous Materials**" has the meaning set forth in Section 5.3.

"**Improvements**" has the meaning set forth in Section 1.1(a).

"**Land**" has the meaning set forth in Section 1.1(a).

"**Laws and Regulations**" has the meaning set forth in Section 2.1.2.

"**Liens and Encumbrances**" means, with respect to any of the Acquired Assets and other than any Permitted Exceptions, any mortgage, deed of trust, deed to service debt, pledge, security interest, lien, charge, lease, claim, encumbrance, notice of pendency, option, right of first refusal, covenants and encroachments, easements, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, or state of facts.

"**Notices**" has the meaning set forth in Section 16.

"**OFAC**" has the meaning ascribed to it in Section 7.1.10.

"**Parties**" has the meaning set forth in the introductory paragraph hereto.

"**PCBs**" has the meaning set forth in Section 5.3.

"**Permitted Exceptions**" has the meaning set forth in Section 2.1.

"**Procedures Motion**" has the meaning set forth in Section 13.1.

"**Property**" has the meaning set forth in Section 1.1.

"**Purchase Price**" has the meaning set forth in Section 3.1.

"**Purchaser**" has the meaning set forth in the introductory paragraph hereto.

"**Purchaser Default**" has the meaning set forth in Section 10.1.

"**Purchaser Related Party**" has the meaning set forth in Section 5.4.

"**Receiver**" means Simon Miller, Esq. or his duly appointed successor.

"**Rights**" has the meaning set forth in Section 2.1.3.

"**Sale Order**" means the Order of the Bankruptcy Court approving the sale of the
Acquired Assets to Purchaser.  It is expressly understood that the Sale Order may be the
Confirmation Order.

"**Seller**" has the meaning set forth in the introductory paragraph hereto.

"**Taking**" has the meaning set forth in Section 11.5.

"**Title Company**" has the meaning set forth in Section 2.2.

"**Title Report**" has the meaning set forth in Section 2.2.

"**Title Report Objection Notice**" has the meaning set forth in Section 2.2.

"**Transfer Tax Returns**" has the meaning set forth in Section 8.1.4.

"**Violations**" has the meaning set forth in Section 2.1.5.

1.      Agreement to Sell and Purchase: Description of Property and Other Acquired
Assets.

        1.1     Subject to the terms and conditions set forth herein, Seller agrees to sell

and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and

{00230151.14 / 1066-001 }

conditions hereinafter contained, all right, title and interest of Seller in and to:

(a) those certain lots, pieces or parcels of land located at 139-141 Orchard Street, New York, New York (Block 415, Lots 66 and 67), as more particularly bounded and described in **Exhibit A** attached hereto and hereby made a part hereof (the "Land") together with (i) the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (ii) all existing partially constructed buildings or structures (the "Building") and any and all other fixtures and improvements erected thereon (collectively, the "Improvements"); (iii) rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iv) any air, zoning, or other development rights appurtenant to the Land or any portion thereof (without representation of the extent, scope or existence of such development rights) and (v) any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land, the Building or any of the Improvements by reason of change of grade or closing of any street, road or avenue, it being understood and agreed that Seller will execute and deliver to Purchaser on the Closing Date (as hereinafter defined) or thereafter, which obligation shall survive the Closing (as hereinafter defined), upon reasonable written request, all proper instruments for the conveyance of such right, title and interest and for the assignment and collection of any such awards or payments, without representation or warranty by or recourse to Seller;

(b) all fixtures, machinery, trailers, tools, tangible personal property and equipment, if any, owned by Seller and located at the Property or used in connection with or attached or appurtenant to or at or upon all or any portion of the Land, the Building and the Improvements at the date hereof, including, without limitation, such fire protection, heating, plumbing, electrical

{00230151.14 / 1066-001 }

5

and air conditioning systems, if any, as now exist thereat;

(c) copies of all books, records, files and other documents relating to the Land, Building or Improvements, including, without limitation, any surveys, architectural plans, engineering plans, building plans or specifications;

(d) to the extent transferrable pursuant to applicable law, any licenses, certificates, permits, authorizations or approvals relating to the Land, Building or Improvements or the operation of thereof issued by any governmental authority, including, without limitation, continuations, renewals or other extensions from the Board of Standards and Appeals (the "BSA"), zoning variances or, building permits;

(e) to the extent transferrable pursuant to applicable law, any other documents, reports, studies and other intangible personal property used in connection with or related in any way to the Land, Building or Improvements and/or the construction of Improvements on the Land, including without limitation, any plans, specifications, warranties, permits, licenses and warranties relating thereto, utility reservations or allocations and any other trademark right, other intangible property right, warranties or guaranties relating to fixtures and equipment in the Building, if any, and guarantees of architects, engineers, contractors, subcontractors, suppliers or materialmen involved in the construction, repair, maintenance, design, reconstruction or operation of the Building or Improvements, or of any equipment or system constituting a part of the Building or Improvements, if any, held solely for use in connection with all or any portion of the Land and the Improvements.(a through e collectively being the "Property");

(f) the Designated Contracts and all of the Seller's rights and interests in such contracts and leases; and

(g) any claims, warranty claims, counter-claims or causes of action of the Seller against any party and any proceeds thereof that relate to or arise from the Acquired Assets. All of the items in this section 1.1 shall together constitute the "Acquired Assets."

      1.2    Excluded Assets/Excluded Liabilities.

    (i) Excluded Assets. The following assets of the Seller are not being sold to the Purchaser (collectively, the "Excluded Assets"):

(a)    cash;

(b)    accounts receivable;

(c)    contracts and leases that are not Designed Contracts;

(d)    the Purchase Price and all rights of the Seller under this Agreement;

(e)    any claim, right or interest of Seller in or to any pending refund, rebate, abatement or other recovery for taxes;

(f)    any of the prepaid assets or properties expressly set forth on **Schedule 1.2** hereto; and

(g)    any claims, defenses, offsets, counter-claims or causes of action the Seller has or may have against any of (i) Orchard Hotel, LLC, (ii) Cava Construction & Development, Inc., (iii) Monty One, LLC, (iv) 81-83 Rivington Corp, and (v) any creditors of the Seller's bankruptcy estate whose claims (a) relate to the Property and (b) arise on or prior to the petition date of the Seller's Bankruptcy Case.

For avoidance of doubt, nothing contained herein is intended to or shall limit the Seller's rights to object to claims asserted against the Seller in its Bankruptcy Case.

    (ii) Excluded Liabilities. The Purchaser shall not assume or be deemed to have assumed any liabilities of the Seller other than post-Closing liabilities under the Designated

Contracts, as set forth in Section 1.3 hereof. Purchaser shall have no liability for any existing indebtedness of the Seller, any federal, state, or local tax liabilities, any fines or penalties assessed against the Seller or its property (including the Property), or any employee-related liabilities of the Seller.

