**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10029
(212) 735-8000
Y. David Scharf
Joseph T. Moldovan
Danielle Lesser
Robert K. Dakis
Brett Dockwell

*Counsel to Orchard Hotel, LLC*

**Hearing Date and Time:**
February 25, 2015 at 2:00 p.m.

**Objection Deadline:**
February 18, 2015 at 5:00 p.m.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| D.A.B. GROUP LLC, | : | Case No.: 14-12057 (SCC) |
| | : | |
| Debtor | : | |

---

## MOTION OF ORCHARD HOTEL, LLC FOR LIMITED RELIEF
## FROM THE AUTOMATIC STAY TO PERMIT STATE COURT
## APPELLATE PROCEEDINGS TO PROCEED

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 4

I.    Orchard's Claim .......................................................................................................... 4

II.    The Loans ................................................................................................................... 5

        A.    The Loan Documents ................................................................................... 5

        B.    Provisions in the Loan Documents Relevant to this Motion ................................ 5

                1.    The Maturity Date ............................................................................ 5

                2.    The Debtor's Payment Obligations ................................................. 6

                3.    No Oral Modifications ...................................................................... 8

III.    The Debtor's Defaults ............................................................................................... 10

        A.    The Cava Mechanic's Lien ........................................................................ 10

        B.    The Debtor's Misappropriation of Loan Funds ......................................... 11

        C.    The Debtor's Failure to Repay the Loans Upon Maturity ........................ 12

IV.    The State Court Proceedings ..................................................................................... 14

        A.    The State Court's March 30, 2012 Decision and Order
              and the Appellate Division's May 28, 2013 Affirmance ........................... 15

        B.    The Appellate Division's February 18, 2014 Order .................................. 16

DISCUSSION .................................................................................................................... 19

I.    The Court Should Grant Stay Relief to Permit the Appellate
    Division to Rule Again on the Debtor's Estoppel Defense ........................................ 19

        A.    Proceedings Before the Non-Bankruptcy Court Will Fully
              Resolve the Issues and the Case Is Ready for Trial .................................. 21

B.      Lifting the Stay Will Not Interfere with the Bankruptcy Case ............................ 23

C.      Lifting the Stay Will Promote Judicial Economy ................................................. 24

D.      Continuing the Automatic Stay Will Impose Substantial Hardships
        on Orchard That Far Outweigh Any Hardships on the Debtor ........................... 25

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Butner v. U.S.,*
440 U.S. 48 (1979) .........................................................................................................22

*In re Castlerock Properties,*
781 F.2d 159 (9th Cir. 1986) .......................................................................................19

*In re Curtis,*
40 B.R. 795 (Bankr. D. Utah 1984) ...........................................................................19

*In re Enron Corp.,* 306 B.R.
465 (Bankr. S.D.N.Y. 2004) ........................................................................................20

*In re Laventhol & Horwath,*
139 B.R. 109 (S.D.NY. 1992) .....................................................................................24

*In re N.Y. Med.Grp., PC,*
265 B.R. 408 (Bankr. S.D.N.Y. 2001) ......................................................................20

*In re R.J. Groover Constr., LLC,*
411 B.R. 460 (Bankr. N.D. Ga. 2008) .......................................................................20

*In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.,*
907 F.2d 1280 (2d Cir. 1990) ................................................................................ 19-20

*In re Todd Shipyards Corp.,*
92 B.R. 600 (Bankr. D. N.J. 1988) .............................................................................23

*In re United Imports, Inc.,*
203 B.R. 162 (Bankr. D. Neb. 1996) ..........................................................................19

*Mazzeo v. Lenhart (In re Mazzeo),*
167 F.3d 139 (2d Cir. 1999) .........................................................................................20

*MacPherson v. State St. Bank & Trust Co.,*
452 F. Supp. 2d 133 (E.D.N.Y. 2006) ......................................................................25

*Robbins v. Robbins,*
964 F.2d 342 (4th Cir. 1992) .......................................................................................19

### STATE CASES

*Orchard Hotel v. Benjamin Zhavian,*
34 Misc. 3d 1219(A) (N.Y. Sup. Ct. Jan. 31, 2012) ............................................................1

### MISCELLANEOUS

Lawrence P. King, COLLIER ON BANKRUPTCY (15th ed. 2006) ............................ 19

Orchard Hotel, LLC ("Orchard"), by and through its undersigned counsel, hereby submits this motion seeking relief from the automatic stay pursuant to section 362(d) of title 11 of the United States Code for the limited purpose of permitting the Appellate Division, First Department, of the New York State Supreme Court ("Appellate Division") to decide an appeal ("Appeal") which was being briefed when this chapter 11 proceeding was commenced, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Since July 2011, nearly three years before this case was commenced, the Debtor, a single-asset real estate entity, has waged a scorched earth litigation battle in the New York State Supreme Court for New York County ("Supreme Court") and in the Appellate Division with Orchard, the note-holder and mortgagee, in a desperate attempt to keep its sole asset, the property located at 139-141 Orchard Street, New York, New York ("Mortgaged Property") from foreclosure. The Debtor had been largely unsuccessful before the Supreme Court and the Appellate Division, and shortly before its brief was due in connection with a third trip to the Appellate Division, the Debtor commenced this chapter 11 case.[1]

2.        As a result of this Court's oversight and direction, the sale of the Mortgaged Property that Orchard has long sought is scheduled to occur on February 10, 2015.[2] What remains in this case is the allowance and payment of the relatively few claims against this estate

---

[1] A second front in this war was waged in the Supreme Court Kings County in connection with the Debtor's principal's liability as the guarantor of all indebtedness to Orchard. The court found in Orchard's favor, and against Zhavian, on the issue of liability. That action is currently stayed pending the resolution of Orchard's claim in this action. *See* Opinion, *Orchard Hotel v. Benjamin Zhavian*, 34 Misc. 3d 1219 (N.Y. Sup. Ct. Jan. 31, 2012) ("Demarest Decision"), a copy of which is annexed hereto as Exhibit 1.

