14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 1 of 86
14-12057-scc    Claim 9-1 Part 39    Filed 12/10/14    Pg 2 of 35

Loan Number: 18-010588-2

# BUILDING LOAN AGREEMENT

in the amount of up to $19,050,000.00

Between

## D.A.B. GROUP LLC

and

## BROOKLYN FEDERAL SAVINGS BANK

Dated as of: August 21, 2008

DOCKETED BY

Property Address:
139 and 141 Orchard Street
New York, New York 10002

Block:        415
Lots:         66 and 67
County:       New York
State:        New York

AMT   $ 19,050,000.00

## DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, New York 10017
Attn: David S. Kriss, Esq.

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

## BUILDING LOAN AGREEMENT

THIS BUILDING LOAN AGREEMENT ("Agreement") dated this 21st day of August, 2008, between **D.A.B. GROUP LLC**, a New York limited liability company having an address of 154 Acres Road, Monroe, New York 10950 ("**Borrower**") and **BROOKLYN FEDERAL SAVINGS BANK**, having an address at 81 Court Street, Brooklyn, NY 10021 ("**Lender**").

## W I T N E S S E T H:

WHEREAS, subject to and upon the terms and conditions hereinafter set forth, Borrower wishes to borrow from Lender and Lender is willing to lend to Borrower, amounts up to but not exceeding NINETEEN MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($19,050,000.00) in the aggregate.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Use of or reference to the following terms herein shall be construed as indicated:

1.1    Advance:  Any disbursement of a portion of the Building Loan by Lender.

1.2    Budget:  Borrower's estimate of the cost to renovate the Improvements in accordance with the Draw Schedule, which estimate was previously delivered to Lender, as the same may be revised from time to time with Lender's approval in accordance with the terms of this Agreement.

1.3    Budgeted Amount:  The portion of the Building Loan that Borrower expects to be advanced for any particular line item of Hard Costs and Soft Costs ("Budget Line Item"), as set forth in the Budget.

1.4    Building Loan: NINETEEN MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($19,050,000.00), or so much thereof as may be advanced by Lender pursuant to the terms and conditions of this Agreement.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3 of Part 59    Filed 12/10/14    Pg 4 of 35
3 of 2    Pg 3 of 86

1.5    Building Loan Mortgage: The Building Loan Mortgage and Security Agreement dated the date hereof, that has been executed and delivered by Borrower to Lender, which encumbers the Property and the Improvements and secures, among other things, Borrower's obligations under the Building Loan Note and under this Agreement.

1.6    Building Loan Note: The Building Loan Note in the original principal amount of up to $19,050,000.00, dated the date hereof, that has been executed and delivered by Borrower in favor of Lender and which evidences the Building Loan.

1.7    Building Loan Term: The period of time commencing on the date hereof and ending on the Maturity Date as defined in the Building Loan Note.

1.8    Business Day: Any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

1.9    Collateral Documents: The Building Loan Mortgage; the Assignment of Leases and Rents, dated the date hereof, executed by Borrower in favor of Lender ("Assignment"); any financing statements filed in connection with the Building Loan Mortgage and/or the Assignment; the Environmental Indemnity Agreement and the Guaranty dated the date hereof, executed by Guarantor in favor of Lender ("Guaranty").

1.10    Funding Date: The date on which an Advance is actually disbursed.

1.11    Guarantor: (of payment and lien-free completion of the Project) Ben Zhavian.

1.12    Hard Costs: The costs of labor, materials and equipment necessary for the completion of the Construction Work in accordance with the Draw Schedule, as set forth and itemized in the Budget.

1.13    Construction Work: The renovation of the Project, which is to be carried out by Borrower using the proceeds of the Building Loan and Borrower's funds in compliance with the Budget, in accordance with the Draw Schedule.

1.14    Improvements: All structures, and buildings and all replacements thereof, now or hereafter located or erected upon the Property including all personal property owned by Borrower of every kind and nature whatsoever affixed to or forming part of said structures and/or buildings.

1.15    Interest Reserve. The sum of $2,000,000.00 which shall be held by Lender to pay interest when due under the Building Loan Note and the Project Loan Note.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
3 of 2    Pg 4 of 86
14-12057-scc    Claim 9-1 Part 99    Filed 12/10/14    Pg 5 of 35

1.16    Lender's Consultant: The appointed designee of Lender

1.17    Legal Requirements: All laws, statutes, treaties, codes, permits, decrees, ordinances, orders, rules, regulations, determinations, or requirements of any governmental authority, arbiter or court, including, without limitation, any environmental laws, any building, use, zoning and land use laws or regulations (including set back requirements), and any applicable covenants and restrictions pursuant thereto.

1.18    Loan Amount: Up to NINETEEN MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($19,050,000.00).

1.19    Net Building Loan: The aggregate of all Hard Costs and Soft Costs.

1.20    Draw Schedule: The trade payment breakdown on Schedule B attached hereto which is derived from the plans and specifications previously submitted to Lender, as the same may hereafter be modified or amended with the express consent of Lender and Lender's Consultant.

1.21    Project: The Property together with the Improvements.

1.22    Property: The premises located at 139 and 141 Orchard Street, New York, New York 10002 as more particularly described on Schedule A attached hereto and made a part hereof.

1.23    Requisition: A written certification and request for an Advance signed by Borrower substantially in the form of Schedule C attached hereto.

1.24    Retainage: Ten Percent (10%) of the sum of the Hard Costs and Soft Costs actually incurred by Borrower for work in place as part of the Improvements, as determined by Lender from time to time.

1.25    Scheduled Completion Date: On or before September 1, 2009, which date shall be extended for up to an additional eighteen months in the aggregate to be coterminous with the Note.

1.26    Soft Costs: The costs relating to the Construction Work or the Building Loan, including but not limited to, fees of architects and engineers, construction management fees, Lender's attorney's fees; recording taxes and title charges in respect of the Building Loan Mortgage, leasing commissions, survey costs, costs of bonding mechanics' liens and insurance premiums, that are part of the "cost of improvement" (as such term is defined in Section 2(5) of the New York Lien Law) with respect to the Construction Work but are not Hard Costs, as itemized in the Budget.

      1.27    Title Company: Metropolitan Abstract Corporation as agent for Commonwealth Title Insurance Company.

      1.28    Title Policy: The title insurance commitment, marked and redated as of the date hereof, that has been issued by the Title Company insuring the second mortgage lien of the Building Loan Mortgage, as the same shall be updated from time to time in accordance with the pending disbursements endorsement that is included therein.

### ARTICLE II

### BUILDING LOAN ADVANCES

      2.1    Agreement to Lend: Subject to the terms and conditions of this Agreement and Borrower's compliance with all the provisions hereof, and relying on Borrower's representations set forth herein, Lender agrees to lend to Borrower, and Borrower agrees to borrow from Lender, an amount not to exceed the Loan Amount, to be disbursed in several advances at such times and in such amounts as Lender shall determine in accordance with the procedures set forth in this Agreement.

      2.2    Advances Generally.

      (a)    Subject to the terms and conditions of this Agreement, each Advance shall be in an amount determined by Lender to be equal to the total Hard Costs and Soft Costs incurred or paid for by the Borrower (subject to Section 2.2(m)) and then due through the end of the period covered by the applicable Requisition less (i) the Retainage through the end of the period covered by the applicable Requisition, and less (ii) the aggregate amount of Advances previously made.

      (b)    Lender shall withhold from each Advance an amount equal to the Retainage with respect to the Hard Costs to be included in any such Advance, to the extent provided in the definition of Retainage in 1.24 hereof. All Retainage shall be advanced in the Final Advance provided the conditions obligating Lender to make the Final Advance shall have occurred. Lender, in its sole and absolute discretion, reserves the right to release to Borrower all or any portion of the Retainage at any time during the Building Loan Term (and any such release shall be considered an Advance for the purposes of subsections 2.2(a) and 2.2(d)).

      (c)    Lender shall not be required to make an Advance more than once in any thirty day period.

      (d)    Lender shall not be required to make an Advance if the sum of that Advance plus the sum of all Advances previously made and the Retainage with respect thereto,

when deducted from the amount of Net Building Loan, leaves an amount that Lender determines is insufficient to pay in full the remaining Hard Costs necessary to complete the Construction Work unless Borrower shall provide Lender with evidence satisfactory to Lender in its sole reasonable discretion that Borrower has the balance of the required funds to pay for the remaining Hard Costs necessary to complete the Construction Work.

(e)    Lender shall not be required to make any Advance other than to pay for, or to reimburse to Borrower for amounts paid for, those line items of Hard Costs and Soft Costs set forth in the Budget ("Line Item"). Lender shall not be required to make any Advance for any Line Item that would cause the aggregate amount advanced for such Line Item to exceed the Budgeted Amount for such Line Item. Lender shall not be required to make any Advance that would reduce the undisbursed portion of any Line Item below an amount that Lender (or Lender's Consultant) determines is the amount of such Line Item that is necessary to complete the Construction Work. Lender further reserves the right to require that Borrower deposit with Lender, within ten (10) days of Lender's demand therefor, good and readily available funds equal to the amount that Lender (or Lender's Consultant) determines is in excess of the Budget amount of such Line Item that is necessary to complete the Construction Work and the undisbursed portion of such Line Item ("Line Item Deficiency Amount").

(f)    Lender shall not be required to make Advances for building materials that have not been incorporated into the Improvements, unless: (i) the Lender's Consultant shall have inspected such materials and found them to be of acceptable quality and in conformance with the applicable Draw Schedule; (ii) Borrower shall have delivered to Lender bills of sale or other evidence reasonably satisfactory to Lender of the cost of, and Borrower's title to, such materials; (iii) Borrower shall have delivered evidence reasonably satisfactory to Lender specifying (1) the security measures that have been taken to protect such materials from theft, casualty or deterioration, and (2) the steps that have been taken to identify and to segregate such materials so as adequately to give notice to all third parties of Borrower's title in and to such materials; (iv) Borrower shall have provided evidence reasonably satisfactory to Lender that such materials are insured against all risk of loss for their full replacement cost; (v) such materials shall be stored on the Property; and (vi) to the extent that Advances with respect to materials that have not been incorporated in the Improvements shall exceed Fifty Thousand Dollars ($50,000), Lender shall have received UCC-1 financing statements or other evidence reasonably satisfactory to Lender of Lender's perfected first priority lien on and security interest in such materials.

(g)    Regardless of whether Borrower has submitted a Requisition therefor, Lender, in its sole and absolute discretion, may from time to time advance amounts that become due for Hard Costs for which Borrower is responsible for payment provided that Borrower has not paid same within ten (10) days of receipt of notice from Lender. Such advances may be made directly to (i) parties to whom such amounts are due, or (ii) Lender to reimburse Lender for sums due to it. All such advances ("Direct Advances") shall be deemed Advances hereunder and shall be secured by the Collateral Documents to the same extent as if

they were made directly to Borrower.

(h)     All Advances, other than Direct Advances, shall be made to Borrowers account at an account established at Lender or such other bank as shall be approved by Lender in writing (the "Bank").

(i)     If Lender, Lender's Consultant or Title Company shall so require, Borrower shall submit with its Requisitions estoppel certificates, lien waivers or other similar certifications in form satisfactory to Lender and Title Company showing amounts paid and amounts due to all persons or organizations furnishing labor or materials in connection with the completion of the Improvements.

(j)     The making of an Advance by Lender shall not constitute Lender's approval or acceptance of the construction theretofore completed.  Lender's inspection and approval of the Draw Schedule, the Construction Work, the Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Lender, the sole obligation of Lender as the result of such inspection and approval being to make the Advances if, and to the extent, required by this Agreement.  Any disbursement made by Lender without Lender having received each of the items to which it is entitled under this Agreement shall not constitute breach or modification of this Agreement, nor shall any written amendment to this Agreement be required as a result thereof.

(k)     ALL POTENTIAL LIENORS ARE HEREBY CAUTIONED TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.  NO POTENTIAL LIENOR SHOULD EXPECT LENDER TO MAKE ADVANCES OF THE BUILDING LOAN IN AMOUNTS AND AT TIMES SUCH THAT IT WILL NOT BE NECESSARY FOR EACH SUCH POTENTIAL LIENOR TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.  MOREOVER, ALL POTENTIAL LIENORS ARE REMINDED THAT SUBDIVISION (3) OF SECTION 13 OF THE NEW YORK LIEN LAW PROVIDES THAT "NOTHING IN THIS SUBDIVISION SHALL BE CONSIDERED AS IMPOSING UPON THE LENDER ANY OBLIGATION TO SEE THE PROPER APPLICATION OF SUCH ADVANCES BY THE OWNER," AND LENDER HAS NO INTENTION OF VOLUNTARILY IMPOSING SUCH OBLIGATION ON ITSELF.

(l)     If at any time the undisbursed balance of a Line Item is, in Lender's judgment, excessive, the excess may be reallocated to any other Line Item balance which Lender deems to be insufficient.

(m)     Loan Balancing.  Notwithstanding anything contained herein to the contrary, if at any time Lender notifies Borrower that, in Lender's sole judgment, the undisbursed balance of the Building Loan is insufficient to pay the remaining Hard Costs and Soft Costs,

Borrower shall within ten (10) days of Lender's notification as aforesaid, deposit with Lender an amount equal to such deficiency (the "Building Loan Deficiency Amount"), which Lender may from time to time apply, or allow Borrower to apply, to such costs. Borrower hereby agrees that Lender shall have a lien on and security interest in any sums deposited pursuant this Section (m) and that Borrower shall have no right to withdraw any such sums except for the payment of the aforesaid costs as approved by Lender. Lender shall have no obligation to make any further Advances of proceeds of the Building Loan until the sums required to be deposited pursuant this Section (m) have been exhausted, and, the Building Loan is back "in balance". Any such sums not used as provided in this Section (m) shall be released to Borrower when and to the extent that Lender determines that the amount thereof is more than the excess, if any, of the total remaining Hard Costs and Soft Costs of completion of the Improvements over the undisbursed balance of the Building Loan, provided, however, that should an Event of Default occur, Lender may, at its option, apply such amounts either to the costs of completion of the Improvements or to the immediate reduction of outstanding principal and/or interest under the Building Loan Note.

(n)    Notwithstanding anything to the contrary, Lender shall not be required to make any Advance if such Advance would result in Lender exceeding its then existing loan to one borrower requirements (or a similar requirement). In such case, Lender shall have no obligation to make any Advance which would result in exceeding any such limitation.

2.3    Certain Conditions Precedent to Lender's Obligation to Make Advances of the Building Loan:  Lender shall not be obligated to make any Advance unless all of the following conditions shall be satisfied as of the proposed Funding Date of such Advance:

(a)    Lender and Lender's Consultant shall have each received a Requisition from Borrower, at least five (5) Business Days prior to the proposed Funding Date, together with (i) paid receipts and lien waivers for all Hard Costs that were included in any prior Advances and invoices for all Hard Costs proposed to be included in the applicable Advance and (ii) an application and certificate for payment (AIA G702) signed by the Architect and Construction Manager, along with a completed continuation sheet (AIA G703).

(b)    If payment or reimbursement is being requested for any Hard Costs, Soft Costs, or any fees of architects and engineers, or construction management fees, Lender shall have received a written statement from Lender's Consultant, at least five (5) Business Days prior to the proposed Funding Date, certifying to Lender (i) the amount of Hard Costs (broken down by Line Item) and the amount of any fees of architects and engineers, or construction management fees, that have been incurred by Borrower, (ii) the Retainage, (iii) the estimated total Hard Costs (broken down by Line Item) necessary to complete the Construction Work in accordance with the Draw Schedule, (iv) whether all municipal governmental agency inspections that should have occurred with respect to the completed construction have occurred, and (v) whether the completed construction has been performed in a good and workman like manner and in accordance with the Draw Schedule.

(c)    At Borrower's sole cost and expense, Lender shall have received an endorsement to the Title Policy pursuant to the pending disbursements clause thereof, changing the date of the Title Policy to the applicable Funding Date, insuring that there has been no change in the state of title to the Property since the previous Advance and that the Building Loan Mortgage remains a second lien encumbering the Project, and increasing the coverage of the Title Policy to include the amount of the applicable Advance.  If an Advance is being requested for payment of funds expended for exterior work performed with respect to the Improvements, such endorsement shall include either (i) an update of the survey reading that is included in the Title Policy, which update shall show no new encroachments unless such new encroachments shall be permitted by applicable law and the Title Policy shall insure that such new encroachments may remain as long as the Improvements shall stand, or (ii) a statement to the effect that the Title Policy shall not be subject to any exceptions by reason of such survey reading having not been updated.

(d)    Lender shall have received evidence satisfactory to Lender that there are no conditional sales contracts, chattel mortgages, leases of personality, financing statements or title retention agreements affecting any of the Chattels (as such term is defined in the Building Loan Mortgage).

(e)    Each of the representations and warranties contained in this Agreement shall be true and correct as of the proposed Funding Date, as determined by Lender.

(f)    No Event of Default shall have occurred and be continuing and no event that with the passage of time or notice, or both, would constitute an Event of Default shall have occurred or be continuing.

(g)    Borrower shall have paid to Lender all fees and expenses required to be paid by Borrower under this Agreement.

(h)    If required by Lender in writing, performance bonds naming Lender as co-obligee and labor and material payment bonds, each in AIA Document No. A-312 (1984 Edition) form or other form approved by Lender, for penal sums equal to the amounts of the general contract (the "General Contract") between Borrower and General Contractor and such subcontractors specified by Lender.

2.4    Special Conditions Precedent to Lender's Obligation to Make the Final Advance:  Without limiting the generality of the foregoing, Lender shall not be obligated to make the final Advance ("Final Advance") unless, in addition to the terms and conditions set forth in Section 2.2 and 2.3 hereof and elsewhere in this Agreement, the additional following conditions shall be satisfied as of the proposed Funding Date for the Final Advance:

       (a)     Lender and Lender's Consultant shall have received a completed AIA Form G704 signed by the Architect, Construction Manager, and Borrower evidencing that the Construction Work has been substantially completed;

       (b)     Lender shall have received a temporary or permanent certificate of occupancy for the Project issued by the municipal body or agency having the authority to do so, all other permits and licenses necessary for occupancy and use of the Project and there must be no violations of the City, State or Federal Government encumbering the property;

       (c)     Lender and Lender's Consultant shall have received a signed and sealed "as-built" survey of the Project dated within ten (10) days of the proposed Funding Date, certified to Lender and Title Company, and showing the completed Improvements.

       (d)     Lender shall have received written certification from Lender's Consultant that the Construction Work has been at least one hundred (100%) percent completed in accordance with the Draw Schedule except that upon Lender's Consultant certifying that the Construction Work is substantially complete and that the final cost to complete any incomplete work is less than $25,000.00;

       (e)     Lender shall have received an original hazard insurance policy written complying with the terms of Section 1.09 of the Building Loan Mortgage and evidence that the current premium or installment payment due on such policy has been paid and that the policy is in full force and effect.

       (f)     Lender shall have received a new title policy, or an endorsement to the Title Policy, insuring that the Building Loan Mortgage is a second lien encumbering the Project (subordinate only to the Project Mortgage) for the amount of the outstanding principal indebtedness of the Building Loan Note, with a survey reading showing no new encroachments unless (i) such new encroachments shall be permitted by applicable law, and (ii) the applicable title policy shall insure that such new encroachments may remain as long as the Improvements shall stand.

       (g)     Lender shall have received final lien waivers from the Construction Manager, and all contractors and all subcontractors that worked on the Project.

