# EXHIBIT 11

FILED: NEW YORK COUNTY CLERK 11/03/2011
NYSCEF DOC. NO. 151
14-12057-scc    Doc 100-12    Filed 02/10/15    Entered 02/10/15 14:36:33    Exhibit 11
Pg 2 of 16
INDEX NO. 850044/2011
RECEIVED NYSCEF: 11/03/2011

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK
-----------------------------------------------------------------X
ORCHARD HOTEL, LLC,

                      *Plaintiff,*

      -against-

D.A.B. GROUP LLC, CAVA CONSTRUCTION
& DEVELOPMENT, INC., FLINTLOCK
CONSTRUCTION SERVICES LLC, JJK
MECHANICAL INC., EDWARD MILLS &
ASSOCIATES, ARCHITECTS PC, CASINO
DEVELOPMENT GROUP, INC., CITYWIDE
CONSTRUCTION WORKS INC., EMPIRE
TRANSIT MIX INC., MARJAM SUPPLY CO.,
INC., ROTAVELE ELEVATOR INC., SMK
ASSOCIATES INC., FJF ELECTRICAL CO. INC.,
CITY OF NEW YORK, NEW YORK STATE
DEPARTMENT OF TAXATION AND FINANCE,
and JOHN DOE #1 through JOHN DOE #100, the
last 100 names being fictitious and unknown to
plaintiff, the persons, or parties intended being the
tenants, occupants, persons or corporations, if any,
having or claiming an interest in or lien upon the
premises described in the complaint,

                      *Defendants,*

Index No. 850044/2011

<u>AFFIDAVIT</u>
<u>IN OPPOSITION</u>

Justice Assigned:
The Honorable
Bernard J. Fried

D.A.B. GROUP, LLC,

                      *Defendant/*
                      *Counterclaiming*
                      *Plaintiff,*

      -against-

BROOKLYN FEDERAL SAVINGS BANK and
STATE BANK OF TEXAS

                      *Defendants on*
                      *the Counterclaims*
-----------------------------------------------------------------X

STATE OF NEW YORK    )
                     )  SS:
COUNTY OF  NASSAU    )

BEN ZHAVIAN being duly sworn deposes and says:

1. I am the majority and managing member of **D.A.B. GROUP, LLC** ("DAB") one of the Defendants herein and as such I am fully familiar with the facts and circumstances stated herein. I submit this **AFFIDAVIT IN OPPOSITION** to two separate motions seeking the identical relief, to wit: the dismissal of DAB's counterclaims against the Plaintiff, Orchard Hotel, LLC ("Orchard Hotel") and the Defendants on the counterclaims Brooklyn Federal Savings Bank ("Brooklyn Federal") and State Bank of Texas ("State Bank").

2. Each one of the movants herein, Orchard Hotel, the Plaintiff and Brooklyn Federal and State Bank the additional Defendants on the counterclaims seek the identical relief, dismissal of DAB's three counterclaims and each one of the movants seek that relief based on virtually identical grounds. Accordingly, rather than burden this Court with duplicative motion papers I will address the factual merits, or lack thereof, of the movants' claims. The accompanying affirmation of my attorney **WILLIAM G. WALLACE, ESQ.** sets forth the legal points and arguments in opposition to these pre-answer/reply motions. For the reasons set forth herein and, in the accompanying affirmation of my attorney, I respectfully submit that each one of these two motions should be denied and that the movants be directed to reply to the counterclaims and proceed with the pre-trial discovery in this matter.

3. I am the majority owner and managing member of DAB, the owner and developer of the subject project located at 139-141 Orchard Street, New York, New York ("Project"). This Project entails the construction of a sixteen story "boutique" hotel on the lower east side of Manhattan.

4. In connection with the Project, DAB obtained two loans, the loan now known as the Project Loan and the loan now known as the Building Loan. While the Project Loan and Building Loan were ultimately made in the name of Plaintiff's assignor Brooklyn Federal with the participation of the State Bank, my initial pre-loan negotiations were actually with State Bank, a bank known nationally to be engaged in hotel and hospitality financing. In fact, a preliminary commitment, a copy of which is annexed hereto as Exhibit "A" was issued by State Bank under the name of "Sushil C. Patel", its executive vice president and chief lending officer.

5. For reasons now unknown to me it was later determined between Brooklyn Federal and State Bank that Brooklyn Federal would, in fact, be the lead lender and State Bank a participant lender pursuant to a loan participation agreement that these two Defendants have referred to in their moving papers, but failed to produce.

