UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Return Date:   March 19, 2015
               11:00 a.m.

-------------------------------------------------------------x

In re:

Chapter 11

D.A.B. GROUP LLC,

Case No.  14-12057 (SCC)

                              Debtor.

-------------------------------------------------------------x

### DEBTOR'S OPPOSITION TO MOTION OF ORCHARD HOTEL, LLC FOR RELIEF FROM THE AUTOMATIC STAY

**TO THE HONORABLE SHELLEY C. CHAPMAN,**
**UNITED STATES BANKRUPTCY JUDGE:**

D.A.B. Group LLC (the "Debtor"), as and for its Opposition to the motion filed by Orchard Hotel LLC ("Orchard") seeking relief from the automatic stay, represents and shows this Court as follows:

### I.    PRELIMINARY STATEMENT

1.    In an obvious display of forum shopping, Orchard seeks to do an end-run around the Debtor's pending objection to Orchard's secured claim, and in response has filed a motion to lift the automatic stay to pursue an appeal of the March 21, 2014 Order and Decision of Judge Charles E. Ramos denying summary judgment on Orchard's foreclosure complaint.  A copy of this Decision is annexed hereto Exhibit "A" for the Court's ready reference.

2.    Summary judgment was denied because Judge Ramos found triable issues of fact relating to the Debtor's equitable defenses arising out of assurances given to the Debtor that maturity of the loans would be extended beyond on March 1, 2011 to coincide with a new construction contract approved by Orchard's predecessor lender, Brooklyn Federal Savings Bank ("BFSB"), involving Flintlock Construction Services, LLC ("Flintlock").

3.     The Flintlock contract extended the project completion date for 430 days to November 26, 2011, well past March 1, 2011.  Indeed, the very existence of the Flintlock contract was highlighted by Judge Ramos in his decision as a pivotal reason for the Debtor to reasonably conclude that the maturity date had been extended.  (Exhibit "A" – Ramos Decision, p. 9).

4.     BFSB's wrongful insistence on a maturity default lies at the heart of the Debtor's companion claim objection, and has been raised to deny Orchard exorbitant default interest at 24% per annum and attorneys' fees. (*See* Debtor's Objection to Various Aspects of the Secured Claim of Orchard Hotel LLC, dated January 19, 2015 (ECF #86) (the "Claim Objection").  With a sale of the hotel property now imminent, the need for foreclosure has been rendered moot, leaving the parties to litigate over entitlement to the sale proceeds.

5.     To be sure, Orchard senses a more receptive audience in the Appellate Division to wage this litigation.  However, its request to lift the automatic stay, filed on the brink of the anticipated confirmation of the Debtor's plan, scheduled for March 19, 2015, comes far too late in the bankruptcy process to make any practical sense, and would invariably lead to incalculable delay to the detriment of all other creditors and equity holders.  Indeed, Orchard has badly minimized the impact of its current "litigation gambit" on the rights of the other constituencies, which are far from minimal in this case.[1]

---

[1]  In addition to Orchard, there are administrative claims of the receiver and professionals, real estate taxes estimated at $680,000, mechanic's lienors asserting total claims of $5,089,442.74 and $1,619,158.98 in claims from unsecured creditors.  While all of these claims are subject to review and possible objection, the other debt in the case is significant, and will involve several millions of dollars under any circumstances.

6.      Moreover, the appellate process is hardly a "quick-fix" for resolving the Claim Objection.  To begin with, the state court litigation is not close to being ready for trial, as a potential appellate ruling on summary judgment is hardly the equivalent of a trial-ready case.

7.      Secondly, once the property is sold in bankruptcy, the purported appeal relating to Orchard's ability to foreclose is likely rendered moot.  It is difficult to imagine the Appellate Division deciding the question of whether to permit foreclosure after the property is no longer owned by the Debtor.

8.      Thirdly, the appeal does not address the central question in bankruptcy of Orchard's alleged entitlement to 24% default interest and attorneys' fees.  As a matter of practice, entitlements to interest, default interest and attorneys' fees are typically addressed later in a foreclosure action in connection with proceedings to confirm a Referee's report under RPAPL §1321.  Because Orchard was denied foreclosure, the trial court was still many months away from getting to the question of entitlement to default interest even without the Debtor's Chapter 11 filing.

9.      Thus, rather than advancing the ball forward, lifting the automatic stay would unnecessarily delay final resolution of the Claim Objection for a year's time or more, and suspend distributions to all other creditors during the hiatus.

