**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10029
(212) 735-8000
Y. David Scharf
Joseph T. Moldovan
Danielle Lesser
Robert K. Dakis
Brett Dockwell

*Counsel to Orchard Hotel, LLC*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| D.A.B. GROUP LLC, | : | Case No. 14-12057 (SCC) |
| | : | |
| Debtor. | : | |
| | : | |

## RESPONSE OF ORCHARD HOTEL, LLC TO THE DEBTOR'S OBJECTION TO ORCHARD HOTEL, LLC'S SECURED CLAIM

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................... 1

GENERAL FACTUAL BACKGROUND ........................................................... 4

    A.    Orchard's Claim ................................................................................ 4

    B.    The Debtor's Objection to Orchard's Claim .................................... 5

    C.    Relevant Provisions of the Loan Documents .................................. 6

        1.    The Maturity Date ................................................................ 6

        2.    The Debtor's Payment Obligations ...................................... 9

        3.    No Oral Modifications or Waivers ..................................... 11

## COLLATERAL ESTOPPEL

I.    THE DEBTOR IS COLLATERALLY ESTOPPED FROM RELITIGATING THE MATURITY OF THE LOANS ....................................................................... 13

    A.    The State Court Orders .................................................................. 14

        1.    Justice Fried's March 30, 2012 Decision and Order and the Appellate Division's May 28, 2013 Affirmance ....................................................... 15

        2.    The Appellate Division's February 18, 2014 Order .................................. 16

        3.    Justice Ramos' March 21, 2014 Ruling ................................ 18

    B.    The March 21 Ruling Is Entitled to No Weight Because the Trial Court Lacked the Authority to Overrule the Appellate Division .................................... 18

    C.    The Debtor Is Collateral Estopped from Contesting the March 1, 2011 Maturity Date ............................................................................... 21

## THE MERITS

II.    THE DEBTOR'S ALLEGATIONS ARE SUBSTANTIVELY MERITLESS ................ 23

    A.    Factual Background ....................................................................... 25

1.      The Debtor's Dispute with Cava Construction & Development and
        Cava's Filing of a Mechanic's Lien ...............................................25

2.      The August 2010 Workout ..........................................................26

3.      The Debtor's Extension Request ................................................32

4.      The Debtor's Repeated Misappropriation of Building Loan Trust
        Funds ..........................................................................................35

B.      Applicable Law .....................................................................................39

C.      The Debtor Waived All Defenses to Enforcement of the Notes ...........40

D.      The Debtor's Waiver and Estoppel Defenses Are Precluded by the Loan
        Documents ............................................................................................43

E.      The Debtor's Contract-Based Defense Is Meritless ..............................48

F.      The Debtor's Defense Based on the Implied Covenant of Good Faith and Fair
        Dealing Is Barred by the Loan Documents ...........................................52

## ORCHARD'S LEGAL FEES

III.    ORCHARD'S LEGAL FEES WERE NECESSARY AND REASONABLE IN LIGHT
        OF THE DEBTOR'S VEXATIOUS LITIGATION CONDUCT ....................................53

A.      The Mortgage Foreclosure Action ........................................................54

        1.      Dispositive Motions .....................................................................54

        2.      Appeals and Motion Practice in the Appellate Division ..........................56

                a.      First Appeal ..............................................................56

                b.      Second Appeal and Related Motion Practice ................................57

                c.      Re-Filing of the Second Appeal and Further Motion Practice ......58

                d.      Third Appeal .............................................................59

        3.      The Debtor's Discovery .................................................................61

        4.      The Debtor's Strategy of Delay .....................................................63

        5.      Legal Proceedings to Protect the Mortgaged Property ..........................64

        6.      The Restraining Order and Subsequent Contempt Motion .......................67

B.    The Guaranty Action............................................................................................69

C.    The Debtor's Objection to Orchard's Legal Fees Must Be Denied......................69

CONCLUSION...........................................................................................................................75

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### FEDERAL CASES

*205 W. 19th St. Corp. v. Plymouth Mgmt. Group,*
 74 A.D.3d 564 (1st Dep't 2010) ...................................................46

*In re 56 Walker LLC,*
 No. 13-11571 (ALG), 2014 Bankr. LEXIS 1160
 (Bankr. S.D.N.Y. March 25, 2014) ............................................23

*In re 785 Partners LLC,*
 470 B.R. 126 (Bankr. S.D.N.Y. 2012) ......................................39

*In re Enron Corp.,*
 306 B.R. 33 (S.D.N.Y. 2004) *aff'd sub nom.,*
 *Enter. Prods. Operating L.P. v. Enron Gas Liquids Inc.,*
 119 Fed. App'x 344 (2d Cir. 2005) ...........................................71

*Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.,*
 334 Fed. App'x 353 (2d Cir. 2009) ............................................41

*Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.,*
 536 F. Supp. 2d 345, 347 (S.D.N.Y. 2008),
 *aff'd,* 334 Fed. App'x 353 (2d Cir. 2009) ...................................41

*In re Kaplan,*
 186 B.R. 871 (Bankr. D.N.J. 1995) ...........................................45

*Kulak v. City of New York,*
 88 F.3d 63 (2d Cir. 1996) ..........................................................21

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.,*
 252 F.3d 218 (2d Cir. 2001) ......................................................51

*In re Marcia Campbell,*
 513 B.R. 846 (Bankr. S.D.N.Y. 2014) ..................................42, 49

*Mid-Island Hospital, Inc. v. Empire Blue Cross & Blue Shield,*
 276 F.3d 123 (2d Cir. 2002) ......................................................53

*In re Milham,*
 141 F.3d 420 (2d Cir. 1998) ......................................................39
*Motorola Credit Corp. v. Uzan,*
 561 F.3d 123 (2d Cir. 2009) ........................................................2

*In re: PCH Associates*,
    122 B.R. 181 (Bankr. S.D.N.Y. 1990) ...........................................................71

*In re Residential Capital, LLC*,
    508 B.R. 851 (Bankr. S.D.N.Y. 2014) ..........................................................39

*In re S. Side House, LLC*, 451 B.R. 248 (Bankr. E.D.N.Y. 2011),
    *aff'd, sub nom.*, *United States Bank Nat'l Ass'n v. S. Side House LLC*,
    No. 11-CV-4135, 2012 U.S. Dist. 10824 (E.D.N.Y. Jan. 24, 2012), ...............39

*Segura v. Wells Fargo Bank, N.A.*,
    No. 14-04195, 2014 U.S. Dist. LEXIS 143038 (C.D. Cal. Sept. 26, 2014) ....................53

*In re Sheba Realty Corp.*,
    No. 12-75455, 2014 Bankr. LEXIS 1282 (Bankr. E.D.N.Y. March 27, 2014) ..........42, 49

*In re Sultan Realty, LLC*,
    No. 12-10119, 2012 Bankr. LEXIS 5879 (Bankr. S.D.N.Y. Dec. 20, 2012) ..................39

*Travelers Casualty & Surety Company of America v. Pacific Gas & Electric (Travelers)*,
    549 U.S. 443 (2007) ...................................................................................70

*In re: Vanderveer Estates Holdings*,
    283 B.R. 122 (Bankr. E.D.N.Y. 2002)..........................................................70

*Westnau Land Corp. v. United States Small Business Admin.*,
    1 F.3d 112 (2d Cir. 1993) .....................................................................40, 45

*In re Wonder Corp. of America*,
    72 B.R. 580 (Bankr. Conn. 1987), *aff'd*, 82 B.R. 186 (D. Conn. 1988) ..........................71

*Woods Automobile Gallery, Inc.*,
    379 B.R. 875 (Bankr. W.D. Mo., 2007) ........................................................70

## STATE CASES

*Anglo Irish Bank Corp. v. Ashkenazy*,
    No. 103006/10, 2010 Misc. LEXIS 3784 (Sup. Ct. N.Y. Cnty. Aug. 4, 2010) ...............42

*Antonini v. Petito*,
    96 A.D.3d 446 (1st Dep't 2012) ...................................................................43

*Arnot v. Union Salt Co.*,

186 N.Y. 501 (1906) ...............................................................................45

*Bank of Suffolk County v. Kite*,
    49 N.Y.2d 827 (1980) ......................................................................41

*Beacon Terminal Corp. v. Chemprene, Inc.*,
    75 A.D.2d 350 (2d Dep't 1980) ......................................................50

*Bishop v. Maurer*,
    83 A.D.3d 483 (1st Dep't 2011) .....................................................22

*Bombardier Capital, Inc. v. Reserve Capital Corp.*,
    295 A.D.2d 793 (3d Dep't 2002) ...................................................53

*Broadway Nat'l Bank v. Barton-Russell Corp.*,
    154 Misc. 2d 181 (Sup. Ct. N.Y. Cnty. 1992) ..............................53

*Cadlerock, L.L.C. v. Renner*,
    72 A.D.3d 454 (1st Dep't 2010) .....................................................46

*Carmona v. Mathisson*,
    92 A.D.3d 492 (1st Dep't 2012) .....................................................20

*Copp v. Sands Point Marina*,
    17 N.Y.2d 291 (1966) ......................................................................45

*CrossLand Savings, FSB v. Loguidice-Chatwal Real Estate Inv. Co.*,
    171 A.D.2d 457 (1st Dep't 1991) ...................................................44

*D'Arata v. New York Central Mut. Fire Ins. Co.*,
    76 N.Y.2d 659 (1990) ...............................................................21, 23

*Delta Props. v. Fobare Enters.*,
    251 A.D.2d 960 (3d Dep't 1998) ...................................................52

*European America Bank v. Perspective Dev. Corp.*,
    220 A.D.2d 717 (2d Dep't 1995) ...................................................45

*Fesseha v. TD Waterhouse Investor Servs.*,
    305 A.D.2d 268 (1st Dep't 2003) ...................................................52

*Fleet Credit Corp. v. Cabin Serv. Co.*,
    210 A.D.2d 57 (1st Dep't 1994) .....................................................19

*Forbush v. Forbush*,
    115 A.D.2d 335 (4th Dep't 1985) ..................................................19

*Fortress Credit Corp. v. Hudson Yards, LLC*,
    78 A.D.3d 577 (1st Dep't 2010) ...........................................................41

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt. L.P.*,
    7 N.Y.3d 96 (2006) ...........................................................................46

*Glascock v. City National Bank of W. Virginia*,
    213 W. Va. 61 (2002) .........................................................................53

*In re Glazier Group, Inc.*,
    2013 WL 1856305 (Bankr. S.D.N.Y. 2013) .............................................70, 71

*Grossman v. Meller*,
    213 A.D.2d 221 (1st Dep't 1995) ..........................................................19

*Hotel 71 Mezz Lender, LLC v. Mitchell*,
    63 A.D.3d 447 (1st Dep't 2009) ............................................................42

*IDT Corp. v. Tyco Group, S.A.R.L.*,
    13 N.Y.3d 209 (2009) ........................................................................51

*Jamaica Savings Bank F.S.B. v. Ascot Owners*,
    245 A.D.2d 20 (2d Dep't 1997).............................................................40

*In re Jennifer G.*,
    110 A.D.2d 801 (2d Dep't 1985) ...........................................................20

*JP Morgan Chase Bank, N.A. v. Ilardo*,
    36 Misc. 3d 359 (2012) .......................................................................52

*Kenny v. City of New York*,
    74 A.D.3d 630 (1st Dep't 2010) ............................................................20

*L.K. Sta. Group, LLC v. Quantek Media, LLC*,
    62 A.D.3d 487 (1st Dep't 2009) ............................................................51

*Maracina v. Schirrmeister*,
    152 A.D.2d 502 (1st Dep't 1989) ..........................................................19

*Massachusetts Mut. Life Ins. Co. v. Gramercy Twins Assocs.*,
    199 A.D.2d 214 (1st Dep't 1993) .......................................................43, 47

*McSorley v. Spear*,
    13 A.D.3d 495 (2d Dep't 2004).............................................................45

*Mishal v. Fiduciary Holdings, LLC*,
    109 A.D.3d 885 (2d Dep't 2013) ...........................................................41

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
    56 N.Y.2d 175 (1982) ........................................................................44, 45, 46

*Nestor v Britt*,
    834 N.Y.S.2d 458 (Civil Court, City of New York April 23, 2007)
    *aff'd*, 2008 N.Y. Misc. LEXIS 3038 (N.Y. App. Term May 23, 2008) ...........................72

*Orchard Hotel, LLC v. Zhavian*,
    No. 15013/11, 2012 N.Y. Misc. LEXIS 402
    (Sup. Ct. Kings Cnty. Jan. 31, 2012) ...............................................................41, 69

*PGA Marketing, Ltd. v. Windsor Plumbing Supply, Inc.*,
    124 A.D.2d 576 (2d Dep't 1986) .................................................................41

*Padovano v. Sooknandan*,
    No. 502683/12, 2014 N.Y. Misc. LEXIS 5715
    (Sup. Ct. Kings Cnty. Dec. 24, 2014) ...........................................................48

*Perlstein v. Kullberg Amato Picacone/ABP, Inc.*,
    158 A.D.2d 251 (1st Dept 1990) .................................................................41

*Princes Point, LLC v. AKRF Engg, P.C.*,
    94 A.D.3d 588 (1st Dep't 2012) .................................................................44

*Reichert v. Stilwell*,
    172 N.Y. 83 (1902) ................................................................................45

*River Glen Assocs. v. Merrill Lynch Credit Corp.*,
    295 A.D.2d 274 (1st Dep't 2002) .................................................................52

*Riverhead Sanitation and Carting Corp. v. Hampton Hills Golf & Country Club*,
    2013 N.Y. Misc. LEXIS 1322 (Sup. Ct. Suffolk Cnty. March 21, 2013) ...................72

*Rose v. Spa Realty Assocs.*,
    42 N.Y.2d 338 (1977) ............................................................................47

*Ryan v. New York Telegraph Co.*,
    62 N.Y.2d 494 (1984) ............................................................................21

*State v. Philip Morris, Inc.*,
    308 A.D.2d 57 (1st Dep't 2003) .................................................................19

*Sterling Nat'l Bank v. Biaggi*,
    47 A.D.3d 436 (1st Dep't 2008) .................................................................42

*In re Sucheron*,
   95 A.D.3d 892 (2d Dep't 2012) ..................................................................72

*Syracuse Trust Co. v. First Trust & Deposit Co.*,
   239 A.D. 586 (1st Dep't 1933) ..................................................................48

*The Community Preserv. Corp. v. Midwood Gardens, LLC*,
   No. 500178/13, 2014 N.Y. Misc. LEXIS 1640
   (Sup. Ct. Kings Cnty. Apr. 3, 2014) ..........................................................48

*Triple Cities Constr. Co. v. Maryland Cas. Co.*,
   4 N.Y.2d 443 (1958) ..................................................................................46

*Valley Nat'l Bank v. 58 Vlimp, LLC*,
   No. 25522/2012, 2013 N.Y. Misc. LEXIS 1823
   (Sup. Ct. Suffolk Cnty. April 29, 2013) .....................................................52

*Wasserman v. Harriman*,
   234 A.D.2d 596 (2d Dept 1996) .................................................................44

*Zwicker v. Emigrant Mortg. Co.*,
   91 A.D.3d 443 (1st Dep't 2012) .................................................................52

## FEDERAL STATUTES

Bankruptcy Code § 506(b) ...............................................................................70, 71

CPLR § 5513...................................................................................................23

Lien Law § 79-a..............................................................................................35

Orchard Hotel, LLC ("Orchard"), by and through its undersigned counsel, hereby submits this response to the Objection to Various Aspects of the Secured Claim of Orchard Hotel, LLC [Docket No. 86] (the "Objection") filed by D.A.B. Group LLC (the "Debtor") on or around January 19, 2015, to parts of Orchard's secured claim (Claim No. 9), filed on December 10, 2014 (the "Hotel POC"), and respectfully states:

## INTRODUCTION

1.      The Objection consists of allegations and legal theories – waiver and estoppel, breach of contract, and breach of the implied covenant of good faith and fair dealing – that have been considered and rejected *three times* in the state court foreclosure action that preceded the Debtor's chapter 11 petition.  In three separate decisions, including two from the Appellate Division, the state court found that the loan documents precluded the Debtor from reasonably relying on any purported assurance that the maturity date of the loans would be extended.  It is undisputed that there was never a written extension of the final maturity date of the loans, as required by the loan documents, and the extensive record – including statements by the Debtor's state court counsel – make crystal clear that there was never any oral or other extension of the maturity date either.

2.      Given this procedural background, the Court must make the threshold determination of whether the Debtor's allegations can even be raised in this chapter 11 proceeding.  They cannot.  Orchard's claim involves pre-petition obligations governed by state law, and all three of the Debtor's purported grounds for objection – estoppel and waiver, breach of contract, and breach of the implied covenant of good faith and fair dealing – have already been unsuccessfully argued by the Debtor in the state court.  The Objection is precluded by a final, non-appealable order issued by the Appellate Division on February 18, 2014.

1

3.      Furthermore, the Objection is substantively meritless because the Debtor's allegations are conclusively disproved by documentary evidence and deposition testimony. Although the Debtor portrays itself as an innocent victim and claims that the maturity of the loans "caught the Debtor completely off-guard,"[1] the record establishes that the Debtor was well aware that the loans matured on March 1, 2011 and requested an extension from the original lender, Brooklyn Federal Savings Bank ("BFSB" or "Brooklyn Federal") (*see* ¶¶ 24-26 below), but that request was denied because the Debtor had repeatedly misappropriated building loan trust funds, a crime under New York law.  (*See* ¶¶ 95-100 below).  Rather than trying to make amends, the Debtor's principal, Ben Zhavian ("Zhavian"), berated and threatened BFSB's loan officers, creating needless acrimony and ruining any possibility of a workout.  The Debtor's wild and unfounded claims in the Objection are nothing more than an attempt to obscure the Debtor's role as the author of its own misfortune.

4.      The Debtor has also objected to the amount of Orchard's legal fees, an objection that brings to mind the term "chutzpah."[2]  Orchard attempted to prosecute the state court action as quickly and efficiently as possible.  Other than the initial complaint, virtually all of Orchard's legal fees were incurred in response to the Debtor's vexatious litigation tactics, which significantly increased Orchard's fees and expenses and prolonged the accrual of interest at the default rate.  Even by the rough and tumble practices of state court litigation, the Debtor's conduct was extraordinarily damaging and malicious.  (*See* Section III below).  Having

---

[1]  Objection at ¶ 2.

[2]  "The 'classic definition' of chutzpah has been described as 'that quality enshrined in a man who, having killed his mother and father, throws himself on the mercy of the court because he is an orphan.'  Courts in this Circuit have employed the 'classic definition' and contemporary variations where a party's conduct is especially and brazenly faulty."  *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, n.5 (2d Cir. 2009).

2

intentionally run up Orchard's costs, the Debtor's request that this Court bar Orchard from its contractual right to recoup its fees and costs on the ground that the foreclosure action took too long is sheer chutzpah.

