# Exhibit 2

COPY

1

1

2    SUPREME COURT OF THE STATE OF NEW YORK
              COUNTY OF NEW YORK

3    ------------------------------------------X

     ORCHARD HOTEL, LLC,

4
                             Plaintiff,

5
              - against -                          Index No.
6                                                  850044/2011
     D.A.B. GROUP LLC, ORCHARD CONSTRUCTION LLC,
7    FLINTLOCK CONSTRUCTION SERVICES, LLC, JJK
     MECHANICAL INC., EDWARD MILLS & ASSOCIATES,
8    ARCHITECTS PC, CASINO DEVELOPMENT GROUP,
     INC., CITYWIDE CONSTRUCTION WORKS INC.,
9    EMPIRE TRANSIT MIX INC., MARJAM SUPPLY CO.,
     INC., ROTAVELE ELEVATOR INC., SMK
10   ASSOCIATES INC., FJF ELECTRICAL CO. INC.,
     CITY OF NEW YORK, NEW YORK STATE
11   DEPARTMENT OF TAXATION AND FINANCE,
     LEONARD B. JOHNSON, CITY OF NEW YORK
12   ENVIRONMENTAL CONTROL BOARD, BROOKLYN
     FEDERAL SAVINGS BANK, STATE BANK OF TEXAS,
13   JOHN DOE #1 THROUGH JOHN DOE #100, the
     last 100 names being fictitious and unknown
14   to plaintiff, the persons, or parties
     intended being the tenants, occupants,
15   persons or corporations, if any, having or
     claiming an interest in or lien upon the
16   premises described in the complaint,

17                           Defendants.

     ------------------------------------------X
18

19                           228 East 45th Street
                             New York, New York
20
                             January 7, 2013
21                           10:15 a.m.

22

23            **EXAMINATION BEFORE TRIAL** of **JOANNE B. GALLO**,

24   a Non-Party Witness in the above-entitled action, at the

25   above-mentioned place, before John Pisano, a Notary



2

1

2    Public of the State of New York, taken pursuant to

3    Article 31, Section 3101 et seq. of the C.P.L.R., and

4    pursuant to Judicial Subpoena and Notice Of Deposition

5    Upon Oral Examination.

6
                        ***      ***      ***
7

8
     A P P E A R A N C E S:
9

10
        MORRISON COHEN LLP
11               Attorneys for Plaintiff, ORCHARD HOTEL, LLC
                 and Defendant, ORCHARD CONSTRUCTION, LLC
12               909 Third Avenue - 27th Floor
                 New York, New York  10022
13
        BY:     BRETT D. DOCKWELL, ESQ.
14

15

        FAVATA & WALLACE, LLP
16               Attorneys for Defendant, D.A.B. GROUP, LLC
                 229 Seventh Street - Suite 300
17               Garden City, New York  11530

18      BY:     WILLIAM G. WALLACE, ESQ.

19

20      HOLLANDER & STRAUSS, LLP
                 Attorneys for Defendant, FLINTLOCK
21               CONSTRUCTION SERVICES, LLC
                 40 Cutter Mill Road - Suite 203
22               Great Neck, New York  11021

23      BY:     LARRY HOLLANDER, ESQ.

24

25                                      (Continued...)

3

1

2      A P P E A R A N C E S Continued:

3

4          INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
                   Attorneys for Defendant, EDWARD MILLS &
5                  ASSOCIATES, ARCHITECTS PC
                   250 Park Avenue - 6th Floor
6                  New York, New York  10177

7          BY:    TARA B. MULROONEY, ESQ.

8

9

10         O'REILLY, MARSH & CORTESELLI, P.C.
                   Attorneys for Non-party Witness,
                   JOANNE B. GALLO
11                 222 Old Country Road - 2nd Floor
                   Mineola, New York  11501

12

           BY:    JAMES G. MARSH, ESQ.

