**Exhibit 12**

*To Be Argued By*:
Y. DAVID SCHARF

New York County Clerk's Index No. 850044/2011

# New York Supreme Court

## APPELLATE DIVISION—FIRST DEPARTMENT

◆ ◆

ORCHARD HOTEL, LLC,

*Plaintiff-Appellant,*

—against—

D.A.B. GROUP, LLC,

*Defendant-Respondent,*

—and—

BROOKLYN FEDERAL SAVINGS BANK and STATE BANK OF TEXAS

*Defendants-Appellants,*

—and—

(*caption continued on inside cover*)

## BRIEF FOR PLAINTIFF-APPELLANT

JEROME TARNOFF
Y. DAVID SCHARF
DANIELLE C. LESSER
BRETT D. DOCKWELL
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
(212) 735-8600
jtarnoff@morrisoncohen.com
dscharf@morrisoncohen.com
dlesser@morrisoncohen.com
bdockwell@morrisoncohen.com

*Attorneys for Plaintiff-Appellant*

REPRODUCED ON RECYCLED PAPER

ORCHARD CONSTRUCTION, LLC; FLINTLOCK CONSTRUCTION SERVICES LLC; JJ K MECHANICAL INC.; EDWARD MILLS & ASSOCIATES, ARCHITECTS PC; CASINO DEVELOPMENT GROUP, INC.; CITYWIDE CONSTRUCTION WORKS INC.; EMPIRE TRANSIT MIX INC.; MARJAM SUPPLY CO., INC.; ROTAVELE ELEVATOR INC.; SMK ASSOCIATES INC.; FJF ELECTRICAL CO. INC.; CITY OF NEW YORK; NEW YORK STATE DEPARTMENT OF TAXATION & FINANCE; LEONARD B. JOHNSON; CITY OF NEW YORK ENVIRONMENTAL CONTROL BOARD, JOHN DOE #1 through JOHN DOE #100, the last 100 names being fictitious, their true identities unknown to plaintiffs, and intended to be the tenants, occupants, persons or corporations, if any, having or claiming an interest in or lien upon the premises described in the complaint,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT .................................................................. 1

QUESTIONS PRESENTED ....................................................................... 8

FACTUAL BACKGROUND...................................................................... 10

    I. Relevant Provisions of the Loan Documents ..................................... 10

    II.    The February 2011 Action Plan .......................................... 12

    III. Procedural    Posture .............................................................. 16

        A. Mortgagee's    Motion to Dismiss ............................................... 16

        B.    Mortgagee's Motion for Summary Judgment and
            Defendants' Cross-Motions (Motion No. 6)............................. 18

            1.    The July 31, 2012 Oral Argument and Further
                Discovery ...................................................... 19

            2.    The May 1, 2013 Oral Argument and Further
                Discovery ...................................................... 21

            3.    The June 11, 2013 Oral Argument ................................ 24

THE DECISION BELOW ......................................................................... 24

    I.    Renewal of Mortgagee's Motion to Dismiss and Vacatur of
        Justice Fried's Dismissal Order (Motion No. 10) .............................. 25

    II.    Amendment of DAB's Answer and Counterclaims ........................... 29

    III.    Mortgagee's Motion for Summary Judgment (Motion No. 6) .......... 32

DAB'S AMENDED ANSWER AND COUNTERCLAIMS ................................ 33

i

ARGUMENT ...............................................................................................34

I.    DAB's Motions to Renew and Vacate Were Improvidently
      Granted Because DAB Cannot Satisfy the Requirements of CPLR
      2221 or CPLR 5015................................................................................34

      A.    The Action Plan Does Not Affect Justice Fried's Dismissal
            of DAB's Fraud Counterclaim Because DAB Admits that It
            Was Unaware of the Action Plan's Existence During the
            Events at Issue..........................................................................35

      B.    DAB Has No Reasonable Justification for Failing to Present
            the Action Plan on the Prior Motion Because DAB Made
            No Effort to Obtain the Action Plan Until It Was Directed
            to Do So by the IAS Court on May 1, 2013 .............................36

II.   The IAS Court Improvidently Granted DAB Leave to Amend Its
      Pleading ................................................................................................40

      A.    DAB's Breach of Contract Counterclaims Are Palpably
            Insufficient as a Matter of Law Because the Action Plan
            Does Not Satisfy the Basic Criteria of a Contractual
            Modification ..............................................................................42

            1.    The Action Plan Was Never Communicated to DAB....46

            2.    The Action Plan Is Not an "Agreement" as Required
                  by the Plain Language of the Notes................................48

            3.    The Action Plan Does Not Manifest Mutual Assent to
                  Material Terms.................................................................52

            4.    The Action Plan Was Subject to Conditions
                  Precedent that Were Unsatisfied .....................................54

      B.    DAB's Third Counterclaim and New Affirmative Defenses
            Are Barred by the Loan Documents and the May 28, 2013
            Order of This Court....................................................................55

CONCLUSION ..........................................................................................58

PRINTING SPECIFICATION STATEMENT .......................................59

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### FEDERAL CASES

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.,
    252 F.3d 218 (2d Cir. 2001) ............................................................53

Philips Credit Corp. v. Regent Health Group,
    953 F. Supp. 482 (S.D.N.Y. 1997) ........................................... 47-48

### STATE CASES

320 West 13th St., LLC v. Wolf Shevack, Inc.,
    No. 603730/2007, 2013 N.Y. Misc. LEXIS 2297
    (Sup. Ct. N.Y. Cnty. May 21, 2013) ................................................38

Antonini v. Petito,
    96 A.D.3d 446 (1st Dep't 2012) .....................................................56

Ashwood Capital, Inc. v. OTG Mgmt., Inc.,
    99 A.D.3d 1 (1st Dep't 2012) .........................................................50

Bank Leumi Trust Co. of New York v. Lightning Park, Inc.,
    215 A.D.2d 246 (1st Dep't 1995) ................................................ 8,59

Banow v. Simins,
    53 A.D.2d 542 (1st Dep't 1976) .....................................................34

Beacon Terminal Corp. v. Chemprene, Inc.,
    75 A.D.2d 350 (2d Dep't 1980) .....................................................53

Beiny v. Wynyard (In re: Beiny),
    132 A.D.2d 190 (1st Dep't 1987) ...............................................38-39

Church of God v. Fourth Church of Christ, Scientist,
    76 A.D.2d 712 (2d Dep't 1980), aff'd, 54 N.Y.2d 742 (1981) ......................47

CrossLand Sav., FSB v. Loguidice-Chatwal Real Estate Inv. Co.,
    171 A.D.2d 457 (1st Dep't 1991) ...................................................56

Davimos v. Halle,
    60 A.D.3d 576 (1st Dep't 2009) .....................................................51

Davis & Davis, P.C. v. Morson,
    286 A.D.2d 584 (1st Dep't 2001) ....................................................40

DeCarvalhosa v. Adler,
    57 A.D.3d 367 (1st Dep't 2008) ..............................................34, 39

Delta Props. v. Fobare Enters.,
    251 A.D.2d 960 (3d Dep't 1998) .................................................. 57

Elder v. Elder,
    21 A.D.3d 1055 (2d Dep't 2005) .................................................. 39

Express Indus. & Terminal Corp. v. New York State DOT,
    93 N.Y.2d 584 (1999) ............................................................ 53-54

Fed. Ins. Co. v. Americas Ins. Co.,
    258 A.D.2d 39 (1st Dep't 1999) ...................................................52

Fernandez v. HICO Corp.,
    24 A.D.3d 110 (1st Dep't 2005) ...................................................41

Fesseha v. TD Waterhouse Investor Servs.,
    305 A.D.2d 268 (1st Dep't 2003) .................................................56

GLC Securityholder LLC v. Goldman, Sachs & Co.,
    74 A.D.3d 611 (1st Dep't 2010) ...................................................50

Goldberg v. Colonial Life Ins. Co.,
    284 A.D. 678 (2d Dep't 1954) ......................................................47

Goodstein Constr. Corp. v. New York,
    80 N.Y.2d 366 (1992) ...................................................................55

Gyabaah v. Rivlab Transp. Corp.,
    102 A.D.3d 451 (1st Dep't 2013) .................................................46

IDT Corp. v. Tyco Group, S.A.R.L.,
    13 N.Y.3d 209 (2009) ...................................................................55

Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,
    52 N.Y.2d 105 (1981) ...................................................................54

JP Morgan Chase Bank, N.A. v. Ilardo,
    36 Misc. 3d 359 (2012) ........................................................................57

L.K. Sta. Group, LLC v. Quantek Media, LLC,
    62 A.D.3d 487 (1st Dep't 2009) .......................................................54

Lopez v. Fernandito's Antique, Ltd.,
    305 A.D.2d 218 (1st Dep't 2003) .....................................................50

Moody Eng'g Co. v. Bd. of Educ.,
    205 A.D. 522 (1st Dep't 1923), aff'd, 238 N.Y. 629 (1924) ............. 47

Muzak Corp. v. Hotel Taft Corp.,
    1 N.Y.2d 42 (1956) ...........................................................................49

Nichols v. Curtis,
    104 A.D.3d 526 (1st Dep't 2013) .................................................34-35

Non-Linear Trading Co. v. Braddis Assocs., Inc.,
    243 A.D.2d 107 (1st Dep't 1998) .....................................................40

Orchard Hotel, LLC v. D.A.B. Group LLC,
    106 A.D.3d 628 (1st Dep't 2013) .......................................................1

Peach Parking Corp. v. 346 West 40th St., LLC,
    42 A.D.3d 82 (1st Dep't 2007) .........................................................42

Perrotti v. Becker, Glynn, Melamed & Muffly LLP,
    82 A.D.3d 495 (1st Dep't 2011) .......................................................42

Pollak v. Moore,
    85 A.D.3d 578 (1st Dep't 2011) .......................................................41

R/S Assocs. v. N.Y. Job Dev. Auth.,
    98 N.Y.2d 29 (2002) .........................................................................50

Richardson v. Brisard & Brisard, Inc.,
    No. 10463/2010, 2012 N.Y. Misc. LEXIS 3215
    (Sup. Ct. Kings Cnty. July 9, 2012) .................................................38

Rosado v. Edmundo Castillo Inc.,
    54 A.D.3d 278 (1st Dep't 2008) .......................................................39

Valley Nat'l Bank v. 58 Vlimp, LLC,
    No. 25522/2012, 2013 N.Y. Misc. LEXIS 1823
    (Sup. Ct. Suffolk Cnty. April 29, 2013) ..........................................................57

Wasserman v. Harriman,
    234 A.D.2d 596 (2d Dep't 1996) ......................................................... 56

Waterways Ltd. v. Barclays Bank PLC,
    202 A.D.2d 64 (1st Dep't 1994) ...............................................................42-46

Willmott v. Giarraputo,
    5 N.Y.2d 250 (1959) .....................................................................................54

Zuluaga v. P.P.C. Constr., LLC,
    45 A.D.3d 479 (1st Dep't 2007) ......................................................39

## DOCKETED CASES

Signature Bank v. 77-79 Rivington St. Realty,
    No. 850001-2012 .................................................................................2

## STATUTES

CPLR 2221(e) ........................................................................27, 34, 36

CPLR 3025(b) ...................................................................................40

CPLR 5015(a)(2) and (3) .........................................................27, 34, 36

G.O.L. § 15-301 ...............................................................................44

## MISCELLANEOUS

Federal Interagency Statement on Meeting the Needs of Creditworthy
    Borrowers (2008) ..................................................................... 12-13

Federal Reserve SR-07 (2009) ..............................................................13

Office of the Comptroller of the Currency, Sample Bylaws,
    available at www.occ.gov/topics/licensing/sample-filing-forms-and-
    agency-responses.html ......................................................................48

The American-Heritage Dictionary, 4th ed. (2000) .......................... 50-51

Plaintiff-Appellant Orchard Hotel, LLC ("Mo rtgagee" or "Orchard") respectfully submits this memorandum in support of its appeal of the Order of the IAS Court (Ram os, J.) entered August 28, 2013 (i) granting the m otion of Defendant-Respondent D.A.B. Group LLC ("DAB") to renew Mortgagee's motion to dismiss DAB's counterclaim s and vacating the March 28, 2012 D ecision and Order of the IAS Court (Frie d, J.), wh ich had been affirmed by the Appellate Division, First Depart ment, on May 28, 2013 (106 A.D.3d 628    ), (ii) directing DAB, *sua sponte*, to file an amended answer and counterclaim s, and (ii i) granting the cross-motion of Flintlock Construction Services LLC ("Flintlock") to amend its answer and counterclaims but otherwise withholding consideration of Mortgagee's motion for summary judgment and other relief, which has been pending since April 2, 2012.

