# Exhibit 18

COPY

1

SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK
-------------------------------------X
ORCHARD HOTEL, LLC,

                              Plaintiff,

         - against -                           Index No.
                                               850044/2011
D.A.B. GROUP LLC, ORCHARD CONSTRUCTION LLC,
FLINTLOCK CONSTRUCTION SERVICES, LLC, JJK
MECHANICAL INC., EDWARD MILLS & ASSOCIATES,
ARCHITECTS PC, CASINO DEVELOPMENT GROUP,
INC., CITYWIDE CONSTRUCTION WORKS INC.,
EMPIRE TRANSIT MIX INC., MARJAM SUPPLY CO.,
INC., ROTAVELE ELEVATOR INC., SMK
ASSOCIATES INC., FJF ELECTRICAL CO. INC.,
CITY OF NEW YORK, NEW YORK STATE
DEPARTMENT OF TAXATION AND FINANCE,
LEONARD B. JOHNSON, CITY OF NEW YORK
ENVIRONMENTAL CONTROL BOARD, BROOKLYN
FEDERAL SAVINGS BANK, STATE BANK OF TEXAS,
JOHN DOE #1 THROUGH JOHN DOE #100, the
last 100 names being fictitious and unknown
to plaintiff, the persons, or parties
intended being the tenants, occupants,
persons or corporations, if any, having or
claiming an interest in or lien upon the
premises described in the complaint,

                              Defendants.
-------------------------------------X

                         228 East 45th Street
                         New York, New York

                         January 7, 2013
                         2:40 p.m.


         **EXAMINATION BEFORE TRIAL** of **BRUCE BARRY**

**GORDON**, a Non-Party Witness in the above-entitled action,

at the above-mentioned place, before John Pisano, a



Radazo Reporting, inc.
Serving The Legal Profession For Over 50 Years
(516) 248-1020

```
 1
 2    Notary Public of the State of New York, taken pursuant to
 3    Article 31, Section 3101 et seq. of the C.P.L.R., and
 4    pursuant to Judicial Subpoena and Notice Of Deposition
 5    Upon Oral Examination.
 6                    ***        ***        ***
 7
 8    A P P E A R A N C E S:
 9
10
11    MORRISON COHEN LLP
              Attorneys for Plaintiff, ORCHARD HOTEL, LLC
              and Defendant, ORCHARD CONSTRUCTION, LLC
12            909 Third Avenue - 27th Floor
              New York, New York  10022
13
      BY:     BRETT D. DOCKWELL, ESQ.
14
15
      FAVATA & WALLACE, LLP
16            Attorneys for Defendant, D.A.B. GROUP, LLC
              229 Seventh Street - Suite 300
17            Garden City, New York  11530
18    BY:     WILLIAM G. WALLACE, ESQ.
19
20    HOLLANDER & STRAUSS, LLP
              Attorneys for Defendant, FLINTLOCK
21            CONSTRUCTION SERVICES, LLC
              40 Cutter Mill Road - Suite 203
22            Great Neck, New York  11021
23    BY:     LARRY HOLLANDER, ESQ.
24
25                                              (Continued...)
```

```
 1
 2      A P P E A R A N C E S  Continued:
 3
 4      INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
                Attorneys for Defendant, EDWARD MILLS &
 5              ASSOCIATES, ARCHITECTS PC
                250 Park Avenue
 6              New York, New York  10177

 7      BY:     TARA B. MULROONEY, ESQ.

 8

 9
        O'REILLY, MARSH & CORTESELLI, P.C.
10              Attorneys for Non-party Witness,
                JOANNE B. GALLO
11              222 Old Country Road - 2nd Floor
                Mineola, New York  11501
12
        BY:     JAMES G. MARSH, ESQ.
13

14

15

16      ALSO PRESENT:

17      BEN ZHAVIAN

18

19

20                      ***        ***        ***

21

22

23

24

25
```

B. Gordon

A. Yes.

Q. When did you first become aware of that loan?

A. Around September of 2010.

Q. How was it brought to your attention and why was it brought to your attention?

A. Joanne had a call scheduled with the owner and she asked me the day before to take a look at the file and to take a look at it and join her on the call. We had a rule that two people had to be on a call and nobody else was familiar with it. Actually, we were the work-out department at the time, so I had to be on pretty much every call.

