# Exhibit 21

FILED: NEW YORK COUNTY CLERK 04/18/2013
NYSCEF DOC. NO. 464
INDEX NO. 850044/2011
RECEIVED NYSCEF: 04/18/2013

14-12057-scc    Doc 121    Filed 03/13/15    Entered 03/13/15 18:31:12    Main Document
Pg 2 of 16

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

ORCHARD HOTEL, LLC,

                        *Plaintiff,*                       Index No. 850044/2011

                    *-against-*                       SUPPLEMENTAL AFFIRMATION
                                                                       IN OPPOSITION TO
                                                                         PLAINTIFF'S MOTION
                                                                        FOR SUMMARY JUDGMENT

D.A.B. GROUP LLC, CAVA CONSTRUCTION        Hon. Charles E. Ramos, JSC
& DEVELOPMENT, INC., FLINTLOCK
CONSTRUCTION SERVICES LLC, JJK MECHANICAL
INC., EDWARD MILLS & ASSOCIATES, ARCHITECTS
PC, CASINO DEVELOPMENT GROUP, INC., CITYWIDE
CONSTRUCTION WORKS INC., EMPIRE TRANSIT
MIX INC., MARJAM SUPPLY CO., INC., ROTAVELE
ELEVATOR INC., SMK ASSOCIATES INC., FJF
ELECTRICAL CO. INC., CITY OF NEW YORK, NEW
YORK STATE DEPARTMENT OF TAXATION AND
FINANCE, and JOHN DOE #1 through JOHN DOE #100,
the last 100 names being fictitious and unknown to
plaintiff, the persons, or parties intended being the
tenants, occupants, persons or corporations, if any,
having or claiming an interest in or lien upon the
premises described in the complaint,

                                        *Defendants.*
-----------------------------------------------------------------X

        WILLIAM G. WALLACE, an attorney duly admitted to the practice of law before the courts of the State of New York, respectfully affirms the following to be true under penalties of perjury.

        1.    I am a member of FAVATA & WALLACE LLP, attorneys for the defendant herein, D.A.B GROUP, LLC ("DAB") and as such, I am fully familiar with the facts and circumstances of this matter.

2.  This affirmation is submitted to supplement my prior affirmation and the affidavit of the defendant's principal, Ben Zhavian, previously submitted to this court in opposition to the plaintiff's motion for summary judgment. (The original affirmation & affidavit are marked as court document 341 in the court's records.)

3.  As authorized and directed by the court, the purpose of this supplemental affirmation is to bring to the court's attention, pertinent and relevant testimony developed during the continued discovery conducted during the pendency of this motion (at the court's direction) in furtherance of the defendant's defense of estoppel which had been pleaded in its answer under the allegation entitled, "As and For a Fifth Affirmative Defense, First Counterclaim and Offset..."

4.  Suffice it to say, the gravamen of DAB's defense is that the plaintiff's predecessor, Brooklyn Federal Savings Bank ("Brooklyn Federal"), the original lender on the loans at issue herein, expressly extended the loans beyond the March 1, 2011 maturity date set forth in the loan documents by its conduct in approving the new contract with Flintlock Construction Services LLC ("Flintlock") as general contractor calling for the completion of the project within the 430 day period from the contract's approval and the commencement of the work in August 2010, or until November 2011, and by Brooklyn Federal's express and repeated assurances and advisements to DAB that the loan had been extended beyond the March 1, 2011 date. Based on this conduct and the assurances of Brooklyn Federal, which turned out to be false, misleading, and ostensibly undertaken by the bank solely in a last ditch attempt to save its own failing existence, DAB relied (to its detriment). DAB was lulled into believing that the project could and would proceed with funding provided by Brooklyn and therefore forsook any undertaking to refinance the loan or seek a new lender.

5. It is respectfully submitted that the facts herein clearly warrant the application of the doctrine of estoppel, a defense which the plaintiff concedes in its moving papers is sufficient to defeat its claim.

