UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                    Chapter 11

D.A.B. GROUP LLC,                         Case No.  14-12057 (SCC)

                    Debtor.

---------------------------------------------------------------x

## DEBTOR'S REPLY MEMORANDUM OF LAW
## IN RESPONSE TO THE OPPOSITION SUBMITTED
## BY ORCHARD HOTEL LLC TO THE DEBTOR'S OBJECTION
## TO VARIOUS ASPECTS OF IT SECURED CLAIM

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

Kevin J. Nash, Esq.

# TABLE OF CONTENTS

Page

Table Contents ........................................................................................................... i

Table of Authorities ................................................................................................. ii

Preliminary Statement ................................................................................................1

      Orchard Is Not Entitled To Attorneys' Fees ......................................................4

      The Equities Favor the Debtor ..........................................................................5

Legal Argument .........................................................................................................7

  I: The Debtor's Equitable Defenses Can Be Maintained In Bankruptcy .................7

    A.  The Appellate Division Ruling Does Not Bar the Equitable Defenses .......7

    B.  The Waiver of Defenses Provisions in the Notes do not Eliminate
        the Objection ..............................................................................................7

    C.  The Factual Record Supports that BFSB led the Debtor into Believing
        that the March 1, 2011 Maturity Date had been Extended to Coincide
        with the Flintlock Contract .......................................................................12

        (1) Richard Maher's Testimony ................................................................12
        (2) Joanne Gallo's Testimony ..................................................................15
        (3) Barry Gordon's Testimony ................................................................16

  II: The Requested Legal Fees Should Be Substantially Reduced ..........................17

    A.  Orchard is not Entitled to Legal Fees for Defending its own Conduct ......17

    B.  The Timelogs Evidence Unnecessary Duplication and Overbilling ..........18

CONCLUSION ........................................................................................................21

i

## TABLE OF AUTHORITIES

### Cases

Page

515 Ave. I Corp. v. 515 Ave. I Tenants Corp., 2010 WL 4904671 (Sup. Ct.
Kings Co. 2010)..................................................................................................................20

Anglo Irish Bank Corp. v. Ashkenazy, (No. 103006/10, 2010 Misc. LEXIS
3784 (Sup. Ct. N.Y. Co. Aug. 4, 2010) ............................................................................9

Bank of Suffolk County v. Kite, 49 N.Y.2d 827 (1980).......................................................9

Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New
Jersey, Inc., 448 F.3d 573 (2d Cir. 2006) .......................................................................10

City of New York v. State, 40 N.Y.2d 659 (1976) .........................................................9-10

Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de
C.V., 536 F. Supp. 2d 345 (S.D.N.Y. 2008).....................................................................9

Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de
C.V., 334 Fed. Appx. 353 (2d Cir. 2009) .........................................................................9

Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 125 S.Ct.
1517 (2005)........................................................................................................................2

FDIC v. Frank L. Marino Corp., 74 A.D.2d 620 (2d Dep't 1980) ....................................10

Fortress Credit Corp. v. Hudson Yards, LLC, 78 A.D.3d 577 (1st Dep't 2010)..................9

Hotel 71 Mezz Lender, LLC v. Mitchell, 63 A.D.3d 447 (1st Dep't 2009)..........................9

In re Escobar, 457 B.R. 229 (Bankr. E.D.N.Y. 2011) ........................................................8

In re Mims, 438 B.R. 52 (Bankr. S.D.N.Y. 2010) ...............................................................8

In the Matter of Jennifer G., 110 A.D.2d 801 (2d Dep't 1985) .......................................3-4

JP Morgan Chase Bank v. Etra, 2007 WL 3128244 (Sup. Ct. Nassau Co.
2007)..................................................................................................................................12

## Cases Continued

Page

JPMorgan Chase Bank v. Liberty Mutual Ins. Co., 189 F.Supp.2d 24
(S.D.N.Y. 2002)...........................................................................................................10, 11

Kluge v. Fugazy, 145 A.D.2d 537 (2d Dep't 1988) ............................................................8

Lipton v. Specter, 96 A.D.2d 549 (2d Dep't 1983) ..........................................................18

MCC Funding LLC v. Diamond Point Ent., LLC, 2012 WL 2537893 (Sup.
Ct. Kings Co. 2012) ..........................................................................................................10

Merritt v Bartholick, 9 Tiffany 44, 34 How. Pr. 129 (1867) ..............................................8

Mishal v. Fiduciary Holdings, LLC, 109 A.D.3d 885 (2d Dep't 2013) ........................9, 11

Nassau Trust Company v. Montrose Concrete Products Corp.,
56 N.Y.2d 175 (1982)...............................................................................................3, 9, 11

North Fork Bank v. Computerized Quality Separation Corp.,
62 A.D.3d 973 (2d Dep't 2009)........................................................................................10

Perlstein v. Kulberg Amato Picacone/ABP, Inc., 158 A.D.2d, 251
(1st Dept. 1990) ..................................................................................................................9

PGA Marketing, Ltd. v. Windsor Plumbing Supply, Inc., 124 A.D.2d 576
(2d Dep't 1986) ..............................................................................................................9, 11

