UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                    Chapter 11

D.A.B. GROUP LLC,                         Case No.  14-12057 (SCC)

                        Debtor.

---------------------------------------------------------------x

**APPENDIX OF ADDITIONAL DOCUMENTS
IN SUPPORT OF
DEBTOR'S REPLY MEMORANDUM OF LAW
IN RESPONSE TO THE OPPOSITION SUBMITTED
BY ORCHARD HOTEL LLC TO THE DEBTOR'S OBJECTION
TO VARIOUS ASPECTS OF IT SECURED CLAIM**

GOLDBERG WEPRIN
FINKEL GOLDSTEIN LLP
*Attorneys for the Debtor*
1501 Broadway, 22nd Floor
New York, New York 10036
(212) 221-5700

By:     /s/ Kevin J. Nash, Esq.

1

# EXHIBIT A

| |
|---|
| **Matter of Orchard Hotel, LLC v Ramos** |
| 2014 NY Slip Op 06285 [120 AD3d 1129] |
| September 23, 2014 |
| Appellate Division, First Department |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| As corrected through Wednesday, October 29, 2014 |

[*1]

| |
|---|
| **In the Matter of Orchard Hotel, LLC, Petitioner,**<br>**v**<br>**Charles E. Ramos et al., Respondents.** |

Morrison Cohen, LLP, New York (Jerome Tarnoff of counsel), for petitioner.

John W. McConnell, Office of Court Administration, New York (Pedro Morales of counsel), for Hon. Charles E. Ramos, respondent.

The above-named petitioner having presented an application to this Court praying for an order, pursuant to article 78 of the Civil Practice Law and Rules, now, upon reading and filing the papers in said proceeding, and due deliberation having been had thereon, it is unanimously ordered that the application be and the same hereby is denied and the petition dismissed, without costs or disbursements. Concur—Renwick, J.P., Andrias, Richter and Feinman, JJ.

# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF _New York_

------------------------------------------------------------x

Orchard Hotel,LLC

Plaintiff/Petitioner,

- against -

D.A.B. Group,LLC et al

Index No. **850044/2011**

Defendant/Respondent.

------------------------------------------------------------x

## NOTIFICATION FOR SEALING
## IN ELECTRONICALLY-FILED CASE

To:   County Clerk, County of _New York_

William G. Wallace _____, an attorney admitted to the Bar of the State of New York and counsel for in the above-captioned case filed with the New York State Courts Electronic Filing System ("NYSCEF"), respectfully submits this notification that an order of this court, a copy of which is annexed, requires that the document(s) identified below be sealed. Except in instances in which the order requires sealing of the entire file, each document to be sealed is identified by its title, the date filed with the NYSCEF system, and the number of the document as listed on the NYSCEF List of Documents Filed.

Sealing of Entire File Ordered _____ [Initial here]   Or

Sealing of the Document(s) Identified Below Ordered:

| Title of Document | Number of Document On NYSCEFList of Documents | Date Filed |
|---|---|---|
| 1) Proposed Order To Show Cause motion 15 | No. 750 | 11/14/2013 |
| 2) Affirmation in Support & Exhibits1-9 | No. 751-760 | 11/14/2013 |
| 3) Affidavit in Support | No. 761 | 11/14/2013 |
| 4) Affidavit in Support | No. 762 | 11/14/2013 |
| 5) Affirmation in Opposition | No. 763 | 11/18/2013 |

Dated: January 27,2014

(Name) William G. Wallace

(Address) 229 Seventh St.

Garden City, N.Y. 11530

516-742-9494

(Signature) _/s/ WW/_

(Firm Name) Favata & Wallace,LLP

Defendant D.A.B. Group LLC

Attorney for _____

2/11/10

FILED: NEW YORK COUNTY CLERK 11/19/2013    INDEX NO. 850044/2011
NYSCEF DOC. NO. 764    RECEIVED NYSCEF: 11/19/2013

FILED: NEW YORK COUNTY CLERK 11/19/2013    INDEX NO. 850044/2011
NYSCEF DOC. NO. 799    RECEIVED NYSCEF: 12/11/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

ORCHARD HOTEL, LLC,

                Plaintiff,

    -against-

D.A.B. GROUP, LLC; ORCHARD CONSTRUCTION,
LLC; FLINTLOCK CONSTRUCTION SERVICES
LLC; JI K MECHANICAL INC.; EDWARD MILLS &
ASSOCIATES, ARCHITECTS PC; CASINO
DEVELOPMENT GROUP, INC.; CITYWIDE
CONSTRUCTION WORKS INC.; EMPIRE TRANSIT
MIX INC.; MARJAM SUPPLY CO., INC.; ROTAVELE
ELEVATOR INC.; SMK ASSOCIATES INC.; RJF
ELECTRICAL CO. INC.; CITY OF NEW YORK; NEW
YORK STATE DEPARTMENT OF TAXATION &
FINANCE; LEONARD B. JOHNSON; CITY OF NEW
YORK ENVIRONMENTAL CONTROL BOARD;
BROOKLYN FEDERAL SAVINGS BANK; STATE
BANK OF TEXAS and JOHN DOE #1 through JOHN
DOE #100, the last 100 names being fictitious, their true
identities unknown to plaintiffs, and intended to be the
tenants, occupants, persons or corporations, if any,
having or claiming an interest in or lien upon the
premises described in the complaint,

                Defendants.

-----------------------------------------------------------------x

Index No. 850044/2011

Motion Seq. No. 15

**STIPULATION
AND ORDER**

    This matter having come before the Court by motion of Plaintiff Orchard Hotel, LLC

(Motion Seq. No. 15), and Defendant D.A.B. Group LLC, without admitting to any allegation set

forth in Plaintiff's motion papers, having agreed with Plaintiff, by and between the parties'

respective counsel, to entry of an order pursuant to CPLR § 6301 upon the terms set forth herein,

and for good cause having been shown;

    IT IS HEREBY ORDERED that defendant DAB (as hereinafter defined) shall not contact

or communicate with plaintiff Orchard (as hereinafter defined) by any means, including without

64159261 v3 \022022 \0004

limitation by phone, email, or in-person, unless such contact or communication occurs in the presence of both DAB's and Orchard's respective attorneys of record in this matter; and

IT IS FURTHER ORDERED that DAB shall not visit Orchard's office or the office, home, or place of worship of any Orchard Party (as hereinafter defined); provided, however, that DAB may meet with Orchard by mutual agreement in the presence of both DAB's and Orchard's respective attorneys of record in this matter; and

IT IS FURTHER ORDERED that DAB shall terminate all arbitrations and non-judicial proceedings, including without limitation all proceedings before rabbinical courts, against David Aviram and Y. David Scharf, and shall withdraw all notices and summonses relating to such arbitrations and proceedings, and DAB shall not initiate any further arbitrations or non-judicial proceedings, including without limitation any proceeding before a rabbinical court, against Orchard or any Orchard Party arising from or relating to the above-captioned action, other than within this action or in a state or federal court; and

