**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10029
(212) 735-8000
Y. David Scharf
Joseph T. Moldovan
Danielle Lesser
Robert K. Dakis
Brett Dockwell

*Counsel to Orchard Hotel, LLC*

**Hearing Date and Time:**
June 30, 2015 at 10:00 a.m.

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------

In re:                                                    :        Chapter 11
                                                          :
D.A.B. GROUP LLC,                                         :        Case No.: 14-12057 (SCC)
                                                          :
                           Debtor                         :
                                                          :
-----------------------------------------------------

## NOTICE OF MOTION OF ORCHARD HOTEL LLC AND
## ORCHARD CONSTRUCTION LLC TO CONVERT CASE TO CHAPTER 7

PLEASE TAKE NOTICE that a hearing will be held before the Honorable Shelley C.

Chapman, United States Bankruptcy Judge, in the United States Bankruptcy Court for the

Southern District of New York, located at One Bowling Green, Courtroom 623, New York, NY

10004 on June 30, 2015 at 10:00 a.m. to consider the Motion of Orchard Hotel LLC and Orchard

Construction LLC to Convert Case to Chapter 7, filed by Orchard Hotel LLC and Orchard

Construction LLC pursuant to 11 U.S.C. § 1112 and Bankruptcy Rules 1017.

PLEASE TAKE FURTHER NOTICE THAT objections, if any, to the relief sought shall

be filed in writing through the Clerk's ECF system, with a copy delivered to the Chambers of

Judge Chapman, and served upon counsel for Orchard Hotel LLC and Orchard Construction

LLC, Morrison Cohen LLP, 909 Third Avenue, 27th Floor, New York, NY 10029, so as to be received no later than 5:00 p.m. on June 23, 2015.


Dated: June 12, 2015
      New York, N.Y.

MORRISON COHEN LLP


By: /s/ *Joseph T. Moldovan*
      Joseph T. Moldovan
      Robert K. Dakis
      909 Third Avenue
      New York, New York 10022
      Telephone: (212) 735-8600
      Fax: (212) 735-8708
      bankruptcy@morrisoncohen.com
      www.morrisoncohen.com

*Counsel to Orchard Hotel, LLC and Orchard Construction LLC*

**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10029
(212) 735-8000
Y. David Scharf
Joseph T. Moldovan
Danielle Lesser
Robert K. Dakis
Brett Dockwell

*Counsel to Orchard Hotel, LLC and*
*Orchard Construction, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| D.A.B. GROUP LLC, | Case No. 14-12057 (SCC) |
| Debtor. | |

**MOTION OF ORCHARD HOTEL LLC AND ORCHARD**
**CONSTRUCTION LLC TO CONVERT CASE TO CHAPTER 7**

Orchard Hotel LLC and Orchard Construction LLC (together, "Orchard"), by and through their undersigned counsel, hereby file this motion (the "Motion") for conversion of the above captioned chapter 11 case to a case under chapter 7 of the Bankruptcy Code pursuant to Section 1112(b) of the Bankruptcy Code, and in support thereof respectfully state:

## PRELIMINARY STATEMENT

1.      It has been nearly one year since D.A.B. Group LLC (the "Debtor"), a single-asset real estate entity, filed its voluntary chapter 11 petition. Yet, this case is no closer to resolution today than it was on the petition date. The plan of reorganization proposed by the Debtor and confirmed by the Court has failed. The Debtor's sale of its property to Arcade Orchard Street LLC ("Arcade") has failed, and litigation with Arcade concerning its deposit is now required, at further expense to this administratively insolvent estate. The Debtor owes Simon Miller, who was appointed by the State Court as receiver for the Property during Orchard's foreclosure action (the "Receiver"), and his counsel for amounts the Receiver expended to preserve the property pending the failed sale (those amounts were to be paid at a closing that will never occur). The Debtor needs to (i) engage zoning counsel to shepherd an extension request through the New York City Board of Standards and Appeals ("BSA") to preserve zoning entitlements that, if lost, would significantly reduce the value of the Debtor's property, (ii) engage a new broker to properly re-market the property, (iii) pay significant post-petition expenses owing to the Receiver and take steps to cure large unpaid tax claims, and (iv) begin taking reasonable steps to resolve issues with creditors, including Orchard.

2.      However, the Debtor today has no economic wherewithal to resolve the estate's issues. The Debtor has no unencumbered cash and no ability to generate unencumbered cash. As such, the Debtor cannot fund the actions necessary to preserve its sole asset, a partially developed hotel project located at 139-141 Orchard Street, New York, New York (the "Mortgaged Property" or "Property"), that has been dormant since 2011. Even assuming that Orchard would be willing to either permit its cash collateral (i.e., the deposit from the failed sale of its collateral, once litigation has brought it into the estate) to be used to fund these expenses, or agreed to fund them out of its own pocket, the Debtor will never be in a position to repay

2

these amounts, much less pay its own counsel, as there is no unencumbered value in this case to satisfy administrative claims.[1]

3.      Making matters worse, the Debtor has demonstrated time and again that it has no interest in addressing these problems. Instead, the Debtor's principal, Ben Zhavian, has been pre-occupied with attempting to personally profit from this estate, in blatant disregard of the rights, interests, and entitlements of the estate's creditors. On Zhavian's watch, the Debtor has failed to take any action to prevent the Debtor's zoning entitlements or permits from expiring. The Debtor has not paid any expenses, including insurance costs. Zhavian further created an atmosphere of acrimony among all parties in this case – going so far as to constantly and erratically involve himself in the now failed sale process. In what can only be described as a case of Nero fiddling as Rome burned, Zhavian's sole focus has been on the objection to Orchard's claim, which mainly benefits Zhavian.  As the fiduciary in charge of guarding this estate for the benefit of all stakeholders, Zhavian's self-interested behavior is inexcusable and demonstrates why the Debtor must be removed.

