UNITED STATES BANKRUPTCY COURT   Return Date: June 30, 2015
SOUTHERN DISTRICT OF NEW YORK       10:00 a.m.
--------------------------------------------------------------x
In re:              Chapter 11

D.A.B. GROUP LLC,        Case No.  14-12057 (SCC)

          Debtor.
--------------------------------------------------------------x

**DEBTOR'S OPPOSITION TO MOTION OF ORCHARD HOTEL, LLC
TO CONVERT THE CHAPTER 11 CASE TO CHAPTER 7**

**TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:**

    D.A.B. Group LLC (the "Debtor"), as and for its Opposition to the motion filed

by Orchard Hotel LLC ("Orchard") seeking conversion of the Chapter 11 case to Chapter 7,

represents and shows this Court as follows:

**I.  CONVERSION IS AN UNNECESSARY OVERREACTION BY ORCHARD**

    1.  If a ground for conversion was that a note buyer finds its borrower

difficult to deal with, Orchard's motion might have merit.  However, a decision of this

magnitude must be based on objective evidence.  Orchard's reckless spewing of venom wrongly

defames and slanders the Debtor's principal, Ben Zhavian, and is not proper grounds to convert

this case under 11 U.S.C. §1112.

    2.  It is also the height of impropriety for Orchard to reference, let alone rely

upon a settlement proposal made by Mr. Zhavian during the course of the mediation process.

The fact that Orchard bases part of its motion around the June 2, 2015 settlement email should

badly undermine Orchard's credibility, as its inclusion violates the terms of this Court's April 16,

2015 Mediation Order (ECF #133), a copy of which is annexed hereto as <u>Exhibit "A"</u>.  This

Order leaves no doubt that any offer conveyed during or as a result of the mediation is strictly

confidential.  Orchard's use of the e-mail on the pretext that it was copied to Mr. Zhavian's real estate advisors and architect, and thus loses confidentiality, is an act of "interpretive jiggery-pokery" in the truest Scalian sense.  During the mediation, Mr. Zhavian was in contact with his real estate advisors, as well as his architect, Edward Mills, who attended one of the sessions.  Thus, Mr. Zhavian was within his rights to share his proposal with these individuals without forfeiting confidentiality.

3.      That Orchard's counsel feels aggrieved because complaints have been filed against the firm is the product of its own recklessness.  In fact, all of personal attacks again leveled against Mr. Zhavian are themselves subject to a Stipulated Order sealing the record in the state court entered by Judge Charles Ramos on December 13, 2013.  In view of this Sealing Order (*See* Exhibit "B"), none of the prior allegations should not have resurfaced in this or any other proceeding. Yet, Orchard continues to flout its obligations solely to undermine Mr. Zhavian's credibility for sport, while failing to point to a single event in the actual record of this Chapter 11 case when the Debtor did not proceed in the best interests of all creditors.

4.      It cannot be overstated that the Debtor is as concerned about the future of the property as Orchard (and all other parties for that matter) and is prepared to meet the challenges head-on in a responsible manner.  However, conversion of the Chapter 11 is not a panacea for the estate's ills.  To the contrary, it is extremely detrimental for the reasons explained below and should be avoided.

5.      Orchard is also keenly aware that its claim is under objection, and its motion appears designed to alter the direction of the objection process.  Given the fierce dispute over Orchard's entitlement to default interest at a rate of 24% per annum, plus recovery of $3 million in attorneys' fees, Orchard is hardly in a position to raise the banner of fiduciary duty

when its conversion motion will solely benefit its own financial interests at the expense of all other creditors and equity interests.

6.      To be sure, the complexion of the bankruptcy has changed because of Arcade's default in failing to close.  This is a disappointing turn of events and will necessitate a renewed and vigorous effort to re-market the property.   However, the fallout from Arcade's default should not be laid at the foot of the Debtor; Orchard was a vocal proponent of a sale to Arcade and pushed for an expedited process.  It is often said that success has many fathers and failure is an orphan.  Accordingly, it is disingenuous for Orchard to attempt to divorce itself from the decision-making process and point an accusatory finger at the Debtor and its principal.

7.      At bottom, the only party responsible for the sale collapsing and the current inability to consummate the plan is Arcade.  Under the circumstances, the Debtor requests a reasonable second opportunity to find a new buyer for the property, while the Receiver, Simon Miller, leads the effort to obtain an extension of the BSA deadline to complete construction beyond August 2015.

