**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10029
(212) 735-8000
Y. David Scharf
Joseph T. Moldovan
Danielle Lesser
Robert K. Dakis
Brett Dockwell

Counsel to Orchard Hotel, LLC and
Orchard Construction, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| D.A.B. GROUP LLC, | : | Case No. 14-12057 (SCC) |
| | : | |
| Debtor. | : | |
| | : | |

## RESPONSE OF ORCHARD HOTEL LLC AND ORCHARD CONSTRUCTION LLC TO THE DEBTOR'S AND FLINTLOCK CONSTRUCTION'S OBJECTIONS TO CONVERSION TO CHAPTER 7

Orchard Hotel LLC and Orchard Construction LLC (together, "Orchard"), by and through their undersigned counsel, hereby file this response to the Objections filed by Flintlock Construction and the Debtor [Dkt. No.'s 148 and 149] to the motion for conversion of the above captioned chapter 11 case to a case under chapter 7 of the Bankruptcy Code pursuant to Section 1112(b) of the Bankruptcy Code, dated June 12, 2015 [Dkt No. 141] (the "Conversion Motion"), and in support thereof respectfully state:

**A.**    **The Case Must Be Converted Because The Plan Failed,
        <u>And The Estate Is Administratively Insolvent</u>**

1.      Both the Debtor's and Flintlock's main contention is that the current state
of this case is not the Debtor's fault, and therefore the Debtor should be given more time
to remarket its property and confirm a sale of the Property.  The Debtor goes so far as to
offer to abdicate control of the BSA process to the Receiver.  These arguments, however,
ignore two key issues in the case:  first, the Bankruptcy Code is clear that a case must be
converted after a failed plan, and second the estate lacks the financial resources to
continue for six more months in chapter 11.

1.      **The Case Must Be Converted Because The Plan Cannot
        Be <u>Substantially Consummated</u>.**

2.      Bankruptcy Code section 1112(b) requires the Court to either convert or
dismiss a case upon a showing of cause.  *See* 11 U.S.C. §1112(b) ("on request of a party
in interest . . . the court shall convert a case under this chapter to a case under chapter 7 or
dismiss a case under this chapter, whichever is in the best interests of creditors and the
estate, for cause . . . .").  Section 1112(b)(4)(M) provides that "cause" includes the
"inability to effectuate substantial consummation of a confirmed plan . . . ."

3.      Both the Debtor and Flintlock concede that the Plan failed and cannot be
substantially consummated.  The Plan, by its terms, was based on a sale that was
supposed to close within ten days after the entry of the confirmation order.  Not only did
the sale not close, but the Debtor defaulted the purchaser and there is likely to be
litigation regarding the purchaser's deposit.  As such, there is no question that section
1112(b) is satisfied.

4.      Neither the Debtor nor Flintlock credibly challenge that the Plan was not, and cannot be, substantially consummated.   Instead, both objectors claim, without citation to any authority, that the Plan's failure was not the Debtor's fault and the Debtor should be given another chance to re-market the property and propose a new sale. However, section 1112(b)(4)(M) does not require any showing of blame; the statute only looks to whether a confirmed plan of reorganization can be substantially consummated. Here, the Plan cannot be substantially consummated, and that alone is sufficient to support Orchard's request to convert the case.[1]

**2.      The Case Is Hopelessly Administratively Insolvent.**

5.      Both the Debtor's and Flintlock's pleas for more time ignore the stark economic reality of this case:   the value of the Debtor's assets is insufficient to pay administrative claims in full, and therefore the Plan can never be substantially consummated.   Section 1129(a)(9) requires the Debtor to pay in full, in cash, all administrative claims.[2]  The Debtor lacks the ability to make these payments.