      1.3    Assumption and Assignment of Designated Contracts.

The Seller shall also assign to the Purchaser all of the Seller's rights, title and interest in and to those contracts, if any, being assumed and assigned to Purchaser. Purchaser shall have the right, in its sole discretion, to determine which contracts shall be assumed and assigned, and such contracts shall be identified on **Schedule 1.3** hereto (the "Designated Contracts"). In connection with the assumption and assignment of the Designated Contracts, the Seller shall pay from the Purchase Price the allowed cure costs associated with such Designated Contracts (the "Cure Costs"), up to the total amount of $150,000 in the aggregate and the Purchaser shall be responsible for the payment of any Cure Costs in excess of that amount . The amount of the Cure Costs shall be determined by agreement with the counter-parties to the Designated Contracts or final Order of the Bankruptcy Court at least five days prior to the Closing Date, and shall include all amounts that have accrued under such contracts prior to the Closing Date, whether billed or unbilled.

The Purchaser shall have the right to remove any contract or lease from the schedule of Designated Contracts until the day prior to the Closing Date, and any contract or lease so removed shall not be a Designated Contract. The Purchaser shall, effective as of the Closing Date, assume the liabilities and obligations arising and accruing after the Closing Date under the Designated Contracts.

{00230151.14 / 1066-001 }

8

2.        Exceptions to Title; Title Matters.

2.1       The Property is sold and shall be conveyed subject to the following
(the "Permitted Exceptions"):

2.1.1    All presently existing and future liens for unpaid real estate taxes
and water and sewer charges not due and payable as of the date of the Closing (as hereinafter
defined), subject to adjustment as herein below provided.

2.1.2    All present and future zoning, building, environmental and  other
laws, ordinances, codes, restrictions and regulations of all governmental authorities having
jurisdiction with respect to the Property, including, without limitation, all existing renewals and
current extensions for construction or other matters involving the BSA and/or Department of
Buildings (collectively, "Laws and Regulations").

2.1.3    All    covenants,    declarations,    conditions,    reservations,
encroachments, restrictions and rights of record and all easements and other agreements of
record, including agreements for the erection and/or maintenance of water, gas, steam, electric,
telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and
appurtenances thereto, over, across and under the Property (collectively, "Rights").

2.1.4    Any state of facts which would be shown on or by an accurate
current survey of the Property (collectively, "Facts").

2.1.5    All violations of building, fire, sanitary, environmental, housing
and similar Laws and Regulations whether or not noted or issued at the date hereof or at the
Closing Date (collectively, "Violations"); *provided, however*, that Seller shall pay or caused to
be paid at Closing all fines and penalties assessed against the Property as of the Closing Date for
the Violations of record.

{00230151.14 / 1066-001 }

9

2.1.6   Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property, provided same do not render title unmarketable or diminish, interfere with or alter the intended use, operation and completion of the Property, and further provided the Title Company (as hereinafter defined) will insure that the Building may remain as presently located.

2.1.7   Variations between tax lot lines and lines of record title, provided same do not render title unmarketable.

2.1.8   The standard conditions and exceptions to title contained in the form of title policy or "marked-up" title commitment issued to Purchaser by the Title Company.

2.1.9 Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Property without imposition of material additional premiums.

2.2   Purchaser agrees promptly upon the approval of this Agreement by the Bankruptcy Court, at Purchaser's sole cost and expense, to cause title to the Property to be examined by any reputable title insurer licensed to issue title insurance in the State of New York (the "Title Company") and shall direct the Title Company to deliver copies of such title report (the "Title Report") to Seller's attorney simultaneously with the delivery of same to Purchaser. Purchaser further agrees that not later than the date which is five (5) Business Days following Purchaser's receipt of the Title Report, Purchaser will furnish to Seller's attorneys a writing (the "Title Report Objection Notice") specifying any non-monetary exceptions to title to the Property

{00230151.14 / 1066-001 }

10

set forth in the Title Report which Purchaser believes are not covered by the Permitted Exceptions and "subject to" which Purchaser believes it is not required to accept title. Purchaser's failure to deliver the Title Report Objection Notice to Seller on or prior to 5:00 P.M. New York City Time on the date which is five (5) Business Days following Purchaser's receipt of the Title Report shall constitute Purchaser's irrevocable acceptance of the Title Report and Purchaser shall be deemed to have unconditionally waived any right to object to any matters set forth therein. If, after giving the Title Report Objection Notice to Seller, continuation reports or other written evidence, indicating any non-monetary title defect(s) which are not covered by Section 2.1 hereof and "subject to" which Purchaser is not required to accept title, receipt of such continuation reports or other written evidence of such title defects by Seller's attorneys shall constitute notice of objection to such title defects as if same were set forth in the Title Report Objection Notice.

2.3     If, on the Closing Date, Seller fails or is unable to convey to Purchaser title to the Property subject to and in accordance with the provisions of this Agreement and pursuant to a confirmed plan of reorganization in bankruptcy (the "Plan"), Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed thirty (30) days after the Plan is confirmed and/or this sale is otherwise approved. If Seller does not so elect to adjourn the Closing beyond thirty (30) days following confirmation of the Plan, or if at the adjourned date Seller is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser may (A) terminate this Agreement by written notice to Seller and Escrow Agent, in which event Escrow Agent shall repay to Purchaser the Deposit, together with any interest earned thereon, subject to Section 23, and this Agreement shall thereupon be deemed

{00230151.14 / 1066-001 }

11

canceled and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those provisions which are intended to survive such termination, or (B) complete the purchase in accordance with Section 2.4. Seller shall not be required to take or bring any additional action or proceeding to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor nor shall Purchaser have any right of action against Seller therefor, at law or in equity, except that Seller shall, on or prior to the Closing, pay, discharge or remove of record or cause to be paid, discharged or removed of record at Seller's sole cost and expense all of the Liens and Encumbrances. Notwithstanding the foregoing, Seller shall be required to reasonably address all objections raised by the Title Company as part of the process to confirm the Plan or otherwise pursuant to separate order of the Bankruptcy Court as applicable.

2.4     Notwithstanding anything in Section 2.3 above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller. The acceptance of the Deed by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement except for such items as are specifically set forth to survive the Closing pursuant to the terms of this Agreement.  If the parties mutually elect to further adjourn the Closing as provided in Section 2.3, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms.

2.5     The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge, with interest and penalties, may at the option of Seller be allowed to Purchaser out of the balance of the Purchase Price, if official bills therefore

with interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof. Any taxes and violations being challenged by the Seller at the time of Closing shall remain in escrow with the Escrow Agent pursuant to Bankruptcy Court Order in lieu of payment at Closing.