[2] As a result of a successful 363 process, the Debtor is scheduled to seek approval of a $33 million sale of the Mortgaged Property on February 10, 2015.

including Orchard's claim of approximately $28 million, including interest, fees, and costs.[3] Now that the Debtor has lost its property, it seeks to begin anew the battle with Orchard in this Court over issues the Appellate Division had previously decided in Orchard's favor and was poised to decide again, so that the Debtor's principal can recover from the proceeds of the sale. The Court should not permit that to happen.

3.    The Debtor has filed a blunderbuss objection to Orchard's claim – *See* Debtor's Objection to Various Aspects of the Secured Claim of Orchard Hotel, LLC, *In re D.A.B. Group LLC*, No. 14-12057, Dkt. No. 86 (Bankr. S.D.N.Y. Jan. 19, 2015) ("Objection") – premised upon an alleged promise by the original lender and assignor of the mortgage loans ("Loans"), Brooklyn Federal Savings Bank ("BFSB"), in August 2010 to extend the maturity date of the Loans beyond March 1, 2011. This is the Debtor's so-called "estoppel defense." The Appellate Division has soundly and repeatedly rejected this defense and the Debtor has repeatedly admitted that the final maturity date of the Loans was never, in fact, extended and that the Loans were not repaid upon maturity on March 1, 2011. Though Orchard disagrees with the Debtor's central proposition that as a result of the estoppel defense Orchard is not entitled to contractual default rate interest, and will respond in due course to the balance of the Debtor's contentions, the Objection raises a threshold issue regarding the effect of the proceedings before the Supreme Court and the Appellate Division.

4.    The Objection sets forth identical facts raised by the Debtor during three years of litigation in the State Court, during which the Debtor attacked the Mortgages with variants of the same estoppel defense. Orchard painstakingly defeated those claims and defenses one by one,

---

[3] On December 10, 2014, Orchard filed its proof of claim. *See* Proof of Claim, *In re D.A.B. Group LLC*, 14-12057, Claim No. 9, (Bankr. S.D.N.Y. Dec. 10, 2014), a copy of which is attached hereto as Exhibit 2 together with its Rider and Exhibits (the "Hotel POC").

obtaining three separate decisions and orders - first from the initial Supreme Court Justice assigned to the matter and subsequently two from the Appellate Division - that the Debtor could not have reasonably relied on any purported oral modification of the Loans as a matter of law because the loan documents emphatically prohibited oral modifications. The predicate for the Debtor's estoppel defense -- that the Debtor reasonably relied on an alleged oral extension -- has been held to be legally meritless three times. The defense is also factually meritless, as the Debtor was well aware that the Loans could be modified *only* by a written and signed agreement, which never materialized.[4]

5.       Notwithstanding the three clear and consistent rulings that the Debtor could not have reasonably relied on alleged oral representations by BFSB, on March 21, 2014 a different State Court judge, to whom the case was reassigned after the original judge retired, ruled that the issue of the Debtor's purported reliance on purported representations by BFSB was a question of fact. Indeed, the central thrust of the Objection is that "[a]lthough the Appellate Division dismissed the Debtor's counterclaims on two occasions; Justice Ramos' decision was the last state court ruling prior to the commencement of bankruptcy." *See* Objection at ¶ 9.

6.       However, the Debtor's argument grossly oversimplifies the breadth of this issue. A debtor enters chapter 11 with no more rights than it had prior to the filing.[5] To the extent that the Appellate Division rejected the Debtor's defenses, the Debtor cannot now resurrect them. The Debtor all but concedes that Justice Ramos' ruling directly contravenes the three prior orders entered in the State Court litigation. As such, there is a question regarding what rights, exactly,

---

[4] Based upon virtually the same analysis, the Kings County Supreme Court held the Debtor's principal and guarantor of Orchard's indebtedness liable to Orchard. *See* Demarest Decision at 1.

[5] Other than rights expressly granted a debtor by the Bankruptcy Code, such as the ability to assign leases despite anti-assignment provisions, none of which are implicated here.

the Debtor had to raise the estoppel defense as of the commencement of this case. Consideration of this issue, necessarily, will require the Court to stand as a reviewing court to determine whether Justice Ramos' opinion is contrary to prior decisions of the Appellate Division; however, a federal court cannot review the propriety of orders of the state court.

7.    The purpose of this motion is to avoid the thorny jurisdictional issues raised by the Debtor's ongoing litigation strategy, and, instead to put the question of the effect of Justice Ramos' decision to the Appellate Division – where it was set to be heard before the Debtor commenced this case – in the first instance. Given that the Appellate Division has ruled on the issue twice and but for the Debtor's petition would be poised to rule on it for a third time, the most prudent course here is to permit the Appellate Division to decide the Appeal. If, as is likely, the Appellate Division reaffirms its two prior holdings that the Debtor could not have reasonably relied on any alleged oral representations by BFSB as a matter of law, the Debtor will be precluded from raising any estoppel defense in this proceeding, thereby eliminating the only material contested issue. As such, Orchard respectfully requests that the Court lift the automatic stay for the limited purpose of permitting the Appellate Division to rule on the Appeal as soon as possible.

## **BACKGROUND**

### I.    **Orchard's Claim**

8.    Pursuant to the Mortgages, the underlying promissory notes ("Notes"), a Loan Modification Agreement ("LMA"), a Building Loan Agreement and an Estoppel Certificate (collectively, and together with certain personal guaranties, the "Loan Documents").[6] Orchard

---

[6]    True and correct copies of the Loan Documents are attached to Orchard's Proof of Claim. *See* Exhibit 2, Ex's: A, B, C, D, F, G, H, I.

filed a proof of claim seeking the following amounts that Orchard believed were owing as of the

Petition Date:

| Item | Principal | Interest | Total |
|------|-----------|----------|-------|
| Project Loan | 5,500,000 | 4,513,667 | 10,013,667 |
| Building Loan | 7,960,973 | 6,533,305 | 14,494,278 |
| Protective advances | 800,406 | 363,061 | 1,163,467 |
| Receiver expenses | 111,405 | 56,274 | 167,679 |
| Legal expenses | 2,313,610 | 602,241 | 2,915,851 |
| **Total due** | **16,686,394** | **12,068,548** | **28,754,942** |

## II.    The Loans

### A.    The Loan Documents

9.    The Loans consisted of two rounds of financings – a $5.5 million loan in November 2007 ("Project Loan"), evidenced by a Consolidated Secured Promissory Note ("Project Loan Note") in favor of BFSB and a Mortgage Consolidation, Extension, Modification and Security Agreement ("Project Loan Mortgage"), and a loan of up to $19.05 million in August 2008 ("Building Loan"), evidenced by a Secured Building Loan Promissory Note ("Building Loan Note") in favor of BFSB and a Building Loan Mortgage and Security Agreement ("Building Loan Mortgage"). The Debtor intended to use the Loans to develop a boutique hotel on the Mortgaged Property. The Debtor and BFSB also executed a Building Loan Agreement, setting forth each party's rights and obligations with respect to construction advances.