       2.5     Interest Reserve: Borrower shall establish an Interest Reserve Account ("the Interest Reserve Account") with Lender in the amount of up to $2,000,000.00 for the payment of interest charges accruing under the Building Loan and the Project Loan (as the same is defined in the Mortgage) which shall be funded as set forth herein. Lender shall have the right to make an Advance by making a debit from the amount allocated to the Interest Reserve Account for the payment of such interest charges and, in the event such Interest Reserve Account shall be exhausted, Borrower shall promptly upon notice from Lender replenish such Interest Reserve Account in an amount reasonably

determined by Lender to represent the balance of the interest charges to accrue over the remaining term of the Building Loan and the Project Loan. In the event of any default under the Building Loan Note or any of the other Loan Documents, Lender shall have the right, in its sole and absolute discretion, to cease making Advances from the Interest Reserve Account towards monthly payments due under the Building Loan and Project Loan and to apply all sums in the Interest Reserve Account against the unpaid principal balance of the Building Loan and the Project Loan or any costs due thereunder.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

3.1    <u>Representations and Warranties</u>:  Borrower represents and warrants to Lender, knowing that Lender will rely on such representations and warranties as incentive to make the Building Loan, that:

(a)    Borrower is a limited liability company duly organized and validly existing under the laws of the State of New York and has the authority to do business in the State of New York. Borrower has, and will continue to have, the full power and authority and legal rights to own its properties, to carry on its business as now conducted and to perform its obligations under this Agreement. Borrower conducts no business directly or indirectly except owning and operating the Project.

(b)    Borrower has the authority and legal right to execute and deliver this Agreement. No consent, approval, authorization, exemption, notice, report, registration, filing or declaration that has not been obtained or made is required to be obtained or made with respect to the execution and delivery by Borrower of this Agreement.

(c)    Borrower has furnished Lender with true, correct and complete copies of its Article of Organization and Operating Agreement.

(d)    Borrower, Guarantors, the Project and the Construction Work are in material compliance with all Legal Requirements applicable to Borrower, Guarantors, the Project or the Construction Work, and no written notice of noncompliance with any such Legal Requirements has been received by Borrower, any Guarantor, or, to the best of Borrower's knowledge, by any other person or entity.

(e)    Neither Borrower nor any Guarantor is in violation of any agreement the violation of which might reasonably be expected to have a material adverse effect on Borrower's or any Guarantor's business or assets.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3-1 Part 3    Filed 12/10/14    Pg 13 of 35
3 of 3    Pg 12 of 86

(f)    Neither this Agreement nor the performance, fulfillment of or compliance with the terms and provisions hereof, nor the consummation of the transactions contemplated hereby, conflicts or will conflict with, or will result in a breach of, the terms, conditions or provisions of, or otherwise constitute a default under, or result in the creation of any lien (other than the lien of any of the Collateral Documents) upon any of the properties or assets of Borrower or any Guarantor under any agreement, instrument, arbitration award, order, judgment, decree, statute, law, ordinance, franchise, certificate, permit, rule, regulation or the like to which Borrower or any Guarantor is subject, or by which properties or assets of Borrower or any Guarantor or the Construction Work are bound or affected.

(g)    This Agreement does not contain any untrue statement of a material fact.

(h)    No litigation, investigation or administrative proceeding of or before any court, arbitrator or governmental authority is pending or, to Borrower's knowledge, threatened against Borrower, any Guarantor, or any assets thereof (i) might have a material adverse effect on Borrower's ability to perform its obligations under this Agreement in accordance with the terms thereof, or Guarantors' ability to perform their respective obligations under the Guaranty, (ii) might adversely affect the financial condition of the Borrower or any Guarantor, (iii) might impair the value of the Project, (iv) seeks to enjoin or similarly prevent the Construction Work or the use of the Improvements, or (v) might question the validity of this Agreement.

(i)    No condemnation or taking by eminent domain of any portion of the Property, or affecting any roadways or utilities abutting the Property, or access to the Property therefrom has commenced, or is threatened or contemplated by any governmental authority.

(j)    All management, leasing, marketing, engineering, architectural, construction and maintenance contracts, relating to the Project or the Construction Work to which Borrower or any affiliates of Borrower is a party are listed in the schedule of contracts most recently furnished to Lender by Borrower, and true and complete copies of all such contracts, including all amendments thereto, have been made available to Lender or Lender's Consultant. All contracts listed in such schedule are in full force and effect in accordance with their respective terms, and, except as described in such schedule, no party to any such contract has asserted any written claim of default or offset against Borrower or any affiliate of Borrower, with respect thereto, which claim, default or offset has not been cured or resolved.

(k)    Borrower has not sold, conveyed, assigned or otherwise transferred, or agreed to sell, convey, assign or otherwise transfer, any development, air or floor-area-ratio rights with respect to the Property.

(l)    Borrower has no actual knowledge of any Hazardous Materials (as

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3-1 Part 99    Filed 02/10/14    Pg 14 of 35
2 of 2 Pg 13 of 86

defined in the Building Loan Mortgage) located or disposed of on the Project.

(m)    Borrower's estate, rights, title and interest in, to and under the Mortgaged Property are subject to no liens, charges or encumbrances other than Permitted Exceptions (as defined in the Building Loan Mortgage), and the Building Loan Mortgage, when executed, delivered and recorded, shall constitute a valid lien on such estate, rights, title and interest (which shall be subject only to Permitted Exceptions).

(n)    The Lien Law Statement has been prepared in accordance with Section 22 of the New York Lien Law. The Budget sets forth all of the costs, expenses and fees (including costs, expenses and fees in connection with the making of the Building Loan) that Borrower expects to pay or anticipates becoming obligated to pay to complete the Construction Work. Borrower is not aware of any permits required for the completion of the Project that should not be available as-of-right upon the submission of all required applications therefor.

(o)    Borrower has not dealt with any mortgage broker or other broker or finder in connection with the Building Loan other than Andrew Glass Brokerage.

(p)    All financial statements of Borrower and Guarantors heretofore given and hereafter to be given to Lender, are and will be true and complete in all respects as of their respective dates, fairly represent the financial conditions of the businesses or persons to which they pertain, and no materially adverse change has occurred in the financial conditions reflected therein since the respective dates thereof.

(q)    All necessary action has been taken to permit the Construction Work according to the Draw Schedule and the full use of the Improvements for their intended purpose under all Legal Requirements. When completed according to the Draw Schedule, the Improvements will comply with all Legal Requirements.

(r)    All utility services necessary for the Construction Work and the use of the Improvements are available to the Property or will be available upon completion of the Construction Work. All roads necessary for the full use of the Project for its intended purpose have been completed, or the necessary rights-of-way therefor have been acquired or dedicated, and all necessary steps to date have been taken to insure the completion thereof.

(s)    All documents furnished to Lender by or on behalf of Borrower, as part of or in support of the Building Loan application or pursuant to this Agreement or otherwise in connection with the Building Loan or the Collateral Documents, are true, correct, complete and accurately represent the matters to which they pertain.

14-12057-scc   Doc 100-3   Filed 02/10/15   Entered 02/10/15 14:36:33   Exhibit part
14-12057-scc   Claim 9-1 Part 9   Filed 12/10/14   Pg 15 of 35
2 of 2   Pg 14 of 86

(t)     Borrower and Guarantors are, and upon consummation of the transaction contemplated by this Agreement, the Collateral Documents and any other related documents, will be, solvent.

(u)     Borrower has advised the Title Company in writing prior to the issuance of the Title Policy whether any survey, soils testing, site development, excavation or other work related to the construction of the Improvements was begun or done before the Building Loan Mortgage was recorded.

3.2     Continuing Effectiveness:  All representations and warranties contained herein shall be deemed continuing and in effect at all times while Borrower remains indebted to Lender and shall be deemed to be incorporated by reference in each requisition for advance by Borrower, unless Borrower specifically notifies Lender of any change therein.

## ARTICLE IV

## COVENANTS OF BORROWER

4.1     Covenants:  Borrower covenants and agrees as follows:

(a)     Borrower shall cause the Construction Work to be performed continuously and in a timely manner in accordance with the Draw Schedule and the schedule heretofore approved by Lender and in compliance with all Legal Requirements, so that the Construction Work shall be complete by the Scheduled Completion Date, time being of the essence.

(b)     Borrower shall receive the proceeds of the Building Loan subject to the trust fund provisions of Section 13 of the Lien Law.  Borrower shall use such proceeds solely and exclusively for the Line Items set forth in the Budget, subject to no changes except such changes as have been approved by Lender.

(c)     Borrower shall keep the Project free from liens and encumbrances (except for the Assignment and Building Loan Mortgage), shall pay promptly all persons or entities supplying work or materials with respect to the Construction Work and shall immediately discharge by bond or otherwise, or make other arrangements acceptable to Lender with respect to, any mechanic's or other lien filed against the Project or the Borrower.

(d)     Borrower shall pay promptly when due and before the accrual of penalties thereon all taxes including all real and personal property taxes and assessments levied or assessed against Borrower or the Project and all utility fees and charges in connection with the Project, and to provide Lender with receipted bills therefor if requested by Lender.

(e)     Borrower shall maintain in effect at all times while Borrower is

14-12057-sec    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 9-1 Part 99    Filed 12/10/14    Pg 16 of 35
3 of 3    Pg 15 of 86

indebted to Lender the insurance policies required by the Building Loan Mortgage, and shall notify Lender of any change in the status of such insurance within five (5) days of Borrower's receipt of notice of any such change. Borrower shall repair and restore any casualty loss to the Improvements whether completed or under construction, except to the extent that Lender does not make casualty insurance proceeds available to Borrower for that purpose.

(f)    Borrower shall pay all commitment, loan, reasonable servicing, administrative and inspection fees of Lender, and all expenses involved in perfecting the lien status or priority provided by the Collateral Documents and all other out-of-pocket expenses of Lender directly related to the Building Loan, the protection and preservation of the Project or the enforcement of any provision of this Agreement or of the Collateral Documents, including, without limitation, recording fees and taxes, tax, title and lien search charges, title insurance charges, architects, engineers (including the Lender's Consultant's fees) and reasonable attorneys' fees (including fees for appellate proceedings), real property taxes, personal property taxes and insurance premiums, and shall indemnify and hold Lender harmless against all claims, losses, expenses and liabilities, including reasonable attorneys' fees, incurred by Lender on account of any claim by any party arising out of the Building Loan or Lender's interest in or lien upon the Property or Improvements. Lender shall fund the interest payments due under the Note from the Interest Reserve held pursuant to this Building Loan Agreement.

(g)    Borrower shall deposit the Building Loan Deficiency Amount and/or the Line Item Deficiency Amount with Lender within ten (10) days after Lender's demand therefor.

(h)    Borrower shall: (i) furnish promptly to Lender such information as Lender may reasonably require concerning: costs, progress of construction, marketing, and such other factors as Lender may specify; (ii) notify Lender promptly of (A) any litigation instituted or threatened against Borrower or any Guarantor, any deficiencies asserted or liens filed by the Internal Revenue Service against Borrower, any Guarantor, the Property or the Improvements, any audits of any Federal or State tax return of Borrower or any Guarantor, and the results of any such audit, (B) any condemnation or similar proceedings with respect to any of the Property or Improvements or any proceeding seeking to enjoin the Construction Work and/or the intended use of the Improvements, (C) all changes in governmental requirements pertaining to the Construction Work, the Project, utility availability, and Borrower's anticipated cost of completion of the Construction Work, and (D) any other matters which could reasonably be expected to adversely affect Borrower's ability to perform its obligations under this Agreement.

(i)    Borrower shall maintain complete and accurate account books and records with respect to the Building Loan, the Project, and the Construction Work, which books and records shall reflect the consistent application of accepted accounting principles, and to make such books and records available at reasonable times and upon reasonable notice for inspection and copying by Lender or its agent.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3-1 Part 99    Filed 12/10/14    Pg 17 of 35

2 of 2 Pg 16 of 86

       (j)     Borrower shall permit Lender and its agents to have access to the Project at reasonable times; shall permit Lender to maintain a sign on the Property and otherwise publicize Lender's role as construction lender; and shall name Lender as construction lender in Borrower's publicity and promotion.

       (k)     Borrower shall not authorize or permit any changes to the Draw Schedule or the working drawings with respect to any portion of the Construction Work, without the prior written consent of (i) all governmental bodies having jurisdiction to the extent such approval is required by law or regulation, (ii) Lender, and (iii) Lender's Consultant.

       (l)     Borrower shall notify Lender promptly of the names and addresses of all contractors, subcontractors and materialmen who are employed in connection with the construction of the Improvements, and whose names and addresses were not heretofore supplied to Lender.

       (m)     Borrower shall furnish to Lender, if Lender so requests, the contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

       (n)     Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangement wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Project, unless authorized in advance by Lender in writing.

       (o)     Borrower shall, at Lender's request, execute and deliver to Lender all further documents and perform all other acts which Lender reasonably deems necessary or appropriate to perfect or protect its security for the Building Loan.

       (p)     Borrower shall not enter into any agreement or take any action that would result in the occurrence of an Event of Default or would otherwise cause Borrower's representations and warranties contained herein to be incorrect or misleading.

       (q)     Borrower shall not engage in any business other than the operating, owning, managing, developing, and leasing of the Project.

       (r)     Borrower shall furnish to Lender's Consultant copies of all construction contracts, and any modifications thereto, when and as the same shall be executed and delivered. Each construction contract (and each agreement with respect to the Project and/or Construction Work between Borrower and Architect or Construction Manager) shall contain

14-12057-scc   Doc 100-3   Filed 02/10/15   Entered 02/10/15 14:36:33   Exhibit part
2 of 2   Pg 17 of 86
14-12057-scc   Claim 9-1 Part 99   Filed 12/10/14   Pg 18 of 35

provisions in form and substance reasonably satisfactory to Lender pursuant to which Lender shall be entitled to notice and an opportunity to cure any defaults by Borrower thereunder and to assume (at Lender's sole option) the rights and obligations of Borrower thereunder following the occurrence and during the continuance of any Event of Default.

(s)   Borrower shall timely obtain all permits required for the completion of the Construction Work, and the operation and maintenance of the Improvements as a first-class ninety two (92) room, fifteen (15) story, Boutique Hotel and otherwise consistent with the Plans.

(t)   Borrower (i) shall permit and shall cause each contractor to permit Lender's Consultant and any other agent or representative of Lender, at Borrower's sole cost and expense, to enter upon the Project at all reasonable times during the Construction Work, upon reasonable notice and accompanied by Borrower or Borrower's agents, to inspect the Construction work, the Improvements and all materials to be used in the Project, and (ii) shall permit Lender, Lender's Consultant and any other agent or representative of Lender, at reasonable times upon reasonable notice, to examine all information and documents, including books, contracts and records, relating to the Construction Work and/or the Project, and shall cooperate and cause each contractor to cooperate with the Lender's Consultant to enable it to perform its functions hereunder. At the time of each inspection by Lender's Consultant, Borrower shall make available to Lender's Consultant daily log sheets, if available, covering substantially all of the period since the immediately preceding inspection, showing, for each day during such period, contractors and sub-contractors on the job, the number of workers employed by each, delays encountered and the status of construction. Notwithstanding the foregoing, Lender shall not have any duty to make inspections or cause inspections to be made and shall not incur any liability or obligation as a result of making or not making any such inspection.

(u)   Borrower, upon written demand of Lender's Consultant, together with a reasonable explanation therefor, shall correct or cause the responsible contractor(s) to correct all defects in the Construction Work, or any part thereof, that may be noted by the Lender's Consultant. The making of any Advance shall not constitute a waiver of the right of Lender to require compliance with this covenant with respect to any such defects.

(v)   Borrower shall not make any payment to any contractor with respect to labor or materials relating to the Project unless, in compliance with Section 34 of the New York Lien Law, Borrower shall simultaneously obtain a lien waiver from such contractor with respect to labor performed or materials furnished by such contractor.

(w)   Borrower shall duly perform and observe, or shall cause to be performed and observed, all of the covenants, agreements and conditions on its part to be performed and observed under the Building Loan Note, the Collateral Documents, and by this reference all of such covenants, agreements and conditions are hereby made a part of this

14-12057-scc     Doc 100-3     Filed 02/10/15     Entered 02/10/15 14:36:33     Exhibit part
14-12057-scc     Claim 9-1 Part 99     Filed 12/10/14     Pg 19 of 35
2 of 2   Pg 18 of 86

Agreement to the same extent as if fully set forth herein.

(x)     Borrower shall give notice to Lender within two (2) Business Days after Borrower becomes aware of that any representation or warranty of Borrower contained herein is no longer true and correct.

(y)     All Construction Work shall be done in a manner that shall adequately protect tenants under the Leases, and their employees and invites, from personal injury and loss of property, and shall otherwise be consistent with the requirements of such leases with respect to the continued occupancy of such tenants during the Construction Work.

(z)     Borrower shall deliver this Agreement and the Lien Law Statement to the Title Company for filing in the County Clerk's Office of New York County when and as required by Section 22 of the Lien Law.

(aa)     Borrower shall maintain its existence and shall be in good standing at all times.

(bb)     Borrower shall employ suitable means to protect from theft or vandalism all portions of the Improvements and all tools and building materials stored on the Property.

(cc)     Borrower shall comply with all of the Permanent Loan Conditions and execute all documents necessary for the permanent loan as contemplated in the permanent loan Commitment Letter (as those terms are defined in the Building Loan Note).

## ARTICLE V

## EVENTS OF DEFAULT

5.1     <u>Events of Default</u>: The occurrence of any of the events listed in this Article shall constitute an event of default ("Event of Default") under this Agreement:

(a)     The assignment or attempted assignment by Borrower of this Agreement, any rights hereunder, or any Advance to be made hereunder, or the conveyance, lease, mortgage, or any other alienation or encumbrance of the Project or any part thereof, or any estate or right therein without the prior written consent of Lender, except as explicitly permitted herein or by the Collateral Documents.

(b)     If any certificate, statement, representation, warranty or audit heretofore or hereafter furnished by or on behalf of Borrower pursuant to or in connection with this Agreement or otherwise (including, without limitation, representations and warranties contained herein) or as an inducement to Lender to extend any credit to or to enter into this

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3-1 Part 99    Filed 12/10/14    Pg 20 of 35
3 of 2    Pg 19 of 86

(l)    Any material adverse change in the financial condition of Borrower or any Guarantor, or the existence of any other condition which shall constitute an impairment of Borrower's ability to perform its obligations under this Agreement or any other document evidencing or securing the Building Loan, and which condition is not remedied within twenty (20) days after written notice to Borrower thereof or, if the condition cannot be fully remedied within said twenty (20) days, substantial progress has not been made within said twenty (20) days toward remedy of the condition.

5.2    Event of Default "Continuing".  An Event of Default shall be deemed to be "continuing" for all purposes of this Agreement, notwithstanding any purported curing of such Event of Default, unless, prior to the receipt by Borrower of a notice from Lender stating that Lender shall have elected to accelerate the indebtedness evidenced by the Building Loan Note Borrower shall have cured such Event of Default and so notified Lender.

## ARTICLE VI

## REMEDIES UPON DEFAULT

6.1    Remedies:  (a) If any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under any of the Collateral Documents, including, without limitation, the right to accelerate the Building Loan and foreclose any and all liens and security interests securing the repayment of the Building Loan under any of the Collateral Documents including, without limitation, the Building Loan Mortgage.