6. Be that as it may, DAB proceeded with the loan and, in accordance with the loan documents and the intention of the parties, DAB engaged a general contractor and architect, obtained the necessary permits and proceeded with the Project.

7. This Project experienced delays from the beginning directly attributable to Plaintiff's assignor, Defendant on the counterclaim, Brooklyn Federal. From the beginning

Brooklyn Federal was aware that the lower east side had undergone a down zoning which would have prohibited the full extent of the proposed construction. Accordingly, DAB applied to the Board of Standards and Appeals ("BSA") to be "grandfathered" in.

8. Despite the commencement of substantial construction on the Project such as the demolition of the existing buildings and the installation of the foundation and despite the fact that DAB had engaged a general contractor approved by Brooklyn Federal, Brooklyn Federal failed and refused to fund the Project during the entire pendency of the application before the BSA.

9. This failure to fund by Brooklyn Federal (and State Bank as its participant) effectively shut down the Project from November 2008 to June 2009.

10. In fact, DAB prevailed at the BSA and obtained a grandfather status which permits the intended construction so long as it is completed on or before March 15, 2013. However, by reason of the lenders' failure to fund, the Project was "stalled" for seven months, even though the clock was still ticking on the loan term.

11. Shortly after the BSA approval, work recommenced and proceeded until in or about November 2009 when the city Department of Buildings erroneously issued a stop work order as a result of an issue with an adjoining property owner, not DAB, the owner of this project. Despite the fact that it was ultimately determined by the Department of Buildings that DAB did not violate any building rules or regulations and it was actually the adjoining property owner who was responsible for the stop work order, the Project was again suspended through no fault of DAB from November 2009 to July 2010. [See Exhibit "B" e-mail from Plumey at DOB]

12. In June 2009 Plaintiff's assignor, Brooklyn Federal, and its participate lender State Bank demanded an updated appraisal of the Project before it would continue to fund the loan even though the loan had closed one year earlier and none of the loan documents (mortgage, note or building loan agreement) entitle the lender to withhold funding based on an updated appraised value. This request made by the lenders was arbitrary and violated the terms of the Building Loan Agreement. Notwithstanding the fact that the request for an updated appraisal was unwarranted and in violation of the loan documents, the lenders (Plaintiff's assignors and the additional Defendants on the counterclaim) withheld funding of the loan for approximately four months.

13. As a result of the lenders arbitrary and capricious failure to fund for four months, DAB was compelled to retain counsel to convince Brooklyn Federal and State Bank to withdraw their requirement for an updated appraisal report. While I was successful in getting the lenders to acquiesce, the project was again in limbo, as a result of the lenders' actions for approximately four months with the time still ticking on the loan term. In fact one Marc Leno, then a senior lending officer at Brooklyn Federal advised me that State Bank was refusing to fund the loan and if State Bank could be convinced to fund then Brooklyn Federal would also agree to fund.

14. Of course, as a result of these actions by the lender, the Project was behind schedule and the then general contractor was threatening to file a mechanic's lien and, in fact, did file a mechanic's lien against the Project in or about February 2010.

15. Upon the filing of the mechanic's lien, meetings and conferences were held among the lenders' representatives, including Joanne B. Gallo, now a senior vice-president at

Brooklyn Federal (see affidavit in support of motion to dismiss) and then a consultant for Brooklyn Federal, and Sushil C. Patel, executive vice president and chief lending officer of State Bank.

16. It was agreed among all parties, DAB, the owner and developer, Brooklyn Federal, the nominal lender and State Bank, the participant lender that $960,000.00, the amount initially claimed by the general contractor which filed its lien, would be set aside from the loan proceeds for the purpose of satisfying the mechanic's lien in the event that the contractor prevailed in the mechanic's lien proceeding. By setting aside $960,000.00 the bank assured me that I could engage an alternate general contractor, subject to its approval, and that funding would resume pursuant to the approved contract. Both lenders, Brooklyn Federal and State Bank, through Mr. Sushil Patel were actively involved in this process. See Exhibit "C".

17. On or about March 30, 2010, DAB engaged Flintlock Construction Services, LLC ("Flintlock"). The general contract with Flintlock was entered into on or about March 30, 2010 with a proposed commencement date in or about August 2010. A copy of the Flintlock contract is annexed hereto as Exhibit "D".

18. Pursuant to the loan documents, Brooklyn Federal was entitled to review and approve the general contract between DAB and Flintlock. The contract was, in fact, approved on or about August 26, 2010.