10.     The better course of action, of course, is to decide the issues relating to default interest and attorneys' fees as part of the claims review process in bankruptcy, a task routinely performed in virtually every Chapter 11 case.  The Bankruptcy Court is more than capable of deciding Orchard's alleged entitlement to 24% default interest and attorneys' fees in the context of the pending Claim Objection, and can do so far more efficiently than the state courts.

## II.    ORCHARD'S MOTION DOES NOT PRESENT A COMPLETE NARRATIVE OF THE PRIOR PROCEEDINGS BEFORE THE APPELLATE DIVISION

11.    Inexplicably, Orchard's motion ignores that there is no clear path to taking further review before the Appellate Division.  Instead, Orchard presumes that the Appellate Division is standing ready to hear the appeal, while disingenuously concealing from this Court that the appeal was quite possibly decided when the Appellate Division denied Orchard's petition for immediate review filed last fall.

12.    Perhaps in a fit of over-exuberance, if not narcissism, Orchard was so convinced that the Appellate Division would immediately reverse, that, rather than pursue a conventional appeal, it petitioned the Appellate Division for an expedited ruling reversing Judge Ramos and granting summary judgment to Orchard, or, in the alternative, a Writ of Mandamus directing Judge Ramos to enter granting summary judgment of foreclosure to Orchard, or, as another alternative, a Writ of Prohibition barring Judge Ramos from trying the issue of reasonable reliance.  A copy of the verified Petition for Writs of Prohibition and Mandamus, Summary Judgment and Emergency Relief (without exhibits) dated June 23, 2014 is annexed hereto as Exhibit "B" (the "Petition").

13.    In support of the Petition, Orchard made the very same arguments advanced now on the lift-stay application, namely that Judge Ramos' decision denying summary judgment was inconsistent with the earlier appellate rulings dismissing the Debtor's counterclaims.  Accordingly, Orchard requested that the Appellate Division utilize its "broad power to search the record and grant summary judgment" in its favor.  (Exhibit "B" – Petition, p. 41).

14.    The Appellate Division, however, would have none of it, and unanimously denied the Petition in its entirety on September 23, 2014 pursuant to the Order attached hereto as Exhibit "C".  This Order contains no reservation that Orchard may continue with a further appeal.

15.    In view of this denial, Orchard's motion for stay relief effectively seeks a second bite at the apple before the Appellate Division, without any qualms about the impact of the resulting delay on the Debtor and its creditors or whether the Appellate Division will even entertain further review, based on mootness and other factors.

16.    While we can debate whether or not denial of the Petition ends the appeal process, there can be little doubt that this ruling cannot be totally ignored, and undermines Orchard's analysis of the Sonnax factors.

17.    In fact, Orchard itself opened the door to the potential that the Appellate Division could decline further review, when it combined a request for mandamus with a request that the Appellate Division reverse Judge Ramos' ruling immediately and grant summary judgment on its own volition.

18.    That the Appellate Division subsequently denied the Petition means that Orchard is hardly assured of prevailing again on appeal.  Intuitively, if the Appellate Division was so troubled by Judge Ramos' decision, it could have granted relief to Orchard in connection with the Petition.

19.    For purposes of stay relief, Orchard's inability to point to an appeal – actually primed for argument and decision – lays the foundation for a proper analysis of the Sonnax factors.  While Orchard has addressed these factors only in superficial and conclusory

terms, all of the relevant <u>Sonnax</u> factors militate strongly <u>against</u> vacating the automatic stay and

Orchard's motion should be denied.

## III.  BACKGROUND FACTS

20.     The background facts are already set forth at length in the companion

Claim Objection.    To the extent relevant, the Claim Objection is hereby incorporated by

reference so as to avoid duplication.    However, before turning to an analysis of each of the

<u>Sonnax</u> factors, it is important to briefly review the various pre-bankruptcy state court rulings to

clarify the precise issues presented by Orchard's lift stay motion.

### The Project

21.     The Debtor owns the development site at 139-141 Orchard Street, New

York, NY (the "Property").    In 2007, the Debtor acquired the Property for intended construction

of a 16-story, 92-room upscale boutique hotel (the "Project").    The Project was financed by

BFSB and its junior participant, State Bank of Texas.