5.      This brief is organized into three sections.  Section I addresses the procedural issues raised by the Objection and explains why the Debtor's allegations are precluded by the prior, final orders of the state court.  This section includes a description of the relevant state court decisions, including the March 21, 2014 decision by Justice Ramos relied upon by in the Objection.

6.      Section II demonstrates that the Debtor's allegations are squarely refuted by the Debtor's admissions and by uncontested evidence.  This section sets forth the factual background of this case and presents the record evidence relating to the events at issue.

7.      Section III addresses the Debtor's challenge to the amount of Orchard's legal fees and shows that Orchard's fees were necessary and reasonable in light of the Debtor's obstructions and delays and its repeated efforts to gain a litigation advantage by threatening irreparable damage to the mortgaged property.  This section explains the background of Orchard's legal fees and how the Debtor's scorched earth tactics needlessly turned a straightforward mortgage foreclosure into a protracted and expensive battle.

## GENERAL FACTUAL BACKGROUND

**A.      Orchard's Claim**

8.      The loans at issue consist of a $5.5 million loan in November 2007 (the "Project Loan") and a loan of up to $19.05 million in August 2008 (the "Building Loan," and together

3

with the Project Loan, the "Loans").[3]  The Debtor intended to use the Loans to develop a boutique hotel at 139-141 Orchard Street, New York, New York (the land, improvements and all rights and interests appurtenant thereto, the "Mortgaged Property").

9.    The Debtor states incorrectly that the 2007 Project Loan was "an acquisition loan" to fund the purchase of the Mortgaged Property.  (Obj. ¶ 20).  The Debtor also claims, without citing any evidence, that it contributed "more than $5.0 million to launch the Project."  (Obj. ¶ 22).  However, the Debtor purchased the Mortgaged Property in 1999, not in 2007, and it refinanced the property four times before beginning the hotel project, extracting millions of dollars in equity.  (Hotel POC, Ex. A [Project Note], Sched. A).[4]  There is no evidence that the Debtor contributed anything close to $5 million to the project, and it appears that the Debtor long ago recovered most, if not all, of its investment through its repeated refinancings.

---

[3]    The Project Loan is evidenced by a Consolidated Secured Promissory Note (the "Project Note") and secured by, among other things, a Mortgage Consolidation, Extension, Modification and Security Agreement (the "Project Mortgage").  The Building Loan is evidenced by a Secured Building Loan Promissory Note (the "Building Note," and together with the Project Note, the "Notes") and secured by, among other things, a Building Loan Mortgage and Security Agreement (the "Building Mortgage," and together with the Project Loan Mortgage, the "Mortgages").  The Debtor and BFSB also executed a Building Loan Agreement, setting forth each party's rights and obligations with respect to advances under the Building Loan.  The Notes, Mortgages and Building Loan Agreement, together with a Loan Modification Agreement, an Estoppel Certificate (described below) and any and all other documents which secure the Loans, are referred to herein as the "Loan Documents."  All of the relevant Loan Documents are attached to the Hotel POC.

[4]    As shown on Schedule A of the Project Note (Hotel POC, Ex. A), the Debtor borrowed $825,000 from CFS Bank on March 29, 1999 when it acquired the Mortgaged Property.  The Debtor then borrowed (i) $575,000 against the Mortgaged Property on May 18, 2000, followed by (ii) $366,288 on July 10, 2001, (iii) $972,020 on September 4, 2002, (iv) $764,345 on October 14, 2004, and (v) $2,226,696 from BFSB on November 8, 2007, at which point all of this debt was consolidated into the Project Note.  From 2000 to 2004, the Debtor extracted $2,677,593 in equity from the Mortgaged Property.

4

10.     On June 17, 2011, BFSB assigned the Loans to Orchard.  (Declaration of Brett Dockwell, March 13, 2015 ("Dockwell Decl."), Ex. 1).

11.     As set forth in the Hotel POC, the Debtor owed Orchard the following amounts under the Loan Documents as of the Petition Date:

| Item | Principal | Interest | Total |
|---|---|---|---|
| Project Loan | 5,500,000 | 4,513,667 | 10,013,667 |
| Building Loan | 7,960,973 | 6,533,305 | 14,494,278 |
| Protective advances | 800,406 | 363,061 | 1,163,467 |
| Receiver expenses | 111,405 | 56,274 | 167,679 |
| Legal expenses | 2,313,610 | 602,241 | 2,915,851 |
| **Total due** | **16,686,394** | **12,068,548** | **28,754,942** |

## B.      The Debtor's Objection to Orchard's Claim

12.     The Debtor challenges Orchard's contractual right to default interest and fees on the ground that the final maturity date of the loans, March 1, 2011, should not be enforced by this Court based on equitable considerations, or was rendered ineffective by BFSB's conduct.

13.     The Debtor makes three arguments in support of its Objection:  (i) that interest should not be payable at the default rate and fees "should be eliminated" based on the application of "the principles of waiver and estoppel to reverse the maturity date" (Obj. ¶ 73); (ii) that Orchard's right to interest at the default rate and fees is unenforceable because "the loans should not have been called in the first place on March 1, 2011" (*id.* ¶ 77); and (iii) that it is not liable for interest at the default rate and fees because BFSB "violated basic principles of good faith and fair dealing" by "retroactively declaring a maturity default on March 1, 2011."  (*Id.* ¶ 80).

5

**14.**     In addition, the Debtor challenges the amount of Orchard's legal fees, claiming Orchard's legal fees "are exponentially higher than they should be." (*Id.* ¶ 88).[5]

**C.     Relevant Provisions of the Loan Documents**

**15.**     The Debtor was represented by counsel, William Wallace ("<u>Wallace</u>") of Favata & Wallace LLP, in negotiating both the Project Loan and the Building Loan. (Dockwell Decl. ¶ 3). Wallace also represented the Debtor as litigation counsel during the state court foreclosure action. (*Id.*).

**1.     The Maturity Date**

**16.**     The final maturity date of the Notes was March 1, 2011. That date was never extended.

**17.**     On the maturity date, "the outstanding balance of the Principal Sum, together with accrued and unpaid interest and any other amounts due and payable to the Holder hereunder, under the Mortgage (as hereinafter defined) or the Loan Documents (as hereinafter defined), shall be due and payable." (Hotel POC, Ex. A [Project Note] § 1, Ex. F [Building Note] § 2).

**18.**     Although the March 1, 2011 maturity date was never extended, an earlier maturity date of the Project Note was extended.

**19.**     The Project Note was initially due to mature on December 1, 2008. In August 2008, the Debtor and BFSB agreed to extend the Project Loan to mature at the same time as the Building Loan. On August 21, 2008, BFSB, the Debtor and Zhavian (as loan guarantor), executed a Loan Modification Agreement that extended the maturity date of the Project Note to

---

[5] The Debtor states that as of the date of its Objection, Orchard had not provided copies of its legal invoices. (Obj. ¶ 84). Copies of Orchard's legal invoices are filed herewith (Dockwell Decl., Ex. 32) and will be delivered in hard copy to the Debtor's counsel.

6

September 1, 2009, with three optional six-month extensions to March 1, 2011.  (Hotel POC, Ex.

C).

20.    All other provisions of the Loan Documents remained unchanged.  (*Id.* ¶ 7).

According to Joanne Gallo ("Gallo"), the head of BFSB's Loan Workout Department, BFSB's

practice was to memorialize any maturity date extension in a written agreement like the 2008

Loan Modification Agreement.  (Dockwell Decl., Ex. 2 [Gallo Dep.] 107:9-25, 110:4-18).

21.    As required by the Loan Documents, the 2008 Loan Modification Agreement was

in writing, signed by BFSB's Chief Lending Officer, and notarized.  The Debtor thus knew from

experience that any extension of the maturity date of the Loans had to be memorialized in a

written agreement signed by BFSB.  This requirement was also plainly stated in each of the

Notes and Mortgages.

22.    It is undisputed that, aside from the 2008 Loan Modification Agreement, there

was never any modification of either Loan's final maturity date.

23.    On May 24, 2011, almost three months after the Loans matured, the Debtor's

counsel, Wallace, wrote to BFSB's counsel requesting that BFSB reinstate the Loans.  Wallace

acknowledged that the Loans had matured on March 1, 2011 and that they had not been

extended.  Wallace wrote:

> I understand that the Loan termed out pursuant to the original Loan
> documents on March 1, 2011 and that our respective clients have
> been discussing an extension of that term so that the project may
> continue and the hotel built.  The purpose of this letter is to provide
> you with certain information which may be helpful to you and your
> client in making a determination as to whether or not the Loan
> term should be extended.

(Dockwell Decl., Ex. 3).  Wallace requested "a written extension of the term of the Loan."  (*Id.*).

BFSB did not respond to Wallace's letter.

7

24.    Wallace's letter, written after the Loans had matured and before any litigation, proves that the Debtor knew that the Loans had not been extended.   Notably absent from Wallace's letter is any allegation that the March 1, 2011 maturity date was "retroactively declared," as the Debtor now alleges.   (*See* Obj. ¶¶ 57, 79).   To the contrary, Wallace stated correctly that the maturity date had not been extended.

25.    The Debtor's counsel also conceded in the state court action that the Debtor never received any written extension.   During oral argument before the state court in July 2012, Wallace confirmed that "the loan on the face of it [termed] out on March 2011, no question." (Dockwell Decl., Ex. 4 [7/31/12 Hr'g] 9:23-10:21).   At a hearing one year later, Wallace again conceded that there was no written extension agreement:   "when we got served with the complaint and prepared an answer and counterclaim, the first thing you do is ask the client:  'I read these documents.  Is there a writing extending this agreement?'  He says, 'they told me, they kept telling me back to August of 2010 don't worry.  Your loan is extended.'"  (*Id*., Ex. 5 [7/9/13 Hr'g] 19:22-20:5).   In other words, the "first thing" Wallace did after reading the Loan Documents was ask the Debtor whether there was *a written extension*.   The Debtor's response then, as now, was in the negative, which disposes of its Objection.

### 2.    The Debtor's Payment Obligations

26.    Each Note provides that the Debtor's "failure to make any payment as and when required under this Note (after a ten day grace period, except that there shall be no grace period for the payment due on the Maturity Date) . . . shall constitute an 'Event of Default' under this Note."  (Hotel POC, Ex. A [Project Note] § 3.1, Ex. F [Building Note] § 4.1).

8

27.    Interest began to accrue at the Default Rate automatically on March 1, 2011, without any action by BFSB.  The Building Note states as follows:

> From and after the occurrence of an Event of Default, regardless of whether or not there has been an acceleration of the indebtedness evidenced by this Note, and *at all times after the maturity of the indebtedness evidenced by this Note (whether by acceleration or otherwise)* interest shall accrue on the outstanding Principal Sum plus accrued and unpaid interest at a rate equal to twenty-four percent (24%) per annum (the "Default Rate") until all sums due under this Note, the Mortgage and the Loan Documents shall be paid in full.

(Hotel POC, Ex. F § 4.4(b); *see also* Ex. A [Project Note] § 3.2) (emphasis added).

28.    None of the Loan Documents required BFSB to notify the Debtor of the maturity date of the Notes, and the Debtor waived any right to such notification.  Each Note states:

> Without limiting any other provisions of the Mortgage or the Loan Documents, *Maker*, for itself and all endorsers, guarantors and sureties of this Note, and their heirs, legal representatives, successors and assigns, *hereby waives presentment for payment, demand, notice of nonpayment*, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and *all other notices in connection with the delivery, acceptance, performance, default or enforcement of the payment of this Note*, except as expressly provided herein or in the Mortgage or any of the Loan Documents.

(Hotel POC, Ex. A [Project Note] § 5, Ex. F [Building Note] § 6) (emphasis added).

29.    The Notes also require the Debtor to pay "all costs and expenses incurred in connection with the pursuit by Holder of any of its rights or remedies hereunder or under the Mortgage or any of the Loan Documents or for the protection of, or realization of, collateral, or in connection with any of Holder's collection efforts . . . all such costs and expenses being payable on demand, together with interest at the Default Rate thereon."  (Hotel POC, Ex. A

9

[Project Note] § 3.3, Ex. F [Building Note] § 4.3).  This provision authorizes the Lender to collect its legal fees and protective advances.[6]

30.    The Debtor acknowledged that its obligations under each Note are "absolute and unconditional" and it waived all defenses in any action to enforce the Note.  Each Note states:

> *Maker acknowledges that this Note and Maker's obligations hereunder are and shall at all times continue to be absolute and unconditional in all respects, and shall at all times be valid and enforceable irrespective of any other agreements or circumstances of any nature whatsoever which might otherwise constitute a defense to this Note and the obligations of Maker hereunder* or the obligations of any other person or party relating to this Note or the obligations of Maker hereunder.  This Note sets forth the entire agreement and understanding of Holder and Maker, and *Maker absolutely, unconditionally and irrevocably waives any and all right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever with respect hereto or the obligations of Maker hereunder* or the obligations of any other person or party relating hereto in any action or proceeding brought by Holder to collect the outstanding balance of the Principal Sum, accrued and unpaid interest, late charges, and other amounts owing, or any portion thereof, or to enforce, foreclose and realize upon the liens created by the Mortgage and any other security document.

(Hotel POC, Ex. A [Project Note] § 8.8, Ex. F [Building Note] § 9.8) (emphasis added).  This provision bars the arguments relied upon by the Debtor in its Objection.

### 3.    No Oral Modifications or Waivers

31.    The crux of the Debtor's Objection is that BFSB, by word or conduct, allegedly extended the maturity date, an argument squarely precluded by the Loan Documents.

---

[6]  Similarly, the Building Loan Mortgage provides that if the Debtor fails to perform its covenants, including the payment of taxes, insurance and maintenance of the Mortgaged Property, "the Mortgagee may make advances to perform the same on Mortgagor's behalf" and the Debtor "shall repay on demand by Mortgagee all such sums so advanced by Mortgagee on Mortgagor's behalf with interest at the Involuntary Rate."  (Hotel POC, Ex. H § 1.10).  The Building Loan Mortgage defines "Involuntary Rate" as "the Default Rate as set forth in the Note."  (*Id.* at 3).

32.    Each Note states:

> *Any waiver hereunder shall be valid and enforceable only if in writing and signed by the party against whom enforcement is sought, and then only to the extent therein set forth.* The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law and may be exercised singly or concurrently. *No executory agreement unless in writing and signed by Holder, and no course of dealing between Maker, the endorser(s) or guarantor(s) hereof, or any of them, shall be effective to change or modify or discharge, in whole or in part, this Note.*

(Hotel POC, Ex. A [Project Note] § 8.7, Ex. F [Building Note] § 9.7) (emphasis added).   In addition, each Note "may not be terminated or amended orally, but only by a termination or amendment in writing signed by Holder."  (*Id*., Ex. A § 8.1, Ex. F § 9.1).

33.    The Building Loan Mortgage contains an express acknowledgement by the Debtor that none of the Loan Documents can be modified or waived orally.  The express purpose of this provision is to preclude exactly the type of claims that the Debtor makes in its Objection. The Building Loan Mortgage states as follows –

> The Mortgagor recognizes that, in general, borrowers who experience difficulties in honoring their loan obligations, in an effort to inhibit or impede lenders from exercising the rights and remedies available to lenders pursuant to mortgages, notes, loan agreements or other instruments evidencing or affecting loan transactions, *frequently present in court the argument, without merit, that some loan officer or administrator of the lender made an oral modification or made some statement that could be interpreted as an extension or modification or amendment of one or more debt instruments and that the borrower relied to its detriment upon such "oral modification of the loan document". For that reason, and in order to protect the Mortgagee from such allegations in connection with the transactions contemplated by this Mortgage and the Building Loan Agreement*, the Mortgagor acknowledges that this Mortgage, the Note, the Building Loan Agreement, and all instruments referred to in any of them can be extended, modified or amended only in writing executed by the Mortgagee and that *none of the rights or benefits of the Mortgagee can be waived permanently except in a written document executed*

11

> *by the Mortgagee. The Mortgagor further acknowledges the Mortgagor's understanding that no officer or administrator of the Mortgagee has the power or the authority from the Mortgagee to make an oral extension or modification or amendment of any such instrument or agreement on behalf of the Mortgagee.*

(Hotel POC, Ex. H § 3.21) (emphasis added).

34.    The Building Loan Agreement also prohibits oral modifications or waivers: "Neither this Agreement nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument."  (Hotel POC, Ex. G § 7.1).

35.    These provisions were the basis for the state court decisions holding that the Debtor could not have reasonably relied on any alleged modification of the Loans unless it was embodied in a written, signed agreement like the 2008 Loan Modification Agreement.  As the original state trial court judge held:   "In light of these bargained-for, and agreed-upon, contractual provisions, the allegation that DAB justifiably relied on unsigned, unwritten representations by agents acting on behalf of Brooklyn [Federal] or State Bank, cannot be credited."  (Dockwell Decl., Ex. 6 [3/30/12 Order] at 7).  The Appellate Division affirmed the trial court, holding that the Debtor failed "to allege the requisite reasonable reliance" because the Loan Documents "expressly prohibit oral termination or amendment and provide for termination or amendment only in writing signed by Brooklyn Federal."  (*Id.*, Ex. 7 [5/28/13 Order] at 55). The Appellate Division re-affirmed that holding in a subsequent decision and order.  (*Id.*, Ex. 8 [2/18/14 Order]).  These decisions are law of the case and remain binding notwithstanding the March 21, 2014 ruling cited by the Debtor, which was subject to an active appeal stayed by the Debtor's chapter 11 petition.

12

## I.  THE DEBTOR IS COLLATERALLY ESTOPPED FROM RELITIGATING THE MATURITY OF THE LOANS

36.    Each of the Debtor's arguments against Orchard's contractual right to interest at the Default Rate and fees is premised on a purported extension of the Loans' final maturity date of March 1, 2011.  However, the issue of the Loans' maturity date was fully litigated in the state court foreclosure action and was the subject of three decisions and orders – (i) a memorandum decision and order entered by the trial court (the "Trial Court"), Justice Bernard Fried, on March 30, 2012, (ii) an affirmance of Justice Fried's order by the Appellate Division entered on May 28, 2013, and (iii) a second order by the Appellate Division entered on February 18, 2014.

37.    The Objection ignores these three prior decisions.  Instead, the Debtor focuses on a March 21, 2014 decision of a new Trial Court judge, Justice Charles Ramos, who was assigned the action after Justice Fried retired.  In the March 21 decision, Justice Ramos found, *inter alia*, a triable issue of fact regarding the Debtor's purported reliance on alleged statements and actions of BFSB.[7]  However, the March 21 Ramos Ruling squarely contradicts the prior orders of the Appellate Division – a higher court – and thus cannot be relied upon by this or any other court. Orchard's fully perfected appeal of the March 21 Ramos Ruling was pending when the Debtor filed its chapter 11 petition.  Orchard has moved for partial relief from the automatic stay so that this Court may, if it deems appropriate, permit the Appellate Division to rule on Orchard's appeal.  (Dkt. No. 100).