13

14

15

16    ALSO PRESENT:

17

18         BEN ZHAVIAN

19

20

21                        * * *      * * *      * * *

22

23

24

25

4

1

2                    (Whereupon, the reporter premarked a

3          copy of Judicial Subpoena and Notice Of

4          Deposition Upon Oral Examination, comprising

5          two pages, as Defendant's Exhibit A, for

6          identification as of this date.)

7

8    J O A N N E   B.   G A L L O   ,   a non-party witness

9                    herein, having been first duly sworn

10                   by a Notary Public of the State of New

11                   York, was examined and testified as

12                   follows:

13

14   EXAMINATION BY MR. WALLACE:

15        Q.    May I have your full name for the record,

16   please?

17        A.    Joanne B. Gallo.

18        Q.    Where do you currently reside?

19        A.    11 Fifth Avenue, New York, New York  10003.

20        Q.    Ms. Gallo, my name is William Wallace.  I

21   represent D.A.B. Group LLC in connection with this

22   matter.  I'm going to be asking you a series of questions

23   this morning and showing you some documents.

24             If at any time you don't understand my

25   question, please let me know and I'll attempt to rephrase

27

                              J. Gallo

1

2    it goes smoothly, in a year and a half we'll be

3    celebrating a new hotel?

4         A.    Yes (referring).

5         Q.    Do you know what he's referring to when he

6    refers to that time frame of a year and a half?

7         A.    No.

8         Q.    Did you ever discuss with Mr. Rosenfield

9    where he got the year and a half from?

10        A.    I don't recall (referring).

11        Q.    In your review of the legal docs, did you

12   have an occasion to review the contract between Flintlock

13   and D.A.B. Group?

14        A.    I know I saw it.  Did I do a thorough review?

15   No.

16        Q.    When is it that you saw it?  Would it be

17   that time when you looked at the legal docs?

18        A.    When I looked at the legal docs and you see

19   that you've got a construction contract and a building

20   loan agreement and a mortgage.

21        Q.    And a general contractor?

22        A.    Yes.

23        Q.    When you did that legal doc review, were you

24   aware of the term of the loan?

25        A.    It matured March 1, 2011.

1                              J. Gallo

2      there?

3          A.      That we were concerned about the BSA, that

4      the superstructure needed to be completed by mid November

5      of 2010 (referring).

6          Q.      At the time you sent this e-mail, you were

7      then aware of the fact that the loan termed out on March

8      1st, 2011; correct?

9          A.      Right (referring).

10         Q.      When you sent this e-mail, did you have any

11     idea as to when the projected schedule was for completion

12     of the entire project?

13         A.      We were totally focused on the building of

14     the superstructure (referring).

15         Q.      So that the completion date of the project

16     was not an important issue to you at that time?

17                    MR. MARSH:   Objection to the form, but

18                 you can answer it if you can.

19         A.      As I said, we were concerned about the

20     superstructure (indicating).

21         Q.      And not so much about completion of the

22     project?  At this time (indicating).

23         A.      The superstructure was the critical piece.

24         Q.      Ms. Gallo, did there come a point in time in

25     your tenure, first as a consultant and later as a Senior

42

1                          J. Gallo

2     VP, that Brooklyn was looking to sell some of these

3     commercial real estate loans?

4          A.     Yes.

5          Q.     When did that become important to you in the

6     work-out department?

7          A.     We started our note sale project, probably

8     started in February of 2011.

9          Q.     What was the impetus for that?

10         A.     We were under -- we had to shrink the bank

11    and sell problem assets.

12         Q.     When you say you had to, this came from a

13    higher source?

14         A.     A much higher authority, yes.

15         Q.     And was that OTS?

16         A.     That was the board bank management and OTS.

17    It was to reduce the level of problem assets however you

18    can.

19         Q.     And the problem assets of the bank at that

20    time were primarily commercial real estate loans?

21         A.     Commercial real estate loans.

22         Q.     And was there a list or schedule of the ones

23    that were considered problem assets in February of 2011?