## PRELIMINARY STATEMENT

On May 28, 2013, t his Court correctly affirmed an order of t he IAS Court (Fried, J.) which dism issed all counterclai ms brought by borrowe r DAB, clearing the way to foreclosure of tw o commercia l m ortgages (the "Mortgages"). Since Justice Fried's retirement, this case has veered wildly off-course to the prejudice of all of the lien-holders who are likely to r ecover nothing if this dispute continues on its present path.

1

In a ruling from the bench on July 9, 2013, Justice Charles Ramos, to whom the action was re-assigned following Justi ce Fried's retirement, vacated Justice Fried's affirmed dism issal and directed DAB to file a new responsi ve pleading without e valuating whether a proposed pl eading had merit, effectively returning this two-year-old foreclosure action to "square one." Justice Ramos also intentionally avoided ruling on Mortga gee's summary judgm ent m otion (Motion No. 6), which has been pending si nce April 2, 2012, stating it was "moot," even though the Court granted Flintlock's cross-motion to amend, which was part of the same m otion sequence. These ruli ngs ar e in the C ourt's August 28, 2013 order (the "August 28 Order"), which wa s drafted by DAB and signed without modification or correction.

In the last 16 m onths, Mortgagee's summary judgment m otion was argued four times and was repeat edly cast asid e by Justice Ramos to permit unnecess ary discovery and m otion practice.[1] None of this activity ha s raised a triable issue of fact concerning the two elements of Mortgagee's foreclosure claims: the

---

[1] DAB's principal and its counsel attempted similar gamesmanship and delay in a related foreclosure action pending be fore Justice Sherwood, Signatu re Bank v. 77-79 Rivington S t. Realty, No. 850001-2012. However, in contrast to this action, Justice S herwood exhibited little tolerance, granting summary judgment against DAB's affiliate on June 20, 2013 with little or no discovery, even though that act ion was filed six m onths *after* this action. At the parties' first appearance in this action before Justice Ram os on July 31, 2012, Justice Ram os articulated his misperception that Mortgagee is a "vulture" and that he dislikes "vultures." It is hard to imagine that the Court-sanctioned delays since Justice Fried's retirem ent, and the vacatur of Justice Fried's affirmed dismissal order, are unrelated to the IAS Court's preconceived notion. Remand of this action to Justice Sherwood may be appropriate.

Mortgages are valid and DAB is in default.    Mortgagee respectfully requests that this Court reverse the IAS Court and defi ne a path so that Mortgagee's summ ary judgment m otion can be granted and the    Mortgaged Property auctioned.  Clear guidance from this Court is imp    erative  because the Mortgaged Property is an inactive construction site that can perm    anently lose its zoning entitle   ments if it remains mired in litigation.  Loss of those entitlements would require demolition of eight stori es of the 16-st  ory superstruct ure, destroying the collateral of DAB's creditors.

    Justice Fri ed's March 28,  2012 Decision and Order dism   issed, *inter alia* , DAB's first counterclaim, which alleged th at the original lender, Brooklyn Federal Savings B ank ("Brooklyn Fede  ral"), before assigning    the Mortgage loans (the "Loans") to Mortga  gee, fraudulently m  isrepresented to DAB that the March 1, 2011 m aturity date of the Loans had been    extended.  In dism  issing DAB's fraud counterclaim, Justice Fried held that    DAB could not have reasonably relied on "unsigned, unwritten representations" becau  se the Loan Documents required that contractual m odifications be effected    only by written agreement.  This Court unanimously affirm ed Justice Fried's di smissal on the sam e grounds on May 28, 2013, three weeks after the appellate oral argument.  That appeal was, and remains, correctly decided.

Prior to this Court's May 28 order, Justice Ramos twice heard oral argument on Mortgagee's summary judgment m otion. Each tim e, the IAS Court delayed consideration of the  motion so that DAB   could pursue discovery that was either requested for the first time at o ral argument or imposed by the IAS Court because the Court was "offended" that "there wa  s a m otion under 3211 before there was discovery." (R. 1208.33). [2] Through t hat discovery, DAB obtained an internal Brooklyn Federal "Commercia l Loan Action Plan" date  d February 15, 2011 (the "Action Plan"), in which memb     ers of   the bank's Loan Workout Department recommended to the bank's Loan Workout Committee (the "Workout Committee") that the maturity date of the Loans be     extended, subject to conditions preced ent. The Actio n Plan expressly stated that a  ny extensi on of t he Loans would require prior approval from Brooklyn    Federal's primary regulator , the federal Office of Thrift Supervision (OTS), which had pl aced the bank under scrutiny.  The Action Plan is an internal bank document that     was never communi cated or delivered to DAB and was shortly thereafter revoked by Br ooklyn Federal.  DAB adm its that it was never told of the Action Plan or its   terms, which materia lly differed from the terms of the alleged m isrepresentations pled in DAB's  fraud counterclaim . DA B has consistently adm itted that OTS had   to approve any extension of the Loans,

---

[2] "R. __ " refers to pages of the Joint Record on Appeal.

4

which approval was undisputedly never gran    ted.  In other words, the internal

Action Plan changes nothing about Justice Fried's order or this Court's affirmance.

The Action Plan was revoked by Brookl yn Federal because t he bank caught

DAB's principal, Ben Zhavian ("Zhavi    an"), im properly w ithholding Building

Loan proceeds instead of paying contractors.   This serious mi sconduct violated the

Loan Documents and confirm ed the doubts  of Brooklyn Federal about Zhavian's

integrity.  Brooklyn Federal prom    ptly w ithdrew the Action Plan and requested

OTS approval to sell the Loans to Mortgage e, which approval was granted.  When

asked at a depositi on why Br ooklyn Federal decided to sell the Loans, loan officer

Bruce Gordon was direct:  "we didn't trust Mr. Zhavian."  (R. 963).

There is no question that DAB knew that the March 1, 2011 m aturity date of

the Loans was never extended.  On May 24,    2011, nearly t hree m onths after the

Loans had m atured, DAB's counsel, W illiam Wallace ("Walla ce"), acknowledged

in writi ng to Brookl yn Federa l's counsel that the matur  ity date of the Loans had

not been extended:  "I understand that the  Loan termed out pursuant to the origi nal

Loan documents on March 1, 2011 and th     at our respective clients have been

discussing an extension of t hat term."   (R. 796).  Knowing t hat the parties never

agreed on an extension of the Loans,   DAB initially pled its counterclaim  under a

fraud theory, not a contract theory.  Wall     ace ad mitted as much in court before

5

Justice Ramos: "No w, the loan on the fa ce of it [term ed] out on March 2011, no question." (R. 832).

At a later hearing, Wallace conced ed again that there was no written extension agreement: "when we got serv ed with the co mplaint and prepared an answer and counterclaim , the first thi ng you do i s ask the client: 'I read thes e documents. Is t here a writing extending this agreement?' He says, 'they *told* me, they kept *telling* me back to August of 2010 don't wo rry. Your loan is extended.'" (R. 1208.26-1208.27) (em phasis added). As Justice Fried and this Court correctly held, the Loan Documents explicitly pr ecluded reliance on such alleged oral representations and DAB's fraud counterclaim thus fails as a matter of law.

Those holdings are not affected by DAB's after-the-fact discovery,      two years into the litigation, of an internal bank reco mmendation to extend the Lo ans. DAB could not possibly ha ve relied upon a document th at it was unaware of in 2011 and thus DAB's fraud counterclaim re mains based solely on alleged, non-actionable oral representations. The key que stion on either a m otion to renew or a motion to vacate based on newly discovered facts is the same: would the new facts have likely changed the pri or determination? If the IA S Court had grappled wi th that questi on, it would have reached the inescapable conclusion: the Action Plan cannot be the basis for a fra ud counte rclaim because DAB did not know the

document existed.  The IAS Court's gra nt of DAB's m otion to renew and vacate must be reversed.

The IAS Court also erred in spontan eously directing DAB to file an amended pleading.  This unorthodox proce dure violated the CPLR's requirem ent that the Court evaluate the viability of    proposed new claim s before pe rmitting a party to amend a pleading.  Had the Cour t performed the nece ssary evaluation, it would ha ve been forced to conclude    that amen dment of DAB's pleading to incorporate the Action Plan would be       futile  because the plan was never communicated to DAB; it is not a Loan Docu ment, and DAB is not a party to i t; it fails to com ply with the language of   the Loan Docum ents governing contractual modifications; its proposed term s differ   materially from t he ter ms repeatedly alleged by DAB; it was subject to conditions precedent that were unsatisfied; and it was swiftly revoked by the Workout    Committee upon le arning that DAB had misappropriated Loan funds.  Sim ply  put, DAB cannot pre dicate any claim  or defense on the Action Plan, and a finding       by t his Court that an internal bank memorandum that is never communicated     to t he borrower can be transform ed, years later, into a binding contract woul d reverberate through the banking industry. The IAS Court's di rection to DAB to ame nd its answer and counterclaim s must be reversed, and DAB's amended pleading stricken.

Finally, the IAS Court should be directed to consider Mortgagee's summary judgment motion based on the papers submitted as of May 1, 2013. DAB does not dispute that the Mortgages are duly recorded first and second liens and that the Loans have been unpaid since the contractually stated maturity date of March 1, 2011. Mortgagee has "establishe[d] a *prima facie* case for foreclosure by production of the mortgage documents and proof of default," <u>Bank Leumi Trust Co. of New York v. Lightning Park, Inc.</u>, 215 A.D.2d 246, 247 (1st Dep't 1995), and no party has raised a triable issue of fact precluding foreclosure. (<u>See</u> pp. 18-19, <u>infra</u>). During the past two years, DAB has not paid a dime toward its $24 million mortgage debt, nor toward property taxes, maintenance, or preservation of zoning rights and permits, all of which have been funded by Mortgagee. DAB is manifestly unable or unwilling to satisfy its obligations. Mortgagee's 16-month-old summary judgment motion must be granted before the continued passage of time leads to the permanent loss of the Mortgaged Property's zoning entitlements, irreparably harming the Mortgaged Property and DAB's creditors.

## QUESTIONS PRESENTED

Can a claimant whose fraud claim is dismissed because the claimant is legally barred from relying on alleged oral representations re-assert the same fraud claim based on a document, the content and existence of which were completely unknown to the claimant?

Can such a document be the basis for renewal of a motion to dismiss that has already been granted and affirmed on appeal,

8

or vacatur of the affirmed order granting dismissal, when th e claimant/movant failed to reque st any such docum ents in discovery and obtained the document only after being directed to request it by the Court almost two years after the litigation was co mmenced and more than one year after a pending summary judgment motion had been fully briefed?

Can an af firmed order be vacat ed on the ground of "fraud, misrepresentation, or other m isconduct" where the only "misconduct" alleged was that a litigant did not voluntarily produce irrelevant documents that the litigant repeatedly stated it possesse d but whi ch were, none theless, never requested by the movant?

Can an internal "acti on plan" which was not communicated to a note obligor, whi ch required the sati sfaction of certain conditions precedent (none of which occurred), and which was revoked several weeks lat er, constitute an enforceable modification of a promissory note, notwithstanding that, by its nature, the plan carries no indicia of offer and acceptan ce sufficient to satisfy the promi ssory note's express requirement that modifications be effected by written agreement?

Can a mortgagor in maturity default block foreclosure by asserting –

> a waiver defense even though t he mortgage includes a "no waiver" provi sion and the mortgagor cannot identify any intentional and knowing renunci ation by the m ortgagee of its right to foreclose?