Q. So it was just the two of you?

A. Yeah, I think the third guy didn't join us until at least a few months after that.

Q. Do you know why this particular loan was in the work-out area of the bank at that time?

A. No.

Q. To your knowledge, was it a non-performing loan, was it delinquent in some respect?

A. I remember Joanne telling me at the time they had two issues with it.

Q. Do you remember what they were?

A. One was that it was being built in excess of

1                       B. Gordon
2   did I maintain a desk file?
3       Q.      Yes.
4       A.      No.
5       Q.      Do you have any personal records, at home or
6   some place else, at your office now, regarding that
7   period of time?
8       A.      No.
9       Q.      This meeting that took place with Rick Maher
10  and the owner and some others and Joanne Gallo and
11  yourself, what was discussed at this first meeting that
12  you were at?
13      A.      It arose because we were asked to make an
14  advance and Flintlock, who by then, whenever this was,
15  was the general contractor, refused to sign the lien
16  release.
17      Q.      And what was discussed at the meeting?
18      A.      Why they wouldn't sign the lien release and
19  why we wouldn't advance unless they did.
20      Q.      Is it fair to say they wouldn't sign the
21  lien release because they believed they were owed some
22  money?
23      A.      Well, they said they hadn't been paid.
24      Q.      Did that meeting result in a resolution of
25  some kind?

22

1   B. Gordon
2   guidelines or guidelines between you and Ms. Gallo as the
3   work-out department at the time, that would determine
4   what loans would be included in the virtual data room?
5       A.    There were no written guidelines.  We went
6   through the portfolio together and with the approval of
7   the loan work-out committee of the board, put certain
8   loans up for sale.
9       Q.    Do you recall addressing the topic of the
10  Allen Street Hotel or Orchard Street Hotel loan?
11      A.    Not specifically.  You mean to put it up on
12  --
13      Q.    Yes.
14      A.    No.  I mean, we looked at over a hundred
15  loans.
16      Q.    Do you have any recollection, as you sit
17  here today, as to why that particular loan -- I know
18  technically it's two loans we're talking about but one
19  project -- why that particular loan was included, it was
20  decided among you to include it in the virtual data room?
21      A.    Not specifically.  Let me think about that.
22  I think I remember our motivation.
23      Q.    And what was that?
24      A.    That we didn't trust Mr. Zhavian.
25      Q.    Let me go back.

1  B. Gordon

2  What were the feelings about the project
3  itself?
4  A.   Well, the project itself had some problems.
5  Q.   What were those?
6  A.   There was a restaurant foundation built on
7  property that we didn't have a mortgage on that was
8  adjoining that another bank did.
9  Q.   Anything else?
10 A.   There were two extra floors and we weren't
11 necessarily sure the project would be, the superstructure
12 would be completed in time to grandfather them.  And
13 Mr. Zhavian had, on more than one occasion, failed to pay
14 the contractor with funds that we had advanced.
15 Q.   So, when you first heard from Mr. Aviram, I
16 believe you said it was through Miss Gallo, she either
17 referred --
18 A.   Well, he called her.  I don't think she knew
19 him either.
20 Q.   What was the initial conversation like?
21 A.   He had gone through the portfolio and he
22 had, I think, three loans that he was interested in
23 buying.  I don't remember what the other two were.
24 Q.   Did there come a point in time when he made
25 an offer on this particular loan?

24

1         B. Gordon

2    A.   Yes, subject to due diligence.

3    Q.   And before that was there any other interest
4    by any other parties in this project?

5    A.   I don't remember.

6    Q.   In the early part of 2011, January,
7    February, was there any discussion with the owner,
8    Zhavian or anybody on his behalf, regarding an extension
9    of the maturity date of this loan?

10   A.   I believe there was.

11   Q.   Were you engaged in that conversation?

12   A.   Peripherally.  Joanne was actually doing the
13   talking.  But I was aware of it.

14   Q.   What were you aware of?

15   A.   That it had a maturity coming up.  I forget,
16   March, April, something like that.  And that Mr. Zhavian
17   obviously wanted to extend it and that we were
18   considering it.  Or considering taking it to the board
19   actually would be more accurate.