6. The equitable defense of estoppel exists when a defendant-borrower alleges an act or statement on behalf of the lender was rightfully relied upon by the borrower; the borrower thereupon changing its position to its detriment and suffering injury as a result. *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 NY2d 175, 451 NYS2d 653 (1982).

7. It is clear that the equitable defense of estoppel need not be specifically pleaded for the Court to consider it. *Nassau Trust Co. v. Montrose Concrete Products Corp.*, supra.

8. Moreover, the estoppel defense may not be defeated simply on a claim that there is no writing modifying or extending the loan term. An estoppel rests upon the word or deed of one party upon which another party rightfully relies and in so relying changes its position to its detriment. *Triple Cities Construction Co. v. Maryland Casualty Co*, 4 NY2d 443, 176 NYS2d 292. In order to establish a valid estoppel defense, the party need only show that it was misled and lulled into inactivity to its detriment. *Triple Cities Construction Co. v. Maryland Casualty Co., supra.*

9. The estoppel defense is imposed by law in the interest of fairness to prevent the enforcement of rights which would work an injustice upon the party against whom enforcement is sought.

10. Equity, fairness and justice cry out that the estoppel defense asserted herein be credited and sustained!

11. It is uncontroverted that the Flintlock contract herein dated March 30, 2010 calling for the work to commence upon approval of the contract by the lender was in fact approved by Brooklyn Federal in August 2010 (August 26, 2010). It is uncontroverted, indeed conceded, that the contract provided for a 430 day time period from commencement for completion and that the bank was aware of that time period when it approved the contract at the end of August (with construction therefore to continue until at least November 2011, months beyond the March 1, 2011 maturity date set forth in the loan documents).

12. It was unknown to DAB that at the time it was arranging for the new general contractor to start and otherwise getting ready for work to recommence in August 2010 with funding to be provided by Brooklyn Federal, that on or about October 13, 2009 the federal Office of Thrift Supervision, ("OTS") the then regulatory agency of Brooklyn, had issued a "Report of Examination" essentially declaring that Brooklyn Federal was engaged in "unsafe or unsound practices." Apparently, and unknown to DAB, Brooklyn Federal was in trouble over other of its business practices unrelated to this loan, which was now about to cause the bank to be duplicitous in its dealings with it. (See copy of "Supervisory Agreement" between Brooklyn Federal and OTS dated September 28, 2010 annexed hereto as Exhibit A.). The bank would do anything, scheme as it could, mislead its customers, in order to try to survive.

13. Again, unknown to DAB, apparently at or about the time Brooklyn was approving the contract with Flintlock so that the work could recommence, the bank was entering into a "Supervisory Agreement" with OTS and thereby coming under the regulatory authority's direct oversight as a "troubled bank." (See copy of "Supervisory Agreement" between Brooklyn Federal and OTS dated September 28, 2010 annexed hereto as Exhibit A.)

14. It is the foregoing history, essentially the troubled and failing status of Brooklyn Federal as a viable banking institution concerned with saving itself at all costs, engaged in its misleading and false representations to DAB regarding the extension of the loans, which is made clear by the depositions taken pursuant to the discovery order of the Court.

15. The testimony of the witnesses deposed establishes: (a) Brooklyn Federal was in trouble and was a sinking institution desperate to survive; (b) Brooklyn Federal's officers responsible for this loan had in fact approved the extension of the DAB loan beyond March 1, 2011 and had applied for and received the approval of the bank's Board for the loan's extension beyond March 1, 2011; (c) Brooklyn Federal had approved the Flintlock contract providing for a 430 day period for the completion of the project from August 26, 2010 (or until November 2011); (d) the DAB project was an active construction site with superstructure and mechanical systems in place; the loan was a performing, current loan at all times; (e) Brooklyn Federal was shopping this "performing" loan, while at the same time it was assuring DAB that the loan had been extended and that work could proceed; (f) Brooklyn Federal was misleading DAB by advising it of the loan's extension, confirming the recommencement and ongoing construction, while at the same time it was entering into a contract to sell the loan to the plaintiff. Duplicitous is not adequate to describe its conduct.