PNL Phoenix, LLC v. Janton Industries Inc. 2015 WL 1632449
(Sup. Kings Co. 2015) ......................................................................................................19

Sterling Nat'l Bank v. Biaggi, 47 A.D.3d 436 (1st Dep't 2008) .............................. 9, 10-11

Stone v. Philip Morris, Inc., 308 A.D.2d 57, 66 (1st Dep't 2003).......................................4

Triple Cities Construction Co. v. Maryland Casualty Co., 4 N.Y.2d 443
(1958)................................................................................................................................11

Vardy Holding Co. v. Metric Resales, Inc., 131 A.D.2d 564 (2d Dep't 1987) ................18

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

In re:                                                     Chapter 11

D.A.B. GROUP LLC,                                          Case No.  14-12057 (SCC)

                                    Debtor.

----------------------------------------------------------------x

## DEBTOR'S REPLY MEMORANDUM OF LAW IN RESPONSE TO THE OPPOSITION SUBMITTED BY ORCHARD HOTEL LLC TO THE DEBTOR'S OBJECTION TO VARIOUS ASPECTS OF IT SECURED CLAIM

This Reply Memorandum of Law is respectfully submitted on behalf of D.A.B. Group LLC (the "Debtor"), in response to the opposition papers (ECF #s 117, 120, 121, 122) (collectively, the "Opposition") submitted by Orchard Hotel LLC ("Orchard") to the Debtor's objection (the "Objection") to various aspects of Orchard's secured claim (ECF #86).  For purposes of this Reply Memorandum, terms not otherwise defined below shall have the same meanings as set forth in the Objection.  Accompanying this Reply Memorandum is an Appendix of Additional Documents denominated as "App. Ex. __".

### PRELIMINARY STATEMENT

Despite clocking in at over 80 pages, Orchard's Opposition strikes little new legal ground, and floods the Court with selective references to discovery material and *ad hominem* attacks against the Trial Court Judge, Hon. Charles E. Ramos, and the Debtor's principal, Ben Zhavian.  These gratuitous and unfounded attempts at character assassination have no place in these proceedings, and are nothing more than a thinly veiled effort to draw this Court's focus away from the critical, and yet incontestable fact, that Brooklyn Federal Savings Bank ("BFSB") approved the Debtor's replacement construction contract with Flintlock Construction Services, LLC ("Flintlock"), which extended completion of the Project for another 430 days

1

until November 26, 2011. In view of this circumstance alone, there is a strong basis to argue that BFSB and Orchard (collectively the "Lenders") waived and/or are estopped from retroactively attempting to enforce the original March 1, 2011 maturity date. Name calling and grandiose legal arguments cannot negate the obvious consequences which flow from BFSB's false assurances to fund the Project under the Flintlock contract based on the revised completion date that went months beyond March 1, 2011.

It suffices to say that Orchard's jaded version of the facts is highly disputed by the Debtor and undermined by the actual deposition testimony of the bank personnel actually involved. Many of these individuals informed the Debtor that BFSB was committed to completing the Project even after the alleged maturity date of March 1, 2011.

Moreover, the overriding contention that the Appellate Division somehow already decided Orchard's entitlement to interest, default interest or attorneys' fees is a gross distortion of the prior rulings. To be sure, the Debtor's amended counterclaims were dismissed on appeal, but the fact that the Debtor cannot obtain affirmative recovery for damages under lender liability theories is <u>not</u> tantamount to a preclusive ruling that the Debtor is barred from pursuing equitable defenses to contest foreclosure, or opposing Orchard's entitlement to interest, default interest and legal fees in bankruptcy. The Appellate Division never reached any of these issues, and thus, the Bankruptcy Court is not constrained by Rooker-Feldman principles. *See* <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. 280, 284, 125 S.Ct. 1517, 1521 - 1522 (2005) ("[t]he *Rooker/Feldman* doctrine is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.").

2

In fact, Judge Ramos, in denying summary judgment on Orchard's foreclosure complaint, recognized the important legal differences, as noted by the New York Court of Appeals decision in <u>Nassau Trust Company v. Montrose Concrete Products Corp.</u>, 56 N.Y.2d 175 (1982), between waiver and estoppel of contractual terms on the one hand, and an oral modification of the contract on the other. Whether or not Orchard and its team of lawyers concur with Judge Ramos' ruling is of no moment, since Orchard's efforts to reverse the ruling on summary judgment have also failed.

As part of its selective presentation of events, Orchard also ignores another critical, and yet incontrovertible fact, namely that Orchard's last motion for an immediate reversal of Judge Ramos' summary judgment ruling was denied by the Appellate Division on September 23, 2014. (A copy of the Decision is annexed hereto as App. <u>Ex.</u> "A"). The Appellate Division was presented with substantially all of the same arguments advanced again by Orchard in the Opposition. Yet, the Appellate Division denied any relief to Orchard, sending a clear signal that Orchard's Opposition is premised on false bravado.