IT IS FURTHER ORDERED that DAB shall not enter upon 139-141 Orchard Street, New York, New York (the "Mortgaged Property") outside the presence of Court-appointed Receiver Simon Miller; and

IT IS FURTHER ORDERED that notwithstanding anything to the contrary herein, this Stipulation and Order shall not prohibit DAB's and Orchard's respective attorneys from communicating directly for any purpose; and

IT IS FURTHER ORDERED that for purposes of this Stipulation and Order—

#4790161 v3 \022012\0004

2

"DAB" means D.A.B. Group LLC and its owners, principals, members, directors, officers, managers, employees, and representatives, including without limitation Ben Zhavian (a.k.a. "Zvi Benjamin Shavian," a.k.a. "Ben Zahavian"); and

"Orchard" means Orchard Hotel, LLC and any of its owners, principals, members, directors, officers, managers, employees, and representatives, including without limitation Russel Bernard, Jordan Socaransky, Chad Goodman, David Aviram, Edward Martell, Danielle Lesser, Y. David Scharf, Westport Capital Partners LLC, Maverick Real Estate Partners LLC, the Kor Group and Morrison Cohen LLP (each, an "Orchard Party"); and

IT IS FURTHER ORDERED that Orchard's motion for a temporary restraining order and preliminary injunction (Motion Seq. No. 15) is hereby withdrawn with prejudice; and

IT IS FURTHER ORDERED that the Clerk of Court is directed to seal (i) the Affirmation of Urgency Y. David Scharf in Support of Preliminary Injunction and *Ex Parte* Temporary Restraining Order dated November 12, 2013 and all exhibits thereto [Doc. Nos. 751-760], (ii) the Affidavit of Chad Goodman dated November 12, 2013 [Doc. No. 761], (iii) the Affidavit of Jordan Socaransky dated November 12, 2013 [Doc. No. 762], and (iv) the Affirmation of William Wallace in Opposition to Order to Show Cause dated November 18, 2013 [Doc. No. 763].

[continued on next page]

#4790261 v3 \022022 \0004

3

By executing this Stipulation and Order, counsel to DAB represents that he has discussed the foregoing provisions with DAB's principal, Ben Zhavian, and DAB and Zhavian have agreed to be bound thereto.

Dated: November 18, 2013

MORRISON COHEN LLP

By: _____
    Y. David Scharf
    Danielle C. Lesser
    Brett Dockwell
909 Third Avenue
New York, NY 10016
(212) 735-8600
*Attorneys for Orchard Hotel, LLC*

FAVATA & WALLACE LLP

By: _____
    William G. Wallace
229 Seventh Street, Suite 300
Garden City, NY 11530
(516) 742-9494
*Attorneys for D.A.B. Group, LLC*

Agreed and acknowledged:

_____
Ben Zhavian

Dated: __14/9/13_____, 2013

SO ORDERED

_____
**CHARLES E. RAMOS**

14799241 v3 \023/023 \0004

4

# EXHIBIT C

Attachment to Wallace Letter-
Commercial Loan Action Plan, dated February 15, 2011
[pp. 2311 - 2317]

ORIGINAL

## COMMERCIAL LOAN ACTION PLAN

To:        Loan Workout Committee

From:      Loan Workout Department

Date:      February 15, 2011

Request:   Modification – Maturity Extension
           DAB Group LLC
           Account # 20-070052
           Loan # 18-010521-3
           139-141 Orchard Street, New York, NY 10002
           Developer/Guarantor: Zvi Zhavian

## PURPOSE:

The above loan is scheduled for final maturity on 3/1/2011. The purpose of this review is to recommend (2) six-month extensions to allow for sufficient time to complete the construction, stabilize the property, and secure permanent take-out financing. This is the first extension request beyond the original maturity date. An OTS "non-object" is required as this loan is rated substandard and is a maturity extension to allow BFSF to hold this loan until payoff. The Bank's CFO has confirmed an impairment charge of $764,000 was taken 9/30/10.

| Borrower | D.A.B. Group LLC | Date | February 15, 2011 |
|---|---|---|---|
| Loan # | 18-010588-2 18-010521-3 | Account # | 20-080020 |
| Guarantor | Zvi (Ben) Zhavian | Risk Rating | Substandard |
| Orig. Date Amount | 8/21/2008 $5,500,000 (acquisition note) $19,050,000 (building note) | Current Balance | $5,500,000 (acquisition note) $7,259,568 (building note) |
| Orig. Maturity Date | 9/1/2009 | Current Maturity Date | 3/1/2011 |
| Original (BFSB) Amt & % | $11,550,000 47.046832% | Book Balance (BFSB) | $6,003,074 |
| Participant Amt & % | $13,000,000 52.9531568% - SBOT | Participant Bank Balance Amt. | $6,756,594 52.9531568% - SBOT |
| Collateral | 139-141 Orchard Street Aka 138-140 Allen Street New York, NY | Due for: Accrual/Non Accrual | 3/1/2011 Accrual |
| Collateral Type | Hospitality | Block/Lot | Block: 415 Lot(s): 66 & 67 |
| Appraisal Date | $37,000,000 (as-stabilized) 9/6/2007 – C&W | Impairment/Charge-Off | $764,000 (12/31/10) |
| | | Net Carrying Value | $5,239,074 |
| Legal Status | Current | Counsel | Kriss & Feuerstein |

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          OH-001171

## LOAN HISTORY:

The referenced facilities consist of a Project Loan Note and a Building Loan Note. The total proceeds between the two facilities are $24,550,000 which was used to (a) finance the acquisition of two mixed use buildings for $5,500,000 (Loan #18-010521-3) and (b) $19,050,000 (Loan #18-010588-2) to finance the construction of a 92 room, sixteen-story boutique hotel with a total gross floor area of 50,644 square feet located in New York, New York ( the "collateral"). The State Bank of Texas participated in the transaction and provided (52.95315%) of the total financing.

The acquisition loan was executed on November 8, 2007 and has an outstanding balance of $5,500,000. The building loan was executed on August 21, 2008 and has an outstanding balance of $3,844,170.38. The Project Note was modified on August 21, 2008 to make both loans co-terminus with a final maturity of 3/1/2011.

The Mortgagor is D.A.G. Group LLC (a New York limited liability company). The guarantor on this facility is Zvi Zhavian.

The Loans are priced at WSJP + 175 bps, floor 7.75%. The loan carries an initial term of 12 months with (3) six month renewal options. There is no option to convert to perm.

## CONSTRUCTION STATUS

Based on a site inspection performed by Koch Engineering, P.C on December 22, 2010, the project is at the 33% level of construction completion. The total hard cost budget for this project is $15,250,000 and the total completed and stored to date amount is $5,094,242.11. The project is a year behind schedule due to a stop-work-order implemented by the Building Department as a result of down-zoning of the area. The project was grandfathered and allowed to continue to be built based on the original plans and specifications.