4.      The Bankruptcy Code makes clear that conversion to chapter 7 is appropriate where, as here, the Debtor's confirmed plan of reorganization is incapable of being substantially consummated. The Debtor has defaulted its buyer and, in the absence of an immediate closing, the Plan cannot go into effect. Moreover, under well-settled case law, administrative insolvency constitutes "cause" for conversion to chapter 7.

---

[1] Even if the Debtor's $33 million sale with Arcade had closed, the Debtor's ability to pay all administrative claims in full was doubtful. The Plan specifically provided that payment of administrative claims would only have been from unencumbered property, and there was no unencumbered property.

5.    The Debtor will no doubt resist conversion with the promise of a new plan of reorganization.[2] However, in order for a substitute plan to be confirmable, the Debtor would need to file an amended plan and re-solicit. This would require the Debtor to obtain the agreement of Orchard, the Receiver, and each and every other holder of an administrative expense claim to take less than payment-in-full in cash on the effective date. Suffice it to say, Orchard is unwilling to compromise its post-petition administrative claim.

6.    Wind-down in a chapter 7 resolves these concerns. Chapter 7 is streamlined and straightforward, far less expensive than a chapter 11 plan process (and the related continuing carrying costs of administration), and cannot fail. Chapter 7 is designed for precisely this case. In a chapter 7, the trustee will run a proper sale process to monetize the Mortgaged Property and distribute the proceeds in accordance with the priority scheme set forth in the Bankruptcy Code. Unlike the chapter 11 Debtor, the Trustee will not need to make deals or obtain the consent of any creditor, party in interest, or equity holder in order to monetize this estate. Instead, the case will rapidly move forward to conclusion.

7.    Additionally, conversion will interpose an "honest broker" who can fairly deal with the myriad complicated issues in this case. The chapter 7 trustee will owe a fiduciary duty to the estate and will seek to maximize creditor recoveries. If recoveries will be maximized by prosecuting or settling the Debtor's claims objections, then the chapter 7 trustee could do so unbounded by the effect of resolution on the Trustee's own pocketbook.

---

[2] The Debtor has delayed resolution of this matter for years. After having litigated in state court for over four years, realizing that it was finally facing foreclosure from the pending appeal, the Debtor then filed this bankruptcy case. Now that the Debtor's plan has failed, it will seek further delays with the untenable promise of a viable plan. The Debtor, however, does not have the means, or the disinterested principal, to come up with a viable plan. After five years of the Debtor's shenanigans, conversion to chapter 7 is necessary.

8.      For all of those reasons, and as more fully set forth below, Orchard requests that the chapter 11 Case be converted to a case under chapter 7 of the Bankruptcy Code.

## JURISDICTION, VENUE AND STATUTORY BASIS

9.      The bases for jurisdiction of this Motion are 28 U.S.C. §§ 1334 and 157. Venue is appropriate under 28 U.S.C. § 1408. The statutory bases for the relief requested are Sections 105(a) and 1112 of the Bankruptcy Code.

## BACKGROUND

**A.      The Debtor's Plan of Reorganization Failed.**

10.      On July 14, 2014, the Debtor filed a voluntary petition for chapter 11 bankruptcy relief noting that the case was filed as a single asset real estate case. [Dkt. No. 1]. On October 8, 2014, the Debtor filed its proposed plan of reorganization. [Dkt. No. 42].

11.      On November 13, 2014, the Court directed the Debtor to execute a term sheet with Arcade, commence the short diligence period that Arcade required, and negotiate a formal APA. Inexplicably, the Debtor did not seek approval of a proposed APA and bidding procedures for nearly three weeks. *See* Motion to Approve Bidding Procedures [Dkt. No. 66].

12.      The Court promptly approved the bidding procedures and the Debtor proceeded to market the Mortgaged Property. No additional bids were received and the Debtor finalized the sale of the Mortgaged Property to Arcade. *See Bidding Results* dated February 9, 2015 [Dkt. No. 93]. On February 19, 2015, the Court entered an Order approving the sale of the Mortgaged Property to Arcade. [Dkt. No. 103].

13.      The Debtor amended its plan of reorganization to clarify that the Plan was conditioned on the closing of the sale to Arcade. *See* Second Amended Plan of Reorganization (the "Plan"), filed February 26, 2015 [Dkt. No. 110]. In particular, the Plan provides that its distributions will be funded with the proceeds of the Arcade sale (Plan § 5.1) and that the closing

5

with Arcade is a condition to the effectiveness of the Plan (*see* Plan § 8.1). On April 16, 2015, the Court entered an order confirming the Debtor's plan [Dkt. No. 132] (the "Confirmation Order").

14.    The Plan, however, has not and will not ever become effective. Arcade failed to close by the deadline set forth in the Confirmation Order. On May 20, 2015, counsel for the Debtor filed a letter issuing a Notice of Default and Demand for Deposit [Dkt. No. 139] explaining that because Arcade failed to close, the Debtor was entitled to the deposit. Arcade responded to the Notice of Default [Dkt. No. 140] (the "Arcade Response") indicating that its capital partner withdrew and that it could not secure a replacement.[3] Arcade has also refused to allow its deposit to be released from escrow, and litigation will be required to bring the deposit into the estate.

**B.    The Debtor Is Administratively Insolvent.**

15.    The Debtor's estate currently lacks unencumbered value sufficient to pay all administrative claims in full. Taking into consideration all secured claims (*i.e.*, the Orchard claims and all mechanics' lien claims), the Debtor needs to generate $33,169,936.34 in net sales proceeds to satisfy all secured claims in full and have unencumbered cash to pay administrative claimants. In order to also pay unsecured claims, the Debtor will need $34,789,095.32.[4]

---

[3] Additionally, the Arcade Response notes the rather troubling letter sent by BNH Rivington LLC ("BNH Rivington"), the secured noteholder in the related 77-79 Rivington LLC bankruptcy case wherein BNH Rivington clearly violated the automatic stay by sending a notice that falsely claimed it owned a portion of the Mortgaged Property. To date, the Debtor has not responded to the BNH Rivington letter. Given that BNH Rivington's stay violation is now being used as a cover for why Arcade failed to close the sale transaction, it is incumbent upon an estate fiduciary to investigate and prosecute a claim against BNH Rivington for potentially interfering with the sale transaction.