8.      Orchard's proposed solution of a Chapter 7 trustee brings no identifiable benefit, and immediately eliminates a potential return to other creditors.  Unfortunately, Orchard is so blinded by its desire to remove Mr. Zhavian from the equation that it has totally lost perspective about the significant adverse financial ramifications that would result from conversion.

9.      Besides adding another layer of administrative debt, a sale of the property in Chapter 7 will result in the forfeiture of the Section 1146(a) transfer tax exemptions that are only available through the Chapter 11 plan process.  The Debtor calculates the combined city and state transfer tax exemption equals 3.025% of the purchase price (close to $1,000,000), plus the

3

estate taxes imposition of statutory trustee commissions of more than 3% under Section 326(a). All of this results in a total loss of at least $1,830,750 in value based on a sale price of $30 million.

10.     More significantly, however, Orchard also completely ignores the income tax ramifications of a conversion and ensuing sale of the property in Chapter 7.  A Chapter 7 trustee will be required to pay income or capital gains taxes attributable from the sale.  However, a trustee has no ability to effectuate a 1031 tax exchange to defer taxes, while a Chapter 11 debtor could.  The severe adverse tax consequences posed by a sale in Chapter 7 are summarized in the attached memorandum from the Debtor's accountant, Allen I. Guskin, CPA, a copy of which is annexed hereto as <u>Exhibit</u> "C".  The negative tax implications must figure prominently in any assessment of the advisability of appointing a trustee.  Mr. Guskin calculates that, predicated upon a basis of $10.5 million, a $30 million plus sale will result in federal, state and city income taxes totaling more than $9.7 million.

11.     Thus, Orchard's motion will immediately cost the estate some $11.5 million in unnecessary taxes, trustee commissions and loss of the transfer tax exemption, all without any substantive advantage.  This is truly an instance of Orchard cutting off its nose to spite its face  And to what end?

12.     The appointment of a Chapter 7 trustee would be the death knell for a recovery by other creditors and equity holders.  Yet, it was only two months ago that all parties took comfort in the fact that we were dealing with a fully solvent estate based upon a $33 million purchase price.  Equivalent value can be achieved, using the apparatus of the existing  Chapter 11 case, through a second marketing plan to be developed in conjunction with Orchard and the other stakeholders.  The Debtor has no intention of monopolizing the process.

4

13.     Moreover, a Chapter 7 trustee would be in no better position to address the August 20, 2015 deadline to complete construction set by New York City Board of Standards and Appeals ("BSA").  There is no reason to believe that the appointment of a trustee will cause the BSA to look more favorably or expeditiously on the request to extend the deadline.  In fact, since one of the factors considered by the BSA is the timing of project completion and available financing, conversion of the case will invariably add uncertainty to the extension process, and could very well harm the application.

14.     Nor is a Chapter 7 trustee better placed to market the Debtor's property.  This must be done by an experienced broker.  The well-regarded firm of Cushman & Wakefield, successor to Massey Knakal, is already in place as the Debtor's real estate broker.  In fact, Cushman & Wakefield is still sanguine about the prospects of a resale, as noted in the attached letter of James Nelson annexed hereto as <u>Exhibit</u> "D".

15.     If Orchard is so fearful that Mr. Zhavian will hinder the BSA extension, the Debtor hereby makes a standing offer to allow Mr. Miller to retain the law firm of Goldman Harris LLC as Orchard's preferred BSA counsel to represent the estate's interests.  Mr. Miller and special counsel can file all necessary papers to update the pending application submitted by Herrick Feinstein on behalf of Arcade.  The BSA has already issued a series of questions which must be answered concerning the application.  A copy of the BSA comments is attached hereto as <u>Exhibit</u> "E".

16.     Most importantly, the Debtor agrees that the BSA extension should be directed exclusively by Mr. Miller in his capacity as Receiver.  Mr. Miller is a neutral third party and can minimize tension between Orchard and Mr. Zhavian on this point.