6.      Presently, the Debtor has incurred nearly $550,000 in administrative claims just to maintain the Property over the 12 months that this case has remained in chapter 11.  In October 2014, pursuant to a stipulation between the Debtor, Orchard, and the Receiver, Orchard advanced $298,465.21 to cover certain charges of the Receiver and to pay certain back taxes.    Additionally, according to a request for payment of

---

[1]    The Debtor argues also that the Court should not entertain the Conversion Motion because the Court lacks the authority to install a chapter 11 trustee in the post-confirmation period.  Orchard agrees that the Court likely cannot install a chapter 11 Trustee under section 1104.  As such, and as requested by Orchard, the case should be converted to chapter 7.

[2]    The Confirmation Order expressly provides that administrative claims are to be paid from "unencumbered value, if any . . . ."  Confirmation Order (Dkt. No. 132) at paragraph 4 (c).  As such, if there are insufficient unencumbered funds, the Debtor's confirmed plan could not be substantially consummated.

administrative expense, the Receiver has incurred an additional $251,004.99 to preserve the property. *See Administrative Claim Of Simon Miller, As Receiver, On Behalf Of Himself, His Counsel And His Vendors*, dated, June 19, 2015 [Dkt. No. 146]. Additionally, the Debtor's counsel has likely incurred significant legal fees in conducting this case, and while the Debtor's counsel has yet to disclose the amount of his fees it would be surprising if counsel's fees and expenses were less than $250,000. As such, a conservative estimate of fees and expenses to date is likely at least $800,000.

7.    These amounts do not include the amounts that the estate will need to expend in order to continue maintaining the property for another six months. Given the Receiver's burn rate thus far, it is more likely than not that it will cost the estate an additional $125,000 to maintain and insure the Property for the next six months. Moreover, the Debtor has offered to permit the Receiver to run the BSA extension application process. Assuming that the Receiver were to accept the responsibility, the Receiver will likely want to be paid for his time in supervising that process. Together with legal fees and costs, it is likely that this process will run another $125,000 or more. The administrative claims also do not include the costs of attempting to confirm a new plan of reorganization reflecting the new sale, and the litigation over that plan in the likely event that Orchard objects. As such, this single asset real estate case is facing well over $1 million in administrative expenses simply by remaining in chapter 11 for another six months.

8.    Worse, the Debtor hid a massive and clearly material administrative claim from the Court and the parties until now. In the Plan, the Debtor provided that it "shall comply with all withholding and reporting requirements imposed by federal, state and

local taxing authorities and distributions under the Plan shall be subject to such withholding and reporting requirements . . . ." Plan at § 10.2. The Debtor at no time in the Plan or Disclosure Statement gave any indication that there was any possible tax that could be levied on the estate arising from the sale of the Property. Now, for the very first time in the nearly 13 months that this case has been pending before this Court, the Debtor claims that conversion will subject the estate to nearly $9.7 million in tax because the Debtor's cost basis is less than the sale price of the Property – assuming that the Debtor's assertions of its cost basis can be believed.[3] The Debtor now contends that this $9.7 million tax liability is only chargeable to the estate in the event the case is converted because the Debtor will effect some form of like kind exchange in order to avoid the tax.

9.      This last minute suggestion that the Debtor could defer gain is disingenuous, at best. As the Debtor's accountant likely knows, but failed to explain in its hearsay exhibit, according to the IRS, a business can avoid gain on an investment property where by reinvesting "the proceeds in similar property as part of a qualifying like-kind exchange." *See* IRS, *Like-Kind Exchanges Under IRC Code Section 1031*, FS-2008-18, February 2008. Moreover, where the exchange is not immediate, the Debtor cannot assume control over the proceeds of the property. *Id.* ("It is important to know that taking control of cash or other proceeds before the exchange is complete may disqualify the entire transaction from like-kind exchange treatment and make ALL gain immediately taxable"). As such, in order for there to be a deferred gain, the Debtor

---

[3]    There is some confusion in the Debtor's pleading as to the applicable tax rate. The Debtor suggests, without citation to authority, that conversion will change the character of the asset such that it could be taxed as ordinary income and not capital gains, or vice versa. It is unclear how conversion has any effect on the tax characteristics of an estate asset.

would need to reinvest the proceeds of the sale of the Property into a new building and could not control the proceeds at any point in the exchange process.