2.6     If the Property shall, at the time of the Closing, be subject to any Liens and Encumbrances which would be grounds for Purchaser to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, the Confirmation Order or the Sale Order shall provide that said Liens and Encumbrances shall attach to the proceeds of sale to the extent and priority as allowed and fixed by Order of the Bankruptcy Court, and that the sale to Purchaser shall be "free and clear" of Liens and Encumbrances, subject only to the next sentence. Without prejudicing the Seller's right to object to the mortgage claim, the mortgages held by Orchard Hotel LLC may, at the sole discretion of Purchaser, be amended, restated and assigned to the Purchaser or its designee (which may be Purchaser's lender) on the Closing Date; provided, however, that all of the rights, interests and claims of Orchard Hotel LLC thereunder shall attach to the proceeds of this sale and that such assignment shall be without cost or expense to the Seller. It is provided, further that, without prejudicing Seller's objections to the claims of Orchard Hotel LLC, Seller shall make all reasonable best efforts so that Seller's right to object to the mortgage claim shall not preclude Purchaser's election to have the mortgages assigned.

2.7     Notwithstanding anything contained herein to the contrary, Purchaser may not raise as an objection to title anything that relates to BSA approvals or zoning compliance.

3.     Purchase Price and Payment

3.1     The purchase price payable to Seller for the Property is $33,000,000.00

{00230151.14 / 1066-001 }

13

(U.S.) (the "<u>Purchase Price</u>"), subject to such apportionments, adjustments and credits as are provided in Sections 6, 11 and 24 hereof.

      3.2    The Purchase Price shall be payable as follows:

      3.2.1   $1,500,000.00 (the "<u>Deposit</u>") within three (3) Business Days of this Agreement being fully executed by the Parties and the receipt of the fully executed Agreement by Purchaser. The Deposit shall be provided by check, subject to collection, or by wire transfer, and deposited with First American Title Insurance Company, as escrow agent (the "<u>Escrow Agent</u>") to be held by Escrow Agent in an interest bearing account. The Deposit shall be held by Escrow Agent and disbursed in accordance with the terms and conditions of this Agreement. Any interest earned on the Deposit shall be deemed to be part of the Deposit and shall be paid together with the principal portion of the Deposit to whichever party is entitled thereto, it being understood and agreed that in the event of a Closing between Seller and Purchaser, any interest earned on the Deposit shall not be credited to the Purchase Price upon the Closing and shall remain the property of Seller.

      3.2.2   Disbursement of Deposit. Upon the sole written instruction of the Purchaser, the Deposit (including interest) shall be returned to the Purchaser on or before December 19, 2014 in the event the order approving the bidding procedures, in a form acceptable to the Purchaser, was not entered by the Bankruptcy Court on or before December 18, 2014. Additionally, upon the sole written instruction of the Purchaser, the Deposit (including interest) shall be returned to the Purchaser; (1) in the event the Bankruptcy Court enters an order approving the sale of all or substantially all of the Acquired Assets to any party other than the Purchaser; or (2) an order approving the sale of the Acquired Assets to the Purchaser is not entered on or before February 22, 2015. But for the circumstances described in this subsection,

the Deposit shall be released in accordance with and upon joint written instruction of the Purchaser and the Seller, or upon order of the Bankruptcy Court. For the avoidance of doubt, upon occurrence of the Closing, the Deposit shall be released to Seller upon joint written instruction of the Purchaser and the Seller.

        3.2.3      $31,500,000.00 (U.S.) shall be paid to Seller's counsel (as representative of the Seller's bankruptcy estate) on the date of the Closing, provided that all of the conditions to Closing are satisfied or waived by the party having the right to so waive, subject to the apportionments, adjustments and credits referenced herein, simultaneously with the delivery of the Deed by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Seller by notice to Purchaser at least one (1) Business Day prior to the Closing Date.

        3.3      Purchaser expressly agrees and acknowledges that Purchaser's obligations to close hereunder are not in any way conditioned upon or qualified by Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise). Additionally, Purchaser expressly agrees and acknowledges that it has already conducted full and complete due diligence relating to the Property and Purchaser is fully aware of all legal and regulatory matters affecting the Property and does not require any further due diligence, environment or engineering study, all of which is deemed satisfied and fully completed. To the extent Purchaser separately elects to seek financing, Seller will endeavor to cooperate with any potential lender as reasonable under the circumstances, without creating any liability hereunder or contingencies, it being understood that the Seller is providing such cooperation as an accommodation to Purchaser, and Seller cannot be deemed in default for any alleged failure to cooperate.

4.    Closing.

4.1    The closing of the transaction contemplated hereby (the "Closing" or "Closing Date") shall occur at 10:00 A.M. on the Business Day that is not later than ten (10) days after the order of the Bankruptcy Court confirming the Seller's Chapter 11 Plan of Reorganization and approving this transaction (the "Confirmation Order") has become a final, non-appealable order; provided, however the sale of the Property shall be approved by the Bankruptcy Court on or before February 22, 2015, with a Closing to be scheduled thereafter following entry of the Confirmation Order and the Confirmation Order becoming a final, non-appealable order.

4.2    The Closing will occur at the offices of Seller's attorney Goldberg Weprin Finkel Goldstein, LLP, 1501 Broadway, 22nd Floor, New York, NY 10036 or such other place as the Parties agree.

5.    "AS IS".

5.1    Except as expressly set forth in this Agreement to the contrary, the Purchaser is expressly purchasing the Property in its existing condition "AS IS, WHERE IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, zoning and regulatory issues, conditions and defects, but without any tenants or occupants and otherwise vacant. Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same. Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts and Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Purchaser has, as of the date hereof, undertaken all such investigations and review of the Property, Laws and Regulations, Rights,

{00230151.14 / 1066-001 }

Facts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers and Purchaser is and will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property and, by reason of all the foregoing, Purchaser assumes the full risk of any loss or damage (subject to Section 11 below) occasioned by any fact, circumstance, condition or defect pertaining to the Property.

5.2     Except as expressly set forth in this Agreement to the contrary, Purchaser hereby disclaims all warranties of any kind or nature whatsoever (including warranties of habitability and fitness for particular purposes), whether expressed or implied, including, without limitation, warranties with respect to the Property. Except as is expressly set forth in this Agreement to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, or Broker (as hereinafter defined), with respect to the Property, and that, in fact, except as expressly set forth in this Agreement to the contrary, no such representations were made.

5.3     Seller makes no representation or warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined). The term "Hazardous Materials" shall mean: (a) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes" and "toxic pollutants," as such terms are defined under the Environmental Laws, or any

of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any

fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any

material which contains any hydrated mineral silicate, including, without limitation, chrysotile,

amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e)

polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (f) radon, (g) any

other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (h) any

other substance with respect to which any Environmental Law or governmental authority

requires environmental investigation, monitoring or remediation. The term "Environmental

Laws" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or

hereafter in effect, in each case as amended or supplemented from time to time, including,

without limitation, all applicable judicial or administrative orders, applicable consent decrees and

binding judgments relating to the regulation and protection of human health, safety, the

environment and natural resources (including, without limitation, ambient air, surface, water,

groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and

vegetation), including, without limitation, the Comprehensive Environmental Response,

Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous

Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide,

Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource

Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.), the Toxic Substance

Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C.

§§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et

seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any state or local

counterpart or equivalent of any of the foregoing, and all state and federal common law, and any

federal, state or local transfer of ownership notification or approval statutes.