### B.    Provisions in the Loan Documents Relevant to this Motion

#### 1.    The Maturity Date

10.    The Project Loan Note had an initial maturity date of June 1, 2008, and one optional extension term to December 1, 2008.

11.    The Building Loan Note had an initial maturity date of September 1, 2009, and three optional six-month extension terms to March 1, 2011.

12.    When the Building Loan was made on or about August 21, 2008, the Debtor and BFSB agreed to extend the final maturity date of the Project Loan to match the maturity date of the Building Loan. Accordingly, BFSB, the Debtor, and Zvi Benjamin Zhavian ("Guarantor") executed a written Loan Modification Agreement, which extended the maturity date of the Project Loan Note to September 1, 2009, with three optional six-month extension terms to March 1, 2011. All other provisions of the Project Loan Note and other Loan Documents remained unchanged. *See* Hotel POC at Ex. C, Loan Modification Agreement at 1.

13.    As such, the Notes had a final maturity date of March 1, 2011.

## 2.    The Debtor's Payment Obligations

14.    The Debtor is obligated to repay the outstanding principal on the Notes, together with all costs and expenses incurred by the mortgagee in enforcing the Notes and Mortgages and protecting the Mortgaged Property, all with interest thereon at the default rate. The amounts due cannot be impaired or reduced by defenses or offsets.

15.    The Notes contain identical provisions regarding the Debtor's payment obligations. Each Note provides that the Debtor's "failure to make any payment as and when required under this Note (after a ten day grace period, except that there shall be no grace period for the payment due on the Maturity Date) . . . shall constitute an 'Event of Default' under this Note." *See* Hotel POC at Ex. F, Building Loan Note at §4.1; Hotel POC at Ex. A, Project Loan Note at §3.1.

16.    Upon an Event of Default, the interest rate on each Note automatically increases to a default rate of 24% ("Default Rate"). The Project Loan Note states: "From and after the occurrence of an Event of Default, regardless of whether or not there has been a notice of default

issued by Holder, interest shall accrue on the outstanding Principal Sum at a rate equal to twenty-four percent (24%) per annum (the 'Default Rate')." *See* Hotel POC at Ex. A, Project Loan Note at §§ 3.4(b), 3.1. The Building Loan Note contains a nearly identical provision. *See* Hotel POC at Ex. F, Building Loan Note at §§ 4.4(b), 4.1.

17.    The Notes also require the Debtor to pay "all costs and expenses incurred in connection with the pursuit by Holder of any of its rights or remedies hereunder or under the Mortgage of any of the Loan Documents or for the protection of, or realization of, collateral, or in connection with any of Holder's collection efforts . . . all such costs and expenses being payable on demand, together with interest at the Default Rate thereon." *See* Hotel POC at Ex. A, Project Loan Note at § 3.3; Hotel POC at Ex. F Building Loan Note at § 4.3.

18.    The Debtor acknowledged that its obligations under each Note are "absolute and unconditional" and it waived all defenses in any action to enforce the Note. Each Note states:

> *Maker acknowledges that this Note and Maker's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Note and the obligations of Maker hereunder* or the obligations of any other person or party relating to this Note or the obligations of Maker hereunder. This Note sets forth the entire agreement and understanding of Holder and Maker, and *Maker absolutely, unconditionally and irrevocably waives any and all right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever with respect hereto or the obligations of Maker hereunder or the obligations of any other person or party relating hereto in any action or proceeding brought by Holder to collect the outstanding balance of the Principal Sum, accrued and unpaid interest, late charges, and other amounts owing, or any portion thereof,* or to enforce, foreclose and realize upon the liens created by the Mortgage and any other security document.

*See* Hotel POC at Ex. A, Project Loan Note at § 8.8; Hotel POC at Ex. F, Building Loan Note at § 9.8 (emphasis added).

19.    Consistent with the Notes, the Building Loan Mortgage provides that if the Debtor fails to perform its covenants, including the payment of taxes and insurance and maintenance of the Mortgaged Property, "the Mortgagee may make advances to perform the same on Mortgagor's behalf" and the Debtor "shall repay on demand by Mortgagee all such sums so advanced by Mortgagee on Mortgagor's behalf with interest at the Involuntary Rate."[7] *See* Hotel POC at Ex. H, Building Loan Mortgage at § 1.10.

### 3.    No Oral Modifications

20.    None of the Loan Documents could be amended or modified except by a written, signed agreement.

21.    Each Note states:

> *Any waiver hereunder shall be valid and enforceable only if in writing and signed by the party against whom enforcement is sought, and then only to the extent therein set forth.* The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently. *No executory agreement unless in writing and signed by Holder, and no course of dealing between Maker, the endorser(s) or guarantor(s) hereof, or any of them, shall be effective to change or modify or discharge, in whole or in part, this Note.*

*See* Hotel POC at Ex. A, Project Loan Note at § 8.7; Hotel POC at Ex. F, Building Loan Note at § 9.7 (emphasis added). In addition, each Note "may not be terminated or amended orally, but only by a termination or amendment in writing signed by Holder." *See* Hotel POC at Ex. A, Project Loan Note at § 8.1; Hotel POC at Ex. F, Building Loan Note at § 9.1.