(b) In addition to the foregoing, if any Event of Default shall have occurred and be continuing, all obligations of Lender under this Agreement, including, without limitation, the obligation to make Advances, shall, at the option of Lender, cease and terminate, and Lender may immediately exercise any or all rights, remedies and recourse available to it at law or in equity or under the Building Loan Note or any of the Collateral Documents, including, without limitation, the right to accelerate the Building Loan and foreclose any and all interests securing the repayment of the Building Loan.  In addition to, and without limiting the foregoing, if any Event of Default shall have occurred and be continuing, Lender may take immediate possession of the Project as well as all other property to which title is held by Borrower and in which Lender has a lien as is necessary to fully complete the Construction Work and do anything in its sole judgment to fulfill the obligations of Borrower hereunder, including, availing itself of and procuring performance of existing contracts, amending the same, or entering into new contracts with the same contractors or others and employment of watchmen to protect the Project from injury. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution

14-12057-scc Doc 100-3 Filed 02/10/15 Entered 02/10/15 14:36:33 Exhibit part
3 of 3 Pg 20 of 86
14-12057-scc Claim 9-1 Part 99 Filed 12/10/14 Pg 21 of 35

in the premises to complete construction and equip the Improvements, to use unadvanced
Building Loan funds or funds which Borrower may have deposited with Lender pursuant to this
Agreement, or to advance funds in excess of the Loan Amount pursuant to this Agreement; to
pay all taxes and assessments on the Property or Improvements not paid by Borrower when due
and to add the amounts of any such payments to the amount of indebtedness secured by the
Building Loan Mortgage; to make changes in the Draw Schedule which shall be necessary or
desirable to complete the Construction Work in substantially the manner contemplated by the
Draw Schedule; to retain or employ new construction managers, general contractors, contractors,
subcontractors, architects, engineers and inspectors as shall be required to complete the
Construction Work; to pay, settle, or compromise all bills and claims, which may be incurred in
connection with the Construction Work; to purchase any fixtures, equipment, machinery, fur-
niture or any other personal property as may be necessary or desirable for the completion of the
Construction Work or for the clearance of title; to execute all applications and certificates in the
name of Borrower which may be required; to prosecute and defend all actions or proceedings in
connection with the Construction Work, Property or Improvements, fixtures, equipment,
machinery, furniture or any other personal property; and to do any act which Borrower might do
in its own behalf relating to the Construction Work, Property or Improvements, it being
understood and agreed that this power of attorney shall be a power coupled with an interest and
cannot be revoked. Notwithstanding anything to the contrary contained herein, Lender shall not
be obligated to attempt to use, operate, occupy or manage the Project or any part thereof, perform
the Construction Work, or perform any of the terms, conditions and agreements herein or in any
construction contracts or in any other document on the part of Borrower to be performed, and
Lender shall have no liability to Borrower, Guarantors or any other person or entity for failing,
attempting to perform, or ceasing to perform the same, or for the manner of performing or
attempting to perform the same, or any part thereof.

## ARTICLE VII

## MISCELLANEOUS

7.1    Entire Agreement; Modification, Etc.: This Agreement (together with the
Collateral Documents and any certificates delivered simultaneously herewith) embody and
constitute the entire understanding between the parties with respect to the transaction
contemplated by this Agreement, and all prior agreements, understandings, representations and
statements, oral and written, with respect to the transaction that is the subject of this Agreement
are merged into this Agreement. Neither this Agreement nor any provision hereof may be
waived, modified, amended, discharged or terminated except by an instrument signed by the
party against whom the enforcement of such waiver, modification, amendment, discharge or
termination is sought, and then only to the extent set forth in such instrument.

7.2    Exclusiveness: ALL CONDITIONS TO THE OBLIGATIONS OF
LENDER TO MAKE ADVANCES HEREUNDER ARE IMPOSED SOLELY AND

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 3-1 Part 99    Filed 12/10/14    Pg 22 of 35
2 of 2 Pg 21 of 86

EXCLUSIVELY FOR THE BENEFIT OF LENDER AND LENDER'S SUCCESSORS AND
ASSIGNS AND NO OTHER PERSON OR ENTITY SHALL HAVE STANDING TO
REQUIRE SATISFACTION OF SUCH CONDITIONS IN ACCORDANCE WITH THEIR
TERMS OR BE ENTITLED TO ASSUME THAT LENDER WILL REFUSE TO MAKE
ADVANCES IN THE ABSENCE OF STRICT COMPLIANCE WITH ANY OR ALL
THEREOF AND NO OTHER PERSON OR ENTITY SHALL, UNDER ANY
CIRCUMSTANCES, BE DEEMED TO BE BENEFICIARY OF SUCH CONDITIONS, ANY
OR ALL OF WHICH MAY BE FREELY WAIVED IN WHOLE OR IN PART BY LENDER
ANY TIME IF IN ITS SOLE DISCRETION IT DEEMS IT ADVISABLE TO DO SO.

    7.3    Notices:  Except as may otherwise be expressly provided in this
Agreement, any notice, request, demand, instruction or other communication pursuant to this
Agreement shall be in writing and shall be given in the manner provided in the Building Loan
Mortgage.

    7.4    Governing Law; Jurisdiction:  This Agreement, the Building Loan Note,
the Collateral Documents and all other documents or instruments relating to the Building Loan,
and the rights and obligations of the parties thereto, shall be construed and interpreted in
accordance with the laws of the State of New York.  Lender and Borrower each hereby waives
and renounces any right to a jury trial in any action, suit or proceeding in connection with this
Agreement, the Building Loan Note or any other Collateral Document.

    7.5    Headings:  All descriptive headings of articles and sections in this
Agreement are inserted for convenience only, and shall not affect the construction or
interpretation hereof.

    7.6    Severability:  If any provision of this Agreement shall be held to be
invalid, illegal, void or unenforceable in any respect, (a) such provision shall be given force to
the fullest possible extent that it is valid, legal and enforceable, (b) such invalidity, illegality or
unenforceability shall not affect any other provision of this Agreement, and (c) this Agreement
shall be construed as if such invalid, illegal or unenforceable provision had never been contained
in this Agreement.

    7.7    No Agency, Partnership or Joint Venture:  Lender is not the agent or
representative of Borrower, and Borrower is not the agent or representative of Lender.  Borrower
and Lender intend and agree that the relationship between them shall be solely that of creditor
and debtor.  Neither any provision in any of this Agreement nor any act or omission of Lender or
Borrower shall be construed to create a partnership or joint venture between Borrower and
Lender.  This Agreement shall not make Lender liable to materialmen, contractors, craftsmen,
laborers or others for goods delivered to or services performed by them upon the Project, or for
debts or claims accruing to such parties against Borrower and there is no contractual relationship,
either expressed or implied, between Lender and any materialmen, subcontractors, craftsmen,

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 9-1 Part 99    Filed 12/10/14    Pg 23 of 35
3 of 3    Pg 22 of 86

laborers, or any other person supplying any work, labor or materials for the Construction Work.

7.8    Waiver; Successive Remedies: Any failure (or series of failures) by Lender to insist (or election, or series of elections, by Lender not to insist) upon the strict performance of any of the terms, provisions and conditions of this Agreement or any of the other Loan Documents shall not be deemed to be a waiver of the same or any other term, provision or condition hereof or thereof and Lender shall have the right at any time thereafter to insist upon strict performance of any and all of the same. If Lender makes any Advance in the absence of strict compliance with any or all of the conditions of Lender's obligations to make such Advance, the same shall be deemed to have been made in pursuance of this Agreement and not in modification hereof. No course of dealing and no delay or omission by Lender in exercising any right or remedy hereunder or with respect to any indebtedness of Borrower to Lender shall operate as a waiver thereof or of any other right or remedy and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any other right or remedy. Lender may remedy any default by Borrower to Lender or any other person, firm or corporation in any reasonable manner without waiving the default remedied and without waiving any other prior or subsequent default by Borrower and shall be reimbursed for any and all of its expenses in so remedying such default. All rights and remedies of Lender hereunder are cumulative.

7.9    Assignability: Neither this Agreement nor any right or obligation hereunder, nor any Advance to be made hereunder is assignable by Borrower. The rights of Lender under this Agreement are assignable in part or wholly and any assignee of Lender shall succeed to and be possessed of the rights of Lender hereunder to the extent of the assignment made, including the right to make advances to Borrower or any approved assignee of Borrower in accordance with this Agreement.

7.10    Inconsistencies with Other Building Loan Documents: In the event of any conflict between this Agreement and the provisions of any of the Collateral Documents, the provisions of this Agreement shall control; provided, however, that any provision of any Collateral Document that imposes additional burdens on Borrower or restricts the rights of Borrower or gives Lender additional rights or remedies shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

7.11    Survival: All of the representations, warranties, terms, covenants, agreements and conditions contained in this Agreement shall specifically survive the execution and delivery of this Agreement and the making of all Advances and shall, unless otherwise expressly provided, continue in full force and effect until the indebtedness evidenced by the Building Loan Note and any other amounts payable to Lender hereunder, or under any of the Collateral Documents, shall have been paid in full.

7.12    Negotiated Document: Borrower acknowledges that the provisions and

the language of this Agreement and the Collateral Documents have been negotiated, and are reasonable in light of all circumstances attendant to the execution hereof and thereof, and agrees that no provision of this Agreement or any Collateral Document shall be construed against either Lender or Borrower by reason of either Lender or Borrower having drafted such provision, this Agreement or any Collateral Document.

      7.13   Exhibits:  All exhibits referred to herein are by such reference incorporated into this Agreement as if fully set forth herein.

      7.14   Building Loan Note; Building Loan Mortgage.  The Building Loan shall be evidenced by and repaid in accordance with the Building Loan Note.  The performance of Borrower's obligations under the Building Loan Note and this Agreement shall be secured by the Building Loan Mortgage and the other Collateral Documents.

      7.15   Set off.  Borrower agrees that, in addition to (and without limitation of) any right of setoff, bankers' lien or counterclaim Lender may otherwise have, Lender shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final)held by it for the account of Borrower at any of Lender's offices against any amount payable by Borrower to Lender hereunder or under any other Collateral Document which is not paid when due (regardless of whether such balances are then due to Borrower), in which case it shall promptly notify Borrower thereof; provided that Lender's failure to give such notice shall not affect the validity thereof. Payments by Borrower hereunder or under the other Collateral Documents shall be made without setoff or counterclaim.

      7.16   Borrower's Statement:  A true statement under oath verified by Borrower, as required by Section 22 of the Lien Law, is attached hereto and made a part hereof as Schedule D and all the terms of such oath are incorporated herein by this reference.

      7.17   Indemnification.  Borrower agrees to indemnify Lender and hold Lender harmless from and against all claims, actions, suits, proceedings, costs, expenses, brokerage or other fees, losses, damages and liabilities of any kind including in tort, penalties and interest, which Lender may incur in any manner other than Lender's own active negligence or willful misconduct, by reason of any matter relating, directly or indirectly, to the Building Loan, the Construction Work, the Building Loan Mortgage or the ownership, condition, development, construction, sale, rental or financing of the Project or any part thereof. This indemnification shall continue in effect whether or not the Building Loan is partially or fully advanced and shall survive the repayment of the Building Loan.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 24 of 86
14-12057-scc    Claim 9-1 Part 9    Filed 12/10/14    Pg 25 of 35

## Exhibit A - The Property

 ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 77 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 8 1/2 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 8 1/2 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 66)

Said Property being known as and by the street number 141 Orchard Street, New York, New York.

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 102 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 6 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 6 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 67)

Said Property being known as and by the street number 139 Orchard Street, New York, New York.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 9-1 Part 9    Filed 12/10/14    Pg 26 of 35
2 of 3    Pg 25 of 86

## SCHEDULE B

Draw Schedule

Draw Schedule is the attached hereto which incorporates the plans, specifications, shop drawings and other materials relating to the Construction Work delivered by Borrower to Lender's Consultant or other designee prior to the date hereof.

All disbursements under the Draw Schedule shall be for work in place and completed by the Borrower in accordance with the Line Item Budget annexed hereto.

Notwithstanding anything to the contrary, Lender shall not be required to make any Advance if such Advance would result in Lender exceeding its then existing loan to one borrower requirements (or a similar requirement). In such case, Lender shall have no obligation to make any Advance which would result in exceeding any such limitation

The Lender's obligation to make an Advance is expressly conditioned upon the Borrower's submission to Lender that the Project will comply with all applicable Federal, State and City laws, codes and ordinances. In addition, Lender shall have no obligation to fund the loan in the even that Lender determines in its sole discretion that the Project cannot be completed for a total cost of not greater than $36,550,000.00, inclusive of land cost.

| ITEM | BUDGET | PORTION OF LOAN | BORROWER'S EQUITY |
|------|--------|-----------------|-------------------|
| Land | $17,500,000 | $5,500,000* | $12,000,000 |
| Hard Costs | $15,250,000 | $15,250,000** | $0 |
| Soft Costs | $1,800,000 | $1,800,000*** | $0 |
| Interest | $2,000,000 | $2,000,000**** | $0 |
| TOTAL | $36,550,000 | $24,550,000 | $12,000,000 |

* Previously fully disbursed pursuant to the Project Loan
** $207,000 advanced on the date hereof
*** $1,395,739.58 advanced on the date hereof
**** To be disbursed for payments due under the Project Loan and this loan as further described herein

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
3 of 3    Pg 26 of 86
14-12057-scc    Claim 9-1 Part 99    Filed 12/10/14    Pg 27 of 35

## SCHEDULE C

[Letterhead of Borrower]

BROOKLYN FEDERAL SAVINGS BANK
81 Court Street
Brooklyn, NY 11201

     Re:    Building Loan Agreement ("Building Loan Agreement") between
          **D.A.B. GROUP LLC**, ("Borrower") and BROOKLYN FEDERAL SAVINGS
          BANK ("Lender") dated August 21, 2008

Requisition #_____             Date:_____, 2008

Gentlemen:

       Pursuant to the Building Loan Agreement, Borrower hereby requests that Lender advance to Borrower $_____ with respect to Hard Costs and $_____. Attached hereto is the affidavit of _____ dated the date hereof and Borrower certifies that all statements in that affidavit are true and correct.

       Attached hereto are lien waivers for all Hard Costs included in any prior Advances and invoices for all Hard Costs to be included in this Advance. Additionally, attached hereto are completed AIA Forms G702 and G703 signed and certified by the Architect and Construction Manager. All capitalized terms used herein shall have the meaning given thereto in the Building Loan Agreement.

                    D.A.B. GROUP LLC, a
                    New York limited liability company

                    By: _____
                          BEN ZHAVIAN, Member

## AFFIDAVIT TO BE ANNEXED
## TO EACH REQUISITION

STATE OF NEW YORK    )
                    ) ss.:
COUNTY OF _____   )

      Ben Zhavian, being duly sworn, deposes and says:

      1.     He is the managing member of D.A.B. GROUP LLC ("Borrower"), and has made due investigation as to the matters hereinafter set forth and is making this affidavit to induce BROOKLYN FEDERAL SAVINGS BANK ("Lender") to consider making an advance of $_____ to the Borrower pursuant to the terms of a Building Loan Agreement, dated August 21, 2008 between Borrower and Lender and pursuant to the requisition to which this affidavit is attached ("Current Requisition").

      2.     All representations and warranties contained in the Building Loan Agreement are true and accurate in all material respects as of the date hereof.

      3.     No Event of Default exists under the Building Loan Agreement, and no event or condition has occurred and is continuing or existing that, with the lapse of time or the giving of notice, or both, would constitute such an Event of Default.

      4.     The Improvements have not been damaged by fire or other casualty, and no part of the Property has been taken by eminent domain and no proceedings or negotiations therefor are pending or threatened.

      5.     The Construction Work is progressing in such manner so as to insure completion thereof in accordance with the Draw Schedule on or before the Scheduled Completion Date.

      6.     All funds received from the Lender previously under the Building Loan Agreement have been expended for the sole purpose of paying for the costs set forth in the previous requisitions; and no part of said funds have used for any other purpose. No item of costs previously certified to the Lender in a requisition remains unpaid as of the date of this Affidavit (other than for the Retainage).

      7.     All of the statements and information set forth in the Current Requisition, and all documents attached thereto, are true and correct in every material respect as of the date hereof, and all costs certified to the Lender in the Current Requisition accurately reflect the precise amounts due. All the funds to be received pursuant to the Current Requisition shall be used solely

for the purposes of paying the items of cost specified therein or for reimbursing the Borrower for such items previously paid by the Borrower.

      8.     Nothing has occurred subsequent to the date of the Building Loan Agreement that has or may result in the creation of any lien, charge or encumbrance upon the Property or the Improvements or any part thereof, or anything affixed to or used in connection therewith or which has or may substantially and adversely impair the ability of the Borrower to make all payments of principal and interest on the Building Loan Note or any other note from Borrower to Lender, the ability of the Borrower to meet its obligations under the Building Loan Agreement or the ability of the Guarantors to meet their respective obligations under the Guaranty.

      9.     None of the labor, materials, overhead or other items of expenses specified in the Current Requisition submitted herewith have previously been made the basis of any prior requisition by the Borrower or of any prior payment by the Lender.

      10.    The estimated aggregate cost of completing the Construction Work, including Hard Costs and Soft Costs does not exceed $_____.

      11.    All conditions to the Advance requested by pursuant to the Current Requisition have been met in accordance with the terms of the Building Loan Agreement (including, without limitation, Section 2.2 and 2.3 thereof).

      The capitalized terms used herein have the meaning given thereto in the Building Loan Agreement.

---

      BEN ZHAVIAN

Sworn to before me this
day of _____, 2008

COPY

_____
   Notary Public

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 3    Pg 29 of 86
14-12057-scc    Claim 9-1 Part 9    Filed 12/10/14    Pg 30 of 35

## SCHEDULE D

AFFIDAVIT PURSUANT TO SECTION 22
OF THE LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK    )
                      : ss.:
COUNTY OF NEW YORK  )

BEN ZHAVIAN, being duly sworn, deposes and says:

(1)      I have an address at 154 Acres Road, Monroe, New York 10950.  I am a
Member of D.A.B. GROUP LLC, the Borrower mentioned in the within
Building Loan Agreement.

(2)      The amount of the Loan is: $19,050,000.00

(3)      The consideration for the Loan to be paid and the other expenses heretofore
incurred or to be incurred in connection with and paid out of the Loan are (or are
estimated to be) as follows:

| | | |
|---|---|---:|
| 1. | Lender Commitment Fee | $15,150.00 |
| 2. | Examination and insurance of title and recording fees and Mortgage recording tax | $628,264.58 |
| 3. | Mortgage Broker Fee | $190,500.00 |
| 4. | Lender's Legal Fees | $15,500.00 |
| 5. | Legal Fees re: contracts and plans | $13,375.00 |
| 6. | Title Closer Gratuity | $750.00 |
| 7. | Interest Reserve (funds as required) | $2,000,000.00 |
| | TOTAL: | $2,863,539.58 |

(4)      The amount, if any, to be advanced from the Loan
to repay amounts previously advanced to Borrower
for Hard Costs is:                             $207,000.00

5

14-12057-scc   Doc 100-3   Filed 02/10/15   Entered 02/10/15 14:36:33   Exhibit part
2 of 2   Pg 30 of 86
14-12057-scc   Claim 9-1 Part 9   Filed 12/10/14   Pg 31 of 35

(5)   The net sum available to Borrower from the Loan to pay
      Hard Costs is:                                              $15,043,000.00

(6)   The amount, if any, to be advanced from the Loan
      to repay amounts previously advanced to Borrower
      for Soft Costs is for the sums set forth above and the following costs: $532,200.00
      Lender's Construction Consultant: $368,000
      Architect/Engineering: $144,000
      Insurance: $20,200

(7)   The net sum available to Borrower from the Loan to pay
      Soft Costs is:                                             $404,260.42

(6)   This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law
      of the State of New York.

(7)   If Borrower is a corporation or partnership, this statement is verified by deponent and
      not by Borrower because Borrower is a corporation or partnership of which the
      deponent is an officer or general partner.

(8)   The facts stated above and any costs itemized on this statement are true, to the
      knowledge of the undersigned.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 3    Pg 31 of 86
14-12057-scc    Claim 9-1 Part 39    Filed 12/10/14    Pg 32 of 35

(10) The facts stated above and any costs itemized on this statement are true, to the knowledge of the undersigned.

This statement is made pursuant to Section 22 of the Lien Law of the State of New York.

The facts herein stated are true to the knowledge of the deponent.