19. In connection with the approval of the Flintlock contract, DAB, at the insistence of Brooklyn Federal, executed the "Affidavit and Estoppel Certificate" a copy of which is annexed to the complaint herein as Exhibit "D". At the insistence of the lenders,

Brooklyn Federal and State Bank, both I, on behalf of DAB and Flintlock, the new general contractor, were required to execute the certificate wherein DAB affirms, as of August 26, 2010, that it had no claims against the lender and no defenses to the loan documents.

20. That document executed at the insistence of the lender was delivered in connection with the approval of the new general contract (Exhibit "D") which provides, at section 3.3 thereof that the contractor "shall achieve substantial completion of the entire work not later than 430 (calendar) days..."

21. In August 2010 it was agreed among all of the parties (Joanne B. Gallo on behalf of Brooklyn Federal, Sushil Patel on behalf of State Bank, Stephen Weiss on behalf of Flintlock and me on behalf of DAB that this Project funded by loans made by Brooklyn Federal and State Bank was to be substantially complete in November 2011. With the Estoppel Certificate, an assignment of the general contract to Brooklyn Federal and an acknowledgment by the general contractor Flintlock of said assignment, was executed and delivered to the lenders. It was agreed at that time that the loan funding and term would continue through the substantial completion of the Project approximately, 430 calendar days from August 26, 2010. See also Exhibit "E" wherein the lenders express opinion that construction will be complete in "a year and a half" from August 24, 2010.

22. The Estoppel Certificate (Exhibit "D" to the complaint) expressly and explicitly provides that "Lender and Borrower hereby confirm, renew and extend the rights... [emphasis added].

23. It was agreed among Brooklyn Federal, State Bank, Flintlock as general contractor

and DAB as borrower that the loans (Project and Building) would be extended through the term of the general contract so that the Project could be substantially completed by Flintlock in accordance with the schedule in the Flintlock contract and well within the BSA approval date (March 15, 2013). This fact is evidence by the Estoppel Certificate which was prepared by Brooklyn Federal and contains therein the budget going forward in connection with the Flintlock contract. Pursuant to its terms, it was the intention of the parties that the Flintlock contract would result in substantial completion of the Project in or about November 2011, 430 days after the August 26, 2010 Estoppel Certificate. In fact, with regard to the extension of the loan to conform and run parallel with the term of the general contract, on or about September 24, 2010, less than one month after Brooklyn Federal approved the Flintlock contract, I received an e-mail from Joanne B. Gallo, then a consultant for Brooklyn Federal, the same Joanne B. Gallo who executed the assignment and conveyance of the loan to the Plaintiff herein and the same Joanne B. Gallo who submits an affidavit in connection with Brooklyn Federal's motion to dismiss, now a Senior Vice-President at Brooklyn Federal, in which Ms. Gallo expresses her concern that construction delays, then being experienced "may seriously impact the Project progress and <u>required completion</u> in mid November..." [emphasis added]. A copy of the Gallo e-mail to me is annexed hereto as Exhibit "F". There can be no doubt that as of August 2010 at the time that Brooklyn Federal and State Bank approved the Flintlock contract, they also extended the loans to "mid November" 2011 to conform and run parallel with the time schedule and budget as set forth in the approved Flintlock contract.

24.   It is clear from the approval of the Flintlock general contract by the lenders that

there was never any question that the loans in question were being extended beyond March 1, 2011 to mid November 2011 at which time it was contemplated by all parties that the Project would be substantially complete.

25. In fact, Joanne B. Gallo herself repeatedly assured me that the loans were being extended beyond March 1, 2011 to be coordinated with and run parallel with the completion dates set forth in the general contract between DAB and Flintlock.

26. Not only were those representations made by Ms. Gallo on behalf of Brooklyn Federal but Sushil Patel, the Executive Vice-President and Chief Lending Officer at State Bank, the participant with Brooklyn Federal in the loans in question, also assured me that the subject loans were extended in accordance with the Flintlock general contract. Annexed hereto as Exhibit "G" is an e-mail dated June 30, 2010 from Mr. Patel to me affirming State Bank's commitment to seeing this Project through to the end. In fact, Mr. Patel personally visited the site and sat in my office on site to assure me of this.

27. In fact, contrary to the assertions of Plaintiff Orchard Hotel, in its memorandum in support of this motion, DAB never abandoned the property leaving a sixteen story concrete super structure exposed to the elements. The Project was active until the day Brooklyn Federal and State Bank pulled the plug, the very same day it sold the loans to the Plaintiff herein. In fact, the superstructure and most of the mechanicals were up and construction was active.