22.     BFSB first made an acquisition loan of $5.5 million, followed by

construction financing in sums of up to approximately $19 million.    Both loan agreements

provided for a maturity date of March 1, 2011.

23.     As detailed in the Claim Objection, the Project was stalled for about a

year's time because of zoning and building department issues that were not in any way

attributable to the Debtor's actions.    Persevering despite these unexpected roadblocks, the Debtor

was able to put the Project back on track by the summer of 2010, when it engaged Flintlock as its

substitute contractor, and construction resumed.

24.     As part of the Project revival, the Debtor and Flintlock developed a

revised schedule with a new completion date of November 26, 2011.    This revised schedule and

related construction budget were established in conjunction with BFSB and its representatives. It cannot be disputed that BFSB approved the budget for Flintlock to continue the Project into November, 2011 based on a new completion date that extended well past March 1, 2011.

25.     The very existence of the Flintlock contract gives strong credence to the Debtor's position that the March 1, 2011 maturity date was extended by BFSB. In fact, evidence came to light in the form of a formal BFSB "Action Plan" approved by all of the members of BFSB's workout committee, recommending a one year extension, subject to approval of the Office of Thrift Supervision.

26.     As events unfolded, March 1, 2011 came and went without any controversy. Late in March, however, BFSB apparently fielded an offer from Maverick Real Estate Partners (a principal of Orchard) to purchase the mortgage debt. The Debtor was not made aware of the offer, and only learned of the sale of the mortgage loans after the contract was signed, when suddenly Orchard retroactively declared the loans due as of March 1, 2011, notwithstanding the prior approval of the Flintlock contract.

**Initial Litigation Before Judge Fried**

27.     Within two weeks of closing on the mortgage debt, Orchard commenced a foreclosure action on July 1, 2011. The Debtor asserted various defenses, including waiver and estoppel, plus counterclaims sounding in breach of contract and lender liability. The Debtor's initial set of counterclaims for failure to fund were dismissed by Justice Bernard Fried, pursuant to decision dated March 28, 2012, since they were viewed as oral modifications of the loan documents. This decision was affirmed on appeal by the Appellate Division on May 28, 2013, and the matter was remanded to the trial court for disposition of the foreclosure complaint and the Debtor's equitable defenses.

**Proceedings Before Judge Ramos**

28.    Judge Fried retired from the bench, and Judge Ramos was then assigned the case.   While presiding over the matter, Judge Ramos became increasingly incensed with Orchard and its counsel when he learned almost two years into the case that Orchard had withheld production of the BFSB Action Plan in discovery.   The BFSB Action Plan was obviously a document relevant to the extension of the maturity date, and should have been produced from the outset, even if it was subject to OTS approval.   Ultimately, Judge Ramos determined that the Action Plan constituted new evidence, warranting vacatur of Justice Fried's previous dismissal order, and granting leave to the Debtor to amend its counterclaims.

29.    In February, 2014, the Appellate Division reversed on the ground that the Action Plan has not been approved by the OTS and did not qualify as new evidence.

30.    Orchard looked at this ruling as vindication and came marching back to Judge Ramos for a decision on its motion for summary judgment.   Orchard argued that the Appellate Division reversal ended the matter, and warranted entry of summary judgment on its foreclosure complaint.   While recognizing the Appellate Division's reversal of his earlier ruling, Judge Ramos still denied summary judgment, finding that even without the Action Plan, there was still other credible evidence to "establish a rational basis to find that BFSB led DAB to believe that the loans had been extended." (Exhibit "A" – Decision, p. 9).

31.    Citing to the Court of Appeals decision in Nassau Trust v. Montrose Concrete Prod. Corp. 56 N.Y.2d 175 (1987), Judge Ramos also found a critical legal distinction between instances of waiver and estoppel which do not require a signed writing, as compared to affirmative damage claims to enforce oral modification of loans.   Although the Debtor did not have the right to compel additional construction funding from BFSB as per its counterclaims, it

still retained estoppel defenses to the foreclosure complaint. For purposes of bankruptcy, following a sale of the Property these equitable defenses are relevant to the allowability of those aspects of Orchard's claim relating to 24% default interest and attorney's fees.

### The Orchard Appeal

32.    Orchard appealed Judge Ramos' decision, but proceeded in unconventional fashion and filed the Petition seeking immediate review. In the process, Orchard closed its eyes to the distinction drawn by Judge Ramos regarding waiver and estoppel and oral contractual modifications, and oversimplified a much more nuanced case that did not rely exclusively on the Action Plan.