---

[7]  The erroneous branch of the March 21, 2014 Trial Court decision is referred to in this brief as the "March 21 Ramos Ruling" and is independent of the other branches of the March 21 decision, none of which is at issue.  Orchard's appeal of the March 21 decision relates solely to the March 21 Ramos Ruling.  The Debtor has not appealed any part of the March 21 decision. Flintlock Construction and Development LLC, a mechanic's lienor, has filed a notice of appeal of unspecified portions of the March 21 decision but has not perfected any appeal.

38.     However, this Court can also resolve the Debtor's Objection without recourse to the Appellate Division, by applying basic principles of judicial administration.  As explained below, the Trial Court cannot overrule the Appellate Division and thus the March 21 Ramos Ruling has no precedential value.  Furthermore, under the doctrine of collateral estoppel, the Appellate Division's February 18, 2014 order precludes the Debtor from re-litigating the same issues in another proceeding, including this chapter 11 case.  Under these principles, the March 21 Ramos Ruling is entitled to no weight, and the Debtor, having lost in the state court, cannot contest the maturity date of the Loans again here.

**A.      The State Court Orders**

39.     On July 1, 2011, Orchard filed an action in the state court to foreclose the Mortgages.  The Debtor answered and asserted three counterclaims against Orchard and BFSB. (Dockwell Decl., Ex. 9).

40.     As relevant here, the Debtor pled a combination counterclaim and affirmative defense, alleging that BFSB misrepresented to the Debtor that the maturity date of the Loans would be extended beyond March 1, 2011.  The Debtor characterized its allegations as a counterclaim for fraud and an affirmative defense of estoppel.  (*See id.* ¶ 16).

41.     In opposition to Orchard's motion to dismiss, the Debtor supplemented its answer with an affidavit from Zhavian alleging additional facts.  The Debtor alleged that it was assured by agents of BFSB that the Loans' March 1, 2011 maturity date would be extended.  (*Id.*, Ex. 10 [Zhavian Aff.] ¶¶ 21, 23, 30).  The Debtor conceded that there was no written extension agreement.  (*See* ¶¶ 24-26 above)

**1.      Justice Fried's March 30, 2012 Decision and Order and the Appellate Division's May 28, 2013 Affirmance**

14

42.    Justice Fried's March 30, 2012 order dismissed the Debtor's counterclaims, including its fraud counterclaim, which is identical to its estoppel defense.  As Justice Fried explained, the Loan Documents are replete with provisions prohibiting oral modifications and the Debtor "does not dispute that these provisions are contained within the valid, binding agreements between the parties." (*Id.*, Ex. 6 at 7).  These provisions prevented the Debtor from demonstrating reasonable reliance on any purported misrepresentations by BFSB as a matter of law.  (*Id.*).

43.    Justice Fried's decision was affirmed by the Appellate Division by Decision and Order entered May 28, 2013.  The Appellate Division held that:

> The loan documents expressly prohibit oral termination or amendment and provide for termination or amendment only in writing signed by Brooklyn Federal, and in the mortgage agreement D.A.B. acknowledged that the mortgage and all the other documents could be extended, modified or amended only in writing executed by Brooklyn Federal, and that no officer or administrator of the bank had the power or authority from the bank to make an oral extension or modification or amendment on any of the loan documents on its behalf.

(*Id.*, Ex. 7 at 55).  As a result, the First Department concluded, as did Justice Fried, that the Debtor could not establish reasonable reliance as a matter of law.  (*Id.*).

**2.    The Appellate Division's February 18, 2014 Order**

44.    In June 2012, Justice Fried retired and the action was reassigned to Justice Ramos.  Taking advantage of the change in judges, the Debtor falsely claimed it had been denied depositions of BFSB employees, and Justice Ramos directed the parties to undertake additional discovery.  (These events are recounted in Section III below.)

45.    Following almost one year of discovery and four oral arguments, on July 9, 2013 Justice Ramos vacated Justice Fried's affirmed March 30, 2012 order.  "Judge Fried's decision is withdrawn by me because now I am the judge." (*Id.*, Ex. 5 [7/9/13 Hr'g] 30:6-7).  Without a

15

prior request or a proffered pleading, Justice Ramos, *sua sponte*, directed the Debtor to file an amended pleading referencing an internal BFSB memorandum that the Debtor obtained through new discovery (the "Action Plan"). (*Id.*, Ex. 11). These bench rulings were memorialized in an order entered on August 28, 2013.

46.     The Debtor filed an amended answer and counterclaims on August 8, 2013, alleging affirmative defenses of waiver, estoppel, and "bad faith and lack of fair dealing," and counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. (*Id.*, Ex. 12 ¶¶ 54-61, 72-75, 82-90, 98-121).

47.     Orchard appealed Justice Ramos' decision. The central issue raised by the appeal was whether the Debtor had any viable defense to the Mortgages. Orchard's appellate brief addressed each of the Debtor's affirmative defenses and counterclaims. (*Id.*, Ex. 13 at 55-58).

48.     On February 18, 2014, the Appellate Division reversed Justice Ramos' August 28, 2013 order, reinstating Justice Fried's decision and vacating the Debtor's amended pleading, which the Appellate Division held lacked merit. (*Id.*, Ex. 8)

49.     As in its May 28, 2013 decision, the Appellate Division held that the Debtor could not establish reasonable reliance on any oral representations by BFSB under any legal theory.

50.     The Appellate Division further held that the Action Plan was not an enforceable written modification of the Loans, as required by the Loan Documents, and therefore could not have been reasonably relied upon by the Debtor:

> [The] Action Plan, dated February 15, 2011, was unenforceable because it was an internal bank document that the Office of Thrift Supervision (OTS), the federal oversight agency, never approved – an unfulfilled condition precedent. In addition, Brooklyn Federal ultimately rescinded the Action Plan pursuant to a March 22, 2011 memorandum that it issued prior to OTS's consideration of an extension. Thus, the Action Plan provides no basis to find that

16

> there was reasonable reliance on a writing that extended the loans'
> maturity date.

(*Id.* at 26-27).

51.    The Appellate Division also held that the Action Plan could not be used to bolster

the Debtor's claims of oral misrepresentations because, during the events at issue, the Debtor did

not even know the Action Plan existed.

> Further, even if this Court were to consider this document an
> indication of misrepresentation, DAB cannot establish that it
> reasonably relied upon the Action Plan – a document it was
> unaware of until May 2013 – because it was an internal document
> that was not communicated, delivered or presented to DAB.

(*Id.* at 27).

52.    The Appellate Division also held that the Debtor's proposed amended pleading,

which included the same allegations made in the Objection, "lacks merit." (*Id*. at 29).

### 3.    Justice Ramos' March 21 Ruling

53.    Upon remand, the Trial Court ruled on Orchard's summary judgment motion,

which was then pending.   Disregarding the Appellate Division's repeated holdings that the

Debtor could not have reasonably relied on a purported oral extension of the Loans, on March

28, 2014, Justice Ramos denied Orchard's motion for summary judgment.    (Obj., Ex. B).

Although the court found that Orchard had established its right to foreclose the Mortgages and

that the Debtor's opposition was based on "identical arguments . . . as it made previously in its

counterclaims, which were dismissed," the Trial Court nevertheless found that a "fact-finder

must assess whether DAB was misled or that [sic] it 'significantly and justifiably relied' on these

assurances and conduct." (*Id*. at 11).  This ruling was based on precisely the same factual record

as the Appellate Division's February 18, 2014 decision, and directly contravenes the Appellate

Division's holding that the Debtor cannot establish reasonable reliance as a matter of law.

54.    Orchard immediately appealed the March 21 Ramos Ruling to the Appellate Division.  Neither Orchard nor the Debtor appealed any other branch of the March 21 decision. Orchard perfected its appeal on July 7, 2014.

55.    The Debtor's deadline to oppose the appeal was August 6, 2014.  To avoid an adverse ruling in the Appellate Division, the Debtor commenced this chapter 11 proceeding on July 14, 2014.

**B.    The March 21 Ramos Ruling Is Entitled to No Weight Because the Trial Court Lacked the Authority to Overrule the Appellate Division**

56.    The Debtor asserts that the March 21 Ramos Ruling "provides an important framework for the Objection [and] blunts any argument that the Debtor is precluded from raising defenses to default interest and attorneys' fees because its 'lender liability' based counterclaims were dismissed by the Appellate Division."  (Obj. ¶ 9).

57.    The Debtor's argument ignores basic principles of judicial authority.  The fact that the March 21 Ramos Ruling "was the last state court ruling prior to the commencement of bankruptcy" (Obj. ¶ 9) does not, as the Debtor mistakenly asserts, give the ruling precedence over the prior Appellate Division decisions.[8]

58.    Trial courts lack subject matter jurisdiction to contravene the decisions of the Appellate Division.   "Trial courts are without authority to vacate or modify orders of the Appellate Division, or to reverse holdings of this court."  *Maracina v. Schirrmeister*, 152 A.D.2d 502, 502-503 (1st Dep't 1989); *see also Fleet Credit Corp. v. Cabin Serv. Co*., 210 A.D.2d 57, 57 (1st Dep't 1994) (same).  "Justice Ramos lacked the subject matter jurisdiction or the power

---

[8]    This argument is also disingenuous given that the Debtor's bankruptcy filing was timed to preempt the Appellate Division from considering Orchard's appeal of the March 21 Ramos Ruling.

to, in effect, reverse this Court by modifying the MSA." *State v. Philip Morris, Inc.*, 308 A.D.2d 57, 66 (1st Dep't 2003).[9]

59.    All three prior decisions squarely addressed the issue of reasonable reliance and held that the Debtor's allegations of reasonable reliance fail as a matter of law.  These holdings precluded Justice Ramos from finding that the Debtor might be able to establish reasonable reliance based on the same factual record that was presented to the Appellate Division.  "An appellate court's resolution of an issue on a prior appeal constitutes the law of the case and is binding on the Supreme Court [*i.e.*, the Trial Court] . . . [and] operates to foreclose re-examination of [the] question absent a showing of subsequent evidence or change of law." *Carmona v. Mathisson*, 92 A.D.3d 492, 493 (1st Dep't 2012) (quoting *Kenney v. City of New York*, 74 A.D.3d 630, 630-31 (1st Dep't 2010)); *In re Jennifer G.*, 110 A.D.2d 801, 801 (2d Dep't 1985) ("Trial Judges cannot flout the remittitur of this court, either expressly or implicitly.").

60.    The March 21 Ramos Ruling was not based on new evidence or a change of law, and thus the issue of reasonable reliance is controlled by Justice Fried's March 30, 2012 decision and the Appellate Division's two decisions, not Justice Ramos' March 21 Ruling.  By disregarding the prior orders of the Appellate Division, Justice Ramos exceeded his authority, and the March 21 Ramos Ruling is entitled to no weight.

---

[9]    Justice Ramos also lacked the power to disregard Justice Fried's March 30, 2012 decision and reopen inquiry into the Debtor's purported reasonable reliance.  "The ruling issued by Justice [Fried] on this question remains the law of the case, and it may not be contravened by a court of coordinate jurisdiction." *Grossman v. Meller*, 213 A.D.2d 221, 224 (1st Dep't 1995). *See also Forbush v. Forbush*, 115 A.D.2d 335, 336 (4th Dep't 1985) ("It is fundamental that a Judge may not review or overrule an order of another Judge of co-ordinate jurisdiction in the same action or proceeding.") (citation omitted).

61.    Additionally, even assuming that the March 21 Ramos Ruling were entitled to any weight, it limits the Defendant's estoppel defense solely to the issues surrounding the construction agreement with Flintlock;[10] however, this defense was (i) disposed of in Justice Fried's prior and binding ruling,[11] and (ii) as discussed below, is factually inaccurate.

## C.    The Debtor Is Collaterally Estopped from Contesting the March 1, 2011 Maturity Date

62.    The Debtor's grounds for its objection – waiver and estoppel, breach of contract and breach of the implied covenant of good faith and fair dealing – are barred by the prior state court rulings, and in particular the Appellate Division's February 18, 2014 decision and order.

63.    The preclusive effect of a state court decision is determined under state law. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  Under New York law, the doctrine of collateral estoppel prohibits a party from "relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same."  *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500 (1984).  Collateral estoppel has two elements:  "First, the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action.  Second, the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination."

---

[10]    The March 21 Ramos Ruling states, in pertinent part, that "DAB's estoppels defense is premised upon BFSB's conduct in approving the new contract with Flintlock as general contractor calling for the completion of the project within the 430 day period from the contract's approval and the commencement of the work in August 2010, or until November 2011." March 21 Ramos Ruling at 7.  Justice Ramos determined that this agreement manufactured an issue of fact. *Id.*

[11]    Justice Fried noted that "DAB further alleges that in connection with" negotiations over an extension of the maturity date, BFSB "approved a general contract between DAB and [Flintlock]."  Justice Fried Order dated March 30, 2012 at 5.  Justice Fried proceeded to dismiss DAB's defenses notwithstanding the existence of the Flintlock contract.

*D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 76 N.Y.2d 659, 664 (1990) (internal citations omitted); *Kulak*, 88 F.3d at 72 (same). Both of these elements are met here.

64.    First, the Appellate Division necessarily decided the very same purported defenses that the Debtor now asserts in its Objection. The central issue decided by the Appellate Division in its February 18, 2014 order was whether the Trial Court rightly granted the Debtor leave to amend its answer and counterclaims. (Dockwell Decl., Ex. 8 at 25). Under New York law, leave to amend a pleading "should be freely granted unless the proposed amendment is palpably insufficient to state a cause of action or is patently devoid of merit." *Bishop v. Maurer*, 83 A.D.3d 483, 485 (1st Dep't 2011) (citation omitted). The Debtor's Amended Answer and Counterclaims, which was considered by the Appellate Division, included defenses of waiver, estoppel, and breach of the implied covenant of good faith and fair dealing, and counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. (Dockwell Decl., Ex. 12 ¶¶ 54-61, 72-75, 82-90, 98-121). These very same theories form the Debtor's Objection. (Obj. ¶¶ 73, 77, 80).

65.    The Appellate Division vacated the Debtor's Amended Answer and Counterclaims. Citing the *Bishop* case quoted above, the Appellate Division held that "the proposed amendment lacks merit." (Dockwell Decl., Ex. 8 at 29). In reaching this holding, the Appellate Division necessarily decided that the Debtor's proposed defenses and counterclaims – including the very same defenses raised in the Objection – were palpably insufficient to state a cause of action or patently devoid of merit. The Appellate Division reached its decision based on a 2,990-page record, which included virtually all the evidence cited by the Debtor here. The Appellate Division's rejection of the Debtor's arguments is decisive here because it disposes of the grounds for the Debtor's Objection. Thus, the first element of collateral estoppel is satisfied.

66.     The second element – a full and fair opportunity to contest the issues – is also satisfied.  The Debtor submitted a comprehensive opposition brief to the Appellate Division and the Debtor's counsel orally argued its opposition before a five-judge appellate panel.  (*Id*. ¶ 18, Ex. 14).  Upon entry of the February 18, 2014 order, the Debtor could have sought leave to appeal the order to the Court of Appeals or moved for reconsideration by the Appellate Division, but it failed to do so.  The Appellate Division's order is thus final and non-appealable.  *See* CPLR § 5513.

67.     Because the elements of collateral estoppel are satisfied and each of the grounds for the Debtor's Objection was decided against the Debtor in state court, the Debtor is not permitted to re-litigate its claims here.  *D'Arata*, 76 N.Y.2d at 664-66 (1990); *see also In re 56 Walker LLC*, No. 13-11571 (ALG), 2014 Bankr. LEXIS 1160, at *7 (Bankr. S.D.N.Y. March 25, 2014) (debtor collaterally estopped from re-litigating issues decided in state court foreclosure action).

## II.  THE DEBTOR'S ALLEGATIONS ARE SUBSTANTIVELY MERITLESS

68.     Even if the Debtor's allegations were not precluded by the state court decisions, the Debtor's Objection must be denied because it is substantively meritless.

69.     The Debtor's allegations arise from the Debtor's hiring of a new general contractor in March 2010.  The Debtor's contract with the new contractor, Flintlock Construction Services, LLC ("Flintlock"), provided for substantial completion of construction "not later than 430 (calendar) days" from the commencement of work.  (Obj., Ex. F § 3.3).  The Debtor alleges that BFSB "expressly approved" Flintlock's contract, which "went into effect on or about August 26, 2010 and provided for a revised completion date of 430 days that went well beyond the March 1, 2011 maturity date into late November 2011."  (Obj. ¶ 12).  Based on these allegations,

22

the Debtor contends that the March 1, 2011 maturity date should not be enforced by this Court, allowing the Debtor to avoid its contractual obligation to pay default interest and fees.

70.    However, the Debtor's allegations are squarely contradicted by contemporaneous documents and by deposition testimony.  Although the Debtor claims the Loans were extended "on or about August 26, 2010," the Debtor wrote to BFSB on October 4, 2010 to exercise its final contractual extension to March 1, 2011.  The Debtor would not have sought to extend the Loans on October 4, 2010 if, as the Debtor now alleges, it believed the Loans had already been extended to "late November 2011."  All three BFSB witnesses testified that they did not discuss Flintlock's "430-day" construction timetable with the Debtor, much less assure the Debtor that the March 1, 2011 date would be extended.  (*See* ¶¶ 86, 93 below).

71.    The Debtor's argument also makes no sense.  If the Debtor's allegations were true, the Notes' maturity date would have been rendered vague or nonexistent.  Four-hundred thirty days from "about August 26, 2010" is not an enforceable maturity date, nor is "late November."  Even the math does not work:  430 days from August 26, 2010 is October 30, 2011, not "late November 2011."  A maturity date is an essential term of any loan obligation, yet the Debtor's allegations do not provide one.  A promise like the Debtor alleges here, in which an essential term is impossible to determine, is by its nature unenforceable.  (*See* ¶¶ 129-130 below).

72.    In any event, the Debtor's argument suffers from a more profound problem, which is that the Debtor's own misconduct ensured that the Loans would not be extended.  In early 2011, the Debtor requested an extension of the Loans, and BFSB processed the request internally.  At that time, BFSB was a failing bank and its loan portfolio was under the control of federal regulators at the Office of Thrift Supervision ("OTS").  BFSB requested authority from

23

OTS to potentially modify the Loans, but after the request was made and before approval was granted, BFSB caught the Debtor misappropriating Building Loan trust funds, which is a crime. Unable to trust the Debtor and concerned that extending the Loans would expose the bank to unacceptable risks, BFSB elected, with approval from OTS, to sell the Loans.