24         A.     Yes.

25         Q.     The compilation of that list, was that your

43

1                              J. Gallo

2      responsibility initially or your group's responsibility?

3           A.    Yes.

4           Q.    And that came down from the board directly

5      to you; correct?

6           A.    The list?

7           Q.    No, no, the mandate --

8           A.    The mandate to get rid of the problem assets

9      was mandated by the board and by the OTS to reduce the

10     level.

11          Q.    And who was in charge of initially compiling

12     the list of those problem assets?

13          A.    We maintained a list of all loans that were

14     criticized or classified.

15          Q.    And was the Allen Street Hotel loan one of

16     the ones that was on that list?

17          A.    Yes.

18          Q.    And how would a loan get on that list?  What

19     were the criteria that would put it on the list?

20          A.    If it was criticized or classified.  We also

21     had performing loans on the list.

22          Q.    Let me start with criticized.

23                Is that a term of art, criticized?

24          A.    Criticized, yes.

25          Q.    Can you define that?

44

1                              J. Gallo

2         A.      But it's a special mention loan.

3         Q.      And what does that mean?

4         A.      That means it is a loan that has certain

5    areas of weakness where the ultimate repayment is

6    questionable.

7         Q.      I think you also referred to classified?

8         A.      Classified are substandard loans.

9         Q.      What's the criteria to determine that a loan

10   is substandard?

11        A.      It matured, it stopped paying, the collateral

12   value is not worth the loan value.

13        Q.      You also had, you said, performing loans?

14        A.      Performing loans, um-hmm.

15        Q.      How would a performing loan get on that

16   list?

17        A.      If we felt that there was value there and

18   that perhaps someone would be interested in buying a

19   suite -- a package of loans, one being performing, one

20   being non-performing.

21        Q.      In February of 2011, the Allen Street loan

22   made this list; correct?

23        A.      Yes.

24        Q.      The general list.  And do you recall, as you

25   sit here today, for what reason it was put on this list?

45

J. Gallo

2    Was it a criticized loan, a classified loan or one of

3    these performing loans that you thought you could get

4    value for?

5    A.    We had some concerns about it, particularly

6    with respect to the ability to continue the construction

7    and the payments that had been made to Flintlock.

8    Q.    What were your concerns about the ability to

9    complete the construction?

10    A.    We understood that Flintlock had -- that

11    some moneys had been withheld from Flintlock in terms of

12    their payment under the advances.

13    Q.    Was that addressed with Flintlock?

14    A.    That was addressed with Ed Mills, Flintlock,

15    Nick Zagami.  Once again, I don't recall if Ben was on

16    the phone call or not (indicating), but we did meet about

17    the fact that moneys had been withheld.

18    Q.    What was the sum and substance of those

19    conversations?

20    A.    I believe the amount was approximately

21    $300,000 that was owed to Flintlock under construction

22    advances that we had made that they had not received.

23    Q.    And did you take this up with D.A.B. as

24    well?

25    A.    Yes.  That's why I said Nick Zagami was

1                           J. Gallo

2    there, I don't recall if Ben was on the phone or at the

3    meeting at the time.

4          Q.     And how did D.A.B., for lack of a better

5    word, whether it was Nick or Ben, respond?

6          A.     They subsequently agreed to pay Flintlock

7    the amount of the moneys that had been originally

8    withheld.

9          Q.     And did that affect whether or not they were

10   on the list to sell?

11         A.     Well, you can't do that.  That was not

12   something that was ever contemplated in the agreement;

13   that there would be withholdings.  So we were concerned

14   about, I can't say in a legal term, the legality, but

15   certainly that was never supposed to have happened.

16         Q.     And did there come a point in time when the

17   list was published to solicit purchasers?

18         A.     We have what you call a virtual data room.

19         Q.     And in that room are the --

20         A.     Names and locations of properties were

21   listed for sale and if a person wanted to look at the,

22   what loans were on there, they would sign a

23   confidentiality agreement and they would have to identify

24   which properties they were interested in looking at.