> estoppel, unclean hands, bad faith or unconscionability defenses when the mortgage expressly and em phatically precludes the mortgagor from relying on t he alleged statements complained of?

*The answer to each of the above questions is, no, and t he Order of the IAS Court must be reversed.*

# FACTUAL BACKGROUND

## I.    RELEVANT PROVISIONS OF THE LOAN DOCUMENTS

An extension of t    he Loans' m    aturity date would have entailed the modification of the    Project   Loan Note and Building       Loan Note (together, the "Notes"), which set the m    aturity date,   and m odification of the Building Loan Agreement, which governs disbursement of construction funds.

*The Notes* contain identical provisions contro lling maturity extensions: "No executory agreement unless in writing a nd si gned by Holde r, and no course of dealing be tween Maker, the endorser(s) or    guarantor(s) hereof, or any of them, shall be effective to change or modify or discharge, in whol e or in part, this Note." (R. 141, 247) (emphasis added).  In addit ion, the Notes provide that they "may not be term inated or amended orally, but     only by a  term ination or amendment in writing signed by Holder."  (R. 139, 245).

These provisions were followed by the par ties two years before the ev ents at issue, when they extended the maturity da te of the Project Loan Note.  On August 21, 2008,  DAB and Brookly n Federal signed a Loan Modification Agreement which, just as DAB claim s now, extended   the final maturity date of the Project Loan, from December 1, 2008 to March 1, 2011.  (R. 193-98).  That document was signed, before a notary, by DAB, by Brooklyn Federal's Senior Vice-President and Chief Lending Officer, and by the guarantor of the Loans.  In contrast to the Action

Plan, the 2008 Loan Modific ation Agreement was drawn by counsel, not by l oan

officers, was executed by the borrowe r and guarantor and notarized, and

manifested a clear intent by DAB and Brooklyn Federal to extend the maturity date

of the Loans based on definite and agreed-upon terms.

*The Building Loan Agreement* states that "[n ]either this Agreement nor any

provision hereof may be waived, m odified, amended, discharged or term inated

except by an instrument signed by the party against whom the enforcement of such

waiver, modification, amend ment, discharg e or term ination is sought, and then

only to the extent set forth in such instrument." (R. 881).

*The Building Loan Mortgage* states that it "cannot be alt ered, amended,

waived, m odified or discharged orally , and no executory agreement shall be

effective to modify, waive or d ischarge, in whole or in part, anythi ng contained in

this Mortgage unless it is in writing and signed by the party against whom

enforcement of the m odification, alterati on, am endment, waiver or di scharge is

sought." (R. 928). The Building Loan Mortgage al so cont ains the followi ng

explicit acknowledgement by DAB:

> The Mortgagor recognizes that, in general, borrowers
> who experience difficulties in honoring their loan
> obligations, in an effort to inhibit or impede lenders from
> exercising the rights and remedies avai lable to lenders
> pursuant to m ortgages, notes, loan agreements or other
> instruments evidencing or affecting loan transactions,
> frequently present in court the argum ent, without merit,
> that some loan officer or administrator of the lender made

11

an oral modification or m ade some statement that could be interpreted as an exte       nsion or m   odification or amendment of one or m ore debt instruments and that t he borrower relied to its detriment upon such "ora          l modification of the loan document".  For that reason, and in order to protect the Mortgagee from such allegations in connection with the transacti   ons contem plated by this Mortgage and the Buildin      g Loan Agreemen     t, the Mortgagor acknowledges that   this Mort gage, the Note, the Building Loan Agreement, and        all instruments   referred to in any of them   can be extended, m odified or amended only i n writing executed by the Mortgagee  and that none of the ri  ghts or be nefits of the  Mortgagee can be waived  permanently except in a written document executed by the Mortgagee.      The Mortgagor further acknowledges the Mortgagor   's underst anding that no officer or adm inistrator of  the Mortgagee has the power or the aut  hority from  the Mortgagee to m    ake an oral extension or m  odification or amendment of any such instrument or agreement on behalf of the Mortgagee.

(R. 933) (emphasis added).

## II.    THE FEBRUARY 2011 ACTION PLAN

The Action Plan was a preli     minary st ep in a potential extension of the maturity date of the Loans, wh ich were  classified as substandard.  The document provides an in-depth analysi    s of vari   ous risk factors relating to the Loans, including DAB's financial condition and the value of the collateral, and reflects the routine risk-manag ement that regulated      financial institution s are required t   o perform when making or    modifying loans.   In fact, in 2008, federal banking regulators issued an Interagency Statemen  t "urg[ing] all len ders and servicers to adopt systematic, proactive, and stream lined mortgage loan modification protocols

12

and to review troubled loans using t        hese prot ocols." Fe  deral Interagency
Statement on Meeting the Needs of Creditworthy Borrowers        (2008); see also
Federal Reserve SR-07 (2009  ) (encouraging banks to    perform "com prehensive
reviews of borrowers' fi nancial conditions"). The purp ose of the Action Plan was
risk-management, not the creation of a binding contract.[3]

Based on the risk factors relating to     the Loans, t  he Workout Commi ttee
recommended that the bank offer DAB      two new six-m onth extension opti ons,
subject to conditions.[4] The Action Plan required DAB   to pay an extension fee of
.25% of the loan balance for each six-  month term. Once th e Workout Co mmittee
approved the Action Plan, wri   tten author ization was required from   OTS before
Brooklyn Federal could im plement the plan  and grant an extension. The Action
Plan states: "An OTS 'non-object' is required  as this loan is rated subst andard and
is a maturity extension." (R. 808) (em phasis in original). Ther e is no dispute that
(1) the Action Plan was never provided to     DAB prior to this   litigation, and (2)
DAB was unaware that the document existe     d or that this i   nternal process had
occurred. (R. 57).

---

[3] Affir ming the decision below could substa  ntially affect banking  industry procedures
and practices, effectively turning any internal board document into a potential liability.

[4] Dem onstrating the pr  eliminary n ature  of the Action Plan, the conditions for the
extension options are n ot spec ified. However, the Pro ject Loan Note and Buildin g Loan Note
each contain eight very specific ex tension conditions, only som e of whi ch overlap. (R. 142-43,
248-50).

However, DAB *was* aware that OTS approval   was required and had ne ver been obtained.  DAB acknowledged in its  initial Answer and Counterclaims that it was "repeatedly" advised that  Brooklyn Federal had applie d to "the federal Offic e of Thrift Supervision ('OTS') for permission to explicitly and in writing extend the maturity date of The Loan," which perm ission was never obtained.  (R. 349; see also R. 425).

After the Workout Co   mmittee review ed and approved the Action Plan, Brooklyn Federal sought OTS approval t o extend the Loans, but while that request was pending, the Workout Committee resci   nded the Action Plan and decided to sell the Loans instead.  Th e reasons for  this rescission are uncontested – Zhavian was caught diverting Building Loan pro    ceeds, and the Loans were deemed too risky.  The March 22, 2011 memorandum rescinding the Action Plan states:

> Due to significant issues conc erning the guarantor's [i.e., Zhavian's] honesty we are re   questing t o withdraw the previously approved extension request.
>
> On several occasions we      have caught him   diverting money he has been given via  construction loan advances which has been brought to our  attention by the contractor who failed to be paid. . . .
>
> We recommend this sale as a better alternative to disbursing additional monies and then running the risk of needing takeout fina ncing to repay or the considerable risk that Mr. Zh    avian,  the guarantor/owner, will do something to endanger our position.

(R. 957).

14

The Brooklyn Federal witnesses all testified that their perception of Zhavian as untrustworthy was a major reason why the bank decided to sell the Loans. (R. 943, 947, 953, 961-62, 963, 967-68, 971). Loan officer Richard Maher testified that the Loans were "always problematic." (R. 972-73). Between the dates of June 28, 2010 and October 12, 2010 alone, there are nine entries on Brooklyn Federal's internal "history sheets" stating negative developments regarding the Loans, including delinquent real estate taxes, difficulties with Zhavian, and mechanic's liens. (R. 978-80).

Contrary to its allegations in this action, DAB and its counsel were fully aware that Brooklyn Federal never agreed to extend the maturity date of the Loans. On May 24, 2011, DAB's counsel, Wallace, wrote to Brooklyn Federal's counsel, acknowledging that the Loans had matured nearly three months prior, on March 1, 2011, and that they had not been extended. Wallace wrote:

> I understand that <u>the Loan termed out</u> pursuant to the original Loan documents <u>on March 1, 2011</u> and that our respective clients <u>have been discussing an extension</u> of that term so that the project may continue and the hotel built. The purpose of this letter is to provide you with certain information which may be helpful to you and your client <u>in making a determination as to whether or not the Loan term should be extended</u>.

(R.796) (emphasis added). Wallace explicitly requested "a written extension of the term of the Loan." (R. 797). As Wallace has repeatedly conceded in court, DAB never received any such written extension. (R. 1208.26-1208.27, 832).

15

## III.    PROCEDURAL POSTURE

### A.    MORTGAGEE'S MOTION TO DISMISS

In a decision and two orders dated March 28, 2012, Justice Fried dismissed all three counterclaims asserted by DAB against Mortgagee and against third-parties Brooklyn Federal and State Bank of Texas ("State Bank," and together with Brooklyn Federal, the "Bank Defendants"). DAB's first counterclaim of fraudulent misrepresentation alleged that Brooklyn Federal misrepresented to DAB on August 26, 2010 that the maturity date of the Loans "would be" extended by 430 days, to approximately November 2011. (R. 348). DAB repled this counterclaim in opposition to motions to dismiss by alleging, through an affidavit from Zhavian, that Brooklyn Federal stated that the Loans *were* extended, not merely that they *would be* extended. DAB named Mortgagee as a defendant on this counterclaim because Mortgagee is the assignee of the Mortgages.

Although Zhavian acknowledged that he was "repeatedly" told that approval from OTS was required to extend the Loans, he alleged that –

> It was agreed at that time [i.e., August 26, 2010] that the loan funding and term would continue through the substantial completion of the Project approximately 430 calendar days from August 26, 2010. . . . There can be no doubt that as of August 2010 at the time that Brooklyn Federal and State Bank approved the Flintlock contract, they also extended the loans to "mid November" 2011 to conform and run parallel with the time schedule and budget as set forth in the approved Flintlock contract.

16

(R. 422-23, 425; se e also R. 424). However, Zhavian's allegations are squarely contradicted by contem poraneous corre spondence from Zhavian him self. On October 4, 2010, si x weeks *after* the date of the purporte d 430-day extension, Zhavian sent a letter to Brookl yn Federal, exercising the final six-month extension option under the Loan Docum ents, from *September 1, 2010 to March 1, 2011*. (R. 517). This correspondence refutes DAB's allegation that the Loans were extended by 430 days on August 26, 2010.

In di smissing DAB's fraud counterclaim, Justice Fried noted that the Loan Documents are replete with provi sions prohibiti ng oral m odifications and that "DAB does not dispute that these provis ions are contained within the valid, binding agreements between the parties." (R. 95). Justice Fried held that DAB's allegations did not give rise to a fraud claim because, in light of the "bargained-for, and agreed-upon, contractual provi sions [in the Loan Documents] , the alleg ation that DAB justifiably relied on unsigned, unwritten representations by agents acting on behalf of Brookl yn [Federal] or St ate Bank, cannot be credited." (Id.__). This Court affirmed Justice Fried's decision on the same grounds, ho lding that "D.A.B. fails to allege the requisite reasonable re liance on these oral misrepres entations." (R. 855).

Justice Fried also dism issed DAB's second counterclaim, which alleged that Brooklyn Federal breached obligations re lating to the fundi ng of the Building

17

Loan, and DAB's third counte rclaim, which alleged that Mortgagee and the Bank

Defendants exaggerated the Loans' payof f amounts by miscalculating interest and

late fees. Justice Fri ed's dismissal of DAB's second and thi rd counterclaims was

also affirmed by this Court.    Mortgag ee pointed out to Justice Ramos that the

Action Pl an has no bearing on either of   t hese two counterclaim s and that a ny

vacatur order should exclude these c     ounterclaims. (R. 1208.115, 1208.249).