20   Q.   And that would have to go to the work-out
21   committee of the board?

22   A.   Yes.

23   Q.   Do you remember who was on that work-out
24   committee of the board back in 2011?

25   A.   Mr. Kielty, Mr. Williams, a lady lawyer,

1       B. Gordon

2       Q.      And again, just generally, not specifically
3   to this loan, if it was a performing loan and your group,
4   for lack of a better term, would recommend to the loan
5   committee to either modify or extend a term on a fully
6   performing loan, that decision ultimately could be made
7   by the committee; correct?
8       A.      Yes.
9       Q.      It did not need full board approval?
10      A.      Unless it was an awfully big loan.
11      Q.      Now, things were a little different in the
12  latter part of 2010 into 2011, because the OTS had some
13  involvement, did it not?
14      A.      Starting sometime in the first quarter of
15  2011, yes.
16      Q.      So, you're not there as long as OTS is
17  there?
18      A.      A few months.
19      Q.      But that's the life of a work-out guy, I
20  guess.
21      A.      Yes.
22      Q.      If a loan, again just generally speaking, if
23  a loan at that time were to be either modified or
24  extended, the term, it would require OTS approval?  Do
25  you know?

1  B. Gordon
2  It was during that period, I believe, that we sent it to
3  the OTS. When they actually asked, I don't know.
4     Q.   So, you think it may be a little earlier
5  than that?
6     A.   No idea.
7     Q.   My question then is, you, and when I say you
8  I'm talking about you and Joanne, maybe a third person,
9  made the recommendation to the committee; correct, the
10 bank committee?
11    A.   Yes.
12    Q.   And the bank committee authorized you then
13 or Joanne to make the request of OTS?
14    A.   Yes.
15    Q.   And Joanne did make the request of OTS?
16    A.   As far as I remember, yes.
17    Q.   Do you recall ever receiving or Joanne ever
18 telling you that she received a response from OTS on that
19 request?
20    A.   No.
21    Q.   No, you don't recall or no, you never got a
22 response?
23    A.   As far as I know, we never got a response.
24    Q.   Did Joanne ever contact OTS after the
25 request was made, following up on the status of the

40

1              B. Gordon
2  We looked and couldn't find a set in the office.
3       Q.    When you say "our engineer," you're talking
4  about Mr. Koch?
5       A.    Yes.
6       Q.    He was an outside contractor for the bank?
7       A.    Yes.
8       Q.    He was not employed by the bank, was he, as
9  far as you know?
10      A.    He wasn't an employee, he was like me, a
11 consultant.
12      Q.    Do you know when the sale of loan actually
13 closed?
14      A.    Not specifically. It took awhile. April or
15 May I'm thinking of 2011.
16      Q.    I'm going to show you what has been
17 previously marked at Miss Gallo's deposition as I
18 (handing). Take a look at that, see if that refreshes
19 your recollection.
20      A.    Okay, let's see how good my recollection is.
21            That late (referring)? Okay.
22            I guess it was after June 3rd (referring).
23      Q.    If I told you it was June 17th, does that
24 mean anything?
25      A.    No. I believe you.

44

B. Gordon

        MR. WALLACE: Do you want to jump in and I'll look at my notes? So I don't hold things up (referring).

        MR. HOLLANDER: Sure.

EXAMINATION BY MR. HOLLANDER:

    Q.    Good afternoon, Mr. Gordon.

    A.    Good afternoon.

    Q.    Larry Hollander. I represent Flintlock Construction Services.

    A.    How are you?

    Q.    Fine. Nice to meet you.

        I'm going to refer to them either as Flintlock or FCS, Flintlock Construction Services.

    A.    Yes, I've seen that.

    Q.    Did you personally have any involvement with respect to approval or any action whatsoever by Brooklyn with respect to the Flintlock/D.A.B. construction contract?

    A.    No.

    Q.    Would it be fair to say that you first saw the contract well after August of 2010?

        MR. MARSH: Objection to the form of the question.