16. In fact, Brooklyn Federal's activities overall finally (and again unbeknownst to DAB) resulted in a "cease and desist" order from OTS effective March 31, 2011 based upon its "unsafe or unsound banking practices." (See copy of the cease and desist order annexed hereto as <u>Exhibit B</u>.)

17. Following is a review of relevant testimony of the three Brooklyn Federal senior officers whose depositions have been taken.

## GALLO DEPOSITION

18.   A copy of the deposition of Joanne B. Gallo is annexed hereto as <u>Exhibit C</u>. At all relevant times, Gallo was the chief credit officer and senior vice president at Brooklyn Federal (8). (Parenthetical references are to pages in the transcript of the witness).

19.   Ms. Gallo identified her coworker Richard Maher as the person at Brooklyn Federal who would have reviewed the general contract of Flintlock (28). Gallo testified that she was aware of the fact that the construction schedule set forth in the general contract would have gone beyond the loan term as set forth in the loan documents (32). Gallo further testified that based on the contract, construction was not expected to be completed prior to the loan terming out on March 1, 2011.

20.   Gallo confirmed that in February 2011, the bank started its "note sale" project in an attempt to shrink the bank due to the bank's problems (42). In addition, and perhaps most importantly, Gallo confirmed that Brooklyn approved an extension of the maturity date of this loan beyond the March 1, 2011 date set forth in the loan documents. In that regard, the following testimony was elicited.

Page 60, Line 5:

Q.   So, is it fair to say that, again, your team, you and Gordon, recommended to the loan work-out committee of the board that a request for an extension be made to OTS?

A.   Yes.

Q. Was that made at a monthly meeting?

A. At a monthly meeting it would have been made.

Q. Do you know what monthly board meeting it was made at?

A. Probably February.

Page 61, the following question was asked and answer given.

Q. Did the board approve it, approve your recommendation to go to OTS and ask for an extension?

A. Yes.

21. Gallo testified that although she received a response to every single request made to the OTS regarding other loans, for some unknown reason she never received a response from OTS regarding the DAB loan.

At Page 63, Line 21 the following testimony was elicited.

Q. Did there come a point in time when you received a response from OTS to your request to extend the maturity date of this loan?

A. They would respond to everything we sent.

Q. Did you get a response to this request?

A. We got a response that it was okay to sell the note.

Page 64, Line 14:

Q. When was the request to sell the note made from OTS?

A. I don't recall.

Q. Was it before or after the request to extend the maturity date?

A. It would have been after.

Q. Prior to requesting permission to sell the note had you had a response from your request to extend the maturity date.

A. No.

Q. To you knowledge, did Brooklyn ever obtain a response to request to extend the maturity date.

A. No.

22. In addition, Gallo admits in her testimony that prior to the sale of the note to the plaintiff herein Brooklyn Federal delivered copies of the building plans to the plaintiff, herein, the eventual purchaser of the note (69).

23. Importantly, Gallo acknowledges that while she was promising DAB to extend the maturity date of loan, she was simultaneously talking to a representative of the plaintiff herein in an attempt to sell it the note before the maturity date (95).

24. In addition, Gallo acknowledges the fact that in granting a loan extension it was not a requirement that the extension be reduced to a formal writing (109).

25. Lastly, Gallo concedes that as late as June 2, 2011, three months after the loan is claimed to have termed out, she was still requesting a so called "pre-negotiation letter" from DAB knowing full well that Brooklyn Federal was under contract to sell the note, had no intention at this time of following through on the promised extension, and that in fact the sale was about to close (June 17, 2011). It is obvious that Brooklyn Federal was aware that it had exposure as a result of its deceitful dealings with DAB and was seeking to cover its tracks (138).