Whether Orchard admits it or not, the last two rulings issued by the State Court both clearly favor the Debtor: first, Judge Ramos' denial of summary judgment in recognition of the Flintlock contract, and BFSB's approval of the revised completion schedule; and then the Appellate Division's denial of Orchard's motion seeking an immediate reversal. This Court should not take Orchard's bait to simply ignore Judge Ramos' decision on summary judgment because he allegedly "exceeded his authority and the March 21 Ramos Ruling is entitled to no weight." (Opposition, p. 19). Certainly, the Appellate Division did not think so when it denied Orchard's motion. Nor did the Appellate Division come close to ruling that the Trial Court had "flouted the remittitur of this Court" as in <u>In the Matter of Jennifer G.</u>, 110 A.D.2d 801, 802 (2d

3

Dep't 1985), or "Justice Ramos lacked the subject matter jurisdiction or the power to, in effect, reverse this Court by modifying the MSA" as in Stone v. Philip Morris, Inc., 308 A.D.2d 57, 66 (1st Dep't 2003), to quote two of the cases wrongly relied upon by Orchard in the Opposition.

**Orchard Is Not Entitled To Attorneys' Fees**

Besides overplaying the precedential value of the prior Appellate Divisions rulings, Orchard has also taken great liberties with its request for attorneys' fees and expenses. While Orchard chides the Debtor for its alleged "chutzpah" in disputing entitlement to legal fees, there is a better Yiddish expression for Orchard's unmitigated gall in seeking nearly $3 million dollars in fees and expenses when most of the litigation has been focused on defense of the Lenders' improper conduct. That word is "*Chaza.*" Even the most liberal fee provision is not a license to ring up runaway attorneys' fees that are the product of over-lawyering and duplication of services.

Indeed, Orchard's excessive request for $2,313,610 in pre-petition legal fees alone, plus another $602,241 for interest, is made without regard to the standard of "reasonableness." While citing the heavy litigation costs of motion practice and discovery, Orchard fails to justify the reasonableness of it fees vis-à-vis the results achieved. Lest we forget, Orchard allegedly incurred close to $3 million in fees only to be denied summary judgment on a foreclosure complaint.

Moreover, the time records submitted by Orchard are replete with improper charges, including lumping and vague entries, as well as double and triple billing by its attorneys. Counsel routinely held conferences among 2-4 senior level attorneys in the same firm. In fact, Orchard's counsel appears incapable of attending even the most routine meeting or hearing with less than three attorneys, so in many instances the effective billing rates are

4

close to $2,000 per hour or more. In short, Orchard's request for attorneys' fees goes well beyond permitted "collection costs" and involves a myriad of disputed issues concerning reasonableness.

### The Equities Favor the Debtor

In matters where default interest and attorneys' fees loom, the parties' relative equities often percolate near the top of the analysis. Experience teaches that a tribunal is more apt to permit default interest and attorneys' fees against a perceived "bad actor" than a good faith litigant. This practical reality is likely behind Orchard's strategy to sully the Debtor with unfounded allegations of misconduct.

Orchard should not profit from such a strategy. While this Reply Memorandum will not dignify the outrageous charges with a line by line rebuttal, it is still important to set the record straight on the flawed notion that the Debtor has engaged in a "scorched-earth" litigation or made venal personal threats against Orchard's attorneys. The entire scenario is contrived and false to say the least.

To begin with, it is not unreasonable for the Debtor to vigorously defend itself against an unanticipated foreclosure action that was abruptly commenced by an opportunistic note buyer within two weeks of acquiring the debt. At the time of the foreclosure, the Debtor and Flintlock were working towards completion of the Project. Given the dramatic change of events, it is hardly surprising that the Debtor refused to succumb to such inequitable actions.

The Debtor has consistently maintained that it received assurances from BFSB to extend the maturity date consistent with the Flintlock contract. Early on, this position was roundly ridiculed by Orchard as a purported fabrication by Mr. Zhavian. However, Mr. Zhavian was vindicated after it was discovered that Orchard had failed to disclose BFSB's Action Plan

5

recommending the one-year extension. Judge Ramos quickly came to the conclusion that it was Orchard, and not Mr. Zhavian, which had played fast and loose with disclosure concerning the alleged extension of the maturity date. Orchard emerged as the "bad actor" before the Trial Court.

Orchard also repeats slanderous allegations concerning Mr. Zhavian's personal conduct that held no sway with Judge Ramos, who sealed the record pursuant to a confidentiality order and stipulation because of the scandalous nature of the accusations. Given short shrift by the Trial Court, there is no legitimate reason for Orchard to repeat the sensational headlines again, particularly since Orchard withdrew the Order to Show Cause under the confidentiality stipulation. (*See*, App. Ex. "B").

Likewise, Orchard wrongly alleges that Mr. Zhavian acted illegally with respect to a certain payment due to Flintlock, and attempts to justify its maturity default by claiming Mr. Zhavian's conduct was itself a default. Absent from the analysis, however, is any proof that BFSB actually believed that improper acts had occurred. To the contrary, the Action Plan, which was prepared by BFSB shortly before the March 1 maturity date, speaks favorably of Mr. Zhavian and the Project. It was signed by six BFSA officials, without even a hint of misconduct or improper disposition of funds. (*See*, App. Ex. "C").