## ACTION REQUESTED:

The Borrower has requested a twelve month extension to allow for the completion of the hotel, stabilization of the property and to obtain permanent take-out financing. The Borrower requires additional time because of the stop-work-order imposed on the project due to the down-zoning of the area.

The loan will be modified as follows:

| | Current Terms | Requested Terms |
|---|---|---|
| Loan Amount | $5,500,000 (acquisition) $19,050,000 (building) | Same |
| Rate | WSJP + 175 bps (7.75% floor) | Same |
| Term | One-year + (3) six-month renewal options | (2) six-month renewal options |
| Amortization | None | Same |
| Maturity | 9/1/09, 3/1/10, 9/1/10, 3/1/11 | 9/1/11, 3/1/12 |
| Extension Fee | - | .25% per extension option |
| Appraisal | $37,000,000 (as-stabilized) 9/6/2007 – C&W $9,180,000 – PBF (9/30/10) | Same |

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          OH-001172

## APPRAISAL SUMMARY:

The property was underwritten as follows.  The lesser of $5,500,000 for the project loan and $19,050,000 for the construction loan ($24,550,000 total loan) or 75% of the "as is" appraised value on a stabilized rental basis, or 75% of the total project cost.

The appraisal dated September 6, 2007 reflected an as-stabilized value of $37,000,000 which at 75% LTV yielded a loan amount of $27,750,000 or $3,199,000 over the loan approval.

The total project cost was estimated at $36,050,000 which at 75% LTV yielded a loan amount of $27,037,500 or $1,487,500 over the loan approval. The appraisal was performed by Cushman & Wakefield.

| Cushman & Wakefield September 6, 2007 | Value Conclusion |
|---|---|
| "As-Is" Value | $11,000,000 |
| "As-complete" | $33,000,000 |
| Value at stabilized rental occupancy | $37,000,000 |

## PERFORMANCE HISTORY:

The guarantor has an insufficient credit history to determine his mortgage creditworthiness. The table below shows past and present credit history.

### Credit Analysis:

| Description | Zvi Zhavian 2/20/08 | Zvi Zhavian 1/27/11 |
|---|---|---|
| Equifax FICO | N/A | N/A |
| Transunion FICO | N/A | N/A |
| Experian FICO | N/A | N/A |
| AVERAGED FICO | N/A | N/A |
| INDUSTRY RATING | N/A | N/A |
| DELINQUENCY | 0x30, 0x60, 0x90 | 0x30, 0x60, 0x90/ |

* Per OCC/OTS Metrics Report 2nd qtr 2010, Prime (660+), Alt-A (620-659), and Sub-Prime (-620).

Mr. Zhavian's credit profile was established in 1999. There are no credit scores as Mr. Zhavian retains a minimum of credit usage as a principal (as opposed to as a guarantor).

In the past, he has had three tradelines two of which were leased vehicles and one $500.00 line of credit with HSBC, his primary bank. Both lines have zero balances.

Recurring AGI per tax returns and Net Worth are set for below.

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

OH-001173

**Personal Financial Statements (Un-Audited/Borrower Prepared):**

| Zvi (Ben) Zhavian (100%) | a/o 6/30/2010 | a/o 6/5/2009 | a/o 2/20/2008 |
|---|---|---|---|
| Assets | $23,341,174 | $36,705,766 | $33,990,000 |
| Liabilities | $14,443,695 | $12,300,000 | $9,900,000 |
| Net Worth | $8,897,479 | $24,405,766 | $24,090,000 |
| Liquid Assets | $1,200,000 | $1,435,766 | $4,500,000 |
| RE Assets | $21,941,174 | $35,230,000 | $29,250,000 |

**Cash/Income Analysis (Per IRS Form 1040)**

| Source | Zvi (Ben) Zhavian | | | | 4 Yr. Avg. Recurring Income |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | |
| Wages | $0 | $0 | $0 | $0 | $0 |
| Interest | $164,310 | $17,932 | $0 | $3,978 | $46,555 |
| Dividends | $197 | $246 | $0 | $0 | $111 |
| Tax Refunds | $0 | $0 | $0 | $0 | $0 |
| Bus. Income | $0 | $0 | $0 | $0 | $0 |
| Capital Gains | <$3,000> | <$3,000> | <$3,000> | <$3,000> | <$3,000> |
| RE/Part/S Corps | <$222,096> | <$768,899> | <$457,070> | <$444,743> | <$473,202> |
| Other | $3,125 | $0 | $0 | $0 | $781.25 |
| AGI | <$57,464> | <$753,721> | <$460,070> | <$443,765> | <$428,755> |

## GUARANTOR ANALYSIS:

The guarantor has shown insufficient recurring AGI ($428,755) to cover portions of the current debt service of $77,500 on the loan's outstanding balance of $12,759,568. However, there is $556,945 of interest reserve balance which will carry the loan for 5 to 6 months.

The Borrower also had a liquid asset balance of $1.2 million which will be sufficient to cover the remaining interest to project completion and stabilization. The project is expected to be completed over the next 10 to 12 months.

## LOANS TO ONE BORROWER:

| | |
|---|---|
| Current BFSB Exposure To This Loan | $6,003,074.00 ($11,790,432 undrawn amount) |
| Current BFSB Limit | $9,195,000.00 |

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                OH-001174

## MARKET TRENDS

After the worst slump in decades, all key hotel metrics – occupancy, room rates, and revenues have begun to show signs of improvements but hotel performance correlates closely to growth in gross domestic product (GDP), and an expected elongated economic recovery bodes for a more-sluggish-than typical resurgence in the lodging sector.  Strong brands will attract more business. Guests prefer to play it safe with tried-and-true innkeepers and make sure budgets go  further.  Overall, better capitalized owners can reduce rates and knock out competitors but- business-center hotels in gateway destinations enjoy the best prospects in this sector of the real estate market.

The graphs below shows hotel investment prospect trends, occupancy rates and RevPar in the hotel sector.







5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

OH-001175

## FINANCIAL ANALYSIS:

### Original Underwriting Criteria Reveals The Following Project Economics (Un-Audited):

| Proforma: | | |
|---|---|---|
| Proposed Hotel Income: | | |
| | Based on 111 Rooms at $300 per night at 365 days | $12,154,500 |
| | 30% Vacancy | $3,646,350 |
| Effective Gross Income | | $8,508,150 |
| | | |
| | Expenses: 40% | $3,403,260 |
| Net Operating Income (NOI): | | $5,104,890 |
| | Debt Service ($24.55 MM@7.5%/25 yr. amort) | $2,177,068 |
| Cash Flow: | | $2,927,822 |
| DSCR: | 30% Vacancy | 2.36x |
| | 40% Vacancy | 2.00x |
| | 50% Vacancy | 1.72x |

### SUMMARY ANALYSIS

### The loan will be modified as follows:

| | Requested Terms: | |
|---|---|---|
| Term: | (2) 6-month extensions | |
| Maturity: | 3/1/12 | |

### Recommendation:

The project is 33% complete and the Borrower has requested additional time to complete the project, stabilize the building, and secure permanent take-out financing.