[4] As set forth in the proof of claim filed by Orchard Hotel on December 12, 2014 [Claim No. 9], as of the Petition Date, the Debtor owed Orchard the following amounts:

16.    At present, the Debtor has two sources of value: (i) a claim for no less than $1,500,000 against Arcade arising out of the failed sale of the Mortgaged Property, and (ii) the Mortgaged Property.

17.    Even assuming, however, that the $33 million sale price was the ultimate value of the Property, the Debtor still would not have sufficient unencumbered cash to pay administrative claims in full. Using the Debtor's own calculations, a $33 million sale price would create net sales proceeds of $32,485,000 (assuming solely for this hypothetical that the broker was paid). Assuming no additional tax claims have accrued, the first $680,000 goes to payment of taxes, leaving only $31,805,000 for distribution to creditors, which is approximately $1,300,000 less than all secured claims.

18.    Even if the Debtor gets credit for the full $1,500,000 deposit, the Debtor likely has insufficient value to pay administrative claims in full after satisfying all secured claims.

| Item | Principal | Interest | Total |
|------|----------|----------|-------|
| Project Loan | 5,500,000 | 4,513,667 | 10,013,667 |
| Building Loan | 7,960,973 | 6,533,305 | 14,494,278 |
| Protective advances | 800,406 | 363,061 | 1,163,467 |
| Receiver expenses | 111,405 | 56,274 | 167,679 |
| Legal expenses | 2,313,610 | 602,241 | 2,915,851 |
| **Total due** | **16,686,394** | **12,068,548** | **28,754,942** |

Orchard Hotel's claim of $28,754,942 includes interest calculated at the default rate under the Loans. The Debtor has challenged Orchard's right to interest at the default rate, and that litigation is currently pending before this Court.

In addition to Orchard's claim, there are approximately $4,414,994.34 in claims of mechanics' lien holders (the actual filed amount of mechanics' lien claims is $5,089,442.74, but that amount includes claims that are duplicative of Flintlock's claim).

The Debtor owes unpaid real estate taxes of approximately $680,000 (and those claims continue to accrue), which now encumbers Orchard's collateral. Additionally, the Debtor's disclosure statement indicates that unsecured claims total $1,619,158.98.

Assuming that the $1,500,000 deposit is available to make up the shortfall, there would still be

only $135,000 available to administrative creditors. The Debtor's own estimate shows that as of

January 2015, before accounting for any costs incurred in the Debtor's litigation challenging

Orchard's claim, Orchard's lift stay motion, and the mediation there were approximately

$400,000 of administrative claims. That number has no doubt increased substantially. As such,

there is a shortfall of well over $250,000, and administrative claims continue to accrue.

## C.    The Debtor's Principal Is Acting In His Own Self Interest.

19.    The Debtor's principal, Zhavian, has a long history of acting in his own self-

interest without considering the interests of other stakeholders. In a June 2, 2015 email to

Orchard and various third parties, Zhavian proposed a payment scheme in which, upon the sale

of the Mortgaged Property, Orchard would be paid $14.4 million (approximately half of its

claim), the mechanics' lienors would be paid $2 million (less than half of their claims), and

Zhavian – the Debtor's equity holder – would be paid $8.5 million, plus one-half of all sale

proceeds above $24.9 million. His scheme does not include paying unsecured creditors anything

and he would require all lienholders and administrative claim holders to take a haircut in order to

ensure he has a distribution.[5]

20.    From the outset of these cases, Zhavian has taken steps, or failed to take action, in

an attempt to jeopardize the value of the Mortgaged Property in the hope that he can force

Orchard to make concessions to him – not for the benefit of the estate, but for his personal

---

[5] Zhavian sent this email to, among others, Ronald Solarz, a real estate broker with no connection to this case, Edward Mills, the debtor's prepetition architect who has not be retained in this case, and Orchard's principals and attorneys. This email was not sent under any, and is not subject to, the mediation privilege between the Debtor and Orchard or any settlement privilege. Moreover, the email is being submitted to show the Zhavian's state of mind, and therefore, even if applicable, is outside the scope of Federal Rule of Evidence 408. A true and correct copy of Zhavian's email is attached as Exhibit 1 to the Declaration of Brett Dockwell, dated June 12, 2015 (the "Dockwell Decl."), filed contemporaneously herewith.

benefit. His actions in connection with the Debtor's critical BSA entitlements are the most telling.

21.    Immediately before the filing of the petition, the Debtor's building permits were in peril of revocation. In mid-June 2014, the Receiver was informed that the Stalled Sites program, which had protected the Property's building permits even though construction was halted, would be terminated and that the permits would be revoked on July 1, 2014 unless construction recommenced. (Dockwell Decl., Ex. 2 at ¶ 2). The Receiver was also informed that, without permits, the Property could begin to receive citations for fines in amounts upwards of $50,000 per day. (*Id.*).

22.    Loss of the permits would be devastating. It would require a re-design of the building to meet new, more onerous and more expensive building code regulations. (*Id.* at ¶ 3). Perhaps most significant, without the permits, the eventual owner of the Property would lose the zoning entitlements which were the basis for, among other things, the current height and density of the building's superstructure, which would have to be partially demolished and would substantially limit the scale of the potential development. (*Id.*).