5

17.     Since a plan of reorganization has already been confirmed, there is no middle ground between conversion and continuation of the debtor-in-possession. The possibility of a Chapter 11 operating trustee no longer exists for the fundamental reason that Section 1104 precludes such appointment after entry of an order of confirmation. The statute is very clear, opening with the following: "At any time after the commencement of the case but before confirmation of a plan . . . ."

18.     Based upon the express terms of Section 1104, there is no jurisdictional authority to appoint a Chapter 11 operating trustee in this case. *See, e.g.*, In re Modern Steel Treating Co., 130 B.R. 60, 66 (Bankr. N.D. Ill. 1991) *aff'd sub nom.* In re Modern Steel Trading Co., No. 91 C 5747, 1992 WL 82966 (N.D. Ill. Apr. 1, 1992)("Even if there were bad faith in connection with the Plan, a trustee can only be appointed —before confirmation of a plan.ø § 1104(a)."); In re Schultz, 69 B.R. 629, 631 (D.S.D.) *case dismissed sub nom.* Schultz v. Mitchell-Huron Prod., 837 F.2d 481 (8th Cir. 1987)("it was error for the Bankruptcy Court to order the appointment of a Chapter 11 trustee contemporaneous with confirmation of the liquidation plans."); In re Am. Preferred Prescription, Inc., 265 B.R. 13 (E.D.N.Y. 2000) *rev'd on other grounds* 255 F.3d 87 (2d Cir. 2001).

19.     Thus, Orchard's motion unnecessarily presents an "all or nothing approach." Conversion, however, should be the last alternative, not the first. Time should be given for all parties to develop a mutually acceptable protocol that allows for re-marketing of the Property while an extension of the BSA deadline is sought. This will enable the estate to avoid the tremendous erosion in value that necessarily results from a conversion to Chapter 7.

20.     The "nuclear" option of conversion is always available but, even in the tensest situations, parties explore every avenue of diplomacy before pushing the button of

6

destruction, no matter how uneasy they feel about the other side.  Obviously, this is not a war of nations but a war of words.  Thus, the Court should urge restraint and renewed discussions between the parties.

## II.  BACKGROUND FACTS

### The Project

21.    The background facts are well known and will only be highlighted for the sake of continuity.  The Debtor owns the development site at 139-141 Orchard Street, New York, NY (the "Property"), which consists of a partly constructed 16-story, 92-room upscale boutique hotel (the "Project").  The Project was initially financed by Brooklyn Federal Savings Bank ("BFSB").

22.    The Project became stalled because of zoning and building department issues that were not in any way attributable to the Debtor's actions, including a well-publicized "down-zoning" resolution adopted by the City of New York impacting the entire Lower East Side of Manhattan.

23.    The Debtor took prudent action to initially obtain an exemption from the impact of the downzoning plan, as well as the first extension to complete construction.

24.    The Debtor was able to put the Project back on track by the summer of 2010, when it engaged Flintlock Construction Services LLC ("Flintlock") to resume construction, only to learn that BFSB subsequently refused to continue constructing funding and instead sought to enforce a March 1, 2011 maturity default after Orchard purchased the notes. This was done despite the fact that BFSB previously agreed to the retention of Flintlock based upon a revised completion date of November, 2011.

7

25.     After several years of inconclusive State Court litigation, the Debtor filed for Chapter 11 protection on July 14, 2014.  The Debtor immediately went to work to sell the Property and obtain a fair resolution of Orchard's claim, which had skyrocketed from a principal debt of $13.4 million to more than $28 million because of 24% default interest and attorneys' fees.

## The Chapter 11 Case

26.     The Debtor began the Chapter 11 by negotiating an agreement with Orchard to allow the pre-bankruptcy Receiver, Simon Miller, to maintain the status quo with respect to all BSA issues and provide some semblance of active development (ECF #39).  The Debtor refrained from seeking a turnover of the Property, which was its right, because continuity with the Receiver was in the best interests of creditors.

27.     The Debtor also retained the Massey Knakal firm as its real estate broker with a clear mandate to aggressively market the Property based upon a transparent process in which Orchard received information on a weekly basis.  At no time during the marketing campaign were any issues raised by Orchard regarding its access to information or the Debtor's conduct involving Massey Knakal.

28.     The Debtor became aware of Arcade's interest independently of Massey Knakal and negotiated a $33 million offer that was reduced to a term sheet and ultimately an Asset Purchase Agreement and stalking horse bid.  Arcade's contract was accepted as the highest and best offer pursuant to Order dated February 19, 2014 (ECF #103).