10.     The Debtor's own Disclosure Statement belies the Debtor's "Hail Mary"-like resort to the tax code.  According to the Debtor's Disclosure Statement and plan, the Debtor's counsel, as Disbursing Agent, shall establish the Confirmation Fund.  *See* Disclosure Statement at 19; Plan at §§ 2.21 (defining Disbursing Agent as Debtor's bankruptcy counsel); 2.17 (providing the Confirmation Fund is the fund created by the sale proceeds).  The Debtor then directed the agent to disburse the proceeds to creditors in accordance with the Plan waterfall.  At no point in the Plan or Disclosure Statement is there any time where the Debtor did not control the funds, nor is there any suggestion that the proceeds will be reinvested in a new property in order to defer gain.  Indeed, the Debtor would necessarily realize gain on all amounts above its cost basis used to pay creditor claims as those amounts would not be part of the exchange.  To the extent that the Debtor intended a different result, it had an obligation to disclose the scheme so that the creditors of this estate can determine whether they are willing to take the risk that the Debtor can increase returns by evading its tax liability.

11.     At bottom, the Debtor's newly concocted scheme to avoid its tax liability is not a valid reason to permit this Debtor to remain in possession.  Indeed, this tax liability is further reason why this case must be converted.  Section 503(b) provides that any tax incurred by the estate is afforded administrative expense priority.  As such, pursuant to section 1129, the Debtor would need to satisfy this tax in full in order to consummate the Plan.  Based simply on the evidence before this Court, the Debtor has incurred, or will incur, at least $10.7 million in administrative claims and there is no

question that the Debtor lacks the financial wherewithal to satisfy this administrative burden upon consummation of the Plan.

12.    Unbounded by the economic realities of this case, the Debtor contends that it can satisfy its administrative debt by looking to the Arcade deposit. However, there is no credible dispute that Orchard's liens attach to the deposit. Under the plain language of Orchard's mortgages, the liens attach to any deposits for the sale of the Property. *See* Mortgage Consolidation, Extension, Modification, and Security Agreement, dated as of November 7, 2015 (the "Project Loan Mortgage") at §§ 2(f) (providing that the liens attach to all "accounts, escrows . . . deposits and general intangibles . . . [that] are derived from or are used in connection with the Mortgaged Property"); 2(g) (holding the Mortgaged Property includes "all proceeds, products, offspring rents and profits from any of the foregoing, including, without limitation, those from sale . . . ."). Case law further belies the Debtor's contentions. *See, e.g.*, *In re Aldersgate Foundation, Inc.*, 878 F.2d 1326, 1328 (11th Cir., 1989) (holding secured lender permitted to retain deposit from 363 sale that failed to close and stating that a "secured party judgment creditor at a judicial sale would be entitled to apply the proceeds from a deposit made by a defaulting purchaser toward satisfaction of the secured creditor's judgment. The forfeited earnest money deposits in this case were produced and derived from the real and personal property that was the subject of contracts of sale and the bondholders' liens); *Old Stone Bank v Tycon*, 946 F. 2d 271, 273 (4th Cir., 1991) (reversing lower court and holding "a forfeited earnest money deposit is received upon the disposition of property and should be classified as proceeds"); *In re Vandeventer*, 87 B.R. 59, 61 (Bankr. S.D. Ill 1988) (rejecting argument that proceeds of failed sale belong to estate as liquidated damages

and holding "that the forfeited funds in the trustee's possession herein are "proceeds" of the sale of debtors' real estate to which the secured creditors with valid liens on the real estate are entitled to attach their liens in priority order"); *In re Clancy & Co. Constr.*, 214 B.R. 387, 391 (Bankr. D. Colo. 1997) (holding junior lien holder entitled to forfeited earnest money deposit for failed sale because the deposit constitutes "excess proceeds of the sale of the real property"), *In re D&M Land Co.*, 2010 Bankr. Lexis 260 (Bankr. M.D. N.C. Jan. 15, 2010) (holding earnest money deposit for failed section 363 sale was proceeds of secured lender's collateral). The Debtor's lone case to the contrary is readily distinguishable as that case dealt with equipment, and not real property. *See In re Vermont Knitting Company, Inc.*, 111 B.R. 464 (Bankr. D. Vt. 1990) (holding forfeiting deposit for sale of personal property not proceeds under Vermont UCC).