5.4     Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition. Except as expressly set forth in this Agreement to the contrary, Purchaser releases Seller and its respective successors and assigns from and against any and all claims which Purchaser or any affiliate of Purchaser (each, a "Purchaser Related Party") has or may have arising from or related to any matter or thing related to or in connection with the Property, except as expressly set forth in this Agreement to the contrary, including the documents and information referred to herein, any construction defects, errors or omissions in the design or construction and any environmental conditions, and, except as expressly set forth in this Agreement to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller or its respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages and causes of action. The provisions of this Section 5.4 shall survive the termination of this Agreement or the Closing Date and shall not be deemed to have merged into any of the documents executed or delivered at the Closing. To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

6.     Apportionments.

6.1     At the Closing, the following items shall be apportioned between the Parties as of 11:59 PM on the day preceding the Closing Date. Any errors in the apportionments pursuant to this Section 6 shall be corrected by appropriate re-adjustment between Seller and

{00230151.14 / 1066-001 }

19

Purchaser post-closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to Seller or by Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined. Except as otherwise specifically provided for herein, all apportionments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other apportionments. The items to be apportioned are:

6.1.1    Real estate taxes, unmetered water and sewer charges and vault charges, if any, and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Property in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "Current Tax Year") on a per diem basis based upon the number of days in the Current Tax Year prior to the Closing Date (which shall be allocated to Seller) and the number of days in the Current Tax Year on and after the Closing Date (which shall be allocated to Purchaser). If the Closing shall occur before the tax rate for the Current Tax Year is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation. Promptly after the new tax rate is fixed for the fiscal period in which the Closing takes place, the apportionment of real estate taxes shall be recomputed. Upon the Closing Date and subject to the adjustment provided above, Purchaser shall be responsible for real estate taxes and assessments levied or imposed upon the Property payable in respect of the Current Tax Year following the Closing Date and all periods after the Closing Date. In no event shall Seller be charged with or

{00230151.14 / 1066-001 }

20

be responsible for any increase in the real estate taxes or assessments levied or imposed upon the
Property resulting from the transfer of the Property herein contemplated or from any
improvements made at any time or for any reason.

6.2     If there are water meters on the Property, Seller shall endeavor to furnish
readings to a date not more than thirty (30) days prior to the Closing Date, and the unfixed meter
charges and the unfixed sewer rents, if any, based thereon for the intervening time shall be
apportioned on the basis of such last readings. If Seller fails or is unable to obtain such readings,
the Closing shall nevertheless proceed and the parties shall apportion the meter charges and
sewer rents on the basis of the last readings and bills received by Seller and the same shall be
appropriately readjusted after the Closing on the basis of the next subsequent bills.

6.3     Seller shall not be required to assign any policies of insurance in respect of
the Property to Purchaser and Purchaser shall be responsible for obtaining its own insurance as
of the Closing Date. Seller and Purchaser shall take all necessary actions required to transfer all
utility accounts to Purchaser as of the Closing Date.

The provisions of this Section 6 shall survive the Closing; provided, however, that any re-
proportions or re-apportionments shall be made as and when required under Section 6.1 above.
Any corrected adjustment or proration shall be paid in by federal funds wire transfer of
immediately available funds to an account at such bank or banks as shall be designated by the
party entitled thereto, or by bank check(s) issued to the party entitled thereto.

7.     Representations and Warranties of the Parties; Certain Covenants.

7.1     Seller warrants, represents and covenants to and with Purchaser that each
of the following is true and correct on the date hereof and on the date of the Closing:

7.1.1    Seller is a limited liability company duly formed and in good

standing under the laws of the State of New York and, subject to Bankruptcy Court approval of this Agreement, has the requisite power and authority to enter into and to perform the terms of this Agreement. Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby other than Seller's pending Chapter 11 case. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will be authorized by all requisite action of Seller and order of the Bankruptcy Court. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered following Bankruptcy Court approval, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance with its respective terms. Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, other than approval from the Bankruptcy Court.

7.1.2   Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "Code").

7.1.3   Seller owns the Property and subject to the approval of the Bankruptcy Court, has the right to sell and transfer the Property hereunder.

7.1.4   Seller has not received any notice, written or otherwise, of any pending or threatened condemnation or eminent domain proceedings that would affect the Property.

{00230151.14 / 1066-001 }

22

7.1.5   Seller has entered into no leases, licenses or other occupancy agreements, or any service contracts or other contracts or agreements affecting any portion of the Property as of the date hereof which will be in force on the Closing Date, other than the Designated Contracts, if any.

7.1.6   Except as granted herein to Purchaser, Seller has not conveyed any air rights or development rights appurtenant to the Property, and will not after the date hereof sell or enter into any contract to sell such air rights or development rights.

7.1.7   Seller has purchased certain air rights from the owners of 77-79 Rivington Street and 81-83 Rivington Street. Neither Seller nor any member of Seller has granted any purchase options, rights of first offer or rights of first refusal to any other party to purchase the Property.

7.1.8   Seller has not received any written notice from a governmental authority notifying Seller regarding the presence of Hazardous Materials at the Property or a violation of any Environmental Law at the Property which remains uncured, and Seller has no actual knowledge regarding the presence of any Hazardous Materials at the Property which violate Environmental Laws.

7.1.9   Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or

transactions or be otherwise associated with such persons or entities.

7.1.10 Seller has not commenced or received written notice of the commencement of any pending proceedings for the reduction of the assessed valuation of the Property, excepting Seller's requests for reductions set forth on the attached **Schedule 7.1.10**.

7.1.11 Subject to the approval of the Bankruptcy Court as set forth in 7.1.1 hereof, Seller has the right to sell all of its rights, title and interests in all of the Acquired Assets.

7.2 Purchaser warrants, represents and covenants to and with Seller that each of the following is true and correct true and correct on the date hereof and on the date of the Closing:

7.2.1 Purchaser is or shall be duly organized or formed and in good standing under the laws of the state of its organization or formation and will have the requisite power and authority to enter into and to perform the terms of this Agreement. Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser. This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms.

7.2.2 Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute,

{00230151.14 / 1066-001 }

24

rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

7.2.3   There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, threatened against Purchaser, which would affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.2.4   To the best of Purchaser's knowledge, Purchaser will qualify as a good faith purchaser under 11 U.S.C. § 363(m).

7.2.5   Purchaser is not, and will not become, a person or entity with whom United States' persons or entities are restricted or prohibited from doing business under regulations of OFAC (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

7.2.6   Purchaser shall take no action to improperly hinder the Title Company's decision to insure title to the Property pursuant to an ALTA Owner's Policy of Title Insurance in the amount of the Purchase Price at regular rates and without additional premium, subject only to the Permitted Exceptions and as otherwise provided in this Agreement.