22.    The Building Loan Mortgage contains an express acknowledgement by the Debtor that none of the Loan Documents can be modified orally and that the Debtor could not

---

[7]    The Building Loan Mortgage defines "Involuntary Rate" as "the Default Rate as set forth in the Note." *See* Hotel POC at Ex. H, Building Loan Mortgage at 3.

reasonably rely on any such purported modifications. The Building Loan Mortgage states as follows –

> The Mortgagor recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, *frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the borrower relied to its detriment upon such "oral modification of the loan document". For that reason, and in order to protect the Mortgagee from such allegations in connection with the transactions contemplated by this Mortgage and the Building Loan Agreement,* the Mortgagor acknowledges that this Mortgage, the Note, the Building Loan Agreement, and all instruments referred to in any of them can be extended, modified or amended only in writing executed by the Mortgagee and that none of the rights or benefits of the Mortgagee can be waived permanently except in a written document executed by the Mortgagee. *The Mortgagor further acknowledges the Mortgagor's understanding that no officer or administrator of the Mortgagee has the power or the authority from the Mortgagee to make an oral extension or modification or amendment of any such instrument or agreement on behalf of the Mortgagee.*

*See* Hotel POC at Ex. H, Building Loan Mortgage at § 3.21 (emphasis added).

23.    The Building Loan Agreement also expressly prohibits oral and informal modifications: "Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument." *See* Hotel POC at Ex. G, Building Loan Agreement at § 7.1. It is undisputed that there was never a written, signed extension of the Loans' final maturity date of March 1, 2011.

### III.    The Debtor's Defaults

#### A.    The Cava Mechanic's Lien

24.    The hotel project did not proceed as specified in the Loan Documents. In early

2010, the Debtor terminated its general contractor, Cava Construction & Development, Inc.

("Cava"), causing Cava to levy a mechanic's lien against the Mortgaged Property in the amount

of $959,000.[8] Cava and the Debtor arbitrated Cava's claim, and the arbitrator ruled that the

Debtor had materially breached its contractual obligations to Cava and awarded Cava more than

$1 million in damages. *See* Construction POC at Ex. C, Award of Arbitrator dated as of February

23, 2011.

25.    The Debtor never satisfied Cava's judgment in whole or in part and it did not

bond the Cava mechanic's lien, which remains pending against the Mortgaged Property.

26.    After terminating Cava, the Debtor retained Flintlock Construction Services LLC

("Flintlock") as its new general contractor. However, because the Debtor had failed to bond or

satisfy the Cava mechanic's lien, BFSB suspended further construction advances. Under the

Building Loan Agreement, as a condition precedent to the funding of advances, the Debtor was

required to remove or bond any mechanic's lien no later than 30 days after it was filed. *See* Hotel

POC at Ex. G, Building Loan Agreement at §§ 2.3(f), 5.1(k).

27.    In August 2010, BFSB agreed to resume construction advances, provided that the

Debtor and Flintlock acknowledged BFSB's right to reserve $960,000 in Building Loan funds

until the Debtor satisfied the Cava lien. On August 26, 2010, the Debtor, the Guarantor and

---

[8] Orchard Construction, LLC, an affiliate of Orchard, purchased Cava's lien and all related claims prepetition on or around August 23, 2011. On December 10, 2014, Orchard Construction filed a proof of claim with this court. *See* Proof of Claim, *In re D.A.B. Group LLC*, Claim No. 10 (Bankr. S.D.N.Y. Dec. 10. 2104) a true and correct copy of which is attached hereto at Exhibit 3 together with its Rider and Exhibits ("Construction POC").

Flintlock executed an Affidavit and Estoppel Certificate ("Estoppel Certificate") in which they

acknowledged and agreed to BFSB's reservation of funds. The Debtor also represented and

warranted that it had "no claims against the Lender [*i.e.*, BFSB]" and that to the best of its

knowledge, BFSB had "performed and satisfied all of its obligations under the Note, the

Mortgage and the Loan Documents through the date hereof." *See* Hotel POC at Ex. D, Estoppel

Certificate.

28.    The Debtor further acknowledged that the terms of the Loan Documents remained

unchanged by the Estoppel Certificate:

> Borrower agrees that a novation is expressly denied and not
> intended to be effected, and except as amended or modified by this
> Agreement, the terms, provisions, conditions, rights, duties and
> obligations contained in the Loan Documents shall remain
> unchanged and unimpaired by this Certificate and are in full force
> and effect.

*Id.*

29.    In a letter dated September 1, 2010, the Debtor exercised its final extension option

under the Loan Documents. The letter reads: "This letter is to inform you of my request for a 6-

month renewal option on the above referenced loan [*i.e.*, the Project Loan and Building Loan]."

*See* Letter from Ben Zhavian to BFSB, dated September 1, 2010, a true and correct copy of

which is attached hereto as Ex. 4. This letter extended the Loans' maturity date by six months,

from September 1, 2010 to March 1, 2011.

### B.    The Debtor's Misappropriation of Loan Funds

30.    In early 2011, the Debtor requested a modification of the Loan Documents to

extend the final maturity date of the Notes beyond March 1, 2011. BFSB declined the request for

the extension because the Debtor's principal, Zhavian, was caught diverting Building Loan

proceeds, and the Loans were deemed too risky. A March 22, 2011 internal bank memorandum, which was part of the State Court record, states:

> On several occasions, we have caught him [Mr. Zhavian] diverting money he has been given via construction loan advances which has been brought to our attention by the contractor [Flintlock] who failed to be paid. . . .
>
> We recommend this sale as a better alternative to disbursing additional monies and then running the risk of needing takeout financing to repay or the considerable risk that Mr. Zhavian, the guarantor/owner, will do something to endanger our position.

See Memo from the Loan Workout Department to the Loan Workout Committee, dated March 22, 2011, a true and correct copy of which is attached hereto as Ex. 5. During depositions in the State Court foreclosure action, BFSB witnesses underscored the seriousness of Zhavian's misconduct. BFSB loan officer Richard Maher testified that Zhavian's misappropriation of loan proceeds was "a misuse of funds and potential violations of the law" and that BFSB "should have called the DA." Id.