BEN ZHAVIAN

Sworn to before me this
21st day of August, 2008

Notary Public

ANDREW B. WINSTON
Notary Public, State of New York
No. 01WI4811387
Qualified in Nassau County
Commission Expires Feb. 29, 2011

7

14-12057-scc   Doc 100-3   Filed 02/10/15   Entered 02/10/15 14:36:33   Exhibit part
3 of 2   Pg 32 of 86
14-12057-scc   Claim 9-1 Part 9   Filed 12/10/14   Pg 33 of 35

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement.

**BORROWER:**

D.A.B. GROUP LLC, a
New York limited liability company

By: _____
    BEN ZHAVIAN, Member

**LENDER:**
BROOKLYN FEDERAL SAVINGS BANK

By: _____
    MARC LENO, Senior Vice-President
    and Chief Lending Officer

STATE OF NEW YORK                )
                                 ) ss:
COUNTY OF NEW YORK               )

On the 21st day of August in the year 2008 before me, the undersigned, a Notary Public in and for said State, personally appeared, BEN ZHAVIAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

ANDREW B. WINSTON
Notary Public, State of New York
No. 01WI4811387
Qualified in Nassau County
Commission Expires Feb. 28, 2011

STATE OF NEW YORK                )
                                 )ss.
COUNTY OF NEW YORK               )

On 21st day of August in the MARC LENO personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

ANDREW B. WINSTON
Notary Public, State of New York
No. 01WI4811387
Qualified in Nassau County
Commission Expires Feb. 28, 2011

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

# EXHIBIT H

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2008082600526001001EB94A

## RECORDING AND ENDORSEMENT COVER PAGE    PAGE 1 OF 43

| | | |
|---|---|---|
| **Document ID:** 2008082600526001 | Document Date: 08-21-2008 | Preparation Date: 08-26-2008 |
| **Document Type:** MORTGAGE | | |
| **Document Page Count:** 42 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| METROPOLITAN ABSTRACT CORPORATION (PICK-UP) BRS AS AGENT FOR TITLE INSURANCE (NY345092) ONE OLD COUNTRY ROAD, SUITE 140 CARLE PLACE, NY 11514 516-741-5474 | KRISS & FEUERSTEIN LLP ATTN: DAVID S. KRISS, ESQ. 360 LEXINGTON AVENUE, SUITE 1200 NEW YORK, NY 10017 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 415 | 66 | Entire Lot | 141 ORCHARD STREET |
| | | Property Type: COMMERCIAL REAL ESTATE | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 415 | 67 | Entire Lot | 139 ORCHARD STREET |
| | | Property Type: COMMERCIAL REAL ESTATE | | |

### CROSS REFERENCE DATA

CRFN_____ or Document ID_____ or _____ Year_____ Reel____ Page ____ or File Number_____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| D.A.B. GROUP LLC 154 ACRES ROAD MONROE, NY 10950 | BROOKLYN FEDERAL SAVINGS BANK 81 COURT STREET BROOKLYN, NY 10021 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 19,050,000.00 | | |
| Taxable Mortgage Amount: | $ | 19,050,000.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 95,250.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 214,312.50 | $ | 0.00 |
| Spec (Additional): | $ | 47,625.00 | | |
| TASF: | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** |
| MTA: | $ | 57,150.00 | **OF THE CITY REGISTER OF THE** |
| NYCTA: | $ | 119,062.50 | **CITY OF NEW YORK** |
| Additional MRT: | $ | 0.00 | Recorded/Filed    09-12-2008 09:58 |
| TOTAL: | $ | 533,400.00 | City Register File No.(CRFN): |
| Recording Fee: | $ | 250.00 | 2008000362276 |
| Affidavit Fee: | $ | 0.00 | |

Filing Fee:    $    0.00

*Jeanette M. Hill*

**City Register Official Signature**

Loan No.  18-010588-2

## BUILDING LOAN MORTGAGE
## AND SECURITY AGREEMENT

in the amount of up to $19,050,000.00

from

### D.A.B. GROUP LLC

(Mortgagor)

to

### BROOKLYN FEDERAL SAVINGS BANK
### (Mortgagee)

Dated as of: August 21, 2008

**Property Addresses:**
**139 and 141 Orchard Street**
**New York, New York 10002**

| | |
|---|---|
| **Block:** | **415** |
| **Lots:** | **66 and 67** |
| **County:** | **New York** |
| **State:** | **New York** |

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

## DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

**Kriss & Feuerstein LLP**
**360 Lexington Avenue, Suite 1200**
**New York, New York 10017**
**Attn: David S. Kriss, Esq.**

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 38 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 4 of 44

# BUILDING LOAN
## MORTGAGE AND SECURITY AGREEMENT

THIS BUILDING LOAN MORTGAGE AND SECURITY AGREEMENT
("**Mortgage**"), dated this 21st day of August, 2008 from **D.A.B. GROUP LLC**, a New York
limited liability company having an address of 154 Acres Road, Monroe, New York 10950
("**Mortgagor**"), to **BROOKLYN FEDERAL SAVINGS BANK**, having an address at 81 Court
Street, Brooklyn, NY 10021 ("**Mortgagee**").

## DEFINITIONS

The Mortgagor and the Mortgagee agree that, unless the context otherwise
specifies or requires, the following terms shall have the meanings herein specified, such
definitions to be applicable equally to the singular and to the plural forms of such terms.

"Building Loan Agreement" means the Building Loan Agreement dated of even
date herewith between the Mortgagee, as lender, and the Mortgagor, as borrower, relating to the
Premises as the same may hereafter be modified, amended, renewed or extended.

"Chattels" means all fixtures, fittings, appliances, apparatus, equipment, machinery
and articles of personal property, and additions thereto and replacements thereof, now or
hereafter owned by the Mortgagor or in which the Mortgagor has or shall have an interest, now
or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection
with the complete and comfortable use, enjoyment, occupancy or operation of, the Improvements
(as hereinafter defined) or the Premises (as hereinafter defined), including all building materials
owned by the Mortgagor or in which the Mortgagor has, or shall have, an interest, whether stored
on or off the Premises.

"Event of Default" means an event of default described as such in Section 2.01
hereof.

"Guarantor" means Ben Zhavian.

"Guaranty" means the Guaranty dated of even date herewith, executed by the
Guarantors in favor of the Mortgagee, as the same may be modified, amended, renewed or
extended from time to time.

"Improvements" means all structures and buildings, and replacements thereof, now
or hereafter located or erected upon the Premises, including all Chattels of every kind and nature
whatsoever forming part of said structures and/or buildings.

"Intangibles" means all "general intangibles" (as such term is defined in the
Uniform Commercial Code adopted in New York State, as the same may from time to time be in
effect (the "Code")) in any way relating to the Premises and/or the Improvements and in which
the Mortgagor has any interest, including, without limitation, all licenses, trade names, goodwill
and books and records relating to the Premises, the construction of any Improvements, and/or to

the business operated or to be operated on the Premises or any part thereof, and all unearned premiums, accrued, accruing or to accrue under all insurance policies now or hereafter obtained by the Mortgagor insuring the Mortgaged Property (as hereinafter defined), and all rights and interests of Mortgagor thereunder.

"Note" means that certain Secured Building Loan Promissory Note of up to NINETEEN MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($19,050,000.00) dated of even date herewith, made by the Mortgagor payable to the order of the Mortgagee, as the same may be modified, amended, renewed or extended from time to time.

"Involuntary Rate" means the Default Rate as set forth in the Note, but in no event to exceed the maximum rate allowed by law.

"Draw Schedule" means the draw schedule listed in Schedule B to the Building Loan Agreement which incorporates the plans and specifications submitted to Lender prior to the date hereof, as the same may hereafter be modified or amended.

"Premises" means all that certain plot, piece or parcel of land owned by the Mortgagor as more particularly described in Schedule A hereto, together with all of the improvements thereon, air space, easements, rights, privileges, royalties and appurtenances belonging or in anyway appertaining thereunto, and all of the estate, right, title, interest, claim or demand whatsoever of the Mortgagor therein and in the streets, alleys and ways adjacent thereto, either at law or in equity, in possession or expectancy, now or hereafter acquired.

## RECITALS:

WHEREAS, the Mortgagor is now the owner in fee simple of the Mortgaged Premises, as hereinafter defined; and

WHEREAS, the Mortgagor is now indebted to the Mortgagee in the principal sum of up to NINETEEN MILLION FIFTY THOUSAND AND 00/100 DOLLARS ($19,050,000.00) lawful money of the United States of America (the "Debt"), as aforesaid, with interest as set forth in the Note; and

NOW, THEREFORE, in consideration of the Mortgaged Premises and the mutual covenants and agreements of the parties and the sum of Ten and 00/100 ($10.00) Dollars to each party by the other in hand paid, the receipt and sufficiency of which are hereby acknowledged, and for the purposes of carrying out the intentions as expressed, the Mortgagor and the Mortgagee hereby covenant and agree as follows:

1.    Mortgagor is justly indebted to Mortgagee in the amount of up to $19,050,000.00 and hereby grants to Mortgagee this Mortgage which constitutes a valid single second mortgage

3

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 40 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 6 of 44

against the Mortgaged Property (as hereinafter defined), subject only to the existing lien of Mortgagee, securing the principal sum of up to $19,050,000.00 with interest and all other sums due under the Note, hereunder and under the other Loan Documents (hereinafter defined).

2.      Mortgagor hereby warrants and confirms to Mortgagee that Mortgagor has mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned, and hypothecated and by these presents does hereby mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Mortgagee the real property described in <u>Schedule A</u> attached hereto (the **"Premises"**) and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (the **"Improvements"**);

**TOGETHER WITH**: all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to Mortgaged Property, as hereinafter defined.

All terms of this Mortgage that are not defined above shall have the meaning set forth in this Mortgage.

### GRANTING CLAUSE

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the payment of the principal of the Note, the interest thereunder, and any other sums payable thereunder and/or under this Mortgage (collectively, "Indebtedness"), and the performance and observance of all the provisions of the Building Loan Agreement, this Mortgage and the Note, the Mortgagor hereby gives, grants, bargains, sells, warrants, aliens, premises, releases, conveys, assigns, transfers, mortgages, hypothecates, deposits, pledges, sets over and confirms unto the Mortgagee all the Mortgagor's estate, right, title and interest in, to and under any and all of the following described property ("Mortgaged Property"), whether now owned or held or hereafter acquired:

    (a)      the Premises;

    (b)      the Improvements;

    (c)      the Chattels;

    (d)      the Intangibles;

4

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 41 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 7 of 44

(e)     all leases, subleases, lettings, licenses and other uses and occupancies of the Premises now or hereafter entered into and all right, title and interest of the Mortgagor thereunder, together with the rents, issues, income and profits thereof including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such leases (except that the Mortgagor shall as licensee of the Mortgagee have the right to collect such rents and other amounts, subject to provisions of this Mortgage, so long as no Event of Default shall have occurred and be continuing) and all guaranties of the obligations of the tenants, subtenants, lessees, licensees, users or occupants thereunder;

(f)     all agreements and/or contracts now or hereafter entered into by the Mortgagor relating to the sale, leasing, brokerage, development, construction (including architectural and engineering contracts), equipping, management, maintenance, marketing, and/or operation of the Premises or the Improvements, including all moneys due and to become due thereunder;

(g)     the plans and specifications and working drawings relating to the construction of any Improvements at the Premises;

(h)     all books and records relating to the operation of the Premises and/or construction of any Improvements;

(i)     all options and agreements with respect to any additional real property for the use or development in connection with operation of the Premises and/or construction of any Improvements;

(j)     all Chattel Paper, Accounts, Inventory and Instruments, as such terms are defined in the Code;

(k)     all consents, certificates, authorizations, variances, waivers, licenses, permits and approvals from any governmental authority relating to the Premises and/or the construction of any Improvements; and

(l)     all proceeds of the conversion, voluntary or involuntary, or any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of hazard and title insurance and condemnation awards.

TO HAVE AND TO HOLD unto the Mortgagee, its successors and assigns forever.

5

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 42 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 8 of 44

# ARTICLE I

## PARTICULAR COVENANTS OF THE MORTGAGOR

The Mortgagor covenants and agrees as follows:

Section 1.01.  (a)    Mortgagor represents and warrants that it has and will continue to hold good and marketable title to an indefeasible fee estate in the Premises subject to no lien, charge or encumbrance, other than approved by Mortgagee ("Permitted Exceptions").

(b)    Mortgagor represents and warrants: (i) that it is the owner of, and shall own, the Mortgaged Property free and clear of any liens and claims, other than the Permitted Exceptions, (ii) that this Mortgage is and shall remain a valid and enforceable second lien on the Mortgaged Property subject only to the Permitted Exceptions, (iii) that the execution and delivery of this Mortgage, the Note, and the Building Loan Agreement have been duly authorized by the Mortgagor and that there is no provision in any document evidencing or establishing the existence of the Mortgagor that requires the further consent for such action by any other entity or person, (iv) that it is duly organized, validly existing and is in good standing under the laws of New York State, (v) that it has all necessary licenses, authorizations, registrations, permits and/or approvals, and full power and authority, to own its properties and carry on its business as currently conducted, (vi) that the execution and delivery by it of, and performance of its obligations under this Mortgage, the Note, and the Building Loan Agreement shall not result in the Mortgagor being in default under any provision of any document evidencing or establishing the existence of the Mortgagor or of any mortgage, credit or other agreement to which the Mortgagor is a party or that affects the Mortgagor or the Premises, or any part thereof, (vii) that it shall preserve its fee simple title in and to the Premises and shall forever warrant and defend the same to the Mortgagee, (viii) that it shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever and (ix) that the execution of this Mortgage has been duly authorized by the Members of Mortgagor.

Section 1.02.  The Mortgagor shall, at its sole cost and expense, and without expense to the Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as the Mortgagee shall from time to time reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto the Mortgagee the Mortgaged Property and the rights hereby conveyed or assigned or intended now or hereafter so to be, or which the Mortgagor may be or may hereafter become bound to convey or assign to the Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage, or for filing, registering or recording this Mortgage and, on demand, shall execute and deliver, and hereby authorizes the Mortgagee to execute and file in the name of the Mortgagor to the extent it may lawfully do so, one or more financing statements to evidence more effectively the lien hereof upon the Mortgaged Property or any part thereof.

6

Section 1.03 (a) The Mortgagor forthwith upon the execution and delivery of this Mortgage, and thereafter from time to time, shall, at the sole cost of the Mortgagor, cause this Mortgage and any security instrument creating a lien or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance, to be filed, registered and/or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and to fully protect the lien hereof upon, and the interest of the Mortgagee in, the Mortgaged Property.

(b)     The Mortgagor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property, and any instrument of further assurance, and all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Note, the Building Loan Agreement, this Mortgage or any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance.

Section 1.04. The Mortgagor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America that at the time of such payment shall be legal tender for the payment of public and private debts and all such principal and interest due in respect of the Note is hereby deemed an obligation due under and secured by this Mortgage.

Section 1.05. Mortgagor represents and warrants that Mortgagor shall, so long as it is owner of the Mortgaged Property or any part thereof, do all things necessary to preserve and keep in full force and effect its existence, franchises, rights and privileges as a limited liability company under the laws of the State of New York and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental authority or court applicable to the Mortgagor or to the Mortgaged Property or any part thereof.

Section 1.06. All right, title and interest of the Mortgagor in and to all extensions, improvements, betterments, renewals, substitutes and replacements of, and all additions and appurtenances to, the Mortgaged Property hereafter acquired by, or released to, the Mortgagor, or constructed, assembled or placed by the Mortgagor on the Premises or any part thereof, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by the Mortgagor or Mortgagee, shall become subject to the lien of this Mortgage as fully and completely, and with the same effect, as though now owned by the Mortgagor and specifically described in the granting clause hereof, but at any and all times the Mortgagor shall execute and deliver to the Mortgagee any and all such further assurances, mortgages, conveyances or assignments thereof as the Mortgagee may reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Mortgage.

7

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 44 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 10 of 44

Section 1.07 (a)        The Mortgagor, from time to time when the same shall
become due and payable, shall pay and discharge all taxes of every kind and nature, all general
and special assessments, levies, permits, inspection and license fees, all water and sewer rents
and charges, and all other public charges whether of a like or different nature, imposed upon or
assessed against the Mortgaged Property, or any part thereof, or upon the revenue, rents, issues,
income and profits of the Mortgaged Property, or any part thereof, or arising in respect of the
occupancy, use or possession thereof. In default thereof the Mortgagee may, but shall be under
no obligation to, pay the same, and the Mortgagor shall repay the same to the Mortgagee with
interest and the same shall be a lien of the Premises secured on this Mortgage. The Mortgagor
shall deliver to the Mortgagee receipts evidencing the payment of all such taxes, assessments,
levies, fees, rents and other public charges imposed upon or assessed against the Mortgaged
Property, or any part thereof, or the revenues, rents, issues, income or profits thereof, promptly
upon the payment thereof within ten (10) days of the final date for payment of such charge
without the imposition of interest or penalty. The Mortgagee may, at its option, require the
deposit by the Mortgagor with the Mortgagee, at the time of each payment of an installment of
interest or principal under the Note, of an additional amount sufficient to discharge the
obligations under this subsection (a) plus one-twelfth of the annual insurance premiums as
provided for in Section 1.09(a) hereof. The determination of the amount so payable and of the
fractional part thereof to be deposited with the Mortgagee, so that the aggregate of such deposit
shall be sufficient for this purpose, shall be made by the Mortgagee in its sole and reasonable
discretion. Such amounts shall be held by the Mortgagee without interest and applied to the
payment of the obligations in respect to which such amounts were deposited on or before the
respective dates on which the same or any of them would become delinquent or, at the option of
the Mortgagee, but only if an Event of Default shall have occurred and shall be continuing, to the
payment of any amount due under the Note or hereunder (including principal, interest and late
charges) in such order or priority as the Mortgagee shall determine. If one (1) month prior to the
due date of any of the aforementioned obligations, the amounts then on deposit therefor shall be
insufficient for the payment of such obligation in full, the Mortgagor, within five (5) days after
demand by the Mortgagee, shall deposit the amount of the deficiency with the Mortgagee.
Nothing herein contained shall be deemed to affect any right or remedy of the Mortgagee under
any provision of this Mortgage or of any statute or rule of law to pay any such amount and to add
the amount so paid to the Indebtedness. The Mortgagor hereby grants the Mortgagee a security
interest in any and all such funds to secure the repayment of the Indebtedness.

(b)        Nothing in this Section 1.07 shall require the payment or discharge of any
obligation imposed upon the Mortgagor by this Section 1.07 so long as the Mortgagor shall in
good faith and at its own expense contest the same or the validity thereof by appropriate legal
proceedings which shall operate to prevent the collection thereof or other realization thereon and
the sale or forfeiture of the Mortgaged Property or any part thereof to satisfy the same; provided
that during such contest the Mortgagor shall, at the option of the Mortgagee, provide security
satisfactory to the Mortgagee assuring the discharge of the Mortgagor's obligation under this
Section 1.07 and of any additional charge, penalty or expense arising from or incurred as a result
of such contest; and provided further that if, at any time, payment of any obligation imposed
upon the Mortgagor by subsection (a) of this Section 1.07 shall become necessary to prevent the

8

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 45 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 11 of 44

delivery of a tax deed, or its equivalent, conveying the Mortgaged Property, or any part thereof, because of non-payment, then the Mortgagor shall pay the same in sufficient time to prevent the delivery of such tax deed or its equivalent.

Section 1.08.  (a)    The Mortgagor shall pay, or adequately bond, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers and others, which claims and demands, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general shall do or cause to be done everything necessary so that the lien on this Mortgage shall be fully preserved, at the cost of the Mortgagor, without expense to the Mortgagee.