28. With the commencement of this action it was the Plaintiff who, ex parte, applied to this Court and received the appointment of a receiver to gain control of the Project from DAB. Until only recently there was 24 hour security to prevent trespassers and others

from entering onto the Premises. It is the Plaintiff's refusal to pay for the security that has now left the Premises unprotected. DAB has lost control of the Project by reason of the Plaintiff's actions, not its own.

29. Moreover, the general contractor has retracted its permits and filed a mechanic's lien by reasons of its failure to be paid, all as the result of the banks' failure to fund as required.

30. In the early part of 2011, Brooklyn Federal, the assignor of the Plaintiff herein advised me that it had come under the supervision of the Office of Thrift Supervision ("OTS") and that any approval for the extension of the building loan agreement would require OTS approval. It was my understanding that no extension would be required until November 2011 as the lender had already extended the loan to that date commensurate with the completion date in the general contract with Flintlock. The loan and the contract were to run parallel.

31. In the meantime, Flintlock, the general contractor continued work on the Project and submitted requisition numbers 8 and 9 totaling $1.5 million dollars for payment. Even though the lenders' own engineer approved these requisitions, Brooklyn Federal failed and refused to fund the requisitions for payment. In addition, the lenders have 10% retainage on requisitions 1 through 7 in the amount of $300,000.00.

32. I was advised repeatedly, not only by Joanne B. Gallo but also by Richard T. Maher, a Vice-President and Commercial Loan Officer at Brooklyn Federal that now that OTS had supervisory role with the bank that a loan extension was now required approval from the OTS. Annexed hereto as Exhibit "H" is an e-mail from Mr. Maher in which he

inquires as to the "zoning and building height issue?" Why would Brooklyn Federal care about the zoning requirements on March 16, 2011 if, in fact, it really believed that the loan had matured on March 1, 2011?

33. In addition, after March 1, 2011, the date on which the Plaintiff now claims the loan matured, and after Brooklyn Federal had agreed to sell the loan to the Plaintiff herein, representatives from Brooklyn Federal repeatedly requested that I sign a certain "pre-negotiation" agreement which, among other things, compelled me to waive any defenses I may have to the lenders' wrongful actions. Of course I declined to sign that "pre-negotiation letter" which, in fact, was a waiver of defense agreement. It was about this time that I heard rumors that Brooklyn Federal and State Bank were not seeking approval from OTS for an extension of my loan but rather "shopping" the loan for sale on the market. When I pointedly asked Ms. Gallo, who is now Vice-President of the bank, if the loan was in the process of being sold, she directly and falsely told me that there were no meaningful conversations regarding the sale of the DAB loan. Annexed hereto as Exhibit "I" is her e-mail to me as late as June 2, 2011 in which she again requests that I sign a waiver of defense letter and pointedly advises me that there have been "no meaningful conversations" regarding the sale of the DAB loan. This blatant misrepresentation was made by the same Joanne B. Gallo who executed the assignment and conveyance on June 17, 2011 assigning the loans to the Plaintiff, Orchard Hotel, LLC and is the same Joanne B. Gallo who participated in the "Mortgage Loan Purchase Agreement" dated March 2011.

34. From these e-mails alone it is obvious that lender representatives had sold the loan

and was conspiring with the Plaintiff herein to get me to waive any defenses on behalf of DAB by signing a so called "pre-negotiation" letter when, in fact, Brooklyn Federal and State Bank had no intention of negotiating because it had already agreed to sell the loan to the Plaintiff and knew that the Plaintiff intended to foreclose immediately by falsely claiming that the loan had matured.

35. Attached hereto as Exhibit "J" is an e-mail from David Aviram, the principal of the Plaintiff, directed to Joanne B. Gallo of Brooklyn Federal in which they are clearly conspiring to prematurely mature the loan as there was already an agreement in place to sell the loan to the Plaintiff and the Plaintiff was intending to foreclose, even though DAB was not delinquent in any payments and the loan term had been extended to November 2011. In the attached e-mail of April 14, 2011 Mr. Aviram is cautioning Ms. Gallo not to seek OTS approval for the extension because it would adversely impact his intended foreclosure of the loan. I relied on Brooklyn Federal's representation to me that the loan was extended and accordingly I did not seek any refinance of this debt. At this time the Project was active and secure and approximately six (6) months from completion.