33.    While Orchard claims that it perfected the appeal, the matter was not set for any specific term in the Appellate Division. Following the Chapter 11 filing, the Debtor did not file an appellate brief or retain appellate counsel. In the meantime, Orchard consented to the jurisdiction of the Bankruptcy Court and filed its secured claim on December 11, 2014, which is currently under objection by the Debtor.

34.    Orchard then curiously waited approximately seven months' time to file this lift-stay motion, although it was aware from day one that the Debtor contested its entitlement to 24% default interest and attorney's fees. Orchard's delay only served to elevate the prejudice to the Debtor's other creditors and equity holders. Perhaps, this motion might have been viewed somewhat differently if it had been filed at the outset, but coming on the eve of confirmation, Orchard's arguments ring hollow.

35.    Having participated in every facet of the Chapter 11 process, it is improper for Orchard to attempt to circumvent the claims review process in bankruptcy, particularly since there is no clear timetable as to when, or indeed if, the appeal will be heard.

9

36.    The calendar requirements of the Appellate Division are such that the June

term closes out on March 23, 2015, and no further appeals will be heard until September, 2015 at

the earliest.  A copy of the 2015 Appellate Division calendar is annexed hereto as Exhibit "D".

Thus, if the automatic stay is lifted, the very best possible scenario is that the appeal will be

heard sometime in the fall of 2015, with a decision likely to come weeks, if not months, later,

and probably not until next year.

## IV.  ARGUMENT

### Orchard's Motion to Lift the Automatic Stay Should Be Denied

37.    Bankruptcy is designed to afford the Debtor with a respite from its

creditors through the imposition of the automatic stay, by providing a single forum to deal with a

multitude of differing claims.  When a party seeks to vacate the automatic stay to proceed with

pre-petition state court litigation, the Bankruptcy Court's determination is based on an equitable

balancing test that takes into account the degree of hardship imposed on the bankruptcy estate

and the core goals of the Bankruptcy Code.  In New York, this equitable balancing test is guided

by the well-known factors enunciated by the Second Circuit in In re Sonnax Industries, Inc., 907

F.2d 1280, 1286 (2d Cir. 1990).  These factors include:

> (1) whether relief would result in a partial or complete resolution of the
> issues; (2) lack of any connection with or interference with the bankruptcy
> case; (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been
> established to hear the cause of action; (5) whether the debtor's insurer has
> assumed full responsibility for defending it; (6) whether the action
> primarily involves third parties; (7) whether litigation in another forum
> would prejudice the interests of other creditors; (8) whether the judgment
> claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a
> judicial lien avoidable by the debtor; (10) the interests of judicial economy
> and the expeditious and economical resolution of litigation; (11) whether
> the parties are ready for trial in the other proceeding; and (12) impact of
> the stay on the parties and the balance of harms.

38.    Notably, the burden is squarely on Orchard, as the moving party to establish its entitlement to relief from the stay.  In this regard, the Second Circuit has specifically instructed that:

> Section 362(d)(1) requires an initial showing of cause by the movant . . . If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."

In re Sonnax Industries, Inc., supra, 907 F.2d at 1285.

39.    Orchard pays lip service to its burden, while relying on a number of authorities that denied relief.[2]  For example, Orchard cites to In re Curtis, 40 B.R. 795 (Bankr. D.Utah 1984) even though the Court denied relief from the stay in the context of a state court litigation over fraud and misrepresentation claims, in favor of proceeding in bankruptcy in the context of an adversary proceeding concerning dischargeability.  In Curtis, the Court laid out a detailed review of the policies underpinning of the automatic stay:

> The automatic stay implements two goals. First, it prevents the diminution or dissipation of the assets of the debtor's estate during the pendency of the bankruptcy case. Second, it enables the debtor to avoid the multiplicity of claims against the estate arising in different forums . . .