73.    Because the Objection is substantively meritless, Orchard's claim must be allowed in its entirety.

## A.    Factual Background

74.    The factual record in this case is well developed.  During litigation in the state court, the Debtor served two rounds of document requests and deposed four witnesses to bolster its allegations.  (Dockwell Decl. ¶ 71).  However, the depositions were disastrous for the Debtor's case.  The witnesses repudiated the Debtor's allegations and cataloged the Debtor's duplicity and misconduct.  This testimony was particularly damning for the Debtor, not only because the Debtor chose these witnesses, but also because three of the witnesses were former BFSB employees who had nothing to gain by disparaging the Debtor.  By the time the depositions were taken, BFSB was out of business and all three BFSB witnesses were employed elsewhere.  The outcome of the state court litigation was irrelevant to these witnesses, personally and professionally, making them particularly credible.  Not a single line of testimony from these witnesses appears in the Objection, and it is easy to understand why:  the deposition testimony, like the documentary evidence, squarely contradicts the Debtor's version of events.

### 1.    The Debtor's Dispute with Cava Construction & Development and Cava's Filing of a Mechanic's Lien

75.    The Debtor's project did not proceed as planned.  Following a series of disputes between the Debtor and its original general contractor, Cava Construction & Development, Inc. ("Cava"), including Zhavian's alleged assault of Cava's superintendent, the Debtor fired Cava in

24

early 2010.[12]    On February 23, 2010, Cava filed a $959,000 mechanic's lien against the Mortgaged Property (the "Cava Lien").  (Orchard Construction, LLC Proof of Claim (Claim No. 10), filed December 10, 2014 ("Construction POC"), Ex. A).  Cava and the Debtor arbitrated Cava's claim, and the arbitrator ruled that the Debtor had materially breached its contractual obligations to Cava and awarded Cava $1.1 million in damages.  (Construction POC, Ex. C).

76.    The Debtor never satisfied Cava's award, in whole or in part, and it did not bond the Cava Lien, which remains pending against the Mortgaged Property.[13]

77.    After terminating Cava, the Debtor retained Flintlock as its new general contractor on March 30, 2010.  (Obj., Ex. F).  However, to satisfy the conditions precedent for new Building Loan advances, the Debtor was required to remove or bond the Cava Lien.  (Hotel POC, Ex. G [Building Loan Agrmt.] §§ 2.3(f), 5.1(k)).  As long as the Cava Lien remained pending against the Mortgaged Property, the lien would have priority over any new advances by BFSB, thereby subjecting BFSB to the risk that its security interest in those advances could be wiped out if Cava foreclosed its lien.  BFSB was not contractually obligated to advance funds in such circumstances.

## 2.    The August 2010 Workout

78.    Unable or unwilling to satisfy the Cava Lien, the Debtor nonetheless pressed BFSB to make new advances under the Building Loan.

---

[12]    The construction superintendent's record book documents repeated disputes with the Debtor.  (*See, e.g*., Dockwell Decl., Ex. 15 at 3/17/09, 4/6/09, 9/22/09).  The entry for November 11, 2009 states that Zhavian "hit me in the chest with a bottle of water and told me to get out and everyone else was thrown out.  Just another hissy fit, but this time he [is] throwing shit at me." (*Id.* at 11/11/09).

[13]    Orchard Construction, LLC ("Orchard Construction"), an affiliate of Orchard, purchased Cava's Lien and all related rights and claims pre-petition on August 23, 2011.

79.     To accommodate the Debtor, BFSB agreed to make construction advances if the Debtor permitted BFSB to reserve $960,000 from undisbursed Building Loan funds so that BFSB could pay off the Cava Lien if the Debtor failed to satisfy it.   BFSB ended up never drawing on this reserve and the funds were never charged to the Debtor.

80.     The Debtor incorrectly states that the $960,000 carveout was placed in "escrow" and accuses Orchard of "bad faith" by not paying off the Cava Lien.   (Obj. ¶ 6, n.1).   This accusation is both meritless and illogical.   The $960,000 was never advanced and thus never placed in escrow.   (Dockwell Decl., Ex. 16 [Gallo Aff.] ¶ 11).   This arrangement was solely to protect BFSB and, as Justice Fried and the Appellate Division both found, BFSB was not obligated to pay off the Cava Lien.   (*Id.*, Ex. 6 [3/30/12 Order] at 11-12; Ex. 7 [5/28/13 Order] at 56-57).   Moreover, if BFSB or Orchard had paid off the Cava Lien, the Debtor would be in a *worse* position today because it would be obligated to repay an additional $1.1 million to Orchard and pay interest at the Default Rate on that amount under the Loan Documents.   (Hotel POC, Ex. H [Building Mortgage] §§ 1.08, 1.10).

81.     On August 26, 2010, the Debtor, Zhavian, and Flintlock executed an Affidavit and Estoppel Certificate (the "Estoppel Certificate") in which they acknowledged and agreed to BFSB's reservation of the $960,000.   (Hotel POC, Ex. D).

82.     The August 2010 workout later became the basis for the Debtor's claim that the Loans had been extended.   (Dockwell Decl., Ex. 10 [Zhavian Aff.] ¶¶ 21, 23, 30).   In the Objection, the Debtor repeatedly asserts that BFSB "expressly approved" the Flintlock contract, implying that BFSB had acquiesced to fund construction until the project was complete.   (Obj. ¶¶ 12, 13, 50).

26

83.    However, the Debtor does not cite any evidence to support these allegations, because there is none.  In fact, the Debtor's own contemporaneous correspondence conclusively disproves the Debtor's allegations that the Loans were extended for 430 days as of August 26, 2010.  In a letter dated September 1, 2010 and signed on October 4, 2010, the Debtor exercised its final extension option under the Loan Documents, extending the maturity date from September 1, 2010 to March 1, 2011.  The letter reads:  "This letter is to inform you of my request for a 6-month renewal option on the above referenced loan."  (Dockwell Decl., Ex. 17).  If, as the Debtor now claims, the Loans had been extended on August 26, 2010 for 430 days, then the Debtor would have had no need to exercise an extension option some six weeks later, extending the Loans for only 180 days.  The October 4, 2010 letter refutes the Debtor's present allegations and establishes that the Debtor never believed that the Loans were extended beyond March 1, 2011.

84.    Furthermore, the Estoppel Certificate, the Flintlock contract and deposition testimony from the three BFSB witnesses all rebut the Debtor's allegations.  The Debtor acknowledged in the Estoppel Certificate, executed on August 26, 2010, that the Loan Documents remained unchanged:

> Borrower agrees that a novation is expressly denied and not intended to be effected, and except as amended or modified by this Agreement, the terms, provisions, conditions, rights, duties and obligations contained in the Loan Documents shall remain unchanged and unimpaired by this Certificate and are in full force and effect.

(Hotel POC, Ex. D at 2).  The Debtor also acknowledged that BFSB "shall have no obligation to provide any Advances to Contractor or Borrower except as provided for in the Building Loan Agreement and based upon the Advances to date as detailed in this Certificate."  (*Id.*).  Under the

Building Loan Agreement, BFSB's funding obligations ended on March 1, 2011, not November 2011.  (Hotel POC, Ex. G § 1.25).

85.    The Flintlock contract also does not support the Debtor's allegations.    The Flintlock contract is between the Debtor and Flintlock and does not involve or even mention BFSB, nor does it mention the Loans or any maturity date.  (Obj., Ex. F).  In three years of litigation, the Debtor never identified a shred of evidence that BFSB discussed the "430-day construction period" with the Debtor or provided assurances regarding future construction advances.    The Debtor has never, for example, produced any correspondence or cited any deposition testimony in which someone from BFSB acknowledged that they were aware of a "430-day" deadline buried in a construction contract to which BFSB was not even a party.

86.    Nor does the deposition testimony support the Debtor's allegations.  None of the BFSB witnesses, all of whom were selected by the Debtor, "approved" the Flintlock contract. Bruce Gordon ("Gordon"), a consultant in BFSB's Loan Workout Department, testified that he had no involvement whatsoever with the Flintlock contract.  (Dockwell Decl., Ex. 18 [Gordon Dep.] 44:17-21).  Likewise, Gallo, the head of BFSB's Loan Workout Department, testified that she was not aware of any "approval" of the Flintlock contract and did not recall any discussion with anyone from either the Debtor or Flintlock regarding a construction completion date or "430 days." (*Id.*, Ex. 2 [Gallo Dep.] 27:11-15, 91:18-23, 124:5-13, 125:11-126:5).  Gallo did not even review the Flintlock contract and testified that if anyone from BFSB reviewed the contract, it would have been the bank's construction lending officer, Richard Maher ("Maher").  (*Id.* 28:16-29:3).  When Maher was asked about the purported approval, he testified as follows:

> I believe they [Flintlock] were *approved to do the work*, that we
> felt comfortable with their capacity and experience and size of
> their company to perform the job and get the job done, and
> everyone being cognizant of the mid November time frame

28

> deadline. *I don't remember them, the board or counsel reviewing*
> *their contract, the actual, you know, document to bless this*
> *particular document* in terms of approving them to do the work.

(*Id.*, Ex. 19 [Maher Dep.] 59:17-60:2) (emphasis added).[14]  In short, the evidence refutes the

Debtor's claim that BFSB "approved" the Flintlock contract or was even aware of Flintlock's

construction schedule.[15]

87.    Finally, none of the purported evidence cited by the Debtor in its Objection

supports its allegations.  For example, the Debtor cites a March 2011 meeting and quotes at

length from so-called "meeting notes" taken by Nick Zagami, who is identified as "the Debtor's

representative."  (Obj. ¶ 60).  However, the "meeting notes" are not meeting notes at all.  The

Debtor is quoting from an email sent to the Debtor's attorney on September 3, 2012, more than

18 months after the date of the alleged meeting and, more importantly, 15 months after

commencement of the foreclosure action.  (Obj., Ex. O).  The "meeting notes" are nothing more

---

[14]  The "mid November time frame" referenced by Maher was an interim deadline of November 18, 2010 to complete certain construction work to preserve the Mortgaged Property's zoning entitlements.  (*Id.*, Ex. 19 [Maher Dep.] 89:22-24; Ex. 2 [Gallo Dep.] 23:17-24, 40:22-41:5).  It did not refer to the scheduled completion date for the entire project, which was March 1, 2011 under the Building Loan Agreement.  (*See* ¶ 181 below).

[15]  The Trial Court's assertion in the March 21 Ramos Ruling that BFSB "was demonstrably aware" of the construction timetable when it purportedly "approved the Flintlock contract in late August 2010" (Obj., Ex. B at 9) is contradicted by the very testimony cited by the court, in which Gallo said that she first learned of Flintlock's construction timetable in November or December 2010 or early 2011.  (Dockwell Decl., Ex. 2 [Gallo Dep.] 18:22-19:2, 30:14-31:24).  Moreover, as stated above, Gallo testified that she never reviewed the Flintlock contract and was unaware of anyone from BFSB "approving" it.  (*Id.* 27:11-28:25, 91:12-15, 124:5-126:5).  The cited portions of Maher's deposition transcript are similarly unavailing.  Although Maher testified that he was aware of Flintlock's construction schedule, he stated repeatedly that he did not have knowledge of any discussions regarding a potential extension of the Loans.  (*Id.*, Ex. 19 [Maher Dep.] 29:17-30:9, 66:23-67:23).  Furthermore, the Trial Court overlooked Maher's testimony stating that although BFSB approved of Flintlock *as a contractor*, Maher did not recall anyone reviewing the Flintlock contract.  (*Id.* 59:9-60:2).  Most importantly, the Trial Court failed to address the contemporaneous correspondence from the Debtor on October 4, 2010, which disproves the Debtor's claims.  (*Id.*, Ex. 17).  (*See* ¶ 83 above).

than manufactured hearsay created for use in the litigation.  Moreover, Zagami's email actually undermines the Debtor's claims because, according to Zagami, BFSB representatives (who are unidentified) said they "*believed* that the extension would be granted."  (*Id.*) (emphasis added).  This contradicts the Debtor's claim that BFSB assured the Debtor that "funding for the project *would* continue."  (Obj. ¶ 59) (emphasis added).[16]

88.    The Debtor also cites an email dated August 24, 2010 from Jack Rosenfield to Zhavian in which Rosenfield writes that "[i]t is our most sincere wish that the construction goes smoothly and that a year and a half from now we are celebrating your hotel!"  (Obj., Ex. G).  However, this email does not mention the maturity date of the Loans or reference an extension, and in any case it merely expresses Rosenfield's "*sincere wish*," not a commitment.  (*Id.*).  Moreover, although the Debtor states that Rosenfield was "one of BFSB's representatives," Rosenfield's email is sent from a "Gmail" account, not a BFSB account.  (*Id.*).  In fact, the Debtor truncates the email, deleting Rosenfield's signature block, which identifies Rosenfield as an "Independent CRE Workout Consultant," not a BFSB employee.  (A copy of the full email is attached as Dockwell Decl., Ex. 20).

89.    The Debtor's unsubstantiated assertion that Christopher Koch, a third-party engineer, approved the Flintlock contract is meaningless.  (Obj. ¶ 12).  Koch was retained by BFSB to monitor construction and was not a bank employee and was not authorized to act on

---

[16]   The email from Edward Mills, while ambiguous, also appears to refute the Debtor's claim.  (Obj., Ex. N).  First, Mills thanks Gallo and Maher for their "candor," which suggests they conveyed hard truths, not an assurance of an extension.  Second, Mills reviews the Mortgaged Property's shared zoning rights and states that it "will complicate future actions on everyone's part."  However, the Mortgaged Property's zoning rights would not "complicate future actions" if BFSB extended the Loans, suggesting that the prospect of foreclosure had been discussed.  Finally, Mills' statement that "we also would like the project to continue" appears to refer to a statement made by Chip Weiss of Flintlock, not someone at BFSB.

behalf of BFSB.  (*See* Dockwell Decl., Ex. 18 [Gordon Dep.] 40:3-11).  In fact, the Construction

Progress Review submitted by the Debtor with its Objection states that "Mr. Chris Koch, P.E.,

Koch Engineering P.C., [is the] *third party engineering consultant to Brooklyn Federal Savings

Bank*."  (Obj., Ex. J at 6) (emphasis added).[17]  The Debtor could not have reasonably believed

that a "third party engineering consultant" had the authority to modify the maturity date of the

Loans.

### 3.    The Debtor's Extension Request

90.    In early 2011, the Debtor asked BFSB to extend the final maturity date of the

Loans beyond March 1, 2011.  (*See* Dockwell Decl., Ex. 18 [Gordon Dep.] 24:6-13).

91.    BFSB processed the Debtor's request through the requisite channels, beginning

with an internal memorandum dated February 15, 2011 from the bank's Loan Workout

Department called a "Commercial Loan Action Plan" (the "Action Plan"), which analyzed

various risk factors relating to the Loans.  (*Id.*, Ex. 11).  By early 2011, OTS had mandated that

BFSB "shrink the bank and sell problem assets" such as the Loans, which were rated

"substandard."  (*Id*., Ex. 2 [Gallo Dep.] 41:24-18, 43:8-10, 43:13-17, 44:21-45:22; Ex. 18

[Gordon Dep.] 11:22-12:11).

92.    The Workout Department recommended that the bank offer the Debtor two

additional six-month extension options from March 1, 2011, subject to conditions.  (*Id.*, Ex. 11).

---

[17]    In an attempt to impart significance to the Construction Progress Review, the Debtor
characterizes the review as "post-maturity."  (Obj. ¶ 42).  However, the review was based on a
site visit on February 15, 2011 and evaluated construction work performed months before the
March 1, 2011 maturity date.  (Obj., Ex. J at 2).  The review also states that it "is intended solely
for the use of Brooklyn Federal Savings Bank, its participants, employees and agents" and that it
"is in no way intended for any utilization, reliance or otherwise by the Owner and/or Developer
or agents thereof and other third parties."  (*Id.* at 9).  The review could not be relied upon by the
Debtor for any purpose and is thus irrelevant.

Once the Workout Committee approved the Action Plan, written authorization was required from

OTS before BFSB could implement the plan and grant an extension. The Action Plan states:

"An OTS 'non-object' is required as this loan is rated substandard and is a maturity extension."

(*Id.*) (emphasis in original). There is no dispute that (1) the Action Plan was never provided to

the Debtor prior to the state court action, and (2) the Debtor was unaware that the document

existed or that this internal process had occurred.[18]

93.    Discussions with the Debtor regarding the extension requests were handled by

Gallo on behalf of BFSB. (*Id.*, Ex. 18 [Gordon Dep.] 24:6-13; Ex. 19 [Maher Dep.] 29:17-30:9;

*see also* Ex. 4 [7/31/13 Hr'g] 10:5-10). Gallo never told the Debtor that the Loans would be

extended. To the contrary, she advised the Debtor that OTS approval was required to extend the

Loans. (*Id.*, Ex. 2 [Gallo Dep.] 76:14-25, 116:3-6, 116:25-117:12, 118:2-14, 118:24-119:6; Ex.

18 [Gordon Dep.] 28:22-29:5).

94.    The Debtor admitted that Gallo stated OTS approval was required and had not

been obtained. Although the Debtor now states that it "is still unclear" whether OTS approval of

the Action Plan was required (Obj. ¶ 16), the Debtor admitted that such approval was required in

the state court action. (*Id.*, Ex. 21 [Wallace Aff.] ¶ 13) ("[In 2010] the bank was entering into a

'Supervisory Agreement' with OTS and thereby coming under the regulatory authority's direct

---

[18]  The Debtor accuses Orchard of "concealing the Action Plan" and states that "Orchard
was roundly criticized for its mishandling of discovery." (Obj. ¶¶ 49, 66). These allegations are
preposterous, as the Appellate Division made clear: "The Action Plan was available at the time
of the original motion – indeed, numerous witnesses alluded to it during their depositions. Even
so, DAB did not provide a reasonable justification for its failure to serve a more exacting
discovery demand that specifically requested Brooklyn Federal's internal documents related to
the loan extension issue. . . . As the record demonstrates, had DAB exercised due diligence
during discovery, it could have obtained the Action Plan through discovery well over a year
earlier than it did." (Obj., Ex. T at 27-28). Debtor's counsel surely read the Appellate Division's
decision – it is an exhibit to the Objection – so these inflammatory allegations reflect either
extreme carelessness by the Debtor's counsel or an intentional misrepresentation of the facts.

oversight as a 'troubled bank'"). The Debtor also admitted in the state court that it was "repeatedly" advised that BFSB had applied to "the federal Office of Thrift Supervision ('OTS') for permission to explicitly and in writing extend the maturity date of the Loan," which permission was never obtained. (*Id.*, Ex. 10 [Zhavian Aff.] ¶ 30; Ex. 9 [DAB Answer] ¶¶ 43, 44).[19] Because OTS never approved the extension, the Debtor by its own admission could not have reasonably believed that the Loans had been extended.