25   They also had to provide proof of liquidity.  And if they

J. Gallo

1

2      A.      We got a response that it was okay to sell

3      the note.

4      Q.      Now, at the time that you made a request to

5      extend the maturity date, did you simultaneously --

6      A.      No.

7      Q.      -- ask permission to sell?

8      A.      No.

9      Q.      Did you make a separate request to sell the

10     note?

11     A.      Yes.

12     Q.      Was it done at the same time?

13     A.      No.

14     Q.      When was the request to sell the note made

15     from OTS?

16     A.      I don't recall.

17     Q.      Was it before or after the request to extend

18     the maturity date?

19     A.      It would have been after.

20     Q.      Prior to requesting permission to sell the

21     note, had you had a response from your request to extend

22     the maturity date?

23     A.      No.

24     Q.      To your knowledge, did Brooklyn ever obtain

25     a response to their request to extend the maturity date?

                                        J. Gallo

1

2        A.     No.

3        Q.     How long after the request for an extension

4   did you make your request to sell the note?

5        A.     I don't recall.

6        Q.     Did you have any discussion with Mr. Aviram

7   or anybody else at Maverick regarding your request to

8   extend the maturity date?

9        A.     I don't recall.

10       Q.     Did you exchange any e-mails with Mr. Aviram

11  regarding the possibility of extending the maturity date

12  of the note?

13       A.     I don't remember.

14       Q.     Would you have any records which would

15  reflect whether or not you had any conversation or

16  correspondence with Mr. Aviram or anybody at Maverick

17  regarding the extension of the note, the maturity date of

18  the note?

19       A.     Could you rephrase that?

20       Q.     Sure.  Do you personally have any records

21  which would indicate any conversations or correspondence

22  you had with anybody at Maverick regarding your request

23  that OTS permit the extension of the maturity date?

24                   MR. MARSH:  Objection to the form of

25                   the question.

76

1                              J. Gallo

2    I'll refer to them as either Flintlock or FCS.

3           A.    Okay.

4           Q.    Thank you.

5                 I'd like to clarify some of your testimony

6    with Mr. Wallace concerning --

7                       MR. MARSH:  Objection to that

8                 statement.

9                       You can ask her questions and you'll

10                get answers.

11          Q.    -- regarding the timing on the request for

12   an extension of the loan.

13                If I understood your testimony correctly,

14   please tell me if this is accurate:  Sometime prior to

15   March of 2011, the maturity date of the loan, Brooklyn

16   requested that OTS approve an extension of the loan?  Did

17   I understand that correctly?

18          A.    Yes.

19          Q.    And if I understood correctly, you stated

20   that there is a procedure with the loan committee over at

21   Brooklyn to make that recommendation to OTS; is that

22   correct?

23          A.    I make the recommendation to the loan

24   work-out committee of the board and if they approve it,

25   then I send in information to the OTS.

1                              J. Gallo

2        Q.    Do you recall when that request went from

3   Brooklyn to OTS to extend the loan?

4        A.    No, not specifically.

5        Q.    General procedures of Brooklyn, based on

6   your experience with the company, when would a request

7   for an extension of a loan generally be made relative to

8   the maturity date?

9        A.    Prior to the maturity date.

10       Q.    Do you have a more specific answer for me?

11  Six months before, three months before, a day before?

12  Based on your experience as to general procedure for

13  Brooklyn.

14       A.    I could only speak to my experience there,

15  which was probably anywhere from 30 to 60 days.

16       Q.    Do you have any recollection that that

17  procedure was not followed with respect to the request

18  for the extension of the D.A.B. loan?