Nevertheless, Justic e Ramos opted t    o enter DAB's proposed order without

modification. To t he extent the August    28 Order reinstated these claim s, it is

plainly erroneous and countermands thi   s Court's May 28, 2013 affirmance of

Justice Fried's order.

### B.    MORTGAGEE'S MOTION FO R SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTIONS (MOTION NO. 6)

Following document discovery and with no depositions pending, Mortgagee

moved for summary judgm ent on Februa ry 3, 2012. (R. 1218). Defendant

Orchard Constructi on, LLC ("Orchard C onstruction") cross-m oved, seeking t o

establish l ien pri ority, but ot herwise did not oppose Mortgagee's m otion, while

Flintlock cross-moved, *inter alia*, to amend its answ er and counterclaim s to assert

tort and Lien Law clai ms that do not aff ect the enforceability of the Mortgages.

(R. 1739, 1943).

In its opposition to Mortgagee's motion, DAB did not dispute the validity of the Mortgages or the fact of DAB's nonpayment.  (R. 2144-45).    [5]  Instead, DAB debuted a new purported defense of est    oppel based on the ve    ry same factual allegations and exhibits as DAB's dismissed fraud counterclaim.  (R. 2127).

In reply, Mortgagee argued that DAB's  new estoppel defense, even if it ha d been properly pled, was barred as a matter    of law.  Mortgagee noted that Justice Fried had held t    hat DAB's allegations    did not adequately    allege reasonable reliance, and thus the dism    issal orde r precluded DAB's new unpl    ed estoppel defense, which required reas onable reliance.  The moti on and cross-motions were fully briefed on April 2, 2012.

## 1.    The July 31, 2012 Oral Argument and Further Discovery

The parties appeared before Justice    Ramos for the first time on July 31, 2012, for oral argument on Motion No. 6.        At that hearing, DAB's counsel admitted that the maturity date of the Lo ans was n ever formally extended:  "Now, the loan on the face of it    [termed] out on March 2011,    no question."  (R. 832). Nevertheless, DAB clai    med for the fi    rst tim e that depositions of the Bank Defendants were necessary.    Despite having never prev    iously subpoenaed any bank witnesses, DAB told the Court, inco rrectly, that DAB had been seeking these

---

[5]  Flintlock also opposed Mo    rtgagee's m otion, joined by    defendants E dward Mills & Associates, Architects, P.C. and SMK Associates    Inc.  Like DAB, Flintlock did not dispute the validity of the Mortgages or DAB' s default.  (R. 2068-70, 2072-73).  No other parties opposed Mortgagee's motion.

19

depositions since the outset of the case.   [6]  "Let's take the d    eposition of Joanne Gallo, another man, Bruce Gordon, who se nt these e-mails, maybe Mr. Patel, who is an officer of the p  articpant bank.  Th at's all the defendant has been asking for since day one of t    his case."  (R. 836; see <u>also</u>    R. 840).   Over Mortgagee's objection, the Court directed that depositi ons of the Brooklyn Federal witnesses be taken and instructed the parties:  "I don't want this dragged out.  I want depositions finished by the end of August [2012]."  (R. 844).

Despite the Court's direction to co        mplete depositions "by the end of August," DAB waited until September 11 and September 26 to first subpoena these witnesses.  DAB then dragged its feet    in scheduling the depo sitions, deposing its final witness on April 3, 2013, eight months after the Court's deadline.[7]

At her depositi on, Joanne Gallo ("Gallo  "), the head of Brooklyn Federal's Loan Workout Department, directly rebu tted DAB's claim s, te stifying repeatedly that Brooklyn Federal never tol d DAB that  the Loans woul d be extended and t hat she advised Zhavian that OTS approval    was required to exte nd t he Loans.  (R. 2781-84).  Gallo testified that an extens ion of the Loans ne ver progressed beyond

---

[6]  The only deposition that DAB ha d noticed as of the July 31, 2012 oral argum ent was that of Mortgagee, which DAB had not even at   tempted to schedule.  Mortgagee and the Bank Defendants are independent, unrelated parties.

[7]  Mortgagee inform   ed the Court o  n num erous occasions that DAB was needles    sly protracting these depositions.  Mortgagee sent  letters to the Court on August 15, 2012 (R. 2332) and October 24, 2012 ( R. 2344-45) and raised the issue during status conferences on Nove  mber 20, 2012 and January 8, 2013.

the first step – the internal approval    by the Workout Committee of the general terms set forth in the Action Plan. (R. 2744-45). Gallo, of course, was referencing the Action Plan, which reference Wallace   never pursued. Such approval did not extend the Loans because,   as Gallo testified, Br ooklyn Federal was under OTS supervision and coul d not m odify loans without pr ior written OTS approval. (R. 2741, 2784-85). G allo furt her testified that i  f a nd when OTS approval were granted, the term s of any extension woul d have to be m emorialized in a written agreement like the 2008 Loan Modification Agreement. (R. 2772, 2775). DAB's counsel did not request production of a single document during Gallo's deposition, despite repeated ref erence to the Work  out Committee's internal approval of the recommendation to extend the Loans.

At the direction of t he Court, the par ties filed supplem ental briefs on April 18, 2013, incorporating deposi tion testimony into t he summary judgm ent motion and cross-motions. DAB did not request additional discovery.

## 2.    The May 1, 2013 Oral Argument and Further Discovery

The parties' next oral argument on the summary judgment motion and cross-motions was held on May 1, 2013. DAB to ld the Court of Gallo's testim ony that the Workout Committee had accepted her  department's recommendation to extend the m aturity date of the Loan  s, prom pting Justice Ram os to ask a question that DAB had never previously asked: "Was     there a resolution or writing by the

21

board?" (R. 677).  DAB responded, incorr    ectly, that it did not know where any

such documents were.  However, on Janu    ary 19, 2012, before Mortgagee m  oved

for summary judgment, it produced 1,137       pages of documents in response to

document requests from      DAB.  Mortga      gee's producti  on included various

documents stating that Brooklyn Federal's    files for the Loans (the "Loan Files")

would be delivered to Mortga   gee at clos ing.  (R. 1209, 1212, 1215, 1665).  In

addition, Mortgagee filed    a copy of t   he Mortgage Lo  an Purchase Agreement

(MLPA) as an exhibit in support of it  s summary judgm ent motion on February 3,

2012.  The MLPA stated that "[p]      romptly after the Closing Date, Seller shall

deliver to Purchaser, or its desi gnee, the  Mortgage Loan Files, at such l ocation as

Purchaser shall designate." (R. 1665).  Mo  rtgagee also filed an affidavit on April

2, 2012 from  one of its princi  pals which stated as follows:    "The facts set fort   h

herein are based on m    y persona l knowledge and m  y review of  *the loan files*

*provided to Mort   gagee by Brooklyn Fe     deral Savings Bank, the assignor of*

*Mortgagee, of which I am the   custodi an*." (R. 2248) (em  phasis added).  Despite

repeated notice of the lo    cation of the Loan Files,      DAB never requested the

production of any internal Brooklyn Federal documents.[8]

Upon learning that DAB had never re   quested any such documents, Justice

Ramos direct ed DAB to serve new request  s.  Mortgagee objected, noti ng that the

---

[8]  DAB's docum  ent requests sought only     correspondence and agreem  ents involving
Mortgagee and its affiliate.  (R. 469).

parties had appeared in Court several times after Gallo's deposition and "[n]obody

said a word, a singular word, about needing additional documents – nobody served

a document, nobody followed up a deposition with a letter requesting, by the way,

do you have that." (R. 681-82). Mort        gagee also noted that DAB had filed

supplemental papers on April 18, 2013 and did not request additional discovery –

> We have rules. I would, respectfully, suggest we need to
> play by them. Otherwise we end up where we were last
> July, which is coming into court, everything is briefed
> and they say, "Oh, I need more discovery." Even the last
> time, when they told your Honor they noticed depositions
> [of Brooklyn Federal witnesses], they had not noticed
> any of the depositions that they took.

(R. 686-87). Nevertheless, Justice Ramos postponed consideration of the summary

judgment motion and cross-motions and directed DAB to serve new document

requests on Mortgagee. "Guess what? We're continuing again. You [DAB] make

the demand on the plaintiff and we'll take it from there." (R. 687).

On May 8, 2013, as directed by th      e Court, DAB served new docum    ent

requests, seeking for the first tim    e all docum ents "whic h refer to, enco   mpass

discussions or directions about, or are      otherwise relative to the loans m    ade by

Brooklyn Federal to DAB, specifically       including, but not lim   ited to . . . the

extension of the m aturity date of the    loans." (R. 704-05). Within 48 hours of

DAB's request, Mortgagee produced res ponsive documents, including the Action

Plan.

### 3.    The June 11, 2013 Oral Argument

On June 11, 2013, the parties returned    to Court for a resum    ption of oral argument on Mortga gee's summary judgme nt m otion. Seizing upon t he Action Plan, DAB asked t he IAS Court for leav e to move to vacat e Justice Fried's dismissal order based on newl y found evidence. (R. 634) . Once again, the Court deferred decision on Mortgagee's m otion and from the bench granted DAB leave to seek renewal of Justice Fried's affirm ed order. "Everything is held in abeyance. . . . So if I deny their m    otion to renew  then I'll grant this m otion [fo r summary judgment]." (R. 646-47).

## THE DECISION BELOW

The parties appeared before the IAS Court on July 9, 2013 for oral argument on DAB's motion to renew an d vacate ( Motion No. 10) and Mortgagee's motion for summary judgment (Motion No. 6).

Ruling from the bench, Justice Ramos  granted DAB's m otion to renew and vacated Justice Fried's dismissal order,     stating "Judge Fried's decision is withdrawn by me because now I am the judge." (R. 1208.37). Justice Ramos also, *sua sponte*, directed DAB to file an amended answer and counterclaims. (Id.) The Court refused Mort gagee's request fo r a decision on its m    otion for summary judgment, but granted Flintlock's cross-motion, from the same motion sequence, to amend its pleading. (R. 1208.36-1208.37).

24

The Court entered a short-form      or der on Jul y 30, 2013, from      which

Mortgagee appealed on August 5, 2013.      The next day, seeking to scuttl      e

Mortgagee's appeal, DAB filed a notice of  settlement in the IAS Court, requesting

entry of a long-form  order i n place of th e July 30 order.  (R . 1208.1).  Mortgagee

filed a proposed counter-order that correct ed errors in DAB's proposed order, such

as DAB's failure to distinguish between  its first counterclaim for fraud, which was

at issue on Motion No. 10, and its second  and third counterclaims, which were not

at issue.  (R. 1208.150).  Mortgagee also not ed that the Court partially disposed of

Motion No. 6 by granting Fli ntlock's motion to amend but deemed the balance of

Motion No. 6 "m oot."  (R. 1208.151).  No  twithstanding the se and other accurat e

corrections to DAB's proposed order, t he IAS Court signed DAB's order, without

modification, from the bench on August 26, 2013.

## I.    RENEWAL OF MORTGAGEE'S    MOTION TO DIS  MISS AND VACATUR OF JUSTICE FR        IED'S DISMISSAL ORDER (MOTION NO. 10)

The basis for the Court's grant of DA      B's m otions to rene w and vacate is

unclear.  At the July 9 hearing, the Cour    t stated that the Action Plan effectivel  y

nullified this Court's affirmance of Ju      stice Fried's dism issal of DAB's fraud

counterclaim.

> THE COURT:  [L]et me focus your attent ion on what
> has caught my attention.
> MR. SCHARF:  Sure.

25

THE COURT:  And that is the language from the
Appellate Division. . . . Quote, "The loan documents
expressly prohi bit oral term ination or amend ment and
provide for term ination or  amendment only in w  riting
signed by Brooklyn Federal."

MR. SCHARF:  Yes.

THE COURT:  Cl early, that 's what they wanted   to
see.  For the purposes of a 3211 m   otion only and not a
3212 m otion, doesn't that stop us ri      ght there?  We
already now know that D.A.B.  can satisfy the Appellate
Division's most stat ed concern.  And t   hey repeat that.
They say m odified or amended onl y in writing executed
by Brookl yn Federal.  They     don't say agreement, they
don't say how detailed   or procedurally how it has to be
drafted.  It doesn't necess  arily have to be authenticated.
They just say from  their poi nt of view, a writing si gned
by Brooklyn Federal.  We've go t that now and I think if
Judge Fried had seen that, he  would be com pelled to say
3211?  I don't think so.