## GORDON DEPOSITION

26.     Bruce Barry Gordon was a loan consultant at Brooklyn Federal during all times relevant to this action. A copy of Mr. Gordon's deposition transcript is annexed hereto as <u>Exhibit D.</u>

27.     Mr. Gordon, as had Ms. Gallo, verified that the Flintlock contract was approved by Brooklyn Federal.

At Page 13, Line 16 of Gordon's deposition, the following testimony was elicited.

Q.   By the time you looked at the file, was Flintlock already in place as the general contractor or were you involved in the process?

A.   I don't remember if it wasn't, it wasn't long after that.

Q.   As you sit here today do you recall whether or not the bank required approval of a general contractor when one was being substituted out and one was coming in?

A.   Well, yes.

Q.   In this particular case did the bank actually approve Flintlock as the new general contractor?

A.   I wasn't involved in that, but I assumed they did because they took over.

28.     It is important to note that Mr. Gordon testified that while Brooklyn Federal was talking to DAB about loan extensions, it also placed the note up for sale solely for the reason that it didn't "trust Mr. Zhavian". In that regard the following testimony was elicited at Page 22:

Q.  Do you have a recollection, as you sit here today, as to why that particular loan ---I know technically it's two loans we're talking about but one project-- why that particular loan was included, it was decided among you to include it in the virtual data room?

A.  Not specifically. Let me think about that. I think I remember our motivation.

Q.  And what was that?

A.  That we didn't trust Mr. Zhavian.

29.  In other words, this was not a non-performing or troubled loan; it was not a loan in default. It was personal, a feeling. Mr. Gordon concedes that there were in fact discussions with DAB regarding a loan extension (24). He admits, as did Ms. Gallo, that if OTS received a request on a particular loan, it always responded (32); yet although Brooklyn Federal authorized the loan extension, somehow mysteriously, OTS never responded to the bank's request (35).

## MAHER DEPOSITION

30.  Richard Maher testified that he was an employee, mortgage underwriter and loan administrator for Brooklyn Federal from January 2005 to September 2011. A copy of Mr. Maher's deposition transcript is annexed hereto as <u>Exhibit E</u>.

31.  Mr. Maher testified that as a loan administrator for Brooklyn Federal his job was to make sure that borrowers were in compliance with the terms of the loan documents (9), including making sure that extensions of loans were given during the term of the loan (9). In addition, Mr. Maher testified that he was also involved when "things started to go south" (10), and was thereafter involved in loan workouts (10).

32.    Most importantly, Mr. Maher testified that he was involved when the Flintlock contract was approved. In that regard, Mr. Maher testified as follows, Page 24, Line 3:

Q.    Did there come a point in time you became aware Flintlock was engaged- -.

A.    Absolutely.

Q.    Did the bank approve engagement of Flintlock?

A.    Absolutely.

Q.    In your role, did you have a function for the bank in approving a GC, general.

Not with respect to this loan but generally.

A.    I took the documents. We got references, got the agreement, had management review it, got their references, ran it by the third party engineer what they knew of him. Met with Flintlock. I think there was a meeting with Chip and his brother. I forget the brother's name. They came in. They told us the work they did. Manager was there. We had a lot of confidence in them.

Q.    It resulted in approving them as the contractor on the job?

A.    Correct.

Q.    Was that approval reduced to some kind of writing?

A.    We probably put something in the history sheets.

Page 25, Line 21:

Q.    How was the history sheet physically, how was that maintained back this period of time, 2010?

A. It was in the drive, anyone had involvement with the loan would add into it like an ongoing diary.

Page 26, Line 14:

Q. Do you know what happened to the history sheet when the bank was sold?

A. They were in the drive, computer drive.

Q. Did you maintain any hard copies of the history sheets on any of the loans you were involved in?

A. Maybe.

Q. Could that be some of the stuff that is maybe at your home?

A. Maybe.

33. It is uncontroverted, according to Mr. Maher's testimony, as the loan administrator, that the Flintlock contract containing a provision allowing for a 430 day period of construction to substantial completion was approved by Brooklyn Federal and that the approval was reduced to writing in the computer history sheet. Conspicuous by its absence in any disclosure in this case is the production of those "history sheets".