Finally, Orchard also fails to address two other important documents which are inconsistent with the mudslinging again being directed at Mr. Zhavian. Specifically, neither the March 23, 2011 Default Letter nor the Foreclosure Complaint make any mention of the supposed improper misuse of funds. In sum, Orchard's slanderous attacks against Mr. Zhavian are part of a smokescreen, designed to deflect attention from the pivotal facts regarding the consequences of BFSB's consent to the Flintlock contract, replete with the revised post-maturity completion date.

## LEGAL ARGUMENT

## I. THE DEBTOR'S EQUITABLE DEFENSES
## CAN BE MAINTAINED IN BANKRUPTCY

Besides assailing Judge Ramos's reasoning, Orchard now contends that the Debtor's equitable defenses are barred as a matter of law under the theories that they were already decided by the Appellate Division, or cannot be asserted under the loan documents. Orchard is wrong on both accounts.

### A. The Appellate Division Ruling Does Not Bar the Equitable Defenses

First, Orchard wrongly argues that the Appellate Division's February 18, 2014 decision eliminated the Debtor's affirmative defenses by reversing the Trial Court's order permitting the Debtor to amend its answer to assert new counterclaims. This argument ignores that the Debtor specifically included detailed factual allegations in support of its equitable defenses of waiver and estoppel in its initial answer. Thus, even if the Debtor cannot amend its answer, the equitable defenses existed from the beginning of the case, and they can be pressed in bankruptcy. Because the Debtor acknowledges the principal debt, the primary issues posed by the Objection go to the scope of Orchard's recovery for additional charges such as interest, default interest and attorneys' fees. The equitable defenses can and should be invoked to negate these entitlements. In fact, the Debtor should be permitted to take additional discovery as necessary to further establish the basis for equitable defenses as part of the claims review and objection process.

### B. The Waiver of Defenses Provisions in the Notes do not Eliminate the Objection

Orchard next seems to forget that it filed a secured claim in bankruptcy and points to certain provisions in the underlying notes to argue that the Debtor waived any right to assert possible defenses. While the overall enforceability of a "waiver of defenses" provision is open

7

to debate, Orchard improperly makes this argument in isolation, without due regard for the fact that Orchard has exercised rights as a foreclosing secured creditor in bankruptcy. Indeed, Orchard concedes, as it must, that there is no similar "waiver of defenses" clause in the underlying mortgages (jointly, the Mortgages"). Thus, in pressing the argument, Orchard effectively attempts to bifurcate the Notes from the Mortgages, even though both are essential parts of its secured claim (*See* Claim No. 9). Once Orchard filed a secured claim in bankruptcy, it sought enforcement of the Mortgages in the same functional manner as it sought enforcement of the Mortgages in the foreclosure action. The dubious explanation that Orchard did not raise the "waiver of defenses" issue in the foreclosure action because the foreclosure action was based solely on the Mortgages, and not the Notes [Opposition at p. 38 fn.22], is not persuasive given the filing of a secured claim based on the Mortgages in bankruptcy.

Unless Orchard is now willing to deem itself an unsecured creditor, it cannot rely on select provisions of the Notes that are not contained in the Mortgages. In bankruptcy, a note and mortgage are viewed as being inextricably intertwined for purpose of establishing a secured claim, and a creditor cannot enforce one without the other. New York law is clear that only an entity with possession of both a note and the related mortgage may enforce a secured claim against real property. (See Kluge v. Fugazy, 145 A.D.2d 537, 538 (2d Dep't 1988), *citing* Merritt v Bartholick, 9 Tiffany 44, 34 How. Pr. 129 (1867). Conversely, an assignment of a mortgage without a note has been held to render the debt unenforceable, while assignment of a note without a mortgage bars the noteholder from asserting a secured claim. In re Mims, 438 B.R. 52 (Bankr. S.D.N.Y. 2010); In re Escobar, 457 B.R. 229 (Bankr. E.D.N.Y. 2011). Since Orchard has conceded that the defenses of waiver and estoppel cannot be waived with respect to the Mortgages, these defenses survive in bankruptcy.