The project is a year behind schedule due to a stop-work-order implemented by the Building Department as a result of down-zoning of the area. The project was grandfathered and allowed to continue to be built based on the original plans and specifications. In light of the above, two six-month extension options is recommended to allow the project to be completed.

### Conclusion:

In the absence of proceeding with this proposal, BFSB would face a timely foreclose action on the property or sale of the note at a discount. A foreclosure will take time with additional carry costs accreting to the bank. Allowing this extension will enable the loan to be paid off.

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

OH-001176

ORIGINAL

Loan #        18010521-3
Account #     20-070052
Borrower:     DAB Group LLC
Guarantor:    Zvi (Ben) Zhavian
Premises:     139-141 Orchard Street, New York, NY 10002

APPROVAL:              Approval of (2) six-month extension options.

LOAN OFFICER:                                          DATE: 2/15/11
                       Francillia LeBlanc

LOAN WORKOUT OFFICER:                                  DATE: 4/5/11
                       Bruce Gordon

LOAN WORKOUT OFFICER:                                  DATE: 2/15/11
                       Joanne Gallo


LOAN WORKOUT COMMITTEE APPROVAL

COMMITTEE:                                             DATE: 2/13/11
                       Daniel Reich

COMMITTEE:                                             DATE: 2/15/11
                       Arthur Williams

COMMITTEE:                                             DATE: 2/15/11
                       John Loconsolo

Comments       _____
               _____

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER              OH-001177

# EXHIBIT D

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

------------------------------------------------------------------------X

ORCHARD HOTEL, LLC,

                                        *Plaintiff,*                    Index No. 850044/2011

                    -against-
                                                                        VERIFIED ANSWER
                                                                        AND COUNTERCLAIMS

D.A.B. GROUP LLC, CAVA CONSTRUCTION
& DEVELOPMENT, INC., FLINTLOCK
CONSTRUCTION SERVICES LLC, JJK
MECHANICAL INC., EDWARD MILLS &
ASSOCIATES, ARCHITECTS PC, CASINO
DEVELOPMENT GROUP, INC., CITYWIDE
CONSTRUCTION WORKS INC., EMPIRE
TRANSIT MIX INC., MARJAM SUPPLY CO.,
INC., ROTAVELE ELEVATOR INC., SMK
ASSOCIATES INC., FJF ELECTRICAL CO. INC.,
CITY OF NEW YORK, NEW YORK STATE
DEPARTMENT OF TAXATION AND FINANCE,
and JOHN DOE #1 through JOHN DOE #100, the
last 100 names being fictitious and unknown to
plaintiff, the persons, or parties intended being the
tenants, occupants, persons or corporations, if any,
having or claiming an interest in or lien upon the
premises described in the complaint,

                                        *Defendants,*


D.A.B. GROUP, LLC,

                                        *Defendant/*
                                        *Counterclaiming*
                                        *Plaintiff,*

                    -against-

BROOKLYN FEDERAL SAVINGS BANK and
STATE BANK OF TEXAS

                                        *Defendants on*
                                        *the Counterclaims*

------------------------------------------------------------------------X

Defendant D.A.B. Group LLC ("DAB") by its attorneys FAVATA &

WALLACE, LLP answers the Complaint herein and asserts affirmative defenses

and counterclaims against the Plaintiff and against additional Defendants on the

counterclaims as follows:

1. Denies knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in Paragraphs 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,

14, 15, 16, 17, 18, 20, 27, 28, 33, 43, 44, 52, 53, 56, 65, 66, 67, 68, 76, 77, 78, 79,

80, 86, 89 and 90.

2. Denies each and every allegation set forth in Paragraphs 19, 21, 22, 23,

25, 29 and 30 and refers this Court to the document referred to therein for the

terms, conditions and construction of said document.

3. Denies each and every allegation set forth in Paragraphs 24, 34, 40, 45,

46, 47, 49, 50, 51, 61, 62, 63, 69, 75, 81, 82, 83, 84, 85 and 87.

4. Denies each and every allegation set forth in Paragraph 54 of the

Complaint except admits that there is a prior action pending between the Plaintiff

and this Defendant's principal for relief based on the identical documents as

alleged herein and said prior action pending constitutes a bar to this action

pursuant to CPLR Rule3211(a)(4) and further constitutes a bar to this action based

on the legal doctrine of "election of remedies".

5. Denies each and every allegation set forth in Paragraphs 55, 57, 58, 59,

60, 70 and 71 and refers this Court to the document referred to therein for the

terms, conditions and construction thereof.

6. Denies each and every allegation set forth in Paragraph 88 of the
Complaint except admits that there is a prior action pending between this Plaintiff
and this answering Defendant's principal, which prior action pending constitutes
a bar to this action pursuant to CPLR Rule3211(a)(4) and constitutes a further bar
to this action based on the legal doctrine of "election of remedies".

## FIRST AFFIRMATIVE DEFENSE

7. There is another action pending between the same parties for the same
causes of action in Supreme Court of The State of New York, County of Kings
under Index No.: 15013/11 therefore this action is barred by CPLR Rule
3211(a)(4).

## SECOND AFFIRMATIVE DEFENSE

8. An action has been commenced in Supreme Court State of New York,
County of Kings entitled *Orchard Hotel, LLC v. Ben Zhavian* under Index No.:
15013/11 (the "Kings County Action").

9. The Kings County Action was commenced on or about June 30, 2011
pursuant to CPLR§3213.

10. The Kings County Action seeks judgment on the identical project loan
notes and building loan notes that are the subject of the within foreclosure action.

11. The Kings County Action seeks to impose personal liability on the
Defendant therein by reason of the Defendant's purported personal guarantee of

the project loan notes and building loan notes.

12. The within action was commenced on or about July 1, 2011 subsequent
to the Kings County Action.

13. By reason of the commencement of the Kings County Action seeking
to impose liability on the note herein, the Plaintiff has elected a remedy and is
thereby precluded from pursuing the within foreclosure action.