23.    By letter dated June 20, 2014, Orchard advised Zhavian of these developments, which constituted additional Events of Default under the applicable loan documents because of the Debtor's failure to adequately protect the Property. (Dockwell Decl., Ex. 3). Although Zhavian was advised that loss of the Property's building permits would potentially impose millions of dollars in additional costs and seriously jeopardize the Property's zoning entitlements, Zhavian took no serious action. In response to Orchard's notice, Zhavian sent a jocular email to Orchard and its counsel stating, incorrectly, that there was no cause for concern about the permits. (*Id.*, Ex. 4). Zhavian was either oblivious to the serious jeopardy posed to the

Property by the termination of the Stalled Sites program or he was attempting to mislead Orchard into thinking everything was fine.

24.     As a result of Zhavian's inaction, Orchard and the Receiver were forced to seek emergency relief through the State Court. On June 26, 2014, just three days after the motion was made, the State Court entered an order authorizing the Receiver, *inter alia*, "to take all necessary, reasonable and appropriate action to protect the Mortgaged Property's zoning entitlements and building permits." (*Id.*, Ex. 5).

25.     The Receiver and his contractor, Richter + Ratner, then had to quickly develop detailed construction plans from the design plans on file with the City's Department of Buildings ("DOB") and begin to procure construction supplies and retain the necessary trades to begin active construction. (Dockwell Decl. ¶ 7). At the same time, because of the DOB's insistence that active construction commence immediately, the Receiver and Richter + Ratner were developing a series of immediate-term items to be started at once. (*Id.* ¶ 8). It was the Receiver, and not the Debtor, who worked tirelessly to ensure that the permits remained in place as of the commencement of this case. Moreover, it is the Receiver who is now taking the lead in continuing the permits, while the Debtor stands idly by and permits them to lapse. Orchard funded the Receiver's activities to protect the Debtor's property for itself and all other creditors while the Debtor did nothing. (*Id.* ¶ 7).

26.     On August 20, 2015, the Property's "grandfathered" zoning entitlements will expire (the "BSA Deadline"). (Dockwell Decl., Ex. 2 at ¶¶ 9-10). Unless construction on the Property is substantially complete (and a Certificate of Occupancy is issued) on or before August 20, 2015, the upper floors of the existing structure may have to be removed to comply with the more restrictive zoning that was enacted after the building permits were issued. (*Id.* at ¶ 14).

Removing the upper floors of the existing structure would simultaneously dramatically increase costs and reduce the Property's development and income-producing capacity, materially reducing the Property's value. (*Id.* at ¶ 15). As the Court is well aware, this is a serious issue that has been present since the outset of this case. Failure to obtain an extension of these zoning rights would materially harm the Debtor and all of its creditors.

27.    Despite the urgency caused by the expiring permits, the Debtor has taken no steps to ensure that the BSA grants an extension. The Debtor did not file an application with the BSA seeking an extension of the BSA Deadline at the outset of the case to preserve the Debtor's status. The Debtor did not file any request to extend the BSA Deadline while the sales process was pending.[6] The Debtor did not file any request after it entered into the Arcade sale contract to protect the Property in the event Arcade failed to close. And the Debtor has still done nothing even though Arcade has defaulted under the sale contract and the BSA Deadline is only approximately two months away. The Debtor's inaction is inexcusable and a breach of the Debtor's fiduciary duties to its creditors.

28.    Rather than attempt to protect the value of the Mortgaged Property for all stakeholders, the Debtor has spent the majority of this case attempting to advance its own interest at the expense of the estate. For example:

- In August 2014, in an attempt to frustrate Orchard's prosecution of this case, Zhavian commenced a Beth Din proceeding against Y. David Scharf, lead litigation counsel for Orchard in this matter, and sought to have Scharf shunned in his religious community because of his representation of Orchard. (*Id.*, Ex. 6).

---

[6] The Debtor may suggest that filing an extension request before the BSA is solely the responsibility of the Receiver. However, while the Receiver may have had authority to act, the Debtor was not divested of the responsibility of managing its assets. Even assuming that the Receiver was responsible for filing the application, the Debtor took no steps to facilitate the Receiver's work. Indeed, the Debtor has obdurately refused to even approve the Receiver's budget, thereby preventing the Receiver and his contractor from being paid for their work. (Dockwell Decl. ¶ 9).

- After targeting Scharf, Zhavian then targeted two of Scharf's partners who were also working on this case. On November 4, 2014, Zhavian initiated disciplinary proceedings against Danielle Lesser and Brett Dockwell. Zhavian emailed file-stamped copies of his disciplinary complaints to a large group of recipients, including Julia Marsh, a reporter for the *New York Post* who covers court proceedings. (*Id.*, Ex. 7).

- Zhavian also attempted to discourage potential bidders for the Property, in order to facilitate his preferred plan of maintaining possession of the Property. On September 22, 2014, Zhavian sent an email to Simon Misrahi, a real estate broker, copying various parties, responding to Arcade's offer. Zhavian told Misrahi that Arcade might not want to take the risk of purchasing the Property. Zhavian also tried to discourage high bids like Arcade's $33 million offer by falsely claiming that the Property's mortgage debt was only $13.4 million and that its mechanics' liens were less than $2 million. (*Id.*, Ex. 8).

- Similarly, in an attempt to chill bidding on the Property, on November 7, 2014, Zhavian sent an email to Massey Knakal, the Debtor's retained broker, "informing" them to remind potential bidders that a BSA extension required signatures of the owner of 81-83 Rivington, who is in litigation with the Debtor and has been uncooperative on past BSA applications. (*Id.*, Ex. 9; Dockwell Decl. ¶ 13).

- Before and after the entry of the Sale Order, Zhavian sent countless incoherent emails that served only to complicate and confuse the closing of the Arcade purchase. (Dockwell Decl., Ex. 10).