29.     In the meantime, the Debtor simultaneously moved forward with a plan of reorganization and disclosure statement to preserve the Section 1146(a) transfer tax exemptions.

8

As the sale process evolved, the plan was amended to include specific provisions relating to the sale to Arcade, and was ultimately confirmed by Order dated April 16, 2015 (ECF #132).

30.    The Debtor took steps to clear other impediments to closing relating to litigation involving Monty One, LLC ("Monty One"), which had filed a notice of pendency prior to bankruptcy following an aborted effort to buy the Property.  The Debtor removed the Monty One action and had the notice of pendency removed pursuant to a "So Ordered" stipulation of settlement dated March 26, 2015.

31.    On January 19, 2015, the Debtor filed formal objections to Orchard's claim for default interest and other charges (ECF #86).

32.    In response, Orchard not only filed opposition papers, but months into the case, Orchard moved to vacate the automatic stay so it could file an appeal of Judge Ramos' ruling denying summary judgment.  Curiously, and perhaps schizophrenically, Orchard is still pushing for stay relief while seeking conversion.

33.    Following the confirmation hearing, Arcade advised that one of its major investors had pulled out.  Arcade ultimately failed to close pursuant to the Confirmation Order and was declared in default on May 19, 2015 (ECF #139).

34.    Arcade's failure to close coincided with the scheduled mediation and obviously impacted the scope of mediation which evolved to include the new realities.  Although a settlement was not reached, the mediation was conducted in a professional manner, although any good feelings that may have developed have been potentially damaged by recent events.

## III.  ARGUMENT

### Orchard's Motion To Convert Should Be Denied

35.     Orchard moves for relief under Section 1112(b), which permits conversion or dismissal, "whichever is in the best interests of creditors and the estate" upon a showing of cause.  The burden of proof to establish cause rests squarely on the movant.  <u>In re Court Living Corp.</u>, No. 96 CIV. 965 JSM, 1996 WL 527333, at *2 (S.D.N.Y. Sept. 16, 1996)(movant "bears the burden of proving cause for conversion by a preponderance of the evidence").

36.     Section 1112(b)(4) sets out a non-exclusive list of sixteen factors to be considered when determining "cause."  Orchard focuses its motion on five of the factors, alleging (i) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (ii) gross mismanagement of the estate; (iii) failure to maintain insurance; (iv) failure to pay post-petition taxes; and (v) inability to effectuate substantial consummation of a confirmed plan.

37.     Painting the bleakest possible picture, Orchard presents a version of the situation that overlooks the continued prospects for a successful resolution of this case through a new sale to another buyer at a price equal to or close to $33 million.  The Property is located in the heart of the Lower East Side of Manhattan, making it difficult to think that the Property cannot be sold for equivalent value once the BSA situation is stabilized.  Obviously, the BSA deadline presents a daunting task, but the solution must come from within the confines of the current Chapter 11 case.

38.     Whatever issues exist with BSA approval have existed from the start of the case.  If nothing else, the failed transaction with Arcade led to the filing of an extension

10

application which can be amended and to provide an opportunity at least to realize the inherent equity in the Property.

39.    Moreover, the estate is not necessarily administratively insolvent, since the Debtor retains entitlement to recover the $1.5 million contract deposit from Arcade, plus potential other damages as a result of Arcade's default and misrepresentations about its ability to close.    The Debtor has refrained from suing Arcade in deference to the mediation process. Arcade has no valid defenses to the forfeiture of the deposit since the contract was not contingent on financing or a BSA extension.    In reality, Arcade did not close because it did not have the funds to do so – plain and simple.

40.    While Orchard suggests that it retains a lien on the down payment, this is far from automatic.    Orchard's rights under the mortgage relate to pre-petition assets, while the right to the deposit arose post-petition, and thus arguably constitutes after-acquired property not subject to Orchard's lien under Section 552(b) of the Bankruptcy Code.