13.    Moreover, even assuming that the deposit were not Orchard's collateral, the deposit is far less than the $10.7 million needed to satisfy all administrative claims in this case in full.

14.    The Debtor's sole remaining argument for demonstrating administrative solvency in this case is that if successful in its litigation over the amount of Orchard's secured claim there will be funds available to pay all administrative creditors. As set forth in Orchard's opening brief, litigation results are irrelevant in considering whether to convert a case to chapter 7. *See In re BH S&B Holdings, LLC*, 439 B.R. 341, 350-351 (Bankr. S.D.N.Y. 2010). However, solely for the purpose of this argument, given the large tax burden, even assuming the Debtor were wildly successful in defeating Orchard's contractual right to interest at the default rate, Orchard's claims would only be reduced to approximately $20.6 million, which would increase the amounts available for

distribution to administrative creditors from $0 to $8.1 million, which would not even cover the tax debt.

15.    The Debtor further argues in its response that the parties "took comfort" that at a $33 million sale price, this estate was fully solvent, ignoring any tax liability.  In any event, this is far from accurate.  The Confirmation Order expressly references the fact that the estate may not be administratively solvent by restricting distributions to unencumbered assets, if any.  This case is only administratively solvent if (i) the Debtor successfully wins in its litigation with Orchard and (ii) the Debtor is able to skirt its massive tax debt.  Consistent with every other argument made by this Debtor, these are desperate suggestions of an out-of-the money equity holder and not consistent with the actions of a fiduciary.

**B.    Orchard Properly Relied On the Debtor's Waiver of the Mediation Privilege**

16.    Recognizing that its ability to drag creditors through this case is nearing an end, the Debtor again looks to defame Orchard and its counsel to argue that evidence Orchard relies on is not properly before this Court.  The Debtor first contends that Orchard violated a sealing order before the State Court in providing evidence of Zhavian's violent behavior.  This contention lacks merit.  The sealing order, by its terms, is not a gag order preventing any discussion of Zhavian's troubling behavior and Orchard would never have consented to an order on those terms.  Rather the sealing order simply seals certain affidavits presented to the State Court in connection with Orchard's request for a temporary restraining order.  Orchard did not submit any of the sealed affidavits into the record.  Orchard submitted pleadings that were not subject to the sealing order.  The

information contained in Orchard's affidavits is already part of the public domain, and therefore cannot properly be part of the sealing.[4]

17.     The Debtor further argues that Orchard breached the confidentiality provisions of the Mediation Order by including an email from Zhavian sent during the course of the mediation.  The Mediation Order provides, inter alia:

> Without limiting the applicability of Local Rule 9019-1, General Order M-452, or this Court's Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings . . . correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the mediation shall be strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, **and no person or party participating in the mediation** . . . **shall in any way disclose to any non-party** . . . **any such discussion, mediation statement, other document or information, correspondence, resolution, offer, or counteroffer** . . .

(emphasis added).  The Zhavian email attached to the Motion, however, was not a communication to the parties to the mediation nor was it a communication intending to convey an offer to Orchard, the other party to the mediation. It was an email sent by Zhavian to Ronald Solarz, a real estate broker with absolutely no connection to the mediation or this case for reasons known only to Zhavian.  CC'd on the email were four other people, who were also not parties to the mediation, and two members of Orchard. The mediation privilege, to the extent it even applied to this communication, was clearly waived and in fact, the sending of the email by Zhavian violated the Mediation Order, waiving the mediation privilege.  Orchard, as the other party to the mediation, was and is authorized to waive any applicable mediation privilege. *K&L Gates, LLP v. Savage &*

---

[4]     *See, e.g.,*    http://nypost.com/2014/01/21/developer-allegedly-threatened-to-rape-kill-opponents/. Additionally, it is important to note that these documents are still available for public review.  The Debtor has not taken the steps necessary to follow up with the efile clerk to file these documents under seal and the documents remain readily accessible.  Accordingly, any harm Zhavian claims is the result of his own failure to take all steps necessary to confirm that these documents are under seal.