7.3   Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither the Seller nor the Broker nor any agent nor any representative nor any purported agent or representative of Seller or Broker have made, and neither Seller nor Broker are liable for or bound in any manner by, any express or implied warranties, guaranties,

{00230151.14 / 1066-001 }

25

promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller and Broker have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to (a) the future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's' non-compliance, if any, with said zoning ordinances or the ability of the Purchaser or any other party to obtain any further extensions from the BSA, (d) the availability of any financing for the development, alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for hotel or commercial purposes, (f) the present and future condition and operating state of any machinery or equipment on the Property and the present or future structural and physical condition of any part of the building structure or its suitability for rehabilitation or renovation, (g) the ownership or state of title of any personal property on the Property, (h) the presence or absence of any Laws and Regulations or any Violations, (i) the compliance of the Property with any rent control or similar law or regulation, and (j) the layout, income, expenses, operation, agreements, licenses, easements, instruments or documents of or in any way affecting the Property. Further, Purchaser acknowledges and agrees that neither Seller nor Broker are liable for or bound by (and Purchaser has not relied upon) any

{00230151.14 / 1066-001 }

26

verbal or written statements, representations or any other information respecting the Property furnished by Seller, or Broker or any employee, agent, consultant or other person representing or purportedly representing Seller or Broker. The provisions of this Section 7.3 shall survive the Closing.

8.    Closing Deliveries.

8.1    At or prior to the Closing, Seller shall make, have made or caused to be made, the following deliveries:

8.1.1    Seller shall execute, acknowledge and deliver to Purchaser a bargain and sale deed without covenants against grantor's acts, sufficient to convey fee title to the Property subject to and in accordance with the provisions of this Agreement, in the form attached hereto as **Exhibit B** and made a part hereof (the "Deed").

8.1.2    Seller shall deliver to Purchaser a certificate, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code.

8.1.3    Seller shall deliver to the Title Company a certified copy of the Bankruptcy Court Order approving this Agreement in lieu of a limited liability company resolution of Seller authorizing the transaction contemplated herein and the execution and delivery of the documents required to be executed and delivered hereunder.

8.1.4    To the extent the Sale is not exempt under 11 U.S.C. §1146 (a), Seller shall execute, acknowledge and deliver the New York State TP-584 Form, the New York City Real Property Transfer Tax Form and Form RP-5217 (the "Equalization Form") in respect of the Property (collectively, the "Transfer Tax Returns") and Seller shall promptly pay any taxes due in connection with such Transfer Tax Returns . Payment of all transfer, sales and recording taxes related to and/or arising from this transaction, other than filing fees for the deed,

{00230151.14 / 1066-001 }

shall be the obligation of the Seller.  Seller shall make all reasonable and best efforts to make the

Sale exempt under 11 U.S.C. § 1146(a) and Purchaser shall reasonably cooperate with Seller in

seeking the transfer tax exemption.

    8.1.5   A title affidavit reasonably acceptable to Seller and the Title

Company.

    8.1.6  To the extent in the possession of Seller, copies of all books, records

and other documents relating to the Property, including, without limitation, (a) licenses and

permits relating to the Property, (b) certificates, permits and licenses with respect to the Property

issued by any governmental authority, (c) survey, architectural plans, building plans or

specifications pertaining to the Property and (d) copies of any warranties and guaranties with

respect to the Property or any part thereof.

    8.1.7  An assignment of each of the Designated Contracts, duly executed

by Seller.

    8.1.8  A bill of sale, conveying and transferring to Purchaser all right, title

and interest of Seller, if any, in and to certain personal property at the Property and the other

Acquired Assets, including, without limitation, all assignable licenses, permits, warranties and

guarantees and plans and specifications held by Seller in connection with the Property, duly

executed by Seller, to the extent permitted by applicable law.

    8.1.9   Seller shall execute and deliver such documents as local custom

may require to effect the change of ownership on the City's ownership records or otherwise

reasonably requested by the Title Company in connection with the conveyance of the Property.

    8.1.10 Seller shall take such steps as may be reasonably necessary to

effect the release of any and all of the Liens and Encumbrances on the Property consistent with

{00230151.14 / 1066-001 }

28

bankruptcy law and the Seller's rights to object to any claims; provided however, that Seller shall make all reasonable best efforts so that Seller's right to object to the mortgage claim shall not preclude Purchaser's election to have the mortgages assigned; provided further, however, that (i) all such claims to which the Seller may elect to file an objection, shall attach to the proceeds of the sale; and (ii) Seller shall not be required to take any steps to effect the assignment of the mortgage that prejudice Seller's rights to object to the claims of the current mortgagee.

8.2     At or prior to the Closing, Purchaser or its agents shall make, have made or caused to be made, the following deliveries:

8.2.1   Purchaser shall pay to Seller the balance of the Purchase Price required pursuant to Section 3.2 hereof.

8.2.2   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Transfer Tax Returns, as necessary.

8.2.3   Purchaser shall execute, acknowledge and deliver to Seller a counterpart of the Equalization Form.

8.2.4   Such other instruments, agreements or other documents as may be reasonably necessary or convenient to effectuate the provisions of this Agreement as permitted by the Bankruptcy Court.

8.3     Seller and Purchaser, no later than three (3) Business Days prior to at the Closing, shall prepare, subject to all the terms and provisions of this Agreement, (a) a mutually acceptable closing statement setting forth, inter alia, the closing adjustments and material monetary terms of the transaction contemplated hereby and (b) such other instruments and documents as may be reasonably required to effectuate the consummation of the transactions described in this Agreement.   The Closing Statement shall be binding and conclusive on

{00230151.14 / 1066-001 }

29

Purchaser and Seller (absent manifest error) and at the Closing, the Closing Statement shall be executed and delivered by the parties hereto. Subject to the provisions of Section 6 of this Agreement, any errors in the Closing Statement shall be corrected post-Closing.

        9.      Interim Responsibilities.

        9.1     Seller agrees that during the period between the date hereof and the Closing Date:

        9.1.1 Seller will not remove from the Property any fixtures, machinery, personal property or equipment.

        9.1.2  Seller will not lease the Property or grant any occupancy right to any person or transfer any of the Acquired Assets between the date hereof and the Closing Date.

        9.1.3   Seller or Simon Miller as Receiver shall maintain property and liability insurance coverage in the ordinary course of Seller's business with respect to the Property from the date hereof through the Closing Date or earlier termination of this Agreement.

        9.1.4  Seller will not grant any lien or cause any instrument to be recorded that would further encumber the Property in any manner, other than liens or encumbrances to be discharged by Seller or order of the Bankruptcy Court as of the Closing Date.

        9.1.5  Seller shall promptly after the delivery or receipt thereof deliver to Purchaser copies of all notices relating to the Designated Contracts, if any, notices of releases of Hazardous Materials affecting the Property or any actual or threatened condemnation of the Property or any portion thereof given by or on behalf of any Federal, state or local agency, and copies of all other correspondence sent, filed, served on or received by Seller from any federal, state or local agency affecting the Property from and after the date hereof.

        9.1.6  Seller will not settle or compromise or agree to any settlement or

compromise of any insurance or condemnation claim or award without the prior written consent of Purchaser, which may be granted or withheld in Purchaser's sole and absolute discretion except in the case of an emergency.