### C.    The Debtor's Failure to Repay the Loans Upon Maturity

31.    Because the Debtor failed to negotiate an extension of the Loans' final maturity date, the Loans matured on March 1, 2011. The Debtor failed to repay the amounts due upon maturity, which constituted an Event of Default under the Notes. See Hotel POC at Ex. A, Project Loan Note § 3.1; Hotel POC at Ex. F Building Loan Note § 4.1.

32.    In its loan statement for March 1, 2011, BFSB advised the Debtor that the Loans had matured. In addition, by letter dated March 23, 2011, BFSB advised the Debtor that "the Notes . . . secured by the Mortgages matured by their respective terms on March 1, 2011" and that BFSB "does not consent to any further extension of the Notes and accordingly the Notes are payable in full at this time." See Letter from David Kriss, Esq., to Ben Zhavian, dated March 23, 2011. See Hotel POC at Ex. E.

33.    Under the Notes, the Loans began to accrue interest at the default rate when they were not repaid on March 1, 2011. *See* Hotel POC at Ex. A, Project Loan Note §§ 3.2, 3.4; Hotel POC at Ex. F, Building Loan Note at §§ 4.2, 4.4(b).

34.    On May 24, 2011, the Debtor's attorney, William Wallace, wrote to BFSB's counsel requesting that BFSB reinstate the Loans. Wallace acknowledged that the Loans had matured nearly three months prior, on March 1, 2011, and that they had not been extended. Wallace wrote:

> I understand that the Loan termed out pursuant to the original Loan documents on March 1, 2011 and that our respective clients have been discussing an extension of that term so that the project may continue and the hotel built. The purpose of this letter is to provide you with certain information which may be helpful to you and your client in making a determination as to whether or not the Loan term should be extended.

*See* Letter from William Wallace to David Kriss, dated May 24, 2011, a true and correct copy of which is attached hereto as Exhibit 6. Wallace explicitly requested "a written extension of the term of the Loan." *Id.*

35.    As Wallace later repeatedly conceded before the State Court, DAB never received any such written extension. During oral argument before the State Court in July 2012, Wallace reaffirmed that the final maturity date of the Loans was never extended. "Now, the loan on the face of it [termed] out on March 2011, no question." *See* Excerpt Tr. of July 31, 2012, Pg. 10, lines 20-21, a true and correct copy of which is attached hereto as Exhibit 7. At a hearing several months later, Wallace again conceded that there was no written extension agreement: "when we got served with the complaint and prepared an answer and counterclaim, the first thing you do is ask the client: 'I read these documents. Is there a writing extending this agreement?' He says, 'they *told* me, they kept *telling* me back to August of 2010 don't worry. Your loan is

extended.'" *See* Excerpt Tr. of July 9, 2013, Pg. 19, line 23 – Pg. 20, line 4 (emphasis added), a true and correct copy of which is attached hereto as Exhibit 8.

36.    There has never been any dispute that the Notes matured on March 1, 2011.

37.    On June 17, 2011, BFSB assigned to Orchard all of BFSB's right, title and interest under the Loans.

38.    By letter dated June 23, 2011, Orchard advised the Debtor of additional Events of Default that had occurred since the maturity date. *See* Letter of June 23, 2011, a true and correct copy of which is attached hereto as Exhibit 9.

39.    Since March 1, 2011, the Debtor has not repaid any of the amounts outstanding under the Notes, nor has it paid property taxes, insurance, maintenance, security, or costs incurred to preserve the Mortgaged Property's zoning rights and permits, all of which have been funded by Orchard.

40.    By letter dated June 20, 2014, Orchard advised the Debtor of further Events of Default in connection with the Debtor's failure to adequately protect the Mortgaged Property by jeopardizing the property's development rights. *See* Letter dated June 20, 2014, a true and correct copy of which is attached hereto as Exhibit 10.

## IV.    The State Court Proceedings

41.    On July 1, 2011, Orchard filed an action in the State Court to foreclose the Mortgages. The Debtor answered and asserted three counterclaims against Orchard and BFSB.[9]

42.    As relevant here, in a supporting Affidavit by Ben Zhavian, the Debtor alleged that BFSB misrepresented to the Debtor on August 26, 2010 that the maturity date of the Loans

---

[9]    DAB also asserted its counterclaims against State Bank of Texas ("State Bank"), which was a participant in the Loans with BFSB but not a signatory to any Loan Documents.

would be extended by "approximately 430 days," to "mid-November 2011."[10] The Debtor

alleged:

> It was agreed at that time [*i.e.*, August 26, 2010] that the loan
> funding and term would continue through the substantial
> completion of the Project approximately 430 calendar days from
> August 26, 2010. . . . There can be no doubt that as of August 2010
> at the time that Brooklyn Federal and State Bank approved the
> Flintlock contract, they also extended the loans to "mid
> November" 2011 to conform and run parallel with the time
> schedule and budget as set forth in the approved Flintlock contract.

*See* Zhavian Affidavit in Opposition filed on November 3, 2011, paragraphs 21 – 23, a true and

correct copy of which is attached hereto as Exhibit 11.

43.    The Debtor characterized its allegations as a counterclaim for fraud and an

affirmative defense of estoppel.

**A.    The State Court's March 30, 2012 Decision and Order and the Appellate
Division's May 28, 2013 Affirmance**

44.    By Decision and Order entered March 30, 2012, Justice Bernard Fried of the State

Court dismissed the Debtor's counterclaims, including its fraud counterclaim, which is identical

to its estoppel defense. As Justice Fried explained, the Loan Documents are replete with

provisions prohibiting oral modifications and the Debtor "does not dispute that these provisions

are contained within the valid, binding agreements between the parties." *See* Decision & Order,

---

[10] The Debtor's contention that the maturity date of the Loans was extended on August
26, 2010 is squarely contradicted by an Estoppel Certificate that the Debtor signed the very same
day, in which the Debtor agreed "that a novation is expressly denied and not intended to be
effected, and except as amended or modified by this Agreement [*i.e.*, the Estoppel Certificate],
the terms, provisions, conditions, rights, duties and obligations contained in the Loan Documents
shall remain unchanged and unimpaired by this Certificate and are in full force and effect." The
Debtor further represented and warranted, among other things, that (i) it had no claims against
BFSB, (ii) the Project Loan and Building Loan Mortgages were "valid first and second liens,
respectively, on the Property," (iii) the "Borrower and Ben Zhavian have no defenses to, or
offsets against, any of its obligations under the Note, the Mortgage, the Guarantee or under the
Loan Documents," and (iv) BFSB had satisfied all of its obligations under the Loan Documents.