(b)    The Mortgagor shall pay any and all taxes, charges, fees and/or levies by reason of Mortgagee's ownership of the Note or this Mortgage and/or resulting from the exercise by Mortgagee of any of its rights and/or remedies provided for under this Mortgage, except for income taxes of the Mortgagee.  The obligations assumed by Mortgagor pursuant to this Section 1.08 shall survive the exercise by the Mortgagee of any of its rights and/or remedies under this Mortgage.

Section 1.09. (a)  The Mortgagor, at its sole cost and expense, shall maintain the following insurance:
(i)    Policies of insurance against loss or damage by fire, lightning, wind and such other perils as are included in a standard "all risk" or "special causes of loss" form, and against loss or damage by all other risks and hazards covered by a standard extended coverage insurance policy including, without limitation, riot and civil commotion, vandalism, malicious mischief, burglary and theft.  Such insurance shall be in an amount equal to the greatest of (i) the then full replacement cost of the Improvements and Chattels, without deduction for physical depreciation, (ii) the outstanding principal balance of the Loan, and (iii) such amount that the insurer would not deem Mortgagor a coinsurer under said policies but, in any event, not less than $1,000,000.00 without deduction for depreciation.  The policies of insurance carried in accordance with this paragraph shall be paid annually in advance and shall contain a "Replacement Cost Endorsement" with a waiver of depreciation and an "Agreed Amount Endorsement".  The policies shall have a deductible no greater than $10,000 unless agreed to by Mortgagee in writing.

(ii)    Flood insurance if any part of the Premises is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Program in an amount at least equal to the outstanding principal amount of the Note or the maximum limit of coverage available with respect to the Improvements and Chattels under said Program, whichever is less.

(iii)    Comprehensive General Liability or Commercial General Liability insurance (with contractual liability on an occurrence basis and including blanket contractual

9

liability, completed operations and personal injury coverage) including a broad form comprehensive general liability endorsement and coverage for broad form property damage, contractual damages, death, personal injuries (including death resulting therefrom) and a liquor liability endorsement if liquor is sold on the Mortgaged Property, containing minimum limits per occurrence of $1,000,000.00 and $2,000,000.00 in the aggregate for any policy year.

      (iv)    Insurance against loss or damage from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment pressure vessels or similar apparatus now or hereafter installed in the Premises(without exclusion for explosions), in form as the Mortgagee shall from time to time require and in an amount at least equal to the outstanding principal amount of the Note or $2,000,000.00.

      (v) Worker's compensation insurance, in accordance with all applicable statutory requirements.

      (vi)    Fire insurance in the so-called "Builder's Risk, Completed Value, Non-Reporting Form", or other form approved by the Mortgagee, with "all-risk" extended coverage (including vandalism and malicious mischief) and coverage for "completion and/or premises occupancy" for the full insurable value of all work incorporated in the Improvements and all materials and equipment on or about the Premises intended for permanent use in the Improvements or incident to the construction thereof (such insurance shall only be required during the Building Loan Term, as such term is defined in the Building Loan Agreement executed immediately following this Mortgage).

      (vii)    Builder's "all risk" insurance in an amount equal to not less than the full insurable value of the Mortgaged Property against such risks (including, without limitation, fire and extended coverage and collapse of the Improvements to agreed limits) as Mortgagee may request, in form and substance acceptable to Mortgagee or deemed sufficient by Mortgagee in order to protect its interests.

      (viii)    Rent and/or business interruption insurance for loss occasioned by the perils commonly insured in the "All Risks" policy, so-called, in an amount equal to the greater of (A) estimated gross revenues from the operations of the Mortgaged Property over 12 months or (B) the projected operating expenses (including stabilized management fees, applicable reserve deposits, and debt service) for the maintenance and operation of the Mortgaged Property over 12 months. The amount of such insurance shall be increased in Mortgagee's reasonable discretion from time to time during the Term as and when new Leases and renewal Leases are entered into and the Rents increase or the annual estimate of (or the actual) gross revenue, as may be applicable, increases.

10

14-12057-scc     Doc 100-3     Filed 02/10/15     Entered 02/10/15 14:36:33     Exhibit part
2 of 2     Pg 47 of 86
14-12057-scc     Claim 9-1 Part 10     Filed 12/10/14     Pg 13 of 44

(ix)     Insurance in such amounts as may from time to time be reasonably required by the Mortgagee, against such other insurable casualties, hazards or risks as shall from time to time commonly be insured against in the case of premises comparable to the Premises.

Each policy of insurance required by clauses (i), (ii), (iv), (v), (vi), (vii) and (viii) of this subdivision (a) of this Section 1.09 shall contain the standard non-contributory mortgage endorsement in favor of the Mortgagee, shall name the Mortgagee as loss payee of any and all proceeds payable under such insurance), and shall provide that the Mortgagee shall have the sole and exclusive right to adjust any insurance awards. All policies of insurance required by clause (iii) of this subdivision (a) of this Section 1.09 shall be written on an "on occurrence" basis and shall name the Mortgagee as an additional insured.

All insurance policies and endorsements required pursuant to this Section 1.09 shall be fully paid for, nonassessable and contain such provisions and expiration dates and be in such form and amounts and issued by such insurance companies as shall be satisfactory to the Mortgagee. Without limiting the foregoing, each policy shall specifically provide that (A) such policy may not be canceled or modified except upon thirty (30) days prior written notice to the Mortgagee via certified mail and that no act or thing done by the Mortgagor shall invalidate the policy as against Mortgagee and (B) any and all insurance proceeds shall be paid to the Mortgagee so long as Mortgagee certifies to the insurer that the unpaid Indebtedness exceeds the proceeds of insurance. In addition, from time to time, upon the occurrence of any change in the use, operation or value of the Premises, or in the availability of insurance in the area in which the Premises are located, the Mortgagor shall, within ten (10) business days after demand by the Mortgagee, take out such additional amounts and/or require other kinds of insurance as the Mortgagee may reasonably require. The Mortgagor shall assign and deliver the policies of all such insurance to the Mortgagee, in such manner and form that the Mortgagee and its successors and assigns shall at all times have and hold said policy or policies as collateral and further security for the payment of the Indebtedness until the full payment of the Indebtedness.

(b)     The Mortgagor shall not take out separate insurance concurrent in form or contribution in the event of loss with that required to be maintained under this Section 1.09, unless the Mortgagee is included thereon as a named insured with loss payable to the Mortgagee under a standard mortgagee endorsement of the character above described. The Mortgagor shall immediately notify the Mortgagee whenever any such separate insurance is taken out and shall promptly deliver to the Mortgagee the policy or policies of such insurance.

(c)     If the Premises, or any part thereof, are located in an area which has been identified by the Secretary of Housing and Urban Development as a flood hazard area, the Mortgagor shall keep, for as long as any Indebtedness remains unpaid, the Premises covered by flood insurance in an amount at least equal to the full amount of the Note or the maximum limit of coverage available for the Premises under the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1983, as the same may have been or may hereafter be amended or modified (and any successor act thereto), whichever is less, naming Mortgagee as an additional insured party.

11

(d)    The Mortgagor shall give the Mortgagee prompt notice of any loss covered by insurance (an "Insured Casualty") and the Mortgagee shall have the right to join the Mortgagor in adjusting any loss. Notwithstanding anything to the contrary contained herein or in Section 254 of the Real Property Law or any other provision of applicable law, the proceeds of insurance policies coming into the possession of the Mortgagee shall not be deemed trust funds and the Mortgagee, subject to the provisions of Section 1.09(h) below, shall have the option in its sole discretion to apply any insurance proceeds it may receive pursuant hereto, or otherwise, to the payment of the Indebtedness, or to allow all or a portion of such proceeds to be used for the restoration of the Premises without affecting the lien of this Mortgage for the full amount of the Indebtedness owing prior to receipt of such proceeds. In the event any such insurance proceeds shall be used to reduce the Indebtedness, the same shall be applied by the Mortgagee, after the deduction therefrom and repayment to the Mortgagee of any and all costs and expenses incurred by the Mortgagee in the recovery thereof, in any manner Mortgagee shall designate including but not limited to, the application of such proceeds to the then unpaid installments of the principal balance due under the Note in the inverse order of their due dates, such that the regular payments, if any, under the Note shall not be reduced or altered in any manner. Following the occurrence of any damage or destruction to the Premises, in whole or in part, Mortgagor, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law. The expenses incurred by Mortgagee in the adjustment and collection of insurance proceeds shall become part of the debt and be secured hereby and shall be reimbursed by Mortgagor to Mortgagee upon demand.

(e) All policies of insurance (the **"Policies"**) required pursuant to this paragraph: (i) shall be issued by companies approved by Mortgagee and licensed to do business in the state where the Mortgaged Property is located, with a claims paying ability rating of "BBB" or better by Standard & Poor's Ratings Services, a division of McGraw-Hill Companies, Inc. and a rating of "A:VII" or better in the current Best's Insurance Reports and authorized to do business in the State of New York and which are approved in writing by the Mortgagee; (ii) shall name Mortgagee and its successors and/or assigns as their interest may appear as the mortgagee; (iii) shall contain a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Mortgagee as the person to which all payments made by such insurance company shall be paid; (iv) shall contain a waiver of subrogation against Mortgagee; (v) shall be maintained throughout the Term without cost to Mortgagee; (vi) shall be assigned and the originals or certified copies delivered to Mortgagee (including certified copies of the Policies in effect on the date hereof within thirty (30) days after the closing of the Loan evidencing the payment of not less than the first annual premium, or accompanied by other evidence satisfactory to the Mortgage of such payment, shall be delivered by the Mortgagor to the Mortgagee); (vii) shall contain such provisions as Mortgagee deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that neither Mortgagor, Mortgagee nor any other party shall be a co-insurer under said Policies and that Mortgagee shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation; and (viii) shall be satisfactory in form and substance to

12

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 49 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 15 of 44

Mortgagee and shall be approved by Mortgagee in its reasonable discretion as to amounts, form, risk coverage, deductibles, loss payees and insureds. It is further agreed that the aggregate amount of coverage underwritten by any insurer in conformance with the provisions of this Mortgage shall not exceed 10% of that insurer's surplus to policyholders. Mortgagor shall pay the premiums for such Policies (the "Insurance Premiums") as the same become due and payable and shall furnish to Mortgagee evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Mortgagee (provided, however, that Mortgagor is not required to furnish such evidence of payment to Mortgagee in the event that such Insurance Premiums have been paid by Mortgagee pursuant to Paragraph 1.09(g) hereof).

(f)    If the Mortgagor shall fail to procure, pay for or deliver to the Mortgagee any policy or policies of insurance and/or renewals thereof as in this Section 1.09 required, the Mortgagee may, at its option, but shall be under no obligation to do so, effect such insurance and pay the premium therefor, and the Mortgagor shall immediately repay to the Mortgagee any premiums so paid, with interest thereon at the Involuntary Rate. Any amount so expended by the Mortgagee, with interest thereon at the Involuntary Rate, shall be secured by the lien of this Mortgage. The Mortgagor hereby waives any claim against the Mortgagee by reason of the failure of the Mortgagee to (i) notify the Mortgagor of the cancellation or non-renewal of any insurance required by this Section 1.09, or (ii) effect any such insurance.

(g)    The Mortgagee may, at its option, require the deposit by the Mortgagor, at the time of each payment of an installment of interest or principal under the Note, of an additional amount sufficient to pay the insurance premiums due for the insurance required under this Section 1.09 when such premiums become due. The determination of the amount so payable and of the fractional part thereof to be deposited with the Mortgagee, so that the aggregate of such deposit shall be sufficient for this purpose, shall be made by the Mortgagee in its sole and reasonable discretion. Such amounts shall be held by the Mortgagee without interest and applied to the payment of the premiums in respect to which such amounts were deposited on or before the respective dates on which the same or any of them would become delinquent or, at the option of the Mortgagee, but only if an Event of Default shall have occurred and shall be continuing, to the payment of any amount due under the Note or hereunder (including principal, interest and late charges) in such order or priority as the Mortgagee shall determine. If one (1) month prior to the due date of any of the aforementioned premiums, the amounts then on deposit therefor shall be insufficient for the payment of such premiums in full, the Mortgagor, within five (5) days after demand by the Mortgagee, shall deposit the amount of the deficiency with the Mortgagee. Nothing herein contained shall be deemed to affect any right or remedy of the Mortgagee under any provision of this Mortgage or of any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness. The Mortgagor hereby grants the Mortgagee a security interest in any and all such funds to secure the repayment of the Indebtedness.

(h)    In case of loss or damages covered by any of the Policies, the following provisions shall apply:

13

(i)      In the event of an Insured Casualty that does not exceed ten percent (10%) of the original principal amount of the Note, Mortgagor may settle and adjust any claim without the consent of Mortgagee and agree with the insurance company or companies on the amount to be paid upon the loss; provided that such adjustment is carried out in a competent and timely manner. In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds.

(ii)      In the event an Insured Casualty shall exceed ten percent (10%) of the original principal amount of the Note, then and in that event, Mortgagor shall settle and adjust any claim and agree with the insurance company or companies on the amount to be paid on the loss and the proceeds of any such policy shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iii)      In the event of an Insured Casualty where the loss is in an aggregate amount less than thirty percent (30%) of the original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Premises can be restored within six (6) months and prior to maturity of the Note to an economic unit not less valuable (including an assessment of the impact of the termination of any Leases due to such Insured Casualty) and not less useful than the same was prior to the Insured Casualty, and after such restoration will adequately secure the outstanding balance of the Note, then, if no Event of Default (as hereinafter defined) shall have occurred and be then continuing, the proceeds of insurance (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Premises or part thereof subject to the Insured Casualty, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(iv)      Except as provided above, the proceeds of insurance collected upon any Insured Casualty shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the amounts due under the Note and this Mortgage or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Premises or part thereof subject to the Insured Casualty, in the manner set forth below. Any such application to the amounts due under the Note and this Mortgage shall be without any Prepayment Premium (as such term is defined in the Note, except that if an Event of Default has occurred and is continuing then the Mortgagor shall pay to Mortgagee an additional amount equal to the Prepayment Premium (as such term is defined in the Note), if any. Any such application to the amounts due under the Note and this Mortgage shall (A) be applied to those payments of principal and interest last due under the Note but shall not postpone any payments otherwise required pursuant to the Note other than such last due payments and (B) cause the Note to be re-amortized in accordance with its terms and conditions. Notwithstanding anything to the contrary set forth in this Agreement, the Prepayment Premium, as such term is

14

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 51 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 17 of 44

defined in the Note, shall not apply to any funds received by Mortgagee in connection with proceeds of insurance that are applied to the Principal Sum of the Note.

(v)    In the event Mortgagor is entitled to reimbursement out of insurance proceeds held by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding, (2) funds or, at Mortgagee's option, assurances satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of insurance to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Mortgagee may reasonably require and approve.    Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee in its reasonable discretion prior to commencement of work.    No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of insurance shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in the hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the cost of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien.    Any surplus which may remain out of insurance proceeds held by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall be paid to any party entitled thereto.

In the event that restoration occurs at the Premises, Mortgagor shall also obtain and post, at its sole cost and expense, all necessary Federal, State and local permits and approvals prior to the commencement of such repair or restoration.    Mortgagor agrees that all insurance proceeds to be used to repair or restore the Mortgaged Property shall be held by the Mortgagee and disbursed periodically: (i) on advice from the Mortgagee's architect (who shall be employed by Mortgagee at Mortgagor's sole expense) that the work completed or materials installed conform to said budget and plans, as approved by the Mortgagee; and (ii) upon presentment of receipted bills and releases satisfactory to the Mortgagee.    The expenses incurred by the Mortgagee, including reasonable architects' and reasonable attorneys' fees, and all soft and hard costs in connection with such restoration, shall be paid by Mortgagor to the extent insurance proceeds are insufficient to pay same. At no time shall the Mortgagee be obligated to disburse any funds if the undisbursed balance is, in the opinion of the Mortgagee based on advice from its architect, insufficient to timely complete the restoration of the Mortgaged Property free and clear of all liens or if the advance of funds will, in the opinion of the Mortgagor, adversely affect the priority of the lien of this Mortgage.    The Mortgagor agrees to post such bonds, obtain such guaranteed maximum price general contract agreement and/or enter into such agreements and arrangements as the Mortgagee may require to insure lien-free completion of such repairs or restoration by the end of the period provided herein for completion of such repairs or restoration.

15

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 52 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 18 of 44

Section 1.10. If the Mortgagor shall fail to perform any of the covenants contained in Sections 1.01, 1.03, 1.04, 1.07, 1.08, 1.09 or 1.12 hereof, the Mortgagee may make advances to perform the same on Mortgagors' behalf, and all sums so advanced shall be a lien upon the Mortgaged Property and shall be secured hereby. The Mortgagor shall repay on demand by Mortgagee all such sums so advanced by Mortgagee on Mortgagor's behalf with interest at the Involuntary Rate. The provision of this Section 1.10 shall not prevent any default in the observance by Mortgagor of any covenant contained in Sections 1.01, 1.03, 1.04, 1.07, 1.08, 1.09 or 1.12 hereof from constituting an Event of Default.

Section 1.11 (a) The Mortgagor shall keep adequate records and books of account in accordance with the principles of the cash basis method of accounting, consistently applied, and shall permit the Mortgagee, by its agents, accountants and attorneys, to visit and inspect the Premises and examine the Mortgagor's records and books of account and to discuss its affairs, finances and accounts with the partners or officers, accountants, employees, attorneys and agents of the Mortgagor, at such reasonable times as may be requested by the Mortgagee upon reasonable notice.

(b)    The Mortgagor shall deliver to the Mortgagee (i) with reasonable promptness after the close of each fiscal year of the Mortgagor, but in no event later than ninety (90) days thereafter, the Mortgagor's statement of income, balance sheet, statement of cash flow and statement of contingent liabilities for such fiscal year, together with all schedules appurtenant thereto, prepared on the cash basis method of accounting in accordance with the principles of the cash basis method of accounting, consistently applied, and reviewed by an independent certified public accountant, satisfactory to the Mortgagee, and which financial statements shall be signed by Mortgagor and each Guarantor to certify that said financial statements are true, accurate and complete and that no events have occurred subsequent to the date of said statements that have or would cause a material adverse change in the financial conditions represented therein, (ii) with reasonable promptness after the close of each fiscal year of the Mortgagor, but in no event later than ninety (90) days thereafter, the rent roll for the Premises as described in Section 1.11(d) of this Mortgage, (iii) with reasonable promptness after the close of each fiscal quarter of the Mortgagor, but in no event later than thirty (30) days thereafter, a statement of income and a balance sheet for such quarter, along with a statement of sources and uses of funds for such quarter with respect to any and all accounts of the Mortgagor maintained with the Mortgagee, together with all schedules appurtenant thereto, which statements shall be signed by Mortgagor and each Guarantor to certify that said financial statements are true, accurate and complete and that no events have occurred subsequent to the date of said statements that have or would cause a material adverse change in the financial conditions represented therein, and (iv) with reasonable promptness after its filing with the applicable governmental authority, but in no event later than fifteen (15) days thereafter, copies of the Mortgagor's filed Federal Income Tax Return and New York State Income Tax Return with all schedules appurtenant thereto.  In the event Borrower or any Guarantor fails to provide the financial documents required to be delivered pursuant to the Mortgage, the Guaranty or any of the other loan documents within the time periods set forth in the Mortgage, the Guaranty or any of the other loan documents and such failure continues for

16

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 53 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 19 of 44

thirty (30) days following written demand from Lender, the interest rate under the Loan shall be increased by one (1%) percent and such increase shall remain in effect until such time as Borrower or Guarantor deliver all of the required financial documents.