36. It is now clear that as early as March 1, 2011 a loan purchase agreement was in existence between the Plaintiff Orchard Hotel, LLC as purchaser and Brooklyn Federal and State Bank as seller. Clearly the intent of the parties was to "pull the plug" on my loan even though Plaintiff's assignor, Brooklyn Federal had explicitly and expressly agreed to extend my loan to November 2011, notwithstanding that Brooklyn Federal agreed to sell the loan as early as March 1, 2011. Brooklyn Federal, by one Bruce B.

Gordon, Consultant, e-mailed me on June 6, 2011 again demanding the so called "pre-negotiation letter". A copy of Mr. Gordon's e-mail to me showing a cc to Joanne B. Gallo is annexed hereto as Exhibit "K".

37. I am advised by counsel and I believe that the assignee, the Plaintiff herein, stands in the shoes of the assignor and that the loan extension granted to the borrower by the assignor into November 2011 is binding on the Plaintiff herein. In addition, the claims of fraud and breach of contract asserted against Plaintiff's assignors are applicable and attributable to the Plaintiff herein at least to establish an offset of any of Plaintiff's claims.

38. By reason of Brooklyn Federal's failure to fund properly approved requisitions for work which predated even the March 1, 2010 date, Flintlock, as general contractor, did pull its permits and walk off the job and filed a lien against the Project. Consequently, all of its sub-contractors and the architect similarly filed liens against the job bringing the Project to a halt.

39. Moreover, Brooklyn Federal and State Bank had agreed with me to reserve or set aside $960,000.00 for the payment of the purported mechanic's lien filed by one CAVA CONSTRUCTION & DEVELOPMENT, INC. ("CAVA"). Brooklyn Federal, State Bank and the Plaintiff have each failed and refused to honor that agreement by failing to satisfy the CAVA lien which was finally determined in February 2011 resulting in a judgment against DAB by CAVA which has now been purchased by a nominee (See Exhibit "L") of the Plaintiff herein for the sole purpose of squeezing DAB out of this Project. That judgment should be satisfied from the $960,000.00 reserved by the lenders.

40. In addition, the Plaintiff herein, on my request, provided me with "payoff" letters for the loans in question. In those payoff letters the Plaintiff herein seeks late charges in the sum of $275,000.00 in the case of the Project Loan and $398,000.00 in the case of the Building Loan and derives these figures by multiplying the principal due on the note by the 5% late fee provided for in the note. The late fee, as defined in the loan documents, is 5% of any unpaid payment, not 5% of the total principal balance alleged to be due on the note. Moreover, the loan documents provide that the late charge is to "defray a portion of the expenses incurred by the holder in handling and processing such delinquent payment...". It is unconscionable to believe that $275,000.00 on the Project Loan and $398,000.00 on the Building Loan are appropriate to "defray a portion of the expenses incurred by the holder in handling and processing such delinquent payment". It is clear that the intent of the late charge is to apply it to a late payment, not the total due on the balance of the respective loans. As there is no allegation that any of the periodic payments on the loan were late and that the lender incurred any additional expenses in handling and processing late payments, the application of the late fee to the entire balance that the Plaintiff claims is due is simply wrong. In fact, no periodic interest payment was delinquent and the borrower maintained an interest reserve account with Brooklyn Federal, Plaintiff's assignor from which the interest payments were drawn directly. Therefore, there was no default in payments.

41. With respect to DAB's damages, Brooklyn Federal, Plaintiff's assignor commissioned an appraisal in or about March 2010, requesting market values of the Project as of January 1, 2010, June 1, 2011 and June 1, 2013. The lender's own appraisal

sets a market value on completion of between 32 million dollars and 39 million dollars, meaning that there is equity in the Project in excess of 20 million. A copy of the appraisal reconciliation is annexed hereto as Exhibit "M".

42. Both Brooklyn Federal and State Bank represented directly to me via their authorized personnel, Joanne B. Gallo, Richard T. Maher and Sushil Patel that the loan was extended so that the Project could be completed while at the same time and without my knowledge they were negotiating with and had entered into an agreement with the Plaintiff to sell the loans so that the Plaintiff could call it due and steal the Project in which the owner, DAB has over 20 million dollars in equity.

43. Accordingly, for the reasons set forth in the accompanying affirmation of my attorney William G. Wallace, Esq. and for the reasons set forth herein, this motion to dismiss the counterclaims of DAB against the movants should be denied and the movants herein should be directed to proceed with the demanded discovery in this matter.

BEN ZHAVIAN

Sworn to me this 3rd day of November, 2011

NOTARY PUBLIC

Mary Chong
NOTARY PUBLIC, STATE OF NEW YORK
No. 01CH5030058
Qualified in Queens County
Commision Expires July 5, 2014