> Congress recognized that in some circumstances it would be appropriate to modify the automatic stay "for cause" to permit an action to proceed

---

[2] Interestingly, of the eight cases cited by Orchard in its introductory paragraphs to the discussion of the law on vacating the stay, half of the cases denied the lift stay motion.  See, In re Sonnax Industries, Inc., supra; In re Exxon Corp., 306 B.R. 465 (Bankr. S.D.N.Y 2004); In re United Imports, Inc., 203 B.R. 162 (Bankr. D.Neb. 1996); and In re Curtis, 40 B.R. 795 (Bankr. D.Utah 1984).  In two of the cases cited Orchard which found in favor lifting the stay, a primary consideration cited by the respective courts was that, unlike the current case, an actual trial was about to begin in the state court action.  In re Castlerock Properties, 7781 F.2d 159 (9th Cir. 1986); Robbins v. Robbins, 946 F.2d 342 (4th Cir. 1992) (also decided on basis that domestic relations litigation involved equitable distribution which was within the specialized knowledge of the state courts).  Both of the other cases involved litigation being defended by the debtor's insurer.  In re R.J. Groover Constr., LLC, 411 B.R. 460 (N.D.Ga. 2008); In re N.Y. Med. Grp, P.C., 265 B.R. 408 (Bankr. S.D.N.Y. 2001).

before another tribunal. The term "cause" is not defined in the Bankruptcy Code. . . .

The House Report accompanying H.R. 8200 illustrates several situations in which it might be appropriate to modify the stay to permit litigation in another forum:

> The lack of adequate protection of an interest in property of the party requesting relief from the stay is one cause for relief, but is not the only cause. As noted above, a desire to permit an action to proceed to completion in another tribunal may provide another cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors. The facts of each request will determine whether relief is appropriate under the circumstances.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 343–44 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6300. *See also* S.Rep. No. 95–989, 95th Cong., 2d Sess. 52 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5838. **The legislative history of Section 362(d)(1) thus suggests that Congress intended to limit relief from the stay to a fairly narrow category of circumstances bearing little relationship to the bankruptcy case or to the purpose of the stay.**

Id., supra, 40 B.R. at 798 -799 (emphasis supplied).

40.    The Sonnax factors should be reviewed through the prism of the principles underlying the Bankruptcy Code.   Consequently, the decision to proceed outside of the Bankruptcy Court cannot be made in a vacuum and should only be granted in situations where it is clear that the interests of the estate will not be harmed.  This certainly is not the case here!

*See,* In re Bally Total Fitness of Greater New York, 411 B.R. 142 (S.D.N.Y. 2009) (employing the Sonnax factors and noting that a confirmation hearing was already scheduled, the District

Court affirmed the Bankruptcy Court's denial of a lift stay motion because doing so would unduly risk interfering with the reorganization process).

### Sonnax Factor 1:
### (Vacating the stay will not finally resolve the amount of Orchard's claim)

41.    Factor 1 considers whether vacating the stay would result in a partial or complete resolution of the issues.  The appeal does none of that, because it does not directly involve the interest and attorney's fee question, and merely determines whether denial of summary judgment should be reversed on a foreclosure complaint.  Of course, this specific issue of foreclosure will be stale by the time the case can reach the Appellate Division.  Yet, Orchard does not address the obvious question as to why the Appellate Division would even consider an appeal relating to foreclosure following a sale of the property.

42.    Moreover, even if Orchard could overcome mootness resulting from the sale of the property, it then must overcome the argument that the appeal is mooted by denial of the Petition for immediate review (a denial that is so inconvenient that Orchard failed to disclose it in its motion).  In this particular procedural context, the denial of the Petition is arguably tantamount to dismissal of the appeal because Orchard actually petitioned for a reversal of Judge Ramos' decision in its motion to the Appellate Division.  At the least, the unanimous denial of the Petition is indicative that the appeal will not be summarily decided in Orchard's favor.

43.    Adding further uncertainty and delay, the appeal was not fully briefed as of the Chapter 11 filing.  The current schedule for the Appellate Division, (see Exhibit "D") sets the September 8 term as the earliest possible date for argument on the appeal, so that  many months will pass before the appeal can be heard.

44.    Conversely, the Bankruptcy Court has the ability to deal with questions of entitlement to default interest and legal fees head-on, and in much more rapid fashion.  The

13

Claim Objection has already been filed, and by the time of the hearing on this motion, Orchard's

response will have been filed and the issues briefed.

45.    In view of all of the foregoing, there are compelling grounds to keep the

stay in place, rather than risk sending the matter into the maelstrom of uncertain appellate waters.