### 4.    The Debtor's Misappropriation of Building Loan Trust Funds

95.    After the Workout Committee approved the Action Plan, BFSB sought OTS approval to extend the Loans, but while that request was pending, the Workout Committee rescinded the Action Plan and decided to sell the Loans instead. (*Id.*, Ex. 2 [Gallo Dep.] 64:24-65:2, 77:2-15, 81:6-19; Ex. 18 [Gordon Dep.] 22:16-24, 35:17-23). The reason for the rescission is uncontested – the Debtor was repeatedly caught misappropriating Building Loan trust funds.

96.    Flintlock notified BSFB in January 2011 that the Debtor had withheld trust funds rather than paying them to contractors. BFSB called a meeting with Zhavian and Flintlock to resolve the issue. (*Id.*, Ex. 2 [Gallo Dep.] 119:11-20, 120:14-16; Ex. 18 [Gordon Dep.] 19:9-20:5). After changing his story several times, Zhavian admitted that he had improperly withheld funds instead of paying contractors. (*Id.*, Ex. 22 at 6-7; Ex. 19 [Maher Dep.] 91:22-93:24; Ex. 18 [Gordon Dep.] 19:9-20:5). BFSB's minutes of the meeting state, "Zhavian was told that we wanted cancelled checks to Flintlock . . . and, if not resolved by Friday, we will commence

---

[19]    Without citing a single example, the Debtor asserts that "[f]or close to two years' time after the commencement of the foreclosure action, Orchard consistently denied the existence of any type of writing relating to an extension." (Obj. ¶ 47). This assertion is false. Orchard stated, correctly, that the maturity date of the Loans was never extended, a fact that the Debtor's counsel acknowledged in his May 24, 2011 letter and admitted in open court. (*See* ¶¶ 24-26 above).

foreclosure." (*Id.*, Ex. 22). Facing the threat of foreclosure, Zhavian disbursed the funds to

Flintlock, and BFSB resumed advances. (*See id.*, Ex. 18 [Gordon Dep.] 19:24-20:5).

97.    BFSB's loan officers understood the seriousness of Zhavian's misconduct. (*Id.*,

Ex. 19 [Maher Dep.] 45:14-46:12).    Under New York's Lien Law, the misappropriation of

building loan trust funds is a crime.  Lien Law § 79-a.

98.    However, Zhavian was not chastened by the January 2011 meeting.    In early

March 2011, when BFSB's extension request was pending with OTS, Zhavian again

misappropriated Building Loan funds.  Upon learning of Zhavian's misconduct, Maher emailed

Zhavian on March 3, 2011 and demanded that Zhavian release the Building Loan funds:

> This is misuse of funds and potential violations of the law.  You
> are not helping yourself and you are in breach of the loan
> agreement.  Please call me immediately to resolve the foregoing.

(*Id.*, Ex. 23 at 3).    The issue was ultimately resolved, but the damage was done.    BFSB

concluded it could not trust the Debtor and that extending the Loans would put the bank at risk.

(*Id.*, Ex. 2 [Gallo Dep.] 46:9-15, 81:6-19, 121:6-10; Ex. 18 [Gordon Dep.] 19:17-20:5, 22:16-24,

23:9-14; Ex. 19 [Maher Dep.] 45:14-46:12, 65:10-23).    When asked whether Zhavian's misuse

of Loan proceeds affected his "perception of how trustworthy D.A.B. Group and Mr. Zhavian

were as borrowers," Maher testified as follows:

> A.  Absolutely.  There was all types of things leading up to
> that.  It was always problematic.  I don't have my history sheets
> here.  It was one thing after another.

> Q.  Did that raise concern in your mind about whether the
> borrower could be trusted with the use of loan proceeds?

> A.  Absolutely.

34

(*Id*., Ex. 19 [Maher Dep.] 93:21-94:18).  Gordon was equally direct when asked why BFSB did

not extend the Loans: "we didn't trust Mr. Zhavian." (*Id*., Ex. 18 [Gordon Dep.] 22:16-24).[20]

99.    Concluding that the Debtor was too much of a credit risk, the Workout Committee

decided that BFSB's best option was to sell the Loans.  The March 22, 2011 memorandum

rescinding the Action Plan states:

> Due to significant issues concerning the guarantor's [*i.e.*,
> Zhavian's] honesty we are requesting to withdraw the previously
> approved extension request.
>
> On several occasions we have caught him diverting money he has
> been given via construction loan advances which has been brought
> to our attention by the contractor who failed to be paid. . . .
>
> We recommend this sale as a better alternative to disbursing
> additional monies and then running the risk of needing takeout
> financing to repay or the considerable risk that Mr. Zhavian, the
> guarantor/owner, will do something to endanger our position.

(*Id*., Ex. 24; *see also* Ex. 2 [Gallo Dep.] 64:24-65:2, 77:2-19, 81:6-19).

100.    By letter dated March 23, 2011, BFSB advised the Debtor that "the Notes . . .

secured by the Mortgages matured by their respective terms on March 1, 2011" and that BFSB

"does not consent to any further extension of the Notes and accordingly the Notes are payable in

full at this time."  (Obj., Ex. M).

101.    Zhavian did not take the news well.  He repeatedly berated and threatened BFSB

employees in an ill-conceived effort to convince the bank to reconsider.  Maher testified that it

was impossible to "have a normal conversation" with Zhavian.  (Dockwell Decl., Ex. 19 [Maher

---

[20]    These events belie the Debtor's claim that it "was not subject to any type of monetary
or non-monetary default."    (Obj. ¶ 43).    Maher testified that the Loans were "always
problematic."  (Dockwell Decl., Ex. 19 [Maher Dep.] 94:7-14).  Between the dates of June 28,
2010 and October 12, 2010 alone, there are nine entries on BFSB's internal "history sheets"
stating negative developments regarding the Loans, including delinquent real estate taxes,
difficulties with Zhavian, and mechanic's liens.  (*Id.*, Ex. 17).

Dep.] 65:5-11).   After one of Zhavian's tirades, Maher asked "to be removed from the whole situation.  He [Zhavian] did it twice.  I was afraid he was going to come to the bank and start in with me. . . .   [T]his guy [Zhavian] was very volatile, so I wanted off this thing as soon as possible.  I know that he could – I complained to management.  They said if he came to the bank, to call the police." (*Id.* 98:13-99:6).

102.    BFSB took Zhavian's fulminations seriously enough to refer the matter to the bank's outside counsel, who issued a written warning to Zhavian to stay away from the bank.  In a June 22, 2011 letter, the bank's counsel referred to Zhavian's "actions in personally abusing and harassing officers" of the bank and stated that BFSB "cannot and will not be subject to intimidation and harassment."  (*Id.*, Ex. 25).   Zhavian was warned that he "is not authorized to appear at [the bank's] office and should he do so, it will be treated as a trespass."  (*Id.*).

103.    When Zhavian learned that BFSB had contracted to sell the Loans to Orchard, he began to harass Orchard's principals as well.  Zhavian somehow obtained the personal cell phone number of one of Orchard's managers and began a campaign of harassment and threats against Aviram, calling his cell phone at all hours of the night and yelling curses and threats of violence in an attempt to get Orchard to back out of the deal with BFSB.  (*Id.*, Ex. 52).

104.    Once Orchard closed on its purchase of the Loans, Orchard sent the Debtor a letter dated June 24, 2011 itemizing additional Events of Default that had occurred since the maturity date, none of which has been cured.  (*Id.*, Ex. 26).[21]

---

[21]    These defaults included (i) the cancellation of property insurance because of non-payment by the Debtor, (ii) multiple open municipal violations against the Mortgaged Property, (iii) the filing of six mechanic's liens against the Mortgaged Property, none of which was removed or bonded within 30 days, and (iv) the entry of a judgment against the Debtor, which was not satisfied or discharged within 30 days.  (*Id.*).

105.    After attempting unsuccessfully to discuss a workout with the Debtor, on July 1,

2011 Orchard commenced an action in state court to foreclose the Mortgages.  (*Id.* ¶ 31, Ex. 27).

Orchard attempted to prosecute the action quickly, only to be stymied by the Debtor at every

turn.  The Debtor's dilatory tactics, including chronic adjournments and obstructionism, added

more than two years to the proceedings and substantially increased Orchard's litigation costs.

The Debtor's long record of vexatious conduct is detailed below in Section III.


**B.      Applicable Law**

106.    The Debtor's defenses relate to Orchard's prepetition contractual rights and are

therefore determined by the Loan Documents and state law.  "[A] creditor's entitlement to

prepetition interest under Section 502, default or otherwise, is determined in the first instance by

the agreement between the parties and applicable nonbankruptcy law."  *In re S. Side House,*

*LLC*, 451 B.R. 248, 264 (Bankr. E.D.N.Y. 2011), *aff'd, sub nom., United States Bank Nat'l Ass'n*

*v. S. Side House LLC*, No. 11-CV-4135, 2012 U.S. Dist. 10824 (E.D.N.Y. Jan. 24, 2012),

(allowing claim for prepetition default interest); *see also In re Residential Capital, LLC*, 508

B.R. 851, 858 (Bankr. S.D.N.Y. 2014) ("Where prepetition interest is in question, the answer is

clear: state law controls and contract default interest is awarded so long as state law permits it");

*In re 785 Partners LLC*, 470 B.R. 126, 131 (Bankr. S.D.N.Y. 2012) ("Pre-petition interest is

generally allowable to the extent and at the rate permitted under the applicable nonbankruptcy

law, including the law of contracts") (quoting *In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998)).

107.    The Debtor concedes that New York law "recognizes the validity of default

interest provisions" and that bankruptcy courts will not disallow default interest merely because

"the rate strikes the Court as being high."  (Obj. ¶ 76).  *Accord 785 Partners*, 470 B.R. at 132

("Even where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain

based on its own notions of fairness and equity"); *In re Sultan Realty, LLC*, No. 12-10119, 2012

Bankr. LEXIS 5879, at *3, *14, *21 (Bankr. S.D.N.Y. Dec. 20, 2012) (allowing pre- and post-

petition interest at a default rate of 24% because lender "was entitled to charge interest at the

Default Rate . . . under the express provisions of the Mortgage"); *S. Side House, LLC*, 451 B.R.

at 264 ("It is well settled that an agreement to pay interest at a higher rate in the event of default

or maturity is an agreement to pay interest and not a penalty") (quoting *Jamaica Savings Bank,

F.S.B. v. Ascot Owners*, 245 A.D.2d 20, 20 (2d Dep't 1997)).

## C.    The Debtor Waived All Defenses to Enforcement of the Notes

108.    The maturity date of the Loans and the Debtor's obligation to pay default interest

and fees are set forth in the Notes.  The Notes are "absolute and unconditional" obligations

pursuant to which the Debtor "absolutely, unconditionally and irrevocably waives any and all

right to assert any defense, setoff, counterclaim or crossclaim of any nature whatsoever with

respect hereto or the obligations of Maker [*i.e.*, the Debtor] hereunder."  (Hotel POC, Ex. A

[Project Note] § 8.8; Ex. F [Building Note] § 9.8).[22]

109.    New York courts have consistently held that where, as here, a borrower's

payment obligations under a promissory note or guaranty are unconditional and free of defenses,

---

[22]    This Debtor's waiver of defenses was not raised in the foreclosure action because that
action was brought to enforce the Mortgages, which lacked a waiver of defenses.  "[U]nder New
York law, a creditor is required to elect between the remedies of an action for money damages on
a debt or an equitable action to foreclose a mortgage that secures the debt."  *Westnau Land Corp.
v. United States Small Business Admin.*, 1 F.3d 112, 115 (2d Cir. 1993).  The Debtor's defenses
in the foreclosure action pertained to Orchard's exercise of its rights under the Mortgages, not
enforcement of the Notes.  By contrast, Orchard's claim in this chapter 11 proceeding seeks to
enforce Orchard's contractual rights under the Notes, which are free of defenses.

the obligor cannot escape its contractual obligations even it if has a potentially meritorious defense.  As the Second Circuit stated in affirming the dismissal of a loan obligor's estoppel defense on exactly these grounds:  "Even construing those facts in favor of the defendants, the language of the notes is clear:  the defendants-guarantors not only unconditionally guaranteed payment of the notes but explicitly waived all legal rights.  Therefore the district court grant of summary judgment for EIB is affirmed on this basis and we need not address the defendants' estoppel claim."  *See Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*, 334 Fed. Appx. 353, 355 (2d Cir. 2009).   Indeed, the operative provisions of the loan documents in *Export-Import Bank* were virtually identical to the provisions in the Notes here: both sets of loan documents were "unconditional" and contained waivers of defenses.  *Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 347 (S.D.N.Y. 2008), *aff'd*, 334 Fed. Appx. 353 (2d Cir. 2009).

110.    The decision in *Export-Import Bank* is consistent with an unbroken line of New York decisions holding that, as a matter of law, unconditional obligations like the Notes may not be impaired or offset by defenses.  For example, in *Bank of Suffolk County v. Kite*, 49 N.Y.2d 827 (1980), the Court of Appeals held that the borrowers' defense to enforcement of a promissory note was properly dismissed because the borrowers waived any defenses in the note. *Id*. at 828.   Like the Debtor here, the borrowers in *Bank of Suffolk* sought to evade their contractual obligations by claiming that "there existed an oral understanding that they would not be liable on the note."  *Id.  See also Perlstein v. Kullberg Amato Picacone/ABP, Inc*., 158 A.D.2d 251, 252 (1st Dep't 1990) (waiver of defense in promissory note precluded borrower's defense); *PGA Marketing, Ltd. v. Windsor Plumbing Supply, Inc*., 124 A.D.2d 576, 577 (2d Dep't 1986) (same); *Mishal v. Fiduciary Holdings, LLC*, 109 A.D.3d 885, 885-86 (2d Dep't 2013) (same).

39

111.    In fact, in a separate action brought by Orchard against Zhavian to enforce guaranties of the Loans, the Trial Court rejected the very defenses raised by the Debtor here because the "purported defenses are precluded as to [the guarantor] by the terms of the Guarantees, which waived all such defenses." *Orchard Hotel, LLC v. Zhavian*, No. 15013/11, 2012 N.Y. Misc. LEXIS 402, at *29 (Sup. Ct. Kings Cnty. Jan. 31, 2012); *see also Fortress Credit Corp. v. Hudson Yards, LLC*, 78 A.D.3d 577, 577 (1st Dep't 2010) (dismissing obligor's estoppel defense as "precluded by the guaranty, which waived all defenses and counterclaims except actual payment and performance in full, which defendant has not alleged"); *Hotel 71 Mezz Lender, LLC v. Mitchell*, 63 A.D.3d 447, 448 (1st Dep't 2009) (counterclaim dismissed as a matter of law because guaranty was "absolute and unconditional" and waived the right to assert any defense and counterclaim); *Sterling Nat'l Bank v. Biaggi*, 47 A.D.3d 436, 437 (1st Dep't 2008) (same).

112.    Indeed, the Debtor's counsel, Kevin Nash, previously attempted to raise an estoppel defense in a different lawsuit and failed for the same reasons that the defense fails here. In *Anglo Irish Bank Corp. v. Ashkenazy*, No. 103006/10, 2010 Misc. LEXIS 3784, at *10 (Sup. Ct. N.Y. Cnty. Aug. 4, 2010), the lender sought to recover on an unpaid guaranty, which like the Notes here, was "absolute and unconditional" and contained a waiver of defenses. *Id.* The court granted summary judgment in favor of the lender and rejected the guarantor's estoppel defense. The court stated:

> The defendants attempt to raise an issue of fact by arguing that they were misled by the plaintiff's broken promises that additional loan restructuring was forthcoming but did not eventuate. To this extent, the defendants attempt to argue the doctrine of equitable estoppel. However, it is undisputed that the Guaranty is absolute and unconditional, wherein the defendants waive such defenses. As such, they are precluded from raising this defense.

40

*Id.* The Debtor is likewise precluded from raising an estoppel defense here.

113.    Finally, both of the decisions cited by the Debtor in which courts disallowed default interest – *In re Sheba Realty Corp.*, No. 12-75455, 2014 Bankr. LEXIS 1282 (Bankr. E.D.N.Y. March 27, 2014) and *In re Marcia Campbell*, 513 B.R. 846 (Bankr. S.D.N.Y. 2014) – involved promissory notes that, unlike the Notes here, did not contain waivers of defenses. (Dockwell Decl., Exs. 28, 29).

114.    Because the Notes are "absolute and unconditional" obligations to which the Debtor waived all defenses, the Debtor's attempt to escape its contractual obligation to pay default interest and fees fails as a matter of law.

**D.    The Debtor's Waiver and Estoppel Defenses Are Precluded by the Loan Documents**

115.    In any event, the Debtor's defenses are meritless.  The Debtor's first purported defense is premised on the doctrines of waiver and estoppel, which the Debtor alleges prevent Orchard from establishing that "the declaration of a maturity default against the Debtor, made retroactively, was proper."  (Obj. ¶ 73).  The Debtor's argument is baseless.

116.    The doctrine of waiver is of no help to the Debtor.  Each Note states that "[a]ny waiver hereunder shall be valid and enforceable *only if* in writing and signed by the party against whom enforcement is sought, and then only to the extent therein set forth."  (Hotel POC, Ex. A [Project Note] § 8.7; Ex. F [Building Note] § 9.7) (emphasis added).  The Debtor's waiver defense thus fails because there was no written waiver of the March 1, 2011 maturity date.[23]

*Antonini v. Petito*, 96 A.D.3d 446, 447 (1st Dep't 2012) (waiver defense is meritless "in view of

---

[23]    The Action Plan is not a waiver.  It does not contain a "specific, identifiable promise" not to enforce the March 1, 2011 maturity date.  *Massachusetts Mut. Life Ins. Co. v. Gramercy Twins Assocs.*, 199 A.D.2d 214, 217 (1st Dep't 1993) (rejecting waiver defense because defendant failed to allege "that plaintiff provided a specific, identifiable promise not to proceed with the foreclosure").

the 'no waiver' provision in the operating agreement"). In fact, the Debtor cannot even identify an *oral* waiver. *Massachusetts Mut. Life Ins. Co. v. Gramercy Twins Assocs.*, 199 A.D.2d 214, 217 (1st Dep't 1993) (waiver requires "a specific, identifiable promise").

117. Moreover, even if the Debtor could somehow establish that BFSB waived the March 1, 2011 maturity date, BFSB withdrew any such waiver by sending the Debtor a default notice on March 23, 2011. (Obj. ¶ 59, Ex. M). A waiver, "not being a binding agreement, can, to the extent that it is executory, be withdrawn, provided the party whose performance has been waived is given notice of withdrawal and a reasonable time after notice within which to perform." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982). The Debtor's waiver defense is, at most, good for 22 days, not four years.