19       A.    That would have been followed.

20       Q.    So, if the loan matured on March 7th of

21  2011 --

22       A.    March 1.

23       Q.    I'm sorry, March 1, thank you.  March 1 of

24  2011, then calculated against the 30 to 60 days request

25  time, that would have been made generally sometime after

81

1                          J. Gallo

2        A.      No.

3        Q.      But if it was made, it had to go through you?

4        A.      It had to go through me.

5        Q.      Thank you.

6                Can you explain to me why you, on behalf of

7    Brooklyn, would have requested OTS permission or consent

8    to sell a note while a previous decision had been made to

9    request from OTS an extension of the note?

10               MR. MARSH:  Objection to the form of

11                  the question.

12                  You can answer it.

13       A.      As I previously indicated, we became

14   concerned when we found out that certain funds that

15   should have been paid to Flintlock were withheld and

16   therefore, we felt that if there was another alternative,

17   if there was somehow else that we could probably, you

18   know, reduce this potential problem in terms of all of

19   our assets, that it was in our best interests to do so.

20       Q.      Did you also determine at that time that

21   that action would, without question, result in a default

22   of the note by the borrower?

23               MR. MARSH:  Objection to the form.

24                  Go ahead, you can answer.

25       A.      The notes matured March 1.

91

1                              J. Gallo

2        A.      No.

3        Q.      It does not.  You've answered the question.

4                Could Mr. Aviram be correct, that the, if

5     you will, more accurate time frame in which he first

6     contacted Brooklyn or yourself with respect to purchasing

7     possible notes in fact occurred in December of 2010?

8        A.      That's possible.

9        Q.      Now, you came to the bank in June of 2010 as

10    a consultant.  Did I understand that correctly?

11       A.      Yes.

12       Q.      Did you have involvement with the approval

13    by Brooklyn of Flintlock's construction contract with

14    your borrower?

15       A.      No.

16               MR. DOCKWELL:  Objection; it assumes

17               facts not in evidence.

18       Q.      Did you have any involvement with the

19    approval of the Flintlock contract prior to August of

20    2010?

21               MR. DOCKWELL:  Objection.  Same

22               objection.

23       A.      No.

24       Q.      Did there come a time when you received a

25    copy or had an opportunity to review the Flintlock

                              J. Gallo

1

2        Q.    Did it extend the maturity date of both

3   loans or just of one loan?

4        A.    Both (referring).

5        Q.    Now, putting aside this particular Loan

6   Modification Agreement, during your tenure at Brooklyn

7   Federal were you involved in loan extensions?

8        A.    Yes.

9        Q.    Did Brooklyn Fed have certain procedures for

10  extending loans?

11       A.    We would go to the loan work-out committee

12  and request an extension and then they would go to the

13  OTS and request their non-object.

14       Q.    And if the loan work-out committee and OTS

15  both approved or did not object to an extension of the

16  loan, did the bank then document that extension in a

17  formal written document?

18       A.    Yes.

19       Q.    Returning to Plaintiff's Exhibit 1, if you

20  could please look at page 2, and paragraph 4.

21       A.    (Referring).

22       Q.    I'll just paraphrase this.  The first

23  sentence reads, "The definition of maturity date contained

24  in the note and mortgage as modified by this agreement

25  shall hereby be rendered null and void and completely

110

                              J. Gallo

1

2    extensions because it's within the terms of this

3    agreement (indicating).

4           Q.      So, let me clarify then, if there's an

5    extension that varies the terms of the loan documentation,

6    would that extension be --

7           A.      That would be written in a formal document.

8           Q.      In a document similar in sum and substance

9    to this Loan Modification Agreement?

10          A.      Yes.

11          Q.      And would such a document, a Loan

12   Modification Agreement, typically be executed by the

13   Senior Vice President and Chief Lending Officer of

14   Brooklyn Federal?

15          A.      If it was a loan that was within his

16   responsibility after it had been approved, then he would

17   have done it.  If it was within my responsibility, then I

18   would have signed it.