(R. 1208.21).

At the same time, however, the Court acknowledged the undisputed fact that

the Action Plan was unknown to DAB un til May 2013.  (R. 1208.26).  Thus, even

if the Action Plan were "an amendment . . . in writing signed by Brooklyn Federal"

(which it plainly is not), based on th e IAS Court's own findings DAB could not

have reas onably relied on th e Action Plan in 2010 and 2011 because DAB was

unaware o f it.  The Action Plan therefor e does not affect the dism issal of DAB's

fraud counterclaim.

Moreover, the IAS Court stated repeated ly that, in its view, the Action Plan

*negates* DAB's fraud counterclaim.  Accordi    ng t o the Court, by virt  ue of the

26

Action Plan, Brooklyn Federal's alleged re    presentations to DAB were actually

true.  "This is not a false representation anym ore.  It is not a m isrepresentation.  It

was a representation of an accurate fact.   The bank had approved it. . . .  [T]here is

no fraud a nymore.  It was an accurate repr esentation of wha t the bank had done."

(R. 1208.23, 1208.28-1208.29; see also  R. 1208.24).  Again, based on the Court's

own findi ngs, the Action Plan did not s   upport D AB's fraud allegations and t  hus

did not warrant renewal of Mortgagee's mo    tion to dismiss or vacatur of Justice

Fried's order.

        Finally, the IAS Court m ade no fi nding as to whether DAB demonstrated

either "reasonable justification for the fa    ilure to present such facts o   n the prior

motion" or "fraud, m   isrepresentation,  or other misconduct" by Mortgagee, as

required by CPLR 2221 and 5015(a)(2), (3).   DAB adm itted that it had not served

document requests that encompassed the   Action Plan and that DAB obtained the

document only because, as DAB's counsel    admitted, DAB belat edly served "a

discovery dem and which, qu ite frankly, your Honor,   was insisted upon by you."

(R. 1208.13).  The Court appeared to ac       cept at face value DAB's false and

unsupported clai ms that DAB refrained fr om serving pert inent document request s

during the prior 22 months that th        e action was pending because DAB was

somehow duped by Mortgagee into belie       ving that si   mply requesting "all

27

documents pertaining to the Loans" would have been futile. Mortgagee attempted

to address DAB's baseless allegations squarely but was cut off by Justice Ramos.

> MR. SCHARF: . . . So, renewal isn't appropriate because the defendant, the borrower, D.A.B., cannot demonstrate that it exercised the appropriate due diligence to learn of the information that they are now claiming is, "alas, the proverbial smoking gun."

> THE COURT: Is this a path you folks want to go down? Off the record for a second.

(R. 1208.19). Off the record, Justice Ramos declared that the Action Plan should

have been produced at the outset of the litigation. The Court did not address the

fact that DAB admittedly did not request any such documents until May 8, 2013.

DAB's failure to ask for documents that were always available is the basis for

DAB's argument that the Action Plan was withheld by Mortgagee. The argument

is meritless and is intended to mask DAB's lack of diligence.

In sum, the IAS Court's grant of DAB's motion to renew and vacatur of

Justice Fried's dismissal order was based on flawed findings. Although the IAS

Court found that the Action Plan could have supplied the missing element of

reasonable reliance for DAB's fraud claim based on the language of this Court's

May 28, 2013 decision, the Court also noted that the Action Plan was unknown to

DAB during the events at issue and it held that the Action Plan contradicted

DAB's allegations of a false representation. Furthermore, although it is undisputed

that DAB did not serve pertinent document requests until May 8, 2013, and DAB

28

has presented no evi dence whatsoever of any misrepresentation or m isconduct by

Mortgagee, the IAS Court failed to consider DAB's lack of diligence in discovery.

## II.    AMENDMENT OF DAB'S ANSWER AND COUNTERCLAIMS

The IAS Court's di rection to DAB to amend its pleading was prom pted by

the Court's realization that DAB had not ye t articulated a cognizable claim.  "I'm

trying to think what do we have here.  Is it a contract?  Is it some kind of a fraud?

Is it – I don't know what it is.  I shouldn't   have to draft that claim.  They shoul d

draft it."  (R. 1208.26).

Mortgagee's counsel objected that DAB   had not re quested leave to file  an

amended pleading and that, mo reover, none of DAB's vari ous allegations stated a

cause of action.

> MR. SCHARF:  . . . I am  asking you – let's deal with
> it from any theory.  Let's just deal with breach of
> contract.  Please, just give me a couple of minutes, Judge,
> because I know it's troubling you and I am        tr ying to
> address it.
>
> THE COURT:  Sure.  You are put         ting m e in a
> position of being an advocate for [DAB]  and I shouldn't.
> I don't know what their claim is now.
>
> MR. SCHARF:  They have stated what their clai m is.
> Mr. Wallace put it in his affidavit.
>
> THE COURT:  Good, then let him replead.

(R. 1208.27; see also R. 1208.26, 1208.28-1208.29).

Next, the Bank Defendants' counsel at  tempted to explain t hat the Action

Plan has no legal significance because        it was an internal document that was

29

undisputedly unknown to D AB during the events at i ssue. (See R. 1208. 34,

1208.26).  However, the Court now disputed that fact.

> THE COURT:  Are you conte nding this is an internal office m emorandum? . . .    Have you looked at the affidavit of Ms. Gallo?  She sa id no further action by the board was required.  It was a done deal.
>
> MR. HARVEY:  Your Honor –
>
> THE COURT:  Oh, you want to testify now?
>
> MR. HARVEY:  No, Your Honor.  Looki ng at the document on its face, it says this is a commer cial action plan.  This was a plan that had certain contingencies –
>
> THE COURT:  Excu se me.  I t ake Ms. Gallo, who is the officer of your bank – I guess she is not worki ng for you anymore – an officer of your bank telling me in an affidavit, I think in May of 2013, that no further action was required by the board of directors, that m eans to me it's a done deal.  They didn't have to do anything else.
>
> Now, you saying, "Oh, the defense is that it was never delivered to the defendant"?  We'll find out.  We haven't had any di scovery in this cas e; remember?  The s mallest – the first bit of discovery in this case reveals a document that everyone said didn't exist and it does.
>
> You're [DAB] granted leave to amend your complaint.

(R. 1208.34-1208.35).

The Court's observation that t he pur ported extension "was a done deal"

overlooked multiple paragraphs of Gallo's affidavit that m ade clear that approval

by the Workout Committee was merely a preliminary step in modifying the Loans.

Gallo stated that "[i] f the [Workout Committee] accepted th e recommendation [t o

extend the Loans ], then consent would be sought from the bank's prim ary

30

regulator, the U.S. Treasury Department's Office of Thrift Supervision (OTS), a requirement of any loan extension." (R. 790). Gallo also stated that following OTS approval, the proposed extension "would be memorialized in a written agreement with DAB" upon DAB's "payment of a fee of .25% of the loan balance for each six-month term." (Id.). In fact, Gallo's statement regarding full board approval was not made to suggest that an extension had been granted, but rather to respond to inaccurate statements by counsel and the IAS Court at the May 1, 2013 hearing[9] – statements that required correction because the Court warned Mortgagee that "[i]f we have a document that is said to exist and it is not around and you're in the shoes of the bank, uh oh." (R. 685).

In addition, the Court's statement that there had been little or no discovery in this case was mistaken. In January 2012, Mortgagee responded to DAB's document requests by producing 1,137 pages of documents. At Justice Ramos' direction, DAB deposed four witnesses of its choosing and served a second round of document requests, to which Mortgagee responded by producing an additional 964 pages of documents. The Court's statement was therefore without basis and,

---

[9] Wallace incorrectly told the IAS Court on May 1, 2013 that "The officers in charge of the loan went to the loan committee and the full Board of Directors of the bank and requested an extension of that loan and it was approved. We know that from the testimony." (R. 676). To the contrary, the bank officers testified that approval of the full board was not required nor sought. (See, e.g., R. 2856, 2858). Nonetheless, Wallace's misstatement that the full board of directors had approved the extension was subsequently repeated by the Court several times during the May 1, 2013 hearing (see, e.g., R. 682, 684, 686), prompting Gallo to correct the record in her affidavit.

31

in any event, none of this discovery ha       s produced a triable issue of fact that

precludes summary judgment on Mortgagee's foreclosure claims.

Finally, the Court's statement that "e   veryone said [the Action Plan]   didn't

exist" is also mistaken.  Mortgagee neve   r denied the existence of int   ernal bank

documents referencing a potential extens    ion of the Loans.       Mortga gee m erely

stated, correctly, that the maturity date of the Loans was never extended, a fact that

DAB's counsel acknowledged in hi s May 24, 2011 letter to Brooklyn Federal and

has repeatedly admitted in open court.  (See pp. 5-6 supra).

## III.  MORTGAGEE'S MO   TION FO   R SUM   MARY JUDGM   ENT (MOTION NO. 6)

At the July 9 hearing, Justice Ram       os ruled that    Mortgagee's summary

judgment motion was "moot" given the Court's direction to DAB and Flintl ock to

amend their pleadings. [10]  (R. 1208.32).  The Court pointedl  y refused to deny the

motion because it did not want Mortgag  ee to appeal it.  (R. 1208.36; see also   R.

1208.31).

However, the Court reconsidered its position at the August 26, 2013 hearing,

after being informed that Flintlock's motion to amend was part of Motion No. 6, a

point DAB scrupulously avoided mentioning in its proposed order.  (R. 1208.262).

Both Mortgagee and Flintlock requested an   explicit reference to Motion No. 6 in

---

[10]  Flintlock has conceded that its proposed counterclaims "ha[ve] nothing to do with" the foreclosure of the Mortgages and that "it is a    proper procedure to sever any of the claim  s, try them separately."  (R. 689-90).

the order, leading the Court to ask whethe r it would "be bett er for everyone's sake if I would deny the m otion for summary judgm ent as moot in light of t he fact that the parties are repl eading?" (R. 1208. 266). However, DAB objected to any mention of Motion No. 6 in the order out of fear that this Court would then have a full record, and the Court dropped the s uggestion, signing DAB's proposed order unchanged.

## DAB'S AMENDED ANSWER AND COUNTERCLAIMS

Following entry of the July 30 short- form order, DAB filed an amended pleading, asserting three new counterclaims and five new affirmative defenses.

DAB's first counterclaim, for breach of contract, alleges that the Action Plan is an enforceable extensi on of the Loans' March 1, 2011 maturity date, which Brooklyn Federal breached by declaring the Loans due and payable on March 1, 2011. (R. 1208.96). DAB's second co unterclaim, also for breach of contract, alleges that Brooklyn Federal breached a purported obligation to fund the Building Loan after March 1, 2011. (R. 1208.98-1208.99).

DAB's third counterclaim , a co mbination claim denoted as "fraud/ bad faith/lack of fair dealing," essentially re -pleads the fraud allegations dism issed by Justice Fried and affirm ed by this C ourt – na mely, that Brookl yn Federal purportedly approve d a construction contract on August 26, 2010 and thereby extended the Loans' maturity date by 430 da ys therefrom, to November 2011. (R.

1208.99-1208.101).  According to DAB, Brooklyn Federal took this action "so that
the status of the DAB loans on its books         would be satisfactory to federal
regulators," but then it decided to sell t he Loans "in order t o survive regardless of
its duty of fair dealing and good faith      with its borrower, t he Defendant DAB."
(Id.).

DAB's new affirm ative defenses ar e waiver, esto ppel, unconscionability,
unclean hands, and "bad faith and lack of fair dealing."  (R. 1208.88-1208.92).