34. Mr. Maher also confirmed that Joanne Gallo and Bruce Gordon were working out the loan extension agreement (29-30).

35. In addition, Mr. Maher confirmed that Brooklyn Federal, at this time, was a "sinking ship" and all the participants were scrambling and looking out for their own best interests. When Mr. Maher was questioned about the sale of the DAB loan to the plaintiff herein, he gave the following answers.

Page 31, Line 4:

Q. There is evidence it was sold, the assignment was done June 2011. Were you still at the bank?

A. Yes, I was still at the bank, but I was not involved with that whatsoever. I was busy looking for another job. I was wearing a lead vest at that point trying to keep from getting shot or stabbed from internally or externally.

Q. Figuratively or literally?

A. Figuratively- -you never know.

36. Most importantly, Mr. Maher confirms that as late as March 16, 2011, action had been taken to extend the DAB loan (35-36).

37. In response to questioning by plaintiff's counsel regarding the bank's agreement to extend the DAB loans for the term of the Flintlock contract (430 days from August 2010), Maher gave the following testimony:

Page 74, Line 6:

Q. Earlier you testified regarding the Flintlock contract. I believe Mr. Fulfree asked you questions about that. One of the allegations in this case is that the bank agreed to extend the loan for the term of that general contract. Are you aware of any such extensions?

[continuing on Page 75, Line 5]

A. I am going to have to assume that we were looking to extend the loan so that the project could be finished. We would be out of our minds not to.

38. When counsel for the plaintiff did not get the answer he wanted, he posed the question a different way [Page 75, Line 18]

Q. Let me ask the question a slightly different way. To your knowledge, did anyone ever promise Ben Zhavian or D.A.B. Group this loan would be extended beyond March 1, 2011?

A. I don't know. I think we were trying to get, I think we would want it extended until they could finish it.

39. It is clear from Maher's testimony that the "powers that be" at Brooklyn Federal at the time in question, did in fact extend the DAB loan beyond the March 1, 2011 maturity date as claimed or that at the very least, led DAB to believe that it's loan had been extended through the completion date of the Flintlock contract. He believed it had been extended. Whether they meant it or not, they certainly told DAB's principal Zhavian that his loan had been extended. In reliance thereon, DAB did not pursue a loan refinance or restructure the project at a time when all agree the loan was performing, not in default and the construction project was humming along at a good pace.

40. Again, the basis of an estoppel defense is to prevent the enforcement of rights which would work an injustice upon a party against whom enforcement is sought.

41. The plaintiff will undoubtedly claim that even if Brooklyn Federal somehow is found to have assured DAB of the extension of the maturity date of the loan and even if Brooklyn Federal advised DAB that it had extended the term of the loan, said extension was subject to OTS approval and a formal writing, which never came. However, there is nothing in the record indicating that Brooklyn Federal even requested OTS approval. On the contrary, it appears that the only approval sought by Brooklyn Federal was for the sale of the note to the plaintiff on a date after it had already contracted to sell the note to the plaintiff, all at the same time it was advising DAB that the loan had been extended so that the project could be

completed in accordance with the Flintlock contract. DAB had a right to rely on those assurances. The plaintiff, as successor in interest, assignee of Brooklyn Federal, should be estopped from denying its extension of the loan.

**WHEREFORE,** Defendant DAB respectfully requests that the within motion be denied in its entirety and that this Court direct the parties to complete discovery and proceed to trial and grant such and other relief as may be just, proper and equitable under the circumstances.

Dated: Garden City, New York
April 18, 2013

_____
WILLIAM G. WALLACE