8

Notably, all but one of the cases cited by Orchard regarding the enforceability of the alleged waiver provisions relate to defenses asserted in connection with the execution of the loan documents themselves, rather than a waiver of subsequent acts by the lender. (*See*, Export-Import Bank of the United States v. Agricola del Mar BCS, S.A. de C.V., 536 F. Supp. 2d 345 (S.D.N.Y. 2008), *aff'd*, 334 Fed. Appx. 353 (2d Cir. 2009) (waiver of defense of failure to make a demand); Bank of Suffolk County v. Kite, 49 N.Y.2d 827 (1980) (waiver of defense based on condition precedent to legal effectiveness of the contract); Mishal v. Fiduciary Holdings, LLC, 109 A.D.3d 885 (2d Dep't 2013) (unspecified defenses waived); Hotel 71 Mezz Lender, LLC v. Mitchell, 63 A.D.3d 447 (1st Dep't 2009) (waiver of breach of contract and fraudulent inducement); Sterling Nat'l Bank v. Biaggi, 47 A.D.3d 436 (1st Dep't 2008) (upholding waiver of all defenses except fraud); Perlstein v. Kulberg Amato Picacone/ABP, Inc., 158 A.D.2d, 251 (1st Dept. 1990) (waiver of defense of lack of consideration); PGA Marketing, Ltd. v. Windsor Plumbing Supply, Inc., 124 A.D.2d 576 (2d Dep't 1986) (waiver of breach of contract defense); Anglo Irish Bank Corp. v. Ashkenazy, (No. 103006/10, 2010 Misc. LEXIS 3784, at *10 (Sup. Ct. N.Y. Co. Aug. 4, 2010) (waiver of defense of fraudulently inducement)). The sole exception, Fortress Credit Corp. v. Hudson Yards, LLC, 78 A.D.3d 577 (1st Dep't 2010) involved waiver of a claim for alleged tortious interference, which the Court held lacked any evidentiary support.

Thus, even if the "waiver of defenses" provision can be validly separated from the Mortgages, any waiver should be limited to acts surrounding the making of the loans, consistent with the classic formulation that a waiver is an intentional relinquishment of a known act, and the Debtor cannot waive defenses to a maturity default years before the notes actually became due. (*See*, Nassau Trust Co. v. Montrose Concrete Products Corp., *supra.* at 184; City of New York v. State, 40 N.Y.2d 659, 669 (1976) ("A waiver is the intentional relinquishment of a

9

known right with both knowledge of its existence and an intention to relinquish it"); Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 585 (2d Cir. 2006).

To permit unchecked "waiver of defenses" against future conduct would be to grant the Lenders carte blanche immunity with respect to all actions. Indeed, taking Orchard's interpretation of the waiver provisions in the Notes to its logical limits, Orchard could theoretically be paid in full, sue to enforce the Notes anyway, and the Debtor would be barred from asserting payment as a valid defense. *See, e.g.*, FDIC v. Frank L. Marino Corp., 74 A.D.2d 620, 621 (2d Dep't 1980) (limiting enforceability of waiver of creditor's responsibility for collateral where creditor is alleged to be liable for negligence, finding that creditor cannot "shield itself from its own tortious conduct").

Moreover, it is axiomatic that "parties cannot use contractual limitation of liability clauses to shield themselves from liability for their own fraudulent conduct". JPMorgan Chase Bank v. Liberty Mutual Ins. Co., 189 F.Supp.2d 24, 27 (S.D.N.Y. 2002) (finding that waiver clause was not specific enough to include waiver of fraud in the inducement, and in any event, could not have precluded defense of concealment premised on fraudulent misrepresentations); North Fork Bank v. Computerized Quality Separation Corp., 62 A.D.3d 973 (2d Dep't 2009) (enforcing waiver of counterclaims except in cases of fraud or subsequent negligence); MCC Funding LLC v. Diamond Point Ent., LLC, 2012 WL 2537893 *6 (Sup. Ct. Kings Co. 2012) (limiting waiver of defenses to fraud in the inducement, and permitting defense that entire transaction was part of a fraudulent scheme).

In fact, three of the cases cited by Orchard acknowledge that fraud negates a waiver of defenses. Sterling Nat'l Bank v. Biaggi, supra. (waiver ineffective as to defense of

10

fraud); PGA Marketing Ltd. v. Windsor Plumbing Supply, Inc., supra. ("the waiver would not

preclude a defense of fraud"); Mishal v. Fiduciary Holdings, LLC, supra. ("an exception to such

waiver exists for defenses sounding in fraud"). Although it was held that fraud had not been

sufficiently laid out in the PGA Marketing and Mishal cases to negate the waiver provisions, the

averments in the Debtor's answer include specific and detailed allegations involving misleading

and fraudulent misrepresentations by BFSF in conjunction with, and following execution of the

Flintlock contract, to mislead the Debtor into believing that the maturity date would be extended.

(See, paragraphs 30-50 of the Answer) (App. Ex. "D"). Thus, because the Debtor's equitable

defenses of waiver and estoppel arise out of deceptive and fraudulent activity, this case falls

squarely within the line of cases cited above, including JPMorgan Chase Bank v. Liberty Mutual

Ins. Co., supra., negating Orchard's reliance on the note provision waiving the Debtor's ability to

assert defenses.

   As a matter of law, equitable defenses exist when a defendant-borrower alleges

that an act or statement on behalf of the lender was rightfully relied upon by the borrower to

change its position to its detriment, and injury was suffered as a result. Nassau Trust Co. v.

Montrose Concrete Products Corp., supra. at 184. The Debtor's defenses are not defeated by the

absence of a writing alone, although in this case, the Flintlock contract constitutes a sufficient

writing to breathe life into the Debtor's estoppel theory. See, Triple Cities Construction Co. v.