### THIRD AFFIRMATIVE DEFENSE

14. The first cause of action fails to state a cause of action.

### FOURTH AFFIRMATIVE DEFENSE

15. The second cause of action fails to state a cause of action.

### FIFTH AFFIRMATIVE ACTION

16. Upon information and belief, Plaintiff's assignor Brooklyn Federal
Savings Bank failed to maintain proper reserves and capitalization to fund the
DAB building loan.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE, FIRST COUNTERCLAIM AND OFFSET AGAINST PLAINTIFF ORCHARD HOTEL, LLC AND AS AND FOR A FIRST COUNTERCLAIM AGAINST ADDITIONAL DEFENDANTS ON THE COUNTERCLAIM BROOKLYN FEDERAL SAVINGS BANK AND STATE BANK OF TEXAS PURSUANT TO CPLR§3019(a) and (d), THIS ANSWERING DEFENDANT ALLEGES THE FOLLOWING:

17. At all times hereinafter mentioned Defendant D.A.B. Group, LLC ("DAB") was and still is a New York Limited Liability Company.

18. Upon the information and belief, at all times hereinafter mentioned, Defendant Brooklyn Federal Savings Bank ("Brooklyn Federal") was and still is a federally chartered savings bank maintaining its principal place of business in the County of Kings, State of New York.

19. Upon information and belief, at all times hereinafter mentioned, Defendant State Bank of Texas ("State Bank") was and still is a bank organized and existing and chartered in the state of Texas.

20. Upon information and belief, all times hereinafter mentioned Defendant State Bank was doing business in the State of New York.

21. Upon information and belief, at all times hereinafter mentioned, Defendant State Bank was transacting business in the State of New York.

22. Upon information and belief, at all times hereinafter mentioned, Plaintiff Orchard Hotel, LLC ("Orchard Hotel") was and still is a New York Limited Liability Company.

23. The counterclaims asserted hereinafter are interposed against Plaintiff herein, Orchard Hotel and the additional Defendants on the counterclaims, Brooklyn Federal and State Bank pursuant to CPLR§3019(a) and (d).

24. Upon information and belief "The Project Loan" as defined in the complaint herein was a loan in which Plaintiff's assignor Brooklyn Federal was

the named lender.

25. Upon information and belief, The Project Loan as defined by the complaint herein was a loan in which State Bank was a participant lender but unnamed in the loan documents.

26. Upon information and belief, "The Building Loan" as defined by the complaint herein was a loan in which Brooklyn Federal was the named lender, and a participant in the loan.

27. Upon information and belief, The Building Loan was a loan in which State Bank was a participant lender but unnamed in the loan documents.

28. Plaintiff Orchard Hotel is the assignee of Brooklyn Federal with respect to The Project Loan and The Building Loan.

29. By virtue of State Bank's participation in each of the aforereferenced loans, Plaintiff Orchard Hotel is the assignee of State Bank.

30. The Project Loan and The Building Loan (hereinafter jointly referred to as "The Loan") initially provided for a loan maturity date of March 1, 2011.

31. Prior to March 1, 2011 Defendant DAB and additional Defendants on the counterclaim Brooklyn Federal and State Bank engaged in negotiations for an extension of The Loan maturity date beyond March 1, 2011.

32. In connection with the negotiations among the parties for an extension of The Loan maturity date Brooklyn Federal and State Bank explicitly approved a general contract between DAB and one Flintlock Construction Services, LLC

("Flintlock").

33.  The aforesaid general contract between DAB and Flintlock  expressly
provided a construction completion date well beyond the purported March 1, 2011
loan maturity date.

34.  In furtherance of their express approval of the general contract between
DAB and Flintlock, Brooklyn Federal and State Bank drafted and required DAB
and Flintlock to execute a certain "Affidavit and Estoppel Certificate" ("Estoppel
Certificate") a copy of which is annexed to the complaint herein as Exhibit "D".

35.  The aforesaid Estoppel Certificate provides, in pertinent part, that
"lender and borrower hereby confirm, renew and extend the rights...").

36.  Thereafter Brooklyn Federal repeatedly represented to DAB that the
loan maturity date would be extended beyond March 1, 2011.

37.  Thereafter, State Bank repeatedly represented to DAB that the loan
maturity date would be extended beyond March 1, 2011.

38.  The representations made by Brooklyn Federal and State Bank to DAB
regarding their agreement to extend the maturity date  were false when made.

39.  The representations made by Brooklyn Federal and State Bank to DAB
that the loan maturity date would be extended were known to Brooklyn Federal
and State Bank to be false when made by them to DAB.

40.  Both Brooklyn Federal and State Bank repeatedly requested that DAB
execute a certain "Pre Negotiation Agreement" which Pre Negotiation Agreement

provided that DAB would waive any and all defenses it may have against

Brooklyn Federal and State Bank.

41. The false representations made by Brooklyn Federal and State Bank to

DAB that they were extending the maturity date of the loan were made for the

purpose of inducing DAB to rely thereon.

42. By reason of the course of dealing between the parties prior thereto,

DAB's reliance on the false representations of Brooklyn Federal and State Bank

was justifiable.

43. Both Brooklyn Federal and State Bank repeatedly and falsely

represented to DAB that they had applied for the requisite permission from the

federal Office Of Thrift Supervision ("OTS") for permission to explicitly and in

writing extend the maturity date of The Loan.

44. In fact, the representations and statements made by Brooklyn Federal

and State Bank to DAB that they were requesting permission from OTS to extend

the maturity were false when, in fact, Brooklyn Federal and State Bank were in the

process of negotiating the sale and assignment and had already entered into a

contract for the sale and assignment of The Loan to Plaintiff Orchard Hotel and

had no intention of confirming, in writing, that The Loan maturity date was

extended.

45. The false and fraudulent representations made by Brooklyn Federal and

State Bank to DAB were made solely for the purpose of inducing DAB to rely

thereon and DAB did in fact rely thereon by, among other things, not pursuing a
refinance of the loan or a sale of the building project.

46. DAB's reliance on the false and fraudulent representations made by
Brooklyn Federal and State Bank was justifiable under the circumstances in that
Brooklyn Federal had approved the general contract between DAB and Flintlock
which contract provided for a construction completion date well after The Loan
maturity date and in approving said contract Brooklyn Federal drafted and
required the Estoppel Certificate which it states "lender and borrower hereby
confirm renew and extend the rights...", be executed by DAB and Flintlock.

47. By reason of the foregoing, DAB's reliance on the false and fraudulent
representations made by Brooklyn Federal and State Bank was justifiable under
the circumstances.

48. In reliance on the foregoing false and fraudulent representations DAB
delayed in seeking a refinance of the loan or sale of the building project.

49. By reason of the foregoing false and fraudulent representations made
by Brooklyn Federal and State Bank, Plaintiff Orchard Hotel as assignee stands in
the shoes of Brooklyn Federal and State Bank.

50. By reason of the foregoing DAB has been damaged in a sum not yet
determined but believed to be in excess of fifty million dollars ($50,000,000.00).

## AS AND FOR A SECOND OFFSET AND COUNTERCLAIM
## AGAINST PLAINTIFF ORCHARD HOTEL AND SECOND

## COUNTERCLAIM AGAINST ADDITIONAL DEFENDANTS

## BROOKLYN FEDERAL AND STATE BANK

51. Defendant DAB repeats, reiterates and realleges each and every allegation set forth in the foregoing counterclaim as if those allegations were set forth herein at length.