29.    Zhavian has a long history of reckless and threatening behavior, beginning even before the Loans were in default, and he has repeatedly demonstrated a willingness to destroy the Property's value if he cannot get what he wants. The facts recounted below provide necessary context and demonstrate why the creditors and the Court cannot trust Zhavian to protect the Property. For example, before the commencement of this case:

- Zhavian repeatedly pocketed Building Loan proceeds that were earmarked for Flintlock. As BFSB loan officer Richard Maher wrote in an email to Zhavian on March 3, 2011, "This is a misuse of funds and potential violations of the law." (*Id.*, Ex. 11; *see also* Ex. 12 at 65:19-22). Maher testified that he "should have called the DA in this case, but I didn't," and instead BFSB stopped making Building Loan advances until Zhavian repaid Flintlock. (*Id.*, Ex. 12 at 46:9-10).

- In an internal memorandum, the bank documented its decision to sell the Loans because of "significant issues concerning [Zhavian's] honesty," reporting:

> On several occasions we have caught him diverting money
> he has been given via construction loan advances which has
> been brought to our attention by the contractor [Flintlock]
> who failed to be paid. . . .
>
> We recommend this sale as a better alternative to
> disbursing additional monies and running the risk of
> needing takeout financing to repay or the considerable risk
> that Mr. Zhavian, the owner/guarantor, will do something
> to endanger our position.

(*Id.*, Ex. 13).

- In the fall of 2012, Zhavian obstructed efforts by Orchard and the Receiver to preserve the Property's zoning entitlements. The Debtor's State Court counsel explained during a December 5, 2012 telephonic conference with the State Court's law clerk and other counsel that Zhavian would not voluntarily extend the entitlements because doing so might benefit the next owner of the Property in the event that the Debtor lost the Property through foreclosure. (Dockwell Decl. ¶ 18).

- In December 2012, unable to obtain Zhavian's cooperation in extending the zoning entitlements, the Receiver sought authority from the State Court to execute documents in Zhavian's stead. (*Id.*, Ex. 14).

- In April 2013, notwithstanding a pledge of cooperation to the State Court, Zhavian resumed his attempts to interfere with the BSA extension application filed by the Receiver. Zhavian attended a Community Board meeting at which the Receiver's application to extend the zoning entitlements was discussed and publicly objected to the application as allegedly inaccurate. (*Id.*, Ex. 15 ¶ 5). Incredibly, Zhavian made these objections even though he had, by a signed affidavit, approved the filing of the application and attested to its factual accuracy. (*Id.* ¶¶ 6-7).

- Zhavian also has a long history of aggressive and threatening behavior. Zhavian had repeated disputes with the Debtor's original general contractor, including once incident in which the construction superintendent reported that Zhavian "hit me in the chest with a bottle of water and told me to get out and everyone else was thrown out. Just another hissy fit, but this time he [is] throwing [stuff] at me." (*Id.*, Ex. 16 at 11/11/09; *see also id.* at 3/17/09, 4/6/09, 9/22/09).

- Zhavian also made "a number of verbal threats to officers" of BFSB and "personally abus[ed] and harass[ed] officers" of the bank. (*Id.*, Ex. 17).

- Zhavian somehow obtained the cell phone number of Orchard Manager David Aviram, which he used to conduct a campaign of harassment and threats, calling Aviram's cell phone at all hours of the night and yelling curses and threats. (*Id.*, Ex. 18).

13

- In May 2012, after getting into a dispute with his broker, Zhavian showed up at the broker's house in the middle of the night and, as the broker explained, was:

  > screaming and cursing and the neighbors came out and I almost called the cops. . . . Ben is not normal at all he has issue and mental problems he need to be put in a cage he is crazy [*sic*].

  (*Id.*, Ex. 19).

- On at least two occasions in 2013, Zhavian made threatening and offensive comments about one of Orchard's attorneys, Danielle Lesser. (*Id.*, Ex. 20 ¶¶ 4-5).

- In 2013, Zhavian initiated a rabbinical court proceeding against Orchard attorney Y. David Scharf, seeking to have Scharf shunned solely for representing Orchard. Zhavian showed up unannounced and uninvited at Scharf's synagogue and office. Scharf was forced to retain a rabbi to represent him in the proceeding. (Dockwell Decl. ¶ 10).

- As a result of the personal threats and actions taken against Orchard and its attorneys, Orchard sought sanctions against Zhavian in State Court. On the verge of the sanctions hearing, Zhavian agreed in a stipulation approved by the State Court that he would cease contact with Orchard, its principals, and attorneys and that all contact would be made in the presence of counsel. Zhavian, however, defaulted on this obligation as well. (*Id.*, Exs. 21, 22, 23).

30.    The Property is now dangerously adrift. Zhavian is hopelessly conflicted and lacks the business acumen, temperament, and financial wherewithal to guide this process. Without a chapter 7 trustee in place to secure the Property, assist in obtaining the appropriate approvals to continue the Debtor's entitlements, and rationally address creditor claims to achieve a reasonable solution to the Debtor's financial crisis, there is a clear and present risk that a significant amount of the value of the Mortgaged Property could be lost, and that only Orchard will recover anything in this case, though even that recovery will likely be significantly impaired.

**ARGUMENT**

A.    **Cause Exists To Convert The Case To Chapter 7**.

31.    Section 1112(b)(1) of the Bankruptcy Code provides that "the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate," upon the motion of a party in interest, "if the movant establishes cause." 11 U.S.C. §§ 1112(b)(I).

32.    Section 1112(b)(4) sets forth sixteen events that constitute "cause." That list is non-exclusive, and "courts are free to consider other factors." *In re BH S&B Holdings, LLC,* 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010). In particular, section 1112(b)(4) provides cause is established where movant shows:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (B) gross mismanagement of the estate;
>
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
>
> . . .
>
> (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; [and]
>
> . . .
>
> (M) inability to effectuate substantial consummation of a confirmed plan . . .