41.    There is no New York case addressing the issue of whether a secured creditor is entitled to recovery of a forfeited deposit on a post-petition contract.    The law in other jurisdictions is in conflict.    *Compare* In re Vermont Knitting Company, Inc., 111 B.R. 464 (Bankr. D.Vt. 1990) (applying Vermont law to find that there is no lien in proceeds from the disposition of property, since the deposit has been forfeited because the sale did not close and the property was never disposed of) with Old Stone Bank v. Tycon Building LP, 946 F.2d 271 (4th Cir. 1991) (finding forfeited earnest money from unconsummated sale was received "upon disposition of property" under Virginia law).

42.    To the extent that the estate is entitled to some or all of the deposit, then those funds can be used to pay administrative expenses and post-petition taxes.    While the

Debtor's estate is not immediately liquid, it is not necessarily insolvent.  The two concepts are mutually independent of each other and must be viewed separately for purposes of this motion.

<b>The Personal Attacks On Mr. Zhavian<br>Do Not Establish Gross Mismanagement</b>

43.    Orchard engages in a series of unwarranted personal attacks on Mr. Zhavian in an obvious attempt to conjure up a case of gross mismanagement.    Gross mismanagement does not arise merely because Mr. Zhavian feels that Orchard's claim is overstated and he is entitled to a return on his family's multi-million dollar investment in the Property after the creditors are paid.  For Mr. Zhavian to recover anything, the holders of allowed claims must be paid in full so Mr. Zhavian's interests are aligned with the other creditors.

44.    The pursuit of a recovery by equity is not gross mismanagement.  In this regard, the cases cited by Orchard relating to mismanagement highlight that the standard is much different from the facts of this case.  In <u>In re E. Paul Kovacs and Co., Inc.</u>, 16 B.R. 203 (Bankr. D.Conn. 1981), cited by Orchard as an example of a debtor acting without regard to its fiduciary duties, the debtor leased all of its operating equipment to companies owned by family members without any payment being made in return.  In <u>In re Lodge at Big Sky, LLC</u>, 2011 WL 2358146 (Bankr. D.Mont. June 8, 2011), the principal of the debtor transferred hundreds of thousands of dollars to himself and a wholly owned company.

45.    No similar allegations of insider transactions can be leveled against the Debtor or Mr. Zhavian.  To the contrary, Mr. Zhavian has offered to include the ability to lease his neighboring property at 77-79 Rivington Street to help attract a buyer for the Hotel property.  Far from engaging in self-dealing, Mr. Zhavian is uniquely positioned to bring even greater value

to the estate because he owns the adjoining property which is crucial to the development and realization of maximum value.

46.    Orchard also presents a skewed history of events to bolster its bogus claim that the Debtor is incapable of continuing to oversee the Property.  First and foremost, Orchard fails to give Mr. Zhavian credit for his substantial and successful efforts to keep the Project alive despite numerous obstacles and delays that were entirely outside of the Debtor's control.

47.    Orchard further ignores the steps taken by Mr. Zhavian to retain Flintlock to complete construction so as to meet the initial BSA deadline.  In keeping with this revisionist history, Orchard also ignores the fact that there would not have been any need for an extension beyond November, 2011 had BFSB and Orchard not improperly called a maturity default and halted construction in the first place.

48.    Orchard next falsely accuses Mr. Zhavian of obstructing the Mr. Simon, the Receiver, when in fact the two have a relatively solid working relationship and Mr. Zhavian has cooperated with Mr. Simon and will continue to do so.[1]

49.    Orchard also twists e-mails from Mr. Zhavian that were designed to inform potential buyers about the intricacies of the BSA deadline process (including the need to obtain cooperation from the owner of the adjoining property at 81-83 Rivington) into an effort to chill the bidding.  In point of fact, Arcade may have moved too quickly in the sale without fully understanding all of the nuances involved.  This may explain why its funding sources have evaporated.

---

[1] In its motion, Orchard cites to a purported need to obtain an order from the state court to permit the Receiver to act on the BSA extension because of Mr. Zhavian's alleged non-cooperation. However, the Receiver required an order to expand his powers, and there is no reference whatsoever in the signed order to any lack of cooperation by the Debtor or Mr. Zhavian.

50.     Additional e-mails raising legitimate concerns about the status of Arcade's bid, the BSA and other important issues are ridiculed as "incoherent" because they contain grammatical and typographical errors, notwithstanding that English is not Mr. Zhavian's native language.  Moreover, e-mails sent by cell phones and other hand held devices are notoriously replete with spelling errors.