*Assocs., P.C. (In re Teligent Servs.)* 2010 U.S. Dist. Lexis 49010 at *20, 2010 WL

2034509 (May 13, 2010), *aff'd in full, In re Teligent, Inc.*, 640 F.3d 53 (2d Cir. 2011).

18.     Simply stated, the mediation privilege does not apply to a communication

made completely outside the mediation process.   *Teligent*, *supra*. As such, the Debtor's

disclosure of its offer to a third party with no connection to the mediation waived any

possible privilege, and Orchard was at that point free to disclose the email sent to the

third party.  Orchard can provide an additional and dispositive reason why the mediation

privilege does not apply to this email, but that would require an express waiver of the

overall mediation privilege by Orchard, the Debtor, and the mediator. Orchard consents

to such a waiver.

**C.     The Debtor's Concealment of Its Potential Tax Liability Provides Additional
         Grounds to Convert the Case.**

19.     The central thrust of the Debtor's objection to the Conversion Motion is

that the Court should deny the motion because Orchard is playing loose with the Court.

That the Debtor has the temerity to make this argument in the face of concealing a

potential multi-million dollar tax claim is nothing short of shocking.

20.     This case has been pending in chapter 11 for nearly 13 months.  Through

the course of this case, the Debtor filed three proposed disclosure statements and three

proposed plans of reorganization.   At no point in any disclosure to this Court did the

Debtor disclose to the Court or its creditors that the Debtor's basis in its property was less

than the $33 million sale price, such that there was any possibility of the estate being

saddled with tax debt.

21.     The debtor had an obligation to provide full disclosure of information that

could affect potential recoveries to creditors of this case.  The existence of a taxable gain

that could (i) significantly dilute recoveries to administrative creditors, (ii) ensure that unsecured creditors have no recoveries, and (iii) could lead to an additional layer of administrative expense in having professionals review and, if possible, challenge the tax debt, should have been disclosed.  This is precisely the type of material misrepresentation that could be grounds to unwind the confirmation of the Plan.  The only reason to hide this debt is Zhavian's continued attempt to game the system to give himself some return.

22.    Inherent is every bankruptcy case is a tension between the secured lender, who is entitled to be repaid, and the Debtor who is looking to advance its own agenda.  The bankruptcy process affords a debtor with control over the process and time to attempt to advance its agenda and to secure creditor support for its proposed repayment plan.  But this control is not without limits.  The central question before the Court now is how long should a secured creditor be subject to the whims of a debtor who has shown no regard for the protection of the lender's collateral, and has played fast and loose with the Court and the parties at nearly every turn.  Orchard has waited for over four years to realize on its collateral.  Orchard has given the Debtor a year to sell the property.  During that year, Orchard has gone out of its way to protect its rights, but not interfere with the Debtor's sale or plan processes.  Orchard has given the Debtor more than enough time to resolve this process.  It is time for a change.  Any delay in replacing the leadership of this case will undoubtedly lead to further deterioration of value and continued litigation over issues that rational parties could solve with no involvement of the Court.

## CONCLUSION

WHEREFORE, Orchard respectfully requests that this Court enter an order (i) directing the Office of the U.S. Trustee to appoint a chapter 7 trustee for the Debtor forthwith and (ii) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York

June 29, 2015                     **MORRISON COHEN LLP**


By:     /s/ Joseph T. Moldovan
        Joseph T. Moldovan
        Robert K. Dakis
        909 Third Avenue
        New York, New York 10022
        Telephone:  (212) 735-8600
        Fax:  (212) 735-8708
        bankruptcy@morrisoncohen.com
        www.morrisoncohen.com