9.1.7   Seller shall (A) maintain and materially comply with all of its obligations under all Designated Contracts, if any, and (B) so long as there are no expenditure of funds, obtain Purchaser's consent, which consent may be withheld in Purchaser's reasonable discretion, prior to modifying any such Designated Contracts.

9.1.8   Seller will not enter into any agreement which would require the consent of a third party to this Agreement or the transactions contemplated by this Agreement.

9.1.9   To the extent applicable, the Receiver shall pay all utility and other service charges accrued through the Closing Date.

9.2   Between the date hereof and the Closing Date, Purchaser shall be afforded access to the Property required by Purchaser in connection with its preparation for the Closing. Any access to the Property (i) must be upon written notice to Seller or the Receiver and during business hours, and (ii) at all times Purchaser and its representatives shall be accompanied by a representative of Seller or the Receiver when at the Property (provided, however, that so long as Purchaser has given reasonable prior notice of its request for access (which access shall be during business hours), Purchaser may enter unaccompanied if no representative is available within 24 hours of such requested time). No invasive testing may be conducted by the Purchaser without Seller's prior written consent, not to be unreasonably withheld, conditioned or delayed.

10.   Limitation on Liability of Parties.

10.1   In the event that the Parties agree or the Bankruptcy Court determines that the Purchaser has defaulted in the performance of Purchaser's obligations under this Agreement

{00230151.14 / 1066-001 }

31

and the Closing does not occur as a result thereof (a "Purchaser Default"), Seller shall be entitled to retain the Deposit and any interest earned thereon as and for full and complete liquidated and agreed damages for Purchaser's default, and thereupon Purchaser shall be released from any further liability to Seller hereunder, except for those provisions hereof intended to survive the termination of this Agreement. SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DEPOSIT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT. SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

10.2    Subject to the provisions of Section 3.2.2 hereof, in the event that the Parties agree or the Bankruptcy Court or any other court of competent jurisdiction determines that the Seller has defaulted in the performance of Seller's obligations under this Agreement, Purchaser shall be entitled to (a) instruct Escrow Agent to pay to Purchaser the Deposit with the interest earned thereon, if any, (a "Deposit Return"), upon which Seller shall be released from any further liability to Purchaser hereunder for any other damages resulting from such default, and/or (b) seek specific performance of Seller's obligations hereunder in the Bankruptcy Court. For the avoidance of doubt, Seller shall not be released from any liability (or damages limited) to Purchaser for defaults related to willful or reckless breach of Seller's representations in Section 7.1 of this Agreement.

{00230151.14 / 1066-001 }

32

11.     Fire or Other Casualty, Condemnation.

11.1    Seller agrees to give Purchaser reasonably prompt notice of any fire or other casualty occurring at the Property of which Seller obtains knowledge, between the date hereof and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.

11.2    If all or any part of the existing structure is materially damaged by fire or other casualty occurring on or after the date hereof and prior to the Closing Date, then, if the estimated cost to repair or restore is less than or equal to $1,000,000 and if the estimated time substantially to complete such repair or restoration is three (3) months or less (each as reasonably determined by an engineer selected by Purchaser), neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage.  In such event, Seller shall assign to Purchaser and Purchaser shall have the right to make a claim for and to retain any casualty insurance proceeds received under the casualty insurance policies in effect with respect to the Property on account of such physical damage or destruction substantially to restore the Property to the same condition as it existed prior to the occurrence of such fire or other casualty, and Purchaser shall receive a credit against the cash due at Closing for the amount of the deductible on such casualty insurance policy less any amounts reasonably and actually expended by Seller to collect any such insurance proceeds or to remedy any unsafe conditions at the Property or to repair or restore any damages, in no event to exceed the amount of the loss.

11.3    If the estimated cost of repair or restoration exceeds $1,000,000 or if the estimated time substantially to complete such repair or restoration exceeds three (3) months

{00230151.14 / 1066-001 }

33

(each as reasonably determined by an engineer selected by Purchaser and reasonably acceptable to Seller, and without prejudice to the right of any party to seek relief from the Bankruptcy Court), Purchaser shall have the option, exercisable on or prior to the Casualty Election Date (as defined in Section 11.4 below), time being of the essence, to terminate this Agreement by delivering notice of such termination to Seller, whereupon the Deposit (together with any interest accrued thereon) shall be returned to Purchaser and this Agreement shall be deemed cancelled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other except for such provisions which are expressly provided in this Agreement to survive the termination hereof. If a fire or other casualty described in this Section 11.3 occurs and Purchaser shall not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with the provisions of Section 11.2 hereof (as if the cost of repair or restoration was less than or equal to $1,000,000).

11.4    "Casualty Election Date" means the tenth (10th) day following Purchaser's receipt of the estimates as described in this Section 11.

11.5    If prior to the Closing any part of the Property is taken (other than a temporary taking) or if Seller shall receive an official notice from any governmental authority having eminent domain power over the Property of its intention to take, by eminent domain proceeding, any part of the Property (a "Taking"), then:

(i)    if such Taking involves $1,000,000 or less of value of the Building (as reasonably determined by an architect or engineer selected by Purchaser and reasonably acceptable to Seller, and without prejudice to the right of any party to seek relief from the Bankruptcy Court), neither party shall have any right to terminate this Agreement, and the parties shall nonetheless consummate the transaction in accordance with this Agreement, without any

abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such Taking; provided, however, that Seller shall on the Closing Date (a) assign and remit to Purchaser the net proceeds of any award or other proceeds of such Taking which may have been collected by Seller as a result of such Taking less the reasonable expenses incurred by Seller in connection with such Taking, or (b) if no award or other proceeds shall have been collected, deliver to Purchaser an assignment of Seller's right to any such award or other proceeds which may be payable to Seller as a result of such Taking and Purchaser shall reimburse Seller for the reasonable expenses incurred by Seller in connection with such Taking.

(ii)   if such Taking involves more than $1,000,000 of value of the Building (as reasonably determined by an architect or engineer selected by Purchaser and reasonably acceptable to Seller, and without prejudice to the right of any party to seek relief from the Bankruptcy Court), Purchaser shall have the option exercisable prior to or on the tenth $(10^{th})$ day following Purchaser's receipt of such engineer's or architect's determination of the rentable area of the Building subject to the Taking to terminate this Agreement by delivery of notice to the other party, whereupon the Deposit (together with any interest earned thereon) shall be returned to Purchaser and this Agreement shall be deemed cancelled and of no further force or effect, and neither party shall have any further rights or liabilities against or to the other except pursuant to the provisions of this Agreement which are expressly permitted to survive the termination hereof. If the Taking described in this clause (ii) shall occur and Purchaser shall not timely elect to terminate this Agreement, then Purchaser and Seller shall consummate this transaction in accordance with the provisions of clause (i) (as if the Taking involves $1,000,000 of value or less).

11.6   Nothing contained in this Section 11 shall be construed to impose upon

Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation.