March 30, 2012 at 7 ("Fried Opinion"), a true and correct copy of which is attached hereto as

Exhibit 12.

45.    Justice Fried held that the Debtor's allegations were not actionable because, in

light of the "bargained-for, and agreed-upon, contractual provisions [in the loan documents], the

allegation that DAB justifiably relied on unsigned, unwritten representations by agents acting on

behalf of Brooklyn [Federal] or State Bank, cannot be credited." *Id.*

46.    The Fried Opinion was affirmed by the Appellate Division by Decision and Order

entered May 28, 2013. The Appellate Division held that:

> The loan documents expressly prohibit oral termination or
> amendment and provide for termination or amendment only in
> writing signed by Brooklyn Federal, and in the mortgage
> agreement D.A.B. acknowledged that the mortgage and all the
> other documents could be extended, modified or amended only in
> writing executed by Brooklyn Federal, and that no officer or
> administrator of the bank had the power or authority from the bank
> to make an oral extension or modification or amendment on any of
> the loan documents on its behalf.

*See* Decision & Order, May 28, 2013 at Pg. 55 ("First Appellate Division
Opinion"), a true and correct copy of which is attached hereto as Exhibit 13.

**B.    The Appellate Division's February 18, 2014 Order**

47.    In June 2012, Justice Fried retired and the action was reassigned to Justice

Charles Ramos. Although discovery was complete, Justice Ramos directed the parties to

undertake additional discovery.

48.    On July 9, 2013, Justice Ramos attempted to vacate Justice Fried's affirmed order

dismissing the Debtor's counterclaims. "Judge Fried's decision is withdrawn by me because now

I am the judge." Without a prior request or a proffered pleading, Justice Ramos, *sua sponte*,

directed the Debtor to file an amended pleading referencing an internal BFSB action plan that the

Debtor obtained through discovery ("Action Plan"). These bench rulings were memorialized in an order entered on August 28, 2013.

49.     The Debtor filed an amended answer and counterclaims on August 8, 2013. Included in the Debtor's amended pleading was the affirmative defense of estoppel.

50.     Orchard appealed Justice Ramos' decision, and on February 18, 2014, the Appellate Division reversed the August 28, 2013 order, reinstating Justice Fried's decision and vacating the Debtor's amended pleading, finding the pleading meritless. *See* Decision & Order, Feb. 18, 2014 ("Second Appellate Division Opinion"), a true and correct copy of which is attached hereto as Exhibit 14.

51.     As it had done in the First Appellate Division Opinion, the Appellate Division held that the Debtor could not establish reasonable reliance on any oral representations by BFSB under any legal theory.

52.     The Appellate Division further held that the Action Plan was not an enforceable written modification of the Loans as required by the Loan Documents and therefore could not have been reasonably relied upon by the Debtor:

> [The] Action Plan, dated February 15, 2011, was unenforceable because it was an internal bank document that the Office of Thrift Supervision (OTS), the federal oversight agency, never approved – an unfulfilled condition precedent. In addition, Brooklyn Federal ultimately rescinded the Action Plan pursuant to a March 22, 2011 memorandum that it issued prior to OTS's consideration of an extension. Thus, the Action Plan provides no basis to find that there was reasonable reliance on a writing that extended the loans' maturity date.

*Id.*[11]

---

[11]    The March 22, 2011 memorandum referenced by the Appellate Division stated that BFSB rescinded the Action Plan because BFSB had repeatedly caught the Debtor's principal, Ben Zhavian, diverting Building Loan proceeds, and the Loans were deemed too risky. The memorandum states as follows:

53.    The Appellate Division also held that the Action Plan could not be used to corroborate the Debtor's claims of oral misrepresentations because during the events at issue, the Debtor did not even know the Action Plan existed.

> Further, even if this Court were to consider this document an indication of misrepresentation, DAB cannot establish that it reasonably relied upon the Action Plan – a document it was unaware of until May 2013 – because it was an internal document that was not communicated, delivered or presented to DAB.

*Id.*

54.    The Appellate Division also held that the Debtor's proposed amended pleading, which included the estoppel defense, "lacks merit."

55.    Upon remand, the State Court ruled on Orchard's summary judgment motion, which was then pending. Disregarding the Appellate Division's repeated holdings that the Debtor could not have reasonably relied on a purported oral extension of the Loans, on March 28, 2014, Justice Ramos denied Orchard's motion for summary judgment (the "Ramos Opinion"), a true and correct copy of which is attached hereto as Exhibit 15. Although the court found that Orchard had established its right to foreclose the Mortgages and that the Debtor's opposition to Orchard's motion was based on "identical arguments . . . as it made previously in its counterclaims, which were dismissed," the State Court nevertheless found a triable issue of

---

> On several occasions we have caught him [Zhavian] diverting money he has been given via construction loan advances which has been brought to our attention by the contractor [Flintlock] who failed to be paid. . . .

> We recommend this sale as a better alternative to disbursing additional monies and then running the risk of needing takeout financing to repay or the considerable risk that Mr. Zhavian, the guarantor/owner, will do something to endanger our position.

fact as to the Debtor's alleged reliance on the purported oral extension of the maturity date of the Notes.

56.    Orchard immediately filed a notice of appeal to the Appellate Division of the erroneous branch of the Ramos Opinion. Neither Orchard nor the Debtor appealed any other branch of the Ramos Opinion. Orchard perfected its appeal on July 7, 2014.

57.    The Debtor's deadline to oppose the Appeal was August 6, 2014. Seeking to avoid an adverse ruling in the Appellate Division, the Debtor commenced this chapter 11 proceeding on July 14, 2014.