(c)     The Mortgagor shall cause Guarantor to deliver to the Mortgagee: (i) with reasonable promptness after the end of each year (i.e. December 31st), their personal financial statements delivered on the Mortgagee's form which financial statements shall be signed by Guarantor to certify that said financial statements are true, accurate and complete and that no events have occurred subsequent to the date of said statements that have or would cause a material adverse change in the financial conditions represented therein, and (ii) with reasonable promptness after its filing with the applicable governmental authority, but in no event later than forty-five (45) days thereafter, copies of Guarantor's filed Federal Income Tax Return and New York State Income Tax Return, and all schedules appurtenant thereto.  Mortgagee, however, shall have the option of requiring Mortgagor to deliver annual financial statements reviewed by a certified public account and financial statements conforming to the requirements set forth in subsection 1.11(b)(iii) on a quarterly basis.

(d)     The Mortgagor, within fifteen (15) days after written request, shall deliver to the Mortgagee a current rent roll of the Premises showing the names of tenants, space occupied by each tenant, rent paid by each tenant (gross and per square foot), lease security if any, lease or occupancy expiration dates, options for renewal, rental during renewal terms, cancellation provisions and other relevant information.

(e)     The Mortgagor shall, within five (5) business days after written request from the Mortgagee, furnish to Mortgagee a written statement, duly acknowledged, of the amount due whether for principal or interest under the Note and whether any offsets, counterclaim or defenses exist against payment of the Indebtedness or any part thereof.

(f)     The Mortgagor, with reasonable promptness, shall deliver or cause to be delivered to the Mortgagee such other information (financial or otherwise) with respect to the Mortgagor or any Guarantor as the Mortgagee may reasonably request from time to time.

Section 1.12.  The Mortgagor shall not commit any waste on the Mortgaged Property, or any part thereof, nor make any change in the use of the Mortgaged Property, nor any part thereof, which shall in any way increase any ordinary fire or other hazard arising out of alteration, construction or operation.  The Mortgagor shall, at all times, maintain the Improvements in good operating order and condition and shall promptly make, at its sole expense, from time to time, all repairs, renewals, replacements, additions and improvements in connection therewith which are needful or desirable to such end.

Section 1.13.  Mortgagor shall promptly give Mortgagee written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding (a **"Condemnation"**) and shall deliver to Mortgagee copies of any and all papers served in connection

17

with such Condemnation.  Following the occurrence of a Condemnation, Mortgagor, regardless of whether an Award (hereinafter defined) is available, shall promptly proceed to restore, repair, replace or rebuild the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with applicable law.

(a)    Mortgagee is hereby irrevocably appointed as Mortgagor's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment (**"Award"**) for any taking accomplished through a Condemnation (a **"Taking"**) and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Mortgage.  Notwithstanding any Taking by any public or quasi-public authority (including, without limitation, any transfer made in lieu of or in anticipation of such a Taking), Mortgagor shall continue to pay the amounts due under the Note and this Mortgage at the time and in the manner provided for in the Note, in this Mortgage and the other Loan Documents and the amounts due under the Note and this Mortgage shall not be reduced unless and until any Award shall have been actually received and applied by Mortgagee to expenses of collecting the Award and to discharge of the amounts due under the Note and this Mortgage.  Mortgagee shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note.  Mortgagor shall cause any Award that is payable to Mortgagor to be paid directly to Mortgagee.  Notwithstanding anything to the contrary, the Prepayment Premium, as such term is defined in the Note, shall not apply to any funds received by Mortgagee in connection with an Award that are applied to the Principal Sum of the Note.

(b)    In the event of any Condemnation where the Award is in an aggregate amount less than twenty-five percent (25%) of the original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Mortgaged Property can be restored within six (6) months and prior to maturity of the Note to an economic unit not less valuable (including an assessment of the impact of the termination of any Leases due to such Condemnation) and not less useful than the same was prior to the Condemnation, and after such restoration will adequately secure the outstanding balance of the Debt, then, if no Event of Default shall have occurred and be then continuing, the proceeds of the Award (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to Condemnation, in the manner set forth below.  Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the Award to be made available pursuant to the terms hereof.

(c)    Except as provided above, the Award collected upon any Condemnation shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the amounts due under the Note and this Mortgage or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the

18

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 55 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 21 of 44

Condemnation, in the manner set forth below. Any such application to the amounts due under the Note and this Mortgage shall be without any Prepayment Premium except that if an Event of Default has occurred and is continuing then the Mortgagor shall pay to Mortgagee an additional amount equal to the Prepayment Premium, if any. Any such application to the amounts due under the Note and this Mortgage shall (i) be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments and (ii) cause the Note to be re-amortized in accordance with its terms and conditions. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of such Award, Mortgagee shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the amounts due under the Note and this Mortgage.

(d)    In the event Mortgagor is entitled to reimbursement out of the Award received by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence \reasonably satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding resulting from such condemnation, (2) funds or, at Mortgagee's option, receives assurances reasonably satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of the Award to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of costs, payment and performance as Mortgagee may reasonably require and approve; and Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee prior to commencement of work. No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of the Award shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the costs of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien. Any surplus which may remain out of the Award received by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall, in the sole and absolute discretion of Mortgagee, be retained by Mortgagee and applied to payment of the amounts due under the Note and this Mortgage provided that such application to the amounts due under the Note and this Mortgage shall be without any Prepayment Premium as long as no Event of Default has occurred and is continuing.

Section 1.14. (a)    The Mortgagor shall not enter into any lease of all or any portion of the Premises and/or the Improvements without the prior written consent of the Mortgagee unless done in accordance with the Project Mortgage.

(b)    The Mortgagor shall at all times promptly and faithfully perform, or cause to be performed promptly, all of the covenants, conditions and agreements contained in all leases of

19

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 56 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 22 of 44

the Premises, or any part thereof, now or hereafter existing, on the part of the lessor thereunder to be kept and performed and shall at all times do all things necessary to compel performance by the lessees under each lease of all obligations, covenants and agreements by such lessee to be performed thereunder. If any of such leases provide for the giving by the lessee of certificates with respect to the status of such leases, the Mortgagor shall exercise its right to request such certificates within five (5) days of any demand therefor by the Mortgagee.

Section 1.15. Each lease covering the Premises, or any part thereof, shall by its terms be subject and subordinate to the lien of this Mortgage.

Section 1.16. Mortgagor shall not grant any licenses covering the Premises or a portion thereof without the prior written consent of the Mortgagee.

Section 1.17. In the event any payment provided for herein or in the Note (whether principal, interest or otherwise) shall become overdue for a period in excess of ten (10) days, a late payment premium of five (5) cents for each dollar so overdue shall become immediately due to the Mortgagee for the purpose of defraying the expenses incident to handling such delinquent payment, and such premium shall be deemed to be part of the Indebtedness and therefore secured by the lien of this Mortgage. Late payment premiums shall be payable together with the payment of such overdue payment.

Section 1.18. (a)    The Mortgagor shall, in compliance with Section 13 of the Lien Law, receive the advances secured by this Mortgage and shall hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement and shall apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

(b)    The Mortgagor agrees that it shall indemnify and hold the Mortgagee harmless from and against any loss or liability, cost or expense, including, without limitation, any judgments, reasonable attorneys' fees, costs of appeal bonds and printing costs arising out of or relating to any proceeding instituted by any claimant alleging priority over the lien of this Mortgage, and/or by any claimant alleging a violation by the Mortgagor or the Mortgagee of any section of any applicable law.

Section 1.19. The Mortgagor shall (i) execute and deliver to the appropriate governmental authority any affidavit, instrument, document and/or filing required pursuant to any applicable statute, ordinance, rule and/or regulation, and (ii) deliver to the Mortgagee, within thirty (30) days after request by Mortgagee, all information Mortgagee deems appropriate in order to comply with the provision of any applicable law.

Section 1.20. The Mortgagor expressly covenants and agrees to pay in full the costs and expenses of the Mortgagee (including, without limitation, the reasonable fees and expenses of Mortgagee's counsel), promptly upon receipt of a statement therefor, which are incurred prior to and after the date hereof and which costs and expenses arise in connection with any matter

20

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 57 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 23 of 44

incidental to the preparation, negotiation, execution, delivery, filing and recording, amendment or modification, and enforcement of the Note and/or this Mortgage including, without limitation, the costs and expenses of every kind incurred by Mortgagee (including, without limitation, the reasonable fees and expenses of Mortgagee's counsel) in connection with the commencement of any action to foreclose this Mortgage or to collect the Indebtedness, all which costs and expenses shall, to the extent permitted by law, be a lien on the Mortgaged Property prior to any interest in, or claim upon, the Mortgaged Property arising subsequent to the date hereof. "Costs and expenses" as used in the preceding sentence shall include, without limitation (and in addition to those costs and expenses specified above), the reasonable attorneys' fees and expenses incurred by Mortgagee in retaining counsel for advice, suit, appeal or any insolvency or other proceedings under the Federal Bankruptcy Code or otherwise.

Section 1.21. Mortgagor shall not make any material alterations to the Premises (other than alterations contemplated pursuant to the terms of the Building Loan Agreement) without the prior written consent of Mortgagee which consent shall be granted or withheld in Mortgagee's sole discretion.

Section 1.22. The Mortgagor hereby assigns to the Mortgagee the leases, rents, issues and profits of the Premises, if any, and the Mortgagor grants to the Mortgagee the right to enter upon and to take possession of the Premises for the purpose of collecting such rents, issues and profits and to let the Premises or any part thereof, and to apply the rents, issues and profits, after payment of all necessary charges and expenses, on account of the Indebtedness. This assignment and grant shall continue in effect until the Note shall have been paid in full. The Mortgagee hereby grants to Mortgagor a license for the purpose of collecting said rents, issues and profits, and the Mortgagor shall be entitled to collect and receive said rents, issues and profits; provided, however, after an Event of Default shall have occurred and be continuing under this Mortgage, such license shall automatically terminate upon the Mortgagee's written notice to any tenant of the Premises, or any part thereof, to pay rent directly to the Mortgagee.

21

(End of Article I)

## ARTICLE II

## EVENTS OF DEFAULT AND REMEDIES

Section 2.01. If one or more of the following Events of Default shall happen, that is to say:

(a)    if (i) default shall be made in the payment of the principal and interest due under the Note at maturity, whether by acceleration or otherwise, (ii) default shall be made in the payment of any principal or interest due under the Note, when and as the same shall become due and payable, other than at maturity, and such default shall have continued for a period of ten (10) days, or (iii) default shall be made in the payment of any other fee or amount due under the Note or under this Mortgage and said default shall have continued for a period of ten (10) days; or

(b)    if default shall be made in the due observance or performance of any covenant or agreement on the part of the Mortgagor in this Mortgage contained (other than those covered in clause (a) above) and such default shall have continued for a period of ten (10) days after written notice thereof shall have been given to the Mortgagor by the Mortgagee; or

(c)    if by the order of a court of competent jurisdiction, a trustee, receiver or liquidator of the Mortgaged Property, or any part thereof, or of the Mortgagor shall be appointed and such order shall not be discharged or dismissed within sixty (60) days after such appointment; or

(d)    if the Mortgagor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law or to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Mortgagor or of any substantial part of its property, or if the Mortgagor shall make any general assignment for the benefit of creditors, or if the Mortgagor shall fail generally to pay its debts as such debts become due, or if the Mortgagor shall take any action in furtherance of any of the foregoing; or

(e)    if any of the creditors of the Mortgagor shall commence against the Mortgagor an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect and if such case shall not be discharged or dismissed within ninety (90) days after the date on which such case was commenced; or

(f)    if final judgment for the payment of money in excess of $25,000.00 shall be rendered against the Mortgagor and the Mortgagor shall not discharge the same or cause it to be discharged or paid within thirty (30) days from the entry thereof, or shall not appeal therefrom or

22

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 59 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 25 of 44

from the order, decree or process upon which or pursuant to which said judgment was granted, based or entered, and secure a stay of execution pending such appeal within the aforementioned thirty (30) day period; or

(g) if any of the events enumerated in clauses (c) through (f) of this Section 2.01 shall happen with regard to any Guarantor or any of their respective properties; or

(h) if any Guarantor dies, suffers a material adverse change in its financial condition, files bankruptcy or becomes insolvent, or defaults under or attempts to withdraw, revoke, cancel, or disclaim liability under any guaranty executed in favor of the Mortgagee, including without limitation the Guaranty; or

(i)    if the Mortgagor sells, transfers, assigns, leases, conveys, mortgages or encumbers the Mortgaged Property or any part thereof or any interest therein or in Mortgagee without the prior written consent of the Mortgagee which may be granted or withheld in Mortgagee's sole discretion, except as explicitly permitted under the Project Mortgage; or

(j)    if a default occurs under any mortgage (which mortgage would only be permitted with the prior written consent of the Mortgagee) or any documents executed by Mortgagor in connection with such Mortgage, or any part thereof, that is prior or subordinate to the lien of this Mortgage or the mortgagee under any prior or subordinate mortgage commences a foreclosure action in connection with said mortgage; or

(k) if any interest in the Mortgagor shall be sold, assigned, transferred, conveyed, mortgaged, pledged, hypothecated or alienated without the prior written consent of the Mortgagee which consent may be granted or withheld in Mortgagee's sole discretion; or

(l)    if it shall be illegal for the Mortgagor to pay any tax referred to in Section 1.08 hereof or if the payment of such tax by the Mortgagor would result in the violation of the usury laws of the state in which the Premises are located; or

(m)    if an Event of Default shall have occurred and be continuing under the Building Loan Agreement; or

(n)    if the Mortgagor or any Guarantor defaults under any agreement with the Mortgagee and such default continues beyond the expiration of any applicable notice, grace and/or cure period; or

(o) if the Mortgagor ceases to be a single purpose entity engaged solely in the business of operating the Premises; or

(p) if any certificate, written statement, representation, warranty or financial statement furnished to the Mortgagee by or on behalf of the Mortgagor, or any Guarantor (including, without limitation, representations and warranties contained herein), shall prove to

23

have been false in any material respect at the time as of which the facts therein set forth were
certified, or to have omitted any substantial contingent or unliquidated liability or claim against
the Mortgagor or any Guarantor, or if on the date of the execution of this Mortgage there shall
have been any material adverse change in any of the facts disclosed by any statement or
certificate, which change shall not have been disclosed in writing by the Mortgagor or any
Guarantor to the Mortgagee at or prior to the time of such execution; or

(q) a default under that certain Mortgage Consolidation, Extension, Modification
and Security Agreement dated as of November 8, 2007 by Mortgagor to Mortgagee

then and in each and every such case:

I.    During the continuance of any such Event of Default (other than an
Event of Default under Sections 2.01(c), (d) and (e) hereof), the Mortgagee, by written notice
given to the Mortgagor, may declare the entire principal of the Note then outstanding (if not then
due and payable), and all accrued and unpaid interest thereon, together with all other
Indebtedness, to be due and payable immediately, and upon any such declaration the principal of
the Note, said accrued and unpaid interest thereon, and all other indebtedness shall become and
be immediately due and payable, anything in the Note or in this Mortgage to the contrary
notwithstanding.  The entire principal of the Note then outstanding (if not then due and payable),
and all accrued and unpaid interest thereon, together with all other Indebtedness, shall auto-
matically be due and payable immediately, without demand or notice of any kind, during the
continuance of an Event of Default under Sections 2.01(c), (d) and (e) hereof.

II.   During the continuance of any such Event of Default, the Mortgagee
personally, or by its agents or attorneys, may enter into and upon all or any part of the Mortgaged
Property, and each and every part thereof, whereof it shall become possessed as aforesaid, and
may exclude the Mortgagor, its agents and servants wholly therefrom; having and holding the
same, may use, operate, manage and control the Mortgaged Property and conduct the business
thereof, either personally or by its superintendents, managers, agents, servants, attorneys or
receivers; upon every such entry, the Mortgagee, at the expense of the Mortgaged Property, from
time to time, may maintain and restore the Mortgaged Property, may complete the construction
of any of the Improvements and in the course of such completion may make such changes in the
contemplated Improvements as it may deem desirable and may insure the same; likewise, from
time to time, at the expense of the Mortgaged Property, the Mortgagee may make all necessary or
proper repairs, renewals and replacements and such useful alterations, additions, betterments and
improvements thereto and thereon as it may deem advisable; in every such case the Mortgagee
shall have the right to manage and operate the Mortgaged Property and to carry on the business
thereof and exercise all rights and powers of the Mortgagor with respect thereto either in the
name of the Mortgagor or otherwise as it shall deem best; the Mortgagee shall be entitled to
collect and receive all earnings, revenues, rents, issues, profits and income of the Mortgaged
Property and every part thereof, all of which shall for all purposes constitute property of the
Mortgagee; and after deducting the expenses of conducting the business thereof and of all
maintenance, repairs, renewals, replacements, alterations, additions, betterments and

24

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 61 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 27 of 44

improvements and amounts necessary to pay for taxes, assessments, insurance and prior or other proper charges upon the Mortgaged Property, or any part thereof, as well as reasonable compensation for the services of the Mortgagee and for all of the Mortgagee's attorneys, agents, clerks, and other employees, the Mortgagee shall apply the moneys arising as aforesaid to the payment of the Indebtedness in the manner and in the amounts as the Mortgagee shall elect in its sole discretion.

III.    During the continuance of any such Event of Default, the Mortgagee, with or without entry, personally or by its agents or attorneys, may:

(1)    sell the Mortgaged Property, or any part thereof, to the extent permitted and pursuant to the procedures provided by applicable law, and all estate, right, title and interest, claim and demand therein, and right of redemption thereof, at one or more sales as a single entity or in parcels, and at such time and place upon such terms and after such notice thereof as may be required or permitted by law; or

(2)    institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete foreclosure of this Mortgage in which case the Mortgaged Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner; notwithstanding the foregoing, upon default of the Mortgage or the Note, or other obligation secured thereby, Mortgagee shall have the right to sell the Premises by power of sale pursuant to Article 14 of the New York Real Property Actions and Proceedings Law; or

(3)    take such steps to protect and enforce its rights whether by action, suit or proceeding in equity or at law for the specific performance of any covenant, condition or agreement in the Note, the Building Loan Agreement, or in this Mortgage, or in aid of the execution of any power herein granted, or for any foreclosure hereunder, or for the enforcement of any other appropriate legal or equitable remedy or otherwise as the Mortgagee shall elect.

Section 2.02.    (a)    The Mortgagee may adjourn from time to time any sale to be made pursuant to or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, the Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(b)    Upon the completion of any sale or sales made pursuant to or by virtue of this Mortgage, the Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the purchaser or purchasers a good and sufficient instrument or instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold and shall execute and deliver to the appropriate governmental authority any affidavit, instrument, document and/or filing required pursuant to any applicable statute, ordinance, rule and/or regulation. The Mortgagee is hereby irrevocably appointed the true and lawful attorney of

25

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 62 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 28 of 44

the Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold, and for that purpose the Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, including, without limitation, any required affidavit, instrument, document and/or filing and may substitute one or more persons with like power. The Mortgagor hereby ratifies and confirms all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Nevertheless, the Mortgagor, if so requested by the Mortgagee, shall ratify and confirm any such sale by executing and delivering to the Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of the Mortgagee, for that purpose. Any such sale or sales whether made under or by virtue of this Article II, under the power of sale herein granted, or under or by virtue of judicial proceedings of sale herein granted or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against the Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under the Mortgagor.

(c)    In the event of any sale or sales whether made under or by virtue of this Article II, under the power of sale herein granted, or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the entire principal of, and interest on, the Note, if not previously due and payable, and all other sums required to be paid by the Mortgagor pursuant to this Mortgage, immediately thereupon, shall, anything in the Note or in this Mortgage to the contrary notwithstanding, become due and payable.