### Sonnax Factors 2
### (The Claim Objection is a core bankruptcy proceeding)

46.    Factor 2 addresses whether the litigation is sufficiently related to the

bankruptcy case, In describing the type of actions unrelated to the bankruptcy proceeding in

which stay relief might be warranted, Congress provided the following examples:

> [A] divorce or child custody proceeding involving the debtor may bear no relation
> to the bankruptcy case.   In that case, it should not be stayed.   A probate
> proceeding in which the debtor is the executor or administrator of another's estate
> usually will not be related to the bankruptcy case and should not be stayed.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 343-44 (1977); cf. S Rep. No. 95-989, 95th Cong.,

2d Sess. (1978), reprinted in 1978 U.S.C.C.A.N. at 6300.

47.    In sharp contrast to these legislative examples, the resolution of a lender's

claim for default interest and attorney's fees in the context of a Chapter 11 real estate case

presents a quintessential example of core jurisdiction at the heart of this Court's powers.   Thus,

Factor Two favors the Debtor, based upon the jurisdictional prerogatives of 28 U.S.C. §

157(b)(2)(A), (B), (K), (L) and (O).

### Sonnax Factor 3
### (The Debtor is not a fiduciary)

48.    As the Second Circuit noted in Sonnax, the Senate Report to the

Bankruptcy Code comments directly on this point, explaining that:

> Generally, proceedings in which the debtor is a fiduciary . . . need not be stayed
> since they bear no real relationship to the purpose of the stay which is to protect
> the debtor and the estate from creditors.

14

S.Rep. No. 989, 95th Cong., 2d Sess.52, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5838.

In re Sonnax Industries, Inc., supra, 907 F.2d at 1285-1286.

49.    Here, the Debtor is not fiduciary and the Claim Objection involves rights as between a commercial lender and its borrower.    Thus, the third factor does not support vacating the stay.

### Sonnax Factor 4
### (There is no need for a specialized court to consider the issues)

50.    Factor 4, considering whether the issues presented need to be tried in a specialized court, also provides no assistance to Orchard.    This case presents a "meat and potatoes" issue for the Bankruptcy Court.    As such, the state courts do not have greater expertise in deciding questions of default interest or attorney's fees, making this case readily distinguishable from those involving specialized areas of law, such as domestic relations issues (See, e.g., In re Newman, 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996); Robbins v. Robbins, supra), or a specialized forum (See In re Marketxt Holdings Corp., 428 B.R. 579 (S.D.N.Y. 2010) (deferring to arbitration panel specifically established by the National Association of Securities Dealers to address the issues presented)).

### Sonnax Factor 5
### (There is no insurance)

51.    Factor 5 favors vacating the stay if insurance is available to pay the claim. Because this case does not involve a personal injury claim, there is no insurance, and Factor 5 does not support vacating the stay.

## Sonnax Factor 6
### (The State Court Action does not primarily concern third parties)

52.    The Sixth Factor of whether the state court litigation concerns primarily third parties also militates in favor of denying Orchard's motion.   The purpose behind this inquiry has been explained as follows:

> A court may lift a stay for actions which bear little relation to the bankruptcy case. See 2 Collier on Bankruptcy ¶ 362.07, at 362-50 (15th ed. 1982).  Such lack of connection with the title 11 case occurs where the action essentially involves third parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and resolution of the issue in no way frustrates the orderly distribution of assets of the estate.

In re Mego Intl., Inc., 28 B.R. 324 (Bankr. S.D.N.Y. 1983).

53.    The Claim Objection involves the Debtor as the central actor along with Orchard and its predecessor, BFSB.  Thus, Factor 6 does not support vacating the stay.

## Sonnax Factor 7
### (Creditors will be prejudiced by vacatur of the stay)

54.    Orchard turns the Seventh Factor on its head, noting that the sale is not conditioned on the resolution of the Claim Objection, and arguing that permitting the State Court Action to proceed will not impair either the sale process or "otherwise affect the management and operation of the estate."   Orchard further asserts that because all other creditors are subordinate to its claim, they will not be prejudiced by lifting the stay.

55.    This self-centered analysis completely ignores that the other creditors will greatly benefit from denial of the lift-stay motion and a prompt resolution of the Claim Objection in bankruptcy, as the junior lien holders and general creditors cannot be paid until the amount of Orchard's claim is fixed so everyone has a clear sense of the extent excess proceeds are available for distribution to the other creditors and equity holders.  The prejudice to the other creditors is

palpable, and strongly supports denial of Orchard's motion. *See, e.g.*, In re Dreier, 438 B.R. 449, 456 (Bankr. S.D.N.Y. 2010) (finding that Factor 7 favored denial of the lift stay motion because "[a]waiting a state court determination will prejudice the other creditors that stand behind her alleged first priority, and cannot receive a distribution until the dispute is resolved").