118. The Debtor's estoppel defense fares no better. Reasonable reliance is an essential element of estoppel. However, the Notes and Mortgages expressly preclude the Debtor from reasonably relying on any purported extension of the maturity date of the Loans unless such extension was written and signed. Because it is undisputed that no such written and signed extension ever existed, the Debtor's estoppel claim fails because the Debtor could not reasonably rely on any unwritten assurances. *Princes Point, LLC v. AKRF Eng'g, P.C.*, 94 A.D.3d 588, 588 (1st Dep't 2012) (dismissing estoppel claim based on contractual disclaimer of reliance); *see also CrossLand Sav., FSB v. Loguidice-Chatwal Real Estate Inv. Co.*, 171 A.D.2d 457, 457 (1st Dep't 1991) (dismissing estoppel defense in mortgage foreclosure action as "negated by the express terms of the parties' unambiguous written agreements"); *Wasserman v. Harriman*, 234 A.D.2d 596, 597 (2d Dep't 1996) (estoppel defense in foreclosure action precluded by "mortgage provision barring oral modification").

42

119.    The March 21 Ramos Ruling, which holds that the Debtor's alleged reasonable reliance was a triable issue of fact, is plainly erroneous and none of the decisions cited by the Trial Court supports its ruling. *Nassau Trust*, which was cited by the Trial Court and is the primary decision cited by the Debtor in the Objection, did not even involve an estoppel defense; rather it involved an oral waiver. As explained above, waiver does not apply here.

120.    Furthermore, the specific issue raised in *Nassau Trust* was whether an oral waiver could, in appropriate circumstances, be a defense to mortgage foreclosure. This decision has no bearing on the issue raised by the Debtor's Objection, which concerns default interest and fees under the Notes. "The note represents the primary personal obligation of the mortgagor, and the mortgage is merely the security for such obligation." *Copp v. Sands Point Marina*, 17 N.Y.2d 291, 293 (1966); *see also Reichert v. Stilwell*, 172 N.Y. 83, 88-89 (1902); *Westnau Land Corp. v. United States Small Business Admin*., 1 F.3d 112, 115 (2d Cir. 1993). Because a mortgage is merely security for a debt, defenses to enforcement of a mortgage do not affect the borrower's obligations on the underlying note. *European Am. Bank v. Perspective Dev. Corp.*, 220 A.D.2d 717, 718 (2d Dep't 1995) ("When the foreclosure action was rendered moot and the security of the mortgage was destroyed . . . the only recourse available to the plaintiff was to bring an action in law to recover on the note."); *McSorley v. Spear*, 13 A.D.3d 495, 496 (2d Dep't 2004) (dismissing foreclosure action and stating that "since the foreclosure action is no longer pending and did not result in a judgment in the plaintiff's favor, the plaintiff is not precluded from commencing a separate action on the note"). Thus, *Nassau Trust* is inapplicable here.[24]

---

[24] *Arnot v. Union Salt Co*., 186 N.Y. 501 (1906), another foreclosure action cited by the Debtor (Obj. ¶ 73), is inapplicable for the same reason as *Nassau Trust*, in addition to being factually distinguishable.

121.    The other decisions cited in the March 21 Ramos Ruling and by the Debtor are readily distinguishable from the facts here and serve only to highlight the dearth of evidence proffered by the Debtor to support its allegations.  For example, *In re Kaplan*, 186 B.R. 871, 877 (Bankr. D.N.J. 1995) could hardly be more damaging to the Debtor's Objection:  in contrast to the facts here, in *Kaplan*, "[a] formal restructuring agreement was executed by all of the parties." The absence of a formal loan modification agreement here is the dispositive flaw in the Debtor's arguments.  Similarly, in *Triple Cities Constr. Co. v. Maryland Cas. Co.*, 4 N.Y.2d 443 (1958), the defendant *admitted* that it deliberately engaged plaintiffs in protracted settlement negotiations to lull plaintiffs into failing to act on their lien before it expired.  *Id.* at 448-49.  The record here does not contain any evidence of such mendacity or detrimental reliance.  In *Cadlerock, L.L.C. v. Renner*, 72 A.D.3d 454 (1st Dep't 2010), the plaintiff accepted monthly payments from the defendant for *nine years* without notifying the defendant that it was underpaying the amounts due each month and accruing interest at 14% on the deficiency.  *Id.*  Here, the Debtor fails to point to any misleading conduct by BFSB, much less *nine years* of such conduct.  In *Nassau Trust*, the record contained unrefuted evidence that the lender told the borrower to "disregard" a written payment schedule and that the lender "would waive any default."  *Nassau Trust*, 56 N.Y.2d at 180-81.  The Debtor cannot point to any comparable statement or conduct by BFSB. Finally, *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt. L.P.*, 7 N.Y.3d 96 (2006) involved a non-compete agreement that, unlike the Loan Documents, did not prohibit modifications based on the parties' course of dealing, while *205 W. 19th St. Corp. v. Plymouth Mgmt. Group*, 74 A.D.3d 564 (1st Dep't 2010) is a brief decision that lacks a meaningful discussion of the facts of the case.

44

122.    Setting aside the absence of evidence supporting the Debtor's claims, the Debtor's estoppel defense fails on its own terms.  Where, as here, a contract expressly prohibits oral modifications, the "conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written."  *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344 (1977).  Even if BFSB were aware of the "430 day" construction schedule and "approved" the Flintlock contract, such conduct is entirely compatible with the Notes' March 1, 2011 maturity date.  Construction could have continued after March 1, 2011 without BFSB's involvement under a number of plausible scenarios.  For example, the Debtor could have repaid the Loans and obtained a new loan from another lender.  Indeed, in the foreclosure action, the Debtor acknowledged this possibility and admitted that it failed to take advantage of refinancing opportunities.  (Dockwell Decl., Ex. 9 [DAB Answer] ¶ 48).  In short, even if BFSB had approved the Flintlock contract in August 2010 (and it did not), such approval would not automatically mean the Loans had to be extended beyond March 1, 2011.

123.    In fact, a decision cited in the March 21 Ramos Ruling, *Massachusetts Mutual Life Ins. Co. v. Gramercy Twins Assocs.*, 199 A.D.2d 214 (N.Y. App. Div. 1993), illustrates this point.  The borrower in *Massachusetts Mutual* attempted to raise an estoppel defense based on its failed attempt to negotiate a modification of the loan with the lender.  *Massachusetts Mutual*, 199 A.D.2d at 217-18.  The court rejected the borrower's defense, noting that, like here, "[i]t was at all times within plaintiff's power to cease negotiations" and that whatever actions the borrower undertook were "at its own risk."  *Id.* at 217-18.  The court also noted that, like here, the breakdown in negotiations between the borrower and lender was attributable to the borrower's conduct, a fact that the borrower "studiously avoids addressing."  *Id.* at 217.  The court's conclusion in *Massachusetts Mutual* is perfectly apt here:  "The fact that those negotiations

45

ultimately failed is not significant, as plaintiff never, even according to defendant's allegations, promised unconditionally to restructure the mortgage – a promise which in any event would have been so commercially foolhardy as to be incredible on its face." *Id.* at 218.

**E.      The Debtor's Contract-Based Defense Is Meritless**

124.    The Debtor also raises a contract-based defense to Orchard's claim for default interest and fees.  Relying on two decisions involving the "improper acceleration" of loans, the Debtor asserts that "a maturity default was not properly declared."  (Obj. ¶ 77).  This "defense" is fatally flawed.

125.    Orchard was not required to "declare" the maturity date of the Loans because the maturity date is a defined term in the Loan Documents and was known to the Debtor, as demonstrated by Wallace's May 24, 2011 letter.  (Dockwell Decl., Ex. 3) (noting that the Loans "termed out" on March 1, 2011).  On the maturity date, all outstanding amounts "shall be due and payable" without any action by the lender.  (Hotel POC, Ex. A [Project Note] § 1; Ex. F [Building Note] § 2).  Furthermore, the Debtor waived any right to notices of demand or nonpayment.  (*Id.*, Ex. A § 5; Ex. F § 6).  "Because the Consolidated Note had matured without any further extensions granted, and was due and payable on May 28, 2010, plaintiff was not required to declare a default or to make evident its election to accelerate the amount due prior to commencing this foreclosure action."  *The Community Preserv. Corp. v. Midwood Gardens, LLC*, No. 500178/13, 2014 N.Y. Misc. LEXIS 1640, at *4, *10-11 (Sup. Ct. Kings Cnty. Apr. 3, 2014).  *See also Padovano v. Sooknandan*, No. 502683/12, 2014 N.Y. Misc. LEXIS 5715, at *3-4, *17-18 (Sup. Ct. Kings Cnty. Dec. 24, 2014) ("the Note matured and the entire debt became due, absent any acceleration, on April 1, 2011"); *Syracuse Trust Co. v. First Trust & Deposit Co.*, 239 A.D. 586, 586 (1st Dep't 1933) ("The mortgage was due and payable as to its principal

46

sum on August 1, 1929, and its payment could be enforced after that date without any declaration of default").

126.    The fact that the Loans matured by their own terms distinguishes Orchard's claim from that of the lenders in the two decisions cited by the Debtor, both of which involved non-maturity defaults.  (Obj. ¶¶ 77-79).  *Sheba Realty* involved monetary and non-monetary defaults, following which the lender sent notices of default and acceleration to the borrower, but at the wrong address, and the borrower credibly testified that he never received the notices.  *Sheba Realty*, 2014 Bankr. LEXIS 1282, at *7-8.  Finding that the mis-addressed notices of default and acceleration were ineffective under the loan documents and that the borrower's tender of cure payments thus preceded acceleration, the court disallowed the lender's claim for default interest.  *Id.* at *29, *31.  Here, by contrast, not only were notices of default and acceleration unnecessary because the Loans matured, but the Debtor has never attempted to cure its default.  Since March 1, 2011, the Debtor has not paid one dollar toward the Loans, nor toward the safety of the construction site, property taxes, maintenance, or the preservation of zoning rights and permits.

127.    *Marcia Campbell*, a chapter 13 case, is likewise inapposite.  The case involved a payment default under a note, following which the lender did not provide a notice of default.  *Marcia Campbell*, 513 B.R. at 851.  Finding that "the Note is . . . very clear that default interest is only payable on demand," Judge Gropper held that the lender was not entitled to default interest.  *Id*. at 851-53.  By contrast, here, default interest began to accrue automatically "at all times after the maturity of the indebtedness evidenced by this Note."  (Hotel POC, Ex. F [Building Note] § 4.4(b); *see also* Ex. A [Project Note] § 3.2).

128.    In any case, it is undisputed that BFSB notified the Debtor by March 23, 2011 that the Loans had matured.  (Obj., Ex. M).  Recognizing this fact, the Debtor now alleges for the

47

first time, after nearly four years of litigation, that the March 23 notice "was not sent to the Debtor in accordance with the notice requirements of the loan documents," claiming that the notice should have been sent to 154 Acres Road, Monroe, New York, not 85 West Hawthorne Avenue, Valley Stream, New York. (Obj. ¶ 59). However, like much of the Debtor's Objection, this claim reflects a reckless disregard of the facts. On August 1, 2008, the Debtor sent BFSB a formal change of address directing all correspondence to 85 West Hawthorne Avenue. (Dockwell Decl., Ex. 30). The Debtor then consistently used this address in its own correspondence with BFSB, as evidenced by the three extension requests sent by the Debtor on March 9, 2009, March 25, 2010 and October 4, 2010, on letterhead with the 85 West Hawthorne Avenue address. (*Id.*, Exs. 17, 31). The Debtor also used the 85 West Hawthorne Avenue address in the Flintlock contract, attached as Exhibit F to the Objection. The Debtor even used this address on its chapter 11 petition. (Dkt. No. 1). The Debtor's claim is not only irrelevant because no notice was required, but also disingenuous, as it received notice.

129.    Nor is there any merit to the Debtor's claim that "BFSB acted improperly in retroactively declaring a maturity default on March 1, 2011." (Obj. ¶ 79). The adverb "retroactively" implies that the Loans had previously been extended beyond March 1, 2011 or that BFSB had to perform some affirmative act to trigger maturity. However, there is no legal theory under which the Debtor can validly claim an enforceable extension of the Loans. "Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 354-55 (2d Dep't 1980) (plaintiff failed to demonstrate "the existence of the requisite intent to effectuate a modification agreement"); *see also Louis Dreyfus*

48

*Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 228 (2d Cir. 2001) (a contractual modification "must be established in the same way as is any other contract").

130.    Throughout the state court action and in its Objection, the Debtor has alleged that the Loans were extended for "430 calendar days from August 26, 2010." (Dockwell Decl., Ex. 10 [Zhavian Aff.] ¶¶ 21, 23-25; Ex. 4 [7/31/12 Hr'g] 11:9-15).  By contrast, the BFSB Action Plan proposed a 180-day extension from March 1, 2011, with a further conditional 180-day extension option to March 1, 2012.  The record is therefore clear that the Debtor and BFSB never mutually assented to the single most important term in any loan extension:  the new maturity date.  *See L.K. Sta. Group, LLC v. Quantek Media, LLC*, 62 A.D.3d 487, 491 (1st Dep't 2009) (documents lacked "the essential terms of a loan, such as the interest rate or maturity date, and are thus too uncertain to constitute enforceable agreements").

131.    Furthermore, the conditions precedent to any extension never occurred.  The Debtor has admitted that it was informed "[i]n the early part of 2011" that "any approval for the extension of the building loan agreement would require OTS approval."  (Dockwell Decl., Ex. 10 [Zhavian Aff.] ¶ 30; Ex. 9 [DAB Answer] ¶ 43).  The Debtor does not dispute that OTS never approved an extension of the Loans.  In addition, the Action Plan conditioned any extension on the payment of extension fees, which the Debtor never paid.  As a result, the Action Plan never became a binding contract.  *See IDT Corp. v. Tyco Group, S.A.R.L.*, 13 N.Y.3d 209, 214 (2009) (no agreement was reached because conditions precedent were not satisfied).

132.    In short, there is no factual or legal basis for any contract-based defense to Orchard's rights under the Notes, and the Debtor's Objection must be dismissed.

**F.    The Debtor's Breach of the Covenant of Good Faith and Fair Dealing Defense Is Barred by the Loan Documents**

133.    The Debtor's final argument against Orchard's claim is that "BFSB's conduct violated basic principles of good faith and fair dealing."  (Obj. ¶ 80).  However, this argument is easily disposed of because the express terms of the Building Loan Mortgage precluded the Debtor from relying on any alleged oral modification of the Loans.  (*See* ¶¶ 32-36 above).  "While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights."  *Fesseha v. TD Waterhouse Investor Servs*., 305 A.D.2d 268, 268 (1st Dep't 2003).

134.    Moreover, it is well-settled that a lender's refusal to modify or extend an existing loan does not constitute bad faith or create a defense to enforcement of the debt.  *See Valley Nat'l Bank v. 58 Vlimp, LLC*, No. 25522/2012, 2013 N.Y. Misc. LEXIS 1823, at *13 (Sup. Ct. Suffolk Cnty. April 29, 2013); *see also JP Morgan Chase Bank, N.A. v. Ilardo*, 36 Misc. 3d 359, 377 (2012); *Delta Props. v. Fobare Enters*., 251 A.D.2d 960, 962 (3d Dep't 1998).

135.    The Debtor's claim that BFSB had a fiduciary duty to the Debtor is also meritless. In the Building Loan Agreement, the Debtor and BFSB "intend[ed] and agree[d] that the relationship between them shall be solely that of creditor and debtor."  (Hotel POC, Ex. G § 7.7). Under New York law, "an arm's length borrower-lender relationship is not of a confidential or fiduciary nature."  *River Glen Assocs. v. Merrill Lynch Credit Corp.*, 295 A.D.2d 274, 275 (1st Dep't 2002); *Zwicker v. Emigrant Mortgage Co.*, 91 A.D.3d 443, 444 (1st Dep't 2012) ("'There is no fiduciary duty arising out of the contractual arm's-length debtor and creditor legal relationship between a borrower and a bank.'") (citation omitted).

136.    The cases cited by the Debtor do not establish otherwise.  Two of the decisions do not even involve New York law.  *See Glascock v. City Nat'l Bank of W. Virginia*, 213 W. Va. 61

(2002) (West Virginia law); *Segura v. Wells Fargo Bank, N.A.*, No. 14-04195, 2014 U.S. Dist.

LEXIS 143038 (C.D. Cal. Sept. 26, 2014) (California law).  Two other decisions do not involve

borrowers and lenders.  *See Mid-Island Hospital, Inc. v. Empire Blue Cross & Blue Shield*, 276

F.3d 123 (2d Cir. 2002) (insurer and insured); *Broadway Nat'l Bank v. Barton-Russell Corp.*,

154 Misc. 2d 181 (Sup. Ct. N.Y. Cnty. 1992) (depositary bank and clearing bank).  The last

decision, *Bombardier Capital, Inc. v. Reserve Capital Corp.*, 295 A.D.2d 793, 795 (3d Dep't

2002) did not involve conduct covered by a contractual provision, whereas here, the terms of the

Building Loan Mortgage preclude the Debtor from relying on any alleged oral modification.

## III.  ORCHARD'S LEGAL FEES WERE NECESSARY AND REASONABLE IN LIGHT OF THE DEBTOR'S VEXATIOUS LITIGATION CONDUCT

137.    The Debtor objects to the both the accrual of interest at the Default Rate and the

amount of Orchard's legal fees.[25]  (Obj. ¶ 6, 84).  However, the Debtor protracted the foreclosure

action by lodging meritless allegations, seeking countless adjournments and contesting even

routine matters.  This vexatious conduct served no purpose other than to delay the inevitable sale

of the Mortgaged Property, increase Orchard's costs and prolong the accrual of default interest.

138.    Instead of developing a plan to exit the deep financial hole that the Debtor kept

digging for itself, the Debtor pursued a strategy of harassment and obstruction.  Zhavian

maliciously harassed Orchard's principals and attorneys – resulting in a restraining order against

him and the Debtor – and attempted to imperil the Mortgaged Property's valuable zoning

entitlements in the vain hope that Orchard would panic and acquiesce to the Debtor's demands.

---

[25]  Copies of the legal invoices that are the basis for Orchard's claim for legal fees and
costs are attached as Exhibit 32 to the Dockwell Declaration. Provision of these invoices is not,
and is not intended to be, a waiver of attorney client, work product, or other privileges.

The Debtor's strategy failed in every respect except one:  the Debtor succeeded in significantly delaying foreclosure and substantially increasing the accrual of default interest, fees and, costs.

139.    Below is a summary of the state court litigation which shows that Orchard's attorneys' fees were necessary and reasonable in response to the Debtor's aggressive gamesmanship.

## A.    The Mortgage Foreclosure Action

### 1.    Dispositive Motions

140.    A substantial portion of Orchard's legal fees were incurred in briefing and arguing dispositive motions.

141.    Orchard filed three motions to dismiss and one motion for summary judgment. Orchard also opposed a cross-motion for summary judgment filed by Flintlock.  (Dockwell Decl. ¶ 38).

142.    Orchard's first motion to dismiss sought dismissal of the Debtor's three counterclaims.  The motion was briefed in Fall 2011 and argued on January 18, 2012.  (*Id.* ¶ 39).