19          Q.      We had marked earlier today the Estoppel

20   Certificate, which is Defendant's Exhibit C.

21                  THE WITNESS:  This is the nine sixty?

22                  MR. MARSH:  Yes.

23          A.      Okay (referring).

24          Q.      You testified earlier today that you had

25   seen this document before today; is that correct?

*Radazo
Reporting, inc.*
Serving The Legal Profession For Over 50 Years
(516) 248-1020

```
                              J. Gallo

 1

 2        A.      Yes, I do (referring).

 3        Q.      Did the bank ever agree with D.A.B. Group

 4   and Flintlock that the loans would be extended "at least

 5   for the term of the general contract"?

 6        A.      Not to my knowledge.

 7                MR. HOLLANDER:  Could we just

 8                establish for the record whether or not the

 9                witness is responding based on personal

10                knowledge or on her understanding of the

11                bank's position?  Particularly in light of

12                the fact that she has already testified she

13                had no involvement in the approval of the

14                Flintlock contract at the time of the

15                Estoppel Certificate.

16                MR. MARSH:  Is this a question,

17                statement or what?

18                MR. DOCKWELL:  I'm sorry, I'm

19                confused.  I'll break it down.

20        Q.      To your knowledge, did the bank ever agree

21   with D.A.B. Group and Flintlock that the loans would be

22   extended for "at least for the term of the general

23   contract"?

24        A.      Not to my knowledge.

25        Q.      To your knowledge, did the bank ever agree
```

118

1                           J. Gallo

2          Q.      Moving ahead to 2010 and 2011, did you ever

3    tell Mr. Zhavian or anyone else at D.A.B. Group that the

4    loans could be extended without a formal written Loan

5    Modification Agreement?

6          A.      No.

7          Q.      Did you ever tell Mr. Zhavian or anyone at

8    D.A.B. Group that the loans could be extended for an

9    indefinite period of time?

10         A.      No.

11         Q.      Did you ever tell Mr. Zhavian or anyone else

12   at D.A.B. Group that the loans could be extended without

13   a signed agreement by Brooklyn Federal Savings Bank?

14         A.      No.

15         Q.      I believe you testified that you were present

16   at meetings that were attended by a representative of

17   Flintlock; is that correct?

18         A.      Yes.

19         Q.      Do you recall who that individual was?

20         A.      I don't offhand.

21         Q.      Did you ever tell anyone from Flintlock that

22   the loans would be extended beyond March 1st of 2011?

23         A.      No.

24         Q.      Earlier, you testified that an extension of

25   the loans here needed to be approved by the Office of

1              J. Gallo

2    Thrift Supervision; is that correct?

3         A.    That is correct.

4         Q.    Did you inform Mr. Zhavian that OTS approval

5    was needed to extend the maturity date of the loans?

6         A.    Absolutely.

7         Q.    Do you recall what, if anything, Mr. Zhavian

8    said in response when you told him that OTS approval was

9    needed to extend the loans?

10        A.    I don't recall.

11        Q.    Earlier, you had testified that there was a

12   point in time at which the bank was concerned that

13   proceeds from the building loan were not being applied to

14   construction as they were intended; is that correct?

15        A.    That the proceeds from the building loan,

16   the construction advance, was not -- they were

17   withholding, and Flintlock was short about 300,000 from

18   what it was owed.

19        Q.    And there were withholdings by whom?

20        A.    Ben Zhavian.  Or D.A.B.

21        Q.    How did you become aware that Mr. Zhavian

22   had not been fully advancing funds to Flintlock?

23        A.    To the best of my recollection, we were in a

24   meeting, discussing the status of the loan, when the

25   gentleman from Flintlock said that he hadn't been fully

120

1                              J. Gallo

2     paid.

3          Q.     Did the bank take any precautions after that

4     point to ensure that Flintlock was paid future advances?

5          A.     Well, we had previously taken -- When we had

6     the checks made out to both Flintlock and D.A.B., it was

7     to avoid that very specific problem.   And then when, as I

8     said, after January 1 we said, okay, then we could just

9     make them out to D.A.B., and then we found out that there

10    had been the $300,000 withheld and then there were no

11    further advances because by that time the loan matured.