## ARGUMENT

### I.    DAB'S MOTIONS TO RE     NEW AND VACATE W     ERE IMPROVIDENTLY GRANTED BECAUSE DAB CANNOT SATISFY THE REQUIREMENTS OF CPLR 2221 OR CPLR 5015

To justify renewal under CPLR 2221(e) or vacatu r under CPLR 5015(a)(2),
DAB was required t o dem onstrate (i) th at the newly di scovered evidence would
likely have caused Justice Fried to deny     Mortgagee's m otion to di smiss and (i i)
that the new evidence could not have been produced at the time of the prior motion
even if DAB had exercised due diligen    ce.  CPLR 2221, 5015(a)(2); Ba now v.
Simins, 53 A.D.2d 542, 542 (1st Dep't 1976); De Carvalhosa v. Adler   , 57 A.D.3d
367, 368 (1st Dep't 2008).  DAB's motion failed to satisfy these requirements.

To justify vacatur under CPLR 5015(a)(3 ), DAB was required to show that
Mortgagee procured the dismissal order     by "fraud, m isrepresentation, or other
misconduct."  CPLR 5015(a)(3); Nichols v. Curtis, 104 A.D.3d 526, 529 (1st Dep't

2013). DAB failed to make such a show        ing, and its allega   tions of fraud and misconduct are blatantly false.

**A.    THE ACTION PLAN DOES NOT AFFECT JUSTICE FRIED'S DISMISSAL OF DAB'S FRAUD COUNTERCLAIM BECAUSE DAB ADMITS THA T IT WAS UNAWARE OF  THE ACTION PLAN'S EXISTENCE DURING THE EVENTS AT ISSUE**

In affirm ing Justice Fried's dism   issal of DAB's fraud co   unterclaim, this Court hel d that DAB cannot plead "t     he requisi te reasonable reliance" on any alleged oral extension of t  he Loans' ma turity date because   the Loan Docu ments expressly precluded such reliance absent     a written and executed extension. (R. 855). Even if the Action Plan were a      written and executed extension (which it plainly is not), it is nevertheless irreleva nt to DAB's fraud allegations because, as Justice Ramos noted, the Action Plan was " not known to the defendant when they drafted the counterclaim ." (R. 1208.26).    Again, the Action Plan was an internal bank document which unquestionably was     never communi cated or delivered to DAB and which was subseque ntly rescinded when DAB' s principal was found to have m isappropriated Building Loan fu  nds. The Action Plan, a document first obtained by DAB during discovery, wa s obviously not relied upon by DAB during the events at issue a  nd thus would not  ha ve affect ed Justice Fried's dismissal of DAB's fraud counterclaim. DAB's m otions to renew and vacate were im properly granted, and should be reversed. Nichols , 104 A.D.3d at 529 (denying m otions to renew and vacate because new facts would not have changed prior determination).

35

**B.    DAB HAS NO REASONABLE JUSTIFICATION FO R FAILING TO PRESENT THE ACTION PLAN ON THE PRIOR MOTION BECAUSE DAB MADE NO EFFORT TO OBTAIN THE ACTION PLAN UNTIL IT WAS DIRECTED TO DO SO BY THE IAS COURT ON MAY 1, 2013**

DAB also cannot satisfy the    second   requirement of CPLR 2221(e) and

5015(a)(2) – a reasonable justification for fa iling to present the Action Plan to the

Court in a timely manne r – because DAB mad e *no* effort to obtain t his document

until long after Justice Fried issued his decision.  Indeed, when Brooklyn Federal's

Gallo testified on January 7, 2013 – three  weeks before DAB's deadline to perfect

its appeal of Justic e Fried's order –   that the Workout Committee approved her

department's recommendation to extend    the Loans, DAB's counsel di  d not ask

whether that approval was reduced to writing, nor did counsel attempt to locate any

documents after the deposition.  (R. 944-45).  DAB admits that it served its May 8,

2013 document request only afte r being directed to do so by the IAS Court.  (R.

1208.13, 633).

In an attem pt to justify its failure to  pursue discovery on its own initia tive,

DAB accu ses Mortgagee of concealing the    location of the L oan Files, im plying

that DAB would have sought t he Loan File s if onl y it had known whom  to ask.

"*No one* , including plaintiff ORCHARD'S     attorneys who were present and

participated in each of these depositio ns revealed t hat BROOKLYN F EDERAL'S

file regarding these loans was in ORCH ARD'S possession."  (R. 61) (em phasis in

original).  This accusa tion is patently false. [11]  First, DAB never requested the

production of the Loan Files, instead fo cusing its document requests on an alleged

conspiracy between Brooklyn Federal an d Mortgagee, a claim long ago abandoned

by DAB.  (R. 469).  Second, the location        of t he Loan Files was repeatedly

disclosed to DAB.  Mortgagee's     January 2012 document    production included

correspondence discussing the delivery of  the Loan Files to Mortgagee, while the

MLPA, both produced and filed as an e  xhibit to M ortgagee's summary judgm ent

motion, stated that "the Mortgage Lo  an  Files" would be del ivered to Mortgagee

"[p]romptly after the Closing Date."     (R. 1208.13, 1665).  Furtherm  ore, one of

Mortgagee's principals filed an affidavit in support of summary judgment in which

he stated that he was the     custodian of "the loan file  s provided to Mortgagee by

Brooklyn Federal." (R. 2248).

DAB seeks t  o defl ect attention from   its careless  ness by making wildly

baseless accusations of wrongful conduct   .  However, DAB has no excuse for

failing to request the Lo  an Files for near ly two years until directed to do so by

Justice Ramos.  "Upsetting though it m ight be to pl aintiff, the fact is that plaintiff

has, thus far, failed to ask for any brok erage account statements.  The Individual . .

---

[11]  Moreover, DAB's suggestion that it inquire  d about the location of the Loan Files at
any deposition is disingenuous.  D AB's counsel doe s not point to a single   instance in which he
made any such inquiry.    Furtherm ore, Gallo  in formed DAB at her deposition that Brookly    n
Federal's co rporate reco rds were in the possess ion of Brooklyn Federal's corporate successor,
Investors Bank in "Short Hills, New Jersey." (R. 2728).  DAB never sought any documents from
Investors Bank.

. Defendants were sim ply not required   to provi de documents which were not

requested by plaintiff." 32<u>0 West       13th St., LLC v. Wo    lf Shevack, Inc.  </u>, No.

603730/2007, 2013 N.Y. Misc. LEXIS 2297, at *8-9 (Sup. Ct. N.Y. Cnty. May 21,

2013); <u>Richardson v.  Brisard & Brisard, Inc.  </u>, No. 10463/2010, 2012 N .Y. Misc.

LEXIS 3215, at *21-22 (Sup. Ct. Kings       Cnty. July 9, 2012) (Demarest, J.)

(denying defendants' m otion to preclude   documents that were not produced i  n

discovery because "defenda nts never served a dema    nd for the production of

documents pursuant to CPLR 3120").  Un    fortunately for D AB, a litigant is not

obliged to volunteer documents to its adversary.

Justice Ramos did not consider whether DAB had exercised due dilige nce in

pursuing discovery.  Howeve r, based on his off-t he-record comments, h e appears

to have accepted DAB's baseless al      legations, which were mad    e with great

theatrics, that DAB was somehow duped into sleeping on its rights in discovery.  If

Mortgagee had been perm itted by the Court   to address DAB's allegations at oral

argument, Mortgagee would ha ve demonstrated, as set forth above, that DAB was

repeatedly told that Mortgagee possesse  d the Loan Files and that DAB had no

reasonable justification for fa iling to pursue discovery.    As this Court has held,

renewal of a m otion that has already b   een deci ded and affirmed on appeal is

limited –

> strictly to those cases in which crucial facts were at the
> time of the original  m otion extant, but  <u>could not have  </u>

> been obtained by the party seeking renewal, even if due
> diligence had been exercised  .  Moreover, the parties
> seeking renewal would be under a heavy burden to show,
> in addition, that he was unable at any time before the
> perfection of the appeal  , to b ring the new facts to the
> motion court's attention as he would have been permitted
> to do if in fact the criteria for renewal were satisfied.

Beiny v. Wynyard (In re: Beiny), 132 A.D.2d 190, 210 (1st Dep't 1987) (emphasis

added).  "A motion for leave to renew is not a second chance freely given to parties

who have not exercised due di ligence in ma king their first factual presentation."

Elder v. Elder, 21 A.D.3d 1055, 1055 (2d Dep't 2005) (affirming denial of motion

to renew that was "based upon evidence that , with due dili gence, could have been

discovered earlier").

Because DAB made no effort to obtain documents pertaining to a purported

extension of the mat urity date of the Loans, its motions to renew and vacat e were

improperly granted.  Rosado v. Edm undo Castillo Inc. , 54 A.D.3d 278, 279 (1st

Dep't 2008) ("Plaintiff's m otion to renew  was properly denied  since he failed to

offer a reasonable excuse for not presen ting the new evidence on the prior m otion

when it could have been obtained through  discovery."); Zuluaga v. P.P.C. Constr.,

LLC, 45 A.D.3d 479, 481 (1st Dep' t 2007) (same); DeCarv alhosa, 57 A.D.3d at

368 (motion to vacate properl y denied beca use "the primary cause of defendant's

failure to discover t he new evidence on wh ich she based her pos t-trial motion was

her own lack of due diligence, not plaintiff's misconduct").  DAB did not introduce

a shred of evidence justifying its lack    of due di ligence or support ing its feckless

allegations of misconduct.

## II.    THE IAS COURT IMPROVIDEN  TLY GRANTED DAB LEAVE TO AMEND ITS PLEADING

This Court "has consistently held th      at, in order to conserve judi       cial

resources, an examination of the underlying merits of the proposed causes of action

is warranted, and leave to amend will be  denied where the prop osed pleading fails

to state a cause of action or is palpably in   sufficient as a matter of law." Davis &

Davis, P.C. v. Morson , 286 A.D.2d 584, 585 (1st De p't 2001) (internal citations

omitted).  "[T]he granting of leave to  amend 'without passing upon the validity of

the causes of action as amended . . . re     presents a procedure which is no l   onger

tolerable.'"  Non-Linear Tr ading Co. v. Braddis Assocs., I  nc., 243 A.D.2d 107,

116 (1st Dep't 1998) (citation omitted).

In directing DAB to amend its pleading,  the IAS Court im properly declined

to pass upon t he val idity of any proposed causes of    action, telling Mortgagee's

counsel, "You are asking m  e to dism iss a  claim I haven't seen."  (R. 1208.29).

However, the IAS Court's di rective reverses the burden s on such a moti on.  DAB

was required to demonstrate that it can  plead a valid cause of action by subm itting

a proposed new pleading or affi davit of merits and evidentiary proof.  The absence

of any suc h pleading or affidavit here is al  one sufficient to j ustify reversal of the

IAS Court's order.  See  CPLR 3025(b) ("[a] ny m otion to amend or supplement

pleadings shall be accom    panied by t   he proposed amended or supplemental
pleading"); <u>Pollak v. Moore</u>  , 85 A.D.3  d 578, 579 (1st Dep't 2011) (m    otion to
amend properly denied "as plaintiff faile  d to annex a copy of a proposed second
amended pleading to his motion papers, and he did not otherwise offer an affidavit
of merit") ; <u>Fernandez v. HI    CO Corp.</u> , 24 A.D.3d 110, 111 (1st Dep't 2005)
(motion to am end "properly denied for fa  ilure to subm it a copy of the propose  d
pleading").

If the Court had required DAB to s ubmit a proposed pleading and performed
the requisi te analysis, it would have read  ily determined that leave to amend was
improper.  DAB's first breach of contract     counterclai m f ails as a matt  er of law
because the Action Plan is not a contr    act between Brooklyn   Federal and DAB.
The Action Plan was not delivered or comm     unicated to DAB, and DAB knew
nothing about it unti l years after the Loan  s had matured and th  e Action Plan had
been rescinded.  Furthermore, because there was never an  enforceable extension of
the March 1, 2011 maturity  date, Brooklyn Federal had  neither the obl igation nor
the ability to fund Building Loan advances   after that date.  DAB's two breach of
contract counterclaim thus fail as a matter of law.

DAB's third counterclaim for "fraud/ bad faith/lack of fair dealing" and its
five new affirmative defenses, none of which depend upon  the Action Plan, all fail
for the reasons set forth i  n this C ourt's May 28, 2013 Deci  sion and Order and

because they impermissibly seek to nullify the Loan Documents' clear provisions governing contractual modifications.