Maryland Casualty Co., 4 N.Y.2d 443, 448 (1958), where the Court of Appeals explained that:

> an estoppel may be predicated upon evidence that the defendant, by resort
> to settlement negotiations, intended "to lull the plaintiff into inactivity," to
> "induce it to continue negotiations until after the expiration of the * * *
> time within which an action" could be maintained.

11

*See, also*, JP Morgan Chase Bank v. Etra, 2007 WL 3128244 (Sup. Ct. Nassau Co. 2007)

(finding estoppel where defendant relied upon written statement extending deadline to

cure mortgage default).

### C. The Factual Record Supports that BFSB led the Debtor into Believing that the March 1, 2011 Maturity Date had been Extended to Coincide with the Flintlock Contract

It is uncontroverted that BFSB and its representatives interacted with Flintlock to

approve the contract and develop the funding for the revised completion date of November,

2011. Thus, it was easy to see how the Debtor came to rely upon receiving an extension. The

Action Plan only confirmed the Debtor's expectations, and whether or not the Debtor received

the document matters very little, since the Debtor was repeatedly told about the extension

separately. Moreover, BFSB was coy about its problems with the Office of Thrift Supervision,

("OTS") so the Debtor had no reason to believe that OTS was involved in the extension request.

Despite Orchard's selective analysis of the deposition testimony, many of the BFSB former

employees confirm that it was reasonable for the Debtor to conclude that an extension had been

given.

### (1). Richard Maher's Testimony

Richard Maher testified that he was a mortgage underwriter and loan

administrator for BFSB from January 2005 to September 2011. A copy of the relevant pages of

Mr. Maher's deposition transcript is annexed hereto as App. Ex. "E".

Mr. Maher testified that as a loan administrator for BFSB his function included,

*inter alia*, making sure that extensions of loans were given during the term of the loan (Maher at

p. 9). In addition, Mr. Maher testified that he was also involved when "things started to go

south" (Maher at p. 10) for BFSB, which included loan workouts (Id.). Most importantly, Mr.

Maher testified that he was involved when the Flintlock contract was approved by BFSB. In that

12

regard, Mr. Maher testified quite forcefully that BFSB was in complete agreement with the

Debtor's retention of Flintlock:

> Page 24, Line 3:
>
> Q. Did there come a point in time you became aware Flintlock was engaged- -.
>  A.    Absolutely.
> Q.    Did the bank approve engagement of Flintlock?
> A.    Absolutely.
> Q.    In your role, did you have a function for the bank in approving a GC, general. Not with respect to this loan but generally.
> A.    I took the documents. We got references, got the agreement, had management review it, got their references, ran it by the third party engineer what they knew of him. Met with Flintlock. I think there was a meeting with Chip and his brother. 1 forget the brother's name. They came in. They told us the work they did. Manager was there. We had a lot of confidence in them.
> Q.    It resulted in approving them as the contractor on the job?
> A.    Correct.
> Q.    Was that approval reduced to some kind of writing?
> A.    We probably put something in the history sheets. Page 25, Line 21:
> Q.    How was the history sheet physically, how was that maintained back this period of time, 2010?
> A.    It was in the drive, anyone had involvement with the loan would add into it - like an ongoing diary.
> . . .
>
> Page 26, Line 14:
>
> Q.    Do you know what happened to the history sheets when the bank was sold?
> A.    They were in the drive, computer drive.

Thus, according to Mr. Maher's testimony as the loan administrator, the Flintlock

contract allowing for a revised 430 day period of completion was approved by BFSB and that the

approval was reduced to writing in the computer history sheet.[1]

---

[1] Conspicuous by its absence in any disclosure in this case is the production of those "history sheets".

Moreover, Mr. Maher specifically explained that Flintlock "was approved to do the work, that we felt comfortable with their capacity and experience and size of their company to perform the job and get the job done, and everyone being cognizant of the mid-November time frame deadline". (Maher at p. 59)  Later in his testimony, Mr. Maher clarified that he was speaking of the need to complete the construction by mid-November 2011 to avoid losing a grandfathering protection after a change in zoning (Maher at p. 89).  So there is no question that there was complete awareness by BFSB that construction under the Flintlock contract would continue beyond the March 1, 2011 maturity date.

Most importantly, Mr. Maher also confirmed that as late as March 16, 2011, action had been taken internally by BSFB to extend the Debtor's loan (Maher at pp. 35-36):

> Page 71, Line 9:
>
> There is no reason for us not to get the loan extended.  We'll try to get the loan extended.  If we didn't get the loan extended, where would we be?  It defies common sense.  Of course we went out of our way to get the loan extended.

In response to questioning by Orchard's counsel regarding BFSB's agreement to extend the Debtor's loans for the term of the Flintlock contract (430 days from August 2010 to November 26, 2011), Mr. Maher indicated that the bank "would be out of its mind" not to give a corresponding extension:

> Page 74, Line 6:
>
> Q.    Earlier you testified regarding the Flintlock contract.  I believe Mr. Fulfree asked you questions about that. One of the allegations in this case is that the bank agreed to extend the loan for the term of that general contract. Are you aware of any such extensions?
>
> . . .

14

Page 75, Line 5:

A.      I am going to have to assume that we were looking to extend the
loan so that the project could be finished. We would be out of our minds
not to.