52. During the term of The Building Loan, Brooklyn Federal failed and refused to make appropriate building loan advances.

53. During the term of The Building Loan Agreement Defendant Brooklyn Federal wrongfully and improperly delayed making loan advances without just cause and in breach of the terms of The Building Loan.

54. Brooklyn Federal, in failing and delaying loan advances, impaired DAB's ability to pay contractors and sub-contractors.

55. Brooklyn Federal's failure to and delay in making advances thereby resulted in judgments and liens against DAB.

56. State Bank, as a participant lender and joint venturer of Brooklyn Federal is responsible for the wrongful actions of Brooklyn Federal.

57. Brooklyn Federal's actions as alleged herein constitute a breach of contract pursuant to the loan documents.

58. Orchard Hotel as the assignee of Brooklyn Federal is liable at least to the extent of an offset herein.

59. By reason of Brooklyn Federal's breach of contract DAB has been

damaged in the sum not yet determined but believed to be in excess of fifty million
dollars ($50,000,000.00).

## AS AND FOR A THIRD OFFSET AND COUNTERCLAIM AS
## AGAINST PLAINTIFF ORCHARD HOTEL AND COUNTERCLAIM
## AGAINST BROOKLYN FEDERAL AND STATE BANK

60. Defendant DAB repeats, reiterates and realleges each and every
allegation set forth in the foregoing counterclaims as if those allegations were set
forth herein at length.

61. Brooklyn Federal and Orchard Hotel have grossly exaggerated the
amount necessary to fully satisfy the loan by miscalculating interest and purported
late charges due.

62. By reason of the exaggeration of the loan payoff amount, DAB was
unable to satisfy the loan and / or obtain the necessary financing to refinance the
loan, even though, based upon Brooklyn Federal's own appraisal, DAB had
significant equity in the property exceeding twenty five million dollars
($25,000,000.00).

63. By virtue of its participation and joint venture in this loan State Bank is
liable to DAB.

64. By reason of its own participation in the exaggeration of the loan
payoff amount and by reason of its status as the assignee of Brooklyn Federal,
Orchard Hotel is liable to DAB for the exaggerated loan payoff statements.

65. By reason of the foregoing, DAB has been damaged in the sum not yet determined but belief to be in excess of fifty million dollars ($50,000,000.00).

**WHEREFORE,** Defendant D.A.B. Group, LLC demands judgment dismissing the complaint in its entirety together with an award on each one of its counterclaims in a sum not yet determined but believed to be in excess of fifty million dollars ($50,000,000.00) together with attorney's fees, court costs, interest and such other and further relief as may be just proper and equitable under the circumstances.

**Dated:    Garden City, New York**
**August 15, 2011**

Yours etc.,

**FAVATA & WALLACE, LLP**

By:  **William G. Wallace, Esq.**
229 Seventh Street, Suite 300
Garden City, New York 11530
(516) 742-9494

## CORPORATE  VERIFICATION

STATE OF NEW YORK    )
                           )    ss.:
COUNTY OF _Nassau_    )

        **BEN ZHAVIAN**,  being duly sworn deposes and says that deponent  is the

Managing Member of **DAB GROUP, LLC,** the _Defendant_ in the within action; deponent

has read the foregoing _answer_ and _counterclaims_ and the contents thereof; the same is

true to deponent's own knowledge except as to those matters therein stated to be

alleged on information and belief and as to those matters deponent believes it to be

true.

        The reason this verification is made by deponent and not by the _Defendant_ is

because the _Defendant_ is a Limited Liability Company and deponent is an officer

thereof, to wit its Managing Member.

                                       _____
                                       BEN ZHAVIAN
                                       Managing Member

Sworn to before me this
day of _15th_ ~~July~~, 2011
        August

_____
Notary Public

Corporate Verification*

WILLIAM G. WALLACE
Notary Public State of New York
NO. 02WA4736498
Qualified in Naussau County
Commission Expires October 31, 20_13_

# EXHIBIT E

RICHARD MAHER - 4/3/2013

```
 1                    R. Maher                    Page 9

 2      A      Yes.

 3      Q      Independent contractor?

 4      A      Correct.

 5      Q      Going back to 2005, in addition to

 6   being mortgage underwriter you were loan

 7   administrator?

 8      A      Correct.

 9      Q      Both of those roles were with respect

10   to commercial level or did they include

11   residential, as well?

12      A      Commercial.

13      Q      What did a loan administrator do for

14   Brooklyn in 2005 as opposed to an underwriter?

15      A      Get borrowers to make sure they were in

16   compliance in terms of loan documents.  In other

17   words, giving us financial information that is

18   requested per the loan documents.

19           Making sure they were compliant with

20   anything for a loan -- for the extension of the

21   loans that were given in during the term of the

22   loan.

23

24           For example, if you had a one-year

25   construction loan, two to six-month extensions,

     to get the automatic two to six-month extensions
```

RICHARD MAHER - 4/3/2013

```
 1                     R. Maher
 2   you had to fulfill the interest reserve if
 3   required if that was an issue.  I am giving you
 4   an example.
 5            Making sure they were compliant with
 6   everything with us and that the loan
 7   participants, if there were any in that case,
 8   that everybody was happy with the loan extension
 9   and the borrower's performance in accordance with
10   the notes.
11       Q    Did your job, either title wise or
12   function wise, change in any manner between
13   January '05 and December of 2010?
14       A    No.  I was involved when things started
15   to go south.  In terms of the credit crunch came,
16   market conditions changed.
17            I was involved in loan workouts.  Not
18   really involved in negotiations, but just
19   giving -- you know, I would sit in on a meeting
20   to make sure that everything that the -- making
21   sure the facts were straight in terms of the
22   history of the loan, performance of the loan,
23   where it was going, how it was getting there.
24            Kind of being there.  Giving the
25   workout group the background on this thing
```

RICHARD MAHER - 4/3/2013

Page 24

R. Maher

1

2    transaction as much as possible.

3         Q    Did there come a point in time you

4    became aware Flintlock was engaged --

5         A    Absolutely.

6         Q    Did the bank approve engagement of

7    Flintlock?

8         A    Absolutely.

9         Q    Do you recall when that was?

10        A    I don't.

11        Q    In your role, did you have a function

12   for the bank in approving a GC, general, not with

13   respect to this loan, but generally?

14        A    I took the documents.  We got

15   references, got the agreement, had management

16   review it, got their references, ran it by the

17   third-party engineer what they knew of him.

18             Met with the Flintlocks.  I think there

19   was a meeting with Chip and his brother.  I

20   forget the brother's name.

21             They came in.  They told us the work

22   they did.  Management was there.  We had a lot of

23   confidence in them.