33.    Each of the above conditions is satisfied in this case.

### 1.    The Debtor Cannot Substantially Consummate Its Confirmed Plan of Reorganization.

34.    There is no credible argument that "cause" as set forth in section 1112(b)(4)(M) does not exist in this case.

35.    The Debtor will not be able to substantially consummate the Plan. The Plan is expressly conditioned on consummating a sale of the Mortgaged Property to Arcade. *See* Plan at §§ 5.1(a) (providing the "Plan shall be implemented by the sale of the Property and the establishment of the Confirmation Fund and related reserves on the Closing Date with the Disbursing Agent"); 8.1 ("The following are conditions precedent to the Effective Date that must be satisfied . . . (d) The Closing Date shall have occurred, the purchase price received by the Debtor, and title to the Property shall have been conveyed to the Designated Purchaser in accordance with this Plan, the Sale Order and the Confirmation Order").

36.    Arcade, the Designated Purchaser, failed to fund the purchase price, and therefore the Closing Date did not occur. There is no backup purchaser, and therefore the Debtor cannot substantially consummate its Plan. As such, there is cause to convert the case under section 1112(b)(4)(O).

### 2.    The Estate Is Administratively Insolvent.

37.    Administrative insolvency, on its own, constitutes ample grounds for conversion. *See, e.g. In re Ionosphere Clubs, Inc.,* 134 B.R. 515, 525 (Bankr. S.D.N.Y. 1991) (explaining that "[a]dministrative insolvency is . . . one of the bases for conversion to Chapter 7 under § 1112 (b)"); *In re BH S&B Holdings,* 439 B.R. at 349 ("The Court further concludes that the Debtors' administrative insolvency constitutes cause to convert these cases"); *see also, U.S. v. Hernandez,* 160 F.3d 661, 664 (11th Cir. 1998) (noting debtor's "Chapter 11 cases were . . . converted to Chapter 7 cases because the debtors were insolvent").

16

38.    There is little question here that the Debtor is administratively insolvent. The Debtor has no unencumbered cash and absent either (i) a sale price in excess of the Arcade sale or (ii) agreement with all of its administrative creditors, the Debtor cannot pay all administrative claims in cash on the effective date of any replacement plan.

39.    The Debtor is likely to contend that its estate would not be administratively insolvent if it were able to prevail in its litigation with Orchard. Leaving aside that the Debtor has little chance of success, it is well-settled that "the mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert." *In re BH S&B Holdings,* 439 B.R. at 350 (granting conversion on grounds of, among other things, administrative insolvency despite debtors' claims that a litigation victory could render the estate solvent); *see also In re FRGR Managing Member LLC,* 419 B.R. 576, 582 (Bankr. S.D.N.Y. 2009) (converting case to chapter 7 and holding "most cases reject the need to evaluate the merits of a debtor's litigation claims in deciding whether to dismiss or convert a chapter 11 case"). Moreover, a chapter 7 trustee is equally, and in this case due to Zhavian's glaring conflicts, more capable of evaluating and, if it deems appropriate, prosecuting any such claims. *In re Ameribuild Const. Mgmt., Inc.,* 399 B.R. 129, 133 (Bankr. S.D.N.Y. 2009) (declining to consider merits of litigation commenced by debtor where debtor's business was shuttered and chapter 7 trustee "would be able to prosecute" those claims and converting chapter 11 case to chapter 7).

### 3.    The Debtor Cannot Maintain Insurance.

40.    Section 1112(b)(4)(C) provides that cause to convert a chapter 11 case to chapter 7 exists where a debtor fails to "maintain appropriate insurance that poses a risk to the estate or to the public . . . ." 11 U.S.C. § 1112(b)(4)(C).

41.    The Debtor has no cash flow, no cash reserves, and no ability to generate cash sufficient to satisfy its expenses. The Debtor currently only has insurance because Orchard has been willing to fund the premiums. Orchard is unlikely to continue funding those premiums given the Debtor's current position. The Debtor's failure to have insurance on a partially built development project is, necessarily, a risk to the public warranting conversion.

**4.    The Value of the Debtor's Estate Is Diminishing And The Debtor Has No Possibility of Rehabilitation.**

42.    The Bankruptcy Code provides that conversion is appropriate where the value of a debtor's estate is diminishing and there is no "reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

**a.    The Debtor's losses are substantial and continuing.**

43.    The Debtor's losses in this chapter 11 case are not just "substantial," they are staggering, and they continue to mount. On the income side, the Debtor has no operations. The Debtor is a single asset real estate entity whose sole asset is a partially improved piece of real property. The value of the Mortgaged Property is anything but stable. The Mortgaged Property is in imminent danger of being seriously devalued in the event that certain zoning entitlements are not extended.

44.    Moreover, the Debtor actually operates at a loss. Given that the Debtor has no income, the Debtor has no ability to pay maintenance, security, United States Trustee fees, real estate taxes, and interest on post-petition advances from Orchard. These losses do not even take into account the Debtor's counsel's fees arising from the failed sale, the failed plan, and the heavy litigation thus far. The estate will also need to make significant expenditures in order to extend the Mortgages' zoning entitlements and preserve its permits. The estate is a virtual black

18

hole that is perpetually operating at a loss with no ability to make payments to anyone. Given the threat to the value of the Mortgaged Property, the substantial loss prong is satisfied.