51.     Orchard also wrongly alleges that Mr. Zhavian acted improperly with respect to certain payments owed to Flintlock.  Absent from the analysis, however, is any actual proof that BFSB itself actually believed this to be true.  To the contrary, the Action Plan, which was prepared by BFSB shortly before the March 1 maturity date, speaks favorably of Mr. Zhavian and the Project.  It was signed by six BFSB officials, without even the slightest hint of misconduct or improper disposition of funds.  Orchard also fails to note that neither the March 23, 2011 Default Letter nor the Foreclosure Complaint make any mention of the supposed improper misuse of funds.  (*See*, Action Plan annexed hereto as Exhibit "F").

52.     Additionally, the Debtor has received support from Flintlock as the largest unsecured creditor, which filed its own opposition to the conversion motion (ECF #148).  Flintlock's support blunts the convenient, but unfounded notion that the Debtor is not fulfilling its fiduciary responsibilities.

### The Court Should Deny The Motion Because Of Orchard's Improper Use Of Confidential Documents

53.     Orchard's personal attacks include the June 2, 2015 settlement proposal made by Mr. Zhavian, which Orchard not only mischaracterizes, but had no right to use under any theory.

54.     As the Second Circuit explained, confidentiality is the hallmark of settlement and mediation:

> Confidentiality is an important feature of the mediation and other alternative dispute resolution processes. Promising participants confidentiality in these proceedings ôpromotes the free flow of information that may result in the settlement of a dispute,ö and protecting the integrity of alternative dispute resolution generally. We vigorously enforce the confidentiality provisions of our own alternative dispute resolution, the Civil Appeals Management Plan (ôCAMPö), because we believe that confidentiality is ôessentialö to CAMP's vitality and effectiveness. (internal citations omitted)

In re Teligent, Inc., 640 F.3d 53, 57-58 (2d Cir. 2011).

55.     Moreover, Orchardøs breach of confidentiality goes beyond Local Rule 9019-1 as strictly enforced by the Second Circuit in Teligent, because the April 16, 2015 Mediation Order (see, Exhibit ôAö hereto) expanded the confidentiality provisions of the Local Rule:

> Without limiting the applicability of Local Rule 9019-1, General Order M-452, or this Courtøs Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings, all (a) discussions among any of the Mediation Parties, including discussions with or in the presence of the Mediator, (b) mediation statements and any other documents or information provided to the Mediator or the Mediation Parties in the course of the mediation, and (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the mediation shall be strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party participating in the mediation, whether a direct participant or member of a committee or group, including counsel for any Mediation Party or any other party, shall in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer, or counteroffer that may be made or provided in connection with the mediation, unless otherwise available and not subject to a separate confidentiality agreement that would prevent its disclosure or as authorized by this Court.

56.    Orchard attempts to excuse its violation of the Mediation Order by resorting to a supposed loophole under Federal Rule of Evidence 408.  However, in light of the expansive confidentiality provisions of the Mediation Order, it is clear that this Court's directive is intended to be far more restrictive than Rule 408.  Accordingly, all references to the settlement proposal made by Mr. Zhavian were completely out of bounds.

### All Other Creditors Will Be Harmed By Conversion

57.    Orchard's claims of breach of a fiduciary duty ring hollow when the staggering costs of conversion are considered.  As set forth above, Chapter 7 will eliminate transfer tax savings and expose the estate to millions of dollars of income and capital gains tax liability.  No creditor can possibly benefit from such an occurrence, and the focus of the motion should be on the harm which conversion causes to the rest of the estate.  The Debtor's other creditors are significant, holding potential claims of several million dollars.  These creditors cannot be thrown to the wolves simply to satisfy Orchard's vindictive and self-defeating tendencies.

WHEREFORE, the Debtor respectfully prays for the entry of an Order consistent with the foregoing, together with such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        June 26, 2015

                        GOLDBERG WEPRIN
                        FINKEL GOLDSTEIN LLP
                        Attorneys for D.A.B. Group LLC
                        1501 Broadway ó 22nd Floor
                        New York, New York 10036
                        (212) 221-5700


                        By:     /s/ Kevin J. Nash

x:\gwfg\new data\yen\word\dab group llc - zhabe.34146\opposition to dab motion to convert 06-26-15 (v4).doc