12.    Brokerage.

Purchaser and Seller each represent and warrant that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby other than Massey Knakel ("Broker").  Seller shall pay any commission due the Broker, pursuant to that  separate agreement between Seller and Broker as approved by the Bankruptcy Court.  Purchaser and Seller agree to indemnify and hold each other and the Related Parties of the other harmless from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorney's fees and disbursements) which may be asserted against, imposed upon or incurred by such party by reason of any claim made by any other broker, consultant, finder or like agent for commissions or other compensation for bringing about this transaction or claiming to have introduced the Property to Purchaser and to seek a determination in the Confirmation Order that no other broker, consultant, finder or like agent is entitled to a commission or compensation in connection with this transaction. The provisions of this Section 12 shall survive the Closing or the termination of this Agreement.

13.    Special Provisions for Bankruptcy Court Approval.

13.1    Seller's obligations under this Agreement are entirely subject to, and contingent upon approval of this Agreement and the transactions embodied in this Agreement by the Bankruptcy Court, as may be reflected in the Sale Order or Confirmation Order.  Purchaser acknowledges that the Seller will submit this Agreement, seeking approval of the terms and

conditions of this Agreement and authorization for the sale of the Property, to the Bankruptcy Court for approval pursuant to a motion (the "Procedures Motion") requesting that the Court (i) establish bidding procedures, (ii) approve the Break-up Fee and (iii) schedule an auction (the "Auction"). Seller shall use its best efforts to obtain approval of the Procedures Motion, including the Break-up Fee. The hearing to consider that motion shall occur on December 17, 2014 and the Auction shall occur prior to February 22, 2015. Following the Auction, the Seller will seek the Bankruptcy Court's approval of the sale pursuant to a separate Order; provided, however, that the sale shall also be approved by the Bankruptcy Court no later than February 22, 2015.

13.2 Pursuant to 11 U.S.C. Section 363(b) and (f) and 1123(a)(5)(D) and 1125(b)(4), Bankruptcy Court approval of this Agreement and subsequent confirmation of the Plan is required before the Sale shall be consummated. Notwithstanding when the Sale is approved, the actual Closing shall occur on a post-confirmation basis. Purchaser acknowledges and agrees that the Bankruptcy Court will consider higher or better offers for the Property as part of the bidding procedures process to obtain approval; provided, however, that the Seller will request that the Bankruptcy Court approve a break-up fee equal to 3% of the Purchase Price or $990,000 (the "Break-up Fee") in favor of the Purchaser. The request for a break-up fee shall be made in connection with bidding procedures motion to be filed by Seller referenced above seeking to (i) approve this Agreement as a "Stalking-Horse contract", subject to competitive bidding and otherwise providing for the Auction based upon the Stalking-Horse contract, free and clear of all liens, mortgages, notices of pendency, judgments, claims, interests or non-permitted encumbrances under 11 U.S.C. § 363 (b) and (f); (ii) scheduling a sale approval hearing; and (iii) approving the form and manner of notice thereof. In deference to the requested

{00230151.14 / 1066-001 }

37

Break-up fee, Seller shall also request that the bidding procedures contain an initial overbid of $34,150,000 with bidding thereafter at intervals of $25,000. The Break-up Fee shall be payable to the Purchaser in the event the Bankruptcy Court enters an order approving a sale of the Property to any party other than the Purchaser. The Break-up Fee shall constitute an allowed administrative expense claim pursuant to §503(b) of the Bankruptcy Code, with priority over all other administrative expense claims, shall be payable to Purchaser from the proceeds of any alternative sale transaction and shall be paid ahead of any and all other claims to the sale proceeds, including claims of secured creditors. Receipt of Bankruptcy Court approval for the Break-up Fee in the amount and pursuant to the terms set forth herein, is a condition of this offer and a condition of this Agreement as provided below.

13.3    In the event that the Purchaser is the successful bidder at the Auction, it is a condition precedent to Purchaser's obligation to close under this Agreement that the form of Sale Order is reasonably satisfactory to the Purchaser.

13.4    In the event that the order approving the bidding procedures and/or the order approving the sale to the Purchaser are entered by the Bankruptcy Court, and an appeal is taken or a stay pending appeal is requested from either of such orders, Seller shall immediately notify Purchaser of such appeal or stay request, and shall promptly provide to Purchaser a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. From and after the date of this Agreement until the Closing Date, Seller shall not take any action which is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the order approving the bidding procedures and/or the order approving the sale to the Purchaser.

14.    Conditions Precedent to Purchaser's Obligation to Close.

14.1    Notwithstanding any other provision in this Agreement, Purchaser's obligations to consummate the transactions described in this Agreement, and to take the actions required to be taken by Purchaser at the Closing, is subject to the satisfaction, at or prior to such Closing, of each of the following conditions (any of which may be waived by Purchaser, in whole or in part, in its sole discretion):

(a)    Seller shall have executed and delivered to Purchaser all of the documents, required to be delivered by Seller at the Closing and shall have taken all other action required of Seller at the Closing and shall have complied with all covenants in this Agreement to be complied with by Seller on or prior to Closing.

(b)    All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, except to the extent the facts and circumstances underlying such representations and warranties may have changed as of the Closing.

(c)    The Title Company shall be willing to insure title to the Property pursuant to an ALTA Owner's Policy of Title Insurance in the amount of the Purchase Price at regular rates and without additional premium, subject only to the Permitted Exceptions and as otherwise provided in this Agreement.

(d)    No event shall have occurred that, individually or in the aggregate, could be reasonably expected to result in a material adverse change in the physical condition of the Acquired Assets, it being understood that inability to obtain regulatory approvals shall not be deemed such an event.

(e)    The Break-up Fee, the form of this Agreement and bid procedures

acceptable to Purchaser shall be approved by the Bankruptcy Court at the December 17, 2014 hearing or at the adjourned date of such hearing.

(f)     The sale of the Acquired Assets, including assumption and assignment of the Designated Contracts, to Purchaser shall be approved by the Bankruptcy Court on or before February 22, 2015, pursuant to an order which is acceptable to Purchaser.

(g)     Among other things, the Sale Order shall release the Receiver from his duties with respect to the Property, including, for the avoidance of doubt, those duties previously recognized and approved by Order of the Bankruptcy Court, and direct the Receiver to release and turn over the Property and any Acquired Assets in the possession of the Receiver or his agents, including, without limitation, copies of all books and records maintained or in the custody of the Receiver as it concerns the Acquired Assets.

(h)     The Sale Order shall include mutual releases by the Seller and Purchaser in favor of each other and their affiliates and professionals in a form acceptable to Seller and Purchaser to be effective following the Closing Date, it being understood and agreed that there shall be no release of any obligations that are specifically identified in this Agreement as surviving the Closing.

(i)     The Sale Order shall provide that the sale of the Acquired Assets receives the exemptions provided for under 11 U.S.C. §1146 (a).