## DISCUSSION

**I.    The Court Should Grant Stay Relief to Permit the Appellate Division to Rule Again on the Debtor's Estoppel Defense**

58.    While Bankruptcy Code section 362 operates to stay all pending litigation with or against a debtor, courts often permit "litigation to be concluded in another forum, particularly if the nonbankruptcy suit involves multiple parties or is ready for trial." Lawrence P. King, COLLIER ON BANKRUPTCY (15th ed. 2006) at 362.07[3][a]; *see also In re Sonnax Indus., Inc. v. Tri Component Prods. Corp.*, 907 F.2d 1280 (2d Cir. 1990); *In re Castlerock Properties*, 781 F.2d 159 (9th Cir. 1986); *In re Curtis*, 40 B.R. 795 (Bankr. D. Utah 1984). "Congress did intend that the automatic stay be lifted to allow litigation involving the debtor to continue in nonbankruptcy forums . . . ." *In re United Imports, Inc.*, 203 B.R. 162, 166 (Bankr. D. Neb. 1996) (citing legislative history); *see also Robbins v. Robbins*, 964 F.2d 342, 345 (4th Cir. 1992) (citing legislative history: "it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere").

59.    In determining whether cause exists, most courts "balance the hardship to the creditor, if he is not allowed to proceed with his lawsuit, against potential prejudice to the debtor, debtor's estate and other creditors." *In re R.J. Groover Constr., LLC*, 411 B.R. 460, 463-64 (Bankr. N.D. Ga. 2008). In performing this balancing, courts consider the "*Sonnax*" factors:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interest of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether movant's succession to the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) the impact of the stay on the parties and the balance of the harms.

*In re Sonnax Indus., Inc.*, 907 F.2d at 1286; *see also In re N.Y. Med.Grp., PC*, 265 B.R. 408 (Bankr. S.D.N.Y. 2001).

60.    Not all of the twelve factors will be relevant in every case, and Courts only consider those factors that are relevant to the case at hand. *See Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 143 (2d Cir. 1999), *In re Enron Corp.*, 306 B.R. 465, 476 (Bankr. S.D.N.Y. 2004).

61.    The factors that are relevant here weigh strongly in favor of lifting the automatic stay with respect to permitting the proceedings before the Appellate Division to continue.

### A.    Proceedings Before the Non-Bankruptcy Court Will Fully Resolve the Issues and the Case Is Ready for Trial

62.    The first and eleventh *Sonnax* factors clearly weigh in favor of relief from the stay. The Debtor contends that one of the central purposes of this case is to litigate its purported estoppel defense. As set forth above, the central question of whether the Debtor can assert an estoppel defense – a creature of state law – implicates three prior decisions of the State Court. The Debtor insists that the Court only look at the Ramos Opinion. However, the Ramos Opinion leaves open a limited issue holding only that "DAB has raised an affirmative defense that Orchard Hotel should be estopped from proceeding with foreclosure due to the specific assurances and conduct of its loan officers that the loans would be extended." Ramos Opinion at 11. In particular, Justice Ramos was focused on BFSB's alleged approval of the Flintlock contract, and the implication that BFSB must have extended to Maturity Date to be coextensive with the expected completion date in the Flintlock contract. *Id.* at 10.

63.    The Debtor's suggestion that there is some element of its estoppel defense still alive because of the Ramos Opinion is simply unavailing: in the Ramos Opinion, Justice Ramos ignored that this issue was already considered by Justice Fried, who ruled against the Debtor and in favor of Orchard and by the Appellate Division, which did the same. Justice Fried had previously rejected the Debtor's contentions and this argument noting that the Debtor could never demonstrate reliance because the relevant agreements expressly provide that any amendment must be in a signed writing. Justice Fried held expressly that "[i]n light of these bargained for, and agreed-upon contractual provisions, the allegation that DAB justifiably relied on unsigned, unwritten, representations by agents acting on behalf of [BFSB] cannot be

credited." Fried Opinion at 7. The Fried Opinion has been upheld on appeal twice. Each time, the First Department expressly affirmed the finding that the Loan Documents could not be orally modified and that the Debtor could not rely on any such purported oral modification. *See* First Appellate Division Opinion at 55 (affirming dismissal of DAB's counterclaims and holding that oral statements by BFSB regarding future modifications were insufficient to modify the Loan Documents); Second Appellate Division Opinion (reversing Justice Ramos' vacating of the Fried Opinion). Stated succinctly, Justice Fried, as affirmed by the First Department, rejected the very allegation that Justice Ramos held could proceed to trial. Given that the Debtor cannot acquire more rights simply by filing bankruptcy – *see e.g., Butner v. U.S.*, 440 U.S. 48, 55 (1979) (noting that a debtor's right to property is governed by state law, and that a debtor cannot enhance its position in respect of property simply by filing bankruptcy) – the State Court's prior dismissal of DAB's counterclaims cannot be disturbed by the commencement of this case.

64.    As such, at best, Justice Ramos' order permitting the Debtor to litigate the discrete issue of its reliance on a proposed oral modification creates an ambiguity with the prior orders of the State Court and the Appellate Division. Whether Justice Ramos' insistence on advancing the case to trial in the face of two controlling contradictory decisions of the Appellate Division is proper must be resolved in the first instance by the Appellate Division, which is in the best position to opine on the scope of its previous orders. Resolution of the Appeal before the Appellate Division will materially advance a conclusive resolution of this issue and eliminate the need for future litigation before this Court regarding whether, as a matter of law, the Debtor is entitled to raise its estoppel defense.

65.    Additionally, the Appeal can be concluded in a reasonable period of time. The Appellate Division has twice had the opportunity to consider the Debtor's allegations, and the

parties were in the midst of a third round before the Appellate Division on the same issues. If the Debtor had not filed its petition on July 14, 2014, the Appeal would have been heard by the Appellate Division in the September 2014 Term. If the relief sought through this motion is granted and the stay is lifted by early March 2015, briefing can be completed by the Debtor and the Appeal can be heard by the Appellate Division during its May or June 2015 Terms. (The Court's May Term begins on April 21, 2015 and its June Term begins on May 19, 2015.)