(d)    The purchase money proceeds or avails of any sale made under or by virtue of this Article II, together with any other sums which then may be held by the Mortgagee under this Mortgage, whether under the provisions of this Article II or otherwise, shall be applied as follows:

First:  To the payment of the costs and expenses of such sale, including, but not limited to, the reasonable compensation to the Mortgagee, its agents and attorneys, and any sums that may be due under and/or pursuant to any statute, rule, regulation and/or law that imposes any tax, charge, fee and/or levy in connection with and/or arising from the exercise of any right and/or remedy under this Mortgage or the recording or filing of any deed, instrument of transfer or other such document in connection with any such sale and of any judicial proceedings wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Mortgagee under this Mortgage, together with interest at the Involuntary Rate, on all advances made by the Mortgagee pursuant to this Mortgage.

Second:  To the payment of the whole amount then due, owing or unpaid under the Note for principal and interest, in such order as the Mortgagee shall determine in its sole and absolute discretion with interest on the unpaid principal at

26

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 63 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 29 of 44

the Involuntary Rate from and after the due date (whether by acceleration or otherwise).

Third: To the payment of the surplus, if any, to whomsoever may lawfully be entitled to receive the same.

(e)    Upon any sale made under or by virtue of this Article II, whether made under the power of sale herein granted or under by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, the Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Indebtedness of the Mortgagor secured by this Mortgage the net sales price after deducting therefrom the expenses of the sale and the costs of the action and any other sums which the Mortgagee is authorized to deduct under this Mortgage.

Section 2.03.    (a)    If all of the principal shall be due and payable under the Note, whether by acceleration or otherwise, the Mortgagor shall pay to the Mortgagee (i) interest at the Involuntary Rate on the then unpaid principal of the Note, and on the sums required to be paid by the Mortgagor pursuant to any provision of this Mortgage from the due date thereof until the payment in full of the Indebtedness, and (ii) such further amount as shall be sufficient to cover the costs and expenses of collection, including reasonable compensation to the Mortgagee, its agents, and attorneys and any expenses incurred by the Mortgagee pursuant to the exercise of any of the Mortgage rights hereunder.

(b)    In the event of a sale of the Mortgaged Property, or any part thereof, and of the application of the proceeds of sale, as in this Mortgage provided, to the payment of the debt hereby secured, the Mortgagee shall be entitled to enforce payment of, and to receive all amounts then remaining due and unpaid upon the Note, and to enforce payment of all other charges, payments, costs and amounts due under this Mortgage, and shall be entitled to recover judgment for any portion of the debt remaining unpaid, with interest at the Involuntary Rate. In case of the commencement of any case against the Mortgagor under any applicable bankruptcy, insolvency, or other similar law now or hereafter in effect or any proceedings for its reorganization or involving the liquidation of its assets, then the Mortgagee shall be entitled to prove the whole amount of principal and interest due upon the Note to the full amount thereof, and all other payments, charges, costs and amounts due under this Mortgage, without deducting therefrom any proceeds obtained from the sale of the whole or any part of the Mortgaged Property; provided, however, that in no case shall the Mortgagee receive a greater amount than such principal and interest and such other payments, charges, costs and amounts from the aggregate amount of the proceeds of the sale of the Mortgaged Property and the distribution from the estate of the Mortgagor.

(c)    No recovery of any judgment by the Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of the Mortgagor shall affect in any manner or to any extent, the lien of this Mortgage upon the Mortgaged Property, or any part thereof, or of any liens, rights, powers or remedies of the

14-12057-scc     Doc 100-3     Filed 02/10/15     Entered 02/10/15 14:36:33     Exhibit part
2 of 2     Pg 64 of 86
14-12057-scc     Claim 9-1 Part 10     Filed 12/10/14     Pg 30 of 44

Mortgagee hereunder, but such liens, rights, powers and remedies of the Mortgagee shall continue unimpaired as before.

(d)     Any moneys collected by the Mortgagee under this Section 2.03 shall be applied by the Mortgagee in accordance with the provisions of subsection (d) of Section 2.02.

Section 2.04.   That the holder of this Mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.  Any such receiver shall have the right to immediate possession of the Mortgaged Property from and after his or her appointment, it being the intention of the parties hereto that this Mortgage permit such receiver to have every right and power with respect to the Mortgaged Property that is permitted by applicable law.  It is expressly agreed that any such receiver shall be permitted do any further acts as the Mortgagee may determine to be necessary to complete the development and construction of any Improvements at the Premises pursuant to the Building Loan Agreement and the Draw Schedule.  All such costs and expenses of such receiver that are advanced by the Mortgagee pursuant to the Building Loan Agreement to develop and construct the Improvements as aforesaid shall, to the extent permitted by the Building Loan Agreement and applicable law and subject to the terms of Section 3.16 hereof, be added to the Indebtedness, and secured by this Mortgage.

Section 2.05.   Notwithstanding the appointment of any receiver, liquidator or trustee of the Mortgagor, or of any of its property, or of the Mortgaged Property or any part thereof, the Mortgagee shall be entitled to retain possession and control of all property now or hereafter held by the Mortgagee under this Mortgage.

Section 2.06.   No remedy herein conferred upon or reserved to the Mortgagee is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  No delay or omission of the Mortgagee to exercise any right or power accruing upon any Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Event of Default or any acquiescence therein; and every power and remedy given by this Mortgage to the Mortgagee may be exercised from time to time as often as may be deemed expedient by the Mortgagee.  Nothing in this Mortgage or in the Note shall affect the obligation of the Mortgagor to pay the principal of, and interest on, the Note in the manner and at the time and place therein respectively expressed.

Section 2.07.   The Mortgagor shall not insist upon, or plead, or in any manner whatever claim or take any benefit or advantage of any stay or extension or moratorium law, any exemption from execution or sale of the Mortgaged Property or any part thereof, wherever enacted, now or at any time hereafter in force, that may affect the covenants and terms of performance of this Mortgage, nor claim, take or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisal of the Mortgaged Property,

28

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 65 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 31 of 44

or any part thereof, prior to any sale or sales thereof that may be made pursuant to any provision herein, or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted to redeem the property so sold or any part thereof and the Mortgagor hereby expressly waives all benefit or advantage of any such law or laws, and covenants not to hinder, delay or impede the execution of any power herein granted or delegated to the Mortgagee, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.  The Mortgagor, for itself and all who may claim under it, waives, to the extent that it lawfully may, all right to have the Mortgaged Property marshalled upon any foreclosure hereof.

Section 2.08.    During the continuance of any Event of Default, and pending the exercise by the Mortgagee of its right to exclude the Mortgagor from all or any part of the Mortgaged Property, the Mortgagor agrees to pay the fair and reasonable rental value for the use and occupancy of the Mortgaged Property, or any part thereof that is in its possession for such period, and upon default of any such payment, shall vacate and surrender possession of the Mortgaged Property, or any part thereof, to the Mortgagee or to a receiver, if any, and in default thereof may be evicted by any summary action or proceeding for the recovery of possession of the Mortgaged Property for non-payment of rent, however designated.

(End of Article II)

29

## ARTICLE III

## MISCELLANEOUS

Section 3.01.  In the event any one or more of the provisions contained in this Mortgage, in the Building Loan Agreement or in the Note shall for any reason be held to be invalid, illegal or unenforceable in any respect, such in validity, illegality or unenforceability shall not affect any other provision of this Mortgage, but this Mortgage shall be construed as if such provision had never been contained herein or therein.

Section 3.02.  All notices hereunder shall be in writing and shall be deemed to have been sufficiently given or served for all purposes when delivered in person or sent by registered or certified mail, return receipt requested, to any party hereto at its address above stated (in the case of the Mortgagee, with a copy delivered in like manner to the attention of Kriss & Feuerstein LLP, 360 Lexington Avenue, Suite 1200, New York, NY 10017, Attention: David S. Kriss, Esq. and in the case of the Mortgagor.

Section 3.03.  Whenever notice is required herein, the giving of such notice may be waived in writing by the person or persons entitled to receive such notice.

Section 3.04.  All of the grants, terms, conditions, provisions and covenants of this Mortgage shall run with the land, shall be binding upon the Mortgagor and shall inure to the benefit of the Mortgagee, subsequent holders of this Mortgage and their respective successors and assigns. For the purpose of this Mortgage, the term "Mortgagor" shall include and refer to each of the mortgagors named herein, any subsequent owner of the Mortgaged Property, or any part thereof, and their respective heirs, executors, legal representatives, successors and assigns. If there is more than one Mortgagor, all their undertakings hereunder shall be joint and several, and each representation, warranty, covenant and agreement in this Mortgage shall apply to each and all of such Mortgagors named herein.

Section 3.05.  The enforcement of this Mortgage shall be governed, construed and interpreted by the laws of the State of New York, without regard to the principle of conflicts of laws. Nothing in this Mortgage, the Note or in any other agreement between the Mortgagor and the Mortgagee shall require the Mortgagor to pay, or the Mortgagee to accept, interest in an amount that would subject the Mortgagee to any penalty or forfeiture under applicable law. If the payment of any charges, fees or other sums due hereunder or under the Note or any such other agreement that are or could be held to be in the nature of interest and that would subject the Mortgagee to any penalty or forfeiture under applicable law, then, ipso facto, the obligations of the Mortgagor to make such payment shall be reduced so that interest under the Note shall be the highest rate authorized under applicable law. Should the Mortgagee receive any payment that is or would be in excess of the highest rate authorized under applicable law, such payment shall be deemed to have been made in error, and shall automatically be applied to reduce the outstanding principal balance of the Indebtedness without any penalty.

30

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 67 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 33 of 44

Section 3.06.   That this Mortgage is made pursuant to the Building Loan Agreement intended to be filed in the Office of the Clerk of the County in which the Premises are located on or before the date of recording of this Mortgage, and this Mortgage is subject to all of the provisions of such Building Loan Agreement.

Section 3.07.   Except as expressly set forth herein to the contrary, whenever the consent or approval of the Mortgagee is required, the decision whether to consent or approve shall be in the sole and absolute discretion of the Mortgagee.

Section 3.08.   This Mortgage, the Note, the Building Loan Agreement, and all other documents executed and delivered in connection herewith shall be given a fair and reasonable construction in accordance with the intention of the parties as expressed herein and therein and without regard for any rule of law requiring construction against the party that prepared such instruments.

Section 3.09.   This Mortgage shall constitute a "security agreement," as such term is defined in the Code.  By executing and delivering this Mortgage, the Mortgagor has granted, in the same manner and with the same effect described in the Granting Clause hereof, to the Mortgagee, a security interest in the Chattels, the Intangibles, and those items listed as (f) - (j) in the Granting Clause of this Mortgage (collectively, "Documents").  If any Event of Default shall occur, the Mortgagee shall have, in addition to any and all other rights and remedies set forth in this Mortgage, and may exercise without demand, any and all rights and remedies granted to a secured party under the Code, including, but not limited to, the right to take possession of the Chattels, the Documents, and the Intangibles, or any part thereof, and the right to advertise and sell the Chattels, the Documents, and the Intangibles, or any part thereof, pursuant to and in accordance with the power of sale provided for in this Mortgage.  The Mortgagor agrees that any notice of public or private sale with respect to the Chattels, the Documents, and the Intangibles, or any part thereof, shall constitute reasonable notice if it is sent to the Mortgagor not less than ten (10) days prior to the date of any such sale.  The proceeds of any such sale of the Chattels, the Documents, and the Intangibles, or any part thereof, shall be applied in the manner set forth in Section 2.02(d) of this Mortgage.

Section 3.10.   All covenants hereof shall be construed as affording to the Mortgagee rights additional to and not exclusive of the rights conferred under the provisions of any applicable law.

Section 3.11.   This Mortgage cannot be altered, amended, waived, modified or discharged orally, and no executory agreement shall be effective to modify, waive or discharge, in whole or in part, anything contained in this Mortgage unless it is in writing and signed by the party against whom enforcement of the modification, alteration, amendment, waiver or discharge is sought.

Section 3.12.   The Mortgagor acknowledges that it has received a true copy of this Mortgage.

31

Section 3.13.  This Mortgage may be executed in any number of counterparts, and each of such counterparts shall for all purposes be deemed to be an original; and all such counterparts shall together constitute but one and the same Mortgage.

Section 3.14.  The information set forth on the cover hereof is hereby incorporated herein.

Section 3.15.  (a)    As used in this Section 3.15, the following capitalized terms shall have the meanings set forth below:

"Disposal" means the intentional or unintentional abandonment, discharge, deposit, injection, dumping, spilling, leaking, storage, burning, thermal destruction or placing of any substance so that it or any of its constituents may enter the Environment.

"Environment" means any water including but not limited to surface water and ground water or water vapor; any land including land surface or subsurface, stream sediments, air, fish, wildlife, plants, and all other natural resources or environmental media.

"Environmental Laws" means all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances, regulations, codes and rules relating to the protection of the Environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the policies, guidelines, procedures, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Environmental Permits" means all licenses, permits, approvals, authorizations, consents or registrations required by any applicable Environmental Laws and all applicable judicial and administrative orders in connection with ownership, lease, purchase, transfer, closure, use and/or operation of the Premises and/or as may be required for the storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances.

"Environmental Questionnaire" means a questionnaire and all attachments thereto concerning:  1) activities and conditions affecting the Environment at the Premises, or 2) the enforcement or possible enforcement of any Environmental Law against the Mortgagor.

"Environmental Report" means a written report prepared for the Mortgagee by an environmental consulting or environmental engineering firm.

"Hazardous Substances" means, without limitation, any explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, petroleum and petroleum products, methane, hazardous materials, hazardous wastes, hazardous or toxic substances and any other material defined as a hazardous substance in Section 101(14) of

32

the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42
U.S.C. Sections 9601(14).

"Release" has the same meaning as given to that term in Section 101(22) of
the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42
U.S.C. Section 9601(22), and the regulations promulgated thereunder.

(b)    The Mortgagor represents and warrants to the Mortgagee that:

(i)    the Environmental Questionnaire previously provided to the
Mortgagee was and is accurate and complete and does not omit any material fact the omission of
which would make the information contained therein materially misleading.

(ii)    no asbestos or urea formaldehyde foam insulation is located in
any of the buildings or structures improving the Premises,

(iii)    no above-ground or underground storage tanks containing
Hazardous Substances are or have been located at the Premises,

(iv)    radon gas is not present in buildings on any of the Premises in
concentrations exceeding 4 pCi/1,

(v)    no electrical transformers, capacitors, lighting ballasts or other
electric equipment on any of the Premises contain polychlorinated biphenyls (PCBs) in
concentrations exceeding amounts allowed by any Environmental Law,

(vi)    the Premises are not being used and have not been used for the
Disposal of any Hazardous Substance or for the treatment, storage or Disposal of Hazardous
Substances,

(vii)    no Release of a Hazardous Substance has occurred or is
threatened on, at, or from the Premises,

(viii)    neither the Mortgagor nor the Premises is subject to any existing,
pending or threatened suit, claim, notice of violation or request for information under any
Environmental Law, and

(ix)    the Mortgagor is in compliance with all Environmental Laws
applicable to its operations at the Premises.

(c)    The Mortgagor covenants and agrees with the Mortgagee that so
long as this Mortgage remains a lien on the Premises that:

33

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 70 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 36 of 44

(i) the Mortgagor shall comply with all Environmental Laws in connection with its ownership or use of the Premises or any related property,

(ii) Mortgagor shall not suffer, cause or permit the Disposal of Hazardous Substances at the Premises,

(iii) the Mortgagor shall not suffer, cause or permit the generation, handling, processing, use, or storage of Hazardous Substances on the Premises except in compliance with all Environmental Laws,

(iv) the Mortgagor shall promptly notify the Mortgagee in the event of the Disposal of any Hazardous Substance at the Premises, or any Release, or threatened Release, of a Hazardous Substance, from the Premises,

(v) the Mortgagor shall allow the Mortgagee and its agents access to the Premises at all reasonable times upon reasonable notice and permit such inspections, tests, drilling of monitoring wells, soil borings or other analysis of the Premises as the Mortgagee may reasonably require,

(vi) the Mortgagor shall, at the Mortgagee's request, provide to the Mortgagee, at the Mortgagor's expense, updated answers to Environmental Questionnaires and/or Environmental Reports concerning the Premises, and

(vii) the Mortgagor shall deliver promptly to the Mortgagee (A) copies of any documents received from the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning the Mortgagor's operations at the Premises, and (B) copies of any documents submitted by the Mortgagor to the United States Environmental Protection Agency or any state, county or municipal environmental or health agency concerning its operations at the Premises.

(d)    The Mortgagor agrees to indemnify, defend, and hold harmless the Mortgagee from and against any and all liabilities, claims, damages, penalties, expenditures, losses or charges including, but not limited to, all costs of investigation, monitoring, legal representation, remedial response, removal, restoration or permit acquisition, which may now or in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred by the Mortgagee or any other person or entity as a result of the presence of, Release of, or threatened Release of, Hazardous Substance on, in, under or near the Premises. The liability of the Mortgagor to the Mortgagee under the covenants of this Section 3.15 is not limited by any exculpatory provisions in the Note or in any of the other documents securing the loan and shall survive any foreclosure of this Mortgage, transfer of the Premises by deed in lieu of foreclosure or any other transfer or termination of this Mortgage regardless of the means of such transfer or termination; but the indemnity hereunder shall not apply to acts committed by the Mortgagee, or its designee, nominee or any purchaser at a foreclosure sale that are committed after any of such parties shall have taken title to the Premises.

34

(e)    If the Mortgagor defaults on any of its obligations pursuant to this Mortgage, the Building Loan Agreement, the Note or any other loan document, the Mortgagee or its designee shall have the right, upon reasonable notice to the Mortgagor, to enter upon the Premises and conduct such tests, investigations and samplings, including but not limited to, installation of monitoring wells, as shall be reasonably necessary for the Mortgagee to determine whether any Disposal of Hazardous Substances has occurred on, at or near the Premises. The costs of all such tests, investigations and samplings shall be added to the balance of the Indebtedness.

(f)    The Mortgagor agrees that the Mortgagee shall not be liable in any way for the completeness or accuracy of any Environmental Report or the information contained therein. The Mortgagor further agrees that the Mortgagee has no duty to warn the Mortgagor or any other person or entity about any actual or potential environmental contamination or other problem that may have become apparent or will become apparent to the Mortgagee.

Section 3.16.    If and to the extent the Premises are located in the State of New York, then notwithstanding anything contained herein to the contrary, the maximum amount of indebtedness secured by this Mortgage at execution or which under any contingency may become secured hereby at any time hereafter is $19,050,000.00 plus interest thereon, plus all amounts expended by the Mortgagee after default by the Mortgagor that constitute payment of (i) taxes, charges or assessments that may be imposed by law upon the Premises; (ii) premiums on insurance policies covering the Premises; (iii) expenses incurred in protecting or upholding the lien of this Mortgage, including, but not limited to the expenses of any litigation to prosecute or defend the rights and lien created by this Mortgage; (iv) expenses incurred in protecting the collateral encumbered by this Mortgage; or (v) any amount, cost or charge to which the Mortgagee becomes subrogated upon payment, whether under recognized principles of law or equity, or under express statutory authority.

Section 3.17.    No course of dealing between Mortgagor and Mortgagee and no act, delay or omission by Mortgagee in exercising any right or remedy hereunder, including, without limitation, acceptance of any partial payment on the Indebtedness, shall operate as a waiver of any right, remedy or default hereunder, or of any other right or remedy, and no single or partial exercise of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. All rights and remedies of Mortgagee hereunder are cumulative.

Section 3.18.    The Mortgagee may release any portion or portions of or interest or interests in the Mortgaged Property from the lien of this Mortgage, either with or without consideration, and may release or discharge in whole or in part any other property which it may at any time hold as security for payment of the Indebtedness or any part thereof and may take any other bond, note or obligation as evidence of the Indebtedness, payable at such time and on such terms as the Mortgagee may approve, and may change the rate of interest in accordance with the provisions of the Note, and until the Indebtedness shall have been paid in full, every person who

35

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 72 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 38 of 44

shall be or become personally liable for the Indebtedness shall be bound and continue to be liable for the Indebtedness as fully and effectively as if his consent had been previously obtained.