## Sonnax Factor 8
### (The State Court Action does not involve a claim for equitable subordination)

56.    An action seeking equitable subordination of a claim is only available under federal bankruptcy law, and cannot be brought under state law.  Accordingly, the presence of a cause of action for equitable subordination weighs against vacating the stay under Sonnax Factor 8.  In re 9281 Shore Road Owners Corp., 187 B.R. 837 (E.D.N.Y. 1995).

57.    While equitable subordination has not been directly raised in the Claim Objection, the actions of BFSB and Orchard in reneging on the extension, continuing to lead the Debtor to believe that the extension had been given while initially concealing the sale of the mortgage notes, and then failing to turnover the Action Plan during discovery, provide potential grounds for subordination against Orchard.  Thus, this Factor does not support Orchard's motion.

## Sonnax Factor 9
### (Orchard's success in the State Court Action will not lead
### to an avoidable judicial lien)

58.    Factor 9 is not applicable because the avoidance of liens is not an issue here.  Thus, Orchard cannot rely on Factor 9.

## Sonnax Factor 10
### (Judicial economy favors resolving the issues in Bankruptcy Court)

59.    The question of judicial economy is focused on choosing between two parallel proceedings "to save judicial resources, prevent duplicative litigation, and avoid potentially inconsistent results."  In re Henderson, 352 B.R. 439 (Bankr. N.D.Texas 2006).

Here, this is an easy choice. The Bankruptcy Court already has all of the pertinent issues squarely before it, with the sale proceeds forming the basis of a plan, and has the unquestioned power to make a direct ruling on the allowability and amount of Orchard's claim for purposes of plan consummation. *See*, In re Sonnax Industries, Inc., *supra*, 907 F.2d at 1287 (Affirming retention of the case in Bankruptcy Court where the state court case was not ready for trial, and finding that "the bankruptcy proceeding provides a single, expeditious forum for resolution of the disputed issues").

60.      The state court cannot possibly address the amount of Orchard's claim in the same expeditious manner. It would be terrible waste of time and money for the Debtor to engage counsel and prepare an appellate brief, wait for argument next fall, at which point the Appellate Division will be presented with the issue of whether Orchard can proceed to foreclosure after the property has been sold, to the extent the Appellate Division hears the appeal at all. Just to state this paradigm underscores the futility of the motion.

61.      Nor is there any jurisdictional bar to the Claim Objection being heard in bankruptcy. Orchard voluntarily submitted itself to this Court's jurisdiction, and indeed presented the issue of the amount of the debt to this Court for consideration when it filed a proof of claim. In this regard, Judge Bernstein's decision in In re Dreier, *supra*, is instructive. In that case, the debtor's former spouse sought to vacate the stay to litigate her rights under a divorce decree against property of the Estate. Judge Bernstein denied her motion, finding that there were no issues presented which could not be heard and determined by the Bankruptcy Court, and in particular noting that:

> Elisa has asserted a $7 million first priority claim against the estate. Her claim is based on the acceleration of the domestic support obligations under the Settlement, and the resolution turns on the interpretation of the

parties' contract. She has submitted herself to this Court's jurisdiction, and
her claim raises the very question she wants the state court to decide.

Id., 438 B.R at 456.

62.    Orchard also cites to the Rooker/Feldman doctrine, contending that this
Court lacks jurisdiction to consider the claim because of the pending appeal.   This completely
misstates the doctrine.  As the Supreme Court has explained,

> [t]he Rooker/Feldman doctrine is confined to cases of the kind from which
> the doctrine acquired its name: cases brought by state-court losers
> complaining of injuries caused by state-court judgments rendered before
> the district court proceedings commenced and inviting district court
> review and rejection of those judgments. Rooker–Feldman does not
> otherwise override or supplant preclusion doctrine or augment the
> circumscribed doctrines that allow federal courts to stay or dismiss
> proceedings in deference to state-court actions.

Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284, 125 S.Ct. 1517, 1521 -
1522 (2005) (emphasis supplied).

63.    Clearly, the Claim Objection was not brought by the Debtor to challenge
an adverse state court judgment in the Bankruptcy Court.  In fact, the opposite is true, as the
Debtor prevailed before Judge Ramos, and there is no existing state court judgment precluding
invocation of equitable defenses to mitigate against default interest and attorney's fees.