143.    Orchard filed its summary judgment motion on February 3, 2012.  The motion requested judgment against 13 separate defendants, as well as the severance of Flintlock's cross-claims and counterclaims, the appointment of a referee and the entry of a protective order.  (*Id.*, Ex. 33).  This comprehensive relief was necessary to foreclose the Mortgages.  To obtain clean title to the Mortgaged Property, Orchard was required to obtain a judgment against each defendant.   Accordingly,  Orchard  sought  seven  separate  default  judgments  against  non-answering defendants and six separate judgments against answering defendants who had asserted a total of 35 affirmative defenses and four counterclaims.  In support of its motion, Orchard filed five affidavits and 57 exhibits.  (*Id.* ¶ 42).  Orchard's motion was opposed by four defendants. (*Id.*).

52

144.    In response to Orchard's summary judgment motion, Flintlock cross-moved for summary judgment, challenging the enforceability of the Mortgages, thereby forcing Orchard to oppose the motion.  (*Id*. ¶ 43).  Flintlock also sought leave to file an amended answer and counterclaims.

145.    Flintlock's motion to amend sought to add four new counterclaims against Orchard based on BFSB's alleged conduct.  Because these proposed new counterclaims could have obstructed foreclosure of the Mortgages, Orchard opposed Flintlock's motion to amend. (*Id*.).

146.    Briefing on Orchard's summary judgment motion and Flintlock's cross-motion was completed on April 2, 2012.  At the Trial Court's direction, the parties filed supplemental briefs on April 18, 2013.  In addition to its brief, Orchard submitted two affidavits and nine additional exhibits to rebut the Debtor's allegations.  (*Id*. ¶ 44).

147.    On May 31, 2013, the Debtor's counsel wrote an inflammatory letter to the Trial Court, accusing Orchard's counsel, *inter alia*, of making "false representations" to the court and "secreting" documents.  (*Id*. ¶ 45).  Those charges were entirely without merit, but required a response nonetheless.  Accordingly, Orchard's counsel drafted a rebuttal affirmation, which was filed on June 4, 2013 along with 20 exhibits that refuted the Debtor's claims.  (*Id*.).

148.    Orchard's motion was orally argued four times:  on July 31, 2012, May 1, 2013, June 11, 2013 and July 9, 2013.  Each of these arguments required substantial preparation.  (*Id*. ¶ 46).

149.    At the July 9, 2013 oral argument, the Trial Court granted Flintlock leave to file its amended answer and counterclaims and, *sua sponte*, granted the Debtor leave to file an

amended answer and counterclaims.  (*Id.* ¶ 47).  The Debtor's amended pleading asserted seven affirmative defenses and three new counterclaims.  (*Id.*, Ex. 12).

150.    On August 28, 2013, Orchard moved to dismiss Flintlock's and the Debtor's respective counterclaims.  Briefing of the two motions was completed on November 20, 2013.  (*Id.* ¶ 48).

### 2.    Appeals and Motion Practice in the Appellate Division

151.    Orchard also incurred substantial legal fees in briefing and arguing appeals.

152.    Orchard briefed three separate appeals – two filed by Orchard and one filed by the Debtor.  Orchard also filed a petition seeking emergency relief and writs of mandamus and prohibition from the Appellate Division and briefed five separate appellate motions, three filed by Orchard and two filed by the Debtor.

### a.    First Appeal

153.    On January 23, 2013, the Debtor perfected an appeal of Justice Fried's March 30, 2012 order.  Briefing was completed on March 7, 2013, and the appeal was argued before a five-judge panel on May 7, 2013.  (*Id.* ¶ 49).  The Appellate Division rendered its decision in favor of Orchard on May 28, 2013.  (*Id.*, Ex. 7).

### b.    Second Appeal and Related Motion Practice

154.    At the fourth oral argument on Orchard's summary judgment motion on July 9, 2013, the Trial Court, ruling from the bench, vacated Justice Fried's affirmed March 30, 2012 order and granted the Debtor and Flintlock leave to file amended pleadings.[26]

---

[26]    The Debtor's response to Orchard's attempts to settle an order after the July 9, 2013 oral argument illustrates the Debtor's strategy of delay and belligerence.  As a courtesy, Orchard sent a copy of the July 9 transcript to the Debtor on July 15, 2013.  (Dockwell Decl. ¶ 51).  Orchard then attempted to negotiate a proposed order with the Debtor, to memorialize the Trial Court's rulings from the bench, but the Debtor refused to cooperate.  (*Id.*).  On July 18, 2013,

155.    On July 30, 2013, the Trial Court entered a short-form order stating that the Court's decision was "reflected in the Court's transcript." (*Id.* ¶ 56). On August 5, 2013, Orchard appealed from the Trial Court's short-form order and transcript and perfected its appeal for the Appellate Division's October Term. (*Id.*).

156.    In response to Orchard's appeal, the Debtor filed a notice of settlement *in the Trial Court*, seeking entry of a proposed long-form order to replace the July 30 short-form order. The Debtor's proposed long-form order was substantively the same as the July 30 short-form order and was sought in a transparent attempt to delay Orchard's appeal. (*Id.* ¶ 57).

157.    The Debtor then moved the Appellate Division to dismiss Orchard's appeal on the ground that the July 30 order was not "appealable." (*Id.* ¶ 58). The Debtor also moved for a two-month adjournment of Orchard's appeal on an expedited basis, requiring counsel to appear at the Appellate Division on August 21, 2013 to orally argue the motion. (*Id.*). Orchard opposed the Debtor's motions and cross-moved for an expedited hearing of the appeal. (*Id.*). In an attempt to resolve the motions, Orchard offered a one-month extension, which the Debtor

---

Orchard suggested to the Debtor that in lieu of an order, the parties simply request that the court so-order the July 9 transcript. Later that day, Orchard mailed a letter to all parties enclosing the July 9 transcript with a five-line errata sheet. Orchard also e-filed the letter and enclosures. (*Id.*, Ex. 34). Orchard's filing of the July 9 transcript and errata prompted a set of emails from the Debtor's counsel, writing "An errata sheet? Let's cut the BS and get on with the litigation . . . . The record is the record there is no reason to change it." (*Id.*, Ex. 35). Nonetheless, the Debtor refused to stipulate to the July 9 transcript or provide an errata. The Debtor's counsel then actively misled Orchard's counsel as to the Debtor's position on the July 9 transcript. After promising to send Orchard its objections or responses to the transcript and errata, the Debtor's counsel left for a fishing excursion. Over the next several days, the Debtor's counsel's assistant told Orchard's counsel that the Debtor's counsel was "in a meeting" and would call back. (*Id.* ¶ 53). The Debtor's counsel never called back. (*Id.*). Finally, Orchard's counsel sent a letter to the Debtor's counsel on August 2, 2013, requesting a response. (*Id.*, Ex. 36). The Debtor's counsel responded by email as follows: "I'm on my boat in a multi day fishing tournament and don't have time for your continue[d] lies to the court. . . . Fish on-- got to go." (*Id.*, Ex. 37). The gamesmanship of the Debtor's counsel forced Orchard's counsel to spend hours pursuing a simple errata to a 30-page transcript.

refused.   Following oral argument, the Appellate Division granted the Debtor a one-month extension.  (*Id*. ¶ 59).

158.    On August 26, 2013, counsel appeared before the Trial Court on the Debtor's notice of settlement.  The court settled the order proposed by the Debtor on August 28, 2013, essentially repeating the relief recited in the July 9 transcript.  (*Id*. ¶ 60).

### c.    Re-Filing of the Second Appeal and Further Motion Practice

159.    The Trial Court's August 28, 2013 order vitiated the Debtor's motion to dismiss Orchard's appeal because the August 28 order was indisputably "appealable."   Accordingly, Orchard immediately appealed the August 28, 2013 order.  (*Id*. ¶ 60).

160.    However, rather than perfecting an entirely new appeal simply to add the new August 28 order, Orchard proposed to the Debtor that the parties simply incorporate the new order into the existing appeal, a common practice in the Appellate Division.  (*Id*. ¶ 61).  This proposal was especially sensible in this instance because the record on appeal was 2,990 pages, and the Appellate Division required nine copies.  Amending the existing record would have avoided the unnecessary re-printing of nearly 27,000 pages and would not have prejudiced any party.  (*Id*.).

161.    Nonetheless, the Debtor obstinately refused Orchard's proposal.  As a result, Orchard was forced to perfect a new appeal, filing nine new copies of virtually the same brief and record.  (*Id*. ¶ 62).

162.    In light of the Debtor's extraordinary efforts to obstruct Orchard's appeal, Orchard moved for an expedited hearing of the appeal, which the Appellate Division granted. (*Id*. ¶ 63).

163.    Desperate to delay Orchard's appeal, the Debtor filed a motion to strike the record.  However, rather than file the motion in a timely manner, the Debtor waited until three business days before its opposition brief was due and then immediately brought an emergency application in the Appellate Division to adjourn Orchard's appeal on the basis of the Debtor's strategically timed motion.  (*Id.* ¶ 64).  The Appellate Division denied the Debtor's motion, but the Debtor succeeded in delaying the appeal by another month.  (*Id.*).

### d.    Third Appeal

164.    When Justice Ramos issued his March 21, 2014 decision, Orchard immediately filed a notice of appeal.  (*Id.* ¶ 65).  However, the Appellate Division's calendar prevented Orchard from seeking timely appellate review.

165.    The calendar for the Appellate Division, First Department, is divided into "terms," each of which has pre-set filing deadlines.  Because the First Department does not sit during the summer months, appeals that do not meet the filing deadline for the final term each spring cannot be heard until the following fall.  (*Id.* ¶ 66).  In 2014, the filing deadline for the final spring term was March 17, 2014, four days *before* the March 21, 2014 decision.  (*Id.*).  As a result, the soonest Orchard could obtain appellate review of the March 21 ruling was September 2014.

166.    This six-month delay posed a substantial risk to Orchard and all other creditors because of the time-limited nature of the Mortgaged Property's zoning entitlements.  (*See* ¶¶ 181, 191 below).  That delay would have virtually ensured that the remaining construction work could not be completed before the zoning entitlements expired, and Orchard was concerned that the expiration of these entitlements would have chilled bidding in a state court supervised

foreclosure sale or otherwise could have devastated the value of the Mortgaged Property. (Dockwell Decl. ¶ 67).

167.    Making matters worse, in Spring 2014 the Receiver learned that the Mortgaged Property's building permits were at immediate risk.   (*See* ¶ 192 below).   Like the zoning entitlements, loss of the permits would have greatly impaired the Mortgaged Property.

168.    To protect the value of the Mortgaged Property for itself and all other creditors, Orchard brought a petition for writs of mandamus and prohibition and emergency relief in the Appellate Division.  (Dockwell Decl., Ex. 38).  This extraordinary application – which required Orchard to commence a new action – was the only procedural vehicle to obtain appellate review of the March 21 ruling while the First Department was on summer leave.

169.    Orchard's petition was heard on an emergency basis by a single justice of the Appellate Division, who directed the parties to seek relief from Justice Ramos in the first instance to protect the Mortgaged Property's building permits.  (*Id.* ¶ 69).  The petition was referred to a five-judge panel for consideration.  (*Id.*).

170.    On June 24, 2014, the Receiver filed an order to show cause before Justice Ramos seeking the authority to negotiate an extension of the building permits with the Department of Buildings ("DOB").  That relief was granted two days later.  (*Id.*, Ex. 51).

171.    On July 7, 2014, Orchard perfected its appeal of the March 21 ruling to ensure that the appeal was heard in the next-available term, which was September.  (*Id.* ¶ 70).  The Debtor filed its chapter 11 petition one week later, staying further proceedings in the state court.

### 3.     The Debtor's Discovery

172.    Throughout the state court action, the Debtor used *ad hoc* discovery requests as a device to delay foreclosure.

173.    On August 18, 2011, the Debtor served documents requests on Orchard.  (*Id.* ¶ 72).  In October 2011, Orchard informed the Debtor that it was ready to produce documents, and the parties agreed that they would enter a confidentiality stipulation.  (*Id.*).  Orchard sent the Debtor a slightly modified copy of the New York City Bar Association Model Confidentiality Form.  (*Id.*).  However, the Debtor refused to execute the confidentiality agreement, forcing Orchard to follow up with three letters and then raise the issue with the Trial Court on December 20, 2011.  (*Id.* ¶ 74, Ex. 39).  The Court directed the parties to sign the stipulation, but even then, the Debtor waited until January 6, 2011 before signing.  (*Id.*).  As a result, rather than producing documents in October 2011, Orchard was forced to wait until January 2012, thereby delaying its ability to move for summary judgment.

174.    Having delayed document discovery by nearly three months, the Debtor then played games with depositions.  The parties appeared before Justice Ramos for the first time on July 31, 2012, for oral argument on Orchard's summary judgment motion.  The Debtor's counsel claimed for the first time that depositions of BFSB loan officers were necessary.  Despite having never previously noticed or subpoenaed depositions of any BFSB witnesses, the Debtor's counsel told Justice Ramos, incorrectly, that the Debtor had been seeking these depositions "since day one of this case."  (*Id.*, Ex. 4 [7/31/12 Hr'g] 14:8-13, 18:13-16).  Over Orchard's objection, Justice Ramos directed that depositions of the BFSB witnesses be taken, but in response to Orchard's concern that this was merely another delay tactic, the Court directed the Debtor to complete the depositions in 30 days:  "I don't want this dragged out.  I want depositions finished by the end of August [2012]."  (*Id.* at 22:8-9).

175.    Despite the Trial Court's direction to complete depositions "by the end of August," the Debtor waited until September 11, 2012 to even subpoena its first BFSB witness.

(*Id.*, Ex. 40). The Debtor then dragged its feet in scheduling the depositions. Orchard repeatedly

informed the Trial Court of the Debtor's dilatory tactics, sending letters to the Court on August

15, 2012 and October 24, 2012 and raising the issue during status conferences on November 20,

2012 and January 8, 2013. (*Id.* ¶ 76, Ex. 41). The Debtor finally deposed its final BFSB witness

on April 3, 2013, *eight months* after the July 31, 2012 oral argument. As of April 3, 2013, all of

the Debtor's discovery requests had been answered, and the Debtor made no further requests.

(*Id.* ¶ 77).

176.    At the direction of the Court, the parties filed supplemental briefs on April 18,

2013, incorporating deposition testimony into the summary judgment motion and cross-motions.

(*Id.* ¶ 78).

177.    The parties' next oral argument on the summary judgment motion and cross-

motions was held on May 1, 2013. The Debtor falsely told the Court it was unable to review

BFSB's loan files because it did not know where the files were. (*Id.* ¶79). In fact, the Debtor

had been told numerous times that Orchard had the files, but the Debtor never sought their

production.[27] (*Id.* ¶ 80). Justice Ramos again postponed consideration of Orchard's summary

judgment motion so the Debtor could serve new document requests. (*Id.*). This document

production delayed a decision on Orchard's summary judgment motion by another 10 months.

---

[27] In addition to documents produced by Orchard stating that BFSB's files for the Loans
would be delivered to Orchard at closing, Orchard produced and filed a copy of the Mortgage
Loan Purchase Agreement (MLPA) as an exhibit in support of its summary judgment motion on
February 3, 2012. (Obj., Ex. L). The MLPA stated that "[p]romptly after the Closing Date,
Seller shall deliver to Purchaser, or its designee, the Mortgage Loan Files, at such location as
Purchaser shall designate." (*Id.* § 2.4). Orchard also filed an affidavit on April 2, 2012 from one
of its principals which stated as follows: "The facts set forth herein are based on my personal
knowledge and my review of *the loan files provided to Mortgagee by Brooklyn Federal Savings
Bank, the assignor of Mortgagee, of which I am the custodian*." (Dockwell Decl., Ex. 42)
(emphasis added).

178.    In total, between its unjustified refusal to execute a confidentiality stipulation (3 months), its false claim that it was denied depositions of BFSB witnesses and its subsequent delay in deposing those witnesses (8 months), and its false claim that it did not know whom to ask for BFSB's loan file (more than 10 months), the Debtor delayed a decision on Orchard's summary judgment motion by a remarkable *21 months*.

### 4.    The Debtor's Strategy of Delay

179.    In addition, the Debtor requested countless adjournments of briefing deadlines and oral arguments.  Orchard's attorneys were forced to devote hundreds of hours responding to the Debtor's incessant attempts to prolong the foreclosure action.  (*See, e.g., id.*, Ex. 43) (attaching, as examples, seven separate adjournment requests to the state court)  Over Orchard's objections, the Debtor obtained 28 days of adjournments of Orchard's motion to dismiss alone, and an additional 65 days of adjournments of Orchard's summary judgment motion.  (*Id.* ¶ 83). These delays, as well as others not mentioned here, were in addition to the discovery delays and appeal delays described above.

### 5.    Legal Proceedings to Protect the Mortgaged Property

180.    For years now, the Debtor has refused to cooperate with, and at times actively attempted to thwart, the Receiver's efforts to protect the Mortgaged Property.  (*Id.* ¶ 85).  Most significantly, the Debtor attempted on numerous occasions to imperil the Mortgaged Property's zoning entitlements, the loss of which would have devastated the Mortgaged Property's value and impaired or eliminated recovery by the Debtor's creditors.

181.    The Debtor initially obtained its building permits for the project in Fall 2008. (*Id.*, Ex. 46 ¶¶ 8, 9).  The Mortgaged Property was subsequently down-zoned, but it remained "grandfathered" under the prior zoning, provided construction work was substantially complete by November 18, 2010.  (*Id.* ¶¶ 6, 10-12).  If not, the Mortgaged Property would become subject

to the new zoning regulations, which would have significantly reduced the Mortgaged Property's development potential. (*Id.*) The hotel would have lost approximately 13,024 square feet of floor area – from 39,064 square feet to 26,040 square feet – and more than half of its 16-story height – from 191 feet to 80 feet. (*Id.*). Because the hotel's superstructure is already complete, compliance with the new zoning regulations would require substantial demolition of the existing structure, as well as the loss of millions of dollars in value. (*Id.* ¶ 2).

182.    The Debtor did not meet the November 18, 2010 deadline, and applied to the Board of Standards and Appeals ("BSA") for an extension. The BSA approved the application on March 15, 2011, extending the deadline to March 15, 2013. (Obj., Ex. I).

183.    In Fall 2012, with no end in sight in the state court action, the Receiver began to prepare an application to the BSA for a further extension of the zoning entitlements. (*Id.* ¶ 86). Orchard hired zoning counsel, Goldman Harris LLP, to prepare the application and present it at public hearings of the Community Board and the BSA on behalf of the Receiver. Orchard paid all of these fees. (*Id.* ¶ 87).

184.    The Receiver and Orchard repeatedly asked the Debtor to execute a form so that the Receiver could file the application with the BSA, but the Debtor steadfastly refused. (*Id.* ¶ 88).