12         Q.     I might have asked this; so perhaps you

13    answered it.   Let me just clarify.

14                Flintlock informed the bank that Mr. Zhavian

15    was not fully advancing loan proceeds; is that correct?

16         A.     Yes.

17         Q.     Do you recall if Flintlock submitted any

18    requisition requests after informing the back that it was

19    not receiving loan proceeds?

20         A.     I'm not sure exactly what the timing was.   I

21    know there was a req in February and I know we had a

22    meeting in February.   And there was another req that I

23    think was work done in February but wasn't presented to

24    us in March and the loan matured and we couldn't advance

25    anyway.

```
1                          J. Gallo
2         Q.     Aside from these loans, have you been
3    involved at Brooklyn Federal in any other construction
4    loans or buildings loans?
5         A.     Yes.
6         Q.     From the bank's perspective, is it a
7    material breach of a building loan agreement for a
8    borrower not to advance funds as intended for
9    construction?
10        A.     Yes.
11                    MR. HOLLANDER:   Objection.
12                    MR. WALLACE:   Objection to the
13               question.
14                    MR. HOLLANDER:   It calls for a legal
15               conclusion from the witness.
16                    MR. DOCKWELL:   I'm going to mark as
17               Exhibit 3 Affidavit of Stephen Weiss, dated
18               March 12th, 2012 and filed in this
19               litigation as document number 331 (handing).
20                    (Whereupon, the reporter marked a copy
21               of Affidavit Of Stephen Weiss, as
22               Plaintiff's Exhibit 3, for identification as
23               of this date.)
24        Q.     Have you seen this document before,
25    Miss Gallo (handing)?
```

124

1                               J. Gallo

2        Q.      And what was your understanding of by whom

3    they had been hired?

4        A.      D.A.B.

5        Q.      Earlier, Mr. Hollander asked you some

6    questions in which he had stated that the Flintlock

7    contract had been "approved by the bank."

8                Are you aware of any contract involving

9    Flintlock that had been "approved by the bank"?

10       A.      No.

11       Q.      Had this contract that we're looking at

12   here, this Exhibit 1, been "approved by the bank"?

13       A.      It could not have been approved (referring).

14       Q.      If you could flip back to the first page of

15   this document?

16       A.      (Complying.)

17       Q.      Actually, page 2.

18       A.      Okay (referring).

19       Q.      I'm sorry, of the exhibit.  We're still on

20   the contract.

21       A.      I'm sorry (referring).

22                       (Whereupon, at this time, the witness

23               and her counsel conferred.)

24       A.      So, you want me to be on page --

25       Q.      2.  It's a page that looks like that.  It's



*Radazo Reporting, inc.*
Serving The Legal Profession For Over 50 Years
(516) 248-1020

1                          J. Gallo

2    the page right after the cover page (indicating).

3          A.    Starting with number 1 (referring)?

4          Q.    No.  It's back further.

5          A.    Got it (referring).

6          Q.    Now, Section 3.3 reads, "The contractor

7    shall achieve substantial completion of the entire work

8    not later than 430 calendar days from the date of

9    commencement or as follows, and then there's a colon and

10   there is nothing that follows the colon.

11              Actually, I take that back.  If you flip

12   over to the next page, there is a heading that says

13   Substantial Completion Date and that is blank.

14              Do you see that?

15         A.    Yes, I do (referring).

16         Q.    Do you recall ever having seen this

17   provision of this construction contract before?

18         A.    Not really (referring).

19         Q.    Do you recall ever discussing Section 3.3 of

20   this contract with anyone from D.A.B. Group or Flintlock?

21         A.    No.

22         Q.    Do you recall ever discussing with anyone

23   from D.A.B. or Flintlock the number 430 calendar days?

24         A.    No (referring).

25         Q.    Do you recall having any discussions with