DAB's inability to plead any viable claim or defense is particularly fatal because DAB has been granted all of the discovery that it has requested as well as some discovery that it has not, and yet 43 of the 46 paragraphs of factual allegations in DAB's amended pleading are asserted "upon information and belief." (R. 1208.74-1208.87). DAB's counterclaims and defenses are factually and legally meritless, and the IAS Court's grant of leave to amend must be reversed and DAB's new pleading stricken. Peach Parking Corp. v. 346 West 40th St., LLC, 42 A.D.3d 82, 87 (1st Dep't 2007) (reversing grant of leave to amend because proposed new claim was not actionable); see also Perrotti v. Becker, Glynn, Melamed & Muffly LLP, 82 A.D.3d 495, 499 (1st Dep't 2011) (leave to amend properly denied because proposed cause of action is "palpably insufficient [and] clearly devoid of merit") (citation omitted).

A. **DAB's Breach of Contract Counterclaims Are Palpably Insufficient as a Matter of Law Because the Action Plan Does Not Satisfy the Basic Criteria of a Contractual Modification**

As Mortgagee and the Bank Defendants each attempted to explain at oral argument on July 9, 2013, a precedent of this Court squarely disposes of DAB's allegations. In Waterways Ltd. v. Barclays Bank PLC, 202 A.D.2d 64, 73 (1st Dep't 1994), "[t]he primary issue on appeal . . . [was] whether there was a

modification of the loan agreement or an enforceable contract to forbear." Just like

here, the loan at issue in Waterways   had been m odified once before by a form al

loan modification agreement. Id.  at 66.  Sim ilarly, lik e DAB alleges here, bank

officers met with th e borrower in Waterways  to discuss a modification, and after

one such meeting, a bank offi  cer drafte d an internal m emo setting forth term s

agreed-to by the parties. Id.  at 67.  Like here, any m odification of the loan was

subject to conditions preced ent, and like  here, t he borrower's representative i n

Waterways sent a letter to the lender acknow    ledging that a formal m odification

agreement was requ ired. Id.  at 68-69.  *Unlike* h ere, in Waterways , the internal

memo setting forth proposed l oan term s wa s accidentally faxed to the  borrower.

Id. at 68.

On these facts, this Court held that     the borrower could not establish an

enforceable modification of  the loan.  Each point of  the Court's reasoning applies

here.

> First, an i nternal office me morandum which is not  even
> addressed to one of the purpo  rted parties to the alleged
> agreement, by its nature, carries no indicia of an offer
> and acceptance su    fficient to satisfy the 'agreement'
> language of paragraph 19 [of the promissory note].

Id. at 74.  The Acti  on Plan is an intern  al office mem orandum addressed not to

DAB, but to Brookl yn Federal's Workout  Committee.  By its nature, the Action

Plan – an internal reco  mmendation from  the bank's m anagement to its board –

carries no indicia of an offer and        acceptance between    lender and borrower

sufficient to satisfy t      he provision of      t he Notes control    ling contractual

modifications.  Indeed, the relevant provisi on of the Notes here is substantially the

same as the relevant provision in Waterways:[12]

> *The Notes here –*
>
> "No executory agreement unless in writing and signed by
> Holder . . . shall be effectiv    e to change or m    odify or
> discharge, in whole or in part, this Note."  (R. 141, 247).
>
> *The promissory note in Waterways –*
>
> "This Note may . . . be changed or terminated . . . only by
> an agreement in writing si      gned by t  he party against
> whom enf orcement of such    change or term    ination i s
> sought."  Id. at 66.

The Waterways Court then continued:  "a second factor weighi  ng against a

finding of a binding m  odification i n t his  case is the fact that the circumstan    ces

surrounding the August 1988 m odification of the loan agreement demonstrate that

the parties exercised form    ality in th  eir prior course of dealing."  Id.   __ at 74.

Likewise, here, in August  2008 the parti es extended the fi nal maturity date of the

Project Loan – to March 2011 – by a fo  rmal Loan Modification Agreement which

was drafted by counsel and executed, before  a notary, by Brooklyn Federal's chief

lending officer and by DAB's principal and the Loans' guarantor.  (R. 197).

---

[12]  Like analogous provisions in m any contracts, both provisions track G.O.L. § 15-301,
which provides that contracts containing 'no oral  modifications' clauses "cannot be changed by
an executory agreement unless such  executory agreem ent is in writing and signed by the party
against whom enforcement of the change is sought or by his agent."

Next, the <u>Waterway s</u> Court noted:  "There is also the Decem   ber 14, 1998 letter from George Robinson, which plaintiff  seeks to m ake light of, that contains an acknowledgement by pl     aintiff's repres entative that form    alization of the purported agreement  was contemplated."  I<u>d.</u>  at 74.  Her e, t here is the M  ay 24, 2011 letter from Wallace, DAB's counsel, that acknowledges that the parties "have been discussing an extension,"      that  Brooklyn Federal ha  d not yet made "a determination as to whether or not the Lo an term should be extended," and that "a written extension of the term of the      Loan" was required.  (R. 796-97).  DAB clearly understood that no extension of the Loans had been granted.

Finally, this Court in <u>Waterways</u>  held that "the condition preced   ent noted above also negates any finding that Barclays entered into a binding modification of the loan agreement."  I<u>d.</u>  at 74.  Here, it is undi   sputed that, as stated in the fi  rst paragraph of the Action Plan, OTS approv al was required before Brooklyn Federal could enter into an a greement to extend th e maturity date of  the Loans, and such approval was never granted.

In sum, just like the intern al memorandum in <u>Waterways,</u> the Action Plan is not an enforceable modificati on of the Loans.  This decision was pres  ented to the IAS Court, who gave it short shrift.     (R. 1208.28,  1208.34).   But even ignoring <u>Waterways,</u> the IAS Court's grant of leave to amend viol       ated numerous well-settled principles of contract law:  (i) to  create a bilateral contract, acceptance must

45

be communicated to the offeror; (ii ) an unambiguous contract must be enforced according to its plain term s; (iii) a bind ing contra ct requires a manifestation of mutual assent to mat erial ter ms; and (i v) an agreement does not become effective until all conditions preceden t are satisfied or waived. These bas ic contract principles render DAB's allegations palpab ly insufficient as a matter o f law and warrant reversal of the IAS Court's August 28 Order.

### 1.     The Action Plan Was Never Communicated to DAB

It is undi sputed that the Action Plan was never delivered to DAB and that DAB was never informed of the docum ent's proposed terms.  As DAB told Justice Ramos at oral argument on July 9, 2013 : "We only found out a m onth ago, six weeks ago that [the Loans ] had been ex tended in writing." (R. 1208.27).  Becau se this Court has already held that unde r the Loan Documents, DAB could not reasonably rely on anything short of a writte n and signed extension, the fact that the Action Plan was never communicated to DAB is fatal to DAB's new breach of contract allegations.

"[I]t is essential in any bilateral contract that the fact of acceptan ce b e communicated to the offeror."  <u>Gy abaah v. Rivlab Transp. Corp.</u>, 102 A.D.3d 451, 452 (1st Dep't 2013) (settle ment agreement was not effective because "the <u>executed release</u> was never forwarded to defendant nor was acceptance of the offer otherwise comm unicated to de fendant or its carrier") (em phasis added) (internal

citations omitted). As the Second Department stated in applying this principle, a "notation by appellant on its books would not be a binding acceptance any more than would be the words of a man speaking to himself." Goldberg v. Colonial Life Ins. Co., 284 A.D. 678, 679-80 (2d Dep't 1954) (holding that even if insurer "duly issued the said life insurance policy on its books," no binding policy was created because insurer never informed decedent that it had accepted his insurance application). See also Moody Eng'g Co. v. Bd. of Educ., 205 A.D. 522, 523-24 (1st Dep't 1923), aff'd, 238 N.Y. 629 (1924) (plaintiff cannot state a claim for breach of contract based on board resolution approving contract because resolution was rescinded before board notified plaintiff of the resolution and "until such notification the board was within its rights in rescinding its resolution"); Church of God v. Fourth Church of Christ, Scientist, 76 A.D.2d 712, 714 (2d Dep't 1980), aff'd, 54 N.Y.2d 742 (1981) ("Although the vote of defendant's membership constituted an acceptance [of offer to purchase church property], such acceptance was not effective until communicated to plaintiff.").

This principle has been applied to precisely the same type of document as the Action Plan – an internal memorandum "setting forth the terms as presented to and approved by the Credit Committee." Philips Credit Corp. v. Regent Health Group, 953 F. Supp. 482, 489-90 (S.D.N.Y. 1997). In Philips Credit, the lender's Credit Committee approved proposed loan terms, but, *unlike* here, that approval

47

was communicated to the prospective borrower. Id. The proposed terms were then recorded in an internal memorandum which, like here, the borrower subsequently obtained in discovery. Id.

The Philips Credit Court rejected the borrower's argument that the memorandum, along with other documents, created an enforceable obligation. Id. at 513, 518. Noting that the memorandum "was an 'internal PCC [Philips Credit Corp.] memoranda,' sent only to PCC employees," the court held that a "document first obtained by defendants during discovery commenced by the parties after November 12, 1991 . . . is unquestionably irrelevant to this Court's determination of the parties' intent in July 1989." Id. at 512-13. Just like the PCC memo, the Action Plan was an internal document of Brooklyn Federal that was "first obtained by defendant[] during discovery," and just like the PCC memo, the Action Plan is "unquestionably irrelevant" to this action.[13]

## 2. The Action Plan Is Not an "Agreement" as Required by the Plain Language of the Notes

In rendering the order under appeal here, Justice Ramos placed great weight on the language of this Court's May 28, 2013 decision. Referring to this Court,

---

[13] As illustrated by Philips Credit, internal committee memoranda such as the Action Plan are a routine part of bank administration and arise from the regulatory requirement that a board committee oversee the bank's loan portfolio. See, e.g., OCC Sample Bylaws for Federally Chartered Banks, available at www.occ.gov/topics/licensing/sample-filing-forms-and-agency-responses.html (last accessed July 30, 2013) (a "loan committee" of the board of directors will, among other tasks, "examine and approve loans and discounts [and] exercise authority regarding loans and discounts"). A finding by this Court that a binding contract can be created by an internal committee memorandum would have enormous implications in the banking industry.

Justice Ramos observed:  "They say modified or amended only in writing executed by Brooklyn Federal.  They don't say agre ement, they don't  say how detailed or procedurally how it   has to be drafted.       It doesn't necessarily have to be authenticated.  They just say from      th eir point of view, a writing signed by Brooklyn Federal."  (R. 1208.21).

However, by focusi ng exclusi vely on t he language of   the May 28, 2013 decision, which did not address the que         stion here – whether an internal memorandum can be transformed into        a bindi ng obl igation – Just  ice Ram os ignored t he plain language of the Notes,      which provi de that "[n]  o executory agreement unless in writing and signed by Holder  . . . shall b e effective to change or m odify or discharge, in whole or in part, this Note."        [14]   (See  p. 10, s upra  ). Justice Ramos' focus on the language of the May 28, 2013 decision, from which he concluded that the Notes c  ould be m odified by any  writi ng signed by Brookl yn Federal, impermissibly renders the specific clause of the Notes inoperative.  "There is no m erit to plaintiff's argument that th e provision of the indenture ba rring oral modifications authorizes amen dments to be m ade by any writing si  gned by t he party to be charged, e.g. the side agreem ents.  Plaintiff's read ing of that provi sion

---

[14]  This provision is in cluded in the section of the Notes p rotecting the Holder from any inadvertent waiver or release of its rights a  nd rem edies, and it governs over the more general provisions elsewhere in the Notes a nd the Building Loan Mortgage (see  pp. 10-12, supra ).  See Muzak Corp. v. Hotel Taft Corp.  , 1 N.Y.2d 42, 46 (1956) (specific term  s control over general terms).

impermissibly renders nugatory the spe cific clauses in the indenture governi ng

amendments of the indenture. " GLC S ecurityholder LLC v. Goldman, Sachs &

Co., 74 A.D.3d 611, 612 (1st Dep't 2010).