When Orchard's counsel did not get the answer he wanted, he posed the question a

different way, but still got the same retort that BFSB intended to provide an extension:

Page 75, Line 18:

Q.      Let me ask the question a slightly different way.   To your
knowledge, did anyone ever promise Ben Zhavian or D.A.B. Group this
loan would be extended beyond March 1, 2011?
A.      I don't know. I think we were trying to get, I think we would want
it extended until they could finish it.

It is clear from Mr. Maher's testimony that BFSB did, in fact, commit to

extend the loans beyond the March 1, 2011 maturity date, or, at the very least, led the

Debtor to believe that an extension would be given to coincide with the revised

completion date of the Flintlock contract.  In reliance thereon, the Debtor did not pursue

any other financing alternatives, and concentrated on completing the Project, which was

progressing at a good pace by the early spring of 2011.

### (2) Joanne Gallo's Testimony

Mr. Maher's testimony was confirmed by that of Joanne B. Gallo, the

chief credit officer and senior vice president at BFSB.  A copy of the relevant pages of

Ms. Gallo's deposition transcript is annexed hereto as App. Ex. "F".

Ms. Gallo confirmed that Mr. Maher was the person at BFSB who

reviewed the Flintlock contract (Gallo at p. 28).  Importantly, Ms. Gallo also testified that

she was aware that the revised construction schedule with Flintlock went beyond March

1, 2011 (Gallo at p. 32).

15

Indeed, Ms. Gallo confirmed that BFSB had internally approved an

extension of the maturity date of this loan beyond the March 1, 2011:

> Page 60, Line 5:
> Q.     So, is it fair to say that, again, your team, you and Gordon, recommended to the loan work-out committee of the board that a request for an extension be made to OTS?
> A.     Yes.
> Q.     Was that made at a monthly meeting?
> A.     At a monthly meeting it would have been made.
> Q.     Do you know what monthly board meeting it was made at?
> A.     Probably February.
> . . .
>
> Page 61, Line 15:
> Q.     Did the board approve it, approve your recommendation to go to OTS and ask for an extension?
> A.     Yes.

Ms. Gallo conceded that as late as June 2, 2011, three months after the loan is

claimed to have termed out, she was still requesting a so called "pre-negotiation letter" from the

Debtor to continue the loan even though BFSB was under contract to sell the notes. Thus, the

pattern of creating false impressions for the Debtor continued for a significant period of time

after March 1, 2011 (Gallo at p. 138).

### (3) Barry Gordon's Testimony

Bruce Barry Gordon was also a loan consultant at BFSB. A copy of the relevant

pages of Mr. Gordon's deposition transcript is annexed hereto as App. Ex. "G". Mr. Gordon

corroborated Ms. Gallo's testimony, verifying that the Flintlock contract was approved by BFSB:

> Page 13, Line 16:
>
> Q.     By the time you looked at the file, was Flintlock already in place as the general contractor or were you involved in the process?
> A.     I don't remember if it wasn't, it wasn't long after that.
> Q.     As you sit here today do you recall whether or not the bank required approval of a general contractor when one was being substituted out and one was coming in?

16

A.    Well, yes.

Q.    In this particular case did the bank actually approve Flintlock as the new general contractor?

A.    I wasn't involved in that, but I assumed they did because they took over.

Thus, there is deposition testimony from three separate BFSB's officials confirming the Debtor's contentions of false assurances, giving rise to the affirmative defenses of waiver and estoppel : (a) the officers responsible for the loans had in fact approved the extension of maturity beyond March 1, 2011 and had applied for and received the approval of the extension from BFSB's Board; (b) BSFB happily approved the Flintlock contract providing for a revised 430 day period for the completion of the project from August 26, 2010 (through November 2011); (c) as of March 1, 2011, the Project was an active construction site with superstructure and mechanical systems in place, and the loan was performing and otherwise current; (d) BFSB was apparently "shopping" the loans, while at the same time it was assuring the Debtor that the loans would be extended; and (e) BFSB misled the Debtor by confirming the financing for on-going construction and promising the extension to coincide with the Flintlock contract.

## II. THE REQUESTED LEGAL FEES SHOULD BE SUBSTANTIALLY REDUCED

### A. Orchard is not Entitled to Legal Fees for Defending its own Conduct

In a final act of hubris, Orchard virtually assumes entitlement to over $2.3 million in legal fees and does very little to justify the merit of its request except to accuse the Debtor of high-handed litigation tactics in defending itself, while ignoring, of course, that it was Orchard which failed to disclose the existence of the Action Plan, for which it was rightfully chastised.

As Orchard would have it, the excessive requests are the Debtor's and Flintlock's fault for multiplying the costs of the litigation, and have nothing to do with Orchard's over

17

lawyering of the case and penchant for duplication of services by numerous attorneys. Notably absent from Orchard's analysis is any discussion of the stonewalling and obfuscation by Orchard in concealing the Action Plan during discovery while repeatedly denouncing the Debtor's assertions that there had been any discussion regarding the extension of the maturity date. The truest and best measure of the legitimacy of the Debtor's defenses are typically made by the Trial Court judge, who is in the best position to determine which party is playing by the rules and which is not. Here, the Debtor's litigation strategies never once came under criticism from the Court.