24        Q    It resulted in approving them as the

25   contractor on this job?

RICHARD MAHER - 4/3/2013

Page 26

1                              R. Maher

2   an ongoing diary.

3        Q     There came a point in time Brooklyn

4   Federal Savings' assets were purchased?

5        A     Correct.

6        Q     By investors?

7        A     Investors bought the bank.  Real estate

8   portfolio was spun off to a waterfall group.

9        Q     Were you employed by the bank when this

10  happened?

11       A     No.

12       Q     When did you leave the bank?

13       A     I left September 2011.

14       Q     Do you know what happened to the

15  history sheets when the bank was sold?

16       A     They were in the drive, computer drive.

17       Q     Did you maintain any hard copies of the

18  history sheets on any of the loans you were

19  involved in?

20       A     Maybe.

21       Q     Could that be some of the stuff that is

22  maybe at your home?

23       A     Maybe.

24             Now, this, again, since I was employed

25  at Brooklyn Fed, the week after I left I had a

RICHARD MAHER - 4/3/2013

34

```
1                          R. Maher                        Page 35

2      Q    Do you see the part maturity of 3/1/11?

3      A    Correct.

4      Q    Does that refresh your recollection as

5   to what the maturity date of the loan documents

6   were?

7      A    Yes.  I have to go -- again, I

8   haven't -- if that's what I have down there,

9   that's what it was.

10     Q    Was it your understanding at this time

11  that the bank, the loan committee of the board

12  had approved an extension subject to OTS

13  approval?

14     A    It was probably done in conjunction.

15  We would have to go to them.  We had to go to

16  them for all approvals.  We had to go to them to

17  blow our nose.

18     Q    You are talking about OTS?

19     A    OTS, yes.  We had to go to them --

20  again, this is refreshing my recollection.  As I

21  said, a lot has gone on since then.

22          I don't know if we went to the board

23  first and then to the OTS, I am not sure, or it

24  was done in conjunction.

25     Q    In any regard, as of March 16th, some
```

1-800-325-3376

Merrill Corporation - New York

www.merrillcorp.com/law

RICHARD MAHER - 4/3/2013

Page 36

R. Maher

1

2  action had been taken to extend that loan; is

3  that correct?

4      A    It would appear that way.

5      Q    The last sentence of that e-mail you

6  talk about an answer and what happened at the

7  meeting yesterday.

8          You know what that's about?

9      A    That was referring to the zoning

10  issue.  He had to get approval for what we said.

11  I believe, if I recall, he had to complete the

12  building by November, I remember a November date,

13  I think.  It stuck out in my head.

14          As you said -- again, this is

15  refreshing my recollection -- he had to complete

16  the project by a certain date to be in

17  conformance with this grandfathering.

18      Q    Was it your understanding that date

19  would have been November of 2011?

20      A    I think so.  Again, it's possible.

21          Again, it's been a long time.

22      Q    Right.

23          You seem to refer to a final maturity

24  date of 3/1/11?

25      A    Yes.

RICHARD MAHER - 4/3/2013

1                           R. Maher
2    was for?

3         A    I don't recall.

4         Q    Were you aware that Flintlock's
5    contract afforded them 430 days to complete the
6    construction work?

7         A    I don't remember the details of the
8    project -- the contract.

9         Q    Correct me if I am wrong, but earlier
10   you testified that Brooklyn Federal Savings Bank
11   approval of the construction contract was
12   required before Flintlock could come on as
13   general contractor?

14        MR. MARSH:   Objection to the form of
15   the question.

16        You can answer if you understand it.
17        A    I believe they were approved to do the
18   work, that we felt comfortable with their
19   capacity and experience and size of their company
20   to perform the job and get the job done, and
21   everyone being cognizant of the mid November time
22   frame deadline.

23        I don't remember them, the board or
24   counsel reviewing their contract, the actual, you
25   know, document to bless this particular document

Merrill Corporation - New York

RICHARD MAHER - 4/3/2013

1
                        R. Maher
2    maturity.  I think.

3              I mean, again, two years ago, I don't
4    recall every single detail.

5              I don't think there was any reason for
6    me not to tell them of the loan maturity.  I
7    think I would have said we're going to try to get
8    the loan extended, the loan maturity as of 3/1.

9              There is no reason for us not to get
10   the loan extended.  We'll try to get the loan
11   extended.

12             If we didn't get the loan extended,
13   where would we be?

14             It defies common sense.  Of course we
15   went out of our way to get the loan extended.

16             As you saw in e-mail, we were going to
17   the OTS to get the loan extended.  A, I don't
18   think I wouldn't tell Chip -- who I dealt with --
19   that we wouldn't, I don't think I would not have
20   told him the maturity date.  I would not have
21   hidden anything.

22        Q    What leads you to believe Flintlock
23   knew about the maturity date?

24        A    I don't know what Flintlock knew and
25   didn't know.

RICHARD MAHER - 4/3/2013

Page 74

1                    R. Maher

2    Flintlock.

3        A    There were so many, and project

4    managers, there was so many.  It was a revolving

5    door.

6        Q    Earlier you testified regarding the

7    Flintlock contract.  I believe Mr. Fulfree asked

8    you questions about that.

9             One of the allegations in this case is

10   that the bank agreed to extend the loans for the

11   term of that general contract.

12            Are you aware of any such extension?

13       A    From what I recall, we had our -- I am

14   going to have to go through the whole process

15   here.  It's the only way I can clarify, to

16   explain it.

17            We originated the loan, first it was

18   the project loan and then the construction.

19            There are two separate closing dates.

20   I am not sure when or how much after the

21   construction loan closed, after the project loan,

22   there had to be co-terminus.

23            I don't know if we extended it after.

24   I am going through and trying to think of the

25   process.

RICHARD MAHER - 4/3/2013

Page 75

1

2                R. Maher

   Q    Sure.

3

     MR. MARSH:  If you know the answer.  If

4  you don't know the answer, that's okay.

5    A    I am going to have to assume that we

6  were looking to extend the loan so that the

7  project could be finished.  We would be out of

8  our minds not to.

9

     However, once the cease and desist

10  came, everything was up for sale.  Everything was

11  chaos.  I don't know -- again, we did make an

12  attempt to get an extension beyond the final

13  maturity as per the loan documents by going to

14  the OTS and getting it.

15

     What happened in, you know, during the

16  duration, what happened between now and then, I

17  don't recall.

18

   Q    Let me ask the question a slightly

19  different way.

20

     To your knowledge, did anyone ever

21  promise Ben Zhavian or D.A.B. Group this loan

22  would be extended beyond March 1st, 2011?

23

     MR. WALLACE:  Note my objection to the

24  form.

25

     MR. FULFREE:  Join.

RICHARD MAHER - 4/3/2013

88

1                    R. Maher                    Page 89

2    typed up from Joanne Gallo to D.A.B. Group to Ben

3    and I was cc'd.  Okay.