**b.      The Estate Has no Possibility of Successfully Rehabilitating.**

45.    "Rehabilitation" for the purposes of conversion "does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include an orderly or complete liquidation." *In re AdBrite Corp.,* 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) (converting chapter 11 case to chapter 7). Rather, "[i]n this context, rehabilitation means to put back in good condition and reestablish on a sound basis." *Id.* To be rehabilitated, a debtor must be "reestablished on a secure financial basis, which implies establishing a cash flow from which its current obligations can be met." *Id.*

46.    The Debtor here is not an operating company. The Debtor's only feasible plan of reorganization consists of liquidating the Mortgaged Property. Under these circumstances, rehabilitation for purposes of Section 1112(b)(4)(A) is impossible as a matter of law. *See, e.g., Loop Corp.* v. *U.S. Trustee,* 379 F.3d 511, 516 (8th Cir. 2004) ("[b]ecause the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation"); *In re BH S&B Holdings,* 439 B.R. at 347 (Bankr. S.D.N.Y 2010) ("the Debtors' intention to liquidate (rather than rehabilitate) demonstrates that there is no likelihood of rehabilitation").

47.    For the foregoing reasons, the elements for "cause" articulated in Section 1112(b)(4)(A) have been amply established, and this chapter 11 case should be converted to one under chapter 7. Courts in this Circuit have converted cases in similar circumstances. *See, e.g., In re Natrl Plants & Lands Mgmt. Co.,* 68 B.R. 394, 395 (Bankr. S.D.N.Y. 1986) (converting case where debtors had negative cash flow of approximately $60,000 per month and a stated intent to

terminate business); *In re BH S&B Holdings,* 439 B.R. at 348 (converting case where debtors'

financial statements reflected continuing losses and debtors had stated intention to liquidate).

### 5.    There is Clear Evidence of Gross Mismanagement.

48.    Section 1112(b)(4) also permits conversion where there is evidence of gross

mismanagement. "[W]here, as here, a debtor in possession is oblivious to the fiduciary

responsibilities imposed upon it in dealing with property of the estate, conversion will normally

be justified." *In re E. Paul Kovacs and Co., Inc.,* 16 B.R. 203, 205 (Bankr. D. Conn. 1981)

(converting chapter 11 case to chapter 7 on motion of secured creditor where claims exceeded

the value of the debtor's property and the debtor improperly managed estate resources). Courts

have found mismanagement sufficient to justify conversion where a debtor's sole principal

attempted to use the reorganization process to profit financially to the detriment of his creditors.

*See In re Lodge at Big Sky, LLC,* 2011 Bankr. LEXIS 2296 (Bankr. D. Mont. June 8, 2011)

(finding cause sufficient to convert chapter 11 case to chapter 7 where debtor's principal

attempted "to utilize the reorganization process for personal financial gain . . .").[7]

49.    Zhavian is clearly acting in his own self interest. For nearly four years, Zhavian

has fought tooth and nail to reclaim the Mortgaged Property clear of Orchard's interests. At no

point during the four years of litigation did Zhavian ever entertain a scenario where he did not

---

[7] Section 1104 of the Bankruptcy Code also permits the appointment of a chapter 11
trustee where the movant can establish cause, including gross mismanagement. Cases construing
gross mismanagement for the purposes of section 1104 conducted a similar analysis of the bona
fides of the debtor's management and its conduct throughout the case. *See, e.g., Fukutomi v.
United States Trustee (In re Bibo, Inc.),* 76 F.3d 256 (9th Cir. 1995) (appointing trustee where
single asset real estate debtor's principals sought to benefit personally from kickback scheme in
its management contracts); *In re Russell,* 60 B.R. 42 (Bankr. W.D. Ark. 1985) (appointing
trustee where debtor's principals structured transaction on the eve of bankruptcy in order to
move assets from the reach of creditors); *In re Colby Construction, Inc.,* 51 B.R. 113, 116-118
(Bankr. S.D.N.Y. 1985 (appointing trustee after finding principals effected a complete
conversion of corporate assets).

either (i) own the Mortgaged Property or (ii) receive at least $10 million for ending the dispute. Zhavian's conduct post-petition demonstrates that he has no concept of the duties imposed upon him by the Bankruptcy Code. Rather than attempt to reach consensus with stakeholders on a way forward, Zhavian has advanced the same litigation strategy seeking to fill his own pockets at the expense of the creditors of the estate.

50.    Zhavian's rampant self-interest has apparently narrowed the Debtor's focus such that it has not focused on critical issues affecting the Property. During the nearly 11 months that this case was pending, the Debtor has failed to file any extension to renew the zoning entitlements, or to maintain or secure the Property (the Receiver was permitted to remain in possession of the Property precisely because the Debtor failed to protect it). The Debtor was well aware that its building permits and zoning entitlements were set to expire in June 2015 and August 2015, respectively. The Debtor has not filed a single pleading before this Court to protect those entitlements. Instead, the Receiver on its own initiative took action to have the building permits extended. Arcade, when it was the contract vendee for the Property, filed for an extension of the Debtor's zoning entitlements. At no point did the Debtor, or Zhavian, take steps that a rational fiduciary should take to ensure that the value of the Debtor's property would be preserved. The Debtor cannot credibly suggest that it failed to take any action because it had agreed to sell the property to Arcade. The Debtor was acutely aware that Arcade could, at any minute, decide not to close. The Debtor did nothing to guard against that risk, and this estate now faces an actual crisis as a result.

51.    Zhavian's inaction in the face of expiring permits and entitlements is not surprising, and instead is consistent with his pre-petition litigation strategy. In 2013, the last time the zoning entitlements were set to expire, Zhavian took active steps to prevent Orchard from

extending the zoning entitlements in order to leverage the expiring entitlements into a settlement that preserved Zhavian's equity. Orchard and the Receiver were forced to seek a court order compelling Zhavian to sign the extension application. Zhavian ultimately signed at the hearing on the motion to compel. Undeterred by his signing the application, Zhavian actually appeared at a community board meeting respecting the application and argued against extending the zoning entitlements. Zhavian is apparently taking a page out of that playbook in an attempt to force Orchard into now compromising its claim. This is not the behavior of a fiduciary.

52.    Additionally, as detailed in paragraphs 28 and 29 above, the record before the Court is replete with examples of Zhavian's pre-petition and post-petition malfeasance. These acts, including the direct threats against counsel in these cases, alone provide grounds for conversion.