(j)     The Closing shall occur no later than ten (10) days after the Confirmation Order becomes a final, non-appealable order, unless the Purchaser consents to a later Closing Date.

(k)     Seller shall have agreed in writing that post-closing, it will (i) provide any documents or information required to be provide to Purchaser which is

inadvertently not provided at closing, and (ii) cure any inconsistencies or errors promptly upon Purchaser's request.

(l)     Seller shall have used its best efforts to facilitate the cooperation of the owner of 77-79 Rivington Street with respect to issues affecting both properties, including, without limitation, the construction of walls to separate the shared cellar, and any other items for which such mutual cooperation would increase the value of both properties, it being acknowledged and agreed that Seller's actions shall be on notice to the mortgagee of 77-79 Rivington Street and that all actions affecting 77-79 Rivington Street are subject to the approval of the Bankruptcy Court and must be in compliance with applicable law and not adversely affect either property, as reasonably determined by the Bankruptcy Court.

15.     Conditions Precedent to Seller's Obligations to Close.

15.1     Seller's obligation to consummate the transactions described in this Agreement, and to take the actions required to be taken by Seller at the closing, is subject to the satisfaction, at or prior to such closing, of each of the following conditions.

(a)     Purchaser shall have executed and delivered to Seller all of the documents, shall have paid all sums of money and shall have taken or caused to be taken all of the other action required of Purchaser in this Agreement.

(b)     The Purchaser is deemed to have made the highest and best offer for the Property and the sale is approved by the Bankruptcy Court, pursuant to a confirmed Plan.

16.    Notices.

Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a) personally delivered with signed delivery receipt obtained, or (b) upon receipt, when sent by prepaid reputable overnight courier, in each case addressed as follows:

If to Seller, to:

D.A.B Group LLC
85 West Hawthorne Avenue
Valley Stream, New York 11580
Attn: Zvi Benjamin Zhavian

with a copy to:

Kevin J. Nash, Esq.
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, NY 10036

If to Purchaser, to:

Will Obeid
Arcade Capital LLC
200 Park Avenue South, Suite 1305
New York, NY 10003

with a copy to:

Alan D. Halperin. Esq.
Donna H. Lieberman, Esq.
Halperin Battaglia Raicht, LLP
40 Wall Street, 37th Floor
New York, NY 10005

If to Escrow Agent, to:

First American Title Insurance Company
633 Third Avenue
New York, New York 10017
Attn: Stephen Farber, Esq.

Notices shall be valid only if served in the manner provided above. Notices may be sent by the attorneys for the respective parties and each such Notice so served shall have the same force and effect as if sent by such party.

17.     Survival; Governing Law.

Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing provided for herein. This Agreement shall be governed by, interpreted under, construed and enforced in accordance with, the laws of the State of New York and may be enforced only before the Bankruptcy Court.

18.     Counterparts; Captions.

This Agreement may be executed in counterparts, each of which shall be deemed an original. The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

19.     Entire Agreement; No Third Party Beneficiaries.

This Agreement (including all exhibits annexed hereto), contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or by its agent duly authorized in writing or as otherwise expressly permitted herein. The parties do not intend to confer any benefit hereunder

on any person, firm or corporation other than the parties hereto. The provisions of this Section 19 shall survive the Closing.

20.     Waivers; Extensions.

No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other breach. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

21.     Pronouns, Joint and Several Liability.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require. If Purchaser consists of two or more parties, the liability of such parties shall be joint and several.

22.     Successors and Assigns.

This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective permitted successors and permitted assigns.

23.     Escrow.

23.1     Escrow Agent shall provide the Seller and Purchaser with a proposed form of escrow agreement which will be subject to the approval of the Seller and Purchaser, which approval shall not be unreasonably withheld. The Escrow Agreement will provide that the Parties and the Escrow Agent submit to the jurisdiction of the Bankruptcy Court, Southern District of New York in the event that there is any dispute about the Deposit or the conduct of the Escrow Agent.

23.2     Escrow Agent shall have the right, but not the obligation, to invest the Deposit in savings accounts, treasury bills, certificates of deposit and/or in other money market

instruments, or in funds investing in any of the foregoing, and shall not be liable for any losses suffered in connection with any such investment

24.     Tax Proceedings.

From and after the date hereof until the Closing, Seller shall not commence any new proceeding or proceedings. There are no pending proceedings for the reduction of the assessed valuation of the Property.

25.     Transfer Tax Exemption.

This transaction and all orders approving the same shall provide that consistent with the Supreme Court's interpretation of Section 1146(a) of the Bankruptcy Code in Florida Department of Revenue v. Piccadilly Cafeterias, Inc., 128 S.Ct. 2326 (2008), that the transfer of the Acquired Assets (including the Property) shall be made in furtherance of a confirmed plan of reorganization and shall be exempt from payment of all transfer and recording taxes otherwise owed to a local, state or federal government unit and shall provide that the recorder of deeds or similar official shall accept such deed and instrument for recording without requiring the payment of any filing fees, documentary stamp taxes or transfer taxes, including the New York City RPT and the New York State TP 584.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the day and year first above written.

**SELLER:**
**D.A.B. GROUP LLC**

By:_____

**PURCHASER:**
**ARCADE ORCHARD STREET LLC**

Deposit in savings accounts, treasury bills, certificates of deposit and/or in other money market instruments, or in funds investing in any of the foregoing, and shall not be liable for any losses suffered in connection with any such investment

24.     Tax Proceedings.

From and after the date hereof until the Closing, Seller shall not commence any new proceeding or proceedings. There are no pending proceedings for the reduction of the assessed valuation of the Property.

25.     Transfer Tax Exemption.

This transaction and all orders approving the same shall provide that consistent with the Supreme Court's interpretation of Section 1146(a) of the Bankruptcy Code in Florida Department of Revenue v. Piccadilly Cafeterias, Inc., 128 S.Ct. 2326 (2008), that the transfer of the Acquired Assets (including the Property) shall be made in furtherance of a confirmed plan of reorganization and shall be exempt from payment of all transfer and recording taxes otherwise owed to a local, state or federal government unit and shall provide that the recorder of deeds or similar official shall accept such deed and instrument for recording without requiring the payment of any filing fees, documentary stamp taxes or transfer taxes, including the New York City RPT and the New York State TP 584.

**IN WITNESS WHEREOF,** the parties have duly executed this Agreement as of the day and year first above written.



SELLER:
**D.A.B. GROUP LLC**

By:_____

By: _____
     Authorized Signatory

**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF
CONFIRMING THE PROVISIONS OF SECTION 23:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____

By:_____

ESCROW AGENT:

SOLELY FOR THE PURPOSES OF
CONFIRMING THE PROVISIONS OF SECTION 23:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____

Stephen Farber

## EXHIBITS

Exhibit A                    Legal Description

Exhibit B                    Bargain and Sale Deed

## SCHEDULES

Schedule 1.2 – List of pre-paid assets

Schedule 1.3 – List of Designated Contracts

Schedule 7.1.10 – Proceedings for Reduction of Assessed Valuation