66.    Where, as here, a non-bankruptcy court is familiar with the facts and circumstances of the proceeding, the case is nearly ready for trial, and a determination of the non-bankruptcy court will resolve the matter, relief from the stay to permit the non-bankruptcy court to hear the matter is appropriate.

### B.    Lifting the Stay Will Not Interfere with the Bankruptcy Case

67.    Courts have held that the second and seventh *Sonnax* factors (interference with the case and prejudice to other creditors) is satisfied where, as here, the State Court litigation would only fix the Debtor's liability, and would not otherwise affect any party's priority or right. *See, e.g., In re Todd Shipyards Corp.*, 92 B.R. 600 (Bankr. D. N.J. 1988) ("Since the movants only seek to litigate their claims to the point of judgment and do not seek relief from the stay in order to attach the property of the debtor, such relief does not interfere with the bankruptcy proceedings").

68.    The Debtor has nearly completed the sale of the Mortgaged Property, and that sale is in no way conditioned upon the results of this litigation. As the Debtor has suggested, that process will continue even if Orchard's claim is not liquidated. As such, permitting the actions in State Court to proceed will not impair the sales process or otherwise affect the management and operation of the estate.

69.    Additionally, there is no question that Orchard has a senior lien on the Mortgaged Property, and as such, the remaining parties to this case are already subordinate to Orchard. The only question is to what extent the Debtor can continue to raise defenses to the amount of Orchard's claim. A ruling on the availability of the estoppel defense, therefore, will not interfere with this case and cannot prejudice other creditors who already stand behind Orchard.

### C.    Lifting the Stay Will Promote Judicial Economy

70.    The tenth *Sonnax* factor looks to whether relief from the stay promotes judicial economy. The Court should grant relief from the automatic stay because doing so will serve the interests of judicial economy and expeditious resolution of the issues in the cases. *See In re Laventhol & Horwath*, 139 B.R. 109, 116 (S.D.N.Y. 1992) ("the interests of judicial economy and the expeditious and economical resolution of litigation" are important factors for the Court to consider in determining whether to lift the stay to permit a proceeding to continue before a non-bankruptcy court).

71.    Litigation regarding the Debtor's claims has been pending before the New York state courts for over three years. Orchard and BFSB have produced documents to the Debtor in response to multiple discovery requests. In addition, the parties have been before the Supreme Court five times and the Appellate Division three times on these same issues. It would be extremely inefficient to halt the litigation that is well underway before the Appellate Division and start afresh before this Court. The Appellate Division also has a strong interest in deciding the Appeal so that it can ensure that its prior rulings are properly respected and implemented by this or any other court.

72.    There are also serious jurisdictional and procedural issues regarding whether this Court can, in fact, rule on the availability of the estoppel defense that are avoided by permitting the case to proceed before the Appellate Division. A Federal court cannot stand in review of a

determination by a state court. *See, e.g., MacPherson v. State St. Bank & Trust Co.*, 452 F. Supp. 2d 133, 137 (E.D.N.Y. 2006) ("Rooker-Feldman establishes the clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments.") Here, the Appellate Division has dismissed the Debtor's allegations twice. This Court's consideration of the issues is, necessarily, a reexamination of the issues considered by the New York courts. Rather than spend time and resources litigating whether this Court can, in fact, rule on the Debtor's estoppel defense, the most efficient course of action is to lift the stay and permit the Appellate Division to rule on the precedential value of the Ramos Opinion.

### D.    Continuing the Automatic Stay Will Impose Substantial Hardships on Orchard That Far Outweigh Any Hardships on the Debtor

73.    The final *Sonnax* factor looks to whether the hardship to Orchard outweighs any perceived prejudice to the Debtor. Here, this factor again weighs entirely in Orchard's favor. The Debtor can hardly claim that there is any hardship in completing that litigation sooner rather than later. Indeed, stay relief here would have the effect of completing that litigation in months, with little to no increased costs to the estate because the Debtor has already briefed its purported estoppel defense in the State Court. As such, the Debtor will likely save costs by completing the litigation before the Appellate Division. The Debtor's desire to avoid another trip to the Appellate Division, where it has lost twice previously on the availability of the estoppel defense, is not a sufficient reason to move this issue out of the Appellate Division. Being denied that type of blatant forum shopping is certainly no hardship.

74.    Orchard, on the other hand, will suffer significant hardships if the stay remains in place. Orchard has advanced significant costs in attempting to both litigate with the Debtor and to prevent any deleterious effects of the Debtor's scorched earth litigation strategy from impairing the value of the Mortgaged Property. Orchard has been forced to advance all costs for

the upkeep and taxes on the Mortgaged Property since 2011. Orchard was forced to seek the installation of a receiver in order to maintain the Mortgaged Property, and if possible to continue the build out so as to prevent valuable permits from lapsing. The Debtor has not paid a single penny of maintenance or debt service since 2011, and now wants to further prolong a final adjudication of Orchard's rights while it re-litigates issues before this Court. This is the very definition of hardship, and cannot be countenanced.

## CONCLUSION

75.     Orchard and the Debtor have been litigating the viability of the Debtor's allegations for over three years before the New York State Courts. The Appellate Division has ruled on those allegations twice already, and the very issue of whether those allegations can again be raised is most efficiently heard by the Appellate Division in the first instance. The Appellate Division is well equipped to handle the dispute, the matter is almost fully briefed, and set to be heard in the next few months. Stay relief is manifestly appropriate here.

For the reasons set forth herein, Orchard respectfully requests the Court enter an order granting relief from the automatic stay for the limited purpose of permitting the Appellate Division to hear and determine the Appeal, and granting such other relief as the Court may find to be just and necessary.

Dated: February 10, 2015
      New York, N.Y.

MORRISON COHEN LLP

By: /s/ *Joseph T. Moldovan*
     Joseph T. Moldovan
     Robert K. Dakis
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600
Fax: (212) 735-8708
bankruptcy@morrisoncohen.com
www.morrisoncohen.com
*Counsel to Orchard Hotel, LLC*

26