Section 3.19. If the Mortgagee shall receive from or on behalf of the Mortgagor any sum less than the full amount then due and payable, the Mortgagee may, but shall not be obligated to, accept the same and if the Mortgagee elects to accept any such payment, it may hold the same or any part thereof, without liability for interest, in a special account and may from time to time apply the same or any part thereof to the Indebtedness or to the payment of any taxes, assessments, sewer or water charges or insurance premiums desirable to maintain the lien of this Mortgage or to any expenses, including costs and attorneys' fees and disbursements, incurred by the Mortgagee in attempting to collect any amount owing on the Indebtedness and in bringing any foreclosure proceedings with respect to this Mortgage.

Section 3.20. Without limiting any other right of Mortgagee, whenever Mortgagee has the right to declare any Indebtedness to be immediately due and payable (whether or not it has so declared), Mortgagee at its sole election may set off against the Indebtedness any and all moneys then owed to Mortgagor by Mortgagee in any capacity, whether or not the Indebtedness or the obligation to pay such moneys owed by Mortgagee is then due, and Mortgagee shall be deemed to have exercised such right of setoff immediately at the time of such election even though any charge therefor is made or entered on Mortgagee's records subsequent thereto.

Section 3.21. The Mortgagor recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the borrower relied to its detriment upon such "oral modification of the loan document". For that reason, and in order to protect the Mortgagee from such allegations in connection with the transactions contemplated by this Mortgage and the Building Loan Agreement, the Mortgagor acknowledges that this Mortgage, the Note, the Building Loan Agreement, and all instruments referred to in any of them can be extended, modified or amended only in writing executed by the Mortgagee and that none of the rights or benefits of the Mortgagee can be waived permanently except in a written document executed by the Mortgagee. The Mortgagor further acknowledges the Mortgagor's understanding that no officer or administrator of the Mortgagee has the power or the authority from the Mortgagee to make an oral extension or modification or amendment of any such instrument or agreement on behalf of the Mortgagee.

Section 3.22 This Mortgage is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York and Mortgagee shall be entitled to the benefits afforded thereby. Mortgagor shall (unless such notice is contained in such commercial lease) deliver notice of this Mortgage in form and substance reasonably acceptable to Mortgagee, to all present and future holders of any interest in any

36

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 73 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 39 of 44

commercial lease, by assignment or otherwise, and shall take such other action as may now or
hereafter be reasonably required to afford Mortgagee the fall protections and benefits of Section
291-f. Mortgagor shall request the recipient of any such notice to acknowledge the receipt
thereof.

Section 3.23 (a) Mortgagor covenants and agrees that, in the event of a sale of the
Mortgaged Property or other transfer, it will duly complete, execute and deliver to Mortgagee
contemporaneously with the submission to the applicable taxing authority or recording officer,
all forms and supporting documentation required by such taxing authority or recording officer to
estimate and fix any and all applicable state and local real estate transfer taxes, including, without
limitation, any real estate transfer taxes payable under Article 31 of the New York State Tax Law
or under Title 11, Chapter 21 of the Administrative Code of the City of New York, if applicable,
or any successor provisions thereto (collectively, "Transfer Taxes") by reason of such sale or
other transfer or recording of the deed evidencing such sale or other transfer. This subsection (a)
shall apply only if this Mortgage remains outstanding after any such sale or transfer.

(b) Mortgagor shall pay all transfer Taxes that may hereafter become due
and payable with respect to any transfer, and in default thereof Mortgagee may pay the same and
the amount of such payment shall be added to the Indebtedness and, unless incurred in
connection with a foreclosure of this Mortgage, be secured by this Mortgage. The provisions of
this Section shall survive any transfer and the delivery of the deed in connection with any
transfer.

Section 3.24 Covenants in Addition to RPL. All covenants hereof shall be
construed as affording to Mortgagee rights in addition to and not exclusive of the rights conferred
under the provisions of Sections 254, 271, 272, 273 and 291-f of the Real Property Law of the
State of New York or any other applicable legal requirement.

Section 3.25 Variable Rate Note. The Note is subject to interest rate adjustment
from time to time as provided in the Note.

Section 3.26 (a) Mortgagor represents and warrants to Mortgagee that (i) that any
Leases currently or subsequently entered into at the Mortgaged Property are and will be in full
compliance with all rent control, rent stabilization and other rent regulations laws, rules,
regulations and requirements applicable thereto, including, without limitation, DHCR registration
requirements and the payment of all sums required under Section 26-517 of the New York City
Rent Stabilization Law, and there are no actions or proceedings before any court or
administrative agency alleging a breach of any such rent control, rent stabilization or other rent
regulations laws, rules, regulations and requirements (including, without limitation, actions or
proceedings in respect of failure to maintain services, rent overcharges or harassment, fair market
rent appeals or proceedings to compel the correction of violations affecting the Mortgaged
Property or other actions or proceedings) pending before any court or administrative agency
having jurisdiction thereover, and (ii) no tenant has any credit, offset or defense to the payment
of the maximum lawful rent entitled to be collected in respect of the Leases, including, without

37

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 74 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 40 of 44

limitation, any credit, offset or defense arising in connection with any rent overcharge order, rent reduction order or other order.

(b)    Mortgagor shall and does hereby agree to indemnify and hold Mortgagee free and harmless of, from and against any and all liability, loss, cost, expense, damage, claims or demands of any kind whatsoever which Mortgagee may or might incur or which may be asserted against Mortgagee by reason of Mortgagor's failure to comply fully at all times with all rent control, rent stabilization and other rent regulation laws, rules, regulations and requirements applicable to the Leases or to maintain all required services to be provided to the tenants thereunder, or by reason of the entry of any rent overcharge, rent reduction or other order in any rent overcharge, harassment, fair market, rent appeal, or proceedings to compel the correction of violations affecting the Mortgaged Property or other action or proceeding.  This paragraph shall survive the satisfaction and payment in full of the Debt.

Section 3.27    Patriot Act Compliance.    Mortgagor will use its good faith and commercially reasonable efforts to comply with the Patriot Act (as defined below) and all applicable requirements of governmental authorities having jurisdiction of the Mortgagor and the Mortgaged Property, including those relating to money laundering and terrorism.  The Mortgagee shall have the right to audit the Mortgagor's compliance with the Patriot Act and all applicable requirements of governmental authorities having jurisdiction of the Mortgagor and the Mortgaged Property, including those relating to money laundering and terrorism.  In the event that the Mortgagor fails to comply with the Patriot Act or any such requirements of governmental authorities, then the Mortgagee may, at its option, cause the Mortgagor to comply therewith and any and all reasonable costs and expenses incurred by the Mortgagee in connection therewith shall be secured by this Mortgage and the other Loan Documents and shall be immediately due and payable.  For purposes hereof, the term "Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

Neither the Mortgagor nor any partner in the Mortgagor or member of such partner nor any owner of a direct or indirect interest in the Mortgagor (a) is listed on any Government Lists (as defined below), (b) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as defined below) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (c) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense (as defined below), or (d) is not currently under investigation by any governmental authority for alleged criminal activity.  For purposes hereof, the term "Patriot Act Offense" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (a) the criminal laws against terrorism; (b) the criminal laws against money laundering, (c) the Bank Secrecy Act, as amended, (d) the Money Laundering Control Act of 1986, as amended, or the (e) Patriot Act.  "Patriot Act Offense" also includes the

38

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 75 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 41 of 44

crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "Government Lists" means (i) the Specially Designated Nationals and Blocked Persons Lists maintained by Office of Foreign Assets Control ("OFAC"), (ii) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Mortgagee notified Mortgagor in writing is now included in "Governmental Lists", or (iii) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other government authority or pursuant to any Executive Order of the President of the United States of America that Mortgagee notified Mortgagor in writing is now included in "Governmental Lists".

Section 3.28. This mortgage is intended to be a second mortgage, subject and subordinate to that certain Mortgage Consolidation, Extension, Modification and Security Agreement (the "Project Mortgage") securing a loan in the amount of $5,500,000 (the "Project Loan") made between Mortgagor and Mortgagee on November 8, 2007 and which has been recorded in the office of the City Register of New York County.

Section 3.23. Mortgage Consistency. In the event of any inconsistency between the terms of this Mortgage and Security Agreement and the Project Mortgage with respect to the Mortgagor's requirement to provide and maintain insurance, the application of casualty or condemnation awards, the necessity to escrow taxes or insurance, leasing rights or the grace or cure periods with respect to any Event of Default, the terms and conditions of the Project Mortgage shall govern and control.

Section 3.24 Cross Default.     This Mortgage (the "Building Mortgage") is cross-defaulted against the Project Mortgage.   In the Event of a Default under the Project Mortgage or the Note which it secures, it shall be considered an Event of Default against the Building Mortgage.

Section 3.26   Mortgagee shall at the request of Mortgagor assign the Mortgage to another financial institution provided that the debt secured by this Mortgage is paid in full and that Mortgagor pays Mortgagee's reasonable fees including attorneys' fees in connection with said assignment.

Section 3.27.     This Mortgage is cross-collateralized against the two (2) properties described in Schedule "A", which make up the Premises.   In the Event of a Default under this Mortgage or the Note, Mortgagee reserves the right, in its sole and absolute discretion to exercise its remedies against each of the Properties in any such order determined by Mortgagee or to foreclose simultaneously on both Properties. Further, the foreclosure on any less than all of the Properties shall in no way be considered the exclusive remedy of Mortgagee and Mortgagee shall be permitted to foreclose with respect to both of the Properties until the entire indebtedness due under the Note is satisfied or paid in full. The contemporaneous or separate foreclosure on all or any of the properties making up the Premises shall not constitute an election of remedies by Mortgagor.

39

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 76 of 86
14-12057-scc    Claim 9-1 Part 10    Filed 12/10/14    Pg 42 of 44

Section 3.28.    The Mortgaged Property contains more than one tax lot.  If Mortgagee determines, in its sole and absolute discretion, that it is not feasible to own both of the tax lots, the foreclosure of this Mortgage, as set forth herein may be limited to one tax lot. Notwithstanding anything to the contrary set forth herein, the two tax lots that encompass the Mortgaged Property are interdependent and shall be foreclosed as one tax lot, in the sole and absolute discretion of Mortgagee.

IN WITNESS WHEREOF, this Building Loan Mortgage and Security Agreement has been duly executed by the Mortgagor on the date first above written.

D.A.B. GROUP LLC, a
New York limited liability company

By: _____
        BEN ZHAVIAN, Member

40

STATE OF NEW YORK                    )
                                     ) ss:
COUNTY OF NEW YORK                   )

On the 21st day of August in the year 2008 before me, the undersigned, a Notary Public in and for said State, personally appeared, BEN ZHAVIAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

ANDREW S. WINSTON
Notary Public, State of New York
No. 01WI4811367
Qualified in Nassau County
Commission Expires Feb. 28, 2011

SEAL

N4345092

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

NEW YORK
B 415
L 66-67

41

## Exhibit A - The Property

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 77 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 8 1/2 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 8 1/2 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 66)

Said Property being known as and by the street number 141 Orchard Street, New York, New York.

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 102 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 6 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 6 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 67)

Said Property being known as and by the street number 139 Orchard Street, New York, New York.

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 79 of 86
14-12057-scc    Claim 9-1 Part 11    Filed 12/10/14    Pg 1 of 8

# EXHIBIT I

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 80 of 86
14-12057-scc    Claim 9-1 Part 11    Filed 12/10/14    Pg 2 of 8



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.

2008082600526003002E8933

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 7 |
|---|---|

Document ID: 2008082600526003    Document Date: 08-21-2008    Preparation Date: 08-26-2008
Document Type: SUNDRY MISCELLANEOUS
Document Page Count: 6

| PRESENTER: | RETURN TO: |
|---|---|
| METROPOLITAN ABSTRACT CORPORATION (PICK-UP) BRS AS AGENT FOR TITLE INSURANCE (NY345092) ONE OLD COUNTRY ROAD, SUITE 140 CARLE PLACE, NY 11514 516-741-5474 | KRISS & FEUERSTEIN LLP ATTN: DAVID S. KRISS, ESQ. 360 LEXINGTON AVENUE, SUITE 1200 NEW YORK, NY 10017 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 415 | 66 | Entire Lot | 141 ORCHARD STREET |
| Property Type: COMMERCIAL REAL ESTATE | | | | |
| Borough | Block | Lot | Unit | Address |
| MANHATTAN | 415 | 67 | Entire Lot | 139 ORCHARD STREET |
| Property Type: COMMERCIAL REAL ESTATE | | | | |

### CROSS REFERENCE DATA

CRFN _____ or Document ID _____ or Year _____ Reel _____ Page _____ or File Number _____

### PARTIES

| PARTY 1: | PARTY 2: |
|---|---|
| BROOKLYN FEDERAL SAVINGS BANK 81 COURT STREET BROOKLYN, NY 10021 | D.A.B. GROUP LLC 154 ACRES ROAD MONROE, NY 10950 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 70.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**RECORDED OR FILED IN THE OFFICE
OF THE CITY REGISTER OF THE
CITY OF NEW YORK**
Recorded/Filed    09-12-2008 09:58
City Register File No.(CRFN):
2008000362278

*Annette M. Hill*

*City Register Official Signature*

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 81 of 86
14-12057-scc    Claim 9-1 Part 11    Filed 12/10/14    Pg 3 of 8

## NOTICE OF LENDING

### PURSUANT TO SECTION 73 OF THE LIEN LAW
### (FOR FILING IN THE CITY REGISTER'S OFFICE OF NEW YORK COUNTY)

Date:               August 21, 2008

Lender:             Brooklyn Federal Savings Bank

Address:            81 Court Street, Brooklyn, NY 11201

Borrower:           D.A.B. GROUP LLC

Address:            154 Acres Road, Monroe, New York 10950

Location of
Premises:           139 and 141 Orchard Street
                    New York, New York 10002

                    Block:      415
                    Lots:       66 and 67
                    County:     New York
                    State:      New York

*       *       *

**David S. Kriss, Esq.**
**Kriss & Feuerstein LLP**
**360 Lexington Avenue, Suite 1200**
**New York, New York 10017**

N4345092

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 82 of 86
14-12057-scc    Claim 9-1 Part 11    Filed 12/10/14    Pg 4 of 8

# NOTICE OF LENDING
## PURSUANT TO SECTION 73 OF THE LIEN LAW

This notice of lending is given pursuant to Section 73 of the Lien Laws, as follows:

(1)    The name of the person or party making the advances ("Lender") is:  Brooklyn Federal Savings Bank.

(2)    The address of the Lender is: 81 Court Street, Brooklyn, NY 11201

(3)    The name of the person or party to whom the advances are being made ("Borrower") is:  D.A.B. GROUP LLC

(4)    The address of the Borrower is: 154 Acres Road, Monroe, New York 10950

(5)    The person to whom the advances are being made is the Borrower which is the owner of the real property to be or being improved.

(6)    The improvement is: construction of a ninety two (92) room, fifteen (15) story, Boutique Hotel, all in accordance with plans and specifications on file with Lender.

(7)    The real property being improved is located at 139 and 141 Orchard Street, New York, New York 10002, which is owned by Borrower and is designated as Block 415, Lots 66 and 67 on the New York County Land and Tax Map, and is more particularly described in Schedule "A" annexed hereto and made a part hereof.

2

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
14-12057-scc    Claim 9-1 Part 21   Filed 12/10/14    Pg 5 of 8
2 of 2    Pg 83 of 86

(8)    This notice is effective this 21st day of August, 2008 on which such date there was advanced the sum of $1,602,739.58 by Lender to Borrower and the sum of $2,000,000.00 was reserved for interest accruing under the Building Loan Note and the Project Loan Note.

(9)    The maximum balance of the advances outstanding and yet to be made is $15,447,260.42.

(10)    CONTRACTORS, SUBCONTRACTORS, LABORERS, MATERIAL MEN AND SUPPLIERS ARE CAUTIONED THAT LENDER IS MAKING A $19,050,000.00 BUILDING LOAN TO BORROWER SECURED NOT ONLY BY A BUILDING LOAN MORTGAGE ON THE REAL PROPERTY DESCRIBED IN SCHEDULE "A" BUT ALSO BY OTHER ASSETS, INCLUDING BUT NOT LIMITED TO, (A) ASSIGNMENT OF CERTAIN CONTRACTS AND THE RIGHT TO PAYMENT THEREUNDER INCLUDING THE CONTRACTS BORROWER ANTICIPATES MAKING WITH THIRD PARTY PURCHASERS FOR THE SALE OF INDIVIDUAL RESIDENTIAL UNITS; (B) ASSIGNMENTS OF LEASES, RENTS AND PROFITS; (C) PROCEEDS OF INSURANCE FOR FIRE AND CASUALTY LOSS; AND (D) PROCEEDS OF CONTRACTS TO SELL OR CONDEMNATION PROCEEDS OF ALL OR ANY PART OF THE MORTGAGED REAL ESTATE OR ASSIGNED ASSETS. AS A RESULT OF THE FOREGOING, WHAT OTHERWISE WOULD BE TRUST ASSETS UNDER ARTICLE 3-A OF THE LIEN LAW ARE PAYABLE TO AND WILL BE PAID TO LENDER PURSUANT TO THE BUILDING LOAN MORTGAGE IT HOLDS IN THE AMOUNT OF $19,050,000.00; THE ASSIGNMENT OF LEASES, RENTS & PROFITS AND OTHER ASSIGNMENTS UNDER THE UNIFORM COMMERCIAL CODE FROM BORROWER TO LENDER, AS PERMITTED PAYMENTS OF TRUST ASSETS

14-12057-scc    Doc 100-3    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit part
2 of 2    Pg 84 of 86
14-12057-scc    Claim 9-1    Part 1    Filed 12/10/14    Pg 6 of 8

UNDER ARTICLE 3-A OF THE LIEN LAW AND THEREFORE WILL NOT BE
AVAILABLE TO TRUST FUND BENEFICIARIES.

(11)    The term "person" as used herein includes a corporation and a limited liability
company.

IN WITNESS WHEREOF, the parties hereto have executed this Notice of Lending the
21st day of August, 2008.

D.A.B. GROUP LLC, a
New York limited liability company

By: _____

BEN ZHAVIAN, Member

STATE OF NEW YORK                    )
                                     ) ss:
COUNTY OF NEW YORK                   )

On the 21st day of August in the year 2008 before me, the undersigned, a Notary Public in and for said State, personally appeared, BEN ZHAVIAN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed this instrument.

Notary Public

ANDREW B. WINSTON
Notary Public, State of New York
No. 01WI4811387
Qualified in Nassau County
Commission Expires Feb. 28, 2011

SEAL

NY345092

Recorded At The Request Of
**Metropolitan Abstract Corporation**
One Old Country Road, Suite 140
Carle Place, New York 11514-1885

(516) 741-5474  (718) 343-4334  FAX (516) 877-1195

NEW YORK
B 415
L 66-67

## Exhibit A - The Property

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 77 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 8 1/2 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 8 1/2 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 66)

Said Property being known as and by the street number 141 Orchard Street, New York, New York.

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the westerly side of Orchard Street, distant 102 feet southerly from the corner formed by the intersection of the southerly side of Rivington Street with the westerly side of Orchard Street;

THENCE Westerly parallel with Rivington Street, 87 feet 6 inches to the easterly side of Allen Street;

THENCE Southerly along the easterly side of Allen Street, 25 feet;

THENCE Easterly parallel with Rivington Street, 87 feet 6 inches to the westerly side of Orchard Street;

THENCE Northerly along the westerly side of Orchard Street, 25 feet to the point or place of BEGINNING. (Lot 67)

Said Property being known as and by the street number 139 Orchard Street, New York, New York.