64.    It is also significant that Justice Ramos's decision was procedural, rather
than deciding the merits of the underlying litigation.  See, Mosdos Chofetz Chaim, Inc. v. RBS
Citizens, N.A., 14 F.Supp.3d 191, 225 (S.D.N.Y. 2014) (holding that Rooker/Feldman does not
apply where summary judgment motion was denied on basis of existence of disputed facts,
because there was no adjudication of the substantive claim).

65.    The Debtor also submits that the fact that there is a pending appeal has no
bearing whatsoever on the jurisdiction of this Court to hear the Claim Objection.  As the

19

Supreme Court noted in <u>Exxon Mobil</u>, <u>supra</u>, 544 U.S. at 292, 125 S.Ct. at 1526-1527, "This Court has repeatedly held that the 'pendancy of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" (citations omitted).

66.    In short, since (i) the Bankruptcy Court has clear subject matter jurisdiction over the Claim Objection as a core proceeding in which Orchard already consented to the Court's jurisdiction, (ii) the Bankruptcy Court is best suited to provide a complete and expeditious resolution of the issues, and (iii) Rooker/Feldman does not apply, Factor 10 clearly favors denial of Orchard's motion.

### Sonnax Factor 11
### (The parties are not ready for trial in the State Court Action)

67.    It is beyond a stretch to equate an appeal from a denial of summary judgment to the parties actually being ready for trial.  The proposition is so attenuated that it should be summarily dismissed as a complete non-sequitur.

68.    To the extent that Orchard contends that the Claim Objection should be held in abeyance while it pursues the appeal, it has only itself to blame for failing to move much earlier for stay relief.  Orchard could have filed this same motion promptly after the commencement of the Chapter 11 case on July 14, 2015.  However, Orchard waited until after the Debtor filed its Claim Objection and confirmation is imminent.  The delay until literally the eve of confirmation not only demonstrates that Orchard is not genuinely interested in an expeditious resolution of the issues, but presents an odious odor of forum shopping.

**Sonnax Factor 12**
**(The Balancing of Harms Favors Denial of the Motion)**

69.    Orchard's argument on this factor focuses entirely on its misguided perception of a speedy end to the State Court Action if the stay is vacated. As explained throughout, the appeal will not result in anything near a final determination concerning the actual amount of Orchard's claim. On the other hand, this issue is fully joined before the Bankruptcy Court. Accordingly, a final determination of the Claim Objection can be easily obtained in bankruptcy long before Orchard can possibly come again before the Appellate Division. Even then, there is no certainty as to what will happen if and when an appeal is heard, or what the aftermath will be.

70.    The sole potential "harm" cited by Orchard is to recite the money it paid to protect the Property, including certain real estate taxes. However, once the Debtor's plan is confirmed and the sale closes, there will be no further costs to Orchard. Even at that, Orchard has refused to advance more than the $250,000 budgeted earlier in the Chapter 11 case, so it has closed-off any additional exposure. Additionally, the Debtor is prepared to reimburse Orchard for all principal and documented out of pocket advances while the Claim Objection proceeds.

71.    The absence of any harm to Orchard is more than sufficient to support a finding that Factor 12 favors the Debtor. In re Dreier, supra, 438 B.R. at 456 (finding that where movant fails to identify any harm to herself, "continuation of the stay does not impact her, and the balance of harms does not weigh in favor of stay relief (Factor # 12).").

72.    On the other hand, there is a clear prejudice to the other creditors from the extensive delay attendant to stay relief, which will prevent anyone else from being paid. This presents an obvious harm to the Debtor's estate. Accordingly, the balance of the harms weighs strongly against vacating the stay.

21

73.     In sum, not one of the twelve <u>Sonnax</u> factors actually supports Orchard's position.  Accordingly, the motion must be denied, with the parties instructed to proceed with alacrity before this Court in connection with the Claim Objection.

WHEREFORE, the Debtor respectfully prays for the entry of an Order consistent with the foregoing, together with such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        March 13, 2015

                              GOLDBERG WEPRIN
                              FINKEL GOLDSTEIN LLP
                              Attorneys for D.A.B. Group LLC
                              1501 Broadway – 22nd Floor
                              New York, New York 10036
                              (212) 221-5700


                              By:  _____
                                      Kevin J. Nash