185.    On several occasions, including during a December 5, 2012 telephonic conference with the Trial Court's law clerk and other counsel, the Debtor's counsel stated that the Debtor would not voluntarily extend the Mortgaged Property's entitlements. (*Id.* ¶ 89). According to the Debtor's counsel, the Debtor recognized that it would likely lose the property through foreclosure and refused to take any action that might benefit the property's next owner. (*Id.*).

186.    In December 2012, unable to obtain the Debtor's cooperation, the Receiver moved by order to show cause for authority from the Trial Court to execute documents in the Debtor's stead. (*Id.*, Ex. 44). Orchard brought a concurrent motion, seeking similar relief but also asking the court to enjoin Zhavian from interfering with the Receiver's attempts to extend the entitlements. (*Id.*, Ex. 45). The motions were fully briefed.

187.    At a January 8, 2013 hearing before the Trial Court, rather that attempting to defend the Debtor's conduct, the Debtor's counsel informed the Court that the Debtor had relented after months of intransigence and tens of thousands of dollars in legal costs for Orchard and would now cooperate in applying for the extension. (*Id.* ¶ 93).

188.    In April 2013, despite its pledge of cooperation, the Debtor resumed its efforts to interfere with the Receiver's application to extend the zoning entitlements.

189.    Zhavian attended a Community Board meeting regarding the Receiver's application. Incredibly, Zhavian publicly objected to the application even though he had, by signed affidavit, approved the filing of the application and attested to its accuracy. (*Id.*, Ex. 47 [Travers Aff.] ¶¶ 5-6).

190.    Orchard moved once again for an order enjoining Zhavian from interfering with the Receiver's attempts to protect and extend the zoning entitlements. (*Id.*, Ex. 47).

191.    Fortunately, Zhavian's tactics failed, and in August 2013, the application to extend the Mortgaged Property's zoning entitlements was approved, extending the entitlements to August 20, 2015. (*Id.* ¶ 95).

192.    However, the entitlements were placed in jeopardy again in Spring 2014, when the Department of Buildings (DOB) phased out its "Stalled Sites Program," which had protected the Mortgaged Property's building permits. (*Id.*, Ex. 48 ¶ 2). (The Mortgaged Property's

building permits are separate from, albeit related to, its zoning entitlements.) Loss of the permits would have required the Debtor to re-apply for permits under the new zoning regulations, thereby requiring the substantial demolition of the existing structure to comply with the new height and density limitations. (*Id.*). The Mortgaged Property also faced the possibility of fines in excess of $50,000 *per day*. (*Id.*).

193.    In a June 20, 2014 Notice of Default, Orchard advised the Debtor of these developments, which constituted new defaults under the Mortgages because of the Debtor's failure to adequately protect the Mortgaged Property. (*Id.*, Ex. 49). However, the Debtor took no serious action. Zhavian sent a jocular email to Orchard and its counsel stating, incorrectly, that there was no cause for concern about the permits. (*Id.*, Ex. 50). Zhavian was either oblivious to the serious jeopardy posed to the Mortgaged Property or he was attempting to mislead Orchard into thinking everything was fine.

194.    As a result of the Debtor's inaction, Orchard and the Receiver were forced to seek emergency relief through the state court. (*Id.* ¶ 99). Within two days, on June 26, 2014, the state court entered an order authorizing the Receiver, *inter alia*, "to take all necessary, reasonable and appropriate action to protect the Mortgaged Property's zoning entitlements and building permits." (*Id.*, Ex. 51).

195.    The Receiver was in discussions with the DOB when the Debtor filed its chapter 11 petition. (*Id.* ¶ 102). By Order of this Court entered October 1, 2014, the Receiver was authorized to continue discussions with the DOB and to implement a site safety and maintenance plan.

**6.      The Restraining Order and the Subsequent Contempt Motion**

196. Throughout the state court action, Zhavian personally harassed and threatened Orchard's principals and attorneys. (*See, e.g.*, Exs. 52, 53). Orchard's counsel repeatedly complained to Debtor's counsel about Zhavian's conduct, including his late-night calls to Orchard's principals "yelling obscenities and making personal threats." (*Id.*, Ex. 54).

197. Zhavian also contacted Orchard's attorneys incessantly. Zhavian sent at least 94 emails *directly* to Orchard's attorneys, and left at least 26 voicemails for Orchard's attorneys. Orchard repeatedly asked the Debtor's counsel to put an end to these communications, but they continued unabated. (*Id.*, Ex. 55). Zhavian also initiated a rabbinical court proceeding against one Orchard attorney, Y. David Scharf, seeking to have Scharf shunned solely for representing Orchard, and showed up at Scharf's synagogue and office. (*Id.* ¶ 108). Scharf was forced to retain a rabbi to represent him in the proceeding. (*Id.*).[28] All of these extra-judicial actions are utterly without merit and have been either dismissed or withdrawn by Zhavian to avoid an adverse determination.

198. On at least two occasions Zhavian made abhorrent, alarming and threatening comments about and to Orchard's female attorney, Ms. Lesser. (*Id.*, Ex. 53 ¶¶ 4-5).

199. Zhavian also threatened physical harm to Orchard's managers, attorneys, and their families. (*Id.* ¶ 6). Zhavian threatened to kill Orchard manager, Jordan Socaransky, and his family and vowed that everyone affiliated with Orchard will "get what's coming to you." (*Id.* ¶ 7). Zhavian repeated these threats multiple times to multiple people. (*Id.* ¶¶ 8-9).

---

[28] This type of conduct continued post-petition. For example, Zhavian filed another rabbinical proceeding against Mr. Scharf. Zhavian also filed disciplinary complaints with the New York State Bar Association against two other Orchard attorneys, Danielle Lesser and Brett Dockwell, based solely on their advocacy for Orchard. (Id. ¶ 109). Zhavian emailed copies of his complaints to group of recipients, including the courts reporter for the New York Post, Julia Marsh. (Id., Ex. 56).

200.    Zhavian's violent threats against Orchard's principals and attorneys and his threats to damage the Mortgaged Property grew so alarming that in November 2013, Orchard was forced to seek a restraining order against Zhavian.  (*Id*., Ex. 57).  Orchard's papers in support of the order documented in detail the conduct cited above, as well as other incidents.  (*Id*. ¶ 104).  On the return date of Orchard's motion, rather than attempt to defend his misconduct, Zhavian stipulated to the entry of the restraining order.  (*Id*. ¶ 111).  Zhavian signed the stipulated order, acknowledging that he understood and agreed to its provisions.  (*Id*., Ex. 58).  Zhavian, however, continued his obstreperous course of conduct through and after the Petition Date. (*Id.*, Ex.'s 59, 60).

**B.    The Guaranty Action**

201.    On June 30, 2011, Orchard commenced an action against Zhavian to enforce the guaranties of the Loans.  *Orchard Hotel, LLC v. Zhavian* (Sup. Ct. Kings Cnty. Index No. 15013/11).  (*Id*. ¶ 116).

202.    The action was brought under CPLR 3213 for summary judgment in lieu of complaint.  The motion was fully briefed on September 6, 2011 and orally argued on or about September 7, 2011.  (*Id*. ¶ 117).

203.    At oral argument, the presiding judge, Justice Carolyn Demarest, asked the parties to submit bench memos addressing whether New York's one-action rule, RPAPL § 1301, applied.  On September 30, 2011, Orchard filed an 18-page brief addressing this point.  (*Id*. ¶ 118).

204.    On January 31, 2012, Justice Demarest granted Orchard's motion, finding that Zhavian was liable under the guaranties.  However, Justice Demarest stayed further proceedings

66

in the guaranty action until the amount of the Debtor's liability to Orchard is established. *Orchard Hotel, LLC v. Zhavian*, 2012 N.Y. Misc. LEXIS 402, at \*38-40.

## C.      The Debtor's Objection to Orchard's Legal Fees Must Be Denied

205.     The Debtor makes two arguments in opposition to Orchard's legal fees:   (i) Orchard's prepetition attorneys fees did not satisfy an inapplicable bankruptcy standard for postpetition services to be paid by a bankruptcy estate, and (ii) Orchard's fees in litigation were inherently unreasonable notwithstanding the Debtor's conduct in protracting the litigation.

206.     As a threshold matter, there is no question that Orchard is entitled to attorneys' fees incurred in connection with the foreclosure litigation.  As the Debtor conceded, the Notes explicitly provide for the reimbursement of attorneys fees.[29]  The legal invoices in question are being provided for review, and New York law, which governs the parties' substantive legal rights in determining the enforceability of Orchard's claim, allows for reasonable attorneys fees. The fees incurred here are reasonable, especially in light of the obstructionism, delay tactics, and attempts at intimidation by the Debtor and its principal, Zhavian.

207.     Prepetition attorneys' fee claims will be allowed in bankruptcy to the extent that the claims are enforceable under applicable state law.  *See Travelers Casualty & Surety Company of America v. Pacific Gas & Electric (*"*Travelers*"*)* 549 U.S. 443 (2007) (explaining that "an otherwise enforceable contract allocating attorney's fees ... is allowable in bankruptcy except where the Bankruptcy Code provides otherwise").

---

[29]  The Debtor argued in part that Orchard's legal fees are not recoverable on the ground that the Claim did not specify which sections of the Notes provide for its legal fees and had not attached copies of the invoices.  However, the Notes permit Orchard to recover "all costs and expenses" in enforcing the Loan Documents.  (*See* ¶ 30 above).  Copies of Orchard's legal invoices are filed herewith.  (Dockwell Decl., Ex. 32).

208.    In an attempt to manufacture an objection to Orchard's contractual right to attorneys' fees, the Debtor attempts to import the standard for allowance of attorneys fees set forth in Bankruptcy Code section 506(b).   Even the Debtor's authority recognizes that this argument is a non-sequitor, as section 506(b) does not apply to attorneys' fees incurred pre-petition.   Section 506(b) applies only to post-petition fees incurred by a secured creditor.   *See Woods Auto Gallery, Inc.*, 379 B.R. 875 (Bankr. W.D. Mo., 2007) (citing *In Re: Vanderveer Estates Holdings*, 283 B.R. 122, 131 (Bankr. E.D.N.Y. 2002) (holding that pre-petition interest, fees and costs are part of the secured creditor's claim and are not governed by §506(b)); *In re Glazier Group, Inc*., 2013 WL 1856305, *3 (Bankr. S.D.N.Y. 2013) (applying section 506(b) to an oversecured creditor's fee request and overruling a debtor's objection that the fees were unreasonable because the secured creditor's position was never in jeopardy), *In re: PCH Associates*, 122 B.R. 181 (Bankr. S.D.N.Y. 1990) (discussing the payment of fees incurred by an oversecured creditor in the post-petition period); *In re Wonder Corp. of America*, 72 B.R. 580 (Bankr. Conn. 1987), *aff'd* 82 B.R. 186 (D. Conn. 1988) (discussing the propriety of fees incurred by oversecured creditors during the course of the chapter 11 case).[30]

---

[30] Even assuming that the section 506(b) standard applied to Orchard's claims, which it does not, there is little question that Orchard met the standard.  A request for attorneys' fees under section 506(b) is appropriate where a secured creditor shows "(1) that its claim is over-secured in excess of the fees requested; (2) that the fees are reasonable; and (3) that the agreement giving rise to the claim provides for attorneys' fees." *In re Enron Corp.*, 306 B.R. 33, 43 (S.D.N.Y. 2004) *aff'd sub nom. Enter. Prods. Operating L.P. v. Enron Gas Liquids Inc.*, 119 Fed. Appx. 344 (2d Cir. 2005).  Here, in light of the sale to Arcade, there is little question that Orchard is oversecured by more than the amount of the fees requested and that the Notes provide for attorneys' fees.  Moreover, there is no credible question that Orchard's fees are reasonable within the scope of section 506(b).  *See In re PCH Assocs.*, 122 B.R. at 204 (holding that consideration of reasonableness of post-petition fees under section 506(b) requires a court to "determine whether the creditor reasonably believed the services were necessary to protect its interest in the debtor's property").  In *Glazer Group*, the bankruptcy court awarded an over-secured creditor the full measure of its post-petition fees where (i) the case was filed as part of an

68

209.    Given that Orchard's claim for pre-petition attorneys fees is not controlled by section 506(b), the Court must look to New York state law to determine whether Orchard's fees are reasonable.    Courts applying New York law consider seven factors in determining the reasonableness of attorneys' fees: (1) the time and labor required; (2) the lawyer's expertise, ability and reputation; (3) the amount involved and benefit to the client from the services provided; (4) the customary fee charged for similar services; (5) the contingency or certainty of compensation; (6) the results obtained; and (7) the responsibility involved.    *See Riverhead Sanitation and Carting Corp. v. Hampton Hills Golf & Country Club*, 2013 N.Y. Misc. Lexis 1322 (Sup. Ct. Suffolk Cnty. March 21, 2013) (citing *In re Sucheron*, 95 A.D.3d 892, 894 (2d Dep't 2012).

210.    Fees incurred by Orchard's counsel manifestly satisfy the standard.    First, counsel's time and labor were justified, given the Debtor's litigation tactics.    The professional services rendered by Morrison Cohen as counsel to Orchard required the continuous expenditure of time and effort, under time pressure which at times necessitated providing services late into the evening, on weekends and holidays.    The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch. Mindful of the cost of these cases, however, Morrison Cohen staffed the case leanly so as to efficiently handle each issue for which it was tasked.

211.    Additionally, the length and complexity of this case cannot be understated. Courts considering the reasonableness of attorneys' fees will consider the overall course of the

---

overall strategy by the debtor's principal, (ii) the debtor resisted selling its assets until the secured creditor and the committee applied significant pressure forcing the sale, and (iii) in light of management's intransigence, the secured creditor's action was necessary to protect its liens. Given the litigation history of these cases, Orchard's responses to the scorched earth litigation tactics employed by the Debtor were reasonable and necessary.

litigation in question. *Nestor v Britt*, 834 N.Y.S.2d 458 (Civil Court, City of New York April 23, 2007) *aff'd*, 2008 N.Y. Misc. LEXIS 3038 (N.Y. App. Term May 23, 2008) is instructive. In *Nestor*, landlords brought numerous proceedings in an attempt to evict a holdover tenant from a valuable piece of Manhattan real estate. After winning, the tenant was entitled to reimbursement of reasonable attorneys' fees as a matter of New York real property law. The landlords objected to the request, claiming that the time spent by the tenant's counsel researching and drafting pleadings in defense of the landlords' action was not justified – arguing in part that the tenant's assertions that the litigation was frivolous supported the landlords' contention. The court awarded attorneys' fees to the tenant, explaining that landlords' argument was akin to it "saying that [its] proceeding was meritorious when they brought it but frivolous after they lost it."

212.    Here, the Debtor's litigation strategy expanded what should have been a simple foreclosure action into a complex litigation involving tactics that went far beyond the court room. The Debtor's dilatory tactics added more than two years to the proceedings and substantially increased Orchard's litigation costs. When these tactics did not cause as much delay as the Debtor hoped, more drastic measures were taken. Over the course of the litigation:

a.    Debtor's counsel added three months to the litigation by delaying execution of a NYC Bar form confidentiality agreement. (*See* ¶ 173 above).

b.    The Debtor used deposition timing to extend a one month task into 8 months. (*See* ¶¶ 174-174 above).

c.    The Debtor requested countless adjournments of briefing deadlines and oral arguments, forcing Orchard's attorneys to devote hundreds of hours responding to the Debtor's incessant attempts to prolong the foreclosure action. (*See* ¶ 179 above).

70

      d.     The Debtor refused to cooperate with the Receiver's attempts to preserve the Mortgaged Property's zoning entitlements, forcing Orchard to seek injunctive relief twice from the Trial Court.  (*See* ¶¶ 179-186 above).

      e.     At a January 8, 2013 hearing before the Trial Court, the Debtor's counsel informed the Court that the Debtor had relented (after months of intransigence) and would now cooperate in applying for the extension.  (*See* ¶ 187 above).  However, in April 2013, notwithstanding its pledge of cooperation, the Debtor resumed its attempts to interfere with the extension application filed by the Receiver.  (*See* ¶¶ 188-189 above).

      f.     Zhavian also threatened Orchard's attorneys and principals, as well as their families, and publicly disparaged them.  (*See* ¶¶ 196-200 above).

213.    As the author of this unfortunate drama, the Debtor cannot now complain about the cost of the ink and paper required to print it.

214.    In determining the reasonableness of attorneys' fees, Courts also consider the experience and reputation of the attorneys and the responsibility involved.  Morrison Cohen has extensive experience in corporate litigation, and in commercial foreclosure litigation.  Morrison Cohen's services on behalf of Orchard have been rendered in a highly efficient manner by attorneys who have achieved a high degree of expertise in these areas.  The skill and competency of the Morrison Cohen attorneys who have represented Orchard ensured that these cases have been administered in the most efficient and expeditious manner, which was unquestionably difficult given the Debtor's scorched earth litigation strategy.

215.    Courts next consider whether the fees charged are customary for the services provided.  The rates charged by Morrison Cohen in this representation are the rates Morrison

Cohen regularly charges its hourly clients.  Morrison Cohen's hourly rates are based on, and largely lower than, compensation charged by comparably skilled practitioners in similar cases.

216.    Courts also consider the amounts at issue, the benefit to the client, and the results obtained.  Orchard's claim is in excess of $28 million, its collateral consists of a property improved with a partially completed hotel subject to grandfathered zoning and rapidly expiring permits, the Debtor has consistently and aggressively delayed Orchard's foreclosure action, and the Debtor's principal has endangered the property's zoning and construction permits and attempted to intimidate Orchard's principals and counsel, forcing Orchard to take additional precautions.  Notwithstanding the Debtor's dilatory and obstructionist tactics, Morrison Cohen successfully defeated the Debtor's claims before the State Court and successfully prosecuted two appeals.  There is little question that Morrison Cohen's services were essential to Orchard's attempt to enforce its contractual rights, and that Morrison Cohen provided value to Orchard.

217.    Given the foregoing, there is little question that Morrison Cohen's fees satisfy the lodestar standard and are reasonable in light of the complexity, length, and acrimony caused by the Debtor in this litigation.  As such, there is no credible argument that Orchard should not be reimbursed for its fees.

## CONCLUSION

218.    For the reasons set forth herein, Orchard respectfully requests the Court allow Orchard's claim (Claim No. 9) in its entirety and grant such other relief as the Court may deem just and necessary.

Dated: March 13, 2015
        New York, N.Y.

                                MORRISON COHEN LLP

                                By:  __/s/ Joseph T. Moldovan__
                                        Y. David Scharf

72

Joseph T. Moldovan
Danielle C. Lesser
Robert K. Dakis
Brett Dockwell
909 Third Avenue
New York, New York 10022
Telephone:  (212) 735-8600
Fax:  (212) 735-8708
bankruptcy@morrisoncohen.com
www.morrisoncohen.com

Counsel to Orchard Hotel, LLC