Under New York law, an unam biguous contract "must b e enforced as

written, and not interpreted in some othe r way based on one part y's assertion that

'when [it] used the words, [it]      inte nded som ething [ot her] than the usual

meaning.'" Ashwood Capital, Inc. v. OTG Mgmt., Inc., 99 A.D.3d 1, 4 (1st Dep't

2012) (internal citations om itted). The No tes do not define "agreem ent," so the

term m ust be gi ven its "plai n, ordina ry, popular and nont echnical meaning."

Lopez v. Fernandito's Antique, Ltd. , 305 A.D.2d 218, 219 (1st Dep't 2003); R/  S

Assocs. v. N.Y. Job Dev. Auth.    , 98 N.Y.2d 29, 32-33 (   2002) (same). The

dictionary definition of "agreement" is as follows:

> 1. The act of agreeing. 2. Harm ony of opinion; accord.
> 3. An arrangement between pa rties regarding a course of
> action; a covenant. 4. *Law* a. A properly executed and
> legally bi nding contract. b. The writing or doc ument
> embodying this contract.

The Amer ican-Heritage Di ctionary, 4th ed. (2000). The Action Plan is not an

"agreement." By its own term s, the Ac tion Plan recommended a course of action

to the bank's Workout Comm ittee. The d ocument was not addressed to DAB, nor

was it co mmunicated or delivered to DA B, nor does it purport to be a leg      al

document or to memorialize or effect an agreement with DAB. The document was

merely intended, as it states, to intern    ally recommend a plan of action to the

Workout Committee, nothing more.

The fact t hat the Action Plan is not an  agreement is evident from  the use of

the term "agreement" in other Loan Document s.  "[I]t is a well- established rule of

contract law that all contemporaneous    instruments between the same parties

relating to the same subject matter are to    be read together    and i nterpreted as

forming part of one and the same  transaction."  Davim os v. Halle, 60 A.D.3d 576,

577 (1st Dep't 2009) (citation omitted).  The two Mortgages and the Building Loan

Agreement were all  call ed "agreements"  by the p arties, and  each document was

signed by DAB and Brookl    yn Federal and sets fort    h re ciprocal rights and

obligations.  (R. 1578, 898, 862).  Moreove r, in 2008, DAB a nd Brooklyn Federal

signed a Loan Modification Agreement    which, just as DAB s eeks here, extended

the final maturity date of the Project    Loan.  (R. 193-98).  That document was

signed by both part ies and the Loan s' guarantor before a not ary.[15]  DAB was thus

well aware of the requirements for exte    nding the maturity date of the Notes

because t his prior conduct by Brooklyn    Federal and DAB had m   anifested th e

parties' understanding of the pl ain mean ing of "agreement" as  "[a]n arrangem ent

between parties" and   "[a] properly executed and le  gally binding contract."  The

American-Heritage Dictionary, 4th ed. (2000).  Moreove r, the May 24, 2011 letter

---

[15]  Gallo  te stified tha t a Loan Modif ication Agreem ent was part of Brooklyn Federal's
normal procedures for modifying a final maturity date.  (See p. 21, supra).

from DAB's counsel, Wallace, requesting a "w ritten extension of the term of the Loan," dem onstrated DAB's awareness th at the any written m odification of the Loans would be, at t he very least, deliver ed to DAB, not simply m aintained in the bank's files. (R. 797). "[T] he parties' course of perf ormance under the contract is considered to be the 'm ost persuasive evidence of the agreed intention of the parties.'" Fed. Ins. Co. v. Americas Ins. Co. , 258 A.D.2d 39, 44 (1st D ep't 1999) (citation om itted). This prior perfo rmance by DAB a nd Brooklyn Federal conclusively dem onstrates that the part ies intended that an extension of the maturity date of the Loans be effected precisely as st ated by the plain language of the Notes: by a writ ten, signed agreement, not an internal reco mmendation to the bank's Workout Committee.

### 3.    The Action Plan Does Not Manifest Mutual Assent to Material Terms

Throughout this litigation, DAB h as al leged that the Loan s were ext ended for "430 calendar days from August 26, 2010." (R. 422; see also R. 423-24, 833). By contrast, the Action Plan proposed a 180-day extension from March 1, 2011, with a further conditional 180-day extension option to March 1, 2012. The Action Plan also required t he paym ent of exte nsion fees, a requirement DAB has never alleged as part of any purpo rted agreement. The vast difference between the ter ms repeatedly alleged by DAB and the terms pr oposed in the Action Plan proves there

was never an enforceable m odification of the Loans because th ere was no meeting of the minds between DAB and Brooklyn Federal as to material terms.

"Fundamental to the establishment of a contract m odification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 354-55 (2d Dep't 1980) (plaintiff failed to demonstrate "the existence of the requisit e intent to effectuate a modificati on agreement"); see also Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 228 (2d Ci r. 2001) (a c ontractual modification "must be established in the same way as is any other contract").

At oral argum ent on Jul y 9, 2013, Mortgagee attem pted to explai n the "massive disconnect" between DAB's al leged 430-day extens ion in August 2010 and the proposed 180-day extension set forth i n the Action Plan in February 2011, but the IAS Court dem urred: "You are t rying to put m e in a position of saying, okay, Judge, there i s the chall enge. Dr aft the pleading around these facts." ( R. 1208.24-1208.25). However, th is disconnect is fatal to DAB's counterclaim and cannot be remedied by artful drafting. "Generally, courts look to the basic elements of the offer and the acceptance t o determine whether there is an objective meeting of the minds sufficient to give ri se to a binding and enforceable contract . The first step then is to determ ine whether there is a sufficiently definite offer such that its unequivocal acceptan ce will give rise to an enfo rceable contract." Express

53

Indus. & Ter minal Corp. v. New York State DOT , 93 N.Y.2 d 584, 589-90 (1999)

(internal citations omitted).

Even a cursory review of the Acti on Plan reveals that it is not the

unequivocal acceptance of a definite offer.  The maturity date of a promissory note

is an essential term.  See L.K. Sta. Group, LLC v. Quantek Media, LLC, 62 A.D.3d

487, 491 (1st Dep't 2009) (documents lacked "the essential terms of a loan, such as

the interest rate or m aturity date, an d are thus too uncertain to constitute

enforceable agreeme nts"); Willmott v. Giarraputo , 5 N.Y.2 d 250, 253 (1959)

(option to purchase real estate was unenf orceable because parties alleged different

maturity dates for mortgage loan).  Th e essential term s a lleged by DAB and the

terms proposed in t he Action Plan cannot be reconciled, thereby precluding the

creation of an enforceable agreement.   "[B]efore the power of law can be invoked

to enforce a pro mise, it must be sufficien tly certain and speci fic so that what was

promised can be ascertained." Jose ph Mar tin, Jr., Delicatess en, Inc. v.

Schumacher, 52 N.Y.2d 105, 109 (1981).  The requi site certainty and specificity of

terms is absent here, and DAB cannot i nvoke the power of law to enforce any

alleged extension of the Loans.

### 4.    The Action Plan Was Subject to Conditions Precedent that Were Unsatisfied

Finally, the Action Plan is ineffective as an extension of the maturity date of

the Loans because it was, by its own term s, subject to conditions precedent that

54

never occurred.  Not only did the Action Pl an require DAB to pay an extension fee at the beginning of each new six-month  term, but more significantly, no extension could be granted without prior written approval from OTS.

DAB has ad mitted that it was inform ed "[i]n the early part of 2011" that "any approval for the extension of the bu ilding loan agreement would require OTS approval." (R. 425, 349).  DAB does not      dispute that OTS never approved an extension of the Loans.  As a result,      the Action Plan never became a binding contract.  See IDT Corp. v. Tyco Group, S.A.R.L. , 13 N.Y.3d 209, 214 (2009) (no agreement was reached because conditions   precedent were unsatisfied); see also Goodstein Constr. Corp. v. New York     , 80 N.  Y.2d 366,  372 (1992) (Land Disposition Agreement never became eff  ective because "the Board of Estimat    e was required to approve the LDA in order for it to be a binding contract").

## B. DAB'S THIRD COUNTERCLAIM A ND NEW AFFIRMATIVE DEFENSES ARE BARRED BY THE   LOAN DOCUMENTS AND THE MAY 28, 2013 ORDER OF THIS COURT

DAB's third counterclaim and its five new affirmative defenses are based i n tort and equity and do not involve the Action Plan.  All of these allegations fail as a matter of law, and the IAS Court should never have permitted them to be asserted.

DAB's fraud counterclaim has already be en ruled upon by t his Court and is non-actionable.  (R. 855).  To the extent th at DAB's third counterclaim  also seeks to assert a breach of the implied covenant     of good faith and fair dealing, those

allegations fail as well because the express terms of the Building Loan Mortgage precluded DAB from relying on any alleged oral modification of the Loans. (See pp. 11-12, supra). "While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." Fesseha v. TD Waterhouse Investor Servs., 305 A.D.2d 268, 268 (1st Dep't 2003).

DAB's estoppel defense fails for the same reason as DAB's fraud counterclaim: It is "negated by the express terms of the parties' unambiguous written agreements." CrossLand Sav., FSB v. Loguidice-Chatwal Real Estate Inv. Co., 171 A.D.2d 457, 457 (1st Dep't 1991) (dismissing estoppel defense in mortgage foreclosure action); see also Wasserman v. Harriman, 234 A.D.2d 596, 597 (2d Dep't 1996) (estoppel defense in foreclosure action precluded by "mortgage provision barring oral modifications.").

DAB's waiver defense fails because the Building Loan Mortgage contains a "no waiver" provision (see p. 11, supra), and DAB cannot identify any intentional and knowing renunciation by the mortgagee of its right to foreclose. Antonini v. Petito, 96 A.D.3d 446, 447 (1st Dep't 2012) (waiver defense is meritless "in view of the 'no waiver' provision in the operating agreement").

Finally, DAB's unclean hands, bad faith and unconscionability defenses all fail because, again, the Building Loan Mortgage precluded DAB from relying on

any alleged oral m odification of the Lo ans. Brooklyn Federal's decision not t o extend the Loans is not actionable and was,   in any case, en tirely justified by the bank's discovery that DAB's principal, Zh avian, had deliberately m isappropriated Loan funds. "[A] failure to m odify or refinance an existing loan does not give rise to an estoppel or constitute bad faith, unc lean hands or other conduct upon which a mortgagor defendant may predicate a cognizable defense to a claim for foreclosure and sale." Valley Nat'l Bank v. 58 Vlimp, LLC, No. 25522/2012, 2013 N.Y. Misc. LEXIS 1823, at *13 (Sup. Ct. Suff olk Cnty. April 29, 2013); see also JP Morgan Chase Bank, N.A. v. Ilardo , 36 Misc. 3d 359, 377 (2012) ("To the extent that the Ilardos' unsubstant iated and non-speci fic allegations of m isleading and unconscionable conduct and bad faith ove r the course of the unsuccessfu l modification may be construed as soundi ng in tort, they are legally insufficient."); Delta Props. v. Fobare Enters., 251 A.D.2d 960, 962 (3d Dep't 1998).

## <u>CONCLUSION</u>

For the foregoing re  asons, the Augus  t 28, 2013 Order of the IAS Court

should be reversed and summary judgment granted for Mortgagee.

Dated:   New York, New York
             September 3, 2013

MORRISON COHEN LLP

By:
Jerome        Tarnoff
     Y. David Scharf
     Danielle C. Lesser
 Brett        D. Dockwell
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600

*Attorneys for Plaintiff-Appellant
Orchard Hotel, LLC*

58

## PRINTING SPECIFICATION STATEMENT

Pursuant to § 600.10 the foregoing br ief was prepared on a com puter using Microsoft Word.

*Type*:  A proportionally spaced typeface was used, as follows:

Name of typeface:  Times New Roman

Point size:  14

Line spacing:  Double

*Word Count:*  The t otal num ber of words in  this brief, inclusive of point headings and foot notes and exclusive of  pages containing t he table of contents, table of citations, proof of service, cer tificate of com pliance, or any a uthorized addendum containing statutes, rules, regulations, etc., is 13,976.

59