Substantively, Orchard is only entitled to the actual and necessary "costs of collection", including reasonable attorneys' fees, which does not permit recovery of all fees incurred in the underlying litigation. *See*, Vardy Holding Co. v. Metric Resales, Inc., 131 A.D.2d 564 (2d Dep't 1987) ("The promissory notes evidencing the underlying obligations provided, in relevant part, for attorneys' fees to be awarded '[i]f this note be not paid when due'. 'That provision in the note[s] is not the equivalent of an obligation to pay reasonable counsel fees in an action to foreclose a mortgage'") *quoting* Lipton v. Specter, 96 A.D.2d 549 (2d Dep't 1983).

### B. The Timelogs Evidence Unnecessary Duplication and Overbilling

With respect to the details of the fee request itself, even a cursory review of the documentation supplied by Orchard shows that the stated fees are bloated, duplicative and unreasonable by any measure. The very thought that Orchard seeks a multi-million dollar fee award in connection with a foreclosure complaint that has not advanced beyond denial of summary judgment is testament to the inherent unreasonableness of the fees. Under any

18

circumstances, Orchard remains subject to a standard of reasonableness under New York State law:

> It is well settled that attorneys' fees are subject to review and must be reasonable . . . In deciding an application for counsel fees the Court must consider "the following factors: time and labor required, the difficulty of the questions involved, and the skill required to handle the problems presented; the lawyer's experience, ability and reputation; the amount involved and benefit resulting to the client from the services; the customary fee charged by the Bar for similar services; the contingency or certainty of compensation; the results obtained; and the responsibility involved.

PNL Phoenix, LLC v. Janton Industries Inc. 2015 WL 1632449, 3–4 (Sup. Kings Co. 2015).

Although a complete analysis of the timelogs appended as exhibits to Orchard's Opposition is difficult because there are no summaries, the bulk of the pre-petition services appear to have been performed by several different lawyers billing at rates ranging between $245 – $650 with no explanation (biographical or otherwise) to permit the reader to identify the attorneys performing the work, much less assess the reasonableness of the hourly rates or the time devoted to each task. Moreover, the timelogs are entirely chronological, without any effort to break them down into project categories for ease of evaluation.

"Lumping" of multiple services into one large time entry is rampant, while a number of entries contain vague descriptions such as "draft and revise various litigation papers." The phrase "Emails and telephone conferences" appears throughout the time records without any effort to identify the subject or the persons with whom communication was had, except in the most general terms. A substantial amount of the billing are listed in large even-numbered chunks of time, such as 5 hours, 2.5 hours and 1 hour, etc., with no real effort to keep a strict accounting of the time actually spent.

19

Besides these fundamental deficiencies, it is apparent that the fee statements are grossly overstated based upon unnecessary duplication occasioned by counsel's practice of staffing the matters with multiple parties performing the same tasks. Thus, the effect billing rate is close to $2,000 per hour for even the most routine tasks.

For example, the timelogs evidence numerous interoffice conferences at the partnership level, and it appears that at least two partners, and sometimes three or four attorneys, attended every single court hearing. This might be acceptable if different lawyers handled different parts of the case, but it further appears that only one attorney actually appeared on the record at any hearing. This failure to exercise billing judgment has resulted in fees that are far higher than they should be. As one Court has cautioned,

> Moreover, although the Court has no reason to question the experience, ability, or reputation of counsel, or the high quality of the representation, it was surprised to see, in review of the invoices, that virtually all of the time was billed at the highest rate, *i.e.,* $190 per hour or $250 per hour. Counsel's firm is comprised of 16 attorneys, but of the 438.05 hours billed through June 30, all but 2.25 hours were billed at the partners' rate. "Hours which reflect ... inefficiency ... are to be disallowed." Although the use of experienced attorneys is not necessarily inefficient there is no explanation here for why virtually all of the services required the attention of the more experienced attorneys with the higher billing rates. [internal citations omitted]

515 Ave. I Corp. v. 515 Ave. I Tenants Corp., 2010 WL 4904671, *9 – 10 (Sup. Ct. Kings Co. 2010).

In many foreclosures, the request for attorneys' fees is the tail wagging the dog, but considering that the demand is for nearly $3.0 million, it is too large a tail to even be considered without substantial review and scrutiny.

## CONCLUSION

The Debtor respectfully requests the entry of an Order disallowing so much of

Orchard's claim as seeks interest, default interest, and attorneys' fees, together with such other

relief as may be just and proper.

Dated: New York, New York
      May 12, 2015

> GOLDBERG WEPRIN
> FINKEL GOLDSTEIN LLP
> *Attorneys for the Debtor*
> 1501 Broadway, 22nd Floor
> New York, New York 10036
> (212) 221-5700

By:    /s/ Kevin J. Nash, Esq.
             Kevin J. Nash, Esq.
             A Member of the Firm