4        Q     You had referenced in response to some

5    questions from Mr. Fulfree a mid November time

6    frame?

7        A     Yes.

8        Q     What year of November were you

9    referring to when you said mid November time

10   frame?

11       A     I think it might have been November

12   2011.  I think.  I believe that was the date.

13       Q     Why do you say it would be November

14   2011?

15       A     You know, I don't recall.

16             Again, a lot has gone on since then.  I

17   am not sure.

18       Q     Let me ask it a slightly different way.

19             When you were referring to the mid

20   November time frame, were you referring to the

21   expiration of zoning entitlements?

22       A     Yes, he had to get that building

23   complete.  A C of O had to be issued by that

24   November, 2010 or 2011, I don't recall.

25       Q     Whenever the C of O had to be issued,

# EXHIBIT F

28

J. Gallo

1      Q.    And you were aware of that when you did this

2  review that you told us about?  I mean, I know you know

3  that as you sit here today.

4      A.    Right.

5      Q.    But do you recall taking note of that when

6  you reviewed the legal docs back in the second half of

7  2010?

8      A.    No, I knew what the maturity date was, so I

9  didn't really...

10      Q.    Well, without looking at the loan docs, how

11  did you know what the maturity date was?

12      A.    Because it's in the loan docs.  It's one of

13  the first things that you look at is, you sort of say,

14  what's the date of the loan and when does it mature?

15      Q.    And in connection with that review, do you

16  also look at the general contract?

17      A.    No.

18      Q.    It's not important to you?

19      A.    I don't have the sufficient expertise and

20  that's done by the people that are more responsible for

21  construction lending.

22      Q.    And who would that have been back in 2010?

23      A.    That would have been Richard Maher.

24      Q.    What was Mr. Maher's position?

32

J. Gallo

1

2  discussions?

3                    MR. MARSH:  Objection to the form.

4                    You can answer it if you understand

5           it.

6           A.     The borrower being Nick Zagami was involved.

7  And Ben was on a few phone calls.  I don't recall if he

8  was physically at some of the meetings.

9           Q.     Who do you know Nick Zagami to be?

10          A.     He was Ben Zhavian's right-hand person.

11          Q.     If I told you owners representative was his

12  title, that doesn't mean anything to you?

13          A.     Doesn't mean anything to me.

14          Q.     At least in the early part of 2011, you were

15  aware that the loan termed out on March 1st, 2011;

16  correct?

17          A.     Yes.

18          Q.     You were also aware of the fact that

19  construction in all likelihood would have not been

20  completed by March 1st, 2011; is that correct?

21          A.     Yes.

22          Q.     Did you have an idea or were you given some

23  estimates, either internally from your group or

24  externally from the contractor, as to when it was

25  anticipated construction would be complete?

60

J. Gallo

1

2   A.   Right.   Which was subject to the approval of

3   the loan work-out committee of the board before it could

4   go to OTS.

5   Q.   So, is it fair to say that, again, your

6   team, you and Gordon, recommended to the loan work-out

7   committee of the board that a request for an extension be

8   made to OTS?

9   A.   Yes.

10   Q.   Was that made at a monthly meeting?

11   A.   At a monthly meeting it would have been

12   made.

13   Q.   Do you know what monthly board meeting it

14   was made at?

15   A.   Probably February.

16   Q.   And when, ordinarily, did the board meet?  I

17   know it's monthly, but was it --

18   A.   I don't remember whether it was the third or

19   the fourth Thursday of the month.

20   Q.   And you're sure or you're not sure that your

21   request to the loan work-out committee of the board was

22   made in February?  Or could it have been made in January?

23   MR. MARSH:  Objection to the form of

24   the question.

25   If you can understand it, you can

61

                              J. Gallo

1

2         answer it.

3         A.    I don't recall specifically.

4                MR. WALLACE:   Off the record.

5                (Colloquy off the record.)

6         Q.    The recommendation for application to OTS

7    initially came from you or your group; correct?

8         A.    Yes.

9         Q.    And we don't know what month the meeting

10   was, it was certainly before March 1st?

11        A.    Exactly.

12        Q.    Could it have been made in 2010, the

13   December meeting?

14        A.    I doubt it.

15        Q.    Did the board approve it, approve your

16   recommendation to go to the OTS and ask for an extension?

17        A.    Yes.

18        Q.    And then explain to me the process of going

19   to the OTS.  Does that come from you, does it come from

20   the loan work-out committee or does it come from --

21        A.    It comes from me.

22        Q.    And do you write a letter to OTS or send an

23   e-mail to OTS?  How did that work?

24        A.    We sent a cover memo and the background

25   information on the deal and what was being requested.

138

J. Gallo

1

2      Q.      And it did, in fact, close, okay.

3              Now I'm going to show you what was marked,

4      again it's an exhibit to an exhibit, it was Plaintiff's 2

5      today and it's Exhibit C attached to Plaintiff's 2

6      (indicating).

7      A.      (Referring).

8      Q.      Now, this appears to be an e-mail from you

9      dated June 2nd, 2011 to Ben Zhavian at D.A.B. Group?

10     A.      Yes (referring).

11     Q.      Do you recall having sent this e-mail?

12     A.      Yes (referring).

13     Q.      Is this a copy, a correct copy of the e-mail

14     you sent on or about that date, June 2nd?

15     A.      I don't recall the date, but -- because we

16     were trying to get a pre-negotiation letter signed

17     (referring).

18     Q.      Now, let me ask you about that.  The

19     pre-negotiation letter was in connection with what?

20     A.      We were trying to -- Any time we enter into

21     negotiations where we have a loan that was problematic

22     in default we requested that we have a signed

23     pre-negotiation letter so that no one, what's said in the

24     room stays in the room.

25     Q.      And by June 2nd, you've already had the

# EXHIBIT G

13

1                              B. Gordon

2          Q.    I'm not talking about today.  I'm sorry.

3     That's fine.  That I'm beyond now.

4          A.    At the time I took a quick look through the

5     most recent stuff in the file, I looked at the

6     construction loan agreement, just to see if there wasn't

7     anything strange in it.

8          Q.    Did you find anything strange in it?

9          A.    Not particularly.

10         Q.    What else do you recall looking at?

11         A.    The note, some e-mails.  Some references to,

12    I believe -- I can't remember the name of the previous

13    contractor.

14         Q.    Cava?  If I told you Cava?

15         A.    Cava, yeah.

16         Q.    By the time you looked at the file, was

17    Flintlock already in place as the general contractor or

18    were you involved somewhat in that process?

19         A.    I don't remember.  If it wasn't, it wasn't

20    long after that.

21         Q.    As you sit here today, do you recall

22    whether or not the bank required approval of a general

23    contractor when one was being substituted out and one was

24    coming in?

25         A.    Well, yes.