53.    Zhavian has also shown no capacity to rationally negotiate with any constituency in this case. Despite being an estate fiduciary with a duty to maximize value for creditors, Zhavian appeared to take steps to actually chill bidding on the Mortgaged Property. As detailed above, Zhavian sent an email to a broker in response to Arcade's offer that Arcade may not want to take the risk of this deal. Zhavian's mad ramblings with Arcade continued in a series of additional emails sent during the course of the sale process. These emails range from incoherent to frantic, making it entirely unclear whether Zhavian is attempting to facilitate the sales process or impede it. Zhavian further made sure to copy parties to potential litigation (*i.e.*, BNH Rivington and its counsel) on emails discussing the litigation against those parties, which compromises any claims the estate may bring.

54.     Zhavian is also blinded by his own self interest. As noted above, Zhavian sent an email to a proposed broker in the case outlining his "plan" to force every constituency in this case to take a significant discount on the face value of their loans in order to ensure that he gets an $8.5 million "base" payment, plus upside. This flagrant self-dealing by an estate fiduciary is nothing less than shocking.

55.     In similar instances where a Debtor's rampant self interest and inability to properly manage the estate has caused a rift between the Debtor and its creditors such that there is no possibility of a consensual reorganization, courts have removed the Debtor – either through conversion or the imposition of a chapter 11 trustee. *See, e.g., Wolf v. Weinstein*, 372 U.S. 633, 651 (1963) (the willingness to permit a debtor to remain in possession is "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee. And if they default in this respect, the court may at any time replace them with an appointed trustee"); *In re V. Savino Oil and Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in possession defaults in this respect, [s]ection 1104(a)(1) [of the Code] commands that stewardship of the reorganization effort must be turned over to an independent trustee"); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (removing the debtor in possession where "level of acrimony found to exist certainly [made] the appointment of a trustee in the best interest of the parties and the estate").

56.    This case has been pending for nearly one year, and all the Debtor has to show for it is a busted plan, a failed sale, and expiring entitlements. The Debtor has been singularly focused on defeating Orchard's claim for interest on its loans to secure a recovery for Zhavian at the expense of its secured and unsecured creditors. The Debtor's absolute failure to act as a fiduciary for all creditors has jeopardized the recoveries for the stakeholders of this case, and constitutes grounds to convert the case to chapter 7.

**B.    Conversion to Chapter 7 Is in the Best Interests of the Debtors' Creditors and the Estate.**

57.    The only assets remaining in the Debtor's estate are (i) the Mortgaged Property and (ii) potential claims and causes of action against BNH Rivington and Arcade. In order for creditors to receive any hope of a meaningful distribution, an application for an extension of the zoning entitlements must be prosecuted, the Mortgaged Property must be sold, and claims must be evaluated and brought.

58.    Each of the tasks that must be accomplished in this case is squarely in the purview of a chapter 7 trustee. Indeed, those tasks are some of the very duties of a chapter 7 trustee that are identified in Section 704 of the Bankruptcy Code. *See* 11 U.S.C. §§ 704(a)(1) (collect and reduce to money property of the estate [*i.e.,* causes of action] and close the estate as expeditiously as possible); 704(a)(4) (investigate financial affairs of debtor); 704(a)(5) (examine and object to proofs of claim, if necessary). Trustees undertake these tasks every day, quite capably. With respect to allocation, to the extent these issues cannot be resolved among the secured creditors consensually, a chapter 7 trustee would be more than capable of seeking judicial intervention or participating in any action relating to allocation.

59.    There would be no degradation in value to the estate from conversion to chapter 7. Any chapter 7 trustee that is appointed will have a duty to investigate and prosecute all causes of action it believes will maximize value for the stakeholders of the estate. 11 U.S.C. § 704(a)(4). The chapter 7 trustee can, if it so chooses, even retain the Receiver and his counsel to secure the Mortgaged Property, continue its maintenance, and prosecute the zoning entitlements.

60.    Chapter 7 is the only path out of this case. As noted above, the Debtor cannot afford to pay even one dime of the administrative claims, and such administrative claims continue to accrue - a trial on the Debtor's objection to Orchard's claim and a contested lift stay hearing are looming and the Debtor has no funds to pay its own counsel for these activities.

61.    Most importantly, the chapter 7 trustee will owe a fiduciary duty to the estate and will satisfy that duty by seeking to maximize recoveries. Unburdened by the irresponsible self-centered focus of an out-of-the-money equity holder, the chapter 7 trustee will be able to fairly evaluate the estate's position with respect to Orchard's claims and the claims of other creditors in this case. A chapter 7 trustee will, undoubtedly, be able to negotiate not in his or her own self-interest, but with an eye towards what is in the best interests of all creditors. No valid, surviving causes of action will be lost, no valid claims objections will be ignored. Chapter 7 trustees are uniquely qualified to commence litigation and evaluate claims; indeed, it is one of their main functions.

## CONCLUSION

Chapter 7 is the clear-cut answer to the problems facing this Debtor and is in the best interests of the Debtor's estate and its creditors. The Debtor faces serious problems, and it is time for serious leadership to step in and work towards solving those problems. Neither the Debtor nor its principal provides any value to this case and the creditors of this estate simply cannot afford Zhavian's gross mismanagement and voracious self-interest.

WHEREFORE, Orchard respectfully requests that this Court enter an order (i) directing the Office of the U.S. Trustee to appoint a chapter 7 trustee for the Debtor forthwith and (ii) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 12, 2015

**MORRISON COHEN LLP**

By:      /s/ Joseph T. Moldovan
Joseph T. Moldovan
Robert K. Dakis
909 Third Avenue
New York, New York 10022
Telephone: (212) 735-8600
Fax: (212) 735-8708
bankruptcy@morrisoncohen.